# EXHIBIT 1

## PLENARY SUMMONS
## THE HIGH COURT

Record No. 2019/ *8775 P*

Between:

### RYANAIR DAC

**Plaintiff**

and

### BOOKING.COM B.V

and

### OY SRG FINLAND AB

**Defendants**

**TO THE DEFENDANTS** Booking.com BV with a registered address at Herengeracht 597, 1017 CE, Amsterdam, Netherlands and Oy SRG Finland Ab with a registered address at PL 720, 00101 Helsinki, Finland.

This Plenary Summons requires you to enter an appearance in person of by a solicitor in the Central Office, Four Courts, Inns Quay, Dublin 7, Ireland in the above action within 5 weeks after the summons has been served on you (exclusive of the day of such service).

**AND TAKE NOTICE** that if you do not enter an appearance within that time the Plaintiff may proceed in its action and judgment may be given in your absence.

**BY ORDER** - the Honourable Frank Clarke, Chief Justice of Ireland
the 14th day of November, Two Thousand and Nineteen

**N.B.** This summons is to be served within twelve calendar months from the date hereof, unless the time for service has been extended by the Court.

The Defendants may appear hereto by entering an Appearance either personally or by solicitor at the Central Office, Four Courts, Inns Quay, Dublin 7, Ireland.



## GENERAL INDORSEMENT OF CLAIM

**The Plaintiff's claim is for:**

1. A Declaration that the activities of the Defendants their servants or agents (hereinafter **"the Defendants"**), full particulars of which are known to the Defendants, which result in the offering for sale and sale of the Plaintiff's flights on the Defendants' websites or otherwise on the internet other than through the Plaintiff's website (hereinafter **"the relevant activities"**), are wrongful, unlawful, or prohibited in whole or in part, on the basis of one or more of the causes of action below, or otherwise.

2. A Declaration that the terms of use of the Plaintiff's website (which prohibit the relevant activities in whole or in part) are binding on the Defendants.

3. A Declaration that the Defendants are contractually, or otherwise, prohibited from engaging in the relevant activities, in whole or in part.

### Injunctions

4. An Order restraining the Defendants from engaging or further engaging in the relevant activities, in whole or in part.

5. An Order restraining the Defendants from encouraging or facilitating others in engaging in the relevant activities, in whole or in part, or from further encouraging or facilitating same.

6. An Order restraining the Defendants from using or further using the Plaintiff's website in breach of the Terms of Use thereto.

7. An Order restraining the Defendants from breaching or further breaching the Plaintiff's rights, whether as protected by the law of contract, tort, intellectual property (trade mark, copyright, database), constitutional law, restitution, or otherwise.

### Specific Performance

8. Specific performance of the contract(s) entered into between the parties to these proceedings under which the whole or part of the relevant activities are prohibited.

**Damages**

9.   Damages (hereinafter to include aggravated or exemplary damages, if appropriate), in lieu or in addition to specific performance, for breach of contract.

10.   Damages for breach of contract at common law.

11.   Damages for breach of duty or negligence

12.   Damages for misrepresentation in tort or contract.

13.   Damages for nuisance.

14.   Damages for passing off.

15.   Damages for trespass to goods.

16.   Damages for conversion.

17.   Damages for infringement of trade marks.

18.   Damages for infringement of database rights.

19.   Damages for infringement of copyright.

20.   Damages for negligent or wrongful interference in economic relations or contractual relations, causing loss by unlawful means, or inducing or procuring breach of contract.

21.   Damages for breach of the Plaintiff's constitutional / ECHR / EU law property rights, right to a good name, right to earn a livelihood or other related rights.

22.   Further or in the alternative an account of the profits made by the Defendants, their servants and/or agents, as a result of their infringement of Ryanair's copyright and /or database rights and/or trade marks and/or for passing off.

### Restitution

23. Relief for unjust enrichment, in the form of restitution/damages, arising out of the benefit obtained by the Defendants, at the expense of the Plaintiff.

### Miscellaneous

24. An order for all necessary and consequential accounts, directions and inquiries (including an account of the profits made by the Defendants and payment thereto to the Plaintiff and/or an order for disclosure of all persons involved in the whole or part of the relevant activities).

25. An Order for any other appropriate reliefs under the European Communities (Enforcement of Intellectual Property Rights) Regulations, 2006 as to this Honourable Court deems fit.

26. Interest pursuant to statute.

27. Such further or other order as to this Honourable Court shall appear appropriate.

28. Costs.

This Honourable Court has the power and jurisdiction to hear and determine this claim under the provisions of European Regulation (EU) No. 1215/2012 of the European Parliament and of the Council of 12 December 2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (recast), and in particular pursuant to Articles 7(1)(a) and/or 7(2) and/or 25(1) thereof.

No proceedings between the parties concerning this cause of action are pending between the parties in another Member State in the European Union.

*Philip Lee*

Philip Lee
Solicitors for the Plaintiff
7-8 Wilton Terrace
Dublin 2

This summons was issued by Philip Lee, having its place of business at 7-8 Wilton Terrace, Dublin 2, solicitor for the Plaintiff, Ryanair DAC, being an Irish registered designated activity company having its registered office at Corporate Head Office, Airside Business Park, Swords, Co. Dublin

This summons was served by me at _____

On the first Defendant on the       day of       2019.

Indorsed (for Booking.com B.V) on the       day of       2019.

Signed:       _____

Address:       _____

      _____

      _____

This summons was served by me at _____

On the second Defendant on the       day of       2019.

Indorsed (for Oy SRG Finland Ab) on the       day of       2019.

Signed:       _____

Address:       _____

      _____

      _____

PLENARY SUMMONS

THE HIGH COURT

Record No.

Between:

RYANAIR DAC

Plaintiff

-AND-

BOOKING.COM B.V.

Defendant

-AND-

OY SRG FINLAND AB

Defendant

Philip Lee Solicitors
7/8 Wilton Terrace
Dublin 2

# EXHIBIT 2



**COURTS SERVICE**
*An tSeirbhís Chúirteanna*

**IRELAND**

**High Court Search**

| Help | Common Questions | Privacy and Security Statement |

**Note: Details last updated at close of business on 04/01/2021**

Search
**Case Details**
**Filings**
**Order**
**Listing**
**Plaintiff Details**
**Defendant Details**
**Judgment**

## Search Results

Click on the "view" link to the right of the case you would like to view

Cases By Plaintiff

| Plaintiff ▲ | Record Number | Title | View Details |
|---|---|---|---|
| RYANAIR DAC | 2012 6736 P | RYANAIR DAC -V- THE REVENUE COMMISSIONERS & ORS | View |
| RYANAIR DAC | 2013 11363 P | RYANAIR DAC & ANOR -V- VAN ZWOL & ORS | View |
| RYANAIR DAC | 2016 11128 P | RYANAIR DAC -V- MOMONDO A/S | View |
| RYANAIR DAC | 2017 1844 P | RYANAIR DAC -V- EXPEDIA INC | View |
| RYANAIR DAC | 2017 8543 P | RYANAIR DAC -V- SC VOLA.RO SRL | View |
| RYANAIR DAC | 2017 8782 P | RYANAIR DAC -V- SC VOLA.RO SRL & ANOR | View |
| RYANAIR DAC | 2020 1644 P | RYANAIR DAC -V- FLIGHTBOX SP ZOO | View |
| RYANAIR DAC | 2018 10263 P | RYANAIR DAC -V- MINISTER FOR FINANCE & PUBLIC EXPENDITURE & REFORM & ORS | View |
| RYANAIR DAC | 2019 4442 P | RYANAIR DAC -V- FLUGHAFEN KOLN & BONN GMBH & ANOR | View |
| RYANAIR DAC | 2019 6239 P | RYANAIR DAC -V- BELLEW | View |
| RYANAIR DAC | 2019 6489 P | RYANAIR DAC -V- FORSA & ORS | View |
| RYANAIR DAC | 2019 8775 P | RYANAIR DAC -V- BOOKING.COM BV & ANOR | View |
| RYANAIR DAC | 2019 9399 P | RYANAIR DAC -V- SKYSCANNER LTD & ORS | View |
| RYANAIR DAC | 2017 10240 P | RYANAIR DAC -V- INDEPENDENT NEWSPAPERS [IRELAND] LTD T/A IRISH IND & ANOR | View |

*Use of this site is subject to acceptance of our [terms and conditions](#).*

# EXHIBIT 3



ENGLISH  Gaeilge

<<Back

Search for [                    ]   **Click to Search**

**Advanced Search**   ◉ All Sections   ○ Practice Directions   ○ Court Rules   ○ Terms & Sittings

**Printable Version**   ○ Legal Diary   ○ Offices & Maps   ○ Judgments & Determinations

An tSéirbhís Chúirteanna
Courts Service
**IRELAND**

Home

For court users:
· Court Fees
· Court Forms
· Court Rules
· Family Law
· Going to Court
· High Court Procedure
· Judgments & Determinations
· Jury Service
· Legal Diary
· Offices & Maps
· Practice Directions
· Probate
· Small Claims
· Terms & Sittings
· The Courts

General:
· About Us
· Annual Report
· Freedom of Information
· Job Opportunities
· News & Announcements
· Publications
· Schools
· Statistics
· Feedback
· Search Site
· Sitemap
· Data protection

JUDGMENTS & DETERMINATIONS - Homepage

Judgments by year   Judgments by court   Judgments by judge
Determinations   Judgments help   Disclaimer & copyright

**Judgment**

**Title:** Ryanair dac -v- SC Vola.ro srl

**Neutral Citation:** [2019] IEHC 239

**High Court Record Number:** 2017 8782 P

**Date of Delivery:** 01/14/2019

**Court:** High Court

**Judgment by:** Ní Raifeartaigh J.

**Status:** Approved

[2019] IEHC 239

**THE HIGH COURT**

**[Record No. 2017/8782P]**

BETWEEN

**RYANAIR DAC**

**Plaintiff**

-and-

**SC VOLA.RO SRL**

**Defendant**

**Judgment of Ms. Justice Ní Raifeartaigh delivered on the 14th of January, 2019**

**Nature of the Case**

1. The Court, in this judgment, is concerned with a motion brought by the defendant, an online travel agent in Romania, contesting the jurisdiction of the Irish courts to hear and determine the plaintiff airline's substantive case. Ryanair is domiciled in Ireland and the defendant Vola in Romania. The case therefore raises issues relating to Regulation (EU) 1215/2012 ("the Regulation"). The defendant claims that Romania, its domicile, is the proper jurisdiction in which to hear all of the plaintiffs' claims, following the general rule under Article 4 of the Regulation which provides that a defendant should be sued in its place of domicile. The plaintiff seeks to displace the general rule in Article 4 and relies upon Articles 7(1) and (2) as well as Article 25(1)(a) and (c) of the Regulation.

2. The plaintiff's substantive case involves claims of breach of contract, breach of copyright and database rights, passing off, infringement of

trademark, trespass to property/goods and conversion. The plaintiff claims that the defendant committed those legal wrongs by using information obtained (or "scraped") from the Ryanair website in real time regarding flight times and prices and subsequently selling and booking the plaintiff's flights at an inflated price by interposing its website between the passengers of the plaintiffs and the plaintiff's website. The defendant denies that it uses Ryanair's website in any manner whatsoever and asserts, *inter alia*, that any data it obtains from the plaintiff comes from legitimate third parties who have prior arrangements with the plaintiffs.

3. A central feature of the defendant's case as presented on affidavit and in written submissions was that this case was distinguishable from previous authorities involving Ryanair and screen-scraping because the defendant Vola did not in fact interact with the Ryanair website in any way but rather sourced Ryanair data from third party service providers who obtain this information legitimately from Ryanair.

4. An alternative argument was put forward at the oral hearing, namely that even if the Court was to find that Vola was interacting with the Ryanair website, such interaction as could be demonstrated did not establish that there had been assent to the Terms of Use by "click-wrapping" as arose in other cases, because there was an element of "auto-ticking" by the Ryanair system as distinct from manual ticking by the user.

5. The Court is mindful that it must be careful not to conflate issues of jurisdiction and substance; and that it should not go beyond the appropriate parameters of fact-finding when the issue arising is one of jurisdiction. Nonetheless, it seems to me that this is one of those cases in which it is inevitable that the Court must engage to some degree in fact-finding before applying the relevant principles of law to the facts so found. The facts include some technical matters relating to the Ryanair and Vola websites.

**Glossary of Terms**
6. Given that the evidence on affidavit contained some jargon particular to the online travel industry and the technical aspects of such websites, a brief glossary of terms is appended to this judgment. The explanations of the terms or acronyms there are derived by me from the affidavits in this case and any errors therein are therefore mine.

**The relevant EU Regulation**
7. The Regulation the provisions of which were in issue before me was Regulation (EU) 1215/2012. Many of the authorities opened to me concerned predecessors to these Regulations; namely, the 1968 Brussels Convention on jurisdiction and the enforcement of judgments in civil and commercial matters, the 1988 Lugano Convention on jurisdiction and the enforcement of judgments in civil and commercial matters, and Regulation (EC) No 44/2001. For ease of reading, I refer to those earlier Conventions, Regulations and Articles in generic terms such as "the predecessor Regulations" or "the predecessor to the current Article 7" rather than by specific title or number.

**Terms of Use on the Ryanair Website**
8. Central to this case are the Terms of Use of the plaintiff's website. It is not in dispute that these Terms of Use are available for inspection on each page of the Ryanair website by way of hyptertext link. Ryanair also sent them to Vola under cover of a letter dated 19th September, 2017.

9. I have italicised certain passages of the Ryanair Terms of Use for emphasis:-

"**General [Clause 1]**

The owner of this website is Ryanair DAC, an Irish company…By using this website or its content, whether directly or through a third party, you agree to be legally bound by and act in accordance with these Terms of Use. In particular you agree not to do the acts prohibited under paras 3 to 5 below. If you disagree with these Terms of Use, you are not permitted, and agree not to, use this website or its content.

**Exclusive online distribution channel. [clause 2]**

*This website is the only website authorised to sell Ryanair flights*, whether on their own or as part of a package. *Price comparison websites may apply to enter into a written Licence Agreement with Ryanair, which permits such websites to access Ryanair's price, flight and timetable information for the sole purpose of price comparison.*

**Permitted use. [clause 3]**

You are not permitted to use this website (including mobile app and any webpage and/or data that passes through the web domain at Ryanair.com) its underlying computer programs (including the application programming interfaces ("APIs")) domain names, Uniform Resource Locators ("URLS") databases, functions or its content other than for private, non-commercial purposes. *Use of any automated system or software, whether operated by a third party or otherwise, to extract any data from this website for commercial purposes ("Screen scraping") is prohibited*. Ryanair reserves its right to take such action as it considers necessary, including issuing legal proceedings without further notice, in relation to any unauthorised use of this website

**Intellectual Property. [clause 4]**

All information data, underlying computer programs (including APIs), domain names, URLS, databases, and materials presented on this website, including names, logos, flight schedules, prices, etc. as well as the colour scheme and the layout of the website are subject to copyright, trade mark rights, database rights and/or other intellectual property rights. You may use such content as strictly required for permitted personal, non-commercial purposes. Any other use and/or reproduction of such content, without prior written consent of Ryanair, is prohibited and will constitute a breach of these Terms of US and may infringe Ryanair's IP rights."

**Links to this Website. [clause 5]**

You may not establish and/or operate links to this website without the prior written consent of Ryanair………..

**Applicable Law and Jurisdiction [clause 7]**

*It is a condition precedent to the use of the Ryanair website, including access to information relating to flight details, costs etc. that any such party submits to the sole and exclusive jurisdiction of the Courts of the Republic of Ireland* and to the application of the law in that jurisdiction, including any party accessing such information or facilities on their own behalf or behalf of others. In the absolute and sole discretion of Ryanair,

a legal action may be brought by Ryanair against any party in breach of these terms and conditions, at its election, in Ireland or the place of breach or the domicile of that party, and if more than one party, in the domicile of any one of those parties, and all other parties shall submit to that jurisdiction. For the sake of clarity, where a passenger or person carried or to be carried pursuant to a contract of carriage with Ryanair wishes to institute proceedings shall be brought by the passenger solely in accordance with the provisions of the Montreal Convention 1999 and EU Regulation No. 2027/1997 (as amended by Regulation No. 889/2002) or any such further amendment to the Montreal Convention or further amendment by Regulation as may arise from time to time."

**Evidence on Affidavit in relation to the Motion to Contest Jurisdiction**

10. There was much material in the numerous affidavits filed on this motion and I will confine myself to such information as I consider relevant to the specific issues arising in relation to jurisdiction. The evidence, even so confined, is nonetheless quite extensive.

*Mr Truica's Grounding Affidavit*

11. Mr Daniel Truica, a director of the defendant company which is based on Romania, swore an affidavit on the 6th February, 2018 denying that Vola engaged in the "screen scraping" of Ryanair's website. He gave the following description of what he said takes place. He said that Ryanair provides its flight data and information to various third parties in the online marketplace through Application Programming Interface (API) processes separate from Ryanair's public website and that Vola, in turn, relies on the information provided by these third parties via its own API arrangements with those parties. A result of this process, Mr Truica averred, is that Vola does not access Ryanair's public website at any time. He did not explain the API processes in question but said that they were legitimate. He said that Ryanair provided companies such as Travelport, Amadeus, and Sabre with access to Ryanair's information and that other companies such as Travelfusion, with whom Vola had an API arrangement with until recently, and Ypsilon, with whom Vola continued to deal with, were well established entities in the market of online information. He referred to litigation by Ryanair against the latter two companies which had since been resolved by entering commercial arrangements with them. He pointed to evidence from Ypsilon's website which showed that Ypsilon acquires its data from API processes linked with Navitaire, a separate company with whom Ryanair stores its data as a client. Mr Truica said that this showed that a legitimate method existed by which an online travel agent could acquire Ryanair's data without accessing the Ryanair website, namely by interacting with a third party or Global Distribution System (GDS) provider who in turn had acquired data from Ryanair. He averred that entities such as Travelfusion and Ypsilon "cannot operate without legitimate and accepted access by Ryanair to its data" and that "these companies could only be operational if they have an arrangement with Ryanair or an arrangement with a provider". Mr Truica denied that there was any relationship between Vola and Ryanair, contractual or otherwise.

12. Ryanair responded to Mr. Truica's affidavits with a number of affidavits sworn by employees in the legal, technical, and marketing departments dealing with the facts from those various points of view. Mr. Truica's account was strongly disputed and it was strongly asserted that the Vola website

was indeed using the Ryanair website, contrary to what Mr. Truica had averred.

*Mr. McNamara's Affidavit*

13. Mr. Thomas McNamara, head of Ryanair's legal department, swore an affidavit on the 5th March, 2018. He asserted that since Mr. Truica had admitted to using information obtained through Ryanair's website, Vola was bound by the jurisdiction clause in clause 7 notwithstanding the existence of a third party intermediary.

14. He also said that Ryanair does not accept that Vola in fact obtained this information through such an intermediary such as Travelfusion and Ypsilon, pointing out that no contract or agreement to this effect has been exhibited by Vola. He set out the Ryanair view that Vola was directly screen-scraping the information from Ryanair's website and as such was bound to the terms through its use of the site. He referred extensively to the plaintiff's statement of claim in this regard, which claims that the defendant was engaging in screen scraping through the use of a "robot" or a "spider".

15. Mr. McNamara also averred that the Terms of Use were made available by way of hyperlink on every page of the Ryanair website and asserted that viewing or browsing the website in these circumstances was sufficient to form a contract; he said that this process, known as browse wrapping, was commonplace.

16. He also averred that contracts were formed when Vola booked through Ryanair's call centre as this required the booker to click on the "Let's Go" button, under which lines of text made clear that clicking the button bound the clicker to the Terms of Use. He averred that he did not believed the terms were overly burdensome or onerous, and that it was entirely normal that jurisdiction clause would be present given the universally accessible nature of the website.

17. He pointed out that Ryanair also sent the Terms of Use to Vola by letter of the 19th September containing the Terms.

18. In relation to the third parties and GDS operators referred to by Mr. Truica, Mr. McNamara said that the contracts under which such parties operate do not allow for the transmission of Ryanair's data to others such as Vola or any other screen scrapers such as Travelfusion or Ypsilon, nor do those screen scrapers themselves have access to a GDS. He averred that if a GDS provider with an agreement with Ryanair was providing screenscrapers with access, its relationship with Ryanair would be terminated. Moreover, Mr. McNamara categorically denied that Travelfusion and Ypsilon had agreements with Ryanair.

19. In relation to Navitaire, Mr. McNamara averred that it was common knowledge that Ryanair was a client but that, contrary to Mr. Truica's averments, Navitaire does not in turn provide access to or the use of the Ryanair website to the online travel market place. Rather, it is an exclusive service whereby Navitaire hosts some of Ryanair's data; any data held on that database is not publicly available and only becomes so when it is presented by Ryanair on the Ryanair website.

*Ms. Daly's Affidavit*

20. Ms. Avril Daly, a senior project manager of Ryanair Labs Ltd., also swore an affidavit on the 5th March, 2018 in which she outlined a test she did involving the plaintiff's and the defendant's websites. She exhibited extensive screen shots connected with this. She first booked a return flight

from Dublin to Edinburgh using the Ryanair website and then booked the same flight using the Vola website. In terms of this "booking experience" from the point of view of the customer, she averred that there were a number of differences, as follows:

i. A customer interacting with the Vola website is never offered a range of options and services which are on offer from Ryanair, such as the premium ticket package, reserved seating, priority boarding, security fast check, parking, car hire, accommodation, and bus transfer.

ii. The travel insurance offered on the Vola experience is not from the provider used by Ryanair.

iii. A user of the Vola website is not given the chance to view or agree to (whether by click wrapping or browse wrapping) the Ryanair terms of use or the conditions of carriage; the only terms indicated are those of Vola.

iv. There was a significant difference in price between the two bookings; booking with Ryanair cost €37.02 whereas booking with Vola cost €53.00, once a service fee of €15.00 and additional charge of 0.98c were added by Vola.

v. The confirmation emails sent to Ms. Daly from the Vola-booked flight contained no direct details to the Ryanair flight or to Ryanair but rather to Vola-owned email addresses.

21. Ms. Daly then analysed the data that was sent to Ryanair's internal booking system, Skyspeed, on foot of the two bookings. She found that the Skyspeed system logged that the Ryanair-booked flight provided the same details of the credit card Ms. Daly had used, had a record of the email address and contact details she had provided, recorded the same I.P address from which the booking was made, and displayed a reservation number which corresponded to the one Ryanair had emailed her when confirming her booking. In contrast, Skyspeed did not display any of these details for the Vola-booked flight; the credit card number recorded was different to the one she had used, as was the IP address and email address provided and the reservation number Vola had emailed her following the booking. The system did record some details identically for both flights such as the passenger name.

22. Ms. Daly also made a series of general points arising out of her analysis. First, she noted that Vola's search engine does not allow the user to specify which airlines should be searched, but said that since Ryanair's flight information is given as a result for a search, this demonstrates that screen scraping of Ryanair's website is occurring in real time. Secondly, the users of Vola who book a Ryanair flight never read or agree to the Ryanair terms of Use or Conditions of Carriage at any point, but are nonetheless subject to Vola's terms of use. Thirdly, Vola described itself as an agent of the Tourism Service Provider (in this case Ryanair) which is not, nor is it a direct service provider or an intermediary.

*Mr. Hurley's Affidavit*

23. A further affidavit was sworn on the 5th March, 2018 by John Hurley, the Chief Technology Officer at Ryanair. He averred that Ryanair does not object to price comparison sites simpliciter and that it, in fact, facilitates legitimate price comparison by offering license agreements; what Ryanair does object to is the selling of Ryanair tickets by third parties. He averred that Ryanair uses software (called "Shield") to inhibit screen scraping on its

website but that this software has its limits and because screen scrapping technology mimics human users, it can be difficult to detect.

24. He averred that the relationship between Ryanair and Navitaire is a "private, direct, closed and exclusive" connection and that the data held by Navitaire is not publicly available nor accessible to the "online travel market place" and only becomes public when it is presented by Ryanair on its website.

25. Mr. Hurley also commented on the experiment performed by Ms. Daly; pointing out that at no stage was a customer using the Vola website transferred or directed to the Ryanair website; and that any "front-end" use of the Ryanair website by Vola would render it bound by the Terms of Use since it must first click the "Let's Go" button on the Ryanair website, beneath which it is explicitly stated that clicking "Let's Go" binds the user to the Terms of Use. Moreover, he averred that any "back-end" use of the website would first require "front-end" usage, again binding the user to its terms. This was so because in order to search for a Ryanair flight, it is an essential prerequisite that the searcher knows the Ryanair specific Uniform Resource Locators (URLs) which communicate with, and are critical to the functioning of, Ryanair's APIs. Functionality of the APIs is critical because it acts as an essential link between the user's search parameters and the Navitaire database storing Ryanair data. In order to know the specific URL which enables the functioning of the API it is necessary, Mr. Hurley averred, to go through the front end of the Ryanair website on at least one occasion and identify and extract the specific URL through the normal flight search function. This is impossible without first agreeing to be bound by the Terms of Use and the specific URL requires that the Terms of Use be agreed to for any search and he averred to the relevant part of the URL text which, he averred, must be contained in the URL for it to function and which could only be inputted through acceptance of the terms.

26. He also echoed Mr. McNamara's point about browse wrapping, which he said was binding on the user irrespective of whether or not a user clicks the "Let's Go" button. He referred to Ms. Daly's analysis and stated the fact that Vola books Ryanair's flight is proof that Vola interacts with the Ryanair website.

*Mr. O'Gorman's affidavit*

27. Another affidavit was sworn on the 5th March, 2018 by a Greg O'Gorman, Ryanair's director of ancillary revenue. This is revenue garnered through "in house" services such as those relating to reserved seating, baggage, boarding, SMS, holidays, and external services provided by third parties through Ryanair such as insurance. Mr. O'Gorman described the essential role that ancillary revenue plays in Ryanair's business model. He averred that because the airline places the number of passengers it carries per year as its premium target, the ticket fare will often be adjusted to prices as low as €1 in order to reach this target. In such circumstances, ancillary revenue from passengers takes on an essential role in maintaining Ryanair's profitability and the ability to focus on low ticket fares and high passenger volume. Mr. O'Gorman's affidavit went on to describe how the interposition of Vola's website between Ryanair and its customers negatively affected Ryanair's chance to earn ancillary revenue by denying a point of contact with Ryanair and the customer, and by reducing traffic and activity from Ryanair's websites. Moreover, Mr. O'Gorman averred that Ryanair's goodwill is damaged when customers see the inflated price offered by Vola for a Ryanair flight, which harms the plaintiff's low fare reputation

*Mr. Truica's Second Affidavit*

28. Mr. Truica swore a replying affidavit on the 16th April, 2018. He claimed that Ryanair had not addressed Vola's core point that it obtains data from third party providers and not from the Ryanair website. Mr. Truica stated that Vola has access to Ypisolon and a GDS terminal. He averred that these third parties have access to a direct connection to Ryanair or other providers like GDS and that Ryanair has confirmed it permits direct access to these entities. He said that Mr. McNamara stated that Ypislon and Travelfusion are not permitted access to the Ryanair website, but not that they could not access Ryanair's data via a GDS provider or terminal or another direct non-website connection and averred that Ryanair did not deny that it gave permission for such direct connection to these entities to their online booking system. He repeated his denials that Vola does not use the Ryanair website for scraping activities. In relation to Vola's third party data and booking providers, Mr. Truica averred that Vola would disclose these agreements but that they are subject to confidentiality clauses and would need to be suitably redacted to protect commercially sensitive information. He also averred that Ryanair should disclose its own third party agreements.

29. Mr. Truica averred that if any damage had occurred, it would have been suffered by Ryanair where Vola is domiciled, where its website is hosted, where the Vola business is directed and where its customers reside. He denied that Vola's position was that Ryanair had given its data to the world at large, rather Ryanair had given its data and permission of use to a variety of companies in the airline distribution industry which included major GDSs such as Travelport. He described Vola as a company with access to a GDS terminal and made a sample booking of a Ryanair flight through "Vola's Worldspan GDS terminal" and exhibited screenshots to this effect, noting that now boxes had to be ticked during the booking. He stated that Vola would disclose the agreement it had to use the Travelport/Worldspan GDS terminal (again with suitable redactions). He denied that Vola had knowledge of any agreements between Ryanair and GDS providers not to allow other third parties such as Vola access to any Ryanair information. He stated that Mr. McNamara is incorrect to say that Ryanair data is not available to the public as, in so far as Vola is a member of the public, it too can access data through a GDS terminal.

30. He outlined Vola's position on the Navitaire system; in essence it allows Ryanair to seamlessly transmit its data into the Amadeus GDS network, thereby allowing those with GDS terminals access to that data. He cited excerpts from the Ryanair F20 report which noted that Rynair permits GDS operators, Sabre, Amadeus, Travelport to have access to Ryanair data. He stated that user experiences add nothing in relation to establishing jurisdiction and that descriptions of what it is like to access the Ryanair website are irrelevant.

31. He stated that the terms of Vola's website erroneously contained a statement suggesting the existence of a legal arrangement with Ryanair but stated that this had since been rectified.

32. He said that Ryanair did not contradict that Skyspeed tracked all bookings of Ryanair flights and not just bookings from Ryanair's website, but that bookings made from a GDS will also appear, noting Mr. Hurley's averment that Skyspeed "tracks all its flight bookings". In relation to Ms. Daly's averments that a customer with Vola is able to check in through Vola's website for a Ryanair flight, Mr. Truica averred that this was done through third party suppliers and was a service provided by Vola again through supplier APIs. In relation to her point about credit cards and emails, he averred that there was nothing sinister about this but was just a service provided by Vola. In relation to the IP address recorded by Skyspeed, he stated that this corresponded to an IP address of the

company Vodafone in Germany and not Vola, demonstrating that it is not Vola which accesses the site and it was not evidence that one of its data suppliers did also, rather it is only evidence that a booking of a Ryanair flight was made through one of the various distribution channels Vola operates.

*Mr. McNamara's Second Affidavit*

33. Mr. McNamara swore a supplemental affidavit on the 15th May, 2018. He averred that Mr. Truica had deliberately failed to disclose precisely how Vola processes a search and booking of a Ryanair flight and had failed to engage with what Ryanair had said about its relationship with third parties.

34. In relation to Mr. Truica's described use of a GDS terminal, he said it was unclear how Mr. Truica came to use the GDS provider in question. He averred that GDS providers provide a service for business customers only and not the general public and are subject to strict contractual obligations to Ryanair which included a prohibition on providing access to Ryanair flight data to online travel agents like Vola. The Ryanair website is the only permissible publicly available source to search for and book flights. He said that GDS terminals are physically located in travel agent offices and Mr. Truica's use of one as described in his second affidavit proved only that he has some undisclosed arrangement with a travel agent which allowed him use of a terminal on one occasion. GDS providers engage with business customers only and Ryanair is a party to a contract with two providers, Sabre and Travelport. Mr. McNamara stated that while these contracts were commercially sensitive, he could confirm that the contracts prohibit GDS providers from providing access to or use of Ryanair's flight and price data to third parties. He referred to the fact that Amadeus, with whom he stated Ryanair previously had a relationship, owned Navitaire and was not significant as Ryanair began contracting with Amadeus years before it acquired Navitaire in 2016.

35. Mr. McNamara specifically exhibited a letter from Travelport stating that in accordance with the agreement between Ryanair and Travelport, "Travelport confirms that it does not currently distribute Ryanair's content to Vola for the purposes of online distribution."

36. Mr. McNamara categorically denied that third party operators are permitted to connect with or in any way use Ryanair's data, be that through its website or through GDS providers or through its booking system, stating that if Travelfusion or Ypsilon or other third parties were engaging in this activity, Ryanair would take such action as appropriate against these entities.

37. Mr. McNamara also laid out a series of points relating to Ms. Daly's test booking via the Vola website, which he described as unrefuted; (1) that a user of the Vola website who booked a Ryanair flight does not leave the confines of the Vola site throughout the process; (2) that the user does not necessarily elect to search for a Ryanair flight but rather it is Vola that produces the Ryanair search result; and (3) that the Ryanair website was accessed during the course of the Vola website booking. With regard to this latter point, he referred to several technical matters; the 'Dotrez API' point made by Mr. Hurley in his second affidavit discussed below, the Skyspeed records indicating that the Ryanair Dublin servers were engaged, the Ryanair web logs demonstrating access of the Ryanair website, the IP address recorded on Skyspeed and the credit card details with Mr. Truica's name on them and the email address provided to Skyspeed, being a Vola email address.

38. In relation to Mr. Truica's suggestion that there had been "an error" in the Vola terms and conditions insofar as it suggested a relationship or agency between Vola and Ryanair, Mr. McNamara stated that this was untenable and disingenuous and that Vola still holds itself out as an agent for Ryanair. In this regard, he exhibited screenshots of the current Vola terms and conditions which stated that "…*the company is authorised by the airline companies who operate the flights; our company acts as an intermediary of these airline companies and shall be subject to trade rules and restrictions imposed by the airline companies and shall be subject to trade rules and restrictions imposed by the airline companies as direct service providers.*"

*Mr. Hurley's Second Affidavit*

39. Mr. Hurley, the Chief Technology Officer at Ryanair, swore a further affidavit on the 15th May, 2018. The thrust of his affidavit was that it is simply impossible that Vola utilises professional third party suppliers such as Ypsilon and Travelfusion or a GDS terminal in order to access Ryanair's website. He gave a number of reasons for this.

40. He averred that when Ryanair's information (stored on Navitaire) is accessed by the Ryanair website, a unique link between the website and Navitaire, known as the "Dotrez API" (Application Programming Interface) is triggered. Every triggering of the "Dotrez API" in turn indicates use of the website. He then referred to the screenshots of Ms. Daly's booking experiment, which demonstrated that in both the booking through Ryanair.com and Vola.ro, the booking system known as Skyspeed logged the "original agent" (the API which first accessed Navitaire) as the dotrez API. Mr. Hurley averred that this was proof that Vola uses the Ryanair website.

41. Moreover, Mr. Hurley averred that using a GDS terminal does not involve interacting with the Ryanair website for the booking in question and that, accordingly, the dotrez API would not be triggered in the case of a GDS booking. He searched for the reservation number of the exhibited sample flight Mr. Truica had claimed was booked through a GDS terminal and found on Skyspeed that the original agent for this flight was not the dotrez API, but TVLPORT, a reference to Travelport. This indicated that a GDS terminal had in fact been used for this booking and not the Ryanair website but it was notable that Mr. Truica did not claim that this booking was processed through the Vola website or provide any other details of the circumstances of this single booking.

42. He explained that Skyspeed, in addition to collecting information about the 'original agent', also collects relevant information when a booking is made. These are: the credit card number, the billing address, the IP address, and the server used. In relation to the credit card number and billing address, Mr. Hurley exhibited 3 bookings which were made using a card under Mr. Truica's name and with a first line identical to the defendant's billing address. Mr. Hurley also stated that the Bank Identification Number ("BIN") of the card corresponded to Romania, as did the country code of the BIN; "RO". The spreadsheet exhibited also records that the email address used by the booker ended in "@vola.ro". He averred that 3,800 of such bookings using these details were made in April 2018 alone. Mr. Hurley averred that Skyspeed recorded the original agent for the three bookings as the dotrez API. Furthermore, Skyspeed recorded the servers used for the three bookings as "BTDDTAPPS138" and "BTDDTAPPS137", both of which were, Mr. Hurley stated, Ryanair servers located in Dublin. These demonstrated that screen-scraping was indeed taking place.

43. In relation to Mr. Truica's averment that if Vola was accessing Ryanair's website, SkySpeed would have logged a Vola IP address during Ms. Daly's experiment (which it did not), Mr. Hurley responded by stating that while an IP address logged by a website will often correspond to the IP address and location of the computer user, it can be masked or replaced by other IP addresses which the website will log instead. This can be done by purchasing large blocks of alternate IP addresses, the use of IP proxies or by virtual private networks (VPNs). The fact that the IP logged by Skyspeed was a German IP address was, Mr. Hurley averred, therefore irrelevant; what was relevant was that it was not Ms. Daly's address and by process of elimination must have been used by Vola in booking the flight on the Ryanair website.

44. Mr. Hurley also averred that the web logs which recorded that a Ryanair API was triggered by Ms. Daly's booking through Vola, showed that a GDS terminal could not have been used. Similarly, these web logs recorded the same IP address as Ms. Daly, as noted on Skyspeed. The web logs also recorded a Cookie ID, an identifier used to track and identify the movements of a user on a website. This could have been created only through Vola's front end use or through a false Cookie ID created by Vola to access the back end of the website by pretending to be a front end user.

45. Mr. Hurley reiterated the point made in his previous affidavit in relation to the URLs necessary to be obtained in order to render the APIs operable to access the Navitaire database, and that these URLs could only be attained through front end use of the websit, and therefore by acceptance of the Terms of Use. He exhibited screenshots which demonstrated that the website deemed the terms of use as having been accepted.

46. A further issue was then raised in an affidavit of Ms Tessa Robinson, described below, which was in turn responded to on behalf of Ryanair.

*Clicking, Ticking and Auto-Ticking the White Box*

47. On the 9th July, 2018, Ms Tessa Robinson, a solicitor of the firm on record for the defendant, swore an affidavit for the purposes of demonstrating to the Court how the Ryanair website operated from the "front end" (i.e. from the point of view of an ordinary user interacting with the website) on the particular date of certain tests carried out by her. Ms Robinson averred that she performed three sets of interactions with the website homepage. The three interactions focus on the small "white box" to the left of the "Let's Go" logo on the relevant Ryanair page, which white box is to the left of the following text: "By clicking Let's Go I agree to Website Terms of Use".

48. *The Unticked White Box Version*: First, she visited the Ryanair website, entered a travel destination into the allotted box on the homepage, and clicked "continue". She then selected outbound and inbound travel dates and clicked "Let's Go!" *without* ticking the white box to the left of the text. Ms. Robinson exhibited a screenshot showing that she had been allowed by the website to continue with the flight booking, as the page now demonstrated a series of flight times on the relevant dates. In other words, the website was allowing her to proceed even though she had not ticked the white box. Ms. Robinson then closed her browser, restarted it and commenced a new session at Ryanair.com.

49. *The Manually Ticked White Box Version*: She then began a second set of interactions. This time she repeated the process described above but this time she *did* tick the white box. The booking process continued onto a new webpage where various flight times for the selected dates were offered to

her. At this stage she averred that she closed the browser again, restarted it and logged back onto the home page of the plaintiff's website.

50. *The Ticked then Unticked White Box Version*; The Ms Robinson now began her final set of interactions; she repeated the process she *ticked* the white box beside the text "By clicking Let's Go I agree to Website Terms of Use" *and then unticked* the box. At this stage, the "Let's Go" button became "pale and unresponsive" and she could not proceed any further. Upon re-ticking the box, the "Let's Go" button became operable again and Ms. Robinson was able to proceed with the flight inquiry.

51. Obviously, the purpose of the exercise was to demonstrate that a user interacting with the Ryanair website could proceed to use the website and make a booking by clicking the "Let's Go" box *but without manually* ticking the white box, as described in the first operation (the "Unticked White Box Version").

*Ms. Daly's second affidavit*

52. Ms Daly of Ryanair swore a replying affidavit the following day. As regards the third version, she averred that it stood to reason that ticking and unticking the box would cause the "Let's Go!" button to become unresponsive because manually unticking the box would raise an obvious doubt as to whether the user was accepting the Terms of Use. Ms Daly performed the operation described above as version one i.e. she clicked on the "Let's Go!" button but did not tick on the white box; on the date on which she did this, the tick in the white box, previously empty, appeared automatically. She stated that this was the way the Ryanair flight search was designed; "the tick-box will automatically check by the user clicking the "Let's Go!" button". She also pointed out that the "Let's Go!" button had the words beside it: "By clicking Let's Go I agree to Website Terms of Use". She further averred that the reason this tick did not appear in the white box at the time Ms Robinson carried out this particular operation was because of temporary and unintended coding changes in the Ryanair Website; this had resulted recently by reason of the website developers working on a new display of a particular service on the Ryanair website which changes caused the auto-tick function ceasing to function unintentionally. Ms Daly averred that when this issue was brought to Ryanair's attention on the 9th July, 2018, they set about correcting the error so that the automatic-tick function was restored i.e. the normal system is that when the user clicks "Let's Go!", the system automatically ticks the white box and allows the user to proceed.

## The proper approach to making findings of fact on an application concerning jurisdiction

53. In *Ryanair v Bravofly and Travelfusion Ltd* [2009] IEHC 41, Clarke J. identified two important principles from the European authorities concerning the Regulation (being the predecessor to the Regulations in issue in the present case). First, he said that the ECJ was concerned to ensure that issues relating to the applicability of jurisdiction clauses were determined as a matter of European law without reference to the many different laws of the individual member states, and had been at pains to point out that the question of whether the requirements for a choice of jurisdiction clause to apply have been met is wholly separate from any questions concerning the validity or enforceability of the contract, and is governed by an autonomous application of Community law. Secondly, decisions as to whether a choice of jurisdiction clause applies "should be made in a relatively straightforward way", particularly as the issue would normally be decided at an early stage of proceedings. Clarke J. said that in most cases there would not be any significant tension between these two principles, but that in some cases, the question of the validity of a contract under the law of the Member State

concerned (the substantive issue) would be very similar to the question of the applicability of the choice of jurisdiction clause (the jurisdictional issue). He said that in such cases, it would be most unsatisfactory if a court were to enter upon a detailed inquiry in relation to the underlying facts, similar to that which would need to be conducted to determine the central issues in the substantive proceedings in order to determine jurisdiction, but he considered that sometimes it might not be possible to avoid doing so.

54. In *Ryanair v. Unister* [2013] IESC 14, Clarke J. returned to this theme and said that in some cases courts will be required "to determine questions of fact which may be material to the very question of jurisdiction even though some of the same questions of fact may also be material to the substantive issues which arise in the proceedings generally" (para 8.6) and said that:-

> "There may be some doubt as to the precise extent to which it is appropriate for a court, in considering whether it has jurisdiction, to enter into detailed and contested factual questions in order to reach a conclusion as to whether jurisdiction has been established. However, it seems to me that the position adopted on behalf of Unister, which is to the effect that if the matter is not very clear the default jurisdiction applies, is not consistent with the jurisprudence of the ECJ. It follows that there may well be some cases where an Irish court will be required to enter into some consideration of contested facts in order to determine whether, in accordance with the Regulation, it has jurisdiction."

55. This approach was approved by the Supreme Court in *Ryanair v On the Beach* [2015] IESC 11. Charleton J. said (at para 28):-

> "Where a contract is concerned, a particular cause for confusion can arise because the clause as to choice of jurisdiction may be merely a numbered clause within several other terms of a disputed agreement. No final decision can be made as to the existence of a contract where the question before the court is only the interlocutory issue as to whether the case is properly to be tried before the courts urged to assume jurisdiction. To the extent that it is necessary, however, but only to that extent, the court deciding the issue of jurisdiction may need to enter into a consideration of such limited facts as are relevant to jurisdiction while leaving any decision as to the substance of the case to the trial."

And at para 30:-

> "…Difficult cases will arise. The duty of the courts remains to enter into an analysis of such limited facts as can determine whether the parties reached a consensus on jurisdiction."

56. Charleton J. quoted in this regard from the *Case C-159/97 Societad Trasporti Castelletti Spedizioni Internazionali SA v. Hugo Trumpy SpA* [1999] ECR I-1597, where it was said (at para 48):-

> "As the Court has repeatedly stated, it is in keeping with the spirit of certainty which constitutes one of the aims of the Convention, that the national court seised should be able readily to decide whether it has jurisdiction on the basis of the rules of the Convention, without having to consider the substance of the case".

57. In light of the above, I have sought to make only such limited findings of fact as are necessary to determine the issue relating to jurisdiction on this motion and not to enter upon the substantive matters in the case.

**My findings of fact**
*Were bookings made through third parties?*

58. Mr Truica's account of a booking through a GDS operator is, in my opinion, seriously lacking in detail. He did not identify the operator nor did he describe the circumstances of the booking. Further, he did not aver that this is how Vola bookings of Ryanair flights are usually or typically made. Nor has Vola produced copies of any agreements with third parties, even in redacted form. Various generalised claims were made about third parties, named and unnamed. On the other side, the Ryanair witnesses gave firm evidence that Ryanair has some agreements with some named third parties but that every such agreement prohibits the third party from passing on data to other parties such as Vola, and that Ryanair would terminate the agreement if it learned that the third party was acting in breach of this prohibition. One of the third parties referred to by Mr Truica (Travelport) has written a letter indicating that it does not currently distribute Ryanair's content to Vola for the purposes of online distribution Vola. Mr. Truica made other generalised assertions about access to Navitaire but, in my view, they are credibly contradicted by the technical evidence from Ryanair. In those circumstances, I am satisfied on the balance of probabilities for present purposes that Vola does not typically make bookings through third parties and that a Vola customer would typically book through the Vola website, which operates in the manner described by Ms. Daly, who made an experimental or test booking through the Vola website and provided descriptive and documentary detail of this.

*Does the Vola website interact with the Ryanair website?*

59. I am also satisfied that the technical traces left by Ms. Daly's experimental booking through the Vola website show that the Vola website *does* interact with the Ryanair website when dealing with a booking. These "technical traces" were described in detail by Mr. Hurley, Chief Technology Officer with Ryanair as described above and included: (a) the engagement of the Ryanair dotRez API during such a booking; (b) the engagement of a Ryanair server during the booking; (c) the Ryanair "web logs" evidence; (d) the IP address recorded by Skyspeed; and (e) the credit card information.

*What is the factual position regarding clicking, ticking and auto-ticking on the Ryanair website?*

60. It is not in dispute that there is a hyperlink to the Terms of Use on each webpage of the Ryanair website. The Terms of Use contain the choice of jurisdiction clause.

61. It is not in dispute that the following text appears beside the "Let's Go" button on the Ryanair website: "By clicking Let's Go I agree to Website Terms of Use"

62. Regarding the white box beside the "Let's Go" button, the position is as follows. First, if a user ticks the white box beside the "Let's Go" button and then clicks the "Let's Go" button, the user can proceed to make a booking. Secondly, if a user ticks and then unticks the white box beside the "Let's Go" button, the user is precluded from proceeding further and/or making a booking. Thirdly, the normal position when a user clicks on the "Let's Go" button without interacting with the white box at all is that the computer system *automatically* inserts a visible tick into the white box and allows the user to proceed onwards through the website; but, for some temporary

period while certain technical works were being carried on, the system did not automatically insert such a visible tick (i.e. the white box was left blank) but nonetheless did allow the user to proceed through the website.

63. The evidence concerning the white box is the specific area of evidence upon which the defendant ultimately rested its submission that there was no "click-wrap" agreement in the present case. The submission, which is described in further detail below, was in essence that a user could not be said to assent to Terms of Use, nor could there be said to be a consensus as to the jurisdiction clause within those Terms, in circumstances where the user was allowed by the system to proceed onwards through the website when the white box was, at best, auto-ticked by the system instead of manually ticked by the user, or (for some unidentified temporary period) was left blank and not even auto-ticked by the system. In other words, the defendant equated the manual ticking of the white box with establishing assent to the Terms of Use. I will return to this submission below in my conclusions on the legal issues.

**The relevant provisions of Regulation (EU) 1215/2012**

64. The defendants rely on Article 4 of the Regulation which provides for the general rule that persons shall be sued in the courts of the Member State where they are domiciled. Article 7(1) and (2) of the Regulation relate to "special jurisdiction" and provide as follows:-

> A person domiciled in a Member State may be sued in another Member State:
>
> > (1) (a) in matters relating to a contract, in the courts for the place of performance of the obligation in question;
> >
> > (b) for the purpose of this provision and unless otherwise agreed, the place of performance of the obligation in question shall be: — in the case of the sale of goods, the place in a Member State where, under the contract, the goods were delivered or should have been delivered, — in the case of the provision of services, the place in a Member State where, under the contract, the services were provided or should have been provided;
> >
> > (c) if point (b) does not apply then point (a) applies;
>
> > (2) in matters relating to tort, delict or quasi-delict, in the courts for the place where the harmful event occurred or may occur.

65. Article 25 of the Regulation, entitled 'Prorogation of Jurisdiction', provides: -

> > "1. If the parties, regardless of their domicile, have agreed that a court or the courts of a Member State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have jurisdiction, unless the agreement is null and void as to its substantive validity under the law of that Member State. Such jurisdiction shall be exclusive unless the parties have agreed otherwise. The agreement conferring jurisdiction shall be either:
> >
> > > (a) in writing or evidenced in writing;

(b) in a form which accords with practices which the parties have established between themselves; or

(c) in international trade or commerce, in a form which accords with a usage of which the parties are or ought to have been aware and which in such trade or commerce is widely known to, and regularly observed by, parties to contracts of the type in the particular trade or commerce concerned.

2. Any communication by electronic means which provides a durable record of the agreement shall be equivalent to 'writing'.

3. The court or courts of a Member State on which a trust instrument has conferred jurisdiction shall have exclusive jurisdiction in any proceedings brought against a settlor, trustee or beneficiary, if relations between those persons or their rights or obligations under the trust are involved.

4. Agreements or provisions of a trust instrument conferring jurisdiction shall have no legal force if they are contrary to Articles 15, 19 or 23, or if the courts whose jurisdiction they purport to exclude have exclusive jurisdiction by virtue of Article 24.

5. An agreement conferring jurisdiction which forms part of a contract shall be treated as an agreement independent of the other terms of the contract. The validity of the agreement conferring jurisdiction cannot be contested solely on the ground that the contract is not valid."

## The Article 25(1)(c) issue
*Relevant Authorities*

66. It is well established that the question of whether the requirements of Article 25(1)(c) have been satisfied is a matter of European law and not of the domestic law of an individual member state. The applicable principles should be interpreted and applied in a uniform manner throughout the EU. The essential issue is whether there is a consensus as to jurisdiction between the parties. As discussed in a number of cases, including the *Bravofly* decision discussed below, the question of whether there is an agreement or consensus as to jurisdiction under Article 25(1)(c) is separate and distinct from the question in the substantive proceedings as to whether there is a contract between the parties. A number of previous Irish decisions have dealt with jurisdictional issues in the context of proceedings brought by Ryanair in respect of alleged unlawful use of data from their website, including *inter alia* the Article 25(1)(c) basis of jurisdiction, and for that reason are particularly pertinent to the present proceedings. Indeed, the plaintiff submitted that some of them apply without factual distinction to the present case. This is, of course, disputed by the defendant, which seeks to rely in the first instance on the denial by Vola that it interacted with the Ryanair website at all, which it says distinguishes the present case from previous cases where such interaction was admitted; and secondly, on the basis of the evidence concerning the white box described earlier.

67. In *Ryanair v Bravofly and Travelfusion Ltd* [2009] IEHC 41, Bravofly admitted to using automated systems and software to extract real time flight information from Ryanair's website for the purposes of presenting it

on its websites. Ryanair claimed that Bravofly acquired the information necessary to do this from Travelfusion. The latter entity contested jurisdiction on the basis that it was bound by the Ryanair website's Terms of Use, which at that point in time had a jurisdiction clause in favour of England and Wales, while Ryanair argued that the choice of law clause did not apply. Accordingly, as Clarke J. (as he then was) said, the facts were highly unusual insofar as "[t]he party who has produced the standard form containing a choice of jurisdiction clause is the one saying it does not apply" while "the party denying that there is any contract at all is the one who is placing reliance on a clause which arises out of a contract alleged by its opponent but denied by it". I have set out earlier the comments of Clarke J. with regard to the necessity to keep distinct the issues of jurisdiction and substance, and because the Court embarked on a jurisdictional inquiry carefully to consider what findings of fact need to made (if any) in the light of that important distinction. In the unusual circumstances of the case before him, he thought that "it would do significantly less damage to the jurisdiction regime specified in the Brussels Regulation to permit, for the purposes of an action, a party to accept, for jurisdictional purposes only, the applicability of a jurisdiction clause sought to be imposed by the other side (while denying in the substantive proceedings the existence of any agreement) rather than creating a situation where it would be necessary to embark on a level of inquiry into the facts which would very closely parallel the inquiry that would be necessitated by a hearing of the substantive proceedings themselves".Clarke J. accepted that the ECJ in *Case 24/76 Estasis Salotti* [1976] ECR 1831 had said that the consensus between the parties must be "clearly and precisely demonstrated", but he again emphasised that the facts of the case before him involved a party which had inserted the jurisdiction clause being the party seeking to deny it, and he thought that it would create no injustice to require both parties to be governed by the jurisdiction clause. "The clause itself was inserted into any contractual relations that might be said to exist by Ryanair" and therefore, that was "a sufficient consensus to meet the requirements of the Regulation even though Travelfusion asserts the absence of any contractual relationship".

68. In both *Ryanair v Billigfluege* [2010] IEHC 47 and *Ryanair v On the Beach* [2013] IEHC 124, the more usual situation arose insofar as the party which had inserted the jurisdictional clause (Ryanair) was also seeking to have it enforced. Ireland was the jurisdiction designated under the choice of law clause contained in the Terms of Use. These cases are highly relevant for present purposes as both involved facts concerning the Ryanair website and "screen-scraping", as well as an analysis of the Regulation and the practices of "click-wrapping" and "browse-wrapping". The High Court, in each of those cases (Hanna J., and Laffoy J., respectively), held that Ireland had jurisdiction pursuant to Article 25(1)(c) of the Regulation. The respective conclusions of Hanna J. and Laffoy J. were reached by different routes. The general approach of Laffoy J. to the legal issues was considered "more correct" by the Supreme Court in the subsequent appeal (discussed below), and it may therefore be helpful considering her judgment in greater detail than that of Hanna J.

69. However, I think it important to note the references of Hanna J. to American cases concerning "click-wrapping" in *Billigfleuge*. Hanna J. referred, *inter alia*, to *Caspi v Microsoft Network* (1999) 323 N.J. Super. 118; 732 A.2d 528, in which a jurisdiction clause was held to be enforceable in circumstances where it was contained in an online subscriber agreement of Microsoft and the user was required to click "I accept" before subscribing. He also referred to *Specht v. Netscape Communications. Corporation* (2002) 306 F.3d 17, where it was held that it was more likely than not that a user of the website in question would not scroll down the webpage sufficiently enough to see the software licence terms which were

placed below the download button, and which button would have to be pressed to download the relevant product. The court stated that: "Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility" (p.20).

70. In *Ryanair v. On the Beach* [2013] IEHC 124, the background was that the company known as On the Beach was one of the leading online travel agencies in the United Kingdom. The bookings were done by consumers through the company's website or on the phone and were fully automated. Details were set out on affidavit as to the processes involved. It was not in dispute that the data available to On the Beach was obtained from Ryanair by "screen scraping", described as "a computer software technique for extracting information from websites involving the creation of an automated tool which interrogates the operator's website". However, it was averred on behalf of the defendant that this raw data was furnished by third parties and that the defendant itself was not involved in the collection of the data. Further, the defendant sought to argue that the defendant was merely an agent for the consumer, and that there was no contract between the defendant and plaintiff. Ryanair, however, averred that the jurisdiction clause in the Terms of Use applied to the defendant and pointed out, *inter alia*, that the consumer was never made aware of its Terms of Use and that it was the defendant who 'ticked the box' concerning the Terms of Use on the Ryanair website.

71. In the course of her judgment, Laffoy J. considered the decisions of Clarke J. in *Bravofly* and Hanna J. *Billigfleuge*, and also found helpful the discussion of "click wrapping" and "browse wrapping" in a decision of the Supreme Court of British Columbia, *Century 21 v Zoocasa* [2011] BCSC 1196, [2011] B.C.J. No. 1679. Commenting on the *Century 21* case, Laffoy J. said as follows:-

> "32. According to the judgment, a "click wrap" agreement arises in a situation where the user of the website indicates his agreement by clicking on an "I Agree" box. In support of this proposition, one of the U.S. authorities relied on by the plaintiff in this case, i.Lan Systems Inc v. Netscout Service Level Corp 183 F. Supp 2d 328, a decision of the United District Court in the district of Massachusetts, is cited. In that case, the click was characterised as explicit assent.

> 33. As regards a "browse wrap" agreement, the judgment states it does not require that the website user indicate agreement by clicking on an "I Agree" button. All that is required is that the user "use the product after being made aware of the product's Terms of Use". On this point, many of the decisions of the courts of the United States relied on by the plaintiff are considered including Specht v Netscape Communications Corp 306 F. 3d 17, a decision of the United States Court of Appeals, Second Circuit, which laid down that two requirements must be met before a contract is found: "reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers ...". Summarising the position in relation to "browse wrap" agreements, the Canadian Court stated (at para. 107):

>> "As noted in the authorities referred to above, the law of contract requires that the offer and its terms be brought to the attention of the user, be available for review and

be in some manner accepted by the user. Such an analysis turns on the prominence the site gives to the proposed Terms of Use and the notice that the user has respecting what they are agreeing to once they have accepted the offer. To establish a binding contract consideration will also be given to whether the user is an individual consumer or a commercial entity and in addition a one-time user or a frequent user of the site."

34. In addressing an argument made on behalf of Zoocasa that it would be contrary to public policy to accede to the arguments of Century 21 respecting the binding nature of the Terms of Use, as it would have negative effects on the operation of the internet, in a passage specifically relied on by counsel for the plaintiff in this case, the Canadian Court stated (at para. 114):

"The evolution of the internet as an 'open' medium with its ability to hyperlink, being key to its success, does not mean it must function free of traditional contract law. It is simply the manner of contracting that has changed not the law of contract. The acceptance of click wrap and browse wrap agreements acknowledges the right of parties to control access to, and the use of, their websites."

Later, the Canadian Court stated (at para. 119):

"Taking the service with sufficient notice of the Terms of Use and knowledge that the taking of the service is deemed agreement constitutes acceptance sufficient to form a contract. The act of browsing past the initial page of the website or searching the site is conduct indicating agreement with the Terms of Use if those terms are provided with sufficient notice, are available for review prior to acceptance, and clearly state that proceeding further is acceptance of the terms."

72. Laffoy J. emphasised, however, that the ultimate analysis has to be conducted within the framework of the EU Regulation itself. In this regard, she found helpful the summary of principles emerging from the CJEU authorities as outlined in Delaney & McGrath *Civil Procedure in the Superior Courts* (3rd Ed.) at paragraphs 1 - 379 *et seq*. These were that a strict approach should be adopted in determining whether the formalities for jurisdiction clauses have been complied with and in their interpretation; that the onus is on the party who asserts that the prorogation applies to show that the Regulation's provisions have been complied with; and that it must be clearly and precisely demonstrated that the jurisdiction clause was the subject of consensus between the parties. She also referred to the decision in *Case C-106/95 Mainschiffahrts-Genossenschaft MSG v Les Gravierers Rhenanes SARL* [1997] ECR 1 -911 (hereinafter "the MSG case"), where the Court of Justice discussed the predecessor of Article 25(1)(c) and said that there must be "real consent" on the part of the persons concerned but that consensus is "presumed to exist where commercial practices in the relevant branch of international trade or commerce exist in this regard of which the parties are or ought to have been aware". At paragraph 39 of her judgment, Laffoy J. referred with approval to the summary in Delaney & McGrath *Civil Procedure in the Superior Courts* (3rd Ed.) at paragraphs 1 – 395 of what a national court must determine in order to satisfy Article 25(1)(c): -

"The court held that it is for the national court to determine whether:

> (i) the contract in question comes under the head of international trade or commerce;

> (ii) there was a practice in the branch of international trade or commerce in which the parties are operating; and

> (iii) the parties were aware or are presumed to have been aware of that practice."

73. Laffoy J. also cited some of the European authorities in support of the proposition that the objective of the Article was to secure legal certainty and foreseeability of outcome, including *Benincasa v Dentalkit* [1997] ECR 1 6767 and *Case C-159/97 Trasporti Castelletti Spedizioni Internazionali SpA v Hugo Trumpy SpA* [1999] ECR I-1636.

74. Applying the principles set out in the *MSG* case to the facts before her, Laffoy J. held that the contract in question did come under the heading of international trade or commerce because the plaintiff was an international airline which sells flights and other services through its website and the defendant was a travel agent specialising in online business and in the course of that business, utilised the data on, and interacted with, the plaintiff's website. Secondly, she held that the evidence clearly established that within the airline and travel agency online business, the practice is that the website user becomes contractually bound by clicking or ticking a box by which the user demonstrates assent or agreement to the terms displayed by the website owner. She added: "*Moreover, in accordance with the standard internet practice in that business, the Terms of Use of a particular website are available throughout by way of hyperlink with the objective that, by utilising a provision such as Clause 1 of the plaintiff's Terms of Use, the use of the website, browsing or viewing the website, binds the user to the Terms of Use.*" (page 29) Thirdly, the evidence before the Court in her view clearly demonstrated that the defendant was aware of the practice, it being a practice which was generally and regularly followed when making bookings with online travel agents and with airlines and may be regarded, in the words of the *MSG* case, as being a "consolidated practice". She concluded therefore that the case fell within the relevant prorogation provision of the Regulation (the predecessor of the current Article 25(1)(c)) and that the defendant was bound by the jurisdiction clause in the Terms of Use on the plaintiff's website.

75. Laffoy J. also said that the question of whether the defendant was acting as agent of the customer in accessing the Ryanair website and making a booking was irrelevant, because the question of whether the requirements of a choice of jurisdiction clause are met under the Regulation fell to be determined on the basis of an autonomous application of Community law and not with reference to principles of domestic law on agency and principals. She added that she took the view in any event that even if the defendant was acting as an agent for the consumer, it was still bound by the jurisdiction clause because of the actual wording of the relevant clause of the Terms of Use ("……any party accessing such information or facilities on their own behalf or on behalf of others"). She was satisfied in all the circumstances that there was a "real consent" to be bound by the jurisdiction clause; from the very outset of the defendant's interaction with the Ryanair website, it encounters the hyperlink connection to the plaintiff's Terms of Use; if it did not wish to be bound by it, "it should desist from proceeding beyond its first encounter with the hypertext link".

76. Appeals by the defendants in each of the two High Court cases were dismissed by the Supreme Court in *Ryanair Ltd v Billigfluege; Ryanair v On the Beach Ltd* [2015] IESC 11. Charleton J., delivering the judgment of the Supreme Court, examined the evidence and the findings of fact made in each of the two cases and concluded that there was nothing to suggest that the Supreme Court should interfere with the respective decisions of Hanna J. and Laffoy J., although he was at pains to make clear that no decision was being made in the *Billigfleuge* case that there was a binding contract (i.e. the substantive issue in the proceedings), and that it was merely a decision that a clear choice of jurisdiction had been made by the parties. With regard to the legal issues in such cases, Charleton J. said that the 'more correct approach' was that of Laffoy J. insofar as she did not base her judgment on any aspect of the formation of a contract, unlike Hanna J who dealt with the issue with reference to the traditional contract principles of offer, acceptance and consideration. In this regard, Charleton J. said (at paragraph 18):-

> "… Hanna J dealt with the issue of jurisdiction in the Billigfluege litigation by reference to "traditional contract principles of offer, acceptance and consideration". Laffoy J, however, in the On the Beach case, did not base her judgment on any aspect of the formation of a contract. That emerges as the more correct approach. Central to the disparate contentions of the parties is whether there ever was a contract between Ryanair and Billigfluege and Ryanair and On the Beach respectively. It is not for the Court to now adjudicate on this matter, as essential to the rights asserted by Ryanair, and denied by the travel companies, are the rights and obligations under the contract, if any, and any other intellectual property rights that are asserted on Ryanair's pleadings. What is clear from both the judgments of Hanna J and Laffoy J in the High Court is that each judge was made aware of the minutiae of setting up a system such as that operated by Billigfluege and by On the Beach. The attention to detail that such a system involves may reasonably infer, absent factors to contradict that inference, a close scrutiny of not only the data that needed to be captured from the sites of airlines such as Ryanair in order for these comparison and purchase online sites to work, but also the other aspects of the airlines' requirements for use of their online material; whether valid or not. That included in this instance the conditions for using the Ryanair site. The effect of contractual and other obligations is for trial, and not for this appeal."

77. Charleton J. set out six principles in relation to interpretation and application of the Brussels Regulation, based on the authorities, as follows:-

> i. The primacy of the default rule under what is now Article 4;
>
> ii. The careful scrutiny required in applying the exceptions to Article 4 such as special jurisdiction under Article 7 and choice of jurisdiction under Article 25 (Case C-269/95 *Benincasa v Dentalkit Srl* [1997] ECR I-3767);
>
> iii. That what is or is not a choice of jurisdiction does not depend on traditional concepts of the formation of a contract, whether under civil law or common law, but the applicable law is a matter that emerges as a requirement from the text of the Regulation, and consent to

jurisdiction must be interpreted uniformly throughout the European Union and is an autonomous regime (*Benincasa*, Case 150/77 *Bertrand* [1978] ECR 1431, paragraphs 14, 15, 16 and 19, and Case C-89/91 *Shearson Lehman Hutton* [1993] ECR I-139, paragraph 13);

iv. The requirement for certainty, and thus foreseeability, for litigants under the Regulation in order to fulfil its objective of introducing confidence in commercial relations (Case C-256/00 *Besix SA v Wasserreinigungsbau Alfred Kretzschmar GmbH & Co* [2002] ECR I-169);

v. Derogation from Article 4 in favour of Article 25 prorogation requires a demonstration that consensus has been reached between the parties as to where the dispute is to be litigated, this consensus must be clear and is "a matter of the independent will of the parties"; a court may need to enter into a consideration of such limited facts as are relevant to jurisdiction while leaving any decision as to the substance of the case to the trial (Case C-387/98 *Coreck Maritime GmbH v Handelsveem BV* E.C.R. I-9337 at paras. 13 and 14. In Case C-24/76 *Estas Salotti v Rua* [1976] ECR 1831);

vi. In relation to Article 25(1)(c), which relates to customs within a branch of international and commerce, a court may inquire into those customs to determine a choice of jurisdiction (*MSG*, *Hugo Trumpy*).

78. As regards (v) above, Charleton J. said (at para 28):-

"Where a contract is concerned, a particular cause for confusion can arise because the clause as to choice of jurisdiction may be merely a numbered a numbered clause within several other terms of a disputed agreement. No final decision can be made as to the existence of a contract where the question before the court is only the interlocutory issue as to whether the case is properly to be tried before the courts urged to assume jurisdiction. To the extent that it is necessary, however, but only to that extent, the court deciding the issue of jurisdiction may need to enter into a consideration of such limited facts as are relevant to jurisdiction while leaving any decision as to the substance of the case to the trial."

He referred to the *Hugo Trumpy* case and *Ryanair v Unister GmbH* [2013] IESC 14 in this regard.

*Submissions of the parties*

79. At the time of the filing of its affidavits and written submissions, the defendant's primary submission regarding Article 25(1)(c) of the Regulation was the submission that Vola did not in fact interact with the Ryanair website and that, therefore, cases such as *Billigfleuge*, *On the Beach* and *Bravofly* were distinguishable on the basis of this crucial fact alone. I accept the general point made on behalf of the defendant that if there were a relevant factual point of distinction between those authorities and the present case, the reasoning in those cases might not apply, because the question of jurisdiction is a factual one, as was made clear by Charleton J. in *On the Beach*. However, I have made a finding of fact earlier in this

judgment that the evidence establishes, on the balance of probabilities, that Vola did interact with the Ryanair website and I must proceed on that basis.

80. The defendant's submission by the time of the conclusion of the oral hearing had become a more nuanced one; namely, that even if Vola had interacted with the Ryanair website, the precise nature of the interaction emerging from the evidence, even taken at its height from Ryanair's point of view, was not sufficient to amount to an agreement to jurisdiction within the meaning of the European authorities. In oral argument, counsel on behalf of Vola conceded or suggested that the Court should examine his case on the assumption that his client had interacted with the Ryanair website at its "front-end" (i.e. as if it were entering the site as an ordinary user) but argued the evidence at its height did not demonstrate an agreement to the Terms of Use. This, he contended, was because the evidence established that a user of the Ryanair website could access the website content and make a booking without necessarily having to click on the white box indicating assent to the Terms of Use. At best, it was submitted, the evidence showed that the Ryanair website automatically ticked the white box on behalf of the user if it was left blank by a user who then clicked Let's Go; and indeed, the experiment conducted by Ms Tessa Robinson showed that at least for some period, the Ryanair website did not even automatically tick the white box and instead proceeded to allow a booking to be made, having left the white box unticked or blank. It was submitted that while previous authorities dealt with click-wrapping in the sense of a user expressly ticking a box, and browse wrapping, none of the authorities dealt with a scenario of *auto-ticking* by the system itself. It was submitted that the Court should not infer a consensus within the meaning of the Regulation on the basis of an auto-tick by the system as distinct from an express ticking by the user. Further, it was submitted that there was no evidence before the Court that there was common usage within the industry of the auto-ticking method, as distinct from the practices of click wrapping (in the sense of express ticking of a box) and/or browse wrapping. As to the fact that the user was permitted to proceed to use the website as a result of this automatic tick, it was submitted that this did not of itself mean that there was a 'consensus' as to the Terms of Use; if Ryanair really wished to prevent the user going forward to make a booking without first agreeing to the Terms of Use, it was argued, Ryanair could prevent the user from doing so in the same way as it did when a user ticked and then unticked the white box, as described earlier. It was said that if the Court were to find a consensus or agreement on the basis of the auto-tick, this would amount to finding consensus or agreement 'by activity' and that there was no authority for this. It is clear from all of this that considerable emphasis was placed upon the white box located on the webpage beside the "Let's Go" button.

*My conclusion*

81. In my view, despite the very able and indeed ingenious arguments put forward by counsel on behalf of the defendant Vola in this regard, the plaintiff has established on the evidence that there was an agreement to be bound by the Terms of Use (which contained the jurisdiction clause) within the meaning of Article 25(1)(c) of the Regulation. I base this view upon the findings of fact set out earlier in this judgment. In those findings, I rejected the submission that the facts were that Vola bookings were effected through third parties rather than through the Vola website. This brings me to a consideration of the alternative argument of counsel, namely that even if Vola did interact with the Ryanair website, a user could not be said to assent to the Terms of Use, nor therefore could it be said that there was a consensus as to the jurisdiction clause within those Terms, in circumstances where the white box beside the "Let's Go" button on the Ryanair website was (or may have been) auto-ticked by the system instead of manually

ticked by the user. Even accepting that there may be an element of auto-ticking of the white box, what seems to me to be more significant is that the user, in order to move onwards through the site, must click "Let's Go" beside which there is text saying "By clicking Let's Go I agree to Website Terms of Use". The placing of this text beside the "Let's Go" box in my view is crucial. In my view, it gives clear notice to the user both by reason of what it says and by reason of its location and size. The ticking of the white box (be it manual or automatic) in my view is less significant than the clicking of the "Let's Go" button. Further, the Terms of Use themselves are accessible at all times by way of hyperlink on every page of the Ryanair website.

82. It would perhaps be better if the technical arrangements were that the user could never proceed past the "Let's Go" button without *manually* ticking the white box. But simply because there could be an even better arrangement does not mean that the present situation does not contain the essential ingredients to amount to an agreement by "click-wrap". This is not a situation where a user is allowed to proceed without any adequate notice of the existence and content of the Terms of Use. The "Let's Go" button is larger and more prominent than the white box, and the user's clicking of Let's Go is unambiguously linked with the Terms of Use via the text to which I have referred. I am satisfied that this is a form of agreement by "click-wrapping" within the meaning of that term as discussed in the authorities dealt with above, the key elements of which perhaps can be summarised as:-

> 1. That there be reasonable and adequate notice of the existence of terms or conditions (which contain the jurisdiction clause) before the user proceeds to click a particular button;
>
> 2. That the full content of the terms or conditions (which contain the jurisdiction clause) be accessible, for example by hyperlink, before the user proceeds to click the button; and
>
> 3. That it is made clear to the user that by clicking a particular button, he or she will be taken to have assented or agreed to those terms or conditions from that point onwards.

83. Accordingly, I am of the view that although the evidence and facts are slightly different to those pertaining in the *On the Beach* case, the reasoning of the High Court (Laffoy J.) in that case (approved on appeal by the Supreme Court) applies with equal force, and the conditions of Article 25(1)(c) are satisfied i.e. there was in this case an agreement as to jurisdiction between the parties which was effected through a click-wrapped agreement, this being a form of agreement which accords with a usage in international trade or commerce of which the parties are aware or ought to have been aware and which in such trade or commerce is widely known to, and regularly observed by, parties to contacts of the type involved in this particular trade or commerce.

84. I note also and in particular the following comments of Charleton J in On the Beach and *Billigfluege*, where he said:-

> "What is clear from both the judgments of Hanna J and Laffoy J in the High Court is that each judge was made aware of the minutiae of setting up a system such as that operated by Billigfluege and by On the Beach. The attention to detail that such a system involves may reasonably infer, absent factors to contradict that inference, a close scrutiny of not only the data that needed to be captured from the sites of airlines such as Ryanair in order for these comparison and purchase online sites

> to work, but also the other aspects of the airlines' requirements
> for use of their online material; whether valid or not. That
> included in this instance the conditions for using the Ryanair
> site." (p. 10)

And, as regards the *Billigfleuge* case:-

> "…the setting up of this operation involved a skilled scrutiny of
> the data for the purpose of sharing it". (p.35)

This may echo the consideration underlying the view of the Supreme Court
of British Columbia in the *Century* 21 case that "consideration will also be
given to whether the user is an individual consumer or a commercial entity
and in addition a one-time user or a frequent user of the site". It seems to
me to suggest that a court should have regard to the realities of the
position of the user who is said to have agreed to the jurisdiction clause, as
well as the detail of how one proceeds through the website from a technical
point of view. In this regard, the situation in the present case is also on all
fours with *On the Beach* and *Billigfleuge* insofar as the user is a company
engaged in the business of online travel and not an individual consumer.

**The Article 25(1)(a) issue**
85. Article 25 of the Regulation provides that "if the parties…have agreed
that a court or the courts of a member state are to have jurisdiction… that
court or those courts shall have jurisdiction unless the agreement is null
and void as to its substantive validity under the law of that Member State",
provided *inter alia* that the agreement is "*(a) in writing or evidenced in
writing".*

86. I note that Article 25(2) provides that "any communication by electronic
means which provides a durable record of the agreement shall be
equivalent to 'writing'".

87. Laffoy J. in *Ryanair v On the Beach* pointed out that, under the
predecessor sub-Article, what must be in writing is the agreement of the
parties to be bound by the jurisdiction clause, rather than the jurisdiction
clause itself. She said that the manner in which the plaintiff had sought to
establish this in the case before her was by pointing to a letter sent by
Ryanair to the defendant, in which it enclosed the Terms of Use and alleged
that the defendant was in breach of them. The defendant did not alter its
conduct, and it was argued on behalf of the plaintiff that this conduct
amounted to acceptance by them of the jurisdiction clause. Laffoy J.
rejected this argument, saying that the plaintiff was in reality relying on
conduct rather than writing, and therefore the condition in Article 25(1)(a)
had not been satisfied. This reasoning applies to the same argument made
in the present case with regard to the letter sent by Ryanair to Vola on the
19th September, 2017. What is in question with regard to Article 25(1)(a) is
not whether there was an agreement *simpliciter*, but whether there is an
agreement in writing or evidenced in writing.

88. Charleton J., in his judgment on the appeal in the *On the Beach* case,
decided not to deal with a different argument apparently raised on appeal in
relation to this sub-paragraph, namely that the agreement was evidenced in
writing by reason of the 'clicking' by the user of the Terms of Use on the
Ryanair website. He refused to do so because the point had not been
argued at first instance. He said as follows: -

> "In contending that there was an agreement conferring
> jurisdiction that was evidenced in writing, Ryanair claim that
> every click of assent to their terms and conditions of their
> website or their booking of flight terms and conditions amounts

to a "communication by electronic means" and also contend that through their computer booking system they can provide "a durable record of the agreement", considered under Article 23.2 to be equivalent to writing. This may or may not be correct. There is no record of it ever having been argued before either Hanna J or Laffoy J in the judgments of either court. For that argument to succeed, there would have to be an averment supported by appropriate computer print outs or screen shots of a small but representative sample of the transactions together with an opportunity to the travel companies to reply to that contention. The point should not be first decided on appeal."

89. The plaintiff referred me to the Court of Justice decision in *Case C-322/14 Jaouad El Majdoub v CarsOnTheWeb.Deutschland GmbH* [2015] ECR ECLI:EU:C:2015:334 which dealt with the issue of click-wrapping in the context of the predecessor provision to Article 25(1)(a). This arose in the context of a consideration of the website of a car dealer accessed by a potential car purchaser. The court noted that it was an essential feature of the case that on this particular website, the potential purchaser "must expressly accept the seller's general terms of sale by clicking the relevant box before making a purchase" but that this operation did not automatically lead to the opening of the document containing the seller's general terms, as an extra click on a specific hyperlink for that purpose was still necessary. Those general terms and conditions contained a jurisdiction clause. The Court held that this constituted an agreement in writing or evidenced in writing, and that it was sufficient that the method of agreement "makes it possible to print and save the text of those terms and conditions before the conclusion of the contract". The Court noted *inter alia* that according to the Explanatory Memorandum on the proposal for the Regulation, the aim of the provision was to include a choice of forum clause that was not written on paper was "accessible on screen" and added that its purpose was "to treat certain forms of electronic communications in the same way as written communications in order to simplify the conclusion of contracts by electronic means". It said: "In order for electronic communication to offer the same guarantees, especially as regards evidence, it is sufficient that it is 'possible' to save and print the information before the conclusion of the contract" (para 36). On the facts of the case, it was not disputed that "click-wrapping" made printing and saving the text of the general terms and conditions possible before the conclusion of the contract and therefore the fact that the webpage containing the information did not open automatically on registration on the website and during each purchase "cannot call into question the validity of the agreement conferring jurisdiction".

90. I note that the purchaser did actively assent to the general terms and conditions in the CarsOnTheWeb website, however. I have not been referred to any authority on the issue of auto-clicking as distinct from user-ticking. I have set out earlier the precise evidence relating to the element of auto-ticking of the white box in the present case and my factual conclusions. I have also dealt in detail with this in relation to Article 25(1)(c).

91. In my view, where a user clicks the "Let's Go" button on the Ryanair website, he or she thereby indicates agreement to the Terms of Use because of the wording of the text beside the button. Further, the content of those Terms of Use is accessible to him or her at all times and could be printed out, as was the situation in the *CarsOntheWeb* case. However, is there a written record of the agreement to the Terms of Use in writing in the absence of a manual click by the user? Should the clicking of the "Let's Go" button be considered a written record? Would the presence of a tick in the white box be necessary to constitute a written record? And does it matter whether the tick is manual (a user-tick) or automatic (a system-

tick)? The answer seems to me to be borderline, but on balance, having regard to what was said by Laffoy J. with regard to the distinction between "conduct" and "writing" in the *On the Beach* case as described above, it seems to me that the clicking of the "Let's Go" button amounts to "conduct" rather than "writing". Accordingly, insofar as the evidence establishes that Vola's interaction with the Ryanair website may have arisen in circumstances where the white box was never ticked or was ticked automatically by the system, that situation seems to me to fall short of an agreement as to jurisdiction "in writing or evidenced in writing" within the meaning of Article 25(1)(a). Certainly, the content of the Terms of Use is evidenced in writing; but the agreement itself is not.

**The Article 7(1)(a) issue**

92. Article 7(1)(a) provides that a person domiciled in a Member State may be sued in another Member State "*in matters relating to a contract, in the courts for the place of performance of the obligation in question".*

93. It is well established that it is permissible to invoke the special jurisdiction in Article 7(1) in circumstances where the existence of the contract itself is in dispute; *Case 38/81 Effer v. Kantner* [1982] ECR 825. The dispute between the parties in the present case in relation to Article 7(1) of the Regulation concerns the issue of whether the contractual "obligation" in question is a positive or negative obligation, where the obligation is to be performed, and the proper application of certain decisions of the CJEU (*Case C-256/00 Besix v WABAG and Plafog* [2002] ECR I-1699, and Case C-19/09 *Wood Floor Solutions Andreas Domberger GmBh v. Silva Trade SA* [2010] E.C.R I-2121 in particular) as well as two Irish decisions, that of the Supreme Court in *Handbridge Limited v British Aerospace* [1993] 3 IR 342 and a more recent decision of the Court of Appeal in *Castlelyons Enterprises Ltd. V EUKOR Car Carriers Inc*. [2018] IECA 98. In *Ryanair v On the Beach* [2013] IEHC 124, the High Court (Laffoy J.), on similar facts, held that Article 7(1) did not apply. The plaintiff invites the Court to decline to follow the decision of Laffoy J. in the *On the Beach* case on the basis that she was incorrect in her analysis on this particular issue. The defendant submits that the conclusion reached by Laffoy J. should also be reached in any event upon a proper construction of *Besix* even if the Court were to disagree with some of the reasoning employed by Laffoy J. There was no appeal to the Supreme court on the Article 7(1) issue in the *On the Beach* case.

94. In *Handbridge Limited v British Aerospace* [1993] 3 IR 342, the Supreme Court considered the predecessor of Article 7(1) in the context of a dispute concerning a contract for the design and manufacture of computer systems. It was submitted on behalf of the plaintiff that the contractual obligation which characterised the alleged contract was the obligation upon the plaintiff to manufacture computers at its premises in Shannon, with an obligation upon the defendant to take delivery of the computers at those premises, and that the breach complained of was the defendant's failure to place orders in accordance with this contract. The defendant submitted that its principal obligation under the alleged contract was to take delivery of the goods in a location in England and therefore the courts of England had jurisdiction. The Supreme Court, having regard, *inter alia*, to the Court of Justice decision in Case C-189/87 *Kalfelis v Bankhaus Schroeder* [1988] ECR 5565, held that where a plaintiff sought to invoke one of derogations from the primary rule that a defendant should be sued in the place of his domicile, the onus was on the plaintiff unequivocally to show that his claim fell within the scope of the derogation relied upon. This meant that the plaintiff was required to show that the obligation in question was one which *must*, by virtue of the terms of the contract or by operation of law, be performed within the State. This was not discharged where the evidence tendered by the plaintiff established a 'possibility' of performance within the

State. The obligation, the alleged breach of which formed the basis of the plaintiff's claim, was the obligation upon the defendant to place orders for the goods, but the plaintiff had not established with the degree of particularity required by the Convention that it was a term of the alleged contract that performance of the obligation in question must take place within the State.

95. In *Case C-256/00 Besix v WABAG and Plafog* [2002] ECR I-1699, two entities (WABAG and Besix) had signed in Brussels an agreement whereby they undertook to submit a joint tender for a project involving water supply in the Cameroon, and, if their tender were accepted, to perform the contract jointly. Under the terms of the agreement, the two companies undertook to act exclusively and not to commit themselves to other partners. The WAPAG-Besix group did not win any part of the contract. It emerged that one lot of the contract was awarded to a group which included the company Plafog, which was a subsidiary of the same corporate group as WAPAG. Besix brought an action for damages in Brussels based on alleged breach of the exclusivity clause. A national court referred a question to the Court of Justice for preliminary ruling as to whether Article 5(1) (the predecessor to Article (7)(1)) applied where the obligation consisted of an obligation "not to do something" which is to be performed anywhere in the world. The Court held that the sub-Article did not apply in those circumstances. At paragraph 24 of its judgment, it emphasised the objective of legal certainty which lay behind the Convention (a predecessor of the Regulation), and, at paragraph 25, pointed out that this led to the need to interpret it in such a way as to enable a defendant to reasonably foresee before which courts he may be sued; and to avoid creating a situation in which a number of courts have jurisdiction in respect of the same dispute. From this, the Court said, it followed that the sub-Article should be interpreted as meaning that "in the event that the relevant contractual obligation has been, or is to be, performed in a number of places, jurisdiction to hear and determine the case cannot be conferred on the court within whose jurisdiction any one of those places of performance happens to be located" (para 28). Rather, it was clear that "a single place of performance must be identified". This was because the special rules of jurisdiction laid down in that part of the Convention were justified by reason of the consideration that there was a "close connection between the dispute and the court called upon to resolve it" (para 30). The court went to say, at paras 34-5: "Where parties have agreed a contractual obligation not to do something, applicable without any geographical limit, that approach does not avoid a multiplicity of competent courts, since it leads to the result that the places of performance of the obligation in question are in all of the Contract States. It also involves the risk that the claimant will be able to choose the place of performance which he judges to be most favourable to this interests. Consequently, that interpretation does not make it possible to identify the court most qualified territoriality to determine the case. Furthermore, it is likely to reduce the predictability of the competent court, so that it is incompatible with the principle of legal certainty".

96. I note also that at paragraphs 43-44, the Court rejected an argument put forward by Besix that where the negative obligation could be regarded as a corollary of the obligation arising from the agreement to participate in submitting a tender, it would be the place of the latter obligation which should be determined. The Court laid emphasis on the wording of Article 5(1) which, in some language versions, specified that the obligation whose place of performance determines which court has jurisdiction is "the obligation which forms the basis of the claim'.

97. At paragraph 49 of its judgment, the Court said:-

"By its very nature, an obligation not to do something, which, like that in question in the main proceedings, consists in an undertaking to act exclusively with a contracting partner and a prohibition restraining those parties from committing themselves to another partner for the purpose of submitting a joint tender for a public contract and which, according to the parties' intention, is applicable without any geographical limit and must therefore be honoured throughout the world - and, in particular, in each of the Contracting States -, is not capable of being identified with a specific place or linked to a court which would be particularly suited to hear and determine the dispute relating to that obligation. By definition, such an undertaking to refrain from doing something in any place whatsoever is not linked to any particular court rather than to any other."

98. At paragraph 55, it said:

" In the light of all the foregoing considerations, the answer to be given to the question referred for a preliminary ruling must be that the special jurisdictional rule in matters relating to a contract laid down in Article 5(1) of the Brussels Convention is not applicable where, as in the present case, the place of performance of the obligation in question cannot be determined because it consists in an undertaking not to do something which is not subject to any geographical limit and is therefore characterised by a multiplicity of places for its performance. In such a case, jurisdiction can be determined only by application of the general criterion laid down in the first paragraph of Article 2 of the Convention".

99. In her judgment in *On the Beach* insofar as she was dealing with the issue of Article 5(1), Laffoy J. referred to the *Handbridge* decision and went on to comment (para 51):

"As regards reliance on Article 5(1), the plaintiff has definitely not discharged that onus. There is no evidence whatsoever that such contractual obligation (i.e. the service to be provided) as the plaintiff may be under to the defendant must be performed in Ireland. On the contrary, the only reasonable inference from the evidence is that it is more likely to be performed in foreign jurisdictions, for example, between Stansted and Bergamo, that in this jurisdiction, say, between Dublin and Cork".

100. With respect, it may be that Laffoy J. erred in this particular aspect insofar as she appears to have been premising her example on the assumption that the relevant contract was a contract for the carriage of the passenger from one place to another; whereas, as both parties before me appeared to agree, the relevant contract appears to be an alleged contract concerning the use of the Ryanair website. Laffoy J. then went on to refer to *Besix* for the proposition that the primary objective of the Regulation was legal certainty and that where the relevant (negative) contractual obligation is to be performed in a number of places, jurisdiction cannot be conferred on the court with whose jurisdiction any one of those places of performance happens to be located. She then said:

"It was submitted on behalf of the defendant that the contractual obligations arising from the Terms of Use contended for by the plaintiff, many of which are prohibitive or restrictive in nature, are not alleged to be confined in effect or operation to the State alone or to persons within the State. While reiterating that the Court is only concerned at this stage with

the jurisdiction issue, I am satisfied that the plaintiff has failed to identify a single place of performance of the contractual obligations it contends for and has failed to establish that Article 5(1) applies."

101. This appears to me to suggest that notwithstanding her possibly erroneous reference to Stansted and Bergamo, she was basing her decision in this regard on *Besix* and on her own view that the plaintiff had failed to identify a single place of performance of the contractual obligations.

102. In Case C-19/09 *Wood Floor Solutions Andreas Domberger GmBh v. Silva Trade SA* [2010] E.C.R I-2121, what was in issue was a commercial agency contract whereby agency services were provided in a number of states but the business activity was largely conducted in one state (Austria). The ECJ identified the place of provision of services as "the place of the main provision of services by the agent", which was to be deduced from the contract itself or, if this were not possible, by the actual performance of the contract, which was a question of fact. The court explained that its approach was consistent with the objectives of proximity (that there be a close link between the contract and the court called upon to hear the case) and predictability (that a defendant should be able to reasonably foresee where he may be sued). Its conclusion was in the following terms (para 43):-

> "Having regard to all the above considerations… the second indent of Article 5(1)(b) of the regulation must be interpreted as meaning that where services are provided in several Member States, the court having jurisdiction to hear and determine all the claims based on the contract is the court within whose jurisdiction the place of the main provision of services is situated. For a commercial agency contract, that place is the place of the main provision of services by the agent, as it appears from the provisions of the contract or, in the absence of such provisions, the actual performance of that contract or, where it cannot be determined on that basis, the place where the agent is domiciled."

103. In *Castlelyons Enterprises Ltd. V EUKOR Car Carriers Inc*. [2018] IECA 98, the Court of Appeal discussed and applied Wood Floor Solutions. The plaintiff company was an Irish-based company while the second defendant, NMT Shipping (the moving party with regard to the jurisdictional issue), was a UK company with its registered office at Southampton in England. The substantive dispute concerned matters related to the carriage of a cargo of plant machinery under a bill of lading from Ireland to the United Arab Emirates. The Court (judgment delivered by Whelan J.) considered the alleged contract to constitute a contract for services within the meaning of Article 7(1)(b) of the Regulation. The Court said at para 46:-

> "The general principle derived from the jurisprudence, including *Industrie Tessili Italiana v. Dunlop AG* (Case C-12/76) [1976] E.C.R. 1473, is that in any case involving breach of contract and whether the claim lies in damages or for a negative declaration, all matters shall be referred to the courts of the place of delivery or provision of the services in question. It is the place of performance of the specific obligation in question and which is the subject matter of the claim rather than the place of performance of the contract which forms the basis of jurisdiction. Where a contract encompasses a complex suite of obligations the court must identify which specific obligations can be said to form the basis of the proceedings having regard to the maxim *accessorium sequitur principale*, in other words

where various obligations are at issue, it will be the principal obligation which will determine its jurisdiction." The court went on to consider the *Wood Floor Solutions* case in detail, quoting extensively from it, as well as from Civil Jurisdiction and Judgments, by Adrian Briggs 6th ed., 2015, where it commented that the court should try to find the "centre of gravity" of the obligation in question. The court concluded that on the facts of the case before it, the actual performance of the constituent elements of the contract on the part of NMT took place in Southampton, and therefore the 'centre of gravity' of this contract was situate in the United Kingdom. It said that "what was required was a narrow focus on the ambit of the obligation assumed by NMT Shipping on foot of its contract with Castlelyons" and that "the only matter of relevance was the place of performance of those narrow set of obligations".

104. It is clear from all of the above that it is necessary to identify with precision the contract in issue or indeed, more precisely, the exact obligation "which forms the basis of the claim" (this being the phrase used by the CJEU in *Besix* at paragraph 44). As Whelan J. said in the Castlelyons case, what is required is:-

> "a narrow focus on the ambit of the obligation assumed by [one party] on foot of its contract with [other party]. The only matter of relevance was the place of performance of those narrow set of obligations".

105. What then is the relevant contract, and what is the obligation "which forms the basis for the claim" in the present case? The parties before me were agreed that the relevant contract is an agreement concerning use of the website, not an agreement for the provision of flight and related services to customers. For example, in the normal course, a customer might use the website without ultimately booking a flight but would still be bound by the Terms of Use while navigating the website. This much seems to be clear, although I am conscious that Laffoy J. appeared to operate from a different premise when she gave her Stansted – Bergamo example in the *On the Beach* case. If I assume that the relevant contract concerns the use of the Ryanair website, the next question is: what is the obligation "which forms the basis of the claim"? It seems to me that, having regard to the language of the Terms of Use on the website itself, the obligation which forms the basis of the claim is best described as follows: an obligation on the user of the Ryanair website to use the website only in accordance with the Terms of Use or, more specifically, an obligation on the user to use the website and/or extract the data only for a private non-commercial purpose. This can also be put phrased negatively as an obligation not to use the website and/or extract the data for a commercial purpose.

106. It is worth pausing to consider certain aspects of the obligation identified above a little further. First, it seems to me that the obligation can be described in language which employs either a positive or negative formulation. The positive formulation at its simplest is "to extract the data only for a private non-commercial purpose", while the negative formulation is "not to extract the data for a commercial purpose". Secondly, the obligation relates not merely to do an "act" (such as manufacturing a computer or shipping a container) but to perform an act with a particular state of mind. The act is the extraction of data from the website; the state of mind is the prohibited "purpose". As such, a private consumer who extracts the data for personal use and possible personal flight booking does not breach the obligation because he or she lacks the prohibited (commercial) purpose, even though he or she engages in the same act as a person or company which extracts the information for the prohibited

(commercial) purpose. It is only if a person or entity extracts the data for the purpose of commercial use that the obligation is breached; therefore, the purpose or state of mind with which the act was done will determine whether or not there was a breach of obligation. Thirdly, if this is correct, the question of *when* the breach of the obligation takes place (in a hypothetical scenario where there is a breach of the obligation) is worth considering; it seems to me that the user must have had the relevant purpose i.e., using the information for a commercial purpose, *at the time of the act* i.e., the act of extracting the data from the website (although this purpose may of course, and likely will, continue in existence for some time).

107. It may be helpful in this regard to draw an analogy with a physical (rather than a website) scenario in order to lay bare my reasoning. Suppose a company chooses to make its flight information available to the public by way of multiple copies of physical documents at a particular location in Ireland and that it provides (for example at that location, by posters on the walls, or stamp on the documents themselves) that the information in the documents may not be used for commercial purposes and must only be used by private consumers. Suppose a person acting on behalf of a rival commercial company goes to the location and takes away a number of copies of the documents with the purpose in mind of giving that information on a commercial basis to potential customers. Suppose further that the rival company subsequently provides that information to potential customers in France. It seems to me that the breach of the obligation would be said to take place at the moment the person takes the information from the location in Ireland because that was the time he or she engaged in the act of taking at the data with the relevant purpose in his or her mind. In any subsequent court proceedings, the evidence that he or she subsequently gave the information to customers in France would be evidence from which his or her purpose at the time of the taking of the information might or would be inferred, but that is not the same thing as saying that the obligation was not breached until the information was furnished to other potential customers.

108. It seems to me also to follow from the above, if correct, that the *location* of the breach of the obligation in the above example would be said to be Ireland, being the place where the information was taken. By analogy, it could be said that as (according to the evidence) Ryanair controls and operates the website in Ireland and hosts the data on its website on servers located in Ireland, and the data is taken from there, the time of the breach of any obligation on the part of a user is the point in time when the user extracts the data with the relevant purpose in mind, and the place of the breach of the obligation is Ireland.

109. This analysis would yield a different conclusion to that reached by Laffoy J. in *Ryanair v On the Beach*. I am, however, bound by that decision unless one of the exceptional situations for departing from precedent applies in accordance with the authorities; *Irish Trust Bank v. Central Bank of Ireland* [1976-7] I.L.R.M. 50; *In Re Worldport Ireland Limited (In Liquidation)* [2005] IEHC 189; *Brady v. D.P.P.* [2010] IEHC 231, *B.N.J.L. v. Minister for Justice, Equality & Law Reform* [2012] IEHC 74, and *Kadri v. Governor of Wheatfield Prison* [2012] IESC 27 applies. The basis for departing from a precedent of a court of equal jurisdiction was set out in *Worldport* as:-

> "where it was clear that the initial decision was not based upon a review of significant relevant authority, where there is a clear error in the judgment, or where the judgment sought to be revisited was delivered a sufficiently lengthy period in the past

so that the jurisprudence of the court in the relevant area might be said to have advanced in the intervening period".

It seems to me that it is important, therefore, to consider whether my analysis is more generally in conformity with the ECJ authorities, in particular *Besix* and *Wood Floor Solutions*, as well as the Supreme Court decision in *Handbridge* and the Court of Appeal decision in *Castlelyons*.

110. On one view, it might be said that the *Wood Floor Solutions* and *Castlelyons* line of authority, which requires the Court to look at the "hub" or "centre of gravity" of services which may be performed in different locations, concerns "positive obligations" and has no application to a situation concerning "negative obligations" such as those which arose in *Besix*. I am not persuaded that matters are as simple as that, however. The characterisation of contractual obligations into "positive" or "negative" may sometimes dissolve into questions of semantics rather than of substance. For example, as noted above, it seems to me that the key obligation "which forms the basis of the claim" in the present case can be expressed either negatively or positively. Further, the obligation in the present case consists, as discussed, of a combination of act and state of mind or purpose; unlike, for example, the type of obligation in the *Besix* case (an obligation not to enter into an agreement with a third party with regard to a particular subject-matter) or the *Handbridge* case (an obligation to supply computer products). There are numerous potential ways of classifying different types of contractual obligation but, having regard to the authorities referred to, I am not convinced that the key issue of relevance to Article 7(1) is whether the obligation is characterised as "positive" or "negative", or any other black-and-white characterisation of any kind, but rather how the obligation should be viewed in light of the underlying Regulation objectives of "proximity" and "predictability" as those terms are deployed in the authorities. In *Besix*, the primary concern of the Court appears to have been to prevent there being a multiplicity of jurisdictions in which the claim might be brought because the obligation was so open-ended and the potential breaches were geographically unlimited. This concern features repeatedly in all of the other authorities discussed, even though they concerned "positive" obligations. It may well be that the type of "negative" obligation in issue in *Besix* is much more likely in the real world to be associated with geographical unpredictability, but it seems to me that the Court's main focus is supposed to be on the objectives of the Regulation rather than a mechanistic application of a positive/negative characterisation of contractual obligations.

111. This problem of a potential multiplicity of geographic locations of breach does not appear to me to arise in the present case if my above analysis is correct in concluding that the breach of the obligation would take place within the confines of the Ryanair website hosted on servers in Ireland.

112. In the circumstances, with the greatest of respect and reluctance, I intend to depart from the reasoning of Laffoy J. in the *On the Beach* case and to conclude that the plaintiff has discharged the burden of proof to show that the case falls within Article 7(1) of the Regulation. It may even be that my decision does not substantially part company with that of Laffoy J. insofar as she was also focused on the issue of whether a single place of breach of obligation could be identified, but in my respectful opinion, appears possibly to have strayed into error in taking as her starting point an assumption that the relevant contract was a contract of carriage of a passenger rather than a contract as to the use of a website.

**The Article 7(2) issue**

113. Article 7 provides that "A person domiciled in a Member State may be

sued in another Member State… (2) in matters relating to tort, delict or quasi-delict, in the courts for the place where the harmful event occurred or may occur". In the present case, the defendant's primary submission was the factual one that it did not access Ryanair's website but I reject this on the basis of the findings of fact I made earlier.

114. In the alternative, the defendant relied upon the decision of Laffoy J. in *On the Beach* for the proposition that Article 7(2) did not apply to this type of scenario. In my view, Laffoy J. merely said that the burden of proof had not been discharged in that particular case but did not rule out the possibility of it being discharged in a different case. She said that the parties had not identified the factual basis of the allegations in tort as pleaded nor whether, if there was tortious activity on the part of the defendant, it flowed from the use of its own website or the plaintiff's website. This conclusion was reached by Laffoy J in circumstances where, she said, the plaintiff had apparently merely recited the torts alleged to have been committed without engaging with the facts to demonstrate that the underlying event(s) had occurred in Ireland; and where the only authority cited by the plaintiff to the Court was a German case concerning trademark infringements via the internet. Laffoy J. said she considered it unnecessary to consider the evidence produced by the defendant that the plaintiff hosted its data in three locations (Dublin, London and Frankfurt) because the plaintiff had not discharged its onus of proof under the sub-Article. In the present case, however, the plaintiff went considerably further on affidavit and in its written submission in seeking to persuade the Court that Article 7(2) applied to each of the torts pleaded in the statement of claim. My attention was drawn to *Case C-523/10 Wintersteiger AG v. Products 4U Sondermaschinenbau GmBH* [2012] ECLI:EU:C:2012:220, *Case C-170/12 Peter Pinckney v KDG Mediatech AG* [2013] ECLI:EU:C:2013:635 and *Case C-441/13 Pez Hejduk v EnergieAgentur.NRW GmbH* [2015] ECLI:EU:C:2015:28. The defendant engaged little, if at all, with the submissions of the plaintiff concerning the interaction of each tort with Article 7(2), perhaps because its main point of defence was based upon its submission on the facts. Nonetheless, despite the fact that the plaintiff did go considerably further than it did in the *On the Beach* case to identify the evidential underpinnings of each tort claims, and to clarify the relationship between these facts and Article 7(2), I am not satisfied that there has been adequate argument before me (from either side) as to how it is alleged that Ireland is the place "where the harmful event occurred or may occur" as that phrase has been interpreted in the European authorities. I therefore decline to reach conclusions on this aspect of matters, unless the parties wish to list this specifically for further hearing on that particular aspect of the case. They may not wish to do so, in light of my findings on the other aspects of the Convention.

**Conclusion**

115. For the above reasons, I proposed to refuse the relief sought in the defendant' motion.

**Glossary**

**Screen Scraping**: a term used to describe the practice of using software to interact with the website of a passenger carrier (generally an airline) and extract or "scrape" that passenger carrier's data (such as price and flight times) and use it for one's own commercial purposes.

**Click Wrapping**: A term used to describe an agreement between parties which is concluded by one of the parties clicking on a button or box on a website in the following

circumstances: (1) there was reasonable and adequate notice of the existence of the terms or conditions of the agreement before the user proceeded to click a particular button; (2) that the full content of the terms or conditions was accessible, for example by hyperlink, before the user proceeded to click the button; and (3) that it was made clear to the user that by clicking a particular button, he or she would be taken to have assented or agreed to those terms or conditions from that point onwards.

**Browse Wrapping**: Where the user of a website is deemed to have accepted the terms of use of a website by using the website, having been reasonably put on notice as to the existence and content of the terms of use.

**Front End of the Ryanair Website**: A term used to describe how an individual using the Ryanair website would normally interact with it i.e. by logging onto the Ryanair homepage and using the Ryanair flight search engine to find a flight and then continuing through the various links and pages of the website until a booking is completed.

**Back End of a website**: A term used to describe a method of access to data on a website via the website which does not involve going through the front-end.

**Navitaire**: A database which contains, *inter alia*, Ryanair's data on prices, flight dates, and flight times.

**API**: An application programming interface; a computer program involved in the communication of information from one location to another.

**The "Ryanair dotRez API"**: The API which acts as the link which between the database on which Ryanair stores this flight information (Navitaire) and the search engine on the Ryanair website engaged with by the user. This API engages another API known as the "Ryanair availability API" in the course of attempting to access the flight database.

**URL**: A Uniform Resource Locator; also known informally as a web address. This is the address which appears in a browser and indicates the website and webpage is currently being accessed.

**IP Address**: A numerical address (e.g. 36.32.155.31) which indicates a general geographic location for a computer (e.g. Dublin Ireland). Knowledge of an IP address and the geographical location to which it corresponds will generally indicate where the computer user transmitting the address is physically located. However, proxies and other software such as virtual private networks (VPNs) can be used to indicate a different IP address, and thus a different geographical location, from where the computer user is actually physically located.

**Web Logs**: A series of log entries, like a journal, giving the viewer an update of when and how a website is interacted with.

**GDS**: A global distribution system for flight times and prices. A GDS provider uses the system to convey flight information from airlines to travel agents via a GDS computer terminal physically

on the travel agent's premises. Examples are Sabre, Travelport and Amadeus.

**Skyspeed**: The online booking software used by Ryanair to store information related to all bookings of Ryanair flights howsoever made, whether through a GDS terminal, the Ryanair website or the Ryanair call centre. Skyspeed stores, *inter alia*, the following important information: the passenger's name, the credit card details used, the contact email given during the booking, the IP address of whoever booked the flight, and the price of the flight. Skyspeed also records the method of booking under the title "original agent". The evidence was that if a flight is booked through the Ryanair website, the original agent will be the "Ryanair dotRez API" whereas if a flight is booked through a GDS provider, say Travelport, it will read "TVLPORT".

Back to top of document