```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
        RYANAIR DAC,
 4                                      :    CIVIL ACTION
                     Plaintiff,         :
 5      v                               :
                                        :
 6      BOOKING HOLDINGS INC., BOOKING.COM   :
        B.V., KAYAK SOFTWARE CORPORATION,    :
 7      PRICELINE.COM LLC, and AGODA    :
        COMPANY PTE. LTD.,              :
 8                                      :    NO. 20-1191-LPS
                     Defendants.        :
 9                              - - -

10                        Wilmington, Delaware
                          Thursday, April 15, 2021
11                        Telephonic Oral Argument

12                              - - -

13      BEFORE:       HONORABLE LEONARD P. STARK, Chief Judge

14      APPEARANCES:                   - - -

15              OFFIT KURMAN, P.A.
                BY:  R. TOUHEY MYER, ESQ.
16
                     and
17
                HOLLAND & KNIGHT LLP
18              BY:  R. DAVID DONOGHUE, ESQ.
                     LISA A. KPOR, ESQ., and
19                   ANTHONY J. FUGA, ESQ.,
                     (Chicago, Illinois)
20
                          Counsel for Plaintiff
21

22              RICHARDS, LAYTON & FINGER, P.A
                BY:  JEFFREY L. MOYER, ESQ., and
23                   VALERIE A. CARAS, ESQ.

24                   and

25                                    Brian P. Gaffigan
                                      Official Court Reporter
```

1    APPEARANCES:   (Continued)

2

3               COOLEY LLP
                BY:   JOHN H. HEMANN, ESQ.,
4                     KATHLEEN HARTNETT, ESQ.,
                      LAUREN POMEROY, ESQ., and
5                     DARINA SHTRAKHMAN, ESQ.
                      (San Francisco, California)
6
                            Counsel for Defendants
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22                         - oOo -

23                  P R O C E E D I N G S

24            (REPORTER'S NOTE:  The following telephonic oral

25    argument was held remotely, beginning at 10:10 a.m.)

```
 1                    THE COURT:  Good morning, everybody.  This is
 2    Judge Stark.  Who is there for the plaintiff, please?
 3                    MR. MYER:  Good morning, Your Honor.  This is
 4    Touhey Myer from Offit Kurman from Delaware for plaintiff
 5    Ryanair.  Also on the line with me today is my co-counsel,
 6    Lisa Kpor, David Donoghue, and Anthony Fuga from Holland &
 7    Knight in Chicago.
 8                    THE COURT:  Thank you very much.
 9                    And who is there for defendants, please?
10                    MR. MOYER:  Good morning, Your Honor.  It's Jeff
11    Moyer from Richards Layton & Finger on behalf of defendants.
12    Your Honor, this morning I have with me my colleague from my
13    firm, Valerie Caras; and I'd like to introduce my co-counsel
14    this morning.  I have John Hemann, Kathleen Hartnett, Laura
15    Pomeroy, and Darina Shtrakhman from the Cooley firm.  In
16    addition, we have in-house counsel, Phyllis Wallitt from
17    Booking Holdings Inc., and Andrew Smith from Kayak Software
18    Corp.
19                    THE COURT:  Okay.  Thank you very much.  And
20    good morning to all of you.
21                    My court reporter, of course, is on the line.
22    For the record, it is my case of Ryanair DAC vs. Booking
23    Holdings Inc., et al, Civil Action No. 20-1191-LPS.
24                    This is the time we set for argument on the
25    defendants' motion, so we will hear from defendants first,
```

```
 1   please.
 2              MR. MOYER:  Your Honor --
 3              MS. HARTNETT:  Good morning, Your Honor.  Oh,
 4   thank you.
 5              MR. MOYER:  Go ahead.
 6              THE COURT:  Good morning.  Whoever is going to
 7   speak, let me know who you are, please.
 8              MS. HARTNESS:  Of course, Your Honor.  Hi, I'm
 9   Kathleen Hartnett from Cooley.  And I'm appearing today on
10   behalf of the defendants.
11              THE COURT:  Okay.  Thank you.  Good morning.  Go
12   ahead.
13              MS. HARTNESS:  Thank you.  We appreciate the
14   opportunity to be here before you today, and I look forward
15   to answering the questions you have.
16              As you know, we're here today on defendants'
17   motion to dismiss the lawsuit or, in the alternative, to stay.
18              There are two independent grounds for dismissal:
19   the doctrine of forum non conveniens and Rule 12(b)(6).
20   Specifically, the non-extraterritoriality of the Computer
21   Fraud and Abuse Act.  Our stay request is in the alternative.
22              Absent any initial questions from the Court, I
23   will first provide some key points of background based on
24   the complaint and the undisputed record submitted to the
25   Court in support of the forum non conveniens motion.  I will
```

1    then address why our motion to dismiss should be granted

2    first based on forum non conveniens and then under 12(b)(6).

3    And finally, I will turn to the alternative stay request.

4              THE COURT:  You can certainly proceed that way.

5    I may interrupt you with questions, but go right ahead at

6    this point.

7              MS. HARTNESS:  Absolutely.  So just as the few

8    key points of background.

9              Plaintiff Ryanair is a low cost, highly

10   profitable European airline based in Ireland.  It flies only

11   in Europe and North Africa.  It has no flights to any U.S.

12   location either within the U.S. or internationally, and it

13   has no operations in the United States.

14             Defendants are four online travel platforms and

15   their parent, Booking Holdings.  Ryanair seeks to hold

16   defendants liable under the Computer Fraud and Abuse Act,

17   which I will refer to as the CFA, for what Ryanair calls

18   screenscraping.  And by this, Ryanair is referring to taking

19   publicly accessible material from a website and using it in

20   alleged violation of the website terms of use and subsequent

21   letters sent by Ryanair.

22             Whether screenscraping of public information

23   from a website violates the CFAA is a question currently

24   before the Supreme Court, and I'll discuss that in a moment.

25             Importantly, the only connection between this

1    lawsuit and Delaware is that three of the five defendants

2    are incorporated here.  No defendant has operations in

3    Delaware, and the holdings company, of course, is a holdings

4    company, not an operating company.

5              One of the defendants, Booking.com is a Dutch

6    company.  And another foreign defendant, Agoda, is

7    Singaporean.

8              The three U.S. companies operate out of

9    Connecticut, and that is Priceline, Kayak, and the holdings

10   company.

11             There has been no evidence identified as being

12   in Delaware, no witnesses, no allegedly intruding computers,

13   no allegedly affected customers.

14             Another point of context is the central target

15   of this lawsuit is Booking.com, the Dutch company.  Ryanair

16   has already sued Booking.com in Ireland for the same nucleus

17   of conduct, yet Ryanair has let that lawsuit sit dormant at

18   this point for almost a year and-a-half.

19             Booking.com is a highly successful

20   European-based hotel booking website that in 2019 got into

21   the flight itinerary market.  Ryanair bristled at this and

22   sued Booking.com in Ireland for screenscraping.

23             And this is all part of the complaint, Your

24   Honor.  You can see this in Exhibit B to the complaint which

25   is a letter from Ryanair to Booking.com listing all the ways

1    in which Ryanair believes screenscraping violates Irish law.

2            When Booking.com did not capitulate to Ryanair's

3    demand, rather than litigate the Irish case, what Ryanair

4    did was then expedite its threats by attacking Booking.com's

5    parent and the other travel platform subsidiaries within

6    the Booking Holdings.  And this can be seen in Exhibit C

7    to the complaint where Ryanair claimed that all of these

8    entities, which it collectively calls "Booking", are

9    violating the CFAA by violating Ryanair's website terms of

10   use and threatening to bring a U.S. suit, and so that is

11   when this lawsuit followed.

12            I just want to emphasize to show the European

13   nature of this dispute, and that the U.S. aspect is

14   incidental at best.  Since 2019, Booking.com, the Dutch

15   company, has sold 55,000 Ryanair itineraries.  And this is

16   in the declarations that we submitted to support our forum

17   non conveniens motion.

18            We have 55,000 Ryanair itineraries sold by

19   Booking.com in 2019.  And this makes sense because

20   Booking.com and Ryanair are both European based and Ryanair

21   flies only in Europe and North Africa.

22            In contrast, Priceline, the American company,

23   has sold only 2,000 Ryanair itineraries in that time period.

24   And that is less than .01 percent of Priceline tickets sold

25   in that time period.

1          You also have Agoda, the Singaporean company,

2   selling only 95 Ryanair itineraries, none to U.S. customers.

3          Of course, the other two defendants don't sell

4   flight itineraries.

5          So these numbers are really telling.  There are

6   55,000 Ryanair itineraries from the European defendant

7   already sued in Ireland, and you have the 2,000 within one

8   of the U.S. defendants.  So this is just a European-based

9   dispute, and it's about Ryanair's desire to eliminate

10  perceived competition from Booking.com.

11          THE COURT:  All right.  Let's talk about that.

12          Is the CFAA limited to sales transactions or

13  does it also apply to access and interception of data and

14  then transmission of data?

15          MS. HARTNESS:  Your Honor, that's a good

16  question.  And that the focus of the CFAA, the wrong being

17  addressed by it is an access.  In this case, what Ryanair is

18  alleging is either unauthorized access, that defendant did

19  not have authority to be on the system at all or exceeding

20  whatever authorized access it had.  So those are its two

21  core theories of a CFAA violation.

22          And those, of course, occur where the access

23  takes place.  And in this case, that would be Ireland where

24  the, where the Ryanair computers are located, the servers

25  that are being allegedly unauthorized -- subject to

1    unauthorized access.

2              THE COURT:  So if that is the case, at minimum

3    I think you are conceding the sales really aren't the issue;

4    right?  It's the alleged breach that access that either

5    exceeded what was authorized or was entirely unauthorized,

6    it's the access that this case is about.  It's not about

7    sales, is it?

8              MS. HARTNESS:  Your Honor, the access is the

9    ultimate, correct, the ultimate wrong that the CFAA would

10   seek to address.  I think the point about the sales is

11   simply being representative of how much, if at all, there is

12   access happening, and from where.

13             And so to the extent, for the forum non conveniens

14   aspect of our motion, the question is, is there actually --

15   is this principally a dispute that belongs here or somewhere

16   else?  And I think our point is that because the computer that

17   is being allegedly subject to the unlawful access is in

18   Ireland, and because the large proportion of any such access

19   is not happening from any United-States-based company, that

20   this is a dispute that properly should be subject to the

21   continued litigation in Ireland rather than duplicated here.

22             THE COURT:  All right.  I understand all that,

23   but if the plaintiff, let's just say evidence ultimately --

24   I know we're not about evidence today, we're really about

25   allegations, but if -- let's even say it's a different case.

1    If somebody was shown to be masterminding unauthorized

2    access of a computer in Ireland but they're doing it here in

3    Delaware, it's me, let's say.  I'm sitting here in Delaware

4    and I'm unauthorized and/or exceeding my authorization

5    accessing a computer in Ireland.  That's a U.S. case, is

6    it not?  And a case that one would presume, being alleged in

7    violation of a U.S. statute, would be litigated in the U.S.

8    Am I right about that?

9              MS. HARTNESS:  Your Honor, you're -- I mean

10   that is obviously, as you said, a totally different case,

11   but yes, we would have to look and see if, by some chance,

12   all of the evidence was in Ireland and if the person in

13   Delaware sitting there was the only connection, but that

14   would seem to be a weak case for, if at all, a forum non

15   conveniens argument.  It will be a different case with

16   respect to the potential extraterritorial application of

17   the CFAA.

18             So for both of our motions, that would be

19   something that's likely a dispositive distinction from what

20   we have here.

21             THE COURT:  So I should -- you think I should

22   read this complaint, turning to this case today, not my fake

23   case, as one that doesn't make any plausible allegations

24   about defendants doing things in the U.S. to obtain the

25   access in Ireland.  That's the way I should read this

1    complaint?

2           MS. HARTNESS:   I do think that is the way you

3    should read this complaint.   And it's the correct way to

4    read it.   Because, you know, it's at the most conclusory

5    level where the complaint attempts to connect it to the

6    United States.

7           You have paragraph 25, this is at, where it

8    says that defendants have committed one or more acts alleged

9    in this complaint within the state and district.   So just a

10   very generalized, nonspecific allegation.

11          And then you have paragraph 74, which is a

12   information and belief allegation, not specific to any

13   defendants, never mind a U.S. defendant, that defendants

14   used and/or procured, either directly or indirectly,

15   screenscrape content.

16          So that is not an allegation of some domestic

17   access of a website abroad.

18          And this would stand in contrast, for example,

19   to the *Apple* case that is cited by Ryanair.   There, you have

20   an allegation that Apple from the United States was kind of

21   propagating computer updates abroad to computers abroad, and

22   so that would be a contrasting situation.

23          So the example of the court in *Expedia*, the

24   Expedia case that Ryanair brought there, where the court

25   was discussing the hypothetical of, you know, you hacking

1    into your neighbor's computer through a server in Ireland or

2    somewhere else, again, with a domestic nexus.

3              Here, what we have is a complaint.  And there

4    is a reason for it, which is that Ryanair is able to

5    determine who is accessing its website.  We have attached

6    to the declaration of our Irish counsel that we submitted

7    in support of our motion an opinion of the Irish courts

8    in another case called Vola.  Vola is a Romanian travel

9    website, and Ryanair is aggressively pursuing litigation

10   against that website in Ireland.  And we can see from that

11   case that Ryanair is able to determine who is accessing

12   its website when it wants to.

13             Here, and this is kind of the final point of

14   context, in actuality, they can't plead the defendants are

15   doing this because in reality, if anyone is doing it,

16   it's third-party aggregators from which of the defendants,

17   some of them purchase inventory, and it's those entities,

18   if anyone, that are engaging in access of Ryanair's website.

19             And so the reason why there is an absence of

20   allegations in the complaint about the actual access of

21   its website is that were such allegations to be made, it

22   would be clear that those are allegations involving a U.K.,

23   a Singaporean, and a Swedish aggregation companies.

24             And just for kind of completeness, the Swedish

25   company actually has a Finish subsidiary that has also been

1    sued already in Ireland by Ryanair.

2            So this dispute has already been brought in

3    Ireland against Booking.com and one of the aggregators.

4    It is kind of sitting there now, and Ryanair is now trying

5    to allege U.S. claims as well to assert further pressure,

6    but I would just submit to you that the complaint is quite

7    cursory and incomplete because if you were to have the

8    whole story actually pled, it would become even more evident

9    that this is a forum dispute.

10            THE COURT:  Let's talk about the terms of use.

11    There seems to be a dispute as to whether that is central

12    to the plaintiff's allegations or arguably irrelevant in

13    the sense of the plaintiff says that if we struck all of

14    the allegations in the complaint that relate to the alleged

15    violation of the terms of use, they would still state a

16    complaint.  Are they wrong about that?

17            MS. HARTNESS:  They're completely wrong about

18    that.  The terms of use -- and I think this is something

19    that, you know, because the terms of use are governed by

20    Irish law, we understand why Ryanair is now trying to

21    distance from them.

22            But if Your Honor, you know, both looks at the

23    complaint itself, which is infused with -- so the entire

24    idea of the CFAA violation is that you do not have

25    authorization or you exceed whatever authorization you have.

1    The whole theory of the case here is that users of the

2    Ryanair website were given some authorization by the terms

3    of use and, according to Ryanair, defendants exceeded that

4    authorization or violated it by doing the actions that

5    Ryanair alleges.  So the terms of use provide the source

6    of the authorization or the lack thereafter.

7              And then there are these letters that Ryanair

8    sent afterwards underscoring to the defendants its belief

9    that the terms of use prohibited this conduct and also

10   saying to stay off the website, you know, through a letter

11   as well -- a letter flowing from what Ryanair claims are

12   the rights it has from the terms of use.

13             So it cannot be more clear from both the

14   letters that are attached to Ryanair's complaint which are

15   completely framed around the terms of use and the complaint

16   itself, which, you know, you can see it yourself.  But

17   paragraphs 41 to 64 discuss the terms of use at length.

18   They then have central allegations, like in paragraphs

19   73 and 99 are ones that basically say that the lack of

20   authorization is flowing from the terms of use.  And then

21   you have paragraphs 103 and 104 saying that the terms of

22   use are violated.

23             So there is other stuff in the complaint that is

24   all either background or sort of screenshots leading up to

25   the punchline, which is that the terms of use do not permit

1    this, but this is a case about whether website terms of use

2    authorize this and whether they're permitted to do so under

3    the CFAA.

4              THE COURT:   Could the letters be a basis for

5    stating a CFAA complaint independent of the terms of use or

6    do you say as a matter of law it's not possible?

7              MS. HARTNESS:   So I think from our perspective

8    that is not possible.   That was not in any way the basis of

9    our 12(b)(6) motion yet.   I think we reserve the right to

10   bring a motion for judgment on the pleadings or another

11   motion at the appropriate time.

12             This exactly the question that the Supreme Court

13   may ultimately consider in the *LinkedIn v hiQ* case.   And

14   there, you had both -- it's almost -- other than some

15   factual differences, it's the same exact scenario, which is

16   a party being told to stay off the website through terms of

17   use, and that it's being told through a letter, too; and the

18   question being whether that is actually something that can a

19   party essentially set up a CFAA violation by another party

20   that way.

21             So I think we would resist the notion that the

22   letter can be a basis for a CFAA violation, but that is not

23   precisely the basis of our motion today.

24             THE COURT:   Okay.   Thank you.

25             MS. HARTNESS:   But just, you know, going back,

1     I do think, and I'm sure you looked at it, but just the

2     letters setting up the dispute which quotes from the terms

3     of use at length, and the letters are not some independent

4     source of law they're seeking to use against defendants

5     but rather they are marshaling the terms of use to explain

6     why they believe that the defendants should stay off and,

7     therefore, it's just hard to conceive of what this case

8     would be if the terms of use were stripped from the case

9     because that is where it all begins and ends.

10                    THE COURT:  Let me just -- I know it's going

11    to come up.  The plaintiff at the very end, maybe their

12    last line of their brief, ask for leave to amend, if I'm

13    potentially persuaded on some of your points about I think

14    the CFAA, as I don't see how an amendment would deal with

15    you stay request or the forum non conveniens point, but

16    we're mostly focused so far on this discussion on the CFAA.

17                    Do the defendants oppose amendment on the

18    assumption, just an assumption for the moment, that you

19    don't persuade me on the stay or the forum non conveniens?

20    In that world, what is your position on whether what some

21    of your arguments are, these allegations are conclusory,

22    they're cursory, they're incomplete.  Do you oppose me

23    giving the plaintiff a chance to try again and state a

24    claim?

25                    MS. HARTNESS:  Thank you, Your Honor.  We don't

1   think an amendment is appropriate or should be allowed here

2   because the complaint has been artfully pled in the first

3   place to try to avoid asserting what they could have

4   asserted before, more specifics about who is accessing their

5   website, if anyone.

6           And we would also submit the forum non

7   conveniens presentation that we have made to the Court

8   is essentially unrebutted.  We've explained that these

9   aggregators, if anyone, are accessing Ryanair's website, and

10  so there had been no responsive submission by Ryanair.  It

11  had a chance to do so.  And so I think that, too, shows the

12  futility.  So we would submit in this, with the benefit of

13  that additional context, we would submit that allowing

14  amendment would not be appropriate.

15          THE COURT:  Well, why don't we talk a little

16  more then about forum non conveniens.  It's a burden on you,

17  and I think it's a fairly significant burden.

18          What have you shown me to show me that the

19  remedy in the Irish court would be adequate?

20          MS. HARTNESS:  Thank you, Your Honor.  And

21  we are familiar with your prior rulings in this area and

22  appreciate that it is our burden to make the forum non

23  conveniens showing, and also that it's a weighty one.

24          I'm familiar with we both have to show the

25  adequacy of the alternative forum and then convince you

1     that the public and private interest factors outweigh the

2     plaintiff's forum choice, so we appreciate that.

3               In terms of adequate forum, I think we have

4     clearly made that showing.  To be clear, the forum non

5     conveniens is not a doctrine to say get rid of this case

6     and they can't bring it anywhere.  It's just about what

7     forum is appropriate.

8               And here, they've actually brought the case in

9     Ireland.  Now, it's not -- they've not pursued it, so it's

10    not like they're saying that they have come to a point of

11    achieving their remedy, but we have unrebutted affidavits

12    from our Irish counsel as well as all the defendants before

13    the Court, but we have their other complaint, and that is

14    back to their own exhibit to the complaint, Exhibit B, which

15    is a letter from Ryanair to Booking.com at the same time

16    that they were filing that initial suit setting forth all

17    the ways in which screenscraping allegedly violates Irish law.

18              And so, again, that is their allegations.  That

19    hasn't been litigated yet in Ireland.  But this letter

20    itself is full of explanation from Ryanair itself as to how

21    the conduct, the conduct has a remedy available in Ireland

22    with emphasis, I should say, in that letter about how Irish

23    courts have jurisdiction over all these actions under its

24    own terms of use.

25              So I think Exhibit B to the complaint is --

1              THE COURT:  Okay.  But I can see how that seems to

2    be an entirely plausible reading of their conduct and whether

3    or not Ireland is an adequate forum with an adequate remedy,

4    but it doesn't seem to me that it's the only reading.  They

5    only sued one of the five defendants in Ireland and, as you

6    say, the case for whatever reason hasn't progressed.

7              Isn't it a plausible reading of all this that

8    rather than trying to abuse your client, they made a

9    determination that they can't get an adequate remedy in

10   Ireland and they found another proper forum which is this

11   court?

12             MS. HARTNESS:  Your Honor, I actually don't

13   think that that is the right kind of looking at both the

14   series of actions in our case, including this, filing

15   this suit, letting it sit, and then coming to bring this

16   additional suit and asking us basically to kind of settle

17   again, and we just have two suits of the pressure rather

18   than one.

19             So I don't think there is any reason to believe

20   that they have any lack of confidence in their Irish theory

21   that they set forth in this letter to Booking.com.  But I do

22   think that the Vola case, which again is submitted as an

23   exhibit to our Irish counsel declaration -- so this is ECF

24   17, and there is an exhibit there which is a somewhat long

25   decision of the Irish court, but I think that actually

1    importantly shows, and this Vola again is a Romanian travel

2    website, so it's again the Booking.com of Romania or it's

3    an online travel agency in Romania.  And there, that is a

4    jurisdictional ruling that we submitted where they were able

5    to -- Ryanair was able to bring this Romanian travel agent

6    into an Irish court and that under similar claims that it

7    was threatening again Booking.com and it is now actively

8    litigating that case in Ireland.  So they have jurisdiction

9    and now it's going through litigation.

10            So it could easily be doing the same thing for

11   us.  There is no, nothing in the record for us to discern

12   that Booking -- sorry, that Ryanair lacks confidence in its

13   Irish theories.  And, moreover, it's, you know, Vola is not

14   alone.  Ryanair has not -- Ryanair has sued other defendants

15   in Ireland for screenscraping.

16            So I think what we have here is a -- this is

17   not a situation like some of the ones in the cases you

18   faced where we -- you have previously faced where you are

19   concerned that there is that corpus that is actually just

20   not doable or that there is some reason to believe there is

21   not a cause of action available.

22            Here, defendants have acceded to that forum.

23   They said that they will be amenable to appear in the Irish

24   forum if Ryanair decides that it needs to add additional

25   defendants from this dispute to the Booking.com defendant,

1    but there is no reason to believe from the record that

2    Ryanair will not be able to get any relief it needs in the

3    Irish court system which has taken jurisdiction over a

4    case just like this.

5              THE COURT:  I want to make sure on the consent

6    point that this is very clear.  If I were to dismiss the

7    action here, you're representing on behalf of all five

8    defendants named here, they will fully consent to jurisdiction

9    in the Irish court; right?

10             MS. HARTNESS:  Yes, Your Honor.  What I think

11   we've said, and we have the declaration from our Irish

12   counsel to put this properly.  But he explained the way that

13   process would issue, to serve the foreign defendants, and

14   we will not resist the jurisdiction of the Court if we're

15   properly served.

16             We may make -- there could be a motion to

17   dismiss or for other grounds, but these defendants, for this

18   specific dispute, will not revisit the jurisdiction of the

19   Irish court, if they're properly served.

20             THE COURT:  Okay.  And that is contingent on

21   this case being dismissed; right?

22             MS. HARTNESS:  Correct, yes.

23             THE COURT:  Okay.

24             MS. HARTNESS:  And the reason for that is simply

25   we don't -- you know, Booking.com has been sued in Ireland.

1    Apparently, the parties have a dispute.  And our view is

2    this should be proceeding in one forum, not in two forums,

3    particularly where ongoing litigation of the matter in two

4    forums, were that to happen, could lead to conflicting

5    rulings, including about the meaning of the terms of use and

6    other issues.

7         And so, again, just like Ryanair is able to do

8    in its ongoing dispute with Vola, we submit the right

9    answer here is to just let it actually litigate the case it

10   initiated in the Irish courts and where there is no evidence

11   that, or any reason to believe on the record that it cannot

12   do that.

13        So beyond showing adequacy of the forum, which I

14   believe we have shown here, and it is distinguishable from

15   the other situations where a forum is not adequate, the

16   next step is to determine the amount of deference due to

17   Ryanair's choice of forum.

18        And, you know, you are no doubt familiar with

19   the Third Circuit case law, including the more recent case

20   decision in the *Wilmot* case, that makes clear the foreign

21   plaintiff's choice of forum is entitled to little deference,

22   particularly whereas here the alleged computer intrusion

23   happened abroad.

24        Now, that doesn't mean that Delaware does not

25   have an interest in the activities of corporations

1    incorporated here, it just means there is little deference

2    to the forum choice in this situation.  There is, under

3    the case law, a doctrine where plaintiff can then make a

4    strong showing of convenience to bolster their otherwise

5    low deference given to their forum.  And there is no such

6    showing made here by Ryanair.  They've identified no

7    relevant evidence, witnesses, or activities in Delaware.

8              And then that, of course, brings us to the

9    private and public factors and figure out whether they

10   outweigh any deference due to the plaintiff's forum choice.

11             Here, we would submit, and I won't walk through

12   all of them, but of course I'm happy to answer any questions

13   on the undisputed record.

14             And, again, our declarations have not been

15   disputed here, that the public and private factors all point

16   to Ireland.

17             For the private factors, the key question is

18   where is the evidence?  Where will it be more convenient to

19   litigate?  And this is where the record shows that there

20   are, again, no witnesses or evidence in Delaware.  The

21   allegedly intruded computers are in Ireland.  The plaintiff

22   is in Ireland, and the key defendants and third parties are

23   all foreign and more accessible to Ireland than to Delaware.

24   And, of course, the main target of the dispute, Booking.com,

25   which is the one that is, you know, allegedly making the

1   most use of Ryanair's website, is a Dutch company.   It's

2   already been sued in Ireland.

3          I would also just flag, this is maybe a minor

4   point, but one of the American defendants, Kayak actually

5   has, as its declaration shows, the relevant witnesses would

6   be abroad.   So it's not even like there is some nucleus of

7   relevant witnesses here in the U.S. from the U.S. companies.

8   Even the U.S. companies' witnesses point in international

9   direction, generally.

10          And then just turning to the public factors.

11   The key question there is whether it makes sense to burden

12   the Delaware courts with this dispute when it could be heard

13   in Ireland.   And that is, of course, not a judgment whether

14   this court is efficient or competent.   It's whether there is

15   a sufficient connection between this dispute and Delaware to

16   keep it here as opposed to Ireland.

17          And for the reasons we have detailed in our

18   brief and discussed today, here, Ireland is where it makes

19   sense to have this litigation.   There is no connection to

20   Delaware other than the state of incorporation.   And the

21   Third Circuit has repeatedly affirmed forum non conveniens

22   dismissals where the locus of the alleged conduct was

23   foreign and the only connection is Delaware was the state of

24   incorporation.

25          And I would point you to the *Dahl*, D-a-h-l, and

1    the *Wilmot* case in the Third Circuit as being specific to

2    that point of the only tie being the state of incorporation.

3    But I --

4              THE COURT:  Is it fair for me to consider that

5    I think it's three of the defendants are Delaware entities,

6    including I guess the parent holding company.  Those three

7    entities chose to organize themselves under Delaware law,

8    and you're clearly familiar with the many cases not just

9    from me but from others on this court.

10             It's difficult, even when you are just trying

11   to transfer venue, much less actually dismiss a case, to

12   show that when you choose to organize under Delaware laws,

13   defending your actions in a Delaware court is inconvenient

14   to you.

15             I guess the questions are:  Isn't that all a

16   fair part of the analysis?  And what have you shown that

17   should lead me to think it really would be inconvenient to

18   the Delaware entities, at least the Delaware defendants to

19   litigate this case here?

20             MS. HARTNESS:  No, Your Honor.  We understand

21   that and recognize, you know, the points you made in your

22   prior rulings, and they're fair points, which is that the

23   company is choosing to incorporate in Delaware.  That's not

24   irrelevant.  That is important.  And the State of Delaware

25   does have an interest in policing its incorporated entities.

1          So I think it's not saying there is a zero

2    interest in that.  It's really when it's the only connection

3    is the place of incorporation, that's where, you know, the

4    Third Circuit has emphasized this in an older case, the *Dahl*

5    case from 1990, and that is where the Third Circuit said the

6    only contact Delaware has with this case is the defendant's

7    state of incorporation.  And they then said that the

8    commitment of, you know, Delaware time and resources is not

9    justified.

10          And then that much more recently in the *Wilmot*

11    case, that was from 2017.  There, again, the Third Circuit

12    emphasized in affirming the forum non conveniens dismissal

13    that the only connection to Delaware is that it's the place

14    of incorporation.

15          Now, you're right, that is one point, but then

16    the question is how inconvenient is this?  And here, I think

17    what is important, the record really does show that it's

18    going to involve a lot of -- to really litigate this dispute

19    in Europe is going to be far more convenient, far easier

20    than do it here in the United States, especially when you

21    have three foreign aggregators that are going to be a source

22    of information, when you are going to have the remaining of

23    the defendants is the "booking" defendant where even the

24    American company Kayak has its witnesses that are relevant

25    in Europe.

1                      So we agree at that point we need to show the

2      burden.  And I think what we have shown and what is really

3      undisputed from the record is that there is going to be

4      very little, if any, evidence that is available in the

5      United States that is relevant to this dispute.  And the

6      vast bulk of evidence will be available more easily to

7      the Irish court, either because of the processes that are

8      available within the European Union or because the computers

9      themselves and the parties -- of the parties here, the

10     plaintiff is in Ireland and it's more convenient to handle

11     that in the jurisdiction rather than to have to bring that

12     all into a U.S. court.

13                      THE COURT:  I think --

14                      MS. HARTNESS:  And again --

15                      THE COURT:  I think what the plaintiff is saying

16     is they have sued the defendants, they've sued you.  They

17     don't buy your denial that you had anything to do with the

18     alleged screenscraping by the third-party aggregators, and

19     they want your evidence.  It could turn out, you know, if

20     your denials are correct, maybe you don't have any evidence;

21     right?  Maybe there really is no evidence that these

22     defendants in front of me today in any way encouraged,

23     authorized, I don't know, benefited from whatever the

24     third-party aggregators did.

25                      But even that absence of evidence is what the

1   plaintiff I think is saying this case is about.  They want

2   to know what is on your computers.  They want to know, you

3   know, what correspondence and interactions you had with the

4   third-party aggregators.  And that is all U.S. focused, they

5   would say.

6             Why, at this very early stage, is that not the

7   way I should be thinking about this forum non conveniens

8   analysis?

9             MS. HARTNESS:  Well, Your Honor, it's because of

10  the record that we have provided.  You know, I appreciate --

11  that they may speculate that, or -- and I think speculate,

12  it is probably less than that.  Because, again, I appreciate

13  the Vola decision that we attached to our Irish counsel's

14  declaration is lengthy, but why it is so lengthy is it

15  contains extensive information of a Ryanair witness trying

16  to show how they were able to connect the dots between the

17  defendant in that case using the website in Ireland.

18            And so I think our point is that they can't

19  simply kind of do a bare bones complaint speculating that

20  defendants have had some involvement or connection to the

21  alleged access and then in the face of our evidentiary

22  presentation, which we have tried to keep, you know, as

23  brief as appropriate but we also in detail explain for each

24  of our five defendants where the relevant evidence would be

25  and what the relevant -- you know, that these other third

1    parties are actually the ones at issue, if anything.

2              And so in response to that evidentiary record,

3    which we take our burden seriously, there has been nothing

4    in respond to that.  And we know from the Vola lengthy

5    discussion of the evidence that Ryanair is able to marshal

6    when it wants to in Vola, that it could have done something

7    like that if it really had something to connect us to the

8    dispute.

9              So, again, we're not saying we have to

10   litigate the entire matter through the forum non conveniens

11   evidentiary record, which is supposed to be, as the cases we

12   cite, is less.  It's not supposed to be a full blown trial,

13   but the point is we have more than shown the European nexus

14   and the Irish connection of this dispute, and the lack of

15   connection to the U.S. through our declarations, and they

16   have had nothing in response other than continuing to say

17   that they would like to pursue it here.

18             So I think it is that record we would submit

19   shows the burden and shows there is basically just no basis

20   for having this case proceed here when there is already a

21   case somewhere else where it could be mitigated much more

22   conveniently.

23             THE COURT:  All right.  I want to make sure to

24   save you sufficient time for rebuttal, but I want to ask you

25   two more questions.

1          MS. HARTNESS:  Sure.

2          THE COURT:  On the stay point, it would seem a

3     reasonable prediction that we're going to hear from the

4     Supreme Court within no more than the next six weeks on the

5     first of the cases, the one that was argued.  It would seem

6     to me that before I'm going to have to make a decision that,

7     you know, you couldn't ask for relief from before this case

8     goes very far, we're going to hear at least something from

9     the Supreme Court.  Is a stay really what I should consider

10    doing at this point?

11         MS. HARTNESS:  Your Honor, you also could just

12    await the Supreme Court's guidance, and we could submit a

13    supplemental brief then without a formal stay of the case.

14         I think our client's position, though, is it

15    would be unfair to subject us to beginning discovery and

16    just kind of undertaking this case in earnest both because

17    of the forum non conveniens point, there is already a case

18    where we're subject to suit on this, but more importantly,

19    without understanding kind of what the metes and bounds are

20    of the CFAA claim, and so I think you could properly discern

21    that the current claim before the Court on the *Van Buren*

22    case is the exceeds authorized access theory.

23         There is also the *LinkedIn* case waiting in the

24    wings which is being held by the Supreme Court until it

25    resolves the *Van Buren* case.  At that point, the Court will

```
1    either grant LinkedIn or vacate it back to the Court of

2    Appeals to apply whatever the teachings of Van Buren are.

3    But regardless, you know, whatever happens in that case will

4    help us understand what the scope of a CFAA claim is.

5              So, yes, we respectfully submit to you whatever

6    makes more sense in order to inform yourself of that dispute

7    will allow the parties to have that shape our initial

8    motions without having us to have to basically litigate a

9    case that may not need to be litigated if the Supreme Court

10   were to, for example, as the LinkedIn case presents, a

11   question of whether website terms of use can be the basis

12   for a CFAA claim.

13             So I think we will know more after Van Buren

14   issues how decisive it is with respect to the specifics of

15   our case, but we would respectfully submit that the litigation

16   in this case should not proceed in earnest before we have

17   that guidance and are able to shape our initial motions

18   accordingly.

19             THE COURT:  All right.  And then one more.

20             In arguing that the Irish court is an adequate

21   forum, you also take the view that potentially there may be

22   some way that plaintiff could put the CFAA claim in front

23   of the Irish court?  You know, I don't know if they have

24   something like supplemental jurisdiction or something like

25   that.  Is that not part of your argument as to why the Irish
```

1    court is adequate?

2              MS. HARTNESS:  Your Honor, that is not part of

3    our argument as to why the Irish court is adequate.  In

4    this case, it would be the situation of having sort of an

5    analogous or similar causes of action available within

6    Ireland, but we don't submit that Ireland has a CFAA, per

7    se, or that it would be able to apply the CFAA in Ireland.

8    It would be more that the several causes of action that were

9    set forth in the letter from Ryanair to Booking.com and then

10   these are the causes of action being actively litigated in

11   Ryanair's lawsuit against Vola.  Those would be the claims

12   that would essentially provide the potential of a remedy

13   that would be similar to what they would get under the CFAA

14   theory in the U.S.

15             THE COURT:  Okay.  Thank you very much.  We'll

16   save the rest of your time for rebuttal.  We'll turn it over

17   to plaintiff.

18             MS. HARTNESS:  Thank you.

19             THE COURT:  Thank you.

20             MS. KPOR:  Good morning, Your Honor.  Thank you

21   for your time today.  Lisa Kpor, K-P-as-in-Peter-O-R, on

22   behalf of plaintiff non-movant Ryanair DAC.

23             THE COURT:  Good morning.

24             MS. KPOR:  Your Honor -- thank you, Your Honor.

25   Good morning.

1          Your Honor, resolution of the defendants' motion

2    to dismiss, in the alternative to stay, boils down to two

3    common threads.

4          First, the fact that Delaware is a more

5    convenient and appropriate forum for this litigation that

6    is based on a uniquely American statute.  And, second, that

7    the defendants repeated failure to meet their high burden

8    of proof with respect to the requisite elements of a forum

9    non conveniens analysis is apparent here.

10         The defendants argue that Ryanair's complaint

11   should be dismissed on the basis of forum non conveniens and

12   extraterritoriality.  They also contend this matter should

13   be stayed in light of two cases pending before the United

14   States Supreme Court, only one of which has been granted a

15   writ of certiorari.

16         With respect to their primary argument, in

17   essence, the defendants request this court to enter an order

18   dismissing Ryanair's complaint on forum non conveniens grounds

19   so that Ryanair can institute this litigation involving a

20   United States statute, three Delaware corporations, and two

21   subsidiaries of a Delaware corporation in Ireland.

22         Despite defendants' assertions to the contrary,

23   in no way is Ireland a more convenient forum than this

24   court.  And this court forum is not so inconvenient as to

25   cause an oppressiveness or vexation to the defendants.

1              Accordingly, defendants' forum non conveniens

2    argument should be disregarded because Ireland is not an

3    appropriate forum for resolution of Ryanair's federal

4    statutory claim.  Ryanair's choice of forum is entitled to

5    some deference, and both the public and private interest

6    factors all weigh in favor of the denying defendants' motion

7    to dismiss.

8              The defendants' extraterritoriality argument

9    also fails because the plain language of the Computer Fraud

10   and Abuse Act, also known as the CFAA, confirms that it

11   applies extraterritorially.  And even if it did not, the

12   extraterritoriality doctrine would not bar Ryanair's claim

13   because there are significant allegations of domestic

14   misconduct orchestrated by primarily domestic corporations

15   that resulted in domestic harm.

16             Finally, defendants' motion for stay is subject

17   to denial because staying this case pending a resolution of

18   the *Van Buren* and *LinkedIn* cases would not simplify the

19   issues for trial and would result in undue prejudice to

20   Ryanair.  All things considered, the defendants' motion

21   should be denied in its entirety.

22             Point one.  The defendants' forum non conveniens

23   argument is without merit.

24             THE COURT:  All right.  Ms. Kpor, I'm going ask

25   to ask you to start with the CFAA and the extraterritoriality

1    arguments.  Could you go to that part of the presentation

2    first, please?

3                    MS. KPOR:  Absolutely, Your Honor.

4                    THE COURT:  Thank you.

5                    MS. KPOR:  Your Honor, this Court should reject

6    defendants' argument that Ryanair's complaint is subject to

7    dismissal because it impermissibly seeks extraterritorial

8    applications of law.

9                    Courts apply a two-step framework for deciding

10   questions of extraterritoriality.  Courts begin by analyzing

11   whether a clear affirmative indication rebuts the

12   presumption against extraterritoriality.

13                   If nothing rebuts that presumption, courts then

14   determine whether the case involves domestic application of

15   the statute.

16                   In this case, defendants extraterritoriality

17   argument also fails under each step of this framework.

18                   First, it is abundantly clear that the CFAA's

19   private right of action applies extraterritorially.

20                   Second, even if the CFAA did not apply beyond

21   the United States, the complaint alleges domestic conduct

22   and domestic harm, thereby placing it outside of the scope

23   of the extraterritoriality doctrine.

24                   Regarding the first point, for more than

25   20 years, every federal court that has opined on whether

1    the CFAA provides a clear indication of extraterritorial

2    application has answered affirmatively.

3            Just three years ago, in *Ryanair vs. Expedia*,

4    Expedia made the very same arguments that the defendants

5    have set forth here.  And the U.S. District Court for the

6    Western District of Washington determined that "the CFAA's

7    text gives a clear affirmative indication that its civil

8    provision applies extraterritorially."

9            Defendants cannot dispute the existence of these

10   rulings that cut directly against their argument.  So instead

11   of addressing them, defendants distinguish those cases by

12   saying all of the conduct here occurred abroad while each of

13   those cases "simply allowed non-U.S. plaintiffs to invoke

14   the CFAA against a United States defendant whose domestic

15   actions allegedly violated the CFAA."

16           But Ryanair has relatedly argued and the

17   allegations of the complaint state that a substantial

18   amount of alleged computer access in this case did in fact

19   occur domestically in Delaware, Connecticut, or both.

20           As a result, just as in the cases where the

21   courts held that the CFAA applies extraterritorially, the

22   present matter is also a case where a non-U.S. plaintiff

23   was permitted to invoke the CFAA against the U.S. defendants

24   and related subsidiaries who allegedly violated the CFAA.

25           And there can be no question that the CFAA

1       applied extraterritorially because, among other things, the

2       CFAA literally defines a protected computer as a computer

3       which, if used in or affecting interstate or foreign

4       commerce or communication, including a computer located

5       outside of the United States, that is used in a manner that

6       affects interstate or foreign commerce.

7               Defendants attempt to radicalize Ryanair's

8       position by contending that Ryanair believes "the CFAA

9       covers every computer intrusion in the world regardless

10      of the connection to the United States."

11              This could not be farther from reality.

12              As noted in the Western District of Washington's

13      opinion, any CFAA lawsuit would require personal jurisdiction

14      over the defendant which obviates the possibility of resolving

15      claims between two foreign parties over a foreign computer

16      that happens to affect American commerce.

17              All things considered, because the CFAA

18      demonstrates with clarity that a statute applies

19      extraterritorially, defendants extraterritoriality argument

20      can be rejected on that basis alone.

21              THE COURT:  Yes.  Let me ask you some questions

22      about that.

23              In pointing to the personal jurisdiction

24      requirement, that seems like you are conceding that your

25      interpretation of the CFAA itself is one that could

1   contemplate, could reach, could treat as a violation of it,

2   a suit between two foreign parties potentially about access

3   to any computer anywhere in the world.  Is that right?

4           MS. KPOR:  Your Honor, that statement is made

5   simply to ensure the Court that we are not attempting to say

6   the CFAA applies to every single situation where a computer

7   is intruded by another party regardless of whether those

8   parties are foreign.

9           So I don't think that I agree with the position

10  you have articulated.  There has to be some hook in order

11  for the CFAA to apply to corporations or to a suit in the

12  United States.

13          THE COURT:  Well, focus me on that, if you

14  would.  What is it that you see in the CFAA that prevents

15  it from applying to any computer anywhere in the world.  I

16  understand the personal jurisdiction argument.  I'm not

17  saying I necessarily reject it, but is there something in

18  the statute itself that also is responsive to defendants'

19  concerns about the breadth of the statutory interpretation

20  you're pressing on the Court?

21          MS. KPOR:  Your Honor, I would argue that the

22  CFAA and the United States -- and additional United States

23  statutes as well ensure that causes of action brought before

24  this Court fall within the purview of the Court's subject

25  matter jurisdiction and as well as the personal jurisdiction

1    requirement that are required with respect to defendants

2    generally.

3              So there is no possibility that the CFAA would

4    apply when in collective use with other statutes to only

5    foreign entities and foreign access with no ties to the

6    United States whatsoever.

7              And, Your Honor, I would also add --

8              THE COURT:  Go ahead.  Sorry.

9              MS. KPOR:  Your Honor, I would also add that

10   even if the CFAA did not apply extraterritorially, Ryanair's

11   complaint would still not be subject to dismissal because

12   the complaint alleges domestic conduct and domestic injury.

13   In other words, Ryanair satisfies the second step of the

14   two-step framework as well.

15             And in the same opinion, where the United

16   States District Court for the District of Washington opined

17   that the CFAA applied extraterritorially, the court also

18   mentioned that the defendants' extraterritoriality argument

19   was not persuasive because the case involved a permissible

20   domestic application of the CFAA given that Ryanair alleged

21   in that case that the defendants' unauthorized access

22   originated in the United States, and that it harmed, among

23   other things, Ryanair's reputation and goodwill with

24   American customers.

25             The same can be said for this case.  Most of the

1   defendants are incorporated in Delaware and have principal

2   places of business in Connecticut.  It follows then that as

3   alleged in the complaint, a substantial part of the actions

4   giving rise to the CFAA violations occurred domestically in

5   Delaware or Connecticut or both and that some unlawful

6   computer access occurs here in the United States by the

7   Delaware defendants.

8              For example, in the declaration submitted by the

9   defendants of Marcos Guerrero.  Mr. Guerrero states that

10  since Booking.com launched its flights product in September

11  2019 and through December 2020, fewer than 100 Ryanair

12  tickets have been sold via Booking.com to customers with a

13  U.S. IP address:  24 through Etraveli and 71 through

14  Priceline.

15             Not only has Priceline sold 2,000 Ryanair tickets

16  since 2019, Priceline sold at least 71 of those ticket to U.S.

17  customers.  Priceline is one of the defendants here that is

18  incorporated in Delaware and maintains a principal place of

19  business in Connecticut.  In making this declaration, Mr.

20  Guerrero essentially concedes that Priceline scraped Ryanair's

21  website without authorization from the United States and sold

22  71 Ryanair tickets to U.S. customers which negatively impacts

23  Ryanair's goodwill among U.S. customers.

24             They --

25             THE COURT:  How -- I'm sorry.  How is that a

1    concession of scraping by Priceline?

2              MS. KPOR:  Your Honor, the only way that that

3    information could have gone on to the Priceline website is

4    if Priceline itself, or someone acting at the direction of

5    Priceline, placed Ryanair flight information on the

6    Priceline website.  So, in essence, they are conceding that

7    this conduct is taking place.  The conduct that is --

8              THE COURT:  Yes.  What if you can't prove they

9    had any knowledge that that third party was scraping or that

10   they were doing it as defendants' direction or request?

11             MS. KPOR:  Yes, Your Honor.  Well, to that

12   point, we have already placed into the -- as an attachment

13   to the complaint, several exhibits that demonstrate that the

14   defendants did have knowledge that they were not permitted

15   to scrape information from Ryanair's website.  And so --

16             THE COURT:  Did you point to anything yet that

17   they had knowledge that the third parties were scraping and

18   that that was the only way the defendants were able to get

19   the Ryanair information?

20             MS. KPOR:  Your Honor, that is something that

21   would likely come out in discovery.  At this time, we do not

22   know, and the Court doesn't know, whether it was the

23   defendants themselves who scraped the Ryanair website or

24   third parties.  And the defendants have attempted to

25   shift blame and say that the third parties scraped that

1     information from the Ryanair website.

2              But to the extent that they are saying that

3     they have no authority or control over their website or no

4     knowledge what is on their website is a far stretch, Your

5     Honor, and I believe that they -- because that information

6     is on the Priceline website, and they did have the ability

7     to sell Ryanair tickets, this Court can assume that

8     Priceline knew or actually directed someone within their

9     organization or a third party to place that information on

10    their Priceline website, and the location of all of that

11    activity is domestic.

12             Accordingly, in light of the fact that a

13    substantial amount of the relevant conduct occurred in the

14    United States, defendants' extraterritoriality argument must

15    fail, and their motion to dismiss should be denied.

16             THE COURT:  All right.  Yes.  Let me ask you

17    some more about that.

18             I recognize it's a motion to dismiss, but the

19    defendants have put a lot of evidence in the record and

20    among other things, they point me to this case in Ireland,

21    and they say it shows, in addition to common sense, that

22    Ryanair knows to a certainty or could figure out to a

23    certainty who has been scraping, if anyone has, the Ryanair

24    website.  And they say you know that the defendants haven't

25    done that.

1          What is your response to that?

2          MS. KPOR:  Your Honor, our response to that is,

3  no, we don't know at this time.  Based upon our information

4  and belief, we have reason to believe that the defendants

5  themselves have engaged in screenscraping.

6          In addition, I would also add that with respect

7  to the Irish action, the fact that we've made certain

8  allegations in that case does not establish necessarily

9  that those causes of action would be actually addressed

10  by an Irish court.  And I know that goes to the forum non

11  conveniens argument, but I want to make that point clear

12  here.

13          And in addition, with respect to

14  extraterritoriality, this is, again, a motion to dismiss,

15  and a 12(b)(6) motion.  It is -- at this time, the

16  allegations of the complaint make it clear, and we have

17  argued, that there is domestic conduct, domestic harm

18  orchestrated by primarily domestic parties.

19          THE COURT:  Can you point me to where in the

20  complaint you allege that the defendants have done the

21  screenscraping themselves?

22          MS. KPOR:  Yes, Your Honor.  So, for example,

23  and as noted by opposing counsel, in paragraph 25 of the

24  complaint, we say, on information and belief, the defendants

25  have also committed one or more of the acts alleged in this

1   complaint within the state and district.

2           Your Honor, we also note in additional locations

3   of the complaint that the conduct alleged here occurred

4   within this district.

5           THE COURT:  So I think they also point to

6   paragraph 74, but their contention is, this is at best

7   information and belief.  This is conclusory.  And again,

8   you have control over your own computers.  We know from the

9   other case you can analyze your own computers.  Why should I

10  find this to be an adequate allegation of domestic conduct

11  by the defendant?

12          MS. KPOR:  Your Honor, this Court is a court

13  that follows the procedures of notice.  We have placed the

14  defendants on notice of what we believe has transpired here,

15  and we are entitled to uncover discoverable information that

16  will go toward the allegations of complaint.

17          If, for instance, the defendants want to set

18  forth that they have not engaged in any activity that would

19  in some way be relevant to the CFAA, then they can do so,

20  but they are required to do so, and they are required and

21  will be compelled to produce witnesses under Rule, Federal

22  Rule of Civil Procedure 30(b)(6) to establish whether or not

23  they have engaged in this conduct.

24          And even if they are not doing it, we can allege

25  that they are commanding agents to do this.

1            So, Your Honor, I hope that that answers your

2      question.  Are there any additional questions that I might

3      be able to address?

4            THE COURT:  Yes.  Thank you.

5            So if I were to find your allegations of

6      domestic activity inadequate at this point, you have asked

7      for leave to amend.  Are you able to represent that your

8      client would be able to allow you to amend in a way that

9      would more fulsomely allege how it is you know that the

10     defendants have -- I think you are alleging both, at least

11     you are arguing you have alleged both -- both that the

12     defendants actually are screenscraping Ryanair's website and

13     that they're directing and controlling third parties to do

14     so.

15           If I think you haven't adequately alleged that

16     and give you leave to amend, can you do better and give us

17     more to possibly make that into a plausible allegation?

18           MS. KPOR:  Yes, Your Honor.  And we can make

19     additional allegations of fact regarding whether the

20     third-party aggregators themselves conducted in this and

21     whether the defendants themselves have engaged in this

22     activity.

23           But I would add, Your Honor, the declarations

24     submitted by the defendants themselves establish that they

25     have engaged in misconduct, that they are placing Ryanair

1    information on their website, selling tickets to Ryanair's

2    customers, and that is sufficient for this court to

3    determine that domestic conduct is being engaged in by the

4    defendants in violation of the CFAA.

5           THE COURT:  All right.  Going back to I suppose

6    the first step of the analysis, the extraterritoriality

7    breach of the statute.  Is it your view that Ryanair could

8    sue only Booking.com, which is a Dutch company, in this

9    court for a CFAA violation?

10          MS. KPOR:  No, Your Honor.  That is not our

11   position.  Our position is that this Court can find all five

12   defendants have violated the CFAA.

13          THE COURT:  Right.  I recognize that.  I did not

14   articulate that question well.  If you wanted only to bring

15   suit against Booking.com, that is only a foreign entity,

16   could I hear that case, you know, between just Ryanair and

17   Booking.com?  Could I hear a case for an alleged violation

18   by those two foreign actors for violation of U.S. law?

19          MS. KPOR:  Yes, Your Honor.  I believe that the

20   circumstances here would allow the Court to make a ruling

21   with respect to Booking.com's violation of the CFAA.  In

22   that circumstance, you have a party that is conducting

23   business in the United States within this district, and that

24   the court would have personal jurisdiction over Booking.com

25   in that instance.  And you also have the ability to address

1    that matter given their extraterritorial application of the

2    CFAA and what is submitted and defined as a protected

3    computer under the circumstances.

4              THE COURT:  Would you then agree you'd have to

5    allege that Booking.com did something in the U.S.?

6              MS. KPOR:  Yes, Your Honor.  So that goes to

7    multiple points actually.  Your Honor, first, the alleged

8    computer access could have occurred in the United States.

9    It could have also had domestic harm, domestic injury to

10   U.S. customers, to the goodwill that Ryanair has established

11   to U.S. customers.

12             Ryanair's domestic injury could also extend to

13   the inability to obtain a greater amount of revenue given

14   that Booking.com would be targeting the United States

15   customers and inflating prices of Ryanair flights.

16             And the imposition of additional fees on private

17   Ryanair flights could be an additional U.S. harm, a U.S.

18   related harm.

19             THE COURT:  You talk about in your brief about

20   a, I think you call them a conduct test and an effects test.

21             The defendant says those have both been rejected

22   by the Supreme Court.  What is your response to that?

23             MS. HARTNETT:  Your Honor, we do not believe

24   that both of those tests have been rejected by the Supreme

25   Court expressly.  We believe that the effects test, the

1    effects test and conduct test, under either test Ryanair

2    has satisfied all of the requisite elements in those tests

3    and, in addition, were there under some circumstances the

4    court, the Supreme Court did reject either test, then we

5    have already established, first, that the CFAA provides a

6    clear indication of extraterritorial application.

7              And multiple federal courts have already decided

8    that.  For instance, in *United States vs. Ivanov*, which was

9    handed out in the District Court of Connecticut, there, the

10   court states Congress has clearly manifested its intent to

11   apply the CFAA to computers needed for either interstate or

12   foreign commerce.

13             So regardless of whether the United States

14   Supreme Court has rejected either test, it's clear this

15   Court does not have to address either test because the CFAA

16   applies extraterritorially.

17             THE COURT:  I think we were talking about

18   paragraph 25 before.  You have a paragraph, I think it's 27.

19   I don't have the complaint in front of me right at this

20   moment, but I think you allege on information and belief a

21   substantial part of the actions giving rise to the claim

22   occurred in this district.

23             What is the basis for that information and

24   belief in that allegation?

25             MS. KPOR:  Your Honor, as we have indicated,

1      three of the defendants are incorporated in Delaware.  And

2      so to the extent that any of those Delaware organizations

3      were conducting business in Delaware that violated the CFAA,

4      such actions would give rise to the claim.  Here, it has

5      been advanced in the complaint.

6                In addition, the defendants also have principal

7      places of business in Connecticut.  And because they have

8      businesses in Connecticut and they are incorporated in

9      Delaware, it is clear that some of the relevant conduct has

10     occurred in Delaware and/or Connecticut, and that establishes

11     that this court is more convenient of a location to advance

12     this litigation than an Irish court.

13               And, Your Honor, if we may turn to the forum non

14     conveniens argument.

15               We want to establish that not a single factor

16     under the forum non conveniens analysis has been satisfied

17     by the defendants, and that the defendants cannot meet their

18     heavy burden of opposing Ryanair's selected forum choice.

19               Your Honor --

20               THE COURT:  Yes, you can certainly turn to that.

21     Let me ask you, though, another question as you do.

22               In your answering brief at page 10, you say

23     relevant evidence will likely be found in Delaware.  What is

24     the basis for that?

25               MS. KPOR:  Your Honor, again the basis is that

1    they are incorporated in Delaware.  And they are likely

2    doing business in Delaware and Connecticut as Delaware

3    entities, three entities that are incorporated in Delaware.

4              THE COURT:  Does it follow as a factual or legal

5    matter that if you are incorporated here, you conduct

6    business here, you take actions here, and you maintain

7    evidence here?

8              MS. KPOR:  Your Honor, I don't think that that

9    is necessarily the case in all circumstances.  However, here

10   we believe that the evidence will show that some of the

11   relevant access and additional activity that is relevant to

12   the complaint took place in Delaware.

13             THE COURT:  Can you give me any even single

14   basis for why you say that?  I recognize you have that

15   belief, but why shouldn't I just deny that or, you know,

16   reject it as complete speculation?

17             MS. KPOR:  Your Honor, for instance, there have

18   been, there have been declarations submitted by opposing

19   counsel, Your Honor.  And, for instance, in one of those

20   declarations by Mr. Christopher Winter, the Vice President

21   of Air Revenue Development for Defendant Priceline, he

22   points out that Priceline has sold 2,000 Ryanair tickets

23   through its websites in 2019.  He is situated in Norwalk,

24   Connecticut and likely operates out of Priceline's office.

25   However, given that that corporation is incorporated in

1    Delaware, it is likely that some of their relevant conduct

2    has actually occurred in Delaware.

3            THE COURT:  Should I consider transferring this

4    case to Connecticut?  It sounds like you are more likely to

5    find evidence and activity and business conducted by

6    defendants in Connecticut.

7            MS. KPOR:  Your Honor, I don't think that motion

8    is before the Court at this time, and I don't think that

9    that would be an appropriate step for this Court to take

10   under the circumstances given this Court has personal

11   jurisdiction over three of the defendants here and that the

12   other two defendants are subsidiaries of Booking Holdings

13   which is a corporation that is incorporated in Delaware.

14           In addition, Your Honor, I think that it is

15   very important for this Court to look at the defendants'

16   motion as a whole.  They have brought a motion to dismiss

17   this action on forum non conveniens grounds, and they have

18   not met any of the elements of a forum non conveniens

19   analysis.

20           Those four elements include, first, the

21   existence of adequacy of an alternative forum; the amount of

22   deference accorded to the plaintiff's choice of forum; the

23   convenience of the parties and the private interest factors;

24   and the interest of the forum which is known as the public

25   interest factors.

1              And for the first factor, Ireland is not an

2    adequate alternative forum for resolution of Ryanair's

3    CFAA claim.  And to qualify as an alternative adequate

4    forum, there are two requirements:  one, the alternative

5    jurisdiction must offer reasonable remedies and, two, the

6    defendant must be amenable to process within that other

7    forum.

8              The defendants have not proven either element,

9    and it is their burden to do so.

10             With regard to point one in Ryanair's response,

11   we noted that defendants have never identified a single

12   cause of action under Irish law that would provide

13   reasonable redress for Ryanair's injuries.  It would have

14   been logical for the defendants to reply to this argument by

15   specifically identifying Irish claims that are analogous to

16   the CFAA claim particularly given the defendant bears the

17   burden of establishing Irish law provides some remedy but

18   they did not.

19             THE COURT:  Of course, they point, they point to

20   your lawsuit.  Why is that not enough to meet their burden?

21   You all decided to at least the one entity in Ireland.

22   Doesn't it follow from that, that you thought you had a

23   cause of action and an adequate remedy there?

24             MS. KPOR:  Yes, Your Honor.  But the Irish High

25   Court in Vola simply declared that it sought to make --

1    that, first of all, there has been no finding in the Irish

2    High Court that those cases will actually be viable or that

3    the claims that were advanced in that case will be viable.

4    And, secondly, the ruling that the Court did make in Ryanair

5    vs. SC Vola simply declared that it sought only to make such

6    limited findings of fact as necessary to determine the issue

7    related to jurisdiction and not to enter upon substantive

8    matter in that case.   In other words, the Irish High Court

9    did not hold that a claim for screenscraping would be

10   viable under Irish law.   It only addressed the matter of

11   jurisdiction.

12           And today, for the first time, from what we

13   believe, defendants' counsel attempted to direct this Court

14   to the arguments advanced in one of Ryanair's letters that

15   is attached to the complaint.   However, that is not

16   sufficient to shoulder their burden.   This is a CFAA case.

17   And the defendants have not pointed to any cause of action

18   that would award a reasonable remedy to Ryanair under

19   Irish law.   And without establishing that Ireland offers

20   reasonable remedies analogous to the CFAA claim raised here,

21   they cannot set aside the first element of a forum non

22   conveniens analysis.   And given that it is defendants'

23   burden to meet this element, their motion to dismiss is

24   subject to denial on this basis alone.

25           THE COURT:   All right.   But what about your case

1    against one, I think it's one of the "booking" defendants?

2    You, Ryanair, you have sued one of these defendants in

3    Ireland.  Doesn't it follow from that that Ryanair believes

4    it has a cause of action, an adequate forum and an adequate

5    remedy for the screenscraping in Ireland?

6              MS. KPOR:  Your Honor, regardless of what

7    Ryanair believes, it is defendants' burden to establish

8    with their causes of action under Irish law that are

9    analogous to the CFAA, and they have failed to do so.

10   According to --

11             THE COURT:  I don't, I don't -- I'm not

12   following that.  Don't they meet their burden by pointing to

13   a complaint that you filed against them in that other forum?

14             MS. KPOR:  No, Your Honor.  Filing -- the

15   filing of a complaint does not establish that Irish law

16   would permit any defendant to successfully argue under any

17   particular law that a claim such as the one raised here

18   would provide reasonable redress to Ryanair or any of the

19   defendants.  That simply has not been held or decided by the

20   Irish courts.

21             THE COURT:  Well, perhaps one reason that hasn't

22   happened is at least they tell me that you all have not

23   moved your case against them and it's been pending a

24   year-and-a-half.  What can you tell us about why that case

25   is not moving?  And doesn't that undermine your argument

1    that a stay of the case here in front of me would unfairly

2    prejudice you?

3              MS. KPOR:  Your Honor, the progress of the

4    Ryanair Irish litigation bears no relevance whatsoever to

5    the resolution of defendants' motion.

6              The parties in the Irish litigation are almost

7    entirely different.  As you've noted, only one of the

8    defendants here is a party to the Irish suite and the causes

9    of action in the Irish litigation are different.

10             Furthermore, to directly address defendants'

11   argument on this point would lead to the disclosure of

12   privileged information which we will not divulge here.  And

13   what matters in this case is that there are three Delaware

14   defendants and two defendants that are subsidiaries of a

15   Delaware corporation that are begging this Court to dismiss

16   this case because litigating in Ireland would be more

17   convenient for them.  That particular argument is disingenuous.

18             And with respect to the second point, Your

19   Honor, and this is very important, defendants have also

20   failed to establish they are amenable to process in Ireland.

21             In their reply brief, the defendants claim that

22   they are amenable to process in Ireland and to date, in

23   response to your question, defendants' counsel stated that

24   all five defendants will fully consent to the jurisdiction

25   of the Irish courts.

1            However, this statement is in direct

2      contravention of the evidence submitted before the court by

3      the defendants.   In their reply brief, defendants stated

4      there "amenability to process in Ireland is limited to the

5      specific allegations presented by Ryanair in this matter and

6      is not, nor should be, construed as an acknowledgment of a

7      broader amenability to process in Ireland."

8            Defendants also adds the caveat that they

9      reserve all right to argue in any Irish action by Ryanair

10     concerning the specific allegations presented in this matter

11     that not withstanding personal jurisdiction, this matter

12     should be dismissed.

13           And the defendants' supplemental declaration of

14     Mr. Kelly that was included with their reply demonstrates

15     that Ryanair would need to seek leave of court to serve

16     the defendants in this action that are located outside the

17     European Union.

18           Mr. Kelly's personal opinion that such an

19     application would be readily granted by the Irish courts

20     is insufficient to establish that all five defendants are

21     actually amenable to process in Ireland.

22           Simply put, the defendants cannot have their

23     cake and eat it, too.   Either they are amenable to process

24     in Ireland or they are not.   And it is clear that

25     defendants' statement that they are amenable to process is

```
 1    conclusory and forced in an effort to meet the elements of a

 2    forum non conveniens analysis, not because they are amenable

 3    to process.

 4              THE COURT:  Let me stop you there.  I tried to

 5    get as clear a statement from defense counsel as I could

 6    get that they consent, all five defendants consent to you

 7    pressing your case against them in Ireland.

 8              Did you see some ambiguity in what they were

 9    saying today?

10              MS. KPOR:  Your Honor, we did not see any

11    ambiguity with respect to the answer that they provided to

12    the Court today.  However, it is in conflict with what they

13    have submitted and what evidence that is before this Court

14    in papers written and submitted by the actual parties

15    themselves.  And representations of counsel, that is not

16    evidence, Your Honor.  So to the extent that all five --

17              THE COURT:  All right.  We're starting, we're

18    starting to get low on time, and I have a number of more

19    questions for you.  I'm sorry to interrupt, but ...

20              They point to the possibility of incongruous

21    results, and that I should be concerned about that.  I

22    recognize you are not going to tell us anything about why

23    the case in Ireland isn't moving forward, but as long as

24    it's on the Irish court's docket, if I don't grant the

25    defendants' motion here, shouldn't I be concerned that that
```

1    case is going to end up with a different result than the

2    case here?

3                    MS. KPOR:  Absolutely not, Your Honor.  There

4    is no CFAA claim that will go before the Irish court.

5                    THE COURT:  Well, aren't you challenging, aren't

6    you alleging that the defendant there engaged in the

7    screenscraping, and that is improper under Irish law?

8    Doesn't that completely overlap with part at least of what

9    you are alleging here?

10                   MS. KPOR:  Your Honor, while some of the facts

11   may be the same, this is a completely separate cause of

12   action related to a federal statute that does not exist

13   under Irish law.  So there is no circumstance under which

14   the Court would make a ruling with respect to the CFAA that

15   would impact or somehow be incongruous with the ruling that

16   is set forth in Ireland, to the extent that the Court in

17   Ireland addresses the issue substantively at all.

18                   THE COURT:  What if that Court makes a

19   factual finding that the defendant there did not commit the

20   screenscraping?  Am I to follow that factual finding or

21   would you want me to have a chance to reach a conflicting

22   factual finding?

23                   MS. KPOR:  Your Honor, I don't believe that

24   there would be any conflict whatsoever.

25                   So if you actually look at the causes of action

1    that have been raised here, there are multiple sections of

2    the CFAA that are relevant.  And so there would be no impact

3    with respect to the Irish litigation and this case.  There

4    would be no overlap.

5              For instance, under Section 1030(a)(5)(A),

6    anyone who knowingly causes transmission of a program,

7    information or code that causes damage to a protected

8    computer without authorization may be subject to a civil

9    lawsuit.  And that is one of the causes of action that we

10   have provided here.

11             THE COURT:  All right.

12             MS. KPOR:  Regardless whether there is any

13   ruling, any Irish court regarding screenscraping, that is

14   not going to affect this Court's resolution of whether the

15   defendants in this case knowingly transmitted information

16   from the Ryanair website to their own website without

17   authorization.  It's completely different, different causes

18   of action, and this particular cause of action that has

19   been raised in the complaint is not analogous to the causes

20   of action that are present in the Irish litigation.

21             THE COURT:  You are agreeing, I think but I want

22   to make sure, that as the case proceeds here, you will bring

23   all of your witnesses here for trial and make them available

24   in the United States for deposition if the defendants want

25   that; is that right?

1          MS. KPOR:  The Ryanair parties or the Ryanair

2     witnesses, Your Honor?

3          THE COURT:  Yes.

4          MS. KPOR:  That's correct.

5          THE COURT:  Now, do I need to consider the cost

6     and logistics of getting witnesses to the United States,

7     not just whether you're going to bring yours here and

8     whether I could compel others?  That is, I want to focus on

9     the cost and the logistics.  The cases sometimes say that

10    is relevant.  Do you agree that is relevant?  And, if so,

11    doesn't that help the defendants here?

12         MS. KPOR:  Yes, Your Honor.  Well, the cost of

13    procuring witness attendance is one of the factors of the

14    forum non conveniens analysis.  And we believe that this

15    particular factor weighs against dismissing the lawsuit as

16    well.

17         The defendants argue that the cost of witness

18    attendance favors dismissal because defendants have no

19    witnesses in the United States that is relevant evidence.

20         But in our view, there are relevant witnesses

21    here in the United States with relevant evidence.  Most of

22    them are the Delaware corporations themselves who are

23    operating in Delaware and Connecticut.

24         In addition, Your Honor, I believe that for

25    purposes of the forum non conveniens analysis, it would be

1    illogical for the defendants to suggest that it would be

2    more convenient and cost effective to hail three Delaware

3    entities into an Irish court.

4              Plus, this court has already declared in *Joao*

5    *Control vs. Ford Motor Company* that a Delaware corporation

6    must expect an uphill battle in proving that it is in any

7    meaningful sense inconvenient to defendants' actions in the

8    forum in which the corporation has freely chosen to create

9    itself.  So with respect to cost --

10             THE COURT:  All right.  All right.  Let's -- all

11   right.  I need to interrupt you.  We're starting to get very

12   short on time here.

13             The defendants say and they put all these

14   declarations in the record and I don't believe you have

15   countered any of them.  They say that the witnesses for the

16   U.S. defendants who have relevant knowledge are all located

17   outside of the United States.  Do I have any basis not to

18   believe that for purposes of the forum non conveniens

19   analysis?

20             MS. KPOR:  Yes, Your Honor.  You do have reason

21   not to believe that.  And one of the declarations is the one

22   I mentioned before, the declaration from Mr. Christopher

23   Winter who works out of Priceline's office in Norwalk,

24   Connecticut.  If the defendant are going to attempt to argue

25   that they haven't engaged in the conduct of which is alleged

1    in the complaint, he would potentially would be one of the

2    witnesses that would be required to testify under Rule

3    30(b)(6) to establish whether or not Priceline obtained the

4    information that they placed on the Priceline website from

5    Ryanair's website.  He would have to testify to how that

6    information was somehow placed on the Priceline website and

7    who conducted the alleged screenscraping.

8                 THE COURT:  All right.  Going back to the CFAA,

9    this dispute as to whether or not the violation of the

10   terms of use is central to or at least relevant to your

11   allegations.

12                You say I could just strike all of the

13   references to the terms of use and you would still have a

14   CFAA violation alleged.  Is that based on the letters?  And,

15   if so, what is your response to the point that the letters

16   are based on the terms of use?

17                I want to understand your position on all that,

18   please.  Go ahead.

19                MS. KPOR:  Yes, Your Honor.  As this Court has

20   noted earlier, Ryanair could amend its complaint, remove all

21   references to the terms of use, and the cease-and-desist

22   letters alone could serve as an independent basis for

23   Ryanair's CFAA claims.

24                The defendants say that Ryanair is wrong on this

25   point.  However, a federal court that has already addressed

1    this very issue in a similar action found that Ryanair's

2    terms of use or reference to the terms of use simply

3    "defines the limits of authorization to access to websites."

4    And that Ryanair's cease-and-desist letters served as an

5    independent basis for clarifying that the scraping was

6    unauthorized.

7              The terms of use themselves are not the sole

8    source of establishing that the defendants have known about

9    scraping Ryanair's website.  For instance, U.S. counsel for

10   Ryanair said Booking Holdings -- sent a letter to Booking

11   Holdings' Connecticut office stating that Ryanair does

12   not permit screenscraping of its website content and/or

13   underlined data basis.  So under no circumstances is Irish

14   law going to apply to the adjudication of Ryanair's CFAA

15   claims, and it is easier and less expensive for this Court,

16   which is situated in the United States, to resolve a claim

17   based on a United States statute.

18             THE COURT:  Is that the Western District of

19   Washington case that you are saying reached that conclusion

20   or if not, what is it, please?

21             MS. KPOR:  Yes, Your Honor.  It is the *Ryanair*

22   *vs. Expedia* case out of the Western District of Washington.

23             THE COURT:  Okay.  Thank you.  Your time is up.

24   You have answered all of my questions.  Thank you.  Thank

25   you very much.

1          I'm going to turn it back to defendants for

2    rebuttal.  Ms. Hartnett, go right ahead.

3          MS. HARTNETT:  Thank you so much, Your Honor.

4    I'll try to have brief.  I know we just covered a lot of

5    points.

6          I just have two minor points of just

7    clarification before getting to some of the bigger picture

8    points.  One is just that from our position is that there

9    is not going -- is not that there won't be any U.S. witness.

10   I just wanted to be clear.  We didn't have in that our

11   submission.  But that other than the 30(b)(6) type witness

12   for each of the U.S. entities, there is, you know, no real

13   relevant witness for the holding company because it's a

14   holding company, and then the Kayak witnesses would be

15   abroad, and then there maybe a Priceline witness here, it's

16   possible.

17         So I just wanted to be clear, not to overstate.

18   And I don't think I -- if I did, I apologize, but the point

19   is that the vast majority of witnesses would be abroad, and

20   that creates the inconvenience.

21         I also just wanted to address the amenability of

22   process point.  And I was a little bit surprised at some

23   of the comments because I didn't today need to deviate or

24   create any daylight from what we said in our brief, but to

25   reaffirm what we said in our brief, which is that, as I

1    said, the five defendants are amenable to process.  They're

2    not going to refrain, you know, they're not going to resist

3    the jurisdiction of the Irish court, if they're properly

4    served with respect to this dispute alone.  We are not just

5    talking sort of a general license.

6              And so I just hopefully that is clear to the

7    Court.  But I didn't mean any ambiguity or something sneaky

8    here.  This is simply a point that we believe the dispute

9    should be in one place and that place is in Ireland.

10             You know, on the point of just the CFAA

11   extraterritoriality point and the sufficiency of the

12   pleading.  I think going back to *Morrison* really will -- I'm

13   sure the Court has looked at this and it does clarify.  With

14   respect to the conduct and effects test, for example, the

15   Court made clear in *Morrison* that those criticisms they said

16   were justified, that they're not going to guess in every

17   case whether there is a presumption or not.  So basically

18   in deciding to apply a presumption against extraterritorial

19   application in all cases, *Morrison* made clear that the

20   conduct and effects test are of no moment.

21             So then the question really is whether -- I hope

22   this is clarifying for the Court -- is the plaintiff's

23   pleading to do something sufficient to rebut the presumption

24   against extraterritorial application?  Is there a theory of

25   the case there that is enough to rebut that?

1          And we would grant and read, you know, parts

2    of this in our brief as well, there is a definition of

3    protected computer in the CFAA that can apply to a foreign

4    computer in certain situations.  The question here, though,

5    is has there actually been a specific allegation made in

6    the complaint of any access of this computer from a

7    domestic location, something that would be a permissible

8    extraterritorial application as opposed to a fully foreign

9    application which is not permitted?

10          That would be beyond the scope of what Congress

11    contemplated in the CFAA.  And that follows from the

12    language in *Morrison*, also in *Microsoft* where the Supreme

13    Court has been completely clear that even if a statute

14    allows for some extraterritorial application, you have to

15    read that, limit that to its terms and figure out, basically

16    not allow that extraterritorial application to be any

17    broader than appropriate.

18          And here, and we are not trying to create a

19    parade of horribles, but to the extent that protected

20    computer literally sweeps in any computer in the world minus

21    U.S. contact, that would allow the CFAA to cover worldwide

22    computer intrusion, and so what you need is some alleged

23    U.S. connection.

24          In the *Expedia* case, the only defendant was

25    the United States company, and the allegation there was

1    necessarily of a U.S. connection.

2              Here, in contrast, you have two international

3    defendants, you have no specific allegation anywhere.  And

4    I don't need to repeat the exchange you had with plaintiff's

5    counsel.  There is just no specific allegation anywhere in

6    the complaint of any defendant gaining unauthorized access

7    or of any such actions happening in the U.S. or in Delaware.

8    There is just very generalized language.

9              And so we believe that the pleading here is

10   insufficient to rebut the presumption against extraterritorial

11   application.  Moreover, there is no sufficiently domestic

12   conduct alleged to allow for this dispute to proceed on the

13   current complaint.  And for the reasons we identified earlier,

14   we also believe that amendment is not appropriate.

15             I think just moving to that, that is kind of the

16   CFAA kind of the framework that *Morrison* provides us to help

17   work through whether or not this complaint sufficiently

18   alleges a permissible application of the CFAA; and we

19   respectfully submit it does not.

20             Turning I think to the main other issue that was

21   on the table for the last exchange was about the sufficiency

22   of Irish law here and whether or not, you know, essentially

23   Irish law provides an adequate remedy.

24             I would just say, you know, we have met our

25   burden by pointing to a complaint that they have filed

1    against us in Ireland.  And I would just direct your

2    attention, Your Honor, not simply to their letter that

3    they attached to the complaint, which was helpful because

4    it sketches out in detail their theories of how copyrights,

5    intellectual property rights, and, most importantly,

6    trespass and conversion provide essentially the same types

7    of theory of the case and relief as are available under

8    the CFAA.  The CFAA is a federal trespass statute.

9              But I also would direct your attention to the

10   exhibits that we attached to the declaration of our Irish

11   counsel.  This is Exhibit 1 to ECF 18.  This is Ryanair's

12   statement of claims against "booking" in the Irish case, and

13   it goes in detail for paragraph and paragraph to all the

14   remedies that they say they can get in Ireland for this

15   conduct, including injunction, specific performance,

16   damages, restitution, and miscellaneous.  There is 28

17   paragraphs of relief that they believe they can get in

18   Ireland based on this claim.  And there is simply nothing

19   in the record that would allow us to conclude that there is

20   not a remedy available in Ireland that otherwise would be

21   available in the United States.

22             And that is, of course, what the forum non

23   conveniens case law requires.  It's not whether there is an

24   identical cause of action but whether the same conduct could

25   be addressed and remedied in other jurisdictions.

1          So for that reason, we believe we more than made

2     the case for adequacy of Irish law.

3          I would finally note on prejudice, not only is

4     there no reason to believe that they're not going to be able

5     to obtain any relief to which they're entitled in Ireland,

6     but there is also just no prejudice moreover because of

7     the lack of pursuit of the case in Ireland.

8          So to the extent there is a sense that a stay

9     would be unjust or that anything unjust is happening to

10    Ryanair by any delay of this case or by moving the case to

11    Ireland, I would just submit to the Court that that's just

12    belied by the fact that there is a case sitting there for

13    the last year-and-a-half that could have been used as a

14    vehicle to address the perceived wrongs but that hasn't been

15    used to do so.

16         And so with that, we would respectfully submit

17    that the right answer here is to just dismiss this case both

18    for forum non conveniens but also for failure to allege an

19    impermissible application of the CFAA.

20         In the alternative, the Court should at least

21    await guidance from the Supreme Court in *Van Buren* and

22    permit the parties to submit a status report or supplemental

23    brief after that decision to inform further proceedings in

24    this case.

25         THE COURT:  All right.  Thank you.  Just one

1      last question on the scope of the CFAA.

2              Opposing counsel points to the personal

3      jurisdiction requirement which admittedly is not in the

4      -- it's not part of the statute, but it is, of course, a

5      requirement.

6              Shouldn't I view that as a necessary and

7      appropriate limiting principle that would prevent some of

8      the concerns that you have raised with the plaintiff's

9      interpretation of the statute?

10             MS. HARTNETT:  Your Honor, I appreciate the

11     question.  Actually, I think it may, as you say, address

12     some concerns but certainly not all of them, because it

13     would still allow the application of the CFAA to a foreign

14     intrusion by a foreign actor.

15             I guess conceivably there could be situations

16     where personal jurisdiction would prohibit that suit but

17     others where it wouldn't, and I think the question really

18     before the Court for the extraterritoriality analysis is

19     whether -- not whether some other provision may help solve

20     the issue but whether this presumption, which is a strong

21     presumption against extraterritorial application, has been

22     rebutted.  So to the extent there is no context between, no

23     allegation of a domestic act -- the act again is the

24     intrusion.  It is not the display on the website, it's not

25     the selling of the ticket, it's the intrusion into the

1    computer.   And to the extent those acts happened fully

2    abroad without any direction or connection to the United

3    States, the question is whether Congress meant to prohibit

4    that as a violation of federal law.

5              And we would submit there is just no basis to

6    believe that.   And there is certainly no case that has held

7    that a foreign intrusion of a foreign system like that is

8    sufficient.   There is no case standing for that because

9    that case I guess has not yet been mounted or successfully

10   brought until the attempt here.

11             THE COURT:  Okay.  Thank you.  I want to thank

12   both of you for the helpful argument.  I'm going to take the

13   motion under advisement.  If we need anything further from

14   you, of course we'll let you know.

15             Everybody, stay safe.  And we will be in recess.

16   Bye-bye.

17                  (The attorneys respond, "Thank You, Your Honor.")

18                  (Telephonic oral argument ends at 11:45 a.m.)

19

20        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

21

22                       /s/ Brian P. Gaffigan
                         Official Court Reporter
23                        U.S. District Court

24

25