**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**

| | |
|---|---|
| RYANAIR DAC,<br><br>     *Plaintiff*,<br><br> v.<br><br>BOOKING HOLDINGS INC.,<br>BOOKING.COM B.V., KAYAK<br>SOFTWARE CORPORATION,<br>PRICELINE.COM LLC, and AGODA<br>COMPANY PTE. LTD.,<br><br>     *Defendants*. | C.A. No. 20-01191-WCB<br><br>JURY TRIAL DEMANDED |

**FIRST AMENDED COMPLAINT FOR VIOLATION OF THE
COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030 *et seq.*)**

Plaintiff Ryanair DAC ("Ryanair" or "Plaintiff"), by and through its undersigned counsel, for its First Amended Complaint against Defendants Booking Holdings Inc. ("Booking Holdings"), Booking.com B.V. ("Booking.com"), Kayak Software Corporation ("Kayak.com"), Priceline.com LLC ("Priceline.com"), and Agoda Company Pte. Ltd. ("Agoda.com") (collectively, the "Subsidiaries," and together with Booking Holdings, the "Defendants") alleges as follows:

**PARTIES**

1. Plaintiff Ryanair is a company duly organized under the laws of Ireland having its principal place of business at Ryanair Dublin Office, Airside Business Park, Swords, County of Dublin, Ireland.

2. Ryanair prides itself on providing to its customers low-fare airline travel without sacrificing quality and customer service.

3. Through its website at www.ryanair.com (the "Ryanair Website"), Ryanair offers its customers low-fare flights, along with providing flight advertisement, search, information, reservation, and purchase services for Ryanair flights and ancillary services.

1

4.     Defendant Booking Holdings is a Delaware corporation having its principal place of business at 800 Connecticut Avenue, Norwalk, CT 06854.

5.     Defendant Booking.com B.V. is a Dutch besloten vennootschap having its principal place of business at Herengracht 597, 1017 CE Amsterdam, the Netherlands.

6.     Defendant Booking.com is a subsidiary of Booking Holdings.

7.     Defendant Kayak.com is a Delaware corporation with its principal place of business at 7 Market Street, Stamford, CT 06902, USA.

8.     Defendant Kayak.com is a subsidiary of Booking Holdings.

9.     Defendant Priceline.com is a Delaware limited liability company with its principal place of business at 800 Connecticut Avenue, Norwalk, CT 06854.

10.    Defendant Priceline.com is a subsidiary of Booking Holdings.

11.    Defendant Agoda.com is a Singaporean private limited company having its principal place of business at 30 Cecil Street, #19-08 Prudential Tower, Singapore 049712.

12.    Defendant Agoda.com is a subsidiary of Booking Holdings.

13.    The Defendants each operate online travel companies that, among other services, allow their customers to make and book travel arrangements on their websites. The Defendants' websites offer a broad selection of airline tickets, hotel reservations, and many other travel services throughout the world.

## NATURE OF ACTION

14.    This action arises under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA").

## JURISDICTION AND VENUE

15.    Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com advertise to customers in the United States and, on information and belief, in the forum state.

16.    Booking.com serves customers from the United States and the forum state. Booking.com allows users to choose US Dollars as their preferred currency and "English (US)" as their preferred language.

2

17.    Agoda.com serves customers from the United States and the forum state. Agoda.com allows users to choose US Dollars as their preferred currency and "English" as their preferred language.  The option to select English as a preferred language is presented with an image of half of the flag of the United States, as represented below:



18.    In Booking Holdings's Form 10-K filed on February 26, 2020, Booking Holdings states:

> Our mission is to make it easier for everyone to experience the world. We seek to empower people to cut through travel barriers, such as money, time, language and overwhelming options, so they can use our services to easily and confidently get where they want to go, stay where they want to stay, dine where they want to dine, pay how they want to pay and experience what they want to experience. We connect consumers wishing to make travel reservations with providers of travel services around the world through our online platforms. Through one or more of our brands, consumers can: book a broad array of accommodations (including hotels, motels, resorts, homes, apartments, bed and breakfasts, hostels and other properties); make a car rental reservation or arrange for an airport taxi; make a dinner reservation; or book a cruise, flight, vacation package, tour or activity. Consumers can also use our meta-search services to easily compare travel reservation information, such as airline ticket, hotel reservation and rental car reservation information, from hundreds of online travel platforms at once. In addition, we offer various other services to consumers and partners, such as certain travel-related insurance products and restaurant management services to restaurants.

> We offer these services through six primary consumer-facing brands: Booking.com, KAYAK, priceline, agoda, Rentalcars.com and OpenTable. While historically our brands operated on a largely independent basis and many of them focused on a particular service (e.g., accommodation reservations) or geography, we are increasing the collaboration, cooperation and interdependency among our brands in our efforts to provide consumers with the best and most comprehensive services. We also seek to maximize the benefits of our scale by sharing resources and technological innovations, co-developing new services and coordinating activities in key markets among our brands. For example, Booking.com, the world's leading brand for booking online accommodation reservations (based on room nights booked), offers rental car and other ground transportation services, flights, restaurant reservations, tours and activities reservations and other services, many of which are supported by our other brands. Similarly, hotel reservations available through Booking.com are also generally available through agoda and priceline.

19.     In Booking Holdings's Form 10-K filed on February 26, 2020, Booking Holdings further states that "[w]e maintain websites with the addresses www.bookingholdings.com, www.booking.com, www.priceline.com, www.kayak.com, www.agoda.com, www.rentalcars.com and www.opentable.com, among others."

20.     Booking Holdings's website states that Booking Holdings is "THE WORLD'S LEADING PROVIDER OF ONLINE TRAVEL AND RELATED SERVICES."

21.     From the menu bar at the top of the Booking Holdings website, a user can choose to book travel services, including airline flights, from Booking Holdings's "Brands," including the Subsidiaries.

22.     By selecting a Subsidiary from this menu, the user is directed to a separate page with a link to that Subsidiary's website.

23.     A user can also access the link to each Subsidiary's website from another menu at the bottom of the Booking Holdings website.

24.     This Court has jurisdiction over the subject matter of this claim pursuant to 28 U.S.C. § 1331 because this action arises under federal law, namely, 18 U.S.C. § 1030.

25.     This Court has personal jurisdiction over the Defendants because they operate their business in and have established minimum contacts in this State and District.   On information and belief, the Defendants have also committed one or more acts alleged in this First Amended Complaint within this State and District.

26.     Furthermore, Delaware state is regarded as Booking Holdings, Kayak Software Corporation, and Priceline.com LLC's home.

27.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the Defendants are subject to personal jurisdiction in this District, because, on information and belief, a substantial part of the actions giving rise to the claim occurred in this District.

28.     Furthermore, venue is proper in this district because Booking Holdings, Kayak Software Corporation, and Priceline.com LLC reside in this District, and there is no district in which an action could otherwise be brought under 28 U.S.C. § 1391(b).

## FACTS AND BACKGROUND

**A.      Ryanair and the Ryanair Website**

29.     Ryanair operates internationally as a low-fare airline in part through the Ryanair Website.

30.     The Ryanair Website contains flight advertisements, reservation, and purchase services for Ryanair flights, as well as additional services including accommodation, reservation, car hire, and insurance services.

31.     Ryanair has built considerable goodwill since its creation in 1985 as Europe's first and largest low-fare airline.

32.     Since 1985, Ryanair has become a leading airline, carrying (pre-covid) approximately  150 million passengers per year on approximately 2,500 daily flights across 40 countries.

33.     Ryanair's sales, marketing, and business model is based on offering low fares to its customers. The Ryanair Website is at the center of that model.

34.     Ryanair's business is perpetuated in significant part by the efficacy and performance of the Ryanair Website. This includes delivering prompt, reliable, and efficient results to consumers.

35.     Through the Ryanair Website, Ryanair provides fare, route, and schedule information to its customers and potential customers. Ryanair provides this information in an interactive format.

36.     Approximately 99% of Ryanair bookings are made through the Ryanair Website.

37.     Ryanair has invested substantial time, effort, and money in developing and maintaining the Ryanair Website and its related databases and systems, along with the information contained in them.

38.     Ryanair relies on the Ryanair Website to facilitate and process transactions and to maintain and earn the business and goodwill of its customers.

39.     Given its importance, Ryanair has also invested considerable resources in the design, organization, operation, and maintenance of the Ryanair Website to ensure that it operates in an efficient and user-friendly manner by selecting and verifying the data presented on the Ryanair Website.

40.     Ryanair maintains the exclusive online distribution rights to sell Ryanair flights to consumers authorized to access the Ryanair Website.

**B.      The Defendants are not authorized to access the Ryanair Website**

41.     Contracts and policies prohibit each Defendant (including third parties Defendants engage to access the Ryanair Website) from accessing the Ryanair Website for commercial purposes, such as to scrape Ryanair flight data or to obtain or purchase Ryanair itineraries.

42.     For instance, the Ryanair Website Terms of Use ("Ryanair TOU") explain that by accessing the Ryanair Website, users agree to be legally bound by and act in accordance with the Ryanair TOU.  *See* Exhibit A, ¶ 1, attached hereto.

43.     Ryanair is the exclusive online distribution channel for its airline flights. Specifically, the Ryanair TOU states:

> This website is the only website authorised to sell Ryanair flights, (where "Ryanair Group" includes Ryanair DAC, Ryanair Sun, Ryanair UK, Laudamotion and Malta Air), whether on their own or together with any other services. Price comparison websites may apply to enter into a written Licence Agreement with Ryanair, which permits such websites to access Ryanair Group airlines' price, flight and timetable information for the sole purpose of price comparison.

*See* Exhibit A, ¶ 2, attached hereto.

44.     Users of the Ryanair Website are not permitted to use the Ryanair Website other than for private, non-commercial purposes.

45.     Specifically, the Ryanair TOU states:

> You are not permitted to use this website (including the mobile app and any webpage and/or data that passes through the web domain at ryanair.com), its underlying computer programs (including application programming interfaces

6

("APIs")), domain names, Uniform Resource Locators ("URLs"), databases, functions or its content other than for private, non-commercial purposes. Use of any automated system or software, whether operated by a third party or otherwise, to extract any data from this website for commercial purposes ("screen scraping") is strictly prohibited.

*See* Exhibit A, ¶ 3, attached hereto.

46.    Paragraph two of the Ryanair TOU notifies price comparison websites that they must apply for a license agreement to access Ryanair's price, flight, and timetable information for the purpose of price comparison:

This website is the only website authorised to sell Ryanair Group flights (where "Ryanair Group" includes Ryanair DAC, Ryanair Sun, Ryanair UK, Laudamotion and Malta Air), whether on their own or together with any other services. Price comparison websites may apply to enter into a written Licence Agreement with Ryanair, which permits such websites to access Ryanair Group airlines' price, flight and timetable information for the sole purpose of price comparison.

*See* Exhibit A, ¶ 2, attached hereto.

47.    Ryanair does not permit scraping of the Ryanair Website, its content, and/or its underlying databases.

48.    Any scraping of the Ryanair Website, its content, and/or its underlying databases is unauthorized.

49.    The Ryanair TOU explicitly forbids screen scraping.

50.    For example, the TOU states:

You are not permitted to use this website (including the mobile app and any webpage and/or data that passes through the web domain at ryanair.com), its underlying computer programs (including application programming interfaces ("APIs")), domain names, Uniform Resource Locators ("URLs"), databases, functions or its content other than for private, non-commercial purposes. Use of any automated system or software, whether operated by a third party or otherwise, to extract any data from this website for commercial purposes ("screen scraping") is strictly prohibited.

*See* Exhibit A, ¶ 3, attached hereto.

51.    Paragraph six of the Ryanair TOU notifies the Ryanair Website user of Ryanair's intellectual property and other user restrictions:

7

All information, data, underlying computer programs (including APIs), domain names, URLs, databases, and materials presented on this website, including names, logos, flight schedules, prices, etc., as well as the colour scheme and the layout of the website, are subject to copyright, trade mark rights, database rights and/or other intellectual property rights. You may use such content only as strictly required for permitted personal, non-commercial purposes. Any other use and/or reproduction of such content, without the prior written consent of Ryanair, is prohibited and will constitute a breach of these Terms of Use and may infringe Ryanair's IP rights.

*See* Exhibit A, ¶ 6, attached hereto.

52.    In order to conduct a search on the Ryanair Website, a user is required to input search parameters and click a button entitled *"Search."*

53.    The checkbox next to the Ryanair TOU indicating agreement to the Ryanair TOU must be selected to initiate a search.

54.    There is a box to check above the *"Search"* button on the Ryanair Website.

55.    Next to the checkbox are the words: *"By clicking search you agree to **Website Terms of Use**."*

56.    The statement *"By clicking search you agree to **Website Terms of Use**,"* as described above in paragraph 55, contains an emphasized hyperlink in bold font linking to the Ryanair TOU.

57.    A representation of the Ryanair Website as described above in paragraphs 52 to 56 is shown below:



58.     Users of the Ryanair Website, including Defendants, their agents or third parties Defendants engage to access the Ryanair Website, are put on notice of and subject to the Ryanair TOU.

59.     Flight reservations made through the Ryanair Website must be completed through a feature on the Ryanair Website called "myRyanair."

60.     Access to myRyanair requires authorization from Ryanair.

61.     The myRyanair portion of the Ryanair Website is not public.

62.     For example, if a person is attempting to access the myRyanair portion of the Ryanair website, Ryanair limits that person's access as shown below.



63.     A person must request authorization to access the myRyanair portion of the Ryanair Website.

64.     An authorization request to access the myRyanair portion of the Ryanair Website requires the user to create (and then later enter) certain login information, including an email address and password.

65.     In order to create a user name and password, Defendants, their agents, and/or third parties that Defendants enlist to access the Ryanair Website must click a "*Sign Up*" button.

66.     Directly above the "*Sign Up*" button, there is a message that notifies the user: "*By signing up, you agree to Ryanair's Privacy Policy and Terms of Use*."  The words "*Terms of Use*" are formatted as a hyperlink in a contrasting font color that links users to the Ryanair TOU.

67.     In order to complete a booking on the Ryanair Website, Defendants, their agents, and/or third parties Defendants engage to access the Ryanair Website must agree to the Ryanair TOU. No transaction can be completed without agreeing to the Ryanair TOU, nor can the myRyanair Website be accessed without agreeing to the Ryanair TOU.

68.     At all material times, admission to and use of Ryanair's Website have been subject to the Ryanair TOU or terms of use materially similar.

69.     The Ryanair TOU is available for inspection on the Ryanair Website via hyperlinks that are prominently displayed in multiple locations on the Ryanair Website, including near the search query field and above the "*Sign Up*" button to obtain a myRyanair user name and password.

70.     The conduct of Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com, their agents, or third parties Defendants engage to access the Ryanair Website discussed above in paragraphs 41 to 67 is subject to and breaches the terms of the Ryanair TOU.

71.     Beyond the aforementioned limitations on access to the Ryanair Website, Ryanair has made it explicit that none of the Defendants, their agents, or third parties Defendants engage to access the Ryanair Website are authorized to access the Ryanair Website.

72.     On November 15, 2019, counsel for Ryanair sent Booking.com a cease and desist letter ("Cease and Desist Letter"), demanding that Booking.com immediately stop its practice of screen scraping and revoking any assumed authorization to access the Ryanair Website. *See* Exhibit B, attached hereto.

73.     On July 30, 2020, counsel for Ryanair sent Booking Holdings a second cease and desist letter ("Second Cease and Desist Letter") demanding that Booking Holdings, its Subsidiaries, and their agents stop within fourteen days their practice of screen scraping and revoking any assumed authorization to access the Ryanair Website. *See* Exhibit C, attached hereto.

74.     The Second Cease and Desist Letter references the websites of three of the Subsidiaries in this action: Kayak.com, Agoda.com, and Priceline.com.

75.     The Cease and Desist Letter and Second Cease and Desist Letter made clear to the Defendants that Ryanair does not authorize Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com and/or their agents' access to the Ryanair Website at all, or any form of screen scraping.

76.     The Second Cease and Desist Letter further made clear that any gamesmanship by the Defendants in utilizing third parties to access the Ryanair Website without authorization was to be halted.

77.     The practice of screen scraping is in breach of the Ryanair TOU.

78.     The Ryanair TOU expressly states that the Ryanair Website may not be used for anything other than private, non-commercial purposes; however, the Defendants presently use or have previously used the Ryanair Website – directly or indirectly – for commercial purposes, in violation of the Ryanair TOU.

79.     The Defendants were never authorized to use the Ryanair Website for commercial purposes.

80.     Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com are aware of the Ryanair TOU.

81.     Even if the Defendants incorrectly believed they had authorization for themselves and/or their agents to screen scrape the Ryanair Website, the Cease and Desist Letter and Second Cease and Desist Letter have made it explicit that any assumed authorization has been revoked.

82.     In the Second Cease and Desist Letter, Ryanair wrote: "Ryanair explicitly and unequivocally states that Booking and its subsidiaries have no authorization to access Ryanair's website or its content for any reason. To the extent Booking or its subsidiaries ever believed they had authorization to access Ryanair's website, Ryanair explicitly revokes such authorization which was never provided in the first place. To the extent Booking is currently gaining unauthorized access to Ryanair's website or its content, we demand that you cease and desist from such activity immediately." *See* Exhibit C, p. 2-3, attached hereto.

83.     Ryanair explicitly revoked any and all authorization for parties that Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com may enlist to aid in accessing the Ryanair Website or its content.

84.     The Second Cease and Desist Letter stated: "In addition to Booking, Ryanair explicitly revokes any and all authorization for those parties that Booking may enlist to aid in accessing Ryanair's website or its content, including but not limited to any agents, employees, affiliates, and/or anyone acting on Booking's behalf. This revocation includes third-party vendors or third-party scraping providers that Booking may employ or hire or from which Booking may purchase a service. Technological gamesmanship or the enlisting of a third party to aid Booking in gaining such access does not excuse Booking of liability under CFAA. To the extent Booking is currently utilizing a third party to gain unauthorized access to Ryanair's website or its content, we demand that you cease and desist such activity and provide to Ryanair the third party's business information so that Ryanair can provide that company explicit notice of its continued violations of the CFAA." *See* Exhibit C, p. 3, attached hereto.

85.     On August 20, 2020, Booking Holdings responded to the Second Cease and Desist Letter.  Nowhere in its response does Booking Holdings claim that Booking Holdings or its Subsidiaries are authorized or were ever authorized by Ryanair to access the Ryanair Website.  *See* Exhibit D, attached hereto.

86.     On September 4, 2020, Ryanair filed this lawsuit against the Defendants regarding the Defendants' violations of the CFAA.

87.     On September 22, 2020, all Defendants waived service of the initial complaint.

88.     Like the cease and desist letters, this ongoing lawsuit has made it abundantly clear to the Defendants that their access to the Ryanair Website – whether it is direct access or indirect access – is explicitly unauthorized (or alternatively, in excess of their authorized access) and in violation of the CFAA. No reasonable person or entity could misinterpret this.

89.     Despite this pending lawsuit, the above-mentioned cease and desist letters, and the Ryanair TOU, Defendants have indicated that they intend to argue that certain of the Defendants are authorized to access the Ryanair Website.

90.     Ryanair has served on each Defendant another cease and desist letter, dated May 19, 2022. Collectively, these letters again make it clear to the Defendants that their access to the Ryanair Website – whether it is direct access or indirect access – is explicitly unauthorized (or alternatively, in excess of their authorized access) and in violation of the CFAA. *See* Exhibit E (group exhibit), attached hereto.

## C.     Ryanair implements both technological and contractual limitations on access to the Ryanair Website

91.     Beyond Ryanair's contracts, policies, and express revocation of any authorization to access the Ryanair Website for the Defendants, their agents, or third parties Defendants engage to access the Ryanair Website, Ryanair has also implemented technological (*e.g.*, code-based) limitations on access to the Ryanair Website.

92.     These technological limitations are meant to protect the Ryanair Website from unauthorized access from the Defendants, their agents, and third parties Defendants engage to access the Ryanair Website.

93.     For example, Ryanair requires users that wish to book a Ryanair itinerary to be granted access to do so from Ryanair. To book a Ryanair itinerary, a person must create a myRyanair account and be accepted by Ryanair.

94.     If a person (a) is not prohibited from accessing the Ryanair Website, (b) provides the requisite information to Ryanair, (c) and is accepted by Ryanair, only then is that person

able to access the myRyanair portion of the Ryanair Website, where users are able to purchase a Ryanair itinerary.

95.     Access to myRyanair requires authorization from Ryanair on an independent third party. In order to confirm authorization, Ryanair requires the party to enter a user name, email address, and password.

96.     Ryanair implemented the myRyanair procedure to, in part, stop unauthorized persons and entities from accessing the Ryanair Website.

97.     Ryanair has implemented additional technological limitations beyond those associated with the requirements of myRyanair.

98.     Ryanair has internally developed a program called Shield that has blocked unauthorized users such as the Defendants and third parties Defendants have engaged to access the Ryanair Website from scraping the Ryanair Website and selling Ryanair inventory.

99.     Shield provides a technological barrier to the entire Ryanair Website. A user is only able to view ryanair.com, if the person has been allowed past the Shield barrier or has circumvented the Shield barrier.

100.     Shield has used, in part, a machine learning blocking algorithm based on multiple factors to determine whether a user accessing the Ryanair Website is an unauthorized party.

101.     If Shield determined that an unauthorized user is attempting to access the Ryanair Website, Shield would block that user from accessing the Ryanair Website.

102.     Furthermore, if Shield determined that a user is attempting to access the Ryanair Website in order to screen scrape any portion of the Ryanair Website, Shield would block that user from accessing the Ryanair Website.

103.     Ryanair continues to update and improve the technological limitations it has implemented to protect the Ryanair Website from screen scraping and unauthorized users.

104.     Ryanair has also engaged third party New Relic, Inc. ("New Relic") to assist Ryanair in website error investigations.

105.     Ryanair has spent in excess of $5,000 on its engagement with New Relic.

106.   Ryanair has spent far in excess of $5,000 on third-party service providers supporting Ryanair's defense of the Ryanair Website from unauthorized users, including the Defendants and the parties they engage to access the Ryanair Website.

107.   Ryanair has implemented both contract and policy-based limitations and restrictions on access to the Ryanair Website as well as technological limitations on access to the Ryanair Website.

108.   For instance, as discussed above, Ryanair closely monitors all users of the Ryanair Website. Ryanair has implemented limitations on access to the Ryanair Website, including (a) explicitly rejected certain users' authorization to the Ryanair Website, just as Ryanair has done in this case; (b) implemented contractual restrictions that limit access to the Ryanair Website, such as the Ryanair Website's TOU; (c) formulated technological limitations, such as the Shield program discussed above, which has blocked unauthorized parties from accessing the Ryanair Website; and (d) enabled additional technological limitations on access to the Ryanair Website that have blocked unauthorized users and monitored usage of the Ryanair Website and IP addresses associated with unauthorized users.

109.   The myRyanair portion of the Ryanair Website has had even more barriers and limitations on access.

110.   As explained above, in order to gain access to the myRyanair portion of the Ryanair Website, a person must disclose its email address and create a password.

111.   If a person provided an email address associated with an unauthorized user, Ryanair would block that person's access to the Ryanair Website.

112.   The Shield program, discussed above, has also monitored and protected the myRyanair portion of the Ryanair Website.

113.   Shield has monitored the persons utilizing the myRyanair portion of the Ryanair Website and imposed technological limitations on access to the Ryanair Website.

114.    Additionally, in order to enter the myRyanair portion of the Ryanair Website, the user must *again* acknowledge the TOU, which make clear that access to the Ryanair website is restricted, as is any screen scraping.

115.    Defendants are not authorized to access the Ryanair Website, and Ryanair has utilized the aforementioned tools and limitations to restrict Defendants' access to the Ryanair Website.

116.    Alternatively, Defendants have exceeded their authorized access to the Ryanair Website, and Ryanair has utilized the aforementioned tools and limitations to restrict Defendants' access to the Ryanair Website.

117.    Similarly, Defendants' agents and third parties that have been contracted by the Defendants to, at least in part, access the Ryanair Website are not authorized to access the Ryanair Website, and Ryanair has utilized the aforementioned tools and limitations on access to prohibit those third parties' access to the Ryanair Website.

118.    Alternatively, Defendants' agents and third parties that have been contracted by the Defendants to, at least in part, access the Ryanair Website have exceeded their authorized access to the Ryanair Website, and Ryanair has utilized the aforementioned tools and limitations on access to prohibit those third parties' access to the Ryanair Website.

**D.    Defendants' unauthorized activities**

119.    Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com each operate as online travel agents and booking services for airline flights, hotel reservations, car rentals, and ancillary services.

120.    In Booking Holdings's Form 10-K filed on February 26, 2020, Booking Holdings states:

> Our mission is to make it easier for everyone to experience the world. We seek to empower people to cut through travel barriers, such as money, time, language and overwhelming options, so they can use our services to easily and confidently get where they want to go, stay where they want to stay, dine where they want to dine, pay how they want to pay and experience what they want to experience. We connect

consumers wishing to make travel reservations with providers of travel services around the world through our online platforms. Through one or more of our brands, consumers can: book a broad array of accommodations (including hotels, motels, resorts, homes, apartments, bed and breakfasts, hostels and other properties); make a car rental reservation or arrange for an airport taxi; make a dinner reservation; or book a cruise, flight, vacation package, tour or activity. Consumers can also use our meta-search services to easily compare travel reservation information, such as airline ticket, hotel reservation and rental car reservation information, from hundreds of online travel platforms at once. In addition, we offer various other services to consumers and partners, such as certain travel-related insurance products and restaurant management services to restaurants.

We offer these services through six primary consumer-facing brands: Booking.com, KAYAK, priceline, agoda, Rentalcars.com and OpenTable. While historically our brands operated on a largely independent basis and many of them focused on a particular service (e.g., accommodation reservations) or geography, we are increasing the collaboration, cooperation and interdependency among our brands in our efforts to provide consumers with the best and most comprehensive services. We also seek to maximize the benefits of our scale by sharing resources and technological innovations, co-developing new services and coordinating activities in key markets among our brands. For example, Booking.com, the world's leading brand for booking online accommodation reservations (based on room nights booked), offers rental car and other ground transportation services, flights, restaurant reservations, tours and activities reservations and other services, many of which are supported by our other brands. Similarly, hotel reservations available through Booking.com are also generally available through agoda and priceline.

121.    In Booking Holdings's Form 10-K filed on February 26, 2020, Booking Holdings further states that "[w]e maintain websites with the addresses www.bookingholdings.com, www.booking.com, www.priceline.com, www.kayak.com, www.agoda.com, www.rentalcars.com and www.opentable.com, among others."

122.    Booking Holdings's website states that Booking Holdings is "THE WORLD'S LEADING PROVIDER OF ONLINE TRAVEL AND RELATED SERVICES."

123.    At the time of the filing of this lawsuit, the menu bar at the top of the Booking Holdings website allowed a user to choose to book travel services, including airline flights, from Booking Holdings's "Brands," including the Subsidiaries.

124.    By selecting a Subsidiary from this menu, the user is directed to a separate page with a link to that Subsidiary's website.

125.    At the time of the filing of this lawsuit, a user could also access the link to each Subsidiary's website from another menu at the bottom of the Booking Holdings website.

126.    The Booking.com, Kayak.com, Priceline.com, and Agoda.com websites offer for sale and sell – or have offered for sale during the pertinent timeframe – Ryanair flights individually and as part of a package, *e.g.* flights and hotels, through their respective websites.

127.    On their respective websites, Booking.com, Kayak.com, Priceline.com, and Agoda.com offer – or have offered for sale during the pertinent timeframe – Ryanair flights and packages without Ryanair's permission, in violation of Ryanair's TOU, and by the Defendants direct or indirect unauthorized access (or alternatively, in excess of their authorized access) to the Ryanair Website.

128.    Booking.com, Priceline, and Agoda offer for sale and sell Ryanair flights individually on their respective websites.

129.    KAYAK shows Ryanair schedules and fares on its website.

130.    On information and belief, Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com have used and/or procured, either directly or indirectly, and continue to use and/or procure, information automated systems or software that enables them to enter into and use the Ryanair Website, its content, and/or underlying databases for the purposes of searching and booking Ryanair flights that are ultimately sold, or have been sold, by Booking.com, Kayak.com, Priceline.com, and Agoda.com to customers using the Booking.com, Kayak.com, Priceline.com, and Agoda.com websites, which are accessible from the Booking Holdings website.

131.    Ryanair itineraries are sold by Booking.com, Priceline, and Agoda.

132.    The information related to the Ryanair itineraries (*e.g.*, flight times) is scraped directly or indirectly by the Defendants.

133.    Neither the Defendants nor third parties contracted by Defendants have authorization to access the Ryanair Website for any reason.

134.    Neither the Defendants nor third parties contracted by Defendants have authorization to scrape the Ryanair Website.

135.    Neither the Defendants nor third parties contracted by Defendants have authorization to use the Ryanair Website for commercial purposes.

136.    Neither the Defendants nor third parties contracted by Defendants have authorization to access the Ryanair Website to obtain Ryanair itineraries.

137.    In the alternative, the Defendants, their agents, and third parties contracted by Defendants have exceeded their authorized access to the Ryanair Website.

138.    The automated systems or software described above in paragraph 130 operate on a daily and near-continuous basis in order to procure flight information from the Ryanair Website. This continues to the present day.

139.    For example, as shown below, Kayak continuously monitors Ryanair flight prices to provide its customers updated price information.



140.    In order to monitor flight prices, like in the above example, Kayak directly or indirectly accesses the Ryanair Website without authorization or, alternatively, in excess of its authorized access.

141.    Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com, either directly or indirectly, enter and use the Ryanair Website by engaging in and/or directing, controlling, or procuring their respective agents or contracted third parties to engage in an activity commonly referred to as "screen scraping," "crawling," or the use of a "robot" or "spider."

142.    Defendants, either directly or indirectly by utilizing contracted third parties, go beyond merely scraping the information related to Ryanair itineraries but also bypass the myRyanair and Shield limitations to access the myRyanair portion of the Ryanair Website.

143.    Defendants, either directly or indirectly by utilizing contracted third parties, gain unauthorized access to the myRyanair portion of the Ryanair Website to purchase Ryanair flight itineraries.

144.    A customer who books and purchases a Ryanair flight through the Booking.com, Kayak.com, Priceline.com, and Agoda.com websites does so within the confines of those websites – or has done so within the confines of those websites during the pertinent timeframe. The customer is not transferred to the Ryanair Website.

145.    To the extent one of the aforementioned websites transfer customers to a third-party website or the Ryanair Website, this is a change implemented by the Defendants after this lawsuit was filed.

146.    The automated software or systems described above in paragraphs 130 and 141 enable Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com, either directly or indirectly by utilizing contracted third parties, to enter into and use, or cause to be entered into and used, the Ryanair Website and its content by mimicking an actual customer.

147.   For example, when a consumer purchases a Ryanair flight on one of the Defendants' websites, the relevant Defendant, either directly or indirectly, accesses the myRyanair portion of the Ryanair Website to purchase a Ryanair itinerary.

148.   This access is unauthorized (or, alternatively, exceeds authorized access) and bypasses the limitations on access Ryanair has imposed, which were described above.

149.   For example:

    a.   Defendants, either directly or indirectly, utilize different IP addresses to avoid detection from Ryanair's Shield program;

    b.   Defendants, either directly or indirectly, utilize fake user names to avoid detection from Ryanair's Shield program and other technological protections; and/or

    c.   Defendants, either directly or indirectly, utilize incorrect or manufactured email addresses to avoid detection from Ryanair's Shield program and other technological protections.

150.   Defendants are each not authorized to access any portion of the Ryanair Website, either directly or indirectly.

151.   Alternatively, Defendants have each exceeded their authorized access to the Ryanair Website either directly or indirectly.

152.   Defendants are each not authorized to access the myRyanair portion of the Ryanair Website. Alternatively, Defendants have each exceeded their authorized access to the Ryanair Website either directly or indirectly.

153.   Defendants, however, have organized a system to access the Ryanair Website by using misrepresentation and third parties that misrepresent themselves.

154.   By engaging in such misrepresentations, Defendants directly or indirectly access the Ryanair Website knowingly and with intent to defraud Ryanair and its customers.

155.     Additionally, Priceline.com, through its Priceline Partner Network or Priceline Partner Solutions (the "Priceline Partner Network" or "PPN"), holds itself out as an entity that can provide flight information and flight itineraries to third parties.

156.     PPN states explicitly that it is part of the "world's largest online travel company" and "proud to be part of Booking Holdings, the world's leading provider of online travel & related services to customers in over 220 countries and territories."

157.     PPN states on its "Our Supply" page that PPN connects "to over 300 airlines, 2000 airports in 200 countries worldwide."

158.     PPN does not state whether it is authorized to connect to all of those airlines.

159.     PPN does not state whether it is authorized to access the websites of all those airlines.

160.     PPN is not authorized to access the Ryanair Website.

161.     PPN is not authorized to access the myRyanair portion of the Ryanair Website.

162.     PPN's agents and third parties enlisted by PPN to access airline websites are not authorized to access any portion of the Ryanair Website.

163.     PPN states on its "Our Supply" page that their "product makes it easy for customers to book the right flight with seat selection, flexible date searches, split-ticket options and in-path upgrades."

164.     Merely as an example, BitBook, an online travel platform, partners with PPN and states that its booking engine inventory "will be powered by Priceline Partner Network" and that PPN or Priceline.com provides, among other things, 322+ airlines with global coverage.

165.     Upon this information, Priceline.com provides BitBook with flight information.

166.     BitBook offers Ryanair flights, as shown below:



167.    BitBook does not merely show Ryanair flight information, such as flight prices or flight times.

168.    BitBook also allows its users to book airline flights, including Ryanair flights, via the BitBook website, as shown here:

169.    When booking a Ryanair flight through BitBook, it states that the user is agreeing to BitBook's terms and conditions.

170.    If a user clicks on the hyperlink titled "terms and conditions," BitBook will direct the user to an "Agreement between user and priceline.com LLC."

171.    Based upon this information, when a user books a Ryanair flight on BitBook's website, Priceline.com provides to BitBook and the BitBook user the requested Ryanair flight itinerary.

172.    Priceline.com intentionally and without authorization (or alternatively, in excess of its authorized access) accesses, either directly or indirectly, the Ryanair Website and obtains Ryanair flight information, which as outlined below, causes damage to Ryanair and the Ryanair Website.

173.    In addition, Priceline.com knowingly and without authorization (or alternatively, in excess of its authorized access) causes the transmission, either directly or indirectly, of Ryanair flight itineraries to BitBook, which as outlined below, causes damage to Ryanair and the Ryanair Website.

174.    Ryanair flight itineraries cannot be obtained online without entering the myRyanair portion of the Ryanair Website.

175.    Priceline.com is not authorized to access the Ryanair Website.

176.    Priceline.com is aware that it is not authorized to access the Ryanair Website.

177.    Priceline.com's agents and third parties engaged by Priceline.com to access airline websites, including the Ryanair Website, are not authorized to access the Ryanair Website.

178.    Priceline.com is aware that its agents and third parties engaged by Priceline.com to access airline websites, including the Ryanair Website, are not authorized to access the Ryanair Website.

179.    Priceline.com, through PPN, has entered into multiple agreements similar to the BitBook agreement, including Seats.com and Travala.

180.    Such unauthorized access is not limited to Priceline.com.

181.    For example, below is a representative screen from Booking.com that shows Booking.com offering Ryanair flights without authorization.



182.    Booking.com obtains that information from the Ryanair Website.

183.    A user of Booking.com is able to book a Ryanair flight without leaving the Booking.com website.

184.    Ryanair flights cannot be obtained online on the Booking.com website without entering the myRyanair portion of the Ryanair Website.

185.    Booking.com is not authorized to access the Ryanair Website.

186.    Booking.com is aware that it is not authorized to access the Ryanair Website.

187.    Booking.com's agents and third parties engaged by Booking.com to access airline websites, including the Ryanair Website, are not authorized to access the Ryanair Website.

188.    Booking.com is aware that its agents and third parties engaged by Booking.com to access airline websites, including the Ryanair Website, are not authorized to access the Ryanair Website.

189.    Booking.com intentionally and without authorization (or alternatively, in excess of its authorized access) accesses, either directly or indirectly, the Ryanair Website and obtains Ryanair flight information, which as outlined below, causes damage to Ryanair and the Ryanair Website.

190.    Kayak.com similarly offers Ryanair flights, as shown below:



191.    Kayak.com obtains that information from the Ryanair Website.

192.    A user of Kayak.com is able to book the Ryanair flight without leaving the Kayak.com website, as shown above ("Book on KAYAK").

193.    Ryanair flights cannot be obtained online on the Kayak.com website without entering the myRyanair portion of the Ryanair Website.

194.    Kayak.com obtains Ryanair flight information from the myRyanair portion of the Ryanair Website.

195.    Kayak.com is not authorized to access the Ryanair Website.

196.    Kayak.com is aware that it is not authorized to access the Ryanair Website.

197.    Kayak.com's agents and third parties engaged by Kayak.com to access airline websites, including the Ryanair Website, are not authorized to access the Ryanair Website.

198.    Kayak.com is aware that its agents and third parties engaged by Kayak.com to access airline websites, including the Ryanair Website, are not authorized to access the Ryanair Website.

199.    Kayak.com intentionally and without authorization (or alternatively, in excess of its authorized access) accesses, either directly or indirectly, the Ryanair Website and obtains Ryanair flight information, which as outlined below, causes damage to Ryanair and the Ryanair Website.

200.    Agoda.com sells—or has sold during the relevant time period—Ryanair flight itineraries.

201.    Ryanair flights cannot be obtained online on the Agoda.com website without entering the myRyanair portion of the Ryanair Website.

202.    Agoda.com obtains Ryanair flight information—or has obtained Ryanair flight information—from the myRyanair portion of the Ryanair Website.

203.    Agoda.com is not authorized to access the Ryanair Website.

204.    Agoda.com is aware that it is not authorized to access the Ryanair Website.

205.    Agoda.com's agents and third parties engaged by Agoda.com to access airline websites, including the Ryanair Website, are not authorized to access the Ryanair Website.

206.    Agoda.com is aware that its agents and third parties engaged by Kayak.com to access airline websites, including the Ryanair Website, are not authorized to access the Ryanair Website.

207.    Agoda.com intentionally and without authorization (or alternatively, in excess of its authorized access) accesses, either directly or indirectly, the Ryanair Website and obtains Ryanair flight information, which as outlined below, causes damage to Ryanair and the Ryanair Website.

**E.    Defendants' inclusion of third parties in its scheme to access the Ryanair Website**

208.    Despite Defendants being well-aware that they are not authorized to access any portion of the Ryanair Website (or alternatively, not authorized to use the Ryanair Website for screen scraping or commercial purposes), the Defendants have taken measures to bypass both the technological and contractual limitations to access the Ryanair Website.

209.    Each Defendant bypasses both the technological and contractual limitations imposed by Ryanair to access the Ryanair Website without authorization (or alternatively, in excess of their authorized access).

210.    Each Defendant, either directly or indirectly, accesses the Ryanair Website, bypassing multiple technological and contractual limitations to both obtain Ryanair flight information and acquire Ryanair flight itineraries.

211.    Each Defendant, at least in part, utilizes third parties to access the Ryanair Website to bypass the technological and contractual limitations described in this First Amended Complaint.

212.    Certain entities are known to scrape websites to obtain flight itinerary information, such as flight times and prices.

213.    These entities, upon information and belief, also engage in purchasing flight itineraries, often in bulk.

214.    The scraping and the bulk buying of Ryanair flight itineraries leads to technological issues described herein, causes serious harm to the Ryanair Website, and requires Ryanair to expend substantial costs in both remedying issues created by the Defendants and protecting the Ryanair Website from further unauthorized access by the Defendants, directly or indirectly, and the resulting damage.

215.     Certain of these agents and third parties engaged by Defendants have scraped the Ryanair Website and obtained Ryanair flight itineraries on behalf of the Defendants. For example:

    a.   Agoda.com has an agreement with Priceline.com, which receives Ryanair itineraries from Travelfusion, Mystifly, Kiwi.com, and PKFare. Agoda.com receives – or has received during the pertinent timeframe – Ryanair itinerary information as a result of these agreements.

    b.   Kayak has agreements with Travelfusion and various online travel agents related to obtaining flight information. Kayak receives Ryanair itinerary information as a result of these agreements.

    c.   Booking.com has agreements with Etraveli and Priceline related to obtaining flight information. Booking.com receives Ryanair itinerary information as a result of these agreements.

    d.   Priceline.com has agreements with Mystifly and Travelfusion related to obtaining flight information. Priceline.com receives Ryanair itinerary information as a result of these agreements and transmits Ryanair itinerary information without authorization to third parties through PPN, such as BookBit.

216.     This is unauthorized access, and Ryanair has implemented the same technological and contractual limitations on those entities, as it has on the Defendants.

217.     Defendants cannot avoid CFAA liability by engaging agents and third parties to perform the unauthorized access to the Ryanair Website on their behalf.

218.     In the alternative, Defendants cannot avoid CFAA liability by engaging agents and third parties to exceed the Defendants' authorized access to the Ryanair Website on their behalf.

219.    Defendants direct, encourage, induce and/or affirmatively act in support of their agents and certain third parties who access the Ryanair Website on behalf of the Defendants in violation of the CFAA.

220.    For instance, Defendants have entered into written agreements with their agents and certain third parties who access the Ryanair Website without authorization (or alternatively, in excess of their authorized access) on behalf of the Defendants and then transmit (without authorization) Ryanair's flight itineraries and packages that the Defendants then publish on their respective websites without Ryanair's permission.

221.    Defendants know that neither the Defendants nor these agents and third parties are authorized to access the Ryanair Website.

222.    In the alternative, Defendants are aware that they will exceed their authorized access to the Ryanair Website if they – directly or indirectly – access the Ryanair Website for the purpose of screen scraping or for commercial purposes.

223.    Defendants and the third parties work in concert to access the Ryanair Website, including the myRyanair portion of the Ryanair Website.

224.    Defendants do this to increase their profits while knowingly damaging the Ryanair Website and causing significant technological harm to Ryanair.

225.    For example, and as explained above in paragraphs 215 through 223, when a user books a Ryanair flight on one of the Defendants' websites, either the relevant Defendant or one of its enlisted third parties accesses the myRyanair portion of the Ryanair Website to obtain that flight itinerary.

226.    That specific access to the Ryanair Website would not occur but for the Defendants directing the third party to access the Ryanair Website to obtain a specific Ryanair flight itinerary.

227.    Additionally, the Defendants have extremely close relationships with the parties that Defendants enlist to access the Ryanair Website.

228.     Agoda.com has an agreement with Priceline.com for Priceline.com to provide flight information and obtain flight itineraries for Agoda.com. Both parties are subsidiaries of Booking Holdings.

229.     Priceline.com receives at least some Ryanair flight itineraries from Kiwi.com.

230.     Upon information and belief, Kiwi.com's owner, General Atlantic, has or has had a significant investment in Priceline.com.

231.     Upon information and belief, the Managing Director at General Atlantic, a chief investor in Priceline.com or former significant investor in Priceline.com, is a board member at Kiwi.com.

232.     A Vice President at General Atlantic, a significant investor or former significant investor in Priceline.com, is a board member at Kiwi.com.

233.     The Chief Product Officer at Kiwi.com formerly built product strategies at both Booking.com and Priceline.com.

234.     The Chairman of the Board of Directors of Kiwi.com is the former Chief Financial Officer and Chief Accounting Officer of the entity that is now Booking Holdings.

235.     Priceline.com and General Atlantic partnered in 2000 to form Priceline.com Europe.

236.     Priceline.com and Kayak.com both have separate agreements with Travelfusion where Travelfusion provides flight itineraries, including Ryanair itineraries.

237.     Upon information and belief, Priceline.com invested $500 million in the company Ctrip in 2014, and Ctrip the next year acquired a majority stake in Travelfusion.

238.     Booking.com receives Ryanair itineraries from at least two parties: Priceline.com and Etraveli.

239.     Booking.com and Pricline.com are both subsidiaries of Booking Holdings.

240.     Upon information and belief, Booking Holdings either owns or is in the process of purchasing Etraveli.

241.     Upon information and belief, the interactions between the Defendants and at least a subset of third-party data aggregators that access the Ryanair Website without authorization are not arm's length transactions. *See supra*, paragraphs 227 through 240.

242.     The interests of the Defendants and at least a subset of third-party data aggregators that access the Ryanair Website without authorization are intermingled.

243.     Furthermore, Priceline.com provides data aggregating services for other third parties, including providing Ryanair data and Ryanair flight itineraries that are only available from the Ryanair Website.

244.     Upon information and belief, as explained above, Priceline is directly accessing the Ryanair Website both for itself and for third parties such as BitBook, Seats.com and Travala.

245.     The Defendants control, at least in part, when and how third parties access the Ryanair Website to obtain Ryanair flight itineraries. For instance, if a user books a flight using Priceline.com, either Priceline.com or one of its enlisted third parties accesses the Ryanair Website without authorization and obtain that specific flight itinerary. In order to obtain the Ryanair flight itinerary for a Priceline.com customer, either Priceline.com or an enlisted third party must enter the myRyanair portion of the Ryanair Website, which has even further technological and non-technological barriers to entry.

246.     The Defendants enlist these third parties to assist in the furtherance of the unlawful and unauthorized access of the Ryanair Website.

247.     That is merely an exemplar, and the same process occurs – or has occurred during the operative time period – for each of the other Subsidiaries.

248.     Defendants, both knowingly and willfully, instigate, induce, encourage, and direct third parties to access the Ryanair Website without authorization. This is evidenced by the discussion above about how Ryanair itineraries are obtained when purchased on one of Defendants' websites. *See supra*, paragraphs 243 through 246.

249.     This is not merely each Defendant purchasing data from a third party that accesses the Ryanair Website.

250.    Instead, the Defendants, based on the activities on their websites, control, or at least direct, certain unauthorized access of the Ryanair Website.

251.    As discussed above, there are contractual agreements in place between each Defendant and certain third parties, which would require the third parties to access the Ryanair Website without authorization (or alternatively, in excess of authorized access). Again, Defendants are fully aware that their access to the Ryanair Website is not authorized and have organized a structure with third parties, often intermingled third parties, to access the Ryanair Website without authorization (or alternatively, in excess of authorized access).

252.    The technological limitations imposed by Ryanair to limit access to the Ryanair Website are also intended to stop the third parties enlisted by Defendants. These parties, however, circumvent Shield and Ryanair's other technological limitations by utilizing fake names, fake email addresses, and random IP addresses.

253.    Each Defendant, either directly or indirectly through their enlisted third parties, circumvent Shield and Ryanair's other technological and non-technological limitations on access to the Ryanair Website. Defendants access to the Ryanair Website is unauthorized or, alternatively, in excess of authorized access.

254.    Each Defendant, themselves or through their enlisted third parties, continues to knowingly and intentionally screen scrape the Ryanair Website to its own economic and reputational advantage and to the disadvantage of Ryanair.

255.    Defendants, themselves or through their enlisted third parties, continue to knowingly and intentionally access the Ryanair Website without authorization (or alternatively, in excess of authorized access) to obtain Ryanair flight itineraries.

**F.    Damage and loss resulting from Defendants' unauthorized access**

256.    On information and belief, upon entering into and using the Ryanair Website or its content, each of Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com and/or their agents or contracted third parties conduct or cause a search for flight information on behalf of their own customers.

33

257.     On information and belief, Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com use the information, or have used the information, gleaned from their screen scraping activities for use in conjunction with offers to their respective customers.

258.     Booking.com, Kayak.com, Priceline.com, and Agoda.com misrepresent, or have misrepresented, to their respective customers the true cost of the Ryanair flight.

259.     For example, the images below show that the same flight from Dublin to Cologne departing at 3:55 PM EDT on September 4, 2020 costs $17.85 on the Ryanair Website, $26.73 on the Priceline.com website, and $20.84 on the Kayak.com website:





260.    As another example, the images below show that the same flight from Hamburg to Barcelona departing at 9:45 AM EDT on September 5, 2020 costs $11.90 on the Ryanair Website, $20.55 on the Priceline.com website, and $14.97 on the Kayak.com website:







261.    In another example, the images below show that the same flight from Dublin to Amsterdam departing at 6:50 AM EDT on September 8, 2020 costs $5.96 on the Ryanair Website, $14.28 on the Priceline.com website, and $9.01 on the Kayak.com website:





262.    As shown below, Kayak.com, Priceline.com, and Agoda.com misrepresent the true cost of Ryanair flights, as described in paragraphs 259 to 261, by failing to inform their customers in the search results page that the price of Ryanair flights includes an additional fee imposed by Kayak.com, Priceline.com, or Agoda.com.   Only when customers reach the checkout page do they learn that an additional fee is imposed by Kayak.com, Priceline.com, or Agoda.com, and that said fee is unconnected with Ryanair and paid to Kayak.com, Priceline.com, or Agoda.com or their agents.



263.   The imposition of such additional fees as described above in paragraphs 259 to 262 causes damage to Ryanair's goodwill and reputation.

264.   If a user tries to purchase a flight on the Booking.com website by clicking on "Flights," that user is redirected to the Priceline.com website.

265.   Booking.com, Kayak.com, Priceline.com, and Agoda.com's refusal or failure to transfer the customers to the Ryanair Website for the purpose of booking a flight with Ryanair interferes with Ryanair's commercial interests and damages Ryanair.

266.   The Defendants' ability to sell Ryanair services through the Booking.com, Kayak.com, Priceline.com, and Agoda.com websites is dependent on Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com unauthorized access, whether direct or indirect, and illegal scraping of the Ryanair Website.

267.   Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com, either directly or indirectly, screen scrape the Ryanair Website and deprive Ryanair of the opportunity to maximize its revenues from the Ryanair Website.

268.    On information and belief, Ryanair also suffers a loss when Booking.com, Kayak.com, Priceline.com, and Agoda.com's activities cause Ryanair's potential customers to choose not to travel with Ryanair after viewing the inflated cost shown on the Subsidiaries' respective websites.

269.    Beyond the harm discussed above, Ryanair has suffered significant technological harms due to Defendants' unauthorized access to the Ryanair Website.

270.    The unauthorized access to Ryanair's Website by Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com, whether direct or indirect, greatly increases the quantities of queries on the Ryanair Website.

271.    These automated queries from the aforementioned unauthorized access have the ability to overwhelm the systems of the Ryanair Website, which impairs the Ryanair Website's availability and/or usability for the intended users. This causes material harm to Ryanair, the performance of the Ryanair Website, Ryanair's customers, and Ryanair's reputation.

272.    Because of the data being scraped from the Ryanair Website by Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com and/or their agents, response time on the Ryanair Website can deteriorate, leading to error rates, and unacceptably slow response rates.

273.    For instance, the following graph shows the logging of HTTP 502 errors due to the excessive usage from unauthorized access to the Ryanair Website:



274.    As shown above, there are multiple and long-lasting spikes in errors.

275.    Below is representative of the HTTP 502 errors caused by unauthorized access to the Ryanair Website:

```
DotRez.Framework.Exceptions.Application.DotrezException: <html>
<head><title>502 Bad Gateway</title></head>
<body>
<center><h1>502 Bad Gateway</h1></center>
<hr><center>nginx</center>
</body>
</html>
<!-- a padding to disable MSIE and Chrome friendly error page -->
<!-- a padding to disable MSIE and Chrome friendly error page -->
<!-- a padding to disable MSIE and Chrome friendly error page -->
<!-- a padding to disable MSIE and Chrome friendly error page -->
<!-- a padding to disable MSIE and Chrome friendly error page -->
<!-- a padding to disable MSIE and Chrome friendly error page -->
```

276.    Defendants' unauthorized access, either direct or indirect, leads to increased response time and increased errors.

277.    These increased errors include both the 5xx errors mentioned above and voucher errors.

278.    Below is an example of increased voucher errors due to unauthorized access to the Ryanair Website.



279.    Below is another example of increased errors due to unauthorized access to the Ryanair Website.



280.    These are merely examples of the errors caused by the unauthorized access, including Defendants' unauthorized access, to the Ryanair Website.

281.    For instance and upon information and belief, the errors shown in the paragraphs above came from separate unauthorized accesses related to Travelfusion.

282.    Priceline.com and Kayak.com have agreements with Travelfusion.

283.    Priceline.com and Kayak.com receive information from the Ryanair Website from Travelfusion.

284.    Agoda.com also receives information from the Ryanair Website from Travelfusion through the Priceline.com/Travelfusion agreement.

285.    Booking.com also receives information from the Ryanair Website that is provided by Priceline.com pursuant to an intercompany agreement. As noted above, Priceline.com receives Ryanair itinerary information from Travelfusion.

286.     While Ryanair is constantly improving the barriers to the Ryanair Website, it is difficult to identify with 100% certainty the party that is accessing the Ryanair Website without authorization or by exceeding authorization.

287.     This is because the parties that access the Ryanair Website without authorization or by exceeding their authorization attempt to conceal their true identities by utilizing anonymized IP addresses and email addresses.

288.     The above-described issues, including the errors, are technological harms that damage the Ryanair Website

289.     Ryanair's losses due to these technological harms are significant and well over $5,000.

290.     Excessive unauthorized access to the Ryanair Website by Defendants, as discussed above, creates significant problems throughout the Ryanair system and requires substantial resources, both internal and external to both correct the problems and to protect against future problems.

291.     Ryanair has spent considerable resources, in excess of five thousand dollars ($5,000), to find, diagnose, and block access to the Ryanair Website by Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com, both directly and indirectly. Those resources have included and continue to include the diversion of employees from their usual duties, along with costs paid to third parties.

292.     Ryanair has spent considerable resources, in excess of five thousand dollars ($5,000), to correct technological problems caused by each of Defendants' direct or indirect unauthorized access to the Ryanair Website.

293.     As discussed above, Ryanair has developed a program called Shield that was created, in part, to block unauthorized parties from accessing the Ryanair Website.

294.     Shield uses a machine learning blocking algorithm based on multiple factors to determine whether a user accessing the Ryanair Website is an unauthorized party.

295.    If Shield determines that a user is unauthorized or is attempting to access the Ryanair Website in order to screen scrape the Ryanair Website, Shield can block that user from accessing the Ryanair Website.

296.    Ryanair has spent in excess of five thousand dollars ($5,000) creating, implementing, and improving Shield.

297.    Ryanair employees have spent many hours responding to complications, errors, and problems caused by Defendants' direct or indirect unauthorized access to the Ryanair Website. These hours total far more than $5,000 in costs to analyze, investigate, and respond to this unauthorized access.

298.    Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com's unauthorized and illegal use of the Ryanair Website has impaired the Ryanair Website's value, injured Ryanair, and continues to injure Ryanair.

299.    Furthermore, Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com are aware that screen scraping negatively affects Ryanair and the Ryanair Website.

300.    Booking.com, Kayak.com, Priceline.com, and Agoda.com themselves prohibit screen scraping of their own respective websites.

301.    Use of an automated system or software to extract data from the Kayak.com website would negatively affect the performance of the Kayak.com website.

302.    Use of an automated system or software to extract data from the Booking.com website would negatively affect the performance of the Booking.com website.

303.    Use of an automated system or software to extract data from the Priceline.com website would negatively affect the performance of the Priceline.com website.

304.    Use of an automated system or software to extract data from the Agoda.com website would negatively affect the performance of the Agoda.com website.

305.    The Terms and Conditions of the Booking.com website state that "Our Trip Service is made available for personal and non-commercial use only. Therefore, you are not allowed to resell, deep link, use, copy, monitor (e.g. spider, scrape), display, download, or

reproduce any content or information, software, reservations, tickets, products, or services available on our Platform for any commercial or competitive activity or purpose."

306.    The Terms and Conditions of the Kayak.com website state that "In addition, you agree not to do any of the following without prior express written permission from KAYAK: (i) access the site with any manual or automated process for any purpose other than your personal use or for inclusion of KAYAK pages in a search index. Use of any automated system or software to extract data from Our Website ("screen scraping"), for commercial or non-commercial purposes, is prohibited."

307.    The Terms and Conditions of the Priceline.com website state that "Without limiting the above, and whether or not you have a commercial purpose, you agree not to . . . access, monitor, copy, or reproduce any Content of this Site using any robot, spider, scraper or other automated means or manual process for any purpose without express written permission of priceline.com."

308.    The Terms of Use on the Agoda.com website state that "In addition, you agree not to:  use the Site or its contents for any non-authorized commercial purpose (e.g. forward distribution or resale of bookings without permission); make any speculative, false, or fraudulent booking; access, monitor or copy any content or information of the Site using any robot, spider, scraper or other automated means or any manual process for any purpose without our express prior written permission."

309.    Defendants unauthorized access, whether it is direct or indirect, is causing severe technological harm to the Ryanair Website, and Defendants are knowingly and willfully causing this harm.

## COUNT I
### Violation of Section 1030(a)(2)(C) of the Computer Fraud & Abuse Act
### (Against All Defendants)

310.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 309, above, as if set forth in their entirety herein.

311.    Plaintiff brings this action under 18 U.S.C. § 1030(g) allowing any injured person to maintain a civil action against the violator of 18 U.S.C. § 1030.

312.    The Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing, either directly or indirectly, a computer used for interstate commerce or communication, without authorization or by exceeding authorization and by obtaining information from such a protected computer.

313.    The allegations above prove the Defendants' violation of this subsection. Defendants are intentionally accessing the Ryanair Website, either directly or indirectly, and Defendants are well aware that they have no authorization to access the Ryanair Website.

314.    Defendants have implemented significant technical and non-technical barriers to all portions of the Ryanair Website to stop unauthorized access.

315.    To the extent a portion of the Ryanair Website is found to not have sufficient barriers or limitations and therefore Defendants are deemed to have access to the Ryanair Website, Defendants intentional access of the myRyanair portion of the website, either directly or indirectly, exceeds any authorized access Defendants or their enlisted third parties may have.

316.    To the extent the Defendants are not directly liable for directly accessing the Ryanair Computer without authorization, Defendants are vicariously liable for their indirect unauthorized access to the Ryanair Website, as discussed above.

317.    The computer system or systems that the Defendants have accessed as described above constitute a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2).

318.    Ryanair has suffered damage and loss by reason of these violations, including, without limitation, harm caused by interruption of service to Ryanair's website, data and/or underlying databases, amounts expended attempting to prevent the Defendant's unauthorized scraping, and other losses and damage in an amount well over $5,000 aggregated over a one-year period.

319.    Pursuant to 18 U.S.C. § 1030(g), Plaintiff is entitled to recover compensatory damages and preliminary and injunctive relief prohibiting the Defendants from further

violations of the Computer Fraud and Abuse Act and to prohibit the Defendants from using the data they obtained by scraping Ryanair's website.

## COUNT II
### Violation of Section 1030(a)(4) of the Computer Fraud & Abuse Act
### (Against All Defendants)

320.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 319, above, as if set forth in their entirety herein.

321.    Plaintiff brings this action under 18 U.S.C. § 1030(g) allowing any injured person to maintain a civil action against the violator of 18 U.S.C. § 1030.

322.    The Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4), by knowingly, and with intent to defraud Ryanair, accessing either directly or indirectly a protected computer, without authorization or exceeding authorization, to such a computer, and by means of such conduct furthered the intended fraud and obtained one or more things of value.

323.    The currently-known facts of Defendants intent to defraud both Ryanair and its customers and to cause significant harm to the Ryanair Website are outlined throughout this First Amended Complaint.

324.    For instance, Defendants accessing, either directly or indirectly, the myRyanair portion of the Ryanair Website requires intentional misrepresentation. IP addresses and email addresses are anonymized in order to access the myRyanair Website.

325.    A party misrepresenting itself, whether by lying about its email address or anonymizing its IP address, is fraudulent behavior.

326.    To the extent the Defendants are not directly liable for directly accessing the Ryanair Computer without authorization, Defendants are vicariously liable for their indirect unauthorized access to the Ryanair Website, as discussed above.

327.    The computer system or systems that the Defendants have accessed as described above constitute a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2).

328.    Ryanair has suffered damage and loss by reason of these violations, including, without limitation, harm caused by interruption of service to Ryanair's website, data and/or underlying databases, amounts expended attempting to prevent the Defendant's unauthorized scraping, and other losses and damage in an amount well over $5,000 aggregated over a one-year period.

329.    Pursuant to 18 U.S.C. § 1030(g), Plaintiff is entitled to recover compensatory damages and preliminary and injunctive relief prohibiting the Defendants from further violations of the Computer Fraud and Abuse Act and to prohibit the Defendants from using the data they obtained by scraping Ryanair's website.

## COUNT III
### Violation of Section 1030(a)(5)(A) of the Computer Fraud & Abuse Act
### (Against All Defendants)

330.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 329, above, as if set forth in their entirety herein.

331.    Plaintiff brings this action under 18 U.S.C. § 1030(g) allowing any injured person to maintain a civil action against the violator of 18 U.S.C. § 1030.

332.    On information and belief, the Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A), by knowingly causing the transmission, either directly or indirectly, of a program, information, code, or command and as a result intentionally causing damage without authorization or exceeding authorization to a protected computer owned by Ryanair.

333.    As discussed above, Defendants have entered into numerous contracts with third parties to bypass the technical and non-technical barriers imposed by the Ryanair Website. These third parties knowingly use programs to access the Ryanair Website without authorization or by exceeding authorization and this intentionally causes harm to the Ryanair Website.

334.    To the extent the Defendants are not directly liable for directly accessing the Ryanair Computer without authorization, Defendants are vicariously liable for their indirect unauthorized access to the Ryanair Website, as discussed above.

335.    The computer system or systems that the Defendants have accessed as described above constitute a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2).

336.    Ryanair has suffered damage and loss by reason of these violations, including, without limitation, harm caused by interruption of service to Ryanair's website, data and/or underlying databases, amounts expended attempting to prevent the Defendant's unauthorized scraping, and other losses and damage in an amount well over $5,000 aggregated over a one-year period.

337.    Pursuant to 18 U.S.C. § 1030(g), Plaintiff is entitled to recover compensatory damages and preliminary and injunctive relief prohibiting the Defendants from further violations of the Computer Fraud and Abuse Act and to prohibit the Defendants from using the data they obtained by scraping Ryanair's website.

### <u>COUNT IV</u>
### Violation of Section 1030(a)(5)(B)-(C) of the Computer Fraud & Abuse Act
### (Against All Defendants)

338.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 337, above, as if set forth in their entirety herein.

339.    Plaintiff brings this action under 18 U.S.C. § 1030(g) allowing any injured person to maintain a civil action against the violator of 18 U.S.C. § 1030.

340.    The Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(B) and (C) by intentionally accessing a protected computer without authorization or by exceeding authorization, either directly or indirectly, causing damage to Ryanair, recklessly or without due regard for their actions.

341.    To the extent the Defendants are not directly liable for directly accessing the Ryanair Computer without authorization, Defendants are vicariously liable for their indirect unauthorized access to the Ryanair Website, as discussed above.

342.    The computer system or systems that the Defendants have accessed as described above constitute a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2).

343.    Ryanair has suffered damage and loss by reason of these violations, including, without limitation, harm caused by interruption of service to Ryanair's website, data and/or underlying databases, amounts expended attempting to prevent the Defendant's unauthorized scraping, and other losses and damage in an amount well over $5,000 aggregated over a one-year period.

344.    Pursuant to 18 U.S.C. § 1030(g), Plaintiff is entitled to recover compensatory damages and preliminary and injunctive relief prohibiting the Defendants from further violations of the Computer Fraud and Abuse Act and to prohibit the Defendants from using the data they obtained by scraping Ryanair's website.

<u>**COUNT V**</u>
**Violation of Section 1030(b) of the Computer Fraud & Abuse Act**
**(Against All Defendants)**

345.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 344, above, as if set forth in their entirety herein.

346.    Plaintiff brings this action under 18 U.S.C. § 1030(g) allowing any injured person to maintain a civil action against the violator of 18 U.S.C. § 1030.

347.    The Defendants have violated the Computer Fraud and Abuse act, 18 U.S.C. § 1030(b), by conspiring to commit with third parties to access a protected computer when Defendants do not have authorization to access said computer.

348.    To the extent Defendants are found to have authorization to access any portion of the Ryanair Website, the Defendants have violated the Computer Fraud and Abuse act, 18

U.S.C. § 1030(b), by conspiring to commit with third parties to access a protected computer when Defendants have limited authorization to access said computer.

349.    The computer system or systems that the Defendants have accessed as described above constitute a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2).

350.    Ryanair has suffered damage and loss by reason of these violations, including, without limitation, harm caused by interruption of service to Ryanair's website, data and/or underlying databases, amounts expended attempting to prevent the Defendant's unauthorized scraping, and other losses and damage in an amount well over $5,000 aggregated over a one-year period.

351.    Pursuant to 18 U.S.C. § 1030(g), Plaintiff is entitled to recover compensatory damages and preliminary and injunctive relief prohibiting the Defendants from further violations of the Computer Fraud and Abuse Act and to prohibit the Defendants from using the data they obtained by scraping Ryanair's website.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff demands judgment against the Defendants as follows:

A.    For judgment in favor of Plaintiff and against the Defendants, on Counts I-V of Plaintiff's First Amended Complaint;

B.    That the Defendants' actions constitute a violation of the CFAA, under Federal law;

C.    That the Defendants, and all of their agents, servants, employees, representatives, and all other parties in active concert or participation with them, either directly or indirectly, be permanently enjoined from:

    i.    Using computer programs, including those referred to as spiders or robots, to scrape, mine or otherwise extract data or conduct image stripping of the Ryanair Website and/or underlying databases and the content contained therein;

    ii.    accessing the Ryanair Website in any manner;

  iii. using or disclosing any data or image contained from the Ryanair Website; and

  iv. injuring Plaintiff's business reputation and the goodwill associated with Ryanair.

D. That the Defendants be required to immediately cease its practice of screen scraping the Ryanair Website, either directly or indirectly;

E. That the Defendants be required to immediately cease its practice of circumventing Ryanair's technological and non-technological barriers, either directly or indirectly, to obtain Ryanair flight itineraries;

F. For damages in favor of Plaintiff and against Defendants, sufficient to compensate Plaintiff for the damages sustained as a result of Defendants' actions as alleged herein;

G. That the Defendants be ordered to pay Plaintiff interest on all monetary awards as allowed by law; and

H. For such other and further relief as the Court deems just and proper.

<u>**JURY DEMAND**</u>

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Ryanair DAC demands a trial by jury of all issues triable by jury.


Dated: July 22, 2022     Respectfully Submitted,


         **KRATZ & BARRY LLP**

         */s/ R Touhey Myer*
         R Touhey Myer (#5939)
         800 N. West Street
         Wilmington, DE 19801
         (302) 527-9378
         tmyer@kratzandbarry.com

*Of Counsel:*

**HOLLAND & KNIGHT LLP**
R. David Donoghue
Anthony J. Fuga
Lisa M. Kpor
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600
david.donoghue@hklaw.com
anthony.fuga@hklaw.com
lisa.kpor@hklaw.com

*Attorneys for Plaintiff, Ryanair DAC*