**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

RYANAIR DAC,

*Plaintiff,*

v.

BOOKING HOLDINGS INC.,
BOOKING.COM B.V., KAYAK
SOFTWARE CORPORATION,
PRICELINE.COM LLC, and AGODA
COMPANY PTE. LTD.,

*Defendants.*

C.A. No. 1:20-cv-01191-WCB

JURY TRIAL DEMANDED

**REDACTED VERSION -**
**CONFIDENTIAL**
**MATERIAL OMITTED**

**PLAINTIFF RYANAIR DAC'S RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

R Touhey Myer (#5939)
KRATZ & BARRY LLP
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

R. David Donoghue (*pro hac vice*)
Anthony J. Fuga (*pro hac vice*)
Lisa M. Kpor (*pro hac vice*)
HOLLAND & KNIGHT LLP
150 N Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600
david.donoghue@hklaw.com
anthony.fuga@hklaw.com
lisa.kpor@hklaw.com

*Attorneys for Plaintiff, Ryanair DAC*

Dated: September 1, 2022

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     STATEMENT OF FACTS ...................................................................................3

III.    PROCEDURAL HISTORY...................................................................................5

IV.     LEGAL STANDARD............................................................................................6

V.      ARGUMENT .......................................................................................................7

 A.  Ryanair properly alleges that Defendants directly violated the CFAA. .................7

 B.  The FAC more than adequately establishes a CFAA vicarious liability
  claim......................................................................................................................9

  1.  Courts allow CFAA claims premised upon vicarious liability. ..................9

  2.  Ryanair's FAC more than sufficiently alleges Defendants are
   vicariously liable under the CFAA. ..........................................................12

 C.  The FAC more than adequately alleges violations of five CFAA
  subsections. ........................................................................................................16

  1.  Count III under Section 1030(a)(5)(A) alleges intentional damage. .........17

  2.  Count II under Section 1030(a)(4) contains more than sufficient
   allegations regarding the Defendants' intent to defraud............................18

  3.  Counts I and IV of the FAC properly allege intentional,
   unauthorized access and access in excess of authorization under
   Sections 1030(a)(2), 1030(a)(5)(B), and 1030(a)(5)(C). ..........................21

   i.   The FAC more than adequately alleges that Defendants
    circumvented technological limitations and a "gate" to
    access the Ryanair Website without authorization. .......................21

   ii.  Defendants' terms of use and cease-and-desist arguments
    lack merit. .................................................................................24

  4.  Count V sufficiently alleges a conspiracy claim based on Section
   1030(b) of the CFAA. .............................................................................26

  5.  The FAC alleges actionable harm under the CFAA. .................................27

 D.  This Court should refrain from considering documents beyond the FAC
  that are incomplete, unincorporated and not undisputedly authentic. ..................28

VI.     CONCLUSION...................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*Abbott Lab'ys v. Teva Pharms. USA, Inc*.,
  432 F. Supp. 2d 408 (D. Del. 2006)..................................................................................... 6
*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 S.Ct. 1955 L.Ed.2d 929 (2007).................................................................... 6
*Benninger v. Ohio Twp. Police Dep't*.,
  No. 2:19-CV-00524-PLD, 2020 WL 264967, at *3 (W.D. Pa. Jan. 17, 2020)................. 30
*Buchanan v. Ingram Content Grp*.,
  No. 20-CV-2421, 2020 WL 5957618, at *2 (D.N.J. Oct. 6, 2020)................................... 17
*Campbell ex rel. Campbell v. Sec'y of Health & Hum. Servs*.,
  69 Fed. Cl. 775 (2006) ..................................................................................................... 29
*Charles Schwab & Co. v. Carter*,
  No. 04 C 7071, 2005 WL 2369815, at *6 (N.D. Ill. Sept. 27, 2005)............... 9, 10, 14, 16
*Davis v. Bank of Am., NA*, No. 1:19-13515-NLH-MJS, 2022 WL 683025, at *2 (D.N.J.
  Mar. 8, 2022)..................................................................................................................... 29
*Doe v. Dartmouth-Hitchcock Med. Ctr*.,
  No. CIV. 00–100–M, 2001 WL 873063, at *5 (D.N.H. July 19, 2001) ........................... 10
*Drexel v. Union Prescription Centers, Inc.,*
  582 F.2d 781 (3d Cir. 1978)......................................................................................... 15, 30
*Dudick, ex rel. Susquehanna Precision, Inc. v. Vaccaro*,
  No. CIVA 3:06-CV-2175, 2007 WL 1847435, at *5 (M.D. Pa. June 25, 2007)........ 17, 18
*eBay Inc. v. Digital Point Sols., Inc.*,
  608 F. Supp. 2d 1156 (N.D. Cal. 2009) ....................................................................... 19, 25
*El Omari v. Buchanan*,
  No. 20 CIV. 2601 (VM), 2021 WL 5889341, at *13 (S.D.N.Y. Dec. 10, 2021).............. 19
*Elias Indus., Inc. v. Kissler & Co. Inc*.,
  No. 2:20-CV-01011-CCW, 2021 WL 2141509, at *5 (W.D. Pa. May 26, 2021) ...... 19, 20
*Facebook, Inc. v. Power Ventures, Inc.*,
  844 F.3d 1058 (9th Cir. 2016) .................................................................................... passim
*Genentech, Inc. v. JHL Biotech, Inc*.,
  No. C 18-06582 WHA, 2019 WL 2476617, at *4 (N.D. Cal. June 13, 2019)................. 27
*hiQ Labs, Inc. v. LinkedIn Corp*.,
  31 F.4th 1180 (9th Cir. 2022) ................................................................... 1, 22, 23, 24, 25
*Howard v. New Jersey Div. of Youth & Fam. Servs*.,
  398 F. App'x 807 (3d Cir. 2010).................................................................................... 29
*In re Uni-Marts, LLC*,
  404 B.R. 767 (Bankr. D. Del. 2009) .............................................................................. 29
*In re: Maxim Integrated Prod., Inc*.,
  No. 12-244, 2013 WL 12141373, at *9 (W.D. Pa. Mar. 19, 2013) ................................ 2
*Ipreo Holdings LLC v. Thomson Reuters Corp.*,
  09-CV-8099, 2011 WL 855872, at *8 (S.D.N.Y. Mar. 8, 2011)..................................... 10
*Jones v. Century Oil U.S.A., Inc.*,
  957 F.2d 84 (3d Cir. 1992)............................................................................................ 15

*Lee v. TMZ Prods. Inc*.,
　No. CIV. 2:15-00234 WJM, 2015 WL 5638081, at *3 (D.N.J. Sept. 24, 2015) ............. 29
*NLRK, LLC v. Indoor Ag-Con, LLC*,
　No. 321CV00073LRHWGC, 2022 WL 293252, at *7 (D. Nev. Jan. 31, 2022) ............. 19
*Phreesia, Inc. v. Certify Glob., Inc.*,
　No. DLB-21-678, 2022 WL 911207, at *10 (D. Md. Mar. 29, 2022) .............................. 27
*PLC Trenching Co., LLC v. Newton*,
　No. 6:11-CV-0515, 2011 WL 13135653, at *7 (N.D.N.Y. Dec. 12, 2011)................. 9, 12
*PNY Techs., Inc. v. Salhi*,
　No. 2:12-CV-04916 DMC, 2013 WL 4039030, at *6 (D.N.J. Aug. 5, 2013) ................. 19
*RIGroup LLC v. Trefonisco Mgmt. Ltd*.,
　949 F. Supp. 2d 546 (S.D.N.Y. 2013)................................................................................. 29
*RN Ent., LLC v. Clement*,
　380 F. Supp. 3d 711 (M.D. Tenn. 2019)............................................................................ 27
*Rochester Drug Co-op., Inc. v. Braintree Lab'ys*,
　712 F. Supp. 2d 308 (D. Del. 2010).................................................................................... 6
*Ryanair DAC v. Expedia Inc*.,
　No. C17-1789RSL, 2018 WL 3727599, at *4 (W.D. Wash. Aug. 6, 2018)................... 24
*Spitzer v. Abdelhak*,
　No. CIV. A. 98-6475, 1999 WL 1204352, at *7 (E.D. Pa. Dec. 15, 1999) ..................... 14
*Sprint Nextel Corp. v. Simple Cell, Inc*.,
　No. CIV. CCB-13-617, 2013 WL 3776933, at *6 (D. Md. July 17, 2013) ..................... 19
*Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc*.,
　529 F. Supp. 3d 303 (D. Del. 2021)............................................................................ 14, 16
*Ticketmaster L.L.C. v. Prestige Ent., Inc.*,
　306 F. Supp. 3d 1164 (C.D. Cal. Jan. 31, 2018) .............................................................. 26
*United States v. Nosal*,
　676 F.3d 854 (9th Cir. 2012) .............................................................................................. 2
*Van Buren v. U.S.*,
　141 S. Ct 1648 (2021)................................................................................................. passim
*Wabote v. Ude*,
　No. 5:21-CV-2214, 2021 WL 4901809, at *3 (E.D. Pa. Oct. 21, 2021) ........................ 28
*Wood v. State of New Jersey*,
　No. CV 13-2453 (FLW), 2016 WL 4544337, at *5 (D.N.J. Aug. 31, 2016).................. 15
*Zeno v. Ford Motor Co*.,
　480 F. Supp. 2d 825 (W.D. Pa. 2007)......................................................................... 15, 30

**Statutes**

18 U.S.C. § 1030 ......................................................................................................... passim

18 U.S.C. § 1030(a)(2) ....................................................................................................... 21

18 U.S.C. § 1030(a)(2)(C) ................................................................................................... 3

18 U.S.C. § 1030(a)(4) ............................................................................................. 3, 18, 19

18 U.S.C. § 1030(a)(5)(A) ........................................................................................ 3, 17, 18

18 U.S.C. § 1030(a)(5)(B) ............................................................................................. 3, 21

18 U.S.C. § 1030(a)(5)(C) ............................................................................................. 3, 21

18 U.S.C. § 1030(b) ........................................................................................................... 26

18 U.S.C. § 1030(g) ........................................................................................................... 17

**Rules**

Fed. R. Civ. P. 8(a) ................................................................................................. 18, 19, 20

Fed. R. Civ. P. 9(b) ................................................................................................. 14, 19, 20

Fed. R. Civ. P. 12 ..................................................................................................... 1, 16, 30

Fed. R. Civ. P. 12(b)(6) ......................................................................................... 1, 3, 6, 18, 29

Fed. R. Civ. P. 12(c) ........................................................................................................... 6

Fed. R. Civ. P. 56 ................................................................................................................ 3

Fed. R. Evid. 802 .............................................................................................................. 29

## I.      INTRODUCTION

Defendants filed and lost their first Rule 12 motion more than a year and a half ago. During the intervening months, discovery began and Defendants only filed its next set of Rule 12 motions when it was finally forced to begin producing documents related to the issues in this motion. Defendants' third Rule 12 motion is a last ditch effort to avoid fully participating in this litigation and answering for Defendants' misdeeds.[1] Without sufficient legal authority to support their arguments, Defendants resort to filing what is functionally a hybrid summary judgment motion by improperly attaching ten exhibits, each used to improperly support a disputed fact. This Motion fails, with or without the exhibits, because it does not set forth any valid grounds to dismiss Ryanair's First Amended Complaint ("FAC").

Defendants advance three arguments. First, Defendants argue that they are not liable under the CFAA because "Ryanair fails to allege facts indicating that any Defendant (as opposed to a third-party actor) accessed Ryanair's website." (D.I. 81 at 8; D.I. 87 at 8 ("Mot.")) This argument lacks merit. Ryanair makes factual allegations in the FAC regarding Defendants' direct access of the Ryanair Website and, regardless, Defendants cannot avoid liability by directing third parties to do Defendants' dirty work. Defendants' second argument – that the FAC does not adequately allege the elements of any CFAA violation – is equally unavailing. (Mot., D.I. 81 at 17; D.I. 87 at 17.) Ryanair's allegations more than satisfy the requisite elements for five separate CFAA provisions. Nothing in the *Van Buren* or *hiQ* decisions extinguishes Ryanair's claims. Finally, Defendants' contention that the FAC does not allege any actionable harm caused by the Defendants should be rejected. (Mot., D.I. 81 at 28; D.I. 87 at 28.) Ryanair sufficiently alleges

---

[1] Plaintiff Ryanair DAC ("Ryanair" or "Plaintiff") refers to Defendants Booking Holdings Inc., Booking.com B.V., Kayak Software Corporation, Priceline.com LLC, and Agoda Company Pte. Ltd. collectively as "Defendants" and the pending Rule 12(b)(6) motion as the "Motion."

intentional, technological harms resulting from the misconduct orchestrated by Defendants. (*See e.g.,* FAC, D.I. 76 at ¶¶ 126-154, 213-214, 258-299.)

Defendants repeatedly portray hacking as a sinister, movie-like form of computer attacks that are primarily punishable via criminal statute. (Mot., D.I. 81 at 1; D.I. 87 at 1.) Hacking, however, is simply "the circumvention of technological access barriers." *In re: Maxim Integrated Prod., Inc*., No. 12-244, 2013 WL 12141373, at *9 (W.D. Pa. Mar. 19, 2013); *United States v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012). This is precisely the focus of this litigation.

Ryanair alleges that each Defendant, either directly or indirectly through their enlisted third parties, circumvents Shield and Ryanair's other technological and non-technological limitations to access the Ryanair Website without authorization or in excess of authorized access. (*See, e.g.,* FAC, D.I. 76 at ¶ 253; *see also id*. at ¶¶ 149, 208-210, 245.) This lawsuit is not, as Defendants suggest, "an attempt to convert the CFAA from a shield against computer hacking into a sword to selectively ban access to a public website." (Mot., D.I. 81 at 1; D.I. 87 at 1.) It is instead an attempt to hold Defendants liable for engaging in computer hacking in violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*. ("CFAA") and, importantly, an attempt to stop the ongoing harm Defendants cause to the Ryanair Website. Though they may not view themselves as hackers, Defendants circumvent Ryanair's technological access barriers to gain access to the Ryanair Website.

Defendants' misconduct extends far beyond mere use of a "public website" for "commonplace computer activity," as Defendants suggest. (Mot., D.I. 81 at 1-2; D.I. 87 at 1-2.) On the contrary, Defendants' actions cause substantial harm to Ryanair and the Ryanair Website – forcing Ryanair to spend considerable resources to find, diagnose, and attempt to block Defendants' unauthorized access to the Ryanair Website only for Defendants to repeatedly

circumvent such technology. (*See e.g.,* FAC, D.I. 76 at ¶¶ 126-154, 213-214, 258-299.) To further illustrate the extent of Defendants' misconduct, bookings through the Ryanair Website must be completed through a portion of the Ryanair Website outfitted with additional protections called "myRyanair." (*Id.* at ¶¶ 93-97, 109-114.) Any Ryanair itinerary that a Defendant sells *must* come from unauthorized access to myRyanair, which has heightened security. (*Id.* at ¶¶ 142-147, 243-250.) Such misconduct falls squarely within the reach of the CFAA.

Defendants have inartfully attempted to disguise a Rule 56 summary judgment motion – one that would be denied – as a Rule 12(b)(6) motion to dismiss. Defendants' gamesmanship should be rejected. Ryanair has alleged sufficient facts to state a claim pursuant to Sections 1030(a)(2)(C), 1030(a)(4), 1030(a)(5)(A), 1030(a)(5)(B), and 1030(a)(5)(C) of the CFAA, and Ryanair's case should proceed to discovery despite Defendants' myriad efforts to avoid it.

## II.    STATEMENT OF FACTS

Ryanair is a low-fare airline that operates internationally, in part, through its website at www.ryanair.com (the "Ryanair Website"). (*Id.* at ¶¶ 3, 29.) Ryanair's business is perpetuated in significant part by the efficacy and performance of the Ryanair Website. (*Id.* at ¶ 34.) Ryanair provides fare, route, and schedule information to its customers and potential customers via the Ryanair Website. (*Id.* at ¶ 35.) To make flight reservations through the Ryanair Website, users must access myRyanair – a password-protected portion of the Ryanair Website with heightened security. (*Id.* at ¶¶ 59-61, 93-95.) Users may only access myRyanair by creating (and then later entering) certain login information – including a username, email address and password. (*Id.* at ¶¶ 63-64, 95.) Because the Ryanair Website is an integral component of Ryanair's business model, Ryanair has invested considerable resources in the design, organization, operation, and maintenance of the Ryanair Website to ensure that it operates in an efficient and user-friendly

manner. (*Id*. at ¶ 39.) Ryanair implemented the myRyanair procedure, in part, to stop unauthorized persons and entities from accessing the Ryanair Website. (*Id*. at ¶¶ 96, 214.)

Defendants each operate as online travel agents and booking services for airline flights, hotel reservations, car rentals, and ancillary services. (*Id*. at ¶ 119.) The Booking.com, Kayak.com, Priceline.com, and Agoda.com websites offer for sale and sell – or have offered for sale during the pertinent timeframe – Ryanair flights individually and as part of packages, e.g. flights and hotels, through their respective websites. (*Id*. at ¶ 126.) Ryanair has served Defendants multiple cease and desist letters. (*Id*. at ¶¶ 72-90.) Those letters explicitly revoke any and all authorization for Defendants and their agents to access the Ryanair Website and demand that Defendants immediately cease their unauthorized access. (*Id*.) These letters make clear to Defendants that their access to the Ryanair Website – whether direct or indirect – is explicitly unauthorized (or alternatively, in excess of their authorized access) and in violation of the CFAA. (*Id*. at ¶ 90.)

Despite Defendants being well-aware that they are not authorized to access any portion of the Ryanair Website, Defendants directly or indirectly bypass technological and non-technological limitations to access the Ryanair Website, obtain troves of valuable information from the Ryanair Website, and bulk purchase Ryanair flight itineraries. (*Id*. at ¶¶ 142-143, 150-152, 208-214.) Defendants either directly or indirectly, enter and use the Ryanair Website by engaging with third parties and directing the parties to carry out Defendants' scheme. (*Id*. at ¶¶ 141, 208-255.)

Defendants knowingly and willfully cause severe technological harm to the Ryanair Website. (*Id*. at ¶ 309.) Ryanair has spent considerable resources, in excess of five thousand dollars ($5,000), to find, diagnose, and block access Defendants' unauthorized access to the Ryanair Website. (*Id*. at ¶ 291.) Ryanair has even internally developed a program called Shield that attempts to block unauthorized users such as the Defendants and the third parties they direct to

access the Ryanair Website. (*Id*. at ¶ 98.) Each Defendant, either directly or indirectly through their enlisted third parties, circumvents Shield and Ryanair's other technological and non-technological limitations to access all portions of the Ryanair Website without authorization or, at least, in excess of authorized access. (*Id*. at ¶ 253-254.)

## III.    PROCEDURAL HISTORY

Ryanair filed its original Complaint for Violation of the Computer Fraud and Abuse Act (the "Complaint") on September 4, 2020. (D.I. 1.) Ryanair alleged that Defendants engaged in unauthorized access of the Ryanair Website, thereby impairing the functionality of the Ryanair Website. (*Id*. at ¶¶ 90-127.) The Complaint sought damages on account of Defendants' CFAA violations, as well as an order enjoining Defendants from directly or indirectly accessing the Ryanair Website. (*Id*. at 25.)

On January 21, 2021, Defendants filed a motion to dismiss or to stay (the "First Motion"). (D.I. 16, 17.) Following substantial briefing (that included supplemental briefing regarding *Van Buren v. U.S.*, 141 S. Ct 1648 (2021)) and oral argument, the Court denied Defendants' First Motion (D.I. 42, 43.), holding: (1) that Defendants failed to meet the heavy burden to obtain dismissal on *forum non conveniens* grounds, and (2) that the CFAA applies extraterritorially, thereby allowing Ryanair's claim to proceed against Defendants. (D.I. 42 at 14, 16.) The Court also determined that *Van Buren* was no bar to Ryanair's Complaint, reasoning as follows:

> The Court does not view *Van Buren* as preventing Ryanair from bringing any viable CFAA claim against Defendants. *Van Buren* specifically addressed what it means for a computer user to "exceed[] authorized access," as that term is used in the CFAA. *See* 141 S. Ct. at 1662. Ryanair alleges that Defendants acted "without authorization," which implicates a distinct statutory prohibition that was not at issue in *Van Buren*.

(D.I. 42 at 9 n.7.) After entry of the Opinion denying Defendants' First Motion, the parties commenced written discovery and began to exchange documents.

Months later, on May 25, 2022, Defendants filed a Motion for Judgment on the Pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (the "Second Motion"). (D.I. 64, 65.) In the Second Motion, Defendants argued that (a) Ryanair does not sufficiently allege that any Defendant violated the CFAA; (b) Ryanair does not sufficiently allege a theory of vicarious liability; and (c) Ryanair has not sufficiently alleged the requirements of any of the five subsections of the CFAA. (D.I. 65 at 1-2.) To address matters raised for the first time in Defendants' Second Motion, Ryanair sought and received the Court's authority to amend its complaint. (D.I. 75.) Ryanair subsequently filed its FAC on July 22, 2022. (FAC, D.I. 76.)

On August 10, 2022, Defendants filed their third motion ("Motion") under seal along with the Declaration of John Hemann ("Hemann Declaration"), ten exhibits, and a Request for Judicial Notice of those exhibits ("Request"). (D.I. 80-83.)

## IV.    LEGAL STANDARD

"In reviewing a motion filed under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Rochester Drug Co-op., Inc. v. Braintree Lab'ys*, 712 F. Supp. 2d 308, 314 (D. Del. 2010). "A complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Id*. (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007)). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Abbott Lab'ys v. Teva Pharms. USA, Inc*., 432 F. Supp 2d 408, 419 (D. Del. 2006). "The moving party has the burden of persuasion." *Id*.

## V.    ARGUMENT

### A.    Ryanair properly alleges that Defendants directly violated the CFAA.

Defendants' argue the FAC "does not allege facts to support the notion that any Defendant *directly* interacted with the Ryanair [W]ebsite." (Mot., D.I. 81 at 9; D.I. 87 at 9 (emphasis in original).) This ignores the allegations in the FAC, and misconstrues the CFAA and relevant case law. Merely as an example, Priceline.com holds itself out as an entity that provides flight information and flight itineraries to third parties. (FAC, D.I. 76 at ¶ 156.)[2] One third party, BitBook, facilitates booking Ryanair flight itineraries. (*Id.* at ¶¶ 164-179.) That information and those itineraries are only available on the Ryanair Website, and Priceline provides that to BitBook (and others). (*Id.*) Ryanair makes similar allegations against the other Defendants.  (*See*, *e.g.*, *id.* at ¶¶ 127, 130-132, 139-143, 146-154, 172-179, 189.)

Defendants seemingly attempt to avoid liability by directing third parties – often entangled third parties – to do at least some of Defendants' unauthorized access to the Ryanair Website.[3] (*See, e.g., id.* at ¶¶ 130-132, 164-179, 215, 227-240.) But Defendants cannot offload the blame to third parties whom it contracts with and directs to access the Ryanair Website without authorization, whether that falls under vicarious liability, indirect access, or conspiracy. *See Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016) ("[A] defendant can run afoul of the CFAA when he or she has no permission to access a computer or when such

---

[2] Defendants have recently stated that Priceline's "Partner Network" is not part of Priceline and allegations related to the Partner Network are not relevant. This contradicts available evidence. Priceline outwardly portrays its Partner Network as internal to Priceline: (1) A senior vice president of Priceline oversees the Partner Network; (2) Priceline states that using the Partner Network is "partnering with Priceline"; (3) the Partner Network is a "business unit of priceline.com." *See e.g.*, https://press.priceline.com/priceline-partner-network-to-power-travel-bookings-for-mapquest/. Nevertheless, the Partner Network is, at least, an agent of Priceline and, if necessary, Ryanair is willing to add the Partner Network as a separate defendant.

[3] As an example of entanglement, Booking.com has an agreement with Etraveli ███████████████ ████████████████████████████████████████████ (FAC, D.I. 76 at ¶ 215.) Upon information and belief, Booking Holdings owns or is in the process of purchasing Etraveli. (*Id.* at ¶ 240.)

permission has been revoked explicitly. Once permission has been revoked, technological gamesmanship or the enlisting of a third party to aid in access will not excuse liability.")

Defendants argue that Ryanair should have alleged that Defendants directly accessed the Ryanair Website because Ryanair has supposedly "***admitted*** that it is able to determine the identity of users who access its website." (Mot., D.I. 81 at 9; D.I. 87 at 9 (emphasis in original) (citing D.I. 83, Ex. 10 at ¶¶ 39-45; D.I. 90, Ex. 10 at ¶¶ 39-45).) This is wrong and undercut by the language of the exhibit itself. Exhibit 10 to the Hemann Declaration is an Irish High Court judgment that states, per the affidavit of a Ryanair executive, a booking system collects credit card information, the billing address, the IP address, and the server used when users book a Ryanair flight. (D.I. 83, Ex. 10 at ¶¶ 39-45; D.I. 90, Ex. 10 at ¶¶ 39-45.) However, the judgment itself acknowledges that, "while an IP address logged by a website will often correspond to the IP address and location of the computer user, *it can be masked or replaced by other IP addresses which the website will log instead*." (*Id*. (emphasis added).)

The statements from the judgment correspond directly with Ryanair's allegations that Defendants use anonymized IP addresses and email addresses to directly or indirectly access the myRyanair portion of the Ryanair Website. (*See, e.g.,* FAC, D.I. 76 at ¶¶ 324-325.) Defendants' reliance on this declaration summarized in an Irish High Court only undercuts Defendants' argument.[4] This Court should not be persuaded by Defendants' direct access argument.

---

[4] Defendants attempt to rely upon the Irish High Court judgment is also improper for the reason set out in Ryanair's Response in Opposition to Defendants' Request. And for those reasons, Defendants' argument need not even be considered as it relates to the Irish High Court judgment.

## B.   The FAC more than adequately establishes a CFAA vicarious liability claim.

Despite Defendants' arguments to the contrary, not only does the CFAA permit vicarious liability actions, Ryanair has alleged sufficient facts to state a claim under the CFAA against Defendants based on the doctrine of vicarious liability.

### 1.   Courts allow CFAA claims premised upon vicarious liability.

Defendants present a strained argument in support of the notion that the CFAA does not allow vicarious liability claims.[5] (Mot., D.I. 81 at 10-12; D.I. 87 at 10-12.) They cite a number of cases and statutes to incorrectly claim that common law agency principles and historical context of the statute "weigh heavily against interpreting the CFAA to permit vicarious liability." (*Id.* at 10-11.) Defendants' argument fails for at least three reasons.

First, for more than a decade, federal courts across the country have determined that defendants can be found vicariously liable under the CFAA. *See, e.g., PLC Trenching Co., LLC v. Newton*, No. 6:11-CV-0515, 2011 WL 13135653, at *7 (N.D.N.Y. Dec. 12, 2011) ("To state a claim for vicarious liability under the CFAA, a plaintiff must allege facts that would plausibly suggest that (1) the defendant affirmatively urged or encouraged its employee to violate the CFAA, and (2) the employee committed such a violation."); *Facebook*, 844 F.3d at 1067 ("[A] defendant can run afoul of the CFAA when he or she has no permission to access a computer or when such permission has been revoked explicitly. Once permission has been revoked, technological gamesmanship or the enlisting of a third party to aid in access will not excuse liability."); *Charles Schwab & Co. v. Carter*, No. 04 C 7071, 2005 WL 2369815, at *6 (N.D. Ill. Sept. 27, 2005) ("[T]he Court assumes that Congress drafted the CFAA with an intent to permit vicarious liability."); *Ipreo Holdings LLC v. Thomson Reuters Corp.*, 09-CV-8099, 2011 WL 855872, at *8 (S.D.N.Y. Mar.

---

[5] Defendants appear to use the terms "indirect liability" and "vicarious liability" interchangeably.

8, 2011) (implicitly agreeing with the parties that "the CFAA allows for vicarious liability only when its violation was affirmatively urged or otherwise by the employer"). This Court should join these courts finding CFAA claims for vicarious liability are plausible causes of action.

Second, Defendants' reliance on *Doe v. Dartmouth-Hitchcock Med. Ctr.*, No. CIV. 00–100–M, 2001 WL 873063, at *5 (D.N.H. July 19, 2001) and similar cases is inconsequential because those cases are not controlling and are distinguishable. In *Dartmouth-Hitchcock*, a doctor engaged in wrongful conduct by accessing a patient's confidential medical records without authorization in violation of the CFAA and his employer's policies. His employer, a hospital operated by the Dartmouth-Hitchcock Medical Center, however, "did not access Doe's medical records without authority, but in fact were victimized by [the doctor's] breach of the policies established to protect Doe's confidentiality." *Id.* at *4. Within that framework, the court rendered the following ruling: "Expanding the private cause of action created by Congress to include one for vicarious liability against persons who *did not act with criminal intent* and *cannot be said to have violated the statute*, like the Dartmouth defendants, would be entirely inconsistent with the plain language of the statute." *Id.* at *5 (emphasis added).

Defendants represent themselves as innocent bystanders or victims of their agents' actions, like the employer in *Dartmouth-Hitchcock*. They are not. They are the perpetrators of the CFAA violation. Defendants direct their respective agents to access the Ryanair Website and obtain Ryanair flight itineraries. (*See e.g.,* FAC, D.I. 76 at ¶¶ 219, 243-250.) As a result, the present case is more analogous to *Charles Schwab & Co., Inc. v. Carter*, No. 04 C 7071, 2005 WL 2369815, at *7 (N.D. Ill. Sept. 27, 2005). In *Charles Schwab*, the court considered *Dartmouth-Hitchcock*, but found that "Schwab alleges that Defendants affirmatively urged Carter to access Schwab's computer system beyond his authorization for their benefit." *Id* at *7. The court held "imposing

vicarious liability would further the CFAA's purpose" to "deter and punish those who intentionally access computer files and systems without authority and cause harm." *Id*. Such reasoning is equally applicable to this action. Ryanair should be permitted to proceed with its CFAA claim against Defendants on a vicarious liability theory.

Third, Defendants' contention that "the CFAA was not intended to address receipt, misappropriation, or misuse of information" is both inapplicable to this case and irrelevant to the issue of whether Defendants can be held vicariously liable for violating the CFAA. (Mot., D.I. 81 at 11; D.I. 87 at 11.) In their Motion, Defendants imply that they cannot be found vicariously liable because the "gravamen of Ryanair's claim" is the "receipt" of information, which is not actionable. (*Id*.) However, the focal points of Ryanair's claims are Defendants' access of the Ryanair Website generally and their access of the myRyanair portion of the Ryanair Website, directly or indirectly – not the receipt or misappropriation of information.[6]

Defendants note that the "Supreme Court in *Van Buren* specifically rejected an interpretation of the CFAA focused on "remediating 'misuse' of sensitive information" in favor of describing it as a "scheme 'aimed at preventing the typical consequences of hacking.'" (*Id*. at 11-12.) But this conclusion supports Ryanair's claims and undercuts Defendants' vicarious liability arguments. The *Van Buren* decision states as follows:

> The statutory definitions of "damage" and "loss" thus focus on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data. Limiting "damage" and "loss" in this way makes sense

---

[6] In fact, Ryanair offers a nearly-free license for third parties to obtain and utilize Ryanair's flight information. One requirement, however, is that the third party obtains the Ryanair information via an application programming interface (API), instead of brutishly accessing the Ryanair Website. This way, the Ryanair Website is not damaged. As made clear in the FAC, the focus of this lawsuit is Defendants' incessant unauthorized access of the Ryanair Website and the extreme damage this causes. An example of this license can be found at the following link from the Ryanair Website. In this sample, the third party pays a nominal amount intended to cover Ryanair's costs, although the cost for large corporate users is slightly larger to cover Ryanair's costs for the volume of calls that entities such as Defendants would make to Ryanair's website. https://www.ryanair.com/content/dam/ryanair/faq%27s/Licence%20Agreement.pdf

in a scheme "aimed at preventing the typical consequences of hacking." The term's definitions are ill fitted, however, to remediating "misuse" of sensitive information that employees may permissibly access using their computers. Van Buren's situation is illustrative: His run of the license plate did not impair the "integrity or availability" of data, nor did it otherwise harm the database system itself. *Van Buren*, 141 S. Ct. at 1660 (internal citations omitted).

The *Van Buren* decision bolsters Ryanair's claim. Ryanair alleges damages regarding the impairment to the integrity and availability of data, systems and information, which are embodied in the definition of damage under the CFAA. *See Van Buren*, 141 S. Ct. at 1659. In particular, Ryanair alleges that it has "suffered significant technological harms due to Defendants' unauthorized access to the Ryanair Website." (FAC, D.I. 76 at ¶ 269.) More specifically, Ryanair pleads that Defendants' misconduct "impairs the Ryanair Website's availability and/or usability for the intended users," "overwhelm[s] the systems of the Ryanair Website," and "leads to increased response time and increased errors" on the Ryanair Website. (*Id*. at ¶¶ 270-280.) Unlike in *Van Buren*, Defendants' actions here *do impair* the integrity and availability of data and the Ryanair Website. (*See, e.g., id*.) Given that Defendants have accessed Ryanair's Website in violation of the CFAA, directly and/or indirectly, resulting in substantial technological harm, Ryanair should be allowed to proceed with its CFAA claim against the Defendants under a theory of vicarious liability. *See, e.g., PLC Trenching*, 2011 WL 13135653, at *8 ("[T]he Court finds that Plaintiff has sufficiently established that Defendant CSI affirmatively urged or encouraged Defendant Newton to commit the CFAA violations discussed.").

### 2.   Ryanair's FAC more than sufficiently alleges Defendants are vicariously liable under the CFAA.

Defendants argue that "[e]ven if vicarious liability were permitted under the CFAA…, none of the theories alluded to by Ryanair in the FAC are adequately pled." (Mot., D.I. 81 at 12; D.I. 87 at 12.) Defendants claim that they cannot be liable because there was no agency relationship between Defendants and any third party. Defendants' arguments fail.

First, Ryanair has sufficiently alleged the existence of an agency relationship between the certain third parties and Defendants. The FAC outlines the extensive scheme orchestrated by Defendants to access the Ryanair Website without authorization (or in excess of authorized access) much to Ryanair's detriment. (*See, e.g.,* FAC, D.I. 76 at ¶¶ 117-118, 188-189, 208-255.) Ryanair specifically alleges, *inter alia*, that "Defendants direct, encourage, induce and/or affirmatively act in support of their agents and certain third parties who access the Ryanair Website on behalf of the Defendants in violation of the CFAA." (*Id.* at ¶ 219.) Ryanair also explains that:

> Defendants have entered into written agreements with their agents and certain third parties who access the Ryanair Website without authorization (or alternatively, in excess of their authorized access) on behalf of the Defendants and then transmit (without authorization) Ryanair's flight itineraries and packages that the Defendants then publish on their respective websites without Ryanair's permission.

(*Id.* at ¶ 220.)

Defendants' control of the unauthorized access is obvious from the mere functionality of the Defendants' businesses. When a user books a Ryanair flight on one of the Defendants websites, the user books a flight for a *specific* time and *specific* departure/arrival locations. Defendants and/or one of its engaged third parties must access the myRyanair portion of the Ryanair Website to obtain and process the *specific* Ryanair flight selected by the user. (*Id.* at ¶¶ 225-226.) It would flout common sense to believe that the Defendants do not direct the relevant third-party activity. The third party would not – and could not – know which Ryanair itineraries to obtain once it accessed the Ryanair Website unless the Defendant provided that information and directed that activity.[7]   These allegations make a case for Defendants' vicarious liability. *See, e.g., Charles*

---

[7] While Defendants have not yet produced any correspondence with the relevant third parties or all relevant technical documents, Defendants have already produced some evidence that undermines their arguments. (*See* Decl. Fuga Supp. Pl.'s Resp. Opp'n Defs.' Req. Jud. Notice, Ex. 3 at 3; D.I. 83, Ex. 9 at 6.8.) Ryanair expects there to be further evidence showing direct communication between the Defendants and third parties regarding the unauthorized access, including at least specifically what flight itineraries to obtain. Defendants' businesses could not function without Defendants providing this direction.

*Schwab*, 2005 WL 2369815, at *7 (holding allegations that "Defendants affirmatively urged Carter to access Schwab's computer system beyond his authorization for their benefit" were sufficient to survive a motion to dismiss and establish a claim for vicarious liability under the CFAA).

Defendants seek to cast blame on Ryanair because the "FAC provides no further detail about this alleged direction, encouragement, or inducement, nor any facts supporting the notion that any Defendant has any control or right to control how aggregators obtain Ryanair's flight itineraries." (Mot., D.I. 81 at 14; D.I. 87 at 14.) As mentioned above, it is inconceivable that Defendants do not direct the relevant third parties to specifically access the Ryanair Website because the third parties are not mere "aggregators." Defendants direct the engaged third parties to access the Ryanair Website for specific purposes – to obtain requested flight itineraries, often in bulk. (*See, e.g., Id.* at ¶¶ 219, 243-250.) Defendants' businesses could not function as they do without this direction. But additionally, the facts Defendants accuse Ryanair of failing to plead are solely within Defendants' possession, custody and control. And Defendants have only recently (and even then partially) begun to provide them to Ryanair through discovery. "When Defendants remain in control of the necessary details, the requirements of Rule 9(b) can be more leniently met." *Spitzer v. Abdelhak*, No. CIV. A. 98-6475, 1999 WL 1204352, at *7 (E.D. Pa. Dec. 15, 1999) (even under Rule 9(b) pleading, which is not required for the CFAA, pleading standards are more lenient where defendants control the information).

Ryanair has adequately alleged a claim for vicarious liability against the Defendants even though it is not privy to additional details regarding the actual practice and nature of the Defendants' relationship with the engaged third parties, and cannot be until discovery is largely complete. *See, e.g., Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc*., 529 F. Supp. 3d 303, 314 (D. Del. 2021) (refusing to agree that the plaintiffs were required to have conducted more fact

14

finding before filing its complaint where the pertinent facts were solely in the defendant's possession and holding as follows: "[c]onsidering the totality of the allegations made against [d]efendant, accepting them as true, and drawing all reasonable inferences in favor of [p]laintiffs, the complaint plausibly alleges acts of infringement"); *Wood v. State of New Jersey*, No. CV 13-2453 (FLW), 2016 WL 4544337, at *5 (D.N.J. Aug. 31, 2016) ("Because Plaintiff's treatment history is presently possessed and controlled by Defendants, Plaintiff cannot be expected to provide detailed factual allegations at this early stage of the proceedings.").

Second, Defendants' ███████████ argument is both inappropriate and incorrect. Without citing a single case, Defendants claim that they cannot be vicariously liable because "the contracts referred to by Ryanair in fact ███████████████████████████

████████████████████████████████████████

(Mot., D.I. 81 at 14; D.I. 87 at 14.) Even if the license agreements could be considered for the purpose of resolving Defendants' Motion, the fact that each agreement contains a █████████ ████ would not be dispositive in determining whether an agency relationship exists.[8]

The Third Circuit has held that "an express denial of an agency relationship in a written contract 'is not determinative of the matter, for it is the actual practice between the parties that is crucial.'" *Zeno v. Ford Motor Co*., 480 F. Supp. 2d 825, 847 (W.D. Pa. 2007); quoting *Jones v. Century Oil U.S.A., Inc.*, 957 F.2d 84, 87 (3d Cir. 1992); *see also Drexel v. Union Prescription Centers, Inc.,* 582 F.2d 781, 786 (3d Cir. 1978) ("The fact that the franchise agreement expressly

---

[8] As set forth in Ryanair's Response in Opposition to Defendants' Request, Defendants cannot rely on the license agreements for various reasons, most critically because they are relied upon for facts that Ryanair has disputed in the FAC and that are disputed by the agreements themselves in some cases. (*See* Pl.'s Resp. Opp'n to Defs.' Req. Jud. Notice filed contemporaneously.) Notably, one of the agreements between Priceline and Mystify states that Priceline "████████████████████████████████████ ██████████" which not only undercuts Defendants' Motion but supports Ryanair on the merits of its claims. *See* D.I. 83, Ex. 9 at 6.8.

denies the existence of an agency relationship is not in itself determinative of the matter."). Any

███████████████ within the license agreements are not alone a bar to vicarious liability claims

against Defendants, even if they were properly before the Court.

Third, Defendants' circular "control" argument cannot stand. (Mot., D.I. 81 at 15-16; D.I. 87 at 15-16.) The FAC alleges that the Defendants offer Ryanair flights through their respective websites. (*See, e.g.,* FAC, D.I. 76 at ¶¶ 126-128.) Defendants claim the FAC lacks sufficient allegations of "actual control or inducement," but here, where evidence of control is solely within Defendants' possession, Ryanair cannot be expected to allege such details at the pleading stage. *See, e.g., Thomson*, 529 F. Supp. 3d at 314. Furthermore, and as discussed above, if a third party accesses the Ryanair Website on Defendants' behalf, Defendants *must* control and direct the third-party's actions, otherwise the third party could not know which flight to obtain. If the relevant third parties were merely accessing Ryanair's Website at sporadic intervals to obtain random flight itineraries, it would be impossible for Defendants to sell Ryanair itineraries. Defendants *must* exercise control over the third parties. (*See, e.g.* FAC, D.I. 76 at ¶ 250 ("[T]he Defendants, based on the activities on their websites, control, or at least direct, certain unauthorized access of the Ryanair Website.").) By alleging that Defendants directed or controlled their agents' unauthorized access of the Ryanair Website, Ryanair sufficiently states a CFAA claim for vicarious liability.[9] *See, e.g, Charles Schwab*, 2005 WL 2369815, at *7.

## C.    The FAC more than adequately alleges violations of five CFAA subsections.

Ryanair's FAC sufficiently alleges each of the elements required under its five CFAA claims. Defendants again characterize the FAC as "criminalizing access to public websites." This

---

[9] The fact that, prior to the entry of the discovery stay, the Defendants were in the early stages of providing discovery related to their relationships with third parties that are accessing the Ryanair Website on Defendants' behalf only emphasizes why this is an inappropriate Rule 12 motion.

is unproductive. "If a statute provides a private right of action, . . . an individual may 'bring suit to remedy or prevent an injury that results from another party's actual or threatened violation of a legal requirement.'" *Buchanan v. Ingram Content Grp*., No. 20-CV-2421, 2020 WL 5957618, at *2 (D.N.J. Oct. 6, 2020). "The CFAA has an express right of action for '[a]ny person who suffers damage or loss by reason of a violation of this section.'" *Id*. (citing 18 U.S.C. § 1030(g)). "Such an individual may bring a civil suit to recover damages." *Id*. There are many instances of plaintiffs enforcing the CFAA's civil remedies to protect themselves. *See, e.g., Dudick, ex rel. Susquehanna Precision, Inc. v. Vaccarro*, No. CIVA 3:06-CV-2175, 2007 WL 1847435, at *5 (M.D. Pa. June 25, 2007). Ryanair sufficiently states a CFAA claim, and the Motion should be denied.

### 1.   Count III under Section 1030(a)(5)(A) alleges intentional damage.

Defendants assert that Ryanair's claim fails under Section 1030(a)(5)(A) because Ryanair's purported "boilerplate recitation" of the intentional damages element "do not actually plead intent to cause harm." (Mot., D.I. 81 at 17-18; D.I. 87 at 17-18.) Defendants, again, ignore the FAC. Within Count III, Ryanair alleges that:

> [o]n information and belief, the Defendants have violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A), by knowingly causing the transmission, either directly or indirectly, of a program, information, code, or command and as a result *intentionally causing damage* without authorization or exceeding authorization to a protected computer owned by Ryanair.

(FAC, D.I. 76 at ¶ 332 (emphasis added).) Ryanair further explains that:

> Defendants have entered into numerous contracts with third parties to bypass the technical and non-technical barriers" in order to "access the Ryanair Website without authorization or by exceeding authorization and this *intentionally causes harm* to the Ryanair Website."

(*Id*. at ¶ 333 (emphasis added).)

The foregoing misconduct spearheaded by Defendants causes substantial harm to Ryanair that Ryanair thoroughly outlined in its FAC. For example, Ryanair alleges:

1. that Defendants' misconduct "causes material harm to Ryanair, its customers, and Ryanair's reputation" (*Id*. at ¶ 271);

2. that Ryanair "spent considerable resources, in excess of five thousand dollars ($5,000), to find, diagnose, and block access to the Ryanair Website by Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com and/or their agents" (*Id*. at ¶ 291); and

3. that Ryanair "developed a program called Shield that has blocked unauthorized third parties such as the Defendants and third parties Defendants have engaged to access the Ryanair Website from scraping the Ryanair Website and selling Ryanair inventory." (*Id*. at ¶ 98.)

Moreover, Ryanair expressly alleges that Defendants' conduct was intentional. (*See, e.g.*, *Id*. at ¶ 309 ("Defendants unauthorized access, whether it is direct or indirect, is causing severe technological harm to the Ryanair Website, and Defendants are *knowingly and willfully causing this harm*.") (emphasis added); *see also id*. at ¶¶ 154, 173, 224, 254-255, 309.) Ryanair even alleges that Defendants are fully aware that their activity negatively affects the Ryanair Website because Defendants prohibit screen scraping and otherwise unlawful access to their own respective web pages. (*See id*. at ¶¶ 299-309.) Taken together, such allegations sufficiently establish that Defendants intentionally caused damage to Ryanair and the Ryanair Website.

Ryanair has more than satisfied the intentional damages element of Section 1030(a)(5)(A). *See, e.g.*, *Dudick*, 2007 WL 1847435, at *6 (rejecting Defendants' argument that the complaint "so closely tracks the language of the CFAA that it merely sets forth conclusory allegations" because "[u]nder the Federal Rules of Civil Procedure liberal notice-pleading requirements, *see* Fed. R. Civ. P. 8(a) and 12(b)(6), these allegations are sufficient to put Defendants on notice").

**2.      Count II under Section 1030(a)(4) contains more than sufficient allegations regarding the Defendants' intent to defraud.**

Defendants maintain that Ryanair's FAC fails under Section 1030(a)(4) because Ryanair failed to plead its allegations of fraud with particularity. (Mot., D.I. 81 at 18-19; D.I. 87 at 18-19.) This argument is baseless for at least two reasons. First, most courts–including those within the

Third Circuit—have held that claims under Section 1030(a)(4) need not adhere to Rule 9(b) heightened pleading standards. Second, Ryanair's FAC sufficiently alleges Defendants' fraudulent conduct and repeated misrepresentations, through not only words but also images and website screenshots, exceeds both the Rule 8 and the Rule 9 pleading standards.

Defendants cite a single Northern District of California case as support for requiring Rule 9(b) pleading.[10] That case is not controlling and is, in fact, wrong when it comes to the Third Circuit law. "District Courts within the Third Circuit hold § 1030(a)(4) claims to the general pleading standards of Rule 8, not Rule 9's heightened pleading standard that normally applies to allegations of fraud." *Elias Indus., Inc. v. Kissler & Co. Inc*., No. 2:20-CV-01011-CCW, 2021 WL 2141509, at *5 (W.D. Pa. May 26, 2021) (citing *PNY Techs., Inc. v. Salhi*, No. 2:12-CV-04916 DMC, 2013 WL 4039030, at *6 (D.N.J. Aug. 5, 2013) ("District Courts within the Third Circuit hold § 1030(a)(4) claims to the general pleading standards of Rule 8, not Rule 9's heightened pleading standard that normally applies to allegations of fraud.")).[11] This Court should reject

---

[10] While the majority of district courts in the Ninth Circuit that have addressed the issue require claims under 18 U.S.C. § 1030(a)(4) to be pled with particularity under Rule 9(b)," even there the heightened standard only applies "when fraudulent conduct is specifically alleged as the basis for the wrongdoing." *NLRK, LLC v. Indoor Ag-Con, LLC*, No. 321CV00073LRHWGC, 2022 WL 293252, at *7 (D. Nev. Jan. 31, 2022). And those courts hold that the state of mind requirement, "intent to defraud," need not be pled with particularity. *Id*. Defendants' unauthorized access and access in excess of Defendants' authorization is the basis of the wrongdoing; not fraud. Thus, Rule 9(b) does not apply to this matter even under Ninth Circuit precedent.

[11] *See also Sprint Nextel Corp. v. Simple Cell, Inc*., No. CIV. CCB-13-617, 2013 WL 3776933, at *6 (D. Md. July 17, 2013) ("Because the statute is more logically read as prohibiting 'wrongdoing' to obtain something of value and not, specifically, only acts that sound in common law fraud, the court will decline to apply Rule 9(b) to Sprint's CFAA claims"); *El Omari v. Buchanan*, No. 20 CIV. 2601 (VM), 2021 WL 5889341, at *13 (S.D.N.Y. Dec. 10, 2021) ("However, the weight of court opinion suggests that that Rule 9(b) does not apply to Section 1030(a)(4) because "intent to defraud" is best understood as requiring wrongdoing, but not the elements of common law fraud."); *eBay Inc. v. Digital Point Sols., Inc.*, 608 F. Supp. 2d 1156, 1164 (N.D. Cal. 2009) (""[F]raud' under the CFAA only requires a showing of unlawful access; there is no need to plead the elements of common law fraud to state a claim under the Act.").

Defendants' argument that fraud allegations under the CFAA must be pled with specificity under Rule 9(b). (D.I. 81 at 18-19; D.I. 87 at 18-19.)

Regardless of whether Rule 8 or Rule 9(b)'s standard is applicable to this action, Ryanair has sufficiently alleged that Defendants wrongfully accessed a protected computer with an intent to defraud. To summarize, Ryanair alleges that Defendants scrape and otherwise access the Ryanair Website without authorization or in excess of their authorized access, obtain and offer Ryanair flights and packages to their respective customers, and "misrepresent the true cost of Ryanair flights." (FAC, D.I. 76 at ¶ 262.) Ryanair documents a series of misrepresentations orchestrated by Defendants, supported by nearly a dozen images, proving that Defendants "misrepresent the true cost of Ryanair flights" to "include[] an additional fee imposed by Kayak.com, Priceline.com, or Agoda.com," thereby "causing harm to Ryanair and its customers." (*Id*. at ¶¶ 257-268.) Defendants also put the entire scheme into motion in order to gain access to the Ryanair Website, which results in a circumvention of technological barriers by using fake names, fake email addresses, and randomized IP addresses. (*See e.g.,* id. at ¶¶ 250-255.) Such allegations meet and even exceed the requisite pleading standard. *See, e.g., Elias Indus., Inc. v. Kissler & Co. Inc*., No. 2:20-CV-01011-CCW, 2021 WL 2141509, at *5 (W.D. Pa. May 26, 2021) ("Plaintiff asserts that Defendant accessed the Client Portal knowingly, intentionally, and repeatedly without authorization and intended to defraud Elias through the Fraudulent Access by obtaining and using the Client Portal Information in economic competition with Elias. These allegations are sufficiently particular to support a claim for fraudulent access at the pleading stage pursuant to the applicable pleading standard from Rule 8.") (internal citation omitted).

**3.**   **Counts I and IV of the FAC properly allege intentional, unauthorized access and access in excess of authorization under Sections 1030(a)(2), 1030(a)(5)(B), and 1030(a)(5)(C).**

Ryanair's allegations are sufficient to state a claim under Sections 1030(a)(2), 1030(a)(5)(B), and 1030(a)(5)(C) because Ryanair adequately alleges that Defendants accessed the Ryanair Website without authorization or in excess of authorized access.

**i.**   **The FAC more than adequately alleges that Defendants circumvented technological limitations and a "gate" to access the Ryanair Website without authorization.**

The *Van Buren* decision, when fleshing out the distinction between "without authorization" and "exceeds authorized access," noted that the "gates-up-or-down approach align[ed] with the computer-context understanding of access as entry." *Van Buren*, 141 S. Ct. at 1659. The court's reasoning was based, in part, on the notion that authorization "turns on whether a user's credentials allow him to proceed past a computer's access gate, rather than on other, scope-based restrictions." *Id*. at 1659, n.9. Ryanair alleges sufficient facts to reflect that the Ryanair Website contained, not only one access gate, but multiple access gates that were improperly circumvented by Defendants, e.g., password authentication requirements and the Shield program. (FAC, D.I. 76 at ¶¶ 63-64, 91-113.) Ryanair's allegations meet and exceed the *Van Buren* standard.

Defendants' extreme stance on *Van Buren* – that no "authorization" is required to access any part of the Ryanair Website – is based entirely on Defendants' misinterpretation of dicta from the *Van Buren* decision and disregard of the FAC. As Judge Stark previously determined, *Van Buren* does not prevent Ryanair's CFAA claim against Defendants. (D.I. 42 at 10.)

Defendants incorrectly claim that, "[i]n *Van Buren*, the Supreme Court clarified that 'without authorization' or 'exceeds authorized access' liability require a showing that the defendant '***cannot*** access a computer system' or '***cannot*** access certain areas within the system.'" (Mot., D.I. 81 at 19; D.I. 87 at 19 (emphasis in original).) The Supreme Court was referring

expressly to "Van Buren's reading" and interpretation of the CFAA. *Van Buren*, 141 S. Ct. at 1658-1659 ("Under ***Van Buren's reading***, liability under both clauses stems from a gates-up-or-down inquiry—one either can or cannot access a computer system, and one either can or cannot access certain areas within the system.") (emphasis added).

The Supreme Court noted that Van Buren's approach generally "aligns with the computer-context understanding of access as entry." *Id*. at 1659. However, the Supreme Court did not render any decision regarding the definition of "without authorization." The Supreme Court specifically declined to address "whether this inquiry turns only on technological (or 'code-based') limitations on access, or instead also looks to limits contained in contracts or policies." *Id*. at 1659 at n.8. Even the *hiQ Labs, Inc. v. LinkedIn Corp*. opinion that Defendants repeatedly cite acknowledges that the *Van Buren* decision "did not directly address the statute's 'without authorization' clause." *hiQ Labs, Inc. v. LinkedIn Corp*., 31 F.4th 1180, 1198 (9th Cir. 2022).

Defendants' interpretation of *Van Buren* is further flawed because, if it required that a user "***cannot*** access a computer system" or "***cannot*** access certain areas within the system" (Mot. at p. 19), then violations of the CFAA would literally cease to exist – there cannot be a CFAA violation without computer access. Instead, under Van Buren's view, users who "cannot" access a computer system functionally means "those who 'acces[s] a computer without any permission at all." *Van Buren*, 141 S. Ct. at 1658. Defendants' interpretation of the CFAA and *Van Buren* is misguided. Ryanair has fully and adequately pled that Defendants access the Ryanair Website with no permission, bypassing the gates Ryanair has constructed. (FAC, D.I. 76 at ¶¶ 142, 148, 208-211.)

Defendants also misconstrue the *hiQ* decision and, again, ignore Ryanair's allegations regarding Ryanair's Website. Defendants rely on *hiQ*, a Ninth Circuit decision, to argue that there can be no CFAA violations of the Ryanair Website because the "computer has erected no gates to

lift or lower in the first place." (Mot., D.I. 81 at 19; D.I. 87 at 19.) This is wrong and disregards the FAC. The *hiQ* court acknowledged that "the CFAA's prohibition on accessing a computer 'without authorization' is violated when a person circumvents a computer's generally applicable rules regarding access permissions, such as username and password requirements, to gain access to a computer." *hiQ*, 31 F.4th at 1201. This is precisely what Defendants do and Ryanair has alleged – circumventing username and password requirements, *in addition to* circumventing Ryanair's technological barriers like Shield. (*See, e.g.,* FAC, D.I. 76 at ¶¶ 146-149, 252.)

Defendants claim the myRyanair username and password barrier does not erect a "gate" to the public "because there is no restriction on the ability of any member of the public to "sign up" and generate their own username and password." (Mot., D.I. 81 at 20; D.I. 87 at 20.) Defendants are mistaken once again. Both the *hiQ* decision and the allegations of the FAC demonstrate that a "gate" has been constructed on the myRyanair portion of the Ryanair Website. (*See, e.g,* FAC, D.I. 76 at ¶¶ 63-64, 91-114.) More specifically, the *hiQ* decision expressly states that there is a "distinction between 'private' computer networks and websites, protected by a password authentication system and 'not visible to the public,' and websites that are accessible to the general public. *hiQ*, 31 F.4th at 1200. The court even noted that a "password gate" is the type of authentication requirement "needed to create the necessary barrier that divides open spaces from closed spaces on the Web." *Id*. at 1197.

Ryanair alleges several gates:

1. "[a]n authorization request to access the myRyanair portion of the Ryanair Website requires the user to create (and then later enter) certain login information, including an email address and password." (FAC, D.I. 76 at ¶¶ 64, 94, 110.)

2. "If a person provided an email address associated with an unauthorized user, Ryanair would block that person's access to the Ryanair Website." (*Id*. at ¶ 111.)

3. Ryanair's Shield program has also "monitored the persons utilizing the myRyanair portion of the Ryanair Website and imposed technological limitations on access to the Ryanair Website." (*Id.* at ¶ 113.)

Even if this Court follows *hiQ*, there is no question that Ryanair has built and alleged "gates." By directly or indirectly circumventing Ryanair's technological limitations and gaining unauthorized access to the Ryanair Website to purchase Ryanair flight itineraries, Defendants violated the CFAA. *See, e.g., id.* at ¶¶ 142-143, 147-152, 245; *see also Facebook*, 844 F.3d at 1068 (finding Power Ventures accessed Facebook's computers without authorization in violation of the CFAA because Facebook imposed a username and password authentication system); *hiQ* 31 F.4th at 1199-1200 (noting the difference in *Facebook* where Facebook "requires its users to register with a unique username and password . . .").[12]

### ii. Defendants' terms of use and cease-and-desist arguments lack merit.

As an extension of the preceding argument, Defendants state Ryanair does not sufficiently allege that "it closed the gates to online travel companies generally (through its [Terms of Use] TOU) or to Defendants specifically (through cease-and-desist letters)." (Mot., D.I. 81 at 20; D.I. 87 at 20.)  Ryanair previously explained that its CFAA claims are not based on its TOU, as follows:

> Ryanair's … claim[s] [are] grounded in a U.S. federal statute. The Complaint alleges facts related to the Ryanair Website TOU solely as support for its allegations that Defendants not only exceeded authorized access to protected computers but also knew of the restrictions imposed by Ryanair. … In fact, even if the Court were to strip away all of the allegation regarding the TOU, the cease and desist letters alone could serve as an independent basis for Ryanair's CFAA claim.

(D.I. 26 at 14 (citing *Ryanair DAC v. Expedia Inc*. No. C17-1789RSL, 2018 WL 3727599, at *4 (W.D. Wash. Aug. 6, 2018) (acknowledging that Ryanair's reference to the "TOU simply define

---

[12] The *hiQ* court also acknowledged that "even computers and servers hosting public websites may contain areas that require authorization to access. Accessing those areas 'without authorization' would violate the CFAA." *hiQ*, 31 F.4th at 1199, n.17. There can be no dispute that the myRyanair portion of the Ryanair Website requires authorization for access.

the limits of authorization to access the website" and that "Ryanair's September 2017 letter serves

as an independent basis clarifying that the scraping was unauthorized.")).) As noted above (*see*

*supra*, Section 3(a)), Ryanair adequately alleges that it constructed a "gate" to the Ryanair Website.

Defendants argue that users cannot be found liable in a CFAA private right of action for

accessing what they call a "public website." This again ignores the FAC and Defendants' own

cited case law. Ryanair has erected barriers to the Ryanair Website to stop unauthorized parties

from gaining access, which is directly in line with *Van Buren*. (*See, e.g.,* FAC, D.I. 76 at ¶¶ 63-64,

91-114.) *See, e.g.*, *Facebook*, 844 F.3d at 1068 ("We therefore hold that, after receiving written

notification from Facebook on December 1, 2008, Power accessed Facebook's computers "without

authorization" within the meaning of the CFAA and is liable under that statute.");  *hiQ*, 31 F.4th

at 1199, n.17 ("Of course, even computers and servers hosting public websites may contain areas

that require authorization to access. Accessing those areas "without authorization" would violate

the CFAA."). Here, the FAC alleges with detail that the Defendants accessed the Ryanair Website,

including the myRyanair portion of the webpage, without authorization. (FAC, D.I. 76 at ¶¶ 142-

143, 147-152, 161, 245.) Ryanair constructed "gates" designed to prevent the Defendants from

accessing the Ryanair Website. Defendants disregarded Ryanair's cease-and-desist letters;

circumvented the Shield program, the password gate, and other technological restrictions; and

accessed the Ryanair Website without authorization or in excess of their authorized access. Such

allegations state a claim under the CFAA. *See, e.g.*, *eBay*, 608 F. Supp. at 1164.

Defendants' argument related to the served cease-and-desist letters also fails. The *hiQ*

decision recognized that the *Facebook* opinion properly held that "after receiving an individualized

cease-and-desist letter, Power Ventures had accessed Facebook computers "without authorization"

and was therefore liable under the CFAA." *hiQ*, 31 F.4th at 1199 (citing *Facebook*, 844 F.3d at

1063-68 (holding defendant liable for accessing Facebook computers after receiving an individualized cease-and-desist letter)).

Defendants rely on *Ticketmaster* and other cases to suggest a cease-and-desist letter is insufficient for a public website. (Mot., D.I. 81 at 24; D.I. 87 at 24.) However, those cases are distinguishable. In *Ticketmaster*, the letters at issue merely acknowledged that the defendants' behavior violated Ticketmaster's terms of use, "but d[id] not actually revoke access authority." *Ticketmaster L.L.C. v. Prestige Ent., Inc.*, 306 F. Supp. 3d 1164 (C.D. Cal. Jan. 31, 2018) (emphasis added). Ryanair explicitly stated that Defendants and their third-party agents have no authorization to access the Ryanair Website and, to the extent they believed they ever did, it was revoked. (FAC, D.I. 76 at ¶ 82.) Ryanair's letters sufficiently revoked Defendants' access to the Ryanair Website, especially in light of the technological barriers erected.

### 4. Count V sufficiently alleges a conspiracy claim based on Section 1030(b) of the CFAA.

Defendants argue that Count V does nothing more than "recit[e] the elements and provid[e] no further detail" about Defendants' conspiracy. (Mot., D.I. 81 at 26; D.I. 87 at 26.) Defendants, however, ignore the 344 prior factual allegations incorporated into the CFAA conspiracy count. Those allegations provide more than sufficient factual foundation.

The FAC alleges that the Defendants "entered into written agreements with their agents and certain third parties who access the Ryanair Website without authorization (or alternatively, in excess of their authorized access) on behalf of the Defendants and then transmit (without authorization) Ryanair's flight itineraries and packages that the Defendants then publish on their respective websites without Ryanair's permission." (FAC, D.I. 76 at ¶ 220.) Ryanair provides a list of various agreements entered into between the Defendants and the engaged third parties in the FAC. (*See id*. at ¶ 215.) Ryanair also pleads sufficient facts to establish that Defendants and third

parties routinely take actions in furtherance of the conspiracy by accessing the Ryanair Website in violation of the CFAA. (*See generally* FAC, D.I. 76.) Such allegations are sufficient to establish the existence of an agreement with another to commit an unlawful act. Ryanair has adequately alleged the *prima facie* elements of a CFAA conspiracy claim. *See, e.g., RN Ent., LLC v. Clement*, 380 F. Supp. 3d 711, 719 (M.D. Tenn. 2019) (holding the plaintiff's "CFAA and CFAA conspiracy claims will be allowed to proceed"); *Phreesia, Inc. v. Certify Glob., Inc.*, No. DLB-21-678, 2022 WL 911207, at *10 (D. Md. Mar. 29, 2022) ("Phreesia has alleged a CFAA violation, and thus it also has alleged a conspiracy to violate that statute."); *Genentech, Inc. v. JHL Biotech, Inc.*, No. C 18-06582 WHA, 2019 WL 2476617, at *4 (N.D. Cal. June 13, 2019).[13]

### 5.   The FAC alleges actionable harm under the CFAA.

Defendants' argument that the FAC does not allege that Defendants caused Ryanair's harm ignores substantial allegations linking Defendants to Ryanair's harm:

- The unauthorized access to Ryanair's Website *by Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com*, whether direct or indirect, greatly increases the quantities of queries on the Ryanair Website. These automated queries from the aforementioned unauthorized access have the ability to overwhelm the systems of the Ryanair Website, which impairs the Ryanair Website's availability and/or usability for the intended users. This causes material harm to Ryanair, the performance of the Ryanair Website, Ryanair's customers, and Ryanair's reputation. (FAC, D.I. 76 at ¶ 270-271 (emphasis added).);

- Because of the data being scraped from the Ryanair Website *by Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com and/or their agents*, response time on the Ryanair Website can deteriorate, leading to error rates, and unacceptably slow response rates. (*Id*. at ¶ 272 (emphasis added).);

- *Defendants'* unauthorized access, either direct or indirect, leads to increased response time and increased errors. (*Id*. at ¶ 276 (emphasis added).); and

---

[13] As referenced above in Footnote 7, Defendants have produced documents that further evidence the conspiracy claim, including Defendants' direction and control of the conspiracy. (*See* Decl. Fuga Supp. Pl.'s Resp. Opp'n Defs.' Req. Jud. Notice.)

- Ryanair has spent considerable resources, in excess of five thousand dollars ($5,000), to find, diagnose, and block access to the Ryanair Website *by Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com and/or their agents*. Those resources have included and continue to include the diversion of employees from their usual duties, along with costs paid to third parties. (*Id*. at ¶ 291 (emphasis added).)

The foregoing examples are sufficient allegations of CFAA damage and loss caused by the Defendants, either directly or indirectly. Defendants' argument to the contrary is baseless. *See, e.g., Facebook* 844 F.3d at 1066 ("It is undisputed that Facebook employees spent many hours, totaling more than $5,000 in costs, analyzing, investigating, and responding to Power's actions. Accordingly, Facebook suffered a loss under the CFAA."); *Van Buren*, 141 S. Ct. at 1660 ("The statutory definitions of 'damage' and 'loss' thus focus on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data.").

### D.   This Court should refrain from considering documents beyond the FAC that are incomplete, unincorporated and not undisputedly authentic.

As outlined in Ryanair's Response in Opposition to Defendants' Request for Judicial Notice (Pl.'s Resp. Opp'n Defs.' Req. Jud. Notice.), this Court should not consider the agreements between certain Defendants and third parties (the "License Agreements"), the Irish High Court documents, or Booking Holding Inc.'s 2021 Form 10-K ("Form 10-K") when analyzing Defendants' Motion. Defendants attempt to re-write the facts of this action in a light more favorable to them by referring to various documents beyond the four corners of the FAC, hoping the Court will be persuaded by something – anything. This approach is ineffective and improper.[14]

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *Howard v. New Jersey Div. of Youth & Fam. Servs*., 398 F. App'x

---

[14] This is often called the "kitchen sink" approach. *Wabote v. Ude*, No. 5:21-CV-2214, 2021 WL 4901809, at *3 (E.D. Pa. Oct. 21, 2021) ("Ude's Motion throws everything and the kitchen sink at the Amended Complaint. However, the arguments made in Ude's Motion lack merit."); *Davis v. Bank of Am., NA*, No.

807, 811 (3d Cir. 2010). While there are certain limited exceptions to this rule for documents incorporated by reference and undisputedly authentic documents, such exceptions are not applicable here. (D.I. 92 at pp. 6-7.) Accordingly, it would be inappropriate for this Court to consider incomplete, unauthenticated documents from the Hemann Declaration when analyzing Defendants' Motion, and such documents must be disregarded. (*See e.g.,* D.I. 83; D.I. 89.)

This Court should also ignore Defendants' improper citations to a Bloomberg Law press release, a Programming Insider article, and a Wikipedia entry (the "Articles"). "Suffice it to say, Wikipedia… is not valid legal authority." *RIGroup LLC v. Trefonisco Mgmt. Ltd*., 949 F. Supp. 2d 546, 557, n.5 (S.D.N.Y. 2013); *In re Uni-Marts, LLC*, 404 B.R. 767, 777 (Bankr. D. Del. 2009) ("[T]he Wikipedia entry is not of record in this case and is probably not admissible as evidence.") (citing Fed. R. Evid. 802.)[15] Similarly, the Bloomberg Law press release and Programming Inside article do not constitute valid legal authority, and Defendants do not attempt to demonstrate why the Articles can be considered on a Rule 12(b)(6) motion to dismiss.

Consequently, this Court should strike and completely disregard the Articles when formulating a decision on the Motion. *See, e.g., Lee v. TMZ Prods. Inc*., No. CIV. 2:15-00234 WJM, 2015 WL 5638081, at *3 (D.N.J. Sept. 24, 2015) (striking articles where the defendants "made no showing as to why those articles can be considered on a Rule 12(b)(6) motion to dismiss"); *Benninger v. Ohio Twp. Police Dep't*., No. 2:19-CV-00524-PLD, 2020 WL 264967, at

---

1:19-13515-NLH-MJS, 2022 WL 683025, at *2 (D.N.J. Mar. 8, 2022) (denying the "[p]laintiff's kitchen-sink styled motion").

[15] *See also Campbell ex rel. Campbell v. Sec'y of Health & Hum. Servs*., 69 Fed. Cl. 775, 781 (2006) (A review of Wikipedia "reveals a pervasive and, for our purposes, disturbing series of disclaimers, among them, that: (i) any given Wikipedia article "may be, at any given moment, in a bad state: for example it could be in the middle of a large edit or it could have been recently vandalized;" (ii) Wikipedia articles are "also subject to remarkable oversights and omissions;" (iii) "Wikipedia articles (or series of related articles) are liable to be incomplete in ways . . .").

*3 (W.D. Pa. Jan. 17, 2020) ("Thus, while the content of these articles may have some relevance to the claim asserted against the Police Department and/or Officer DeJulio, the Court cannot consider them in this context and must limit its review to the allegations in the Complaint.").

In this case, the parties have hardly begun to discover the actual practice and nuances of the relationship between Defendants and the relevant third parties. But one fact is clear – the parties fundamentally disagree on whether an agency relationship exists between the contracting parties, thereby making the existence of an agency relationship a disputed fact.[16] Based on the foregoing, if this Court took judicial notice of the License Agreements and converted Defendants' Motion into a summary judgment motion, denial would still be appropriate given that there are genuine issues of material fact in dispute regarding the existence of an agency relationship. *See e.g., Zeno*, 480 F. Supp. 2d at 847 (denying motion for summary judgment as "premature at this time" where the alleged agency relationship was "so fiercely disputed"); *Drexel*, 582 F.2d at 790 ("We therefore conclude that on the present record genuine issues of material fact exist regarding the nature of the relationship between appellee and its franchisee which preclude the entry of summary judgment.").

## VI.   CONCLUSION

For the reasons set forth herein and in the Response in Opposition to Defendants' Request for Judicial Notice, Ryanair DAC respectfully requests that this Court deny Defendants' Motion to Dismiss in its entirety, and grant such further and necessary relief that this Court deems just and proper.

---

[16] As set out in Ryanair's Response in Opposition to Defendants' Request, which is incorporated herein by reference, each of the License Agreements, the Irish High Court documents and the Form 10-K are offered for a disputed fact and are, therefore, improper for judicial notice at the Rule 12 stage as set out.

Dated: September 1, 2022

Respectfully Submitted,

**KRATZ & BARRY LLP**

*/s/ R Touhey Myer*
R Touhey Myer (#5939)
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

*Of Counsel:*

R. David Donoghue
Anthony J. Fuga
Lisa M. Kpor
HOLLAND & KNIGHT LLP
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600
david.donoghue@hklaw.com
anthony.fuga@hklaw.com
lisa.kpor@hklaw.com

*Attorneys for Plaintiff, Ryanair DAC*