**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

_____

| | |
|---|---|
| RYANAIR DAC, | : |
| | : |
| | :   C.A. No. 1:20-cv-01191-WCB |
| *Plaintiff/* | : |
| *Counterclaim Defendant,* | : |
| | : |
| v. | : |
| | : |
| BOOKING HOLDINGS INC., | : |
| BOOKING.COM B.V., KAYAK SOFTWARE | : |
| CORPORATION, PRICELINE.COM LLC, | : |
| and AGODA COMPANY PTE. LTD., | : |
| | : |
| *Defendants,* | : |
| | : |
| BOOKING.COM B.V.., | :   **PUBLIC VERSION -** |
| | : **CONFIDENTIAL MATERIAL OMITTED** |
| *Counterclaim Plaintiff.* | : |

_____

**RYANAIR'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR**
**SUMMARY JUDGMENT AND TO PRECLUDE EXPERT TESTIMONY**
**OF TIMOTHY JAMES O'NEIL-DUNNE,**
<u>**JORDAN RAE KELLY, AND BASIL IMBURGIA**</u>

Dated: December 20, 2023

R Touhey Myer (#5939)
KRATZ & BARRY LLP
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

R. David Donoghue (*pro hac vice*)
Anthony J. Fuga (*pro hac vice*)
HOLLAND & KNIGHT LLP
150 N Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600
david.donoghue@hklaw.com
anthony.fuga@hklaw.com

Cynthia A. Gierhart  (*pro hac vice*)
HOLLAND & KNIGHT LLP
800 17th Street NW, Suite 1100
Washington, DC 20011
(202) 569-5416
cindy.gierhart@hklaw.com

Ji Mao (*pro hac vice*)
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
(212) 513-3420
ji.mao@hklaw.com

William H. Oliver III (*pro hac vice*)
HOLLAND & KNIGHT LLP
10 St. James Ave. 11th Floor
Boston, MA 02116
(617) 573-5863
william.oliver@hklaw.com

*Attorneys for Plaintiff/*
*Counterclaim Defendant Ryanair DAC*

## TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................1

II.  NATURE AND STAGE OF THE PROCEEDINGS .......................................1

III.  SUMMARY OF THE ARGUMENT ................................................................3

IV.  STATEMENT OF THE FACTS ......................................................................4

  A.  PLAINTIFF RYANAIR ..............................................................................4

  B.  DEFENDANTS BOOKING AND KAYAK.................................................4

  C.  DEFENDANTS ARE NOT AUTHORIZED TO ACCESS THE RYANAIR WEBSITE .....................5

  D.  RYANAIR'S COMMUNICATIONS WITH ITS CUSTOMERS...................................6

V.  LEGAL STANDARD........................................................................................6

VI.  ARGUMENT .....................................................................................................8

  E.  SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNTS I AND IV...........8

    1.  Ryanair Has a Private Right of Action Under the CFAA. ...................8

    2.  Booking and Kayak Are Liable Under CFAA § 1030(a)(2)(C). ...........16

    3.  Booking and Kayak Are Liable Under CFAA § 1030(a)(5)(C). ............26

  F.  BOOKING'S COUNTERCLAIMS SHOULD BE DISMISSED...................27

    1.  Booking's Counterclaims Fail Because Ryanair's Statements Are True. ................27

    2.  Booking's Counterclaims Must Fail Because Ryanair Did Not Act Wrongfully......32

    3.  Booking's Counterclaims Fail Because Booking Cannot Prove Damages...............36

  G.  DEFENDANTS' EXPERTS SHOULD BE EXCLUDED. ...........................................38

    1.  O'Neil-Dunne's Opinions Should Be Excluded As Not Relevant or Reliable..........38

    2.  Kelly's Opinions Should Be Excluded as Unreliable. ...............................................41

    3.  Imburgia Is Not Qualified to Testify on Matters Related to the CFAA, and His Testimony Is Not Reliable and Would Not Help the Trier of Fact...........................47

VII.  CONCLUSION................................................................................................50

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                   **Page(s)**

*Accenture Glob. Servs. GMBH v. Guidewire Software Inc.*,
   581 F. Supp. 2d 654 (D. Del. 2008)..................................................................................32, 36

*Affiliati Network, Inc. v. Wanamaker*,
   No. 1:16-CV-24097-UU, 2017 WL 7361048 (S.D. Fla. Aug. 14, 2017) ...............................40

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................................................................6

*Beard Rsch., Inc. v. Kate*s,
   8 A.3d 573 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11
   A.3d 749 (Del. 2010) ...............................................................................................36, 37, 38

*Brooks v. AM Resorts, LLC*,
   954 F. Supp. 2d 331 (E.D. Pa. 2013) .....................................................................................8

*Buchanan v. Ingram Content Grp.*,
   No. 20-CV-2421, 2020 WL 5957618 (D.N.J. Oct. 6, 2020) ....................................................8

*Charles Schwab & Co. v. Carter*,
   No. 04 C 7071, 2005 U.S. Dist. LEXIS 21348 (N.D. Ill. Sep. 27, 2005)...............................18

*Com. Nat. Ins. Servs., Inc. V. Buchler*,
   120 F. App'x 414 (3d Cir. 2004) .........................................................................32, 33, 35, 36

*Conroy v. Vilsack*,
   707 F.3d 1163 (10th Cir. 2013) .....................................................................................42, 43

*Corning Inc. v. SRU Biosystems, LLC*,
   292 F. Supp. 2d 583 (D. Del. 2003).....................................................................................34

*Cousins v. Goodier*,
   283 A.3d 1140 (Del. 2022) .............................................................................................27, 31

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)....................................................................................................*passim*

*Deutsch v. Novartis Pharms. Corp.*,
   768 F. Supp. 2d 420 (E.D.N.Y. 2011) .................................................................................39

*Elias Indus. v. Kissler & Co.*,
   No. 2:20-CV-01011-CCW, 2021 U.S. Dist. LEXIS 99449 (W.D. Pa. May 26,
   2021) ................................................................................................................................8, 16

*Ely v. Cabot Oil & Gas Corp.*,
    No. 3:09-CV-2284, 2016 U.S. Dist. LEXIS 165597 (M.D. Pa. Feb. 17, 2016) ...............42, 43

*Schneider ex rel. Estate of Schneider v. Fried*,
    320 F.3d 396 (3d Cir. 2003) ..........................................................................................7, 39, 47

*Facebook, Inc. v. Power Ventures, Inc.*,
    844 F.3d 1058 (9th Cir. 2016) ......................................................................................16, 25

*In re Flonase Antitrust Litig.*,
    884 F. Supp. 2d 184 (E.D. Pa. 2012) ............................................................................42, 46

*Gener8, LLC v. Castanon*,
    No. 2022-0426-LWW, 2023 WL 6381635 (Del. Ch. Sept. 29, 2023) ..................................38

*Glennon Co. v. Monday*,
    No. 18-30120-WGY, 2020 U.S. Dist. LEXIS 45917 (D. Mass. Mar. 17, 2020) ...................13

*Grant Mfg. & Alloying, Inc. v. McIlvain*,
    No. 10-1029, 2011 U.S. Dist. LEXIS 108961 (E.D. Pa. Sep. 23, 2011) ...............................20

*Grubbs v. Univ. of Delaware Police Dep't*,
    174 F. Supp. 3d 839 (D. Del. 2016) ...................................................................................27

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022) .......................................................................................20, 25

*Incyte Corp. v. Flexus Biosciences, Inc.*,
    No. CVN15C09055MMJCCLD, 2017 WL 7803923 (Del. Super. Ct. Nov. 1,
    2017) ................................................................................................................................38

*IpLearn, LLC v. Blackboard Inc.*,
    No. 11-876 (RGA), 2014 WL 4954462 (D. Del. Sep. 29, 2014) ..........................................40

*Izume Prods. Co. v. Koninklijke Philips Elecs. N.V.*,
    315 F. Supp. 2d 589 (D. Del. 2004) .....................................................................................7

*John McClelland & Assocs. v. Med. Action Indus.*,
    No. 04-2545-CM, 2006 U.S. Dist. LEXIS 83300 (D. Kan. Nov. 15, 2006) ..........................50

*Leyba v. City of Santa Fe*,
    No. CV 16-185 WPL/LF, 2017 U.S. Dist. LEXIS 21343, at *10 (D.N.M. Feb.
    14, 2017) ..........................................................................................................................43

*Lipson v. Anesthesia Servs., P.A.*,
    790 A.2d 1261 (Del. Super. Ct. 2001) ................................................................................32

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...............................................................................................6

*Monsanto Co. v. Aetna Cas. & Sur. Co.*,
    No. 88C-JA-118, 1993 WL 563246 (Del. Super. Ct. Dec. 21, 1993)......................37

*In re Nat'l Collegiate Student Loan Trusts Litig.*,
    No. CV 12111-VCS, 2020 WL 3960334 (Del. Ch. July 13, 2020)
    ...................................................................................................27, 31, 36

*NovelPoster v. Javitch Canfield Grp.*,
    140 F. Supp. 3d 954 (N.D. Cal. 2014) ...............................................................13

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994)..............................................................................7, 44

*Preston Hollow Cap. LLC v. Nuveen LLC*,
    No. CVN19C10107MMJCCLD, 2022 WL 2276599, at *4 (Del. Super. Ct.
    June 14, 2022).....................................................................................................36

*Riley v. Moyed*,
    529 A.2d 248 (Del. 1987) ...................................................................................27

*Shure Inc. v. ClearOne, Inc.*,
    No. CV 19-1343-RGA, 2021 WL 4894198 (D. Del. Oct. 20, 2021)................35, 36

*Simpson v. Betteroads Asphalt Corp.*,
    No. CIVIL 2011-056, 2013 WL 2255472 (D.V.I. May 18, 2013) .........................40

*In re Skye Min. Partners, LLC*,
    No. BR 18-11430-LSS, 2020 WL 6709892 (D. Del. Nov. 16, 2020) ....................20

*Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron, Inc.*,
    623 F. Supp. 2d 518 (D. Del. 2009)....................................................................37

*U.S. Bank Nat'l Ass'n v. Gunn*,
    23 F. Supp. 3d 426 (D. Del. 2014)..................................................................36, 37

*United Fed'n of Churches, LLC v. Johnson*,
    598 F. Supp. 3d 1084 (W.D. Wash. 2022)...........................................................25

*United States Gypsum Co. v. Lafarge N. Am.*,
    670 F. Supp. 2d 737 (N.D. Ill. 2009) ..................................................................49

*United States v. Bridges*,
    No. 21-1679, 2022 WL 4244276 (3d Cir. Sept. 15, 2022) ...........................7, 48, 50

*United States v. Merrill*,
  No. 08-20574-CR-LENARD/TUR, 2010 U.S. Dist. LEXIS 112879 (S.D. Fla.
  Oct. 8, 2010) .................................................................................................................42, 50

*United States v. Middleton*,
  231 F.3d 1207 (9th Cir. 2000) ...........................................................................................9, 11

*United States v. Nosal*,
  No. CR-08-0237 EMC, 2014 U.S. Dist. LEXIS 4021 (N.D. Cal. Jan. 13, 2014)...............9, 10

*United States v. Schiff*,
  602 F.3d 152 (3d Cir. 2010).....................................................................................................44

*Univ. Sports Publ'ns Co. v. Playmakers Media Co.*,
  725 F. Supp. 2d 378 (S.D.N.Y. 2010).................................................................................8, 13

*Van Buren v. United States*
  141 S. Ct. 1648, 1662 (2021)..............................................................................................20, 25

*Ward v. Blair*,
  No. CV S12C-04-004 RFS, 2013 WL 3816568 (Del. Super. Ct. July 16, 2013)...................38

*Wilco AG v. Packaging Techs. & Inspection LLC*,
  615 F. Supp. 2d 320 (D. Del. 2009).................................................................................32, 34

*Zap Cellular, Inc. v. Weintraub*,
  No. 15-CV-6723, 2022 WL 4325746 (E.D.N.Y. Sept. 19, 2022) ...........................................9

*Zimmer Surgical, Inc. v. Stryker Corp.*,
  365 F. Supp. 3d 466 (D. Del. 2019)..........................................................................................7

**Statutes**

6 Del. C. § 2532(a)(8) ....................................................................................................................27

18 U.S.C. § 1030(a) .............................................................................................................. *passim*

18 U.S.C. § 1030(c) .............................................................................................................. *passim*

18 U.S.C. § 1030(e) ...............................................................................................8, 25, 26, 47

18 U.S.C. § 1030(g) ...........................................................................................3, 14, 15, 16, 26

**Other Authorities**

Fed. R. Evid. 702 .................................................................................................................. *passim*

Fed. R. Evid. 801-804 ..................................................................................................................37

Fed. R. Evid. 901 ..................................................................................................................37

Restatement (Second) of Torts § 769..........................................................................................34

## I.   INTRODUCTION

Booking and Kayak have engaged in a scheme to continuously access Ryanair's website without authorization in order to unlawfully sell Ryanair's flights. In response, Ryanair has developed and implemented technological barriers to halt the access and Ryanair's resulting losses. Despite admitting their intent to access Ryanair's websites and sell flights, Booking and Kayak attempt to avoid Computer Fraud and Abuse Act ("CFAA") liability by blaming third parties – their contracted business partners – for this unlawful activity. This fails. As courts have recognized, such gamesmanship is no defense, and this Court should grant summary judgment that Booking and Kayak have violated §§ 1030(a)(2)(C) and (a)(5)(C) of the CFAA.

The Court should also grant summary judgment for Ryanair on all counterclaims for the reasons detailed, but one simple basis is most obvious: Ryanair is allowed to communicate with its customers truthfully. And, as the facts confirm, that is the entirety of Booking's counterclaims.

Finally, Defendants served purported expert reports from Jordan Rae Kelly ("Kelly"), Timothy James O'Neil-Dunne ("O'Neil-Dunne"), and Basil Imburgia ("Imburgia"). Not one includes testimony that is either reliable or relevant. Each expert lacks understanding of the facts of the case, grounding in the actual elements of the CFAA, and relevance to the issues before the Court. Rule 702 of the Federal Rules of Evidence ("Rule 702") requires exclusion.

## II.   NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff and Counterclaim Defendant Ryanair DAC ("Ryanair") filed this lawsuit against Booking Holdings Inc. ("Booking Holdings"), Booking.com B.V. ("Booking"), Priceline.com LLC ("Priceline"), Kayak Software Corporation ("Kayak"), and Agoda Company Pte. Ltd. ("Agoda") (collectively, the "Defendants") on September 4, 2020, alleging a violation of the CFAA, 18 U.S.C. § 1030, *et seq. See generally* D.I. 1. The Court denied Defendants' January 21,

1

2021 motion to dismiss (D.I. 16, 17), in part, because the Supreme Court's *Van Buren* decision did not bar Ryanair's claims. D.I. 42 at 9 n.7. Defendants answered the Complaint on January 31, 2022 (D.I. 48) and moved for judgment on the pleadings four months later. D.I. 64, 65. With the Court's leave, Ryanair amended its complaint. D.I. 66, 67, 75, 76.

Ryanair's First Amended Complaint ("FAC") alleged five distinct CFAA violations. *See generally* D.I. 76. Defendants moved to dismiss again arguing, in part, that Ryanair had not sufficiently alleged (i) vicarious liability or (ii) that Defendants' access to the Ryanair Website was without authorization. D.I. 80, 81. The Court allowed four counts, only dismissing Count III. D.I. 105 at 27. The Court rejected the aforementioned arguments, holding (i) Defendants can be vicariously liable by inducing third parties to commit CFAA violations and (ii) Ryanair sufficiently pled that Defendants acted without authorization when circumventing authentication mechanisms limiting access to the myRyanair portion of the Ryanair Website. D.I. 105 at 13-14, 24-25.

Defendants answered the FAC, and Booking filed retaliatory counterclaims alleging tortious interference with business relations, unfair competition, defamation, trade libel, and deceptive trade practices (the "Counterclaims"). *See generally* D.I. 111. The Court dismissed Booking's defamation allegations relating to Ryanair's public statements about online travel agencies ("OTAs") and found certain statements were not provably false. *See* D.I. 134 at 10-13.

Defendants have engaged Kelly, O'Neil-Dunne, and Imburgia as purported experts. Ryanair has engaged two experts, Iain Lopata ("Lopata") and Anthony Vance ("Vance"). Defendants served opening reports from Kelly and O'Neil-Dunne. Ryanair served an opening report from Lopata. Defendants served two purported rebuttal reports to the Lopata Report through Imburgia and Kelly. Ryanair served a rebuttal report to the Kelly Report through Lopata and a rebuttal to the O'Neil-Dunne Report through Vance. An amended and supplemented expert report

from Lopata was served on October 6, 2023, and a supplemental rebuttal report from Imburgia was served on October 10, 2023. Ryanair now moves for summary judgment on Counts I and IV of the FAC, and against all of Booking's Counterclaims. Ryanair also moves to exclude the testimony of Kelly, O'Neil-Dunne, and Imburgia.

### III.    SUMMARY OF THE ARGUMENT

1.    Ryanair has an express right of action against Booking and Kayak under the CFAA because Ryanair has suffered at least ███████ in losses in a one-year period due to Booking and at least ███████ in losses in a one-year period due to Kayak. 18 U.S.C. § 1030(g).

2.    Booking and Kayak violate § 1030(a)(2)(C) of the CFAA by entering commercial agreements requiring their third-party partners to access the Ryanair Website without authorization on their behalf. Defendants admit that their access was intentional and circumvents authentication mechanisms implemented by Ryanair specifically to keep Defendants out.

3.    Booking and Kayak are also liable under CFAA § 1030(a)(5)(C) because Defendants have caused damage by at least impairing the integrity of Ryanair's data and rendering Ryanair's payment processing systems inoperable.

4.    Booking cannot prove any of its Counterclaims. The first and second counterclaim fail because: (i) Ryanair did not act *wrongfully* and is allowed to protect its business interests in a lawful manner; (ii) Booking cannot prove it suffered damage as a proximate result of Ryanair's actions; and (iii) Booking cannot prove that Ryanair *knowingly* interfered in Booking's business because Ryanair did not know to which OTA customers it is sending emails.

5.    Booking's other counterclaims fail because Ryanair's statements to customers are true. The trade libel claim also fails because Booking has failed to provide any evidence that it suffered special damages, and it cannot prove actual malice.

6.      O'Neil-Dunne does not opine on matters at issue in this case but, instead, describes generally the airline industry. This is neither relevant nor is it expert testimony.

7.      Kelly has such a drastic misunderstanding of harm under the CFAA and shows such ignorance of relevant facts that any testimony is unreliable.

8.      Imburgia seemingly delegated work and was therefore unaware of simple facts like which Ryanair entity is the plaintiff. He is wholly unreliable.

### IV.      STATEMENT OF THE FACTS

**A.      Plaintiff Ryanair**

Ryanair is a low-cost airline based in Ireland and the largest European airline. Ryanair uses its website (www.Ryanair.com) and the servers hosting it (collectively, the "Ryanair Website") to provide customers with fare and route information, sell Ryanair flights, and provide additional services. Ryanair authorizes flights to be sold only through the Ryanair Website and Global Distribution Systems ("GDS"), with the majority of flights sold via the Ryanair Website. *See* Fuga Dec. Ex. 1 at 75, 90.

**B.      Defendants Booking and Kayak**

Booking operates as an OTA by providing booking services for airline flights, car rentals, and ancillary services. *See* D.I. 111 at 56 ¶ 2. Booking is able to offer Ryanair flights to its customers by contracting with Etraveli, a third-party web scraper, ███████████████

████████████████████████████████████████████████████

████████████████████      Fuga Dec. Ex. 2 at 7-12; Fuga Dec. Ex. 3 at 43:9-16. Defendant Kayak represents that it is a service that aggregates search results from other sources, but, just like Booking, Kayak has contracted with third-party partners to scrape and purchase flights on the Ryanair Website. Fuga Dec. Ex. 4 at 6-8, 11-14, 17. Kayak users can additionally purchase Ryanair flights through Kayak's Link-Out bookings. *Id.* While Booking works exclusively with Etraveli to

source Ryanair flight information and book Ryanair flights, Kayak, as a "metasearch engine," has commercial agreements with a deep roster of third-party web partners. *Id.*

██████████ of all traffic to the Ryanair Website originates from OTA bots like the ones used by Booking and Kayak's partners. Fuga Dec. Ex. 5 at 146:21-147:1. Defendants' bot traffic harms the Ryanair Website by damaging the integrity of the Ryanair passenger data in its database, which prevents Ryanair from contacting or issuing refunds to its passengers, and Booking has taken part in an attack bringing down a portion of the Ryanair Website. *See infra* VI.A.1.a.iii.

## C. Defendants Are Not Authorized to Access the Ryanair Website

Ryanair has served Defendants multiple letters making clear that Defendants' access to the Ryanair Website–direct or indirect–is unauthorized and violates the CFAA. D.I. 76 at Ex. B, C, E. Ryanair has also spent well in excess of ██████ to detect and stop each Defendant's unauthorized access and diagnose and correct the damage Defendants have caused. *See infra* VI.A.1. Ryanair has developed an in-house software program called Shield that determines which users should be permitted to access the Ryanair Website, so that Ryanair can deny access to unauthorized users such as the Defendants. Ryanair has also implemented a restricted, password-protected section of the Ryanair Website, called myRyanair, to stop unauthorized users from accessing the Ryanair Website. Fuga Dec. Ex. 6 at 90; Fuga Dec. Ex. 7 at 16-31. The ability to book flights is restricted to users who log in to the myRyanair portion of the website by providing their access credentials. Lopata Dec. ¶ 16(c)(iii). To obtain access credentials, users must agree to Ryanair's website Terms of Use ("TOU"), demonstrate they are human by providing a valid e-mail address, and prove they have access to that e-mail address by verifying it with Ryanair. *Id.* ¶ 16(c)(v).

Defendants know that they are not authorized to access the Ryanair Website. Regardless, they bypass technological and non-technological barriers to access the site and purchase flights. *See* Fuga Dec. Ex. 8 at 7; Ex. A; Fuga Dec. Ex. 9 at 7, Ex. A.

### D.    Ryanair's Communications With Its Customers

Ryanair communicates with its OTA-based flight customers to notify them of check-in procedures required by Ryanair (never mentioning Booking by name). *See, e.g.*, Fuga Dec. Ex. 10. Ryanair states that it *may* not have the customer's correct contact or payment details because the bookings made through an unauthorized intermediary *often* do not provide Ryanair correct information. *Id*. The communications explain that the customer must verify their information either online or in person before flying. *Id*. Since Ryanair does not always have the correct contact information when customers book through OTAs, Ryanair makes similar statements via social media. Ryanair also states that verification is necessary because Ryanair cannot directly refund a customer if Ryanair does not have correct payment information. *See, e.g.*, Fuga Dec. Ex. 11; Fuga Dec. Ex. 12. Furthermore, EU regulations *require* that Ryanair notify passengers of COVID-positive passengers, flight delays, and their rights in the event of a cancellation. *See* https://www.easa.europa.eu/en/the-agency/faqs/what-i-need-take-account-arriving-airport; https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32004R0261; *see generally* Fuga Dec. Ex. 7 at 5-16. Ryanair *must* have correct contact information to comply.

## V.    LEGAL STANDARD

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Rule 702 explains that an expert qualified by

"knowledge, skill, experience, training or education" can testify only if:

> the proponent [for the expert] demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (amended December 1, 2023).

"Rule 702 has three major requirements: (1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge, *i.e.*, reliability; and (3) the expert's testimony must assist the trier of fact, *i.e.*, fit." *United States v. Bridges*, No. 21-1679, 2022 WL 4244276, at *8 (3d Cir. Sept. 15, 2022) (cleaned up); *see Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). With respect to reliability, the expert testimony "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Schneider ex rel. Est. of Schneider*, 320 F.3d at 404 (citations omitted). "[A]ny step that renders the [expert's] analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994). With respect to fit, "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider ex rel. Estate of Schneider*, 320 F.3d at 404. Expert testimony must be specifically tied to the facts of the case. *See, e.g.*, *Izume Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589, 602 (D. Del. 2004). Accordingly, "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful," *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993), and should be excluded, *see, e.g., Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 500 (D. Del. 2019).

## VI.    ARGUMENT

**E.    SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNTS I AND IV.**

### 1.    Ryanair Has a Private Right of Action Under the CFAA.

"The CFAA has an express right of action for '[a]ny person who suffers damage or loss by reason of a violation of this section.'" *Buchanan v. Ingram Content Grp.*, No. 20-CV-2421, 2020 WL 5957618, at *2 (D.N.J. Oct. 6, 2020) (citing 18 U.S.C. § 1030(g)). This "right of action is ... limited to situations where the defendant's conduct satisfies one of the factors set forth in § 1030(c)(4)(A)(i)(I)-(V)." *Elias Indus. v. Kissler & Co.*, No. 2:20-CV-01011-CCW, 2021 U.S. Dist. LEXIS 99449, at *7-8 (W.D. Pa. May 26, 2021). Section 1030(c)(4)(A)(i)(I) of the CFAA is satisfied by showing that a CFAA offense caused "loss to 1 or more persons during any 1-year period ... aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I).

The CFAA defines such "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Losses may include the "cost of remedial measures taken to investigate or repair the damage to the computer[.]" *See*, *e.g.*, *Brooks v. AM Resorts, LLC*, 954 F. Supp. 2d 331, 338 (E.D. Pa. 2013) (citations omitted). "[T]he costs of investigating security breaches constitute recoverable 'losses,' even if it turns out that no actual data damage or interruption of service resulted from the breach." *Univ. Sports Publ'ns Co. v. Playmakers Media Co.*, 725 F. Supp. 2d 378, 387 (S.D.N.Y. 2010). The evidence conclusively establishes that Ryanair has an express right of action under the CFAA because it has suffered well in excess of $5,000 in losses due to Booking's and Kayak's actions.

### a.    Ryanair Has Suffered Losses in Excess of $5,000 Due to Booking's Actions.

To quantify the losses Ryanair has suffered, Ryanair first determined its losses from all

bot[1] activity and then calculated the proportion of those losses attributable to Booking and Kayak. Lopata Dec. ¶¶ 40-42, 46-47. During the period from March 1, 2022, to February 28, 2023 (the "Booking Period"),[2] Ryanair suffered at least ██████ in losses due to Booking's activity:

> *i.*   *Losses from Conducting a Damage Assessment and Responding to Offenses*

Defendants access the Ryanair website using bots. Fuga Dec. Ex. 6, at 83-84. Ryanair employs multiple technological measures to identify which users accessing its website are bots and assess the damage caused by such bots, and respond to detected bot activity by preventing further access to Ryanair's systems. Ryanair's costs to maintain these measures qualify as losses under the CFAA. *See*, *e.g.*, *United States v. Nosal*, No. CR-08-0237 EMC, 2014 U.S. Dist. LEXIS 4021, at *16 (N.D. Cal. Jan. 13, 2014) ("'actual loss' includes those costs incurred as part of an internal investigation reasonably necessary to respond to the offense, for example by identifying the perpetrator or the method by which the offender accessed the protected information."); *United States v. Middleton*, 231 F.3d 1207, 1213-14 (9th Cir. 2000) (losses include cost of "measures [that] were reasonably necessary to resecure the data, program, system, or information from further damage."); *Zap Cellular, Inc. v. Weintraub*, No. 15-CV-6723, 2022 WL 4325746, at *12 (E.D.N.Y. Sept. 19, 2022) ("losses associated with investigations [should not be read] too narrowly"). Ryanair's costs to maintain these technological measures are:

- <u>Shield Hosting Cost</u>. Shield is a software system designed and implemented by Ryanair to detect and prevent unauthorized access by OTA bots that scrape[3] the Ryanair Website. *See infra*

---

[1] The term bot means any automated program capable of running a script against a website, typically at very high volume and speed. *See* Fuga Dec. Ex. 13 at 59:5-20.

[2] Losses from "**<u>any</u>** 1-year period" in which an offense occurs may be used to satisfy the requirement in 18 U.S.C. § 1030(c)(4)(A)(i)(I). Ryanair calculated its losses for March 1, 2022 to February 28, 2023 because it was, at the time, the most recent period for which Booking had provided data on the number of Ryanair flights it sold. Lopata Dec. ¶ 43.

[3] "Scraping" means using a bot to either (1) pull back data from a website, *e.g.*, obtaining pricing information; or (2) input data or make a transaction on a website, *e.g.*, making a new myRyanair

VI.A.2.c.i. Since Shield's sole purpose is monitoring and identifying unauthorized OTA ███ all Shield costs are CFAA losses. *See, e.g., Nosal*, 2014 U.S. Dist. LEXIS 4021, at \*16. ███████

███████████████████████  ███████████████████████

Lopata Dec. ¶¶ 42, 46-47, 50-53, 114; Fuga Dec. Ex. 6 at 31-32. ███████████

███████████████

• <u>Shield Software Development Cost</u>. Ryanair has employees dedicated solely to developing and updating Shield. Fuga Dec. Ex. 14 at 34:23-35:11. ████████████

██████████████████████  Fuga Dec. Ex. 6 at 29-30; Lopata Dec. ¶¶ 42, 46-47, 55-57, 114.

• <u>Business Intelligence Employee</u>. Ryanair Business Intelligence employees monitor bot activity and help remedy the results of such activity. Fuga Dec. Ex. 6 at 28-29. ████████████

███████████████████████

███████████████████ *See* Fuga Dec. Ex. 13 at 53:6-12; Fuga Dec. Ex. 15 at 235:6-15; Fuga Dec. Ex. 14 at 21:7-29:2. ████████████

███████████████████ Lopata Dec. ¶¶ 42, 46-47, 59-61, 114; *see* Fuga Dec. Ex. 6 at 29.

• ████████████ is a software tool that monitors Ryanair's website functionality. Fuga Dec. Ex. 5 at 135:4-16. ████████████

███████████████████████

███████████████████████

---

account or purchasing a flight. *See* Fuga Dec. Ex. 13 at 59:5-20.
[4] ███████████████
██████████. Lopata Dec. ¶¶ 111-114. The true extent of Booking's unauthorized access is far greater since Booking's unauthorized access extends beyond just booking flights and also includes scraping flight information.

███████████████████████ Lopata Dec. ¶¶ 42, 46-47, 72-79, 114; *see* Fuga Dec. Ex. 6 at 32.

- ██████████████████████████████ works with Shield to monitor and respond to unauthorized OTA access. Fuga Dec. Ex. 5 at 132:6-16. ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████[5]

### ii. *Losses Solely from Responding to Offenses*

████████ of all traffic to the Ryanair Website still originates from OTA ████ Fuga Dec. Ex. 5 at 146:21-147:1. Ryanair has had no choice but to scale up the infrastructure of its website to avoid slowdowns caused by ███████████. Fuga Dec. Ex. 14 at 147:22-148:12. The following costs are losses because they prevent Booking's ██ activity from causing even greater damage—such as causing the website to slow down or stop working entirely. *Middleton*, 231 F.3d at 1213-14 (losses include cost of "measures [that] were reasonably necessary to resecure the data, program, system, or information from further damage.").

- ██████████████ is a third-party platform that makes and stores bookings on Ryanair's Website. Fuga Dec. Ex. 13 at 72:24-73:4. ██████████████████████████

███████████████████████████████████████████████████

---

[5] ████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████ Lopata Dec. ¶ 69.



Lopata Dec. ¶¶ 42, 46-47, 103-105, 114; *see* Fuga Dec. Ex. 16.

• <u>myRyanair</u>. myRyanair is a password-protected, private section of the Ryanair Website where users must log in to access the ability to book flights. *See infra* VI.A.2.c.ii.

### iii.     *Losses from Conducting Damage Assessment and Restoring Data*

Data integrity refers to the accuracy, consistency, and reliability of data throughout its lifecycle. Lopata Dec. ¶ 34(n), fn. 42. Preserving data integrity ensures that data remains unaltered and retains its intended meaning. *Id*. Ryanair's business systems operate based on the assumption that the personal information and payment methods used to make bookings are those of the end customers. *Id.* Ryanair issues refunds to the original method of payment and contacts passengers via the e-mail used to book a flight. Therefore, e-mail methods and payment methods that do not belong to the end customer disrupt the ability to carry out these business processes and damage the integrity of Ryanair's database. *Id.* Defendants' bots often use fabricated payment methods, passenger personal information, and e-mail addresses when booking flights, harming the integrity of Ryanair's data. Fuga Dec. Ex. 15 at 230:24-232:16. As a consequence, Ryanair cannot rely on this corrupted data to issue refunds or conduct customer service inquiries with the passenger. *Id*.

at 238:21-239:7. To restore the integrity of its data, Ryanair has been forced to design and implement costly customer verification procedures to determine if the integrity of their data has been damaged and correct the damage. *Id.* at 244:16-22; 245:4-16. Even if Booking did not fabricate customer e-mail addresses, Ryanair's costs to investigate the data integrity of the e-mail addresses of passengers who purchased Ryanair flights through Booking would still be recognizable as losses under the CFAA. *Univ. Sports Publ'ns*, 725 F. Supp. 2d at 387 ("The costs of investigating security breaches constitute recoverable 'losses,' even if it turns out that no actual data damage or interruption of service resulted from the breach.").[6] Therefore, Ryanair's costs for these customer verification procedures are losses. T.H. *Glennon Co. v. Monday*, No. 18-30120-WGY, 2020 U.S. Dist. LEXIS 45917, at *33 (D. Mass. Mar. 17, 2020) ("Monday's actions caused both damage and loss. Monday's access and copying of confidential information caused damage by compromising the 'integrity' of that information."); *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 954, 962 (N.D. Cal. 2014) (efforts spent to identify data that had been made unavailable and determine how to restore were losses under the CFAA).

- <u>Customer Service Agent</u>. As a result of ▇▇ OTA bookings, Ryanair customer service agents must spend time addressing damaged data integrity. *See* Fuga Dec. Ex. 6 at 30-31. These agents work with customers to replace the incorrect information provided by OTAs with the customer's true information. *Id.* ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *Id.*; Lopata Dec. ¶¶ 42, 46-47, 86-89, 114.

---

[6] Ryanair's investigation costs are especially reasonable since Ryanair is able to determine whether a passenger has booked through an OTA, but not distinguish between OTAs, for example, Booking or Kayak. Ryanair must therefore investigate each OTA passenger's data to restore data integrity.

● <u>Online Customer Verification</u>. Ryanair has implemented a customer verification process to collect and replace inaccurate end-customer information provided by OTA ███ with accurate information provided by the customer. Ryanair customers may complete this process online using the GetID online verification process. Fuga Dec. Ex. 6 at 34. ████████████████

████████████████████████████████████████████

████████████████████████████████████████ *Id.*;

Fuga Dec. Ex. 17; Lopata Dec. ¶¶ 42, 46-47, 91-98, 114.

● <u>In-Person Customer Verification</u>. Customers who booked through an OTA have the option of completing verification at the airport. Fuga Dec. Ex. 6 at 37. ████████████████

████████████████████████████████████████████

████████████████ *Id.* at 38; Lopata Dec. ¶¶ 42, 46-47, 99-102, 114.

● <u>Digital Employees</u>. These employees communicate with passengers who booked through OTAs and verify their true information to obtain refunds. Fuga Dec. Ex. 14 at 14:1-12; 14:20-21:6; Fuga Dec. Ex. 15 at 235:21-237:14. ████████████████████████

████████████████████████ Fuga Dec. Ex. 14 at 14:20-21:22. ████████████████████

████████ Fuga Dec. Ex. 6 at 28-29; Lopata Dec. ¶¶ 42, 46-47, 63-64, 114.

    The table below shows the losses Ryanair has incurred due to Booking's conduct during the Booking Period. ████████████████████████

████████████████████████████████[7]

_____

[7] Even if this Court does not find that all categories are losses, any combination of categories of losses that exceeds $5,000 would meet the requirements of 18 U.S.C. § 1030(g).



| Category | Losses Due to All OTAs | Losses Due to Booking |
|---|---|---|
| | | |

*b.   Ryanair Has Suffered Losses in Excess of $5,000 Due to Kayak's Actions.*

The table below shows the losses Ryanair incurred during the one-year period from March 1, 2019 to February 29, 2020 due to Kayak's conduct. Lopata Dec. ¶ 75. The losses were calculated in the same manner described above for Booking.[8] Kayak's percentage of all OTA bookings can be divided into Facilitated Bookings and Link-Out Bookings. *See infra* VI.A.2.a.iii. For the period from March 1, 2019 to February 29, 2020, Kayak was responsible for ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Lopata Dec. ¶¶ 117-124; Fuga Dec. Ex. 16; Fuga Dec. Ex. 4 at 9-14, 17; Fuga Dec. Ex. 18 at 8-9, Ex. C. Ryanair has incurred at least ▮▮▮▮▮▮ in losses during a 1-year period due to Kayak, which far exceeds the requirements of 18 U.S.C. § 1030(g).[9]

| Category | Losses Due to All OTAs | Losses Due to Kayak Link-Out Bookings | Losses Due to Kayak Facilitated Bookings | Total Losses Due to Kayak |
|---|---|---|---|---|
| | | | | |

---

[8] Losses from Online Customer Verification and In-Person Customer Verification were not calculated, because Ryanair had not implemented its verification process yet.

[9] Even if this Court does not find that all of the categories are losses – or that losses due to Link-Out Bookings can be attributed to Kayak – any combination of losses exceeding $5,000 would meet 18 U.S.C. § 1030(g), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



### 2. Booking and Kayak Are Liable Under CFAA § 1030(a)(2)(C).

Defendants indisputably violate CFAA § 1030(a)(2)(C) because they "(1) access a computer; (2) intentionally; (3) without . . . or exceeding authorized access; and (4) obtain information from [a] protected computer." *Elias Indus.*, 2021 U.S. Dist. LEXIS 99449, at *7.

#### a. Defendants Have Accessed Ryanair's Website Through Third-Party Partners.

This Court has held that CFAA liability extends to defendants who direct, encourage, or induce others to commit acts that violate the statute. D.I. 105 at 7-14 ("Numerous courts have recognized that vicarious or indirect liability under § 1030(g) extends to parties who direct, encourage, or induce others to commit acts that violate the statute."). Defendants cannot offload the blame to third parties with whom they contract and direct to access the Ryanair Website without authorization, whether that falls under vicarious liability, indirect access, or conspiracy. *See Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016) ("Once permission [to access a computer] has been revoked, technological gamesmanship or the enlisting of a third party to aid in access will not excuse liability" under the CFAA.). Since Booking and Kayak have directed, induced, and encouraged third-party partners to access the Ryanair Website on their

behalf, Booking and Kayak are liable as if they had accessed the Ryanair Website themselves. *Id.*

       *i.*    *Booking and Kayak Enlist Third-Party Partners to Access the Ryanair Website.*

There is no dispute that third-party partners have accessed the Ryanair Website on behalf

of Booking and Kayak. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████. *See* Fuga Dec. Ex. 2 at 7-12; Fuga Dec. Ex. 4

at 6-8, 11-14, 17; Fuga Dec. Ex. 19 at 35:12-37:18. Furthermore, ████████████████

████████████████████████████████████████████

████████████████████████████ Fuga Dec. Ex. 6 at 83.

       *ii.*   *Booking and Kayak Have Induced, Directed, and Encouraged Their Partners to Access the Ryanair Website to Obtain Flight Information.*

The evidence conclusively establishes that Booking's and Kayak's partners have obtained

Ryanair flight information at Booking and Kayak's direction, encouragement, and inducement.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

   *iii. Booking and Kayak Have Induced, Directed, and Encouraged Their Partners to Access the Ryanair Website to Book Ryanair Flights.*

  The evidence also conclusively establishes that Booking's partner Etraveli and Kayak's partners have accessed the Ryanair Website to make flight bookings at Booking's and Kayak's direction, encouragement, and inducement. *See* D.I. 105 at 7-14. In the case of Booking, a user may attempt to purchase a Ryanair flight on Booking's website by selecting that flight and providing the user's personal and payment details to Booking. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████ The user requests to book a specific flight for a specific time and specific departure/arrival locations, with specific ancillaries selected, and provides payment to Booking in the specific amount to cover those specific expenses. *Id.* Etraveli would not–and could not–know which Ryanair flight to purchase once it accessed the Ryanair Website unless Booking induced, directed, or encouraged precisely that specific activity. Thus, there is no genuine factual dispute that Booking has induced, directed, or encouraged Etraveli to access the Ryanair Website. *See, e.g.*, *Charles Schwab & Co. v. Carter*, No. 04 C 7071, 2005 U.S. Dist. LEXIS 21348, at *22 (N.D. Ill. Sep. 27, 2005).

  In the case of Kayak, users book flights on the Kayak website through Facilitated Bookings and Link-Out Bookings. ███████████████████████████████[10] ███████████████████████

---

[10] The only difference between flight bookings on Booking as opposed to Facilitated Bookings on Kayak ██████████████████████████ Kayak still induces, directs, and encourages its partner to book the flight. As discussed with regard to Booking, Kayak must direct its partner to book the specific flight that Kayak's customer requested.

      *b.  Booking's and Kayak's Access Was Intentional.*

Before this Court, Booking and Kayak admitted their intentional access of the Ryanair Website. Fuga Dec. Ex. 19 at 38:6-18 ("MS. FORDERER: ... When they're talking about intent and knowledge, the way that the statute is using intent is intentionally accessing a computer without authorization. Intentionally accessing a protected computer. There is no dispute that the access here is intentional; right? You don't need to talk to the CEO of Booking Holdings to understand that somebody is accessing the Ryanair website on purpose"); *In re Skye Min. Partners, LLC*, No. BR 18-11430-LSS, 2020 WL 6709892, at *5 n.2 (D. Del. Nov. 16, 2020).

      *c.  Booking's and Kayak's Access Was Without Authorization or Exceeding Authorized Access.*

Ryanair must also show that Defendants' access to the Ryanair Website was "without authorization or exceeds authorized access." 18 U.S.C. § 1030(a)(2)(C). In *Van Buren v. United States*, the Supreme Court held that "an individual 'exceeds authorized access' when he accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are off limits to him." 141 S. Ct. 1648, 1662 (2021).[11] And "[a]lthough the [CFAA] does not define the term 'without authorization,' interpreting the term in accordance with its ordinary meaning, numerous courts have held a person accesses a computer without authorization when he does so 'without sanction or permission.'" *Grant Mfg. & Alloying, Inc. v. McIlvain*, No. 10-1029, 2011 U.S. Dist. LEXIS 108961, at *19 (E.D. Pa. Sep. 23, 2011) (citations omitted).

This Court has already extensively considered this authorization issue in connection with Defendants' third Rule 12 motion. *See* D.I. 105 at 21-25. Regardless of whether a person exceeds

---

[11] The *Van Buren* Court did not render any decision regarding the definition of "without authorization." *See*, *e.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1198 (9th Cir. 2022).

authorized access or accesses a computer without authorization in the first place, this Court has noted that *Van Buren* and its progeny "make[] clear that the CFAA's concept of authorization focuses heavily on technological barriers," and "[a]lthough the [Supreme Court] declined to expressly decide whether that inquiry 'turns only on technological (or 'code-based' limitations) on access, or instead also looks to limits contained in contracts or policies,' the Court's ultimate holding ... strongly suggests that the operative question is whether a technological or code-based limitation exists to prevent access ...." D.I. 105 at 22. This Court concluded that "in order for the CFAA's 'without authorization' and 'exceeds authorized access' elements to apply," Ryanair must employ some sort of authentication mechanism to limit access. D.I. 105 at 22-23.

Ryanair has erected *at least* ▮▮▮ technological gates – ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ – to prevent unauthorized parties from accessing the Ryanair Website.[12] All barriers authenticate legitimate users while also stopping unauthorized OTA bots.[13] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### i. Defendants Are Never Authorized to Access the Ryanair Website Because Shield Does Not Authenticate Them.

Ryanair has designed and implemented Shield, an in-house computer program used specifically to monitor the Ryanair Website and allow only authorized users, *i.e.*, ▮▮▮ users, to access the Ryanair Website. Fuga Dec. Ex. 5 at 59:4-10; Fuga Dec. Ex. 13 at 55:29-56:29. Shield

---

[12] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Fuga Dec. Ex. 14, at 53:19-68:24, 77:14-79:19; *see also* Ex. 5, at 53:20-54:7.

[13] As the Court noted, the Supreme Court declined to expressly decide whether the authorization inquiry "turns only on technological (or 'code-based' limitations) on access, or instead also looks to limits contained in contracts or policies." Nevertheless, Ryanair only relies on technical barriers in this motion, not its implemented contracts and policies (e.g., Terms of Use).

monitors the entirety of the Ryanair Website and prevents unauthorized OTA ████ from using the Website or accessing the Website at all while allowing authorized users to access the Website. *See* Fuga Dec. Ex. 14 at 35:12-39:17 ("Shield is used ████████████████████████████████ ████████████████████); Fuga Dec. Ex. 15 at 141:17-143:1 (users encounter technical barriers immediately when they visit the website). ████████████████████████████





*ii.*   *Defendants Have At Least Exceeded Authorized Access.*

myRyanair is a restricted, password-protected section of the Ryanair Website. The ability to book flights is restricted to users who log in to the myRyanair portion of the website by providing their access credentials. Lopata Dec. ¶ 16(c)(iii). Even if Shield did not exist and the Court considered the Ryanair Website to be public, Defendants would have still exceeded authorized access because they access the private, password-protected myRyanair portion of the website to make flight bookings. The technological gates that authenticate the identity of users

23

who try to access the myRyanair portion of the Ryanair Website are as follows:

      1.      <u>Account Creation</u>. Users are first required to create an account before they can access the myRyanair portion of the Ryanair Website, and only users who have been authenticated as genuine ███████ users are allowed to create a myRyanair account. *Id.* ¶ 33(c)(iii). To create a myRyanair account, a user must provide an e-mail address and password. █████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Furthermore, Ryanair sends a verification e-mail, which the user must affirm from the account to prove the user has access to it in order to obtain myRyanair access credentials. Lopata Dec. ¶ 128(b). Finally, Ryanair has recently implemented an account verification procedure that requires customers to verify who they are by providing personal identification. *See* https://corporate.ryanair.com/news/ryanair-launches-new-customer-account-verification-to-protect-customers-from-internet-scams/.

      2.      <u>Account Login</u>. After a user has created a myRyanair account, that user can access the myRyanair portion of the website and make bookings only by entering the user's specific login credentials. Therefore, the myRyanair account login step further authenticates users by preventing all users who do not have a myRyanair e-mail address and associated password from accessing the myRyanair portion of the website. Since Ryanair does not allow unauthorized OTA ████ to create myRyanair accounts, OTA ████ cannot legitimately pass this authentication step.

      myRyanair's account creation, e-mail confirmation, and login requirements serve as affirmative methods of authenticating authorized human users and allowing them to access the

myRyanair portion of the Ryanair Website. Even if Shield did not exist, or if a password gate was necessary to satisfy the authentication requirement, Defendants have still exceeded authorized access of the Ryanair Website by using the myRyanair portion of the website to book flights. *See* D.I. 105 at 22-23; *see also Facebook*, 844 F.3d at 1068 (finding Power Ventures accessed Facebook's computers without authorization in violation of the CFAA).

### d.   Booking and Kayak Obtained Information from a Protected Computer.

The CFAA defines the term "protected computer" as "a computer ... which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States." 18 U.S.C. § 1030(e)(2)(B). All computers with Internet access are used in or affecting interstate or foreign commerce or communication. *Van Buren*, 141 S. Ct. at 1652 ("[T]he prohibition now applies—at a minimum—to all information from all computers that connect to the Internet." (citing 18 U.S.C. §§ 1030(a)(2)(C), (e)(2)(B)). "'Protected computer'... include[s] servers, computers that manage network resources and provide data to other computers.'" *hiQ Labs, Inc.*, 31 F.4th at 1195. "Unauthorized access to a plaintiff's account on a computer owned by another entity may be actionable under the CFAA as long as the other elements of the claim are met." *United Fed'n of Churches, LLC v. Johnson*, 598 F. Supp. 3d 1084, 1096 (W.D. Wash. 2022). The Ryanair Website is hosted ███████████████████████████████ ██████ Fuga Dec. Ex. 5 at 149:14-17; Fuga Dec. Ex. 13 at 46:4-47:12. Ryanair's flight inventory and booking data are ████████████████████████████████████████ are both part of the same Ryanair computer system. Fuga Dec. Ex. 15 at 248:4-9. By obtaining flight information and booking flights on the Ryanair Website, Booking and Kayak have obtained information from a protected computer. *See*, *e.g.*, *hiQ Labs*, 31 F.4th at 1195.

25

### 3.   Booking and Kayak Are Liable Under CFAA § 1030(a)(5)(C).

Section 1030(a)(5)(C) of the CFAA largely restates the elements of § 1030(a)(2). It prohibits an individual from "intentionally access[ing] a protected computer without authorization," and "caus[ing] damage and loss." 18 U.S.C. § 1030(a)(5)(C). The Ryanair Website is a protected computer, which Booking and Kayak have accessed without authorization, and as a result Ryanair has suffered losses in excess of $5,000. *See supra* VI.A.1 & 2. The only new requirement in § 1030(a)(5)(C) is the conduct must "cause damage **and** loss." 18 U.S.C. § 1030(a)(5)(C) (emphasis added). The CFAA defines damage as "any impairment to the integrity or availability of data, a program, a system, or information[.]" 18 U.S.C. § 1030(e)(8). Ryanair has suffered damage because, for example, Booking and Kayak have impaired the integrity of its end-user passenger data. *See supra* VI.A.1.a.iii. Ryanair also suffered damage ███████████████

████████████████████████████████████████████████████████████

████████ Fuga Dec. Ex. 6, at 38-48, 84-87; Ex. 22, at 62:3-18, 83:19-85:10, 91:4-93:17; *see also* 18 U.S.C. § 1030(e)(8). Therefore, Ryanair is also entitled to summary judgment on this claim.

In summary, Ryanair has an express right of action against Booking and Kayak under the CFAA because Ryanair has suffered well in excess of $5,000 in losses due to each of Booking and Kayak' unauthorized access to the Ryanair Website. *See* 18 U.S.C. § 1030(g). The evidence also shows that Defendants are liable under § 1030(a)(2)(C) of the CFAA because they have entered into commercial agreements that require their third-party partners to access the Ryanair Website without authorization on Defendants' behalf, have admitted that their access was intentional, and circumvent numerous authentication mechanisms implemented by Ryanair specifically to keep Defendants out. Defendants are also liable under § 1030(a)(5)(C) of the CFAA because their access has caused damage to the Ryanair Website by impairing the integrity of Ryanair's data and rendering Ryanair's payment processing systems inoperable. Therefore, this Court should grant

summary judgment that Defendants have violated §§ 1030(a)(2)(C) and (a)(5)(C) of the CFAA.

**F.    BOOKING'S COUNTERCLAIMS SHOULD BE DISMISSED.**

**1.    Booking's Counterclaims Fail Because Ryanair's Statements Are True.**

Falsity is an element of Booking's defamation, trade libel, and Deceptive Trade Practices Act claims. *Grubbs v. Univ. of Delaware Police Dep't*, 174 F. Supp. 3d 839, 861 (D. Del. 2016) ("If the alleged defamatory statement is demonstrated not to be false, it is unnecessary to consider any of the additional factors.");[14] *Riley v. Moyed*, 529 A.2d 248, 253 (Del. 1987) ("Under Delaware law there is no liability for defamation when a statement is determined to be substantially true."); *In re Nat'l Collegiate Student Loan Trusts Litig.*, No. CV 12111-VCS, 2020 WL 3960334, at *4 (Del. Ch. July 13, 2020) (defining trade libel, in part, as "publish[ing] a false statement"); 6 Del. C. § 2532(a)(8) (defining one deceptive trade practice as "[d]isparag[ing] the goods, services, or business of another by false or misleading representation of fact.").

The counterclaim identifies six statements alleged to be defamatory. *See* D.I. 111, ¶ 80. The Court already dismissed three of the statements, finding the following statements are either true or a protectable opinion: OTAs are unauthorized, OTAs may apply massive mark-ups to Ryanair's fares, and customers must complete an "online verification." *See* D.I. 134 (Apr. 7, 2023 Order), at 13. The three remaining statements, as paraphrased by Booking, are below with the actual language following:

1.   "That OTAs, including Booking.com, use 'screen scraper' software to 'mis-sell

---

[14] Where the challenged statements are on a matter of public concern, the plaintiff bears the burden of proving the statements are false. *See Cousins v. Goodier*, 283 A.3d 1140, 1148 n.40 (Del. 2022). Matters of public concern are those "relating to any matter of political, social, or other concern to the community" and must be considered in the entire context of the communication. *Id.* at 1150. Ryanair's emails are on a matter of public concern, as they communicate steps customers must take so that Ryanair can notify them of "important safety, security and public health requirements," and they inform customers about the effects of booking with unauthorized OTAs. *See* D.I. 111 ¶¶ 25, 26. Booking therefore bears the burden of proving the statements' falsity.

Ryanair flights.'" D.I. 111, ¶ 80(c).

      a.  The actual statement to customers is: "Unauthorized OTAs have no commercial arrangement with Ryanair, and use 'screen scraper' software to mis-sell Ryanair flights in breach of the Terms of Use of the Ryanair website." *Id.* ¶ 26.

2.  "That OTAs, including Booking.com, provide Ryanair with 'false customer details,' including 'false payment and contact details.'" *Id.* ¶ 80(d).

      a.  The actual statement to customers is: "Screen scraper OTAs provide Ryanair with false customer details which prevents us from notifying passengers ..." and "Furthermore, the false payment and contact details screen scraper OTAs provide Ryanair for customers inhibits Ryanair from providing our post-contractual obligations ...." *Id.* ¶ 26.

3.  "That OTAs, including Booking.com, fail to 'confirm compliance with required safety, security and public health protocols' or 'requirements.'" *Id.* ¶ 80(f).

      a.  This statement does not appear in Ryanair's emails to customers. Instead, the emails say: "The check-in process must be completed by a passenger personally to ensure passengers are in notice of, and have confirmed compliance with required safety, security and public health protocols ...." *Id.* ¶ 25.

      b.  The emails also indicate: "Screen scraper OTAs provide Ryanair with false customer details which prevents us from notifying passengers of important safety, security and public health requirements ...." *Id.* ¶ 26.

The Court held that these statements "could potentially be proved false if the evidence supported such a conclusion." D.I. 134 at 13. The evidence proves the statements are true.

First, it is true that "[u]nauthorized OTAs ... use 'screen scraper' software to mis-sell Ryanair flights in breach of the Terms of Use of the Ryanair website." *Id.* ¶ 26. Booking sells Ryanair flights exclusively through Etraveli. Fuga Dec. Ex. 3 at 40:5-8. █████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

[REDACTED]

[REDACTED]

Further, OTAs use this screen-scraping software "to mis-sell Ryanair flights in breach of the Terms of Use of the Ryanair website." D.I. 111, ¶ 26. As is clear from the context of the sentence, "mis-sell" means to sell "Ryanair flights in breach of the Terms of Use of the Ryanair website." *Id.*; *see also* Fuga Dec. Ex. 26 at 27:25-28 (Ryanair's Director of Marketing and Digital testifying that "mis-selling" means being unauthorized and selling flights in violation of Ryanair's Terms of Use). The Court has already held that Booking.com is "unauthorized," "as it is undisputed that Ryanair has not authorized Booking.com to sell tickets for Ryanair flights." D.I. 134, at 13. Thus, it is also a true statement to say that OTAs "mis-sell Ryanair flights in breach of the Terms of Use of the Ryanair website." *See* Fuga Dec. Ex. 27 at RYANAIR-BOOKING_0003837 (Ryanair's Terms of Use state: "Use of any automated system or software, whether operated by a third party or otherwise, to extract any data from this website for commercial purposes ('screen scraping') is strictly prohibited.").

Regarding the second statement, there is no genuine issue of material fact that OTAs provide Ryanair with "false payment and contact details." *See* D.I. 111, ¶¶ 26, 80(d). [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

---

[15] To the extent Booking claims it is Etraveli, rather than Booking, actually doing the screen scraping, Etraveli is itself considered an OTA, so it is true that OTAs, generally, use screen scraping software. *See* Fuga Dec. Ex. 3, at 42:1-24. While Booking is not named, the statement even as applied to Booking is substantially true, as it sells flights sourced through screen scraping.

████████████████████████████████████ *Id*. at 102. Ryanair's expert Iain Lopata

opined, based on his testing, that Booking, Agoda, and Kayak use disposable email addresses and

virtual credit cards. Lopata Dec. ¶¶ 10(d), 20-37. ███████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████ *Id*. ¶ 34. Thus, it is indisputable that OTAs

*do* provide "false payment and contact details" to Ryanair.

Finally, the third allegedly defamatory statement is not even found in Ryanair's customer

emails. Booking complains that Ryanair falsely states that OTAs fail to "confirm[] compliance

with required safety, security and public health protocols" or "requirements." D.I. 111, ¶ 80(f).

The emails do not say that. They say only that "[t]he check-in process must be completed by a

passenger personally to ensure passengers are in notice of, and have confirmed compliance with

required safety, security and public health protocols ...." *Id.* ¶ 25. And the emails say that OTAs

providing false email addresses to Ryanair prevent "notifying passengers of important safety,

security and public health requirements ...." *Id.* ¶ 26. This is true. They do not even suggest that

OTAs *fail* to provide safety and security information, let alone reference Booking.

Ryanair understands its duty under the law is to *directly* inform passengers of necessary

safety and security requirements and that it cannot delegate this requirement to a third party. *See*

Fuga Dec. Ex. 29, at 128:15-22 (testifying that Ryanair was held liable in a German court because

it was unable to notify a customer of a flight cancellation pursuant to EU Regulation 261, and the

fact that Ryanair was given false customer information from the OTA was not a valid defense);

*see also id.* at 176:19-177:3 (describing fines that Ryanair received for passengers arriving in

countries without following COVID protocols because Ryanair could not contact them to inform

them of requirements). Ryanair's ability to provide necessary safety and security information to customers is hampered by not having customers' correct contact information.

Nowhere does Ryanair suggest that OTAs are "failing" to provide this information to customers; the point is that Ryanair cannot – as it must – directly provide the information itself. Booking cannot prove these statements are false, and Booking's defamation, trade libel, and Deceptive Trade Practices Act claims must therefore fail. Trade libel also requires proving actual malice. *See In re Nat'l Collegiate Student Loan Trusts Litig.*, 2020 WL 3960334, at *4 (plaintiff must prove defendant "knows that the statement is false or acts in reckless disregard of its truth or falsity"). Punitive damages may not be awarded for a claim without proof of actual malice. *See Cousins*, 283 A.3d at 1149 n.42.

Booking cannot prove that Ryanair made the challenged statements with knowledge of their falsity or with reckless disregard for their truth or falsity. Ryanair has consistently maintained its belief – as demonstrated by this very lawsuit making the same allegations – that:

(1)    OTAs use screen-scraping software to "mis-sell" (or sell without authorization, according to Ryanair's Terms of Use) Ryanair's flights. *See* Fuga Dec. Ex. 3 at 40:5-8, 43, Fuga Dec. Exs. 24, 25; Fuga Dec. Ex. 26 at 27:25-28:6.

(2)    OTAs provide false customer contact and payment details to Ryanair. *See* Fuga Dec. Ex. 28 at 8; Fuga Dec. Ex. 3 at 87:18-88:8; Lopata Dec. ¶¶ 20-37.

(3)    Ryanair needs customers' correct contact information so that Ryanair can fulfill its obligations to provide safety and security information to its customers. Fuga Dec. Ex. 29, at 128:2-22, 176:19-177:3.

Even if one of these statements were false, which they are not, there is simply no evidence that Ryanair knew these statements to be false and said them anyway. Because Booking cannot prove that Ryanair made the statements with actual malice, Booking's trade libel claim – and request for punitive damages under its defamation claim – must be dismissed for this reason, also.

### 2.   Booking's Counterclaims Must Fail Because Ryanair Did Not Act Wrongfully.

To prevail on both its tortious interference and unfair competition claims,[16] Booking must prove "(1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional, wrongful interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages." *Com. Nat. Ins. Servs., Inc. V. Buchler*, 120 F. App'x 414, 418–19 (3d Cir. 2004); *Accenture Glob. Servs. GMBH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654, 666 (D. Del. 2008) (noting unfair competition and tortious interference substantially overlap). Booking cannot prove that Ryanair acted *wrongfully* in sending emails to its own customers, informing them of mandatory verification procedures. Ryanair is subject to a privilege to protect its own business interests. Additionally, Booking cannot prove that Ryanair *knowingly* interfered in Booking's business relations, since Ryanair simply sent emails to *all* suspected OTA bookings and had no way of knowing whether any emails were sent to Booking customers.

####     a.   *Ryanair Did Not Act Wrongfully.*

Delaware law recognizes a privilege to interfere in another's business relations if the purpose of the action, even if only in part, is "to compete or protect his business interests in a fair and lawful manner." *Wilco AG v. Packaging Techs. & Inspection LLC*, 615 F. Supp. 2d 320, 325 (D. Del. 2009); *Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261, 1287 (Del. Super. Ct. 2001). Courts "narrowly circumscribe the scope of" a tortious interference claim because it "may have the effect of chilling third parties from vigorously competing for business ...." *Lipson.*, 790 A.2d at 1287. Thus, a competitor is liable for interfering in another's business only if it employs

---

[16] Booking's counterclaim does not indicate whether Count I is based on tortious interference with existing contractual relations or prospective business relations; however, in ruling on the Motion to Dismiss, the Court inferred that Booking was asserting tortious interference with prospective business relations. *See* D.I. 134, at 4 (Apr. 27, 2023). Ryanair proceeds with that assumption.

"wrongful means." *Buchler*, 120 F. App'x at 419. "'Wrongful means' are tactics which are sufficiently 'predatory' that they form an independent basis for liability on the part of the defendant ... [such as] breach of fiduciary duty, 'physical violence, fraud....'" *Id.*

Ryanair did not employ "wrongful means" by communicating with its own customers to inform them of a verification process that Ryanair required for passengers who booked through OTAs. OTAs notoriously provide Ryanair with false customer contact information and false customer payment information. Fuga Dec. Ex. 6, at 37-38; Fuga Dec. Ex. 23, at 30; Lopata Dec. ¶¶ 20-37. Not having a customer's correct contact information makes it impossible for Ryanair to contact the customer to notify the customer of safety and important flight information (e.g., schedule changes and flight and cancellations). *See, e.g.*, Fuga Dec. Ex. 29, at 128:9-22 (noting Ryanair is required to notify customers under EU 261 of cancellations and delays); *see also id.* at 176:19-177:3 (describing COVID-era notifications that must be sent to customers). Not having the customer's correct credit card information led to massive problems for Ryanair not being able to refund flights during COVID. Certain regulations control how and when Ryanair refunded its flyers. Ryanair would refund customers with the form of payment it had, only to later learn Ryanair refunded OTAs that did not pass the refunds to customers. *Id.* at 177:23-178:7. This caused concrete harm to Ryanair. *See, e.g.*, Fuga Dec. Ex. 26 at 65:14-66:3 (describing issues arising during COVID where numerous customers complained about not receiving refunds after Ryanair had unknowingly refunded the OTA); *id.* at 56-57 (describing instances where a flight was delayed or canceled, and Ryanair emailed the customer but, because the OTA provided an incorrect email address, the customer was not notified).

Ryanair posted statements online and sent communications to its customers to protect them (ensuring they receive important notifications and refunds) and to protect Ryanair's own financial

interests. Ryanair is privileged in doing so. *See Wilco AG*, 615 F. Supp. 2d at 325. Even if customers chose not to return to Booking after receiving these communications – which Booking cannot show (see below) – Booking's tortious interference claim would still fail because Ryanair is allowed to fairly, lawfully, and truthfully inform its own customers of a verification procedure that they must complete and explain how to obtain refunds.[17] *See, e.g.*, D.I. 111, ¶¶ 25-26, 46. There is nothing wrongful about the communications.

The Restatement (Second) of Torts also recognizes a privilege for one who has a financial interest in the business of a third person, providing that there is no improper interference if the actor "does not employ wrongful means" and "acts to protect his interest from being prejudiced by the relation." Restatement (Second) of Torts § 769; *Corning Inc. v. SRU Biosystems, LLC*, 292 F. Supp. 2d 583, 585 (D. Del. 2003) (citing all of Division 9 of the Second Restatement, which includes various privileges). Ryanair has a financial interest in the business of *its own customers* booking Ryanair flights through a third party. If customers are dissatisfied with their experience flying on Ryanair due to complications with third-party ticketing, Ryanair will bear the brunt of that dissatisfaction. And if Ryanair risks violations of law or regulation because it cannot refund customers, provide necessary notifications to customers, or provide accurate information to border control. Ryanair faces legal and financial consequences. Thus, it is not wrongful for Ryanair to insist that its own customers verify their identity and provide correct contact information and payment information. This procedure is intended to protect both Ryanair's own interests against the harm caused by Ryanair customers booking flights through an unauthorized third party and the

---

[17] *See supra* VI.B.1 for a fuller discussion on why the statements are true. *See also* D.I. 134 (Apr. 7, 2023 Order), at 13 (finding that Ryanair's statements that OTAs are unauthorized, that customers must complete an "online verification" process, and that OTAs "may apply" mark-ups to Ryanair's fares are not provably false and therefore not actionable).

customers' interests in obtaining a refund that complies with the law. Ryanair's actions are privileged and cannot form the basis of a tortious interference or unfair competition claim.

> b. *Ryanair's Actions Were Not Intentional as to Booking.*

Booking must prove that Ryanair had "knowledge of the relationship or expectancy on the part of the interferer." *Buchler*, 120 F. App'x at 418. After all, "[i]t would be hard to 'intentionally interfere' with something that was not known." *Shure Inc. v. ClearOne, Inc.*, No. CV 19-1343-RGA, 2021 WL 4894198, at *2 (D. Del. Oct. 20, 2021). But Ryanair did not know it was communicating with Booking customers. OTAs intentionally conceal their identities and are constantly evolving to evade detection. *See* Fuga Dec. Ex. 26, at 32:15-34:22; *id.* Ex. 29, at 163:29-164:14. Ryanair surmises which bookings are made through an OTA by ███████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████ *See* Fuga Dec. Ex. 29, at 42:18-43:9, 89:6-26. But ██████████████████████████████████████████████████ *Id.* When Ryanair sent emails to suspected OTA customers, it did not "knowingly" interfere with a prospective business relationship between *Booking* and its customers because Ryanair did not know whether it was communicating with a Booking customer. Ryanair cannot "intentionally interfere" with a relationship of which it has no knowledge. *See Shure Inc.*, 2021 WL 4894198, at *2.

Ryanair did not target Booking; it never mentioned Booking in any of the communications that form the basis of the Counterclaims. It merely flagged the booking as an OTA booking *generally* and then notified relevant customers. The same is true of public statements made about OTAs on social media, in which Ryanair simply indicated that a "small number of passengers" would need to request a refund by filling out a "Customer Verification" form "to avoid cases where travel agents have not passed on refunds to the customer." *See* D.I. 111, ¶ 46. Aside from being a true statement and within Ryanair's lawful right to ensure its customers receive refunds, Ryanair

did not target *Booking's* relationships and, thus, did not intentionally interfere with *Booking's* business relations. *See Shure Inc.*, 2021 WL 4894198, at *2. The interference claim must fail.

### 3.   Booking's Counterclaims Fail Because Booking Cannot Prove Damages.

Proof of damages is an essential element of at least tortious interference, unfair competition, and trade libel.[18] *See Buchler*, 120 F. App'x at 418–19 (tortious interference requires that defendant proximately caused "resulting damages"); *Accenture Glob. Servs. GMBH*, 581 F. Supp. 2d at 666 (unfair competition rises and falls with tortious interference); *In re Nat'l Collegiate Student Loan Trusts Litig.*, 2020 WL 3960334, at *4, *7 (trade libel requires special damages). Each of these counterclaims must fail, because Booking cannot prove it suffered damages.

The "Court may not set damages based on mere 'speculation or conjecture' where a plaintiff fails to adequately prove damages." *Beard Rsch., Inc. v. Kate*s, 8 A.3d 573, 613 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010); *see also U.S. Bank Nat'l Ass'n v. Gunn*, 23 F. Supp. 3d 426, 436 (D. Del. 2014). Booking provides no evidence of damages suffered as a result of Ryanair's communications, or at all. In response to an interrogatory asking Booking to explain its contention that it "lost revenue from repeat customers" and a calculation of the alleged damages from this lost revenue, Booking cited only a handful of customer service communications from disgruntled customers where a few customers indicated they would *have booked* their tickets directly on Ryanair if they had known they would have to complete a verification procedure. *See* Fuga Dec. Ex. 30, at 8-9. But Booking provides no evidence that those customers did not return to Booking in the future.

Booking has not provided evidence of a single customer who, in fact, has not returned to

---

[18] Because customer comments are inadmissible hearsay and insufficient to prove the "injury to reputation" required for defamation damages; at most, Booking can seek nominal damages for its alleged defamation claim. *Preston Hollow Cap. LLC v. Nuveen LLC*, No. CVN19C10107MMJCCLD, 2022 WL 2276599, at *4 (Del. Super. Ct. June 14, 2022).

Booking after seeing Ryanair's communications, let alone shown proximate cause. Booking provided only a handful of customer communications, claiming what they would have done differently in the past–not what they intend in the future. Even if they did swear in the heat of the moment while speaking with customer service that they would never return to Booking.com, such a hyperbolic claim to customer service is nothing more than pure speculation about future harm and does not prove that they followed through with the threat. *See Beard Rsch., Inc.*, 8 A.3d at 613. Even further, if Booking could prove customers failed to return, ███████████████████ ████████████████████████████████████████████████████████ Fuga Dec. Ex. 3 at 118:21-119:20.

The comments from the customers are inadmissible hearsay and cannot be relied upon by Booking in support of summary judgment. *See Transportes Aereos Pegaso, S.A. de C.V. v. Bell Helicopter Textron, Inc.*, 623 F. Supp. 2d 518, 529 (D. Del. 2009); Fed. R. Civ. P. 56(e). Many customer comments are even incapable of authentication, as they appear in a spreadsheet under a column titled "comment_translated." *See* Fuga Dec. Ex. 31. It is unclear how they were translated, the accuracy of the translation, or whether the comments are verbatim or paraphrased, and there are no customer names or contact information associated with the comments. *Id.* The comments are entirely unreliable, unauthenticated, and inadmissible. *See* Fed. R. Evid. 901. Even if the comments are authenticated, they are hearsay, used for the truth of the matter asserted (that a customer's threat or request to cancel a flight means the customer actually canceled the flight), for which no hearsay exception exists. *See* Fed. R. Evid. 801-804. Removing this inadmissible testimony from the equation of damages, as the Court must, leaves Booking with *no* evidence whatsoever in support of its damages claim. *See Monsanto Co. v. Aetna Cas. & Sur. Co.*, No. 88C-JA-118, 1993 WL 563246, at *1 (Del. Super. Ct. Dec. 21, 1993).

There is no testimony, lay or expert, regarding Booking potential lost profits. To the

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████ Booking

provided no calculation of damages in response to Ryanair's interrogatory requesting such
information. *See* Fuga Dec. Ex. 30 at 8-9. In contrast, the plaintiffs in *Beard Research* offered an
expert opinion on the loss in value of Plaintiffs' business – "calculated by averaging the results of
two different loss valuation methods, a sales revenue method and a net income method" – and lost
cash flow to support the claims. *Beard Rsch., Inc.*, 8 A.3d at 615-18. It is Booking's burden to
prove it suffered damages as an element of its tortious interference, unfair competition, and trade
libel claims, and it has provided *no* evidence showing any actual damage proximately caused by
Ryanair to Booking. *See also Gener8, LLC v. Castanon*, No. 2022-0426-LWW, 2023 WL
6381635, at *29 (Del. Ch. Sept. 29, 2023), *judgment entered*, (Del. Ch. 2023). As a result,
Booking's claim for tortious interference must fail.

Booking further cannot prove trade libel because it cannot show that "pecuniary loss does
in fact result" as a proximate cause of Ryanair's statements. *Incyte Corp. v. Flexus Biosciences,
Inc.*, No. CVN15C09055MMJCCLD, 2017 WL 7803923, at *7 (Del. Super. Ct. Nov. 1, 2017).
Harm to Booking's reputation is not a pecuniary harm, and Booking has not provided any evidence
(and no damages expert) to show it suffered any specific monetary harm or that any customers in
fact did not return to Booking as a proximate result of receiving Ryanair's emails. *See Ward v.
Blair*, No. CV S12C-04-004 RFS, 2013 WL 3816568, at *8 (Del. Super. Ct. July 16, 2013)
("[M]ere loss of reputation is not sufficient ... [to show] harm of a pecuniary nature ....").

## G.   DEFENDANTS' EXPERTS SHOULD BE EXCLUDED.

### 1.   O'Neil-Dunne's Opinions Should Be Excluded As Not Relevant or Reliable.

O'Neil-Dunne's report explores travel industry history, airline distribution and sales,

online travel agents' role in the industry, and "background on Ryanair." Nothing in the report is relevant to proving any claim or defense, nor are they *expert* opinions. *See Daubert*, 509 U.S. at 589, 591; *see also Schneider ex rel. Estate of Schneider*, 320 F.3d at 404 ("expert testimony must fit the issues in the case"); *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 460-63 (E.D.N.Y. 2011) (excluding expert testimony that is not relevant). This is obvious just from a review of the O'Neil-Dunne Report's table of contents. *See* Fuga Dec. Ex. 33, at 2-3.

O'Neil-Dunne provides (1) information on direct vs. indirect distribution of airline tickets (*see* Fuga Dec. Ex. 33, at 6), (2) a discussion of the "post-internet" travel industry (*id.* at 8), (3) modern methods of booking travel (*see id.* at 9-11), (4) the preferences of airlines (*id.* at 12-13), and (5) the purpose and supposed benefits to consumers of OTAs and, in particular, screen scraping (*id.* at 13-17). Not one of these topics weighs on the issues relevant to the CFAA claims or Booking's counterclaims. For example, the fact that consumers prefer using OTA mobile apps over airline mobile apps has no probative value in determining whether Defendants violated the CFAA. *See* Fuga Dec. Ex. 33, at 14. O'Neil-Dunne's generalized background of the travel industry does not weigh on any claim or defense in this case. When asked the purpose of his report, O'Neil-Dunne said he was "asked to opine on how the industry works and to provide some history … as to how airlines operate and have historically operated and currently operate in the pre- and post-Internet world with the access to their content/product." Fuga Dec. Ex. 34, at 38:19–39:2. When asked which claim or counterclaim his report relates to, O'Neil-Dunne responded, "It's generalist." *Id.* at 39:16–40:9. In other words, O'Neil-Dunne's report does not provide an opinion as to any issue that would help the trier of fact, and his "generalist" report should be excluded.

Even the section on Ryanair simply provides O'Neil-Dunne's subjective observations on irrelevant topics such as the "importance of ancillary revenue to Ryanair," walking the reader

through the myRyanair login, and "brand awareness and reputation." Fuga Dec. Ex. 33, at 18-23.

Not only are these topics irrelevant, but O'Neil-Dunne wouldn't be a qualified expert to opine on

these issues even if they were relevant. Nor are his opinions reliable. *See Simpson v. Betteroads*

*Asphalt Corp.*, No. CIVIL 2011-056, 2013 WL 2255472, at *5 (D.V.I. May 18, 2013).

O'Neil-Dunne does not offer any opinions on this case, nor is he qualified to:

- He discloses no opinion on whether Ryanair.com is a protected website.
- He discloses no opinion on whether the defendants' access of Ryanair's website is unauthorized.
- He discloses no opinion on whether Ryanair's loss related to the access meets the required threshold.
- He discloses no opinion on Booking's counterclaims surrounding Ryanair's communications with customers.

When asked about Defendants' unauthorized access, he stated that he was "not asked to

opine on that." Fuga Dec. Ex. 34, at 37:15-38:9. O'Neil-Dunne failed to (1) provide any specialized

knowledge to assist a jury; (2) identify any methods utilized to provide his observations; or (3)

identify any facts from the case, let alone applying reliable methods to the facts. *See generally*

Fuga Dec. Ex. 33 at 1-25; *see also IpLearn, LLC v. Blackboard Inc.*, No. 11-876 (RGA), 2014 WL

4954462, at *1-2 (D. Del. Sep. 29, 2014). "Expert testimony which does not relate to any issue in

the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (citation omitted). Any

testimony from O'Neil-Dunne would be irrelevant and, necessarily, unhelpful to a jury.

Moreover, expert analysis must be reliable: the "gatekeeping function requires more than

simply 'taking the expert's word for it.'" *Affiliati Network, Inc. v. Wanamaker*, No. 1:16-CV-

24097-UU, 2017 WL 7361048, at *3 (S.D. Fla. Aug. 14, 2017). O'Neil-Dunne provides no

methodology or analysis, and even where he does provide uncited percentages, they are

"guestimates" that he could not support and are therefore unreliable. Fuga Dec. Ex. 34, at 76–77.

### 2. Kelly's Opinions Should Be Excluded as Unreliable.

Kelly discloses three opinions in her opening report:

1. "The Ryanair website is publicly available, to which there is no barrier to access. Anyone with an internet connection can access the website."
2. "Ryanair necessary granted access to its website in order for any flight purchases to have been made."
3. "There is no documentation or evidence that any of the Defendants caused harm to the Ryanair website."

Fuga Dec. Ex. 35 at 5-6. The facts of this case undercut Kelly's opinions to the point that her opinions cannot be considered reliable. Instead of grappling with the facts, she ignores their existence. For at least the third opinion, she either ignores or misunderstands what "harm" is under the CFAA despite proffering an opinion on precisely this point. Kelly's ignorance of facts disclosed during this litigation, whether intentional or not, renders each of her opinions fatally flawed to the point that they should be excluded because they can only mislead a jury.

### a. Kelly Opinion 1: Ryanair's Website Is Public and Contains No Barriers.

Kelly's first opinion is fairly straightforward – the Ryanair website is public and unprotected. *See generally* Fuga Dec. Ex. 35 at 6-19. To come to this conclusion, however, Kelly employs a strained definition of "public" versus "private" and ignores the protections utilized by Ryanair to protect its website. Kelly claims that in order to be a private website, the website provider must limit access to the site to a defined class of people, as opposed to anyone that creates an account on the website. *Id.* at 6-8. By way of example the password-protected portion of the Wall Street Journal or the federal court's PACER websites are public, not private under Kelly's definition. *Id.* Similarly, she claims that the myRyanair portion of Ryanair.com, which is password protected, is public. *Id.* at 12-19. In order to be private a website provider must limit access to a class of people, not just those that create accounts. *Id.* at 6-8. So, a corporate intranet site would likely be private because you must be an employee to access it. *Id.*

This definition is contrary to that used by consumers or the airline industry and it is contrary to common sense. Allowing Kelly's testimony on the private versus public website distinction she manufactures would be unduly prejudicial to Ryanair because it would certainly confound the jury. *See In re Flonase Antitrust Litig.*, 884 F. Supp. 2d 184, 196-97 (E.D. Pa. 2012); *United States v. Merrill*, No. 08-20574-CR-LENARD/TUR, 2010 U.S. Dist. LEXIS 112879, at *29 (S.D. Fla. Oct. 8, 2010) (experts using definitions of words that differ with regulations should be excluded).

Kelly also ignores the Ryanair Website's numerous technological protections introduced to stop Defendants' and other OTA use of the website. For example, Kelly references Lukasz Stocki's ("Stocki") deposition in her report but ignores his explanation of Ryanair's Shield system ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ That alone makes Kelly's opinion unreliable. *See Ely v. Cabot Oil & Gas Corp.*, No. 3:09-CV-2284, 2016 U.S. Dist. LEXIS 165597, at *28 (M.D. Pa. Feb. 17, 2016); *Conroy v. Vilsack*, 707 F.3d 1163, 1170 (10th Cir. 2013) (excluding expert opinion where expert was "oblivious to … key facts").

Kelly bases her opinion of the Ryanair barriers on her "testing," allegedly by ████████ ████ book Ryanair flights. Fuga Dec. Ex. 35 at 14-18. This, however, failed to assess the barriers. For instance, Kelly's testing was completed by ████████████████████████ ███████████████████████████████████████████████████████████ Fuga Dec.

Ex. 36 at 169:5-170:15. When asked to admit that her testing "wouldn't have presented to Shield as ███████████," Kelly responded, "I think that is a fair presumption, yes." *Id.* at 170:7-15. Kelly's testing proved nothing about whether the Shield barrier exists or is effective because Shield ████████████████████████████ *See id.* at 95:16-96:3; 113:4-114:14 (Kelly opines that Ryanair's website contains no barriers but, in deposition, admitted that the "terms gate and barrier are not inherently cybersecurity terminology" and confirmed that her opinion is not "based on some particular cybersecurity standard."). Again, the opinion should be excluded as unreliable. *Ely*, 2016 U.S. Dist. LEXIS 165597, at *28; *Conroy*, 707 F.3d at 1170; *Leyba v. City of Santa Fe*, No. CV 16-185 WPL/LF, 2017 U.S. Dist. LEXIS 21343, at *10 (D.N.M. Feb. 14, 2017).

Ryanair also employs a ██████ barrier to protect its website, namely the myRyanair login. This barrier requires that a website user create a login with an email address and password in order to access the myRyanair portion of the Ryanair website. Kelly acknowledges that Ryanair contends this is a barrier but opines that the myRyanair requirement "in no way serves to block, ban, or deter 'who' or 'what' is establishing an account," relying on the "testing" discussed above. Fuga Dec. Ex. 35 at 18. Kelly's testing again fails because she avoids even considering what triggers a block at this endpoint. ████████████████████████████
████████████████████████████
██████ Lopata Dec. ¶ 127-128; Fuga Dec. Ex. 23 at 12-24. Kelly's testing also does not test Shield because ███████████████████████████ Lopata Dec. ¶¶ 129-136.
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████

████████████████████████████████████

Kelly's test is not reliable. She fails to engage with key facts – facts highly relevant to Ryanair's website's technological barriers – which is fatal under Rule 702. *See* Fed. R. Evid. 702(b); *United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 745. Kelly's departure from an expert's standard of thorough factual examination compromises the integrity of her opinions. Kelly's first opinion is, therefore, inadmissible.

   b.  *Kelly Opinion 2: Ryanair Necessarily Granted Access to Its Website for the Purchase of Flights.*

Kelly's second opinion is also straightforward – even if Ryanair did create a barrier, Ryanair necessarily lifted the barrier "for all traffic, to include traffic related to online travel agencies." *See generally* Fuga Dec. Ex. 35 at 21-32. This opinion again relies upon Kelly's failure to even attempt to examine the relevant facts and an obviously faulty contention: the bots used by defendants are "good bots," not "bad bots," and Ryanair *must* allow traffic from "good bots."[19] Kelly sums this up:

> Ryanair's efforts to selectively ban Defendants, which by cybersecurity definition employ 'good bots,' is ineffective ... [because] Ryanair wants good bots to access its site, with the exception of Defendants ....

Fuga Dec. Ex. 35 at 27.[20]

Kelly willfully ignores the most pertinent evidence – namely, how Ryanair's Shield functions. Kelly describes Shield as a "backward-looking detection tool," that by its very nature allows Defendants' ███ onto the Ryanair website. *See e.g.*, *id.* at 28. But, as discussed above,

---

[19] Kelly includes other irrelevant arguments, such as Ryanair offering its flights through Global Distribution Systems (GDS). Flights purchased through a GDS are not accomplished through the Ryanair website and are, accordingly, not relevant.

[20] Kelly's opinion related to good vs. bad bots is not relevant to the CFAA. The question is whether Defendants access Ryanair's protected computer without or beyond authorization; the CFAA does not treat good bots or bad bots, however defined, any differently. But even if it were relevant, Kelly's opinion on the matter is woefully inadequate.

Shield functions as a barrier ████████████████████████████████████
████████████████████████████████    *See* Fuga Dec. Ex. 5 at 53:28-57:11; 62:3-65:1;

69:8-73:3; 75:3-76:4. Like in Kelly's first opinion, she disregards Shield's functionality without

any justification. This undermines her second opinion.

Kelly's analysis of Shield relied on a website that discussed a third-party software product

that, while *named* Shield, is not in any way connected to or used by Ryanair. Fuga Dec. Ex. 35 at

29; Lopata Dec. ¶ 137. The mere fact that Kelly managed to produce her entire report without

realizing her mistake is demonstrative of the extent to which her understanding (or lack thereof)

of Shield is fundamentally misconceived. For example, Kelly includes three citations in her

paragraph introducing her opinion about Shield being a "generally backwards looking tool." Fuga

Dec. Ex. 35 at 29 n.65-67. All three of those citations are to Shield.com, which is owned by

SHIELD AI Technologies Pte. Ltd., a Singapore company with no relationship with Ryanair and

not relevant to this litigation. Kelly's reliance upon another company's software should alone

disqualify Kelly's opinion. *See Conroy*, 707 at 1170 (10th Cir. 2013).

Furthermore, Kelly's "good bot" versus "bad bot" dichotomy is meaningless. Kelly

admitted that there is no definition of good versus bad bots and is a "colloquial characterization."

Fuga Dec. Ex. 36 at 240:22-241:7. Kelly defines "good bots" as helpful, ethical, and having good

intentions. *Id.* at 242:7-243:22. The bot's intent comes from who creates and deploys the bot. *Id.*

at 260:6-263:8. Confronted with how little sense it made to define a piece of software code's

"intent" by that of its creator, Kelly suggested that the bot's intent could be ascertained from its

software code. *Id.* at 264:7-266:2. But pressed, Kelly acknowledged that the code would not

specifically disclose a bot's intent. *Id.* at 287:7-288:5. Ultimately, Kelly offered no real way to

differentiate good versus bad bots. *Id.* at 282:20-292:11. And despite this – and in the face of the

importance of good versus bad bots in her report – Kelly performed no analysis on the bots. In fact, she did not even determine *what bots* Defendants employ to access the Ryanair website. *Id.* at 283:10-284:2; 285:18-287:5. Without knowing what bots Defendants deploy, she could not look at the code or speak to their creators. She did nothing except create a meaningless distinction and then draw an unsupportable conclusion to Defendants' purported benefit.

Kelly's failure to attempt to understand Shield, her reliance on an unrelated product, and her clear *ipse dixit* opinion on good versus bad bots make her second opinion unreliable. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591; *see also In re Flonase Antitrust Litig.*, 884 F. Supp. 2d at 196-97. She again departs from an expert's standard of thorough examination of pertinent facts. This compromises the integrity of her second opinion, and the Court should it inadmissible.

      *c.   Kelly Opinion 3: There Is No Evidence That the Defendants Caused Harm to the Ryanair Website.*

Kelly opines that Ryanair provided no evidence of *harm* from Defendants' unauthorized access to the Ryanair website. But Kelly's use of the term "harm" is undefined and conflicts with the CFAA's language.[21] Kelly seemingly limits her opinion on harm to "network slowdown or outright disruption" or "a notable damage, a technical impact to a system from which some type of recovery would be necessary." Fuga Dec. Ex. 35 at 41; Fuga Dec. Ex. 36 at 365:20-366:15. There is no explanation as to why Kelly makes such a limitation or how it could be relevant.

The CFAA uses the word "harm" only once referring to causing a "harm provided in subclauses (I) through (VI) of subparagraph (A)(i) ..." *See* 18 U.S.C. § 1030(c)(4)(B)(i). The harm discussed in those subclauses includes "loss to one or more persons," physical injury, threats to public health, damage affecting a computer used by the US government, and damage affecting 10

---

[21] Kelly ignores the substantial evidence of both loss and damage under the CFAA, but Ryanair focuses here on Kelly's use of the term "harm" and the use of "harm" under the CFAA.

or more protected computers. In other words, the CFAA considers harm to be fairly broad and inclusive of the above-referenced issues and not limited to the technical impairments Kelly identifies. For example, the CFAA defines the term loss to include "any reasonable cost to any victim." Kelly's failure to assess harm in a manner consistent with the CFAA renders her third opinion unreliable under Rule 702 and does not fit the issues of the case. *See* Fed. R. Evid. 702; *Schneider ex rel. Estate of Schneider*, 320 F.3d at 404 ("Rule 702 requires that the expert testimony . . . must be relevant for the purposes of the case and must assist the trier of fact."). The Court should find Kelly's third opinion inadmissible.

### 3. Imburgia Is Not Qualified to Testify on Matters Related to the CFAA, and His Testimony Is Not Reliable and Would Not Help the Trier of Fact.

Imburgia is qualified as an accountant; however, Imburgia lacks the experience to testify as a CFAA expert. He has no experience with CFAA claims. Fuga Dec. Ex. 37 at 92:22-93:4. Imburgia has no cybersecurity or technical expertise, each of which is intertwined with the CFAA. *Id.* at 304:7-15. Imburgia lists nearly 30 years of litigation experience, but only four cases related to software, and those were focused on issues like lost profits, unpaid royalties, damages from software issues, and valuations, where he may be a valid expert. *Id.* at 38:8-43:18, 86:11-92:25.

His report and testimony speak only from the perspective of a typical damage analysis. *Id.* at 166:24-167:17, 170:4-173:6. The CFAA requires an understanding of the software systems beyond Imburgia's experience to determine issues in the CFAA such as whether the cost of responding to an offense is a reasonable cost to any victim. *See* 18 U.S.C. § 1030(e)(11) (defining "loss"). For example, Imburgia believes that Ryanair has a duty to mitigate its costs by streamlining processes, like Ryanair's customer verification process, but seems to ignore the possibility that customer verification may be a loss under the CFAA. *See* Fuga Dec. Ex. 37 at 174:25-178:2; Fuga Dec. Ex. 38, ¶¶ 21-22. The theme of viewing the CFAA from an accountant's

perspective is found throughout his testimony where he applies general damage principles (*e.g.,* duty to mitigate, typical damage analysis, prevent windfalls) to the CFAA generally or to specific CFAA requirements (*e.g.,* aggregating loss over $5,000). *See* Fuga Dec. Ex. 37 at 129:17-130:9 (explaining that a duty to mitigate needs to be applied because "the duty to mitigate is the way you do damage analysis"); 133:9-137:7 (explaining that a "typical damage analysis" applies to the CFAA); 142:10-144:9; 166:24-167:17; 184:12-15 (explaining the aggregated $5,000 loss threshold under the CFAA is "typical economic damage work"); 287:10-289:8 (explaining no party may receive a windfall under general damage analysis and that theory applies to the CFAA).

Imburgia's reports and testimony are not reliable because they are not "based on sufficient facts or data." Fed. R. Evid. 702; *see Bridges*, 2022 WL 4244276, at *8. Imburgia delegated his report primarily to other individuals. *See* Fuga Dec. Ex. 37 at 106:21-107:12, 108:17-109:3 (explaining Imburgia, himself, spent 20-25 hours of the total 120-140 hours he and his "core" team spent on the Imburgia Report, but the total hours does not include the "QC work."). He stated he drafted his report by reviewing the pleadings and the opposing expert's report, providing an outline, then editing what his team drafts. *Id.* at 108:1-16. This process has led to errors in his report and testimony because his opinions are not based on sufficient facts of the case.

For example, Imburgia does not understand which Ryanair entity is involved in the present case, and believes Ryanair DAC is the holding company. *Id.* at 137:9-140:3. It is not. Ryanair Group is the parent company. Plaintiff Ryanair DAC operates the airline and website. *See* Fuga Dec. Ex. 1 at 84 (explaining Ryanair Holdings is the holding company for Ryanair DAC, Buzz, Lauda, Malta Air, and Ryanair U.K. and Ryanair DAC operates a low fare passenger airline).[22]

---

[22] The 2022 Ryanair Annual Report (Ex. 1) is one of the documents Imburgia cites to support his misunderstanding of the basic facts of the case. *See* Fuga Dec. Ex. 39 (Imburgia Rebuttal), ¶ 13.

Imburgia propagates his error into the Imburgia Supplemental Report by using revenue figures for the entire Ryanair Group in a calculation specifically meant for Ryanair DAC. *See* Fuga Dec. Ex. 37 at 300:12-303:20; Fuga Dec. Ex. 39, ¶¶ 30-32.

Imburgia is not reliable because he stops his analysis, throughout his report, at the surface level of citations in the Lopata Report (the report Imburgia was rebutting). He states he would have expected the Lopata Report to cite additional sources. *See* Fuga Dec. Ex. 37 at 149:17-150:9. However, Imburgia could not recall if the interrogatories cited in the Lopata Report referenced documents that could show what Imburgia is looking for. *Id.* at 147:12-150:24. Imburgia even states that his critiques would change, if records from an auditable source were available. *Id.* at 194:14-196:7. In fact, the sources were available in the Lopata Report; Imburgia simply failed to actually look at them.

Despite Imburgia's accounting background, he offers unreliable technical opinions. For example, Imburgia opines "it would seem nearly impossible that defendants could definitively cause these [slowdown or shutdown] events." Fuga Dec. Ex. 38, ¶ 76. Nothing in an accounting career would provide Imburgia the expertise to opine upon what would or would not slow down a website. *See*, *e.g.*, *United States Gypsum Co. v. Lafarge N. Am.*, 670 F. Supp. 2d 737, 745 (N.D. Ill. 2009) (barring expert from testifying on wallboard quality because his "expertise is in accounting and damage assessment, not technical judgments of wallboard construction."); *John McClelland & Assocs. v. Med. Action Indus.*, No. 04-2545-CM, 2006 U.S. Dist. LEXIS 83300, at *9 (D. Kan. Nov. 15, 2006) (expert on healthcare-products industry was not qualified to opine on "the parties' written agreements, the understanding and expectations of the parties, or the effect of plaintiff's sales efforts on defendant's past, present or current sales."). ███████

███████████████████████████████████████████████████████

███████████████████████ *See id*.; *see also* Fuga Dec. Ex. 37 at 278:11-280:21.

Imburgia's opinions are not fit to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see Bridges*, 2022 WL 4244276, at *8. Imburgia's qualifications inhibits him to be a proper fit to testify because he conflates and confuses key terms like "loss" and "damage" under the CFAA. *See Merrill*, 2010 U.S. Dist. LEXIS 112879, at *29 (finding that testimony of two experts who "attempt[ed] to use their own definitions of a 'Communist Chinese military company' and 'entity' that [were] different from that provided in the [relevant regulations]" should be excluded because it would confuse the jury). Imburgia has explained he "uses loss and damages synonymously" despite being aware of the specific definitions in the CFAA. Fuga Dec. Ex. 37 at 166:3-5; *see also id.* at 165:11-166:22. This lack of precision would confuse the trier of fact when determining issues, such as, the CFAA requirement that a civil cause of action may be brought if "loss to 1 or more persons during any 1-year period ... aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I).

Imburgia speaks about "damages" only as remedy, but damage and loss under the CFAA have specific meanings. *See, e.g.,* Fuga Dec. Ex. 37 at 166:24-167:17. Conflating loss and damage under the CFAA will only confuse the trier of fact when Imburgia is making the claim that general damage theory is required under the CFAA, such as when aggregating loss over $5,000.

## VII.   CONCLUSION

Ryanair respectfully requests that the Court grant its motion for partial summary judgment that Defendants have violated §§ 1030(a)(2)(C) and (a)(5)(C) of the CFAA and dismiss Defendants/Counterclaim Plaintiff's Counterclaims with prejudice, and grant its motion to preclude expert testimony of Timothy James O'Neil-Dunne, Jordan Rae Kelly, and Basil Imburgia.

Dated: December 20, 2023

Respectfully Submitted,

**KRATZ & BARRY LLP**

*/s/ R Touhey Myer*
R Touhey Myer (#5939)
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

*Of Counsel:*

**HOLLAND & KNIGHT LLP**

R. David Donoghue (*pro hac vice*)
Anthony J. Fuga (*pro hac vice*)
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600
david.donoghue@hklaw.com
anthony.fuga@hklaw.com

Cynthia A. Gierhart (*pro hac vice*)
800 17th Street NW, Suite 1100
Washington, DC 20011
(202) 569-5416
cindy.gierhart@hklaw.com

Ji Mao (*pro hac vice*)
31 West 52nd Street
New York, New York 10019
(212) 513-3420
ji.mao@hklaw.com

William H. Oliver III (*pro hac vice*)
10 St. James Ave. 11th Floor
Boston, MA 02116
(617) 573-5863
william.oliver@hklaw.com

*Attorneys for Plaintiff/*
*Counterclaim Defendant Ryanair DAC*