# EXHIBIT 34

**PUBLIC VERSION - CONFIDENTIAL MATERIAL OMITTED**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


RYANAIR DAC,                      )
                                  )
              Plaintiff,          )
                                  )
         v.                       ) Case No.
                                  ) 1:20-CV-01191-WCB
BOOKING HOLDINGS INC.,            )
BOOKING.COM B.V., KAYAK           )
SOFTWARE CORPORATION,             )
PRICELINE.COM LLC, and AGODA      )
COMPANY PTE. LTD.,                )
                                  )
              Defendants.         )
_____)

 HIGHLY CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER


        Video-recorded videoconference deposition

of TIMOTHY J. O'NEIL-DUNNE, taken remotely on behalf of

the Plaintiff, beginning at 9:03 a.m. and ending at

5:24 p.m., on Tuesday, September 26, 2023, before

JOANNA B. BROWN, Certified Shorthand Reporter No. 8570,

RPR, CRR, RMR.



Page 2

```
1        A P P E A R A N C E S
2   FOR THE PLAINTIFF:
3      HOLLAND & KNIGHT LLP
       BY:  CYNTHIA A. GIERHART, ESQ.
4      800 17th Street NW, Suite 1100
       Washington, DC 20011
5      (202) 569-5416
       cindy.gierhart@hklaw.com
6
7   FOR THE DEFENDANTS:
8      COOLEY, LLP
       BY:  ALEXANDER J. KASNER, ESQ.
9      1299 Pennsylvania Avenue, NW, Suite 700
       Washington, DC 20004
10     (202) 842-7800
       akasner@cooley.com
11     COOLEY, LLP
       BY:  KATHLEEN R. HARTNETT, ESQ.
12        KRISTINE FORDERER, ESQ.
       3 Embarcadero Center, 20th Floor
13     San Francisco, California 94111-4004
       (415) 305-6527
14     khartnett@cooley.com
       kforderer@cooley.com
15
16  ALSO PRESENT:
17     THERESA MAJERS, VIDEOGRAPHER
18
19
20
21
22
23
24
25
```

Page 3

```
1            I N D E X
2   EXAMINATION OF:            PAGE
3   TIMOTHY J. O'NEIL-DUNNE
4
5   BY MS. GIEHART             7
6
7
8          E X H I B I T S
9   PLAINTIFF'S                PAGE
10  Exhibit 125  Expert Report of        52
       Timothy James O'Neil-Dunne
11     (55 pages)
12  Exhibit 126  Booking.com B.V.'s Supplemental   52
       Responses and Objections to
13     Plaintiff Ryanair DAC's
       Interrogatory No. 2 (14 pages)
14
    Exhibit 127  Twitter post by Mr. O'Neil-Dunne  138
15     (1 page)
16  Exhibit 128  "Advantages and Disadvantages of  201
       Online Travel Agencies (OTAs)"
17     (16 pages)
18  Exhibit 129  "Web Scraping for Hospitality    226
       Research: Overview,
19     Opportunities, and Implications"
       (16 pages)
20
    Exhibit 130  August 10, 2008,                 236
21     "Professor Sabena's Blog"
       (1 page)
22
    Exhibit 131  August 18, 2008,                 253
23     "Professor Sabena's Blog"
       (1 page)
24
25
```

Page 4

```
1          E X H I B I T S
2   PLAINTIFF'S                PAGE
3   Exhibit 132  April 16, 2009,         258
       "Professor Sabena's Blog"
4      (1 page)
5   Exhibit 133  "Legal and Ethical Issues of   266
       Collecting and Using Online
6      Hospitality Data" (9 pages)
7   Exhibit 134  "THE BUSINESS IMPACT OF        271
       WEBSITE SCRAPING: IT'S PROBABLY
8      BIGGER THAN YOU THINK - HERE'S
       WHY" (10 pages)
9
10
11
12      UNANSWERED QUESTIONS
13        PAGE   LINE
14        (None.)
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1         Remotely; Tuesday, September 26, 2023
2              9:03 a.m.
3
4         (TIMOTHY J. O'NEIL-DUNNE,
5         deponent, was sworn and examined
6         and testified as follows:)
7
8         THE VIDEOGRAPHER:  We are now on the record.
9   This begins Media File No. 1 in the deposition of
10  Timothy O'Neil-Dunne.  We are taking this deposition
11  remotely via Zoom in the matter of Ryanair DAC versus
12  Booking Holdings, Inc., et al., filed in the
13  U.S. District Court for the District of Delaware,
14  Case No. 1:20-CV-01191-WCB.
15        Today is September 26, 2023.  The time is
16  9:03 a.m.  I am Theresa Majers, the videographer, from
17  Magna Legal Services.  The court reporter is
18  Joanna Brown also with Magna Legal Services.
19        Counsel, please introduce yourselves and who
20  you represent starting with the questioning attorney.
21        MS. GIERHART:  Cynthia Gierhart on behalf of
22  Ryanair.
23        MR. KASNER:  Alex Kasner of Cooley, LLP, on
24  behalf of defendants.  I have with me Kathleen Hartnett
25  also of Cooley, LLP, on behalf of defendants,
```



1  based in Barcelona, and ClearTrip, which is a -- it's
2  now owned by two companies because they split the
3  company in two, but it was an OTA based in India.
4  Excuse me.
5      Q  And I know you said you didn't advise on
6  screen scraping necessarily, but for either eDreams or
7  ClearTrip, did you advise on booking airlines' flights
8  who didn't get permission?
9      MR. KASNER:  Object to the form.
10     THE WITNESS:  It's not my role to define
11 whether they are a commercial-issued crew to each.  I
12 advised the two companies on how to build a booking
13 engine and how to contract with players to provide that
14 capability.
15 BY MS. GIERHART:
16     Q  Did those discussions involve discussions
17 about which airlines they should sell?
18     MR. KASNER:  Object to the form.
19     THE WITNESS:  No.  It wasn't a major topic;
20 but, obviously, any content that was provided through
21 those systems, these companies, eDreams and ClearTrip,
22 for example, wanted to have as much product and service
23 as they could sell to their customers and provide
24 access to that content.  So, yes, we assisted them in
25 those processes.

1  BY MS. GIERHART:
2      Q  At any point, did you advise them that they
3  might not be permitted to access certain airline
4  content?
5      MR. KASNER:  Objection to the form.  Calls for
6  a legal conclusion.
7      THE WITNESS:  The requirement for the access
8  was related to how they could get the access from a
9  technological basis rather than anything else.
10 BY MS. GIERHART:
11     Q  For purposes of this report, what is your area
12 of expertise that you are an expert in?
13     A  So, as you can tell from my CV and the
14 introduction, I have had the privilege of being in this
15 industry for 40 years.  It's a long time.  And as such,
16 I have seen the evolution of distribution.  The
17 expertise that I'm providing for this report is to
18 describe the marketplace, how it works, how it operates
19 both from a technology and a commercial operations
20 process.
21     Q  So just to be clear with the technology, I
22 guess, are you an expert in the technical aspects of
23 gaining access to an airline website?
24     A  So you've used the word "airline website."
25 Irrespective of the place where you go to get the

1  content, my expertise is on how to get access to the
2  stuff behind a website, whether it's via a direct or an
3  indirect form.
4      Q  But you don't have a computer science
5  background; right?
6      So your expertise would not extend to coding,
7  for example; is that right?
8      MR. KASNER:  Object to the form.
9      THE WITNESS:  I think I've already said and
10 it's stated in my documentation here I am not a coder;
11 but I understand how the systems work, and I have deep
12 experience in how they work.  So my knowledge set is
13 not, if you'd like, at the bits and bytes level.  I am
14 not a programmer.  I am not a coder, although that term
15 perhaps is becoming less and less succinct.
16     But I understand how they work, and I believe
17 that I am an expert in that process and those designs
18 and solutions and have familiarity with the different
19 systems that do access -- access and utilize airline
20 product inventory as well as products.
21 BY MS. GIERHART:
22     Q  Okay.  And are you testifying as an expert in
23 authorized versus unauthorized access to a website?
24     MR. KASNER:  Object to the form.
25     THE WITNESS:  I am familiar with how airlines

1  produce content.  I am familiar with how airlines
2  determine how they wish to have their content
3  distributed.
4  BY MS. GIERHART:
5      Q  Is that how you are defining "authorized
6  access"?
7      MR. KASNER:  Object to the form.
8      THE WITNESS:  "Authorized access" is whose
9  authority?  It's a difficult thing to define.  I don't
10 wish to be difficult.  I think the question of
11 authorization depends on what product and services
12 because there is so much information that is publicly
13 available.
14 BY MS. GIERHART:
15     Q  Can you explain what you mean by that.
16     A  Sure.  If I, as a consumer, or you, as a
17 consumer, wish to have access to airline content, I can
18 go look for content on the Web from a wide variety of
19 resources be that Google, who is probably the ultimate
20 screen scraper, to a travel agency, an OTA, or a
21 metasearch for the airline's own website.
22     Q  And so, if it's publicly available, you are
23 saying it's authorized access?
24     MR. KASNER:  Object to the form.  Calls for a
25 legal conclusion.



Page 38

```
 1          THE WITNESS:  I don't think I'm authorized
 2   to -- that's a conclusion.  I can say, technically,
 3   it's possible.  Anybody can access pretty much any
 4   content today because the Web is so broad.
 5   BY MS. GIERHART:
 6      Q   Well, I guess that's sort of my question.
 7   This report does not focus on -- or take an opinion on
 8   authorized versus unauthorized access; is that right?
 9      A   I was not asked to opine on that.
10      Q   Okay.  And for purposes of this report, are
11   you testifying regarding damage to an airline website?
12          MR. KASNER:  Object to the form.
13          THE WITNESS:  I don't think I'm qualified to
14   talk about damage in a specific case.  I can talk about
15   damage to -- because I've actually been involved in how
16   to build websites for airlines.  So I'm familiar with
17   the challenges that airlines face.
18   BY MS. GIERHART:
19      Q   Okay.  So what is the purpose of your report
20   in relation to this litigation?
21          MR. KASNER:  Object to the form.
22          THE WITNESS:  I have been asked to opine on
23   how the industry works and to provide some history --
24   and it's contained in the report -- as to how airlines
25   operate and have historically operated and currently
```

Page 39

```
 1   operate in the pre- and post-Internet world with the
 2   access to their content/product.
 3   BY MS. GIERHART:
 4      Q   Okay.  I guess, since we are on page 4, if you
 5   scroll up to the paragraph right above 1.1, it says
 6   "The purpose of this Report is to assess the claims,
 7   allegations, and information provided in connection
 8   with the pending litigation named above."
 9          Do you assess the claims in your report?
10          MR. KASNER:  Object to the form.
11          THE WITNESS:  I provide the -- I've assessed
12   the claims and provide the context for the
13   conversation.  So the information provided is in
14   connection with that.
15   BY MS. GIERHART:
16      Q   Did you review the complaint in preparing this
17   report?
18      A   I did.
19      Q   Did you review the defendants' counterclaims?
20      A   I did.
21      Q   Did you read them both in full?
22      A   I did.
23      Q   Which claims or counterclaims does your report
24   relate to?
25          MR. KASNER:  Object to the form.
```

Page 40

```
 1          THE WITNESS:  It's generalist.  So I've tried
 2   to provide, if you like, a way to look at the claims
 3   and the counterclaims in connection with the case so
 4   that you can have a good view of how the industry
 5   worked -- works -- excuse me -- how the industry works.
 6          So I assessed the claims and have given you
 7   answers inside the document as to how I believe those
 8   claims and the counterclaims sit.  So those are
 9   contained in each one of the points within the report.
10   BY MS. GIERHART:
11      Q   So there's no -- you don't provide an opinion
12   regarding whether -- regarding unauthorized access of
13   an airline website?
14          MR. KASNER:  Object to the form.
15          THE WITNESS:  I think by the framework of the
16   report is to assess the claims in the context with the
17   industry as a whole.  So I did look at, obviously, the
18   individual claims, and I did look at how I felt the
19   context was and opined accordingly.
20   BY MS. GIERHART:
21      Q   Okay.  So your report is not directed at any
22   specific claim or counterclaim?
23      A   It's just --
24          MR. KASNER:  Object to the form.
25          THE WITNESS:  Sorry.  It's to assess the
```

Page 41

```
 1   claims.  So, yes, I did look at the specific claims.
 2   BY MS. GIERHART:
 3      Q   Right.  But I said it's not meant to address
 4   one particular claim or counterclaim?
 5      A   I think that the way you -- I wrote the report
 6   was to look at the claims in their context.  I can
 7   opine on those.  I obviously can't opine on the
 8   legality of that.  That's not my area or scope of
 9   expertise.  But from the technical and the commercial
10   side of how they operate, that's contained in the
11   report.
12      Q   Is Appendix C everything that you considered
13   in writing your report?
14      A   Can you remind me what Appendix C is because I
15   only have -- one second.
16      Q   If you --
17          MR. KASNER:  Can you direct us to a page,
18   Cindy?
19          THE WITNESS:  Yes.  Sorry.
20   BY MS. GIERHART:
21      Q   Either -- you can either look at the table of
22   contents on page 3 or go to the actual Appendix C,
23   which starts on page 34.
24      A   Okay.  Let me look -- if you don't mind, I'll
25   look at page 34.  All right?
```



Page 74

1  side, the airline can hide information that could be
2  pertinent to the customer.
3  BY MS. GIERHART:
4     Q    Meaning, like, what?
5     MR. KASNER:  Object to the form.
6     THE WITNESS:  He might not tell the customer
7  in other than the fine print where to find a way to,
8  for example, opt out of insurance, just for example.
9  BY MS. GIERHART:
10    Q    So is that any different from OTAs?
11    A    I think -- I think it is.
12    Q    In what way?
13    A    I think it's a question of perspective.  The
14 airline wants to keep its costs as low as possible.
15 The OTA is more related to how I can build a
16 relationship with a customer long term so I can sell
17 him not just the airline ticket itself but also
18 ancillary services such as hotels and cars, et cetera.
19    Q    Are you saying airlines aren't interested in
20 repeat customers?
21    MR. KASNER:  Object to the form.
22    THE WITNESS:  That's not what I'm saying.
23 I'm saying that the ability for an airline to sell a
24 product to the customer is one thing.  If the customer
25 is going via an OTA, the customer is more likely to be

Page 75

1  thinking about the holistic nature of the trip, not
2  just the airline ticket such as how to deal with "I'm
3  not going just from" -- you guys are in New York;
4  right? -- "just going from New York to San Francisco.
5  I'm going from New York to San Francisco, and I need to
6  have a hotel, and I need to figure out transportation
7  to get from the airport to the place of my meeting."
8     The travel agent can provide more information
9  and typically does so, provide more capability to buy a
10 broader product set than a single airline does.
11 BY MS. GIERHART:
12    Q    Typically, airlines nowadays, though, are
13 offering hotel and rental car services also; is that
14 right?
15    A    Some airlines do, but I would say that when
16 one looks at the percentage of hotels sold via an
17 airline website versus a hotel sold connected to an
18 airline ticket on an OTA, you'll see that the OTA sells
19 vastly greater, more hotel bookings than the airline
20 does on a per-unit basis.
21    Q    Okay.  I'm just going to scroll down the
22 report a little to the next page.  So we are at --
23    A    Do you mind if -- do you mind if we go back to
24 the previous form where I can look? because I can
25 look at either side of the page.

Page 76

1     Q    Oh.
2     A    I can't navigate when you are displaying.
3     Q    Yep.  Yep.  Go ahead.  Okay.  So we are going
4  to go to page -- page 7 --
5     A    Okay.
6     Q    -- Section 4.2.  So -- so, now, we are talking
7  about, well, still pre-Internet era.  Actually, we'll
8  go back to it because we kind of jumped around a
9  little.  But the third paragraph, you know, you were
10 talking about indirect distribution.
11    The second sentence there, "Indirect
12 distribution peaked during this period -- in about
13 1995, travel-agency distribution made up approximately
14 70% of all ticket sales," I was just wondering where
15 that percentage came from.  There's no citation.
16    A    No, because I couldn't find one.  But I'm
17 familiar with the situation because 1995 was a, sort
18 of, seminal year.  This is when Delta Air Lines first
19 introduced commission capping to travel agencies.
20 That's why it's kind of known as a well-known year.
21 Seventy percent of all ticket sales was airline ticket
22 sales that went through either indirect channels or
23 direct channels, which is via the airline direct.
24    Q    And that's just a percentage you -- is that a
25 guess?

Page 77

1     A    I could not find a good citation for this.  It
2  is some -- let's put it as a knowledgeable guesstimate.
3     Q    I guess, similarly, if you -- two
4  paragraphs down, there's another percentage there.  You
5  are talking about the indirect channel aggregated
6  behind four major GDS players who, by 1995, had
7  captured over 98 percent of the licensed travel agents
8  in the USA.
9     Is that also just your estimate?
10    A    Yes.  Again, pretty much, I know that to be
11 the case because the figures came from ARC, but I
12 couldn't go as far back as 1998 on their website.
13    Q    From where was it?  AR -- ARC?
14    A    ARC publishes a percentage of travel agencies
15 who are licensed, who are using the GDS systems.
16    Q    Did you say "ARC"?
17    A    Yes.  Airlines Reporting Corporation, ARC,
18 Alpha Romeo Kappa -- sorry -- Control.
19    Q    Okay.  Do you know -- you mentioned this is in
20 the U.S.  Do you know whether this was -- there were
21 similar percentages in Europe at this time?
22    A    They are different, and I can't quote details.
23 There are figures that we could go with, but my focus
24 was on the USA market.  So, no, I did not look at the
25 actual numbers for the rest of the world.  I know the



Page 78

1  functions and the services and how to get to the data.
2     Q   Okay.  Just to clarify, you said they are
3  different.  Would it -- I don't need exact percentages,
4  but would it just -- would it be less in Europe?
5        The GDS players captured less of a percentage
6  of the market?
7        MR. KASNER:  Object to the form.
8        THE WITNESS:  I think it's a little off topic,
9  but the definition of "licensed" is the licensing
10  system is done by an organization called "BSP" or
11  "Bank Supplement Plan," and there's one for each
12  country or just minor groupings of countries.  And
13  that's controlled by IATA, I-A-T-A, which is the
14  airlines' international consortia, and they license
15  travel agents to issue neutral tickets when these were
16  still paper tickets in those days.
17        So the percentage of tickets issued varies by
18  each country, and it can be very different for each
19  country.  Therefore, I wouldn't like to speculate to
20  say that that's a generic term.  It just varies by
21  country because of the different parameters of what
22  goes on in a country.
23  BY MS. GIERHART:
24     Q   Okay.  And since 98 percent is either your
25  recollection or a guess, how confident are you in that

Page 79

1  percentage?
2        MR. KASNER:  Object to the form.
3        THE WITNESS:  For the United States, for the
4  licensed travel agents, that's licensed, meaning those
5  who are authorized to issue tickets, I believe this to
6  be a good number.
7  BY MS. GIERHART:
8     Q   And when you say "licensed and authorized to
9  issue tickets," licensed by who?
10     A   I think I've already said this.  It was ARC,
11  Airlines Reporting Corporation.  They are the licensing
12  body for issuing of neutral tickets in the
13  United States.
14     Q   And I apologize if you did already explain
15  this.  What are neutral tickets?
16     A   That is a ticket that is issued in the same
17  form on the same stock.  They used to be paper in 1995
18  so that the tickets themselves, the blank tickets, were
19  known as "ticket stock," and you could use exactly the
20  same stock to issue a ticket on any participating
21  airline.
22     Q   Did travel agencies back in this pre-Internet
23  era have to be licensed in order to sell airline
24  tickets by the ARC?
25     A   The only way that you could issue a neutral

Page 80

1  ticket, these tickets -- and they are stamped with ARC
2  on them.  Airlines Reporting Corporation is stamped on
3  the ticket.  The only way you can do that is if you are
4  recognized and licensed by ARC.
5        If you can recall, earlier in my testimony, I
6  explained that I was the ticketing agent specialist for
7  Expedia when it got its travel agency license, and that
8  travel agency license is this thing that we are talking
9  about.
10     Q   And is it different in the post-Internet era,
11  this ARC licensing of travel agents?
12        MR. KASNER:  Object to the form.
13        THE WITNESS:  The basic structure and the idea
14  for the participating airlines has not changed.  In
15  other words, in order for a travel agency to issue a
16  participating airline's ticket, they must do so using
17  the ARC stock and must be licensed by ARC.
18  BY MS. GIERHART:
19     Q   I assume all OTAs -- well, let me ask one more
20  question.
21        Is this -- when you are issuing a
22  participating ARC license ticket, are we only referring
23  to paper tickets?
24     A   No.
25     Q   Okay.  Nowadays, you could have a, sort of,

Page 81

1  licensed electronic ticket?
2     A   They banned electronic tickets around about
3  2002, I believe.  So there are no more paper tickets.
4     Q   You said they banned -- who banned electronic
5  tickets in 2002?
6     A   The airlines through ARC ended the practice of
7  the issue -- issuing of paper tickets.
8     Q   Okay.  They ended paper tickets in 2002.
9     A   I'm sorry.  Let me just correct that.  I don't
10  remember the exact date, but it was sometime around
11  2002 that paper -- excuse me -- that paper tickets no
12  longer were eligible to be used.
13     Q   So, I guess, can you just explain.  Nowadays,
14  I mean, how many OTAs are licensed through ARC?
15     A   I don't have those numbers, and I can't say
16  for sure.  I can speculate an answer.
17     Q   Sure.  Just to give us an idea.
18     A   I believe that all of the major OTAs are
19  licensed to issue tickets if they have a physical --
20  sorry -- a legal footprint in the United States; that
21  is, they have the ability to operate in the
22  United States and issue -- U.S. airlines or those
23  airlines who operate in the United States and sell
24  their products in the United States, I believe all of
25  the major players are, in fact, licensed by ARC.



Page 286

1  the same as what a conventional travel agency does.
2      You need to have this minimum information in
3  order to make a reservation.  Yes, that's true.  You
4  can then use that information and look -- when you
5  combine that with, for example, the behavior of the
6  customer.  So you can get -- you do get personalization
7  out of this.  That's standard business.
8  BY MS. GIERHART:
9      Q   Okay.  And, then, your next sentence is that,
10 as such, Ryanair is attempting to establish itself as a
11 competitor of online travel agencies.
12     Is it your contention that Ryanair is trying
13 to establish itself as a competitor because it collects
14 the name, the date of birth, and contact information of
15 its customers?
16     MR. KASNER:  Object to the form.  It's one of
17 the things that Ryanair does.  Ryanair wants to provide
18 the same level of service as an OTA does because, you
19 know, we've gone through this at great length, looking
20 at comparing OTAs and direct airlines, and I think
21 Ryanair is trying to do the same.  They want to be
22 competitive with online travel agencies in gathering
23 the customers' eyeballs.
24 BY MS. GIERHART:
25     Q   You are saying they have the same business

Page 287

1  model, which is to collect information about customers
2  and then target marketing to them; right?
3      MR. KASNER:  Object to the form.
4      THE WITNESS:  That is one of the things they
5  do, yes.
6  BY MS. GIERHART:
7      Q   Isn't that what essentially every company that
8  markets to consumers today does?
9      MR. KASNER:  Object to the form.
10     THE WITNESS:  That's no different.  You are
11 absolutely correct.
12 BY MS. GIERHART:
13     Q   So is -- wouldn't that make every company a
14 competitor of OTAs?
15     MR. KASNER:  Object to the form.
16     THE WITNESS:  Let's put it this way:  Amazon
17 today -- touch wood -- does not sell travel on
18 Amazon.com.  So I think the context of this is very
19 important.  You can't do a search from Dublin to
20 Stansted on Amazon.com.  You can on an OTA, and you can
21 on Ryanair.com.  So I think the context is very
22 important.
23 BY MS. GIERHART:
24     Q   Okay.  Is there anything else supporting your
25 contention that Ryanair is a competitor with OTAs other

Page 288

1  than what's here in the report?
2      A   Sorry.  Ask the question again.
3      Q   Is there anything else that supports your
4  contention that Ryanair is attempting to establish
5  itself as a competitor of OTAs other than what you have
6  here in the report, which is that they are both
7  targeting customers?
8      MR. KASNER:  Object to the form.
9      THE WITNESS:  That is a very broad way that
10 Ryanair and OTAs are competitive, and they both
11 consider each other to be competitive.  So, in my
12 report, I've tried to demonstrate how you get to that
13 point with what is the behavior of an airline, what is
14 the behavior of intermediaries be they GDS or OTAs or
15 other forms, and what is the behavior of the customer.
16     So, as a broad brush, I tried to give that --
17 the answer to that information so that, inside the
18 report, I tried to give a way that describes how
19 Ryanair behaves, and that's very similar to how an OTA
20 behaves, which is what's good.
21     MR. KASNER:  I think we are at time.  So, if
22 we could just wrap this up, that would be great.
23     MS. GIERHART:  Right.  No.  Yeah.  I think --
24 I think I'm -- we are at time.  So I think I'm done.
25     MR. KASNER:  Okay.

Page 289

1      THE WITNESS:  Okay.
2      MS. GIERHART:  Did you have any questions, or
3  are we done?
4      MR. KASNER:  We do not have any questions.
5  We would like to designate the transcript for this as
6  highly confidential pursuant to the protective order.
7      THE VIDEOGRAPHER:  Joanna, do you want copy
8  orders on the record?
9      THE REPORTER:  Yes, please.  Does anyone need
10 a copy of the transcript today?
11     MS. GIERHART:  Yes.  We'll -- e-tran only.  We
12 don't need paper copies, and if we can, get the rough
13 and expedited.
14     MR. KASNER:  The same for us would be great.
15     THE REPORTER:  Thank you.
16     THE VIDEOGRAPHER:  All right.  This concludes
17 the deposition on September 26, 2023, at 5:24 p.m.
18     (Deposition session concluded at 5:24 p.m.)
19                   -oOo-
20
21
22
23
24
25



73 (Pages 286 to 289)

Page 290

```
 7        I certify (or declare) under penalty of
 8  perjury under the laws of the State of California that
 9  the foregoing is true and correct.
10
11  Executed at _____ on _____.
                (Place)         (Date)
12
13       _____
              (Signature of Deponent)
```

Page 291

```
 1           DEPOSITION OFFICER'S CERTIFICATE
 2  STATE OF CALIFORNIA )
                        ) ss.
 3  COUNTY OF ORANGE    )
 4
 5        I, Joanna B. Brown, hereby certify:
 6        I am a duly qualified Certified Shorthand
 7  Reporter in the State of California, holder of
 8  Certificate Number CSR 8570 issued by the Court
 9  Reporters Board of California and which is in full
10  force and effect. (Fed. R. Civ. P. 28(a)).
11        I am authorized to administer oaths or
12  affirmations pursuant to California Code of Civil
13  Procedure, Section 2093(b) and prior to being examined,
14  the witness was first duly sworn by me.
15  (Fed. R. Civ. P. 28(a), 30(f)(1)).
16        I am not a relative or employee or attorney or
17  counsel of any of the parties, nor am I a relative or
18  employee of such attorney or counsel, nor am I
19  financially interested in this action.
20  (Fed. R. Civ. P. 28).
21        I am the deposition officer that
22  stenographically recorded the testimony in the
23  foregoing deposition, and the foregoing transcript is a
24  true record of the testimony given by the witness.
25  (Fed. R. Civ. P. 30(f)(1)).
```

Page 292

```
 1        Before completion of the deposition, review of
 2  the transcript [ ] was [ ] was not requested.  If
 3  requested, any changes made by the deponent (and
 4  provided to the reporter) during the period allowed,
 5  are appended hereto. (Fed. R. Civ. P. 30(e)).
 6
 7
 8  Dated: _____
 9
10
11       _____
```

MAGNA
LEGAL SERVICES

DEPOSITION OF:  TIMOTHY JAMES O'NEIL-DUNNE
DATE OF DEPOSITION:  Tuesday, September 26, 2023
CASE:  *Ryanair DAC v. Booking Holdings Inc., et al*, Case No. 20-1191-WCB

## ERRATA SHEET

The following are the corrections which I have made to my deposition transcript:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| 9 | 12 | "(inaudible)" | gist | Transcription |
| 21 | 21 | pr?cis | précis | Transcription |
| 25 | 14 | buying | enabling | Correction |
| 34 | 11 | crew | credentialed | Transcription |
| 58 | 18 | airline | airline, | Transcription |
| 65 | 19 | serve | settle | Correction |
| 81 | 2 | electronic | paper | Correction |
| 102 | 11 | DDS's | GDSs' | Transcription |
| 109 | 4 | obstructed | abstracted | Transcription |
| 112 | 12 | bot | board | Transcription |
| 113 | 17 | Dog | dot | Transcription |
| 141 | 10 | educators | all comers | Transcription |
| 148 | 9 | part | path | Transcription |
| 149 | 16 | office | offers | Transcription |
| 152 | 7 | gain | against | Transcription |
| 153 | 21 | NDCs | NDC | Transcription |
| 156 | 21 | selling | sourcing | Transcription |
| 158 | 17 | agency or a regular brick… | agency or via a regular brick… | Transcription |
| 160 | 16 | Saudi | Saudia | Transcription |

DEPOSITION OF:  TIMOTHY JAMES O'NEIL-DUNNE
DATE OF DEPOSITION:  Tuesday, September 26, 2023
CASE:  *Ryanair DAC v. Booking Holdings Inc., et al*, Case No. 20-1191-WCB

| Pg. | Ln. | Now Reads | Should Read | Reason |
|-----|-----|-----------|-------------|--------|
| 160 | 16 | Saudi | Saudia | Transcription |
| 161 | 21 | indirect | direct | Transcription |
| 167 | 19 | reaching | reach and | Transcription |
| 168 | 19 | Flair, | Flair then, | Transcription |
| 173 | 19 | that | it | Transcription |
| 179 | 13-14 | "— like the" | "— like the – " | Transcription |
| 190 | 20 | airline's website | airlines' websites | Transcription |
| 217 | 2 | Sendai | Cendyne | Transcription |
| 217 | 3 | Sendai | Cendyne | Transcription |
| 219 | 10 | pausing | parsing | Transcription |
| 219 | 25 | pausing | parsing | Transcription |
| 219 | 15 | 104 | 1040 | Transcription |
| 220 | 4 | scraping/pausing | scraping/parsing | Transcription |
| 220 | 21 | light | flight | Transcription |
| 223 | 5 | pausing | parsing | Transcription |
| 230 | 11 | DDOS | DDoS | Transcription |
| 232 | 8 | earlier line | Value Alliance | Transcription |
| 232 | 22 | ValueAirlines.com | www.ValueAlliance.com | Transcription |
| 238 | 19 | DDS | DDoS | Transcription |
| 241 | 6 | DDOS | DDoS | Transcription |
| 243 | 12 | DDOS | DDoS | Transcription |
| 244 | 23 | DDOS | DDoS | Transcription |

DEPOSITION OF:  TIMOTHY JAMES O'NEIL-DUNNE
DATE OF DEPOSITION:  Tuesday, September 26, 2023
CASE:  *Ryanair DAC v. Booking Holdings Inc., et al*, Case No. 20-1191-WCB

| Pg. | Ln. | Now Reads | Should Read | Reason |
|-----|-----|-----------|-------------|--------|
| 260 | 19 | customer's water | customer is like water | Transcription |
| 261 | 21 | FAA | 2FA | Transcription |
| 267 | 21 | pr?cis | précis | Transcription |
| 277 | 24 | DDOS | DDoS | Transcription |
| 286 | 16 | form. It's one | form." [Insert new line] "THE WITNESS: It's… | Transcription. The transcript improperly combines Mr. Kasner's objection with The Witness's answer |
| 293 | Index | DDOS | DDoS | Transcription |
| 307 | index | DDS's | GDSs' | Transcription |
| 307 | Index | DDS | DDoS | Transcription |
| 307 | Index | DDOS | DDoS | Transcription |
| 331 | Index | pausing | parsing | Transcription |
| 334 | Index | pr?cis | précis | Index should be corrected to reflect "précis" |
| 340 | Index | scraping/pausing | scraping/parsing | Transcription |

I, the undersigned, declare under penalty of perjury, that I have read the above-referenced deposition transcript and have made any corrections, additions or deletions reflecting my true and correct testimony.

EXECUTED this __15__ day of November 2023, at __10:15 P<_____.

*Timothy James O'Neil-Dunne*
Timothy James O'Neil-Dunne

# EXHIBIT 35

**PUBLIC VERSION - CONFIDENTIAL MATERIAL OMITTED**

Expert Report of Jordan Rae Kelly, prepared in connection with *Ryanair DAC v. Booking Holdings Inc. et al.*, C.A. No. 20-01191-WCB (D. Del.).

August 31, 2023



An Intelligence-Led, Expert-Driven, Strategic Approach to Global Cybersecurity Challenges

**Contains Material for Attorneys' Eyes Only Pursuant to the Protective Order**



**Table of Contents**

Introduction ............................................................................................................4

   Personal Background and Qualifications.......................................................... 4

   Materials Considered ...................................................................................... 4

Details of Analysis ..................................................................................................5

   Summary:......................................................................................................... 5

   Opinions:......................................................................................................... 6

   1. Opinion 1: The Ryanair website is publicly available, to which there is no barrier to access. Anyone with an Internet connection can access the website. ............................... 6

      1.1 Purpose ................................................................................................ 7

      1.2 Web Servers: Public vs. Private ............................................................. 7

      1.3 Authorization and Authentication Principles............................................. 9

      1.4 Ryanair has a public website—Ryanair.com—as to which no authorization is required.  Ryanair also has private websites to which authorized access is controlled. 10

      1.5 myRyanair's Email and Password Requirement Is Neither Authorization nor Authentication ............................................................................................. 12

      1.6 No Sensitive Information for Protection.................................................. 18

      1.7 Defendants are a Travel Agent, Not a Hacker, Evidenced by a Common Interest in the Functioning of Ryanair's Site, and Traffic Volume that Mirrors Real Traveler Interest in Ryanair ..................................................................................................... 19

   2. Opinion 2: Ryanair necessarily granted access to its website in order for any flight purchases to have been made. ........................................................................... 21

      2.1 "Good" Bots vs. "Bad" Bots ................................................................. 22

      2.2 Defendants Do Not Deploy "Bad Bots".................................................. 24

      2.3 Ryanair Welcomes Good Bots through its use of industry standard API ................ 24

      2.4 Ryanair's Bot-banning strategy, including SHIELD, necessarily must allow any traffic from Defendants that lead to purchasing a flight........................................................ 28

   3. Opinion 3: There is no documentation or evidence that any of the Defendants caused harm to the Ryanair website. ........................................................................... 32

      3.1 Lack of Address Attribution and Data..................................................... 33

      3.2 Numerous Alternative Causes of Public Website Surge Volume ............................ 35

      3.3  Available Data Undermines Ryanair's Hypothesized Harm from Defendants........ 38

Conclusion.............................................................................................................41

| ATTORNEYS' EYES ONLY

Appendix A: Curriculum Vitae ................................................................................................. 43

Appendix B: Materials Considered ......................................................................................... 47

| ATTORNEYS' EYES ONLY

## Introduction

I, Jordan Rae Kelly, am a Senior Managing Director and Head of Cybersecurity for the Americas at FTI Consulting, Inc. ("FTI"). I have been retained by Defendants Booking Holdings, Inc., in connection with Ryanair DAC v. Booking Holdings Inc., C. A. 20-1191-WCB (D. Del.).

Except as otherwise noted, I have personal knowledge as to all the information set forth in this report. All facts and opinions included in this report are based upon my personal experiences and knowledge, information supplied to me by Counsel, my review of other relevant information related to each of Ryanair's claims, my extensive knowledge of criminal and national security threats, and top-level cybersecurity experience.

## Personal Background and Qualifications

I am a Senior Managing Director and the Head of FTI's Cybersecurity for the Americas practice. I have more than 15 years of experience coordinating incident response and managing cyber policy planning. Prior to joining FTI Consulting, I served as the Director for Cyber Incident Response on the National Security Council at the White House. During my tenure there, I was responsible for both national incident response coordination, as well as management of the U.S. Government's process for managing zero-day exploits. I was also a chief author of the National Cyber Strategy, the first of its kind in the United States in 15 years.

Before joining the National Security Council in 2017, I served as Chief of Staff and Chief of Strategic Initiatives in the Federal Bureau of Investigation's ("FBI") Cyber Division, where I managed daily operations and strategic and policy planning for the FBI's national cyber program. I hold a bachelor's degree from Wake Forest University and a Juris Doctorate from the University of Tennessee College of Law. A complete copy of my Curriculum Vitae, which further describes my background, is attached as Appendix A.

I have been assisted by professionals from FTI, who worked under my direction on this engagement. The fees paid to FTI are not contingent on the outcome of this matter or the opinions expressed herein. My billing rate for this matter is $1,140 per hour. I reserve the right to supplement, update, or otherwise modify my opinions and my report. The opinions offered in this report should not be construed as legal opinions.

## Materials Considered

The documents on which I[1] relied in forming my opinions are cited in my report. A full list of the documents I considered is attached as Appendix B. Should I learn of additional

---

[1] Some of the work described in this report was performed by members of my team at my direction. I have used the pronoun "I" throughout this report to describe both the work that I did myself and the work that my colleagues performed at my direction.

| ATTORNEYS' EYES ONLY

information relevant to my opinions set forth below, I reserve the right to supplement or revise this report and/or the list of materials considered in Appendix B.

## Details of Analysis

### Summary:

On or about July 22, 2022, Ryanair DAC ("Ryanair" or "Plaintiff") filed a complaint against Defendants[2] alleging violation of various aspects of 18 USC § 1030, the Computer Fraud and Abuse Act ("CFAA").[3] Plaintiffs claim that Defendants' efforts to purchase Ryanair flights on behalf of their customers is both a violation of Plaintiffs' Terms of Use (TOU)[4] and a violation of numerous counts of the CFAA.[5] Defendants argue that Ryanair operates a public website, freely and openly available to anyone with an Internet connection, and that Defendants' efforts are neither malicious nor a violation of the CFAA. Defendants engaged FTI to review Ryanair's allegations and to conduct an analysis of any technological implementations present on Ryanair's website[6] as it pertains to the CFAA.

The findings below reflect a technical, non-legal analysis in response to Ryanair's allegations of Defendants' violation of various aspects of the CFAA. The U.S. Supreme Court uses a "gates-up-or-down inquiry"[7] to analyze whether a computer system was accessed in violation of the CFAA, and as such this report follows a similar path. I conducted a review of the information available to me at the time of this report to opine on the technical and technological allegations underpinning Ryanair's CFAA theory. I considered the purpose and availability of the Ryanair website, technological documentation provided by Ryanair on deployed technical solutions, such as "SHIELD," and supporting technical evidence (i.e. logs), or lack thereof, provided by Ryanair to support Ryanair's alleged attribution of harm to Defendants.

As a result of my analysis and examination of the materials provided, I have reached the following opinions:

1. **Opinion 1:** The Ryanair website is publicly available, to which there is no barrier to access. Anyone with an Internet connection can access the website.
2. **Opinion 2:** Ryanair necessarily granted access to its website in order for any flight purchases to have been made.

---

[2] For the purpose of this report, Defendants includes Booking Holdings, Inc., Booking.com B.V., Kayak Software Corporation, Priceline.com, LLC, and Agoda Company PTE. LTD, as outlined in 2022-07-22 D076 First Amended Complaint.pdf

[3] 2022-07-22 D076 First Amended Complaint.pdf

[4] https://www.ryanair.com/us/en/corporate/terms-of-use

[5] 2022-07-22 D076 First Amended Complaint.pdf

[6] Unless specified otherwise, "Ryanair website" includes "myRyanair."

[7] *Van Buren v. United States*, 141 S. Ct. 1648, 1659-60 (2021).

| ATTORNEYS' EYES ONLY

3. **Opinion 3:** There is no documentation or evidence that any of the Defendants caused harm to the Ryanair website.

The following report provides my opinions based up on my review of the facts and materials of this case to date, along with my education, training, experience, and credentials. I reserve the right to enhance, expand, or limit these opinions based upon yet unseen materials and information and any other documents produced in this matter.  In particular, I reserve the right to enhance, expand, or limit these opinions based on additional depositions and document discovery, and the anticipated report of Plaintiff's expert witness, which I have not reviewed.  All opinions expressed in this report are expressed to a reasonable degree of professional certainty and are based on my more than 15 years of experience in the cybersecurity industry coordinating incident response and providing cybersecurity counsel and expertise.

## Opinions:

It is my professional opinion, based on the information available to me as of the date of this report, that Ryanair operated a public website, freely open to anyone with an Internet connection, and therefore presented no "gates" to access. The implementation of a technical solution such as SHIELD is backwards-looking, and therefore cannot be considered a barrier to access within the cybersecurity context—a user has already accessed the website before the user is identified by SHIELD, and no "authorization" is required to access the website. These two key points aside, Ryanair provided insufficient technical documentation to substantiate its attribution of harm to Defendants. Consequently, I find that from a technical perspective, Defendants did not bypass any technological barrier, and Plaintiffs could not technically attribute the alleged Ryanair website harm to Defendants.

## 1. Opinion 1: The Ryanair website is publicly available, to which there is no barrier to access. Anyone with an Internet connection can access the website.

Depending on a website's purpose and resulting configuration, it can be categorized as either "public" or "private," meaning, respectively, open to all visitors or restricted to a select pool of visitors. Categorization as the latter requires technical configurations designed to limit or otherwise prevent public access, and a natural corollary inquiry is what, if anything, is actually being protected by the technical configurations in place on the website. As such, "Opinion 1" reviews and analyzes the Ryanair website against the concepts of a public and private web server, the implementation of access limitation through industry standard principles of Authorization, Authentication, and Accounting (AAA), the purpose of the website in relation to Defendants' activities, and the type of information protected within "myRyanair." Each of these factors influenced my opinion that Ryanair.com is a publicly available website, and the myRyanair login, which requires only a working email and a user-created password, does not constitute a "private" website.

| ATTORNEYS' EYES ONLY

**1.1 Purpose**

At its most basic description, the Ryanair website was created so that public users could purchase Ryanair flights. The purpose of the Ryanair website is best explained by David O'Callaghan, Head of Software Development for Ryanair, during his August 15, 2023 deposition ("O'Callaghan Deposition"). According to Mr. O' Callaghan, "the purpose of Ryanair's website [is]…to interact with our customers. So, to allow us to sell our fares, to allow users to check in, for us to be able to sell various products to our end users."[8] According to the Cambridge Dictionary, "public" is defined as "relating to or involving people in general, rather than being limited to a particular group of people."[9] The very definition of "public," coupled with Mr. O'Callaghan's explicit description of the purpose of the Ryanair website, indicates that the Ryanair website is a publicly available resource and therefore not designed to inhibit who is viewing the website and purchasing flights.

In preparing this report, my colleagues and I have spent considerable time reviewing and interacting with the Ryanair website.  Consistent with Mr. O'Callaghan's description, interacting with the Ryanair website likewise demonstrates that it is a public resource and there is no barrier to access, despite claims by Ryanair to the contrary, as detailed in the remainder of this opinion.

**1.2 Web Servers: Public vs. Private**

SANS[10] defines a web server as "[a] software process that runs on a host computer connected to the Internet to respond to HTTP requests for documents from client web browsers."[11]  Said another way, HTTP, or *Hypertext Transfer Protocol*, is the mutual understanding for web browsers to ask for, and web servers to deliver on, requests for content over a network.

Users of the Internet visit web servers nearly every day in widely varying capacities from, for example, reading news highlights on the AP News website to accessing judiciary resources on the US Courts' intranet. While in both scenarios a web server delivers content over the network, the former is public and the latter is not.

Public web servers offer their content to the Internet at large. Anyone or anything with a web browser can access the content, to include the now-omnipresent non-human AI assistant bots—Alexa, Siri, and Google Assistant—that make requests on humans' behalf. Private servers, however, do not give approval, permission, or empowerment for anyone or

---

[8] DAY 01 081523 (Deposition of David O'Callaghan) – MASON HAYES & CURRAN DEPOSITION, Page 99, Lines 1-5.

[9] https://dictionary.cambridge.org/dictionary/english/public

[10] The SANS Institute has built a strong reputation for decades as providing cutting edge cybersecurity research, education, and certifications.  Their faculty is composed of renowned experts in the field.

[11] https://www.sans.org/security-resources/glossary-of-terms/

| ATTORNEYS' EYES ONLY

anything to access the content. Private servers implement authorization limitations (in other words, limit authorized access) through explicit access control.

For example, consider the web page for California's Office of Emergency Services ("Cal OES"), "http://www.caloes.ca.gov." The web page offers the public information on preparedness, including preparation advice for droughts, earthquakes, fires, and floods. In addition, however, clicking "employee login" at the bottom leads to links to other servers[12] where only employees can access manuals, use webmail, and file service reports. These areas of the site, requiring a username issued by Cal OES and a password assigned to that login to proceed, are not intended for broader public access. Access to this site is controlled by a network administrator, and user credentials are only issued to legitimate employees in line with AAA principles, described below. In the case of Cal OES, an unauthorized person is not able to access the restricted portion of Cal OES' website by simply creating an account with any email and password. Instead, the user must be explicitly identified and then granted access and login credentials, issued by Cal OES' IT personnel.

Ryanair.com, and by extension myRyanair, is available for viewing and accessing by any user seeking, directly or indirectly, to fly Ryanair,[13] and it is a publicly available website as discussed above. As stated in the August 16, 2023 Deposition of Ryanair Chief Technology Officer John Hurley ("Hurley Deposition"), "Everybody who's got access to a computer can browse our website and get the fares."[14]

The site www.ryanair.com is available to the public via any web browser such as "Chrome" or "Firefox", or via non-browser based HTTP request methods, to include, for example, Amazon Alexa's "My Ryanair skill."[15] It is also publicly accessible through the use of a computer's text based command line functionality, as demonstrated below:

---

[12] https://www.caloes.ca.gov/cal-oes/employee-login/;
https://w3.calema.ca.gov/CTD/Secure/oesintranet.nsf/index.

[13] DAY 01 081523 (Deposition of David O'Callaghan) – MASON HAYES & CURRAN DEPOSITION, Page 99, Lines 1-5.

[14] DAY 02 081623 (Deposition of John Hurley) – MASON HAYES & CURRAN DEPOSITION, Page 12, Lines 23-24.

[15] https://www.amazon.co.uk/Cation-Dynamics-Ltd-My-Ryanair/dp/B074CQT8PX

| ATTORNEYS' EYES ONLY

*Figure 1: Command Line Interface output from executing the command:  curl -L https://www.ryanair.com*

A third ▮▮▮▮▮▮▮▮▮▮ access method, ▮▮▮ are discussed in greater detail in this report's second finding.

## 1.3 Authorization and Authentication Principles

Authorization is one of the core tenants of the Authentication, Authorization, and Accounting ("AAA") cyber security framework (CSF). The AAA framework is a fundamental building block of the cybersecurity discipline that helps practitioners frame the connected concepts of controlling access to computer resources, enforcing policies, and auditing usage. As such, the AAA framework "plays a major role in network management and cybersecurity by screening users and keeping track of their activity while they are connected" to the Internet.[16] The SANS Institute, a leading, trusted cybersecurity knowledge base, defines authorization in particular as "the approval, permission, or empowerment for someone or something to do something."[17]  At its most basic level, Authorization dictates what a user is affirmatively allowed (or "authorized") to do with a given resource, implemented through technical permissions established by a network administrator. Authentication is the "process of confirming the correctness of the claimed identity."[18] Authentication is an ongoing process, wherein a user's identity is validated through a variety of technical mechanisms to ensure the correct entity is accessing the resource. So, in short: *while authorization* governs permission, *authentication* validates the identity of the entity claiming permission.

---

[16] Fortinet, Inc., What is Authentication, Authorization, and Accounting (AAA)?, 2023, https://www.fortinet.com/resources/cyberglossary/aaa-security

[17] https://www.sans.org/security-resources/glossary-of-terms/

[18] https://www.sans.org/security-resources/glossary-of-terms/

| ATTORNEYS' EYES ONLY

**1.4 Ryanair has a public website—Ryanair.com—as to which no authorization is required. Ryanair also has private websites to which authorized access is controlled.**

Similar to the above example of the Cal OES employee-only portion of the website, Ryanair offers an employee-only training portal located at https://training.ryanair.com/topclass/login.do. ███████████████████████ ███████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████ .[19] As evidenced by the following screenshots, there is no mechanism by which a member of the public can simply "create an account" or request access. Additionally, in order to reset a password, an individual must input their Crew Code, otherwise the system will reject the request as unauthorized.



*Figure 2: Ryanair Training Portal, located at https://training.ryanair.com/topclass/login.do*

---

[19] DAY 01 081523 (Deposition of David O'Callaghan) – MASON HAYES & CURRAN DEPOSITION, Page 167, Line 29 through Page 168, Line 5 and Page 169, Lines 5-10.

| ATTORNEYS' EYES ONLY



*Figure 3: Screenshot of log-in portal and terms of use for Ryanair training portal, located at https://training.ryanair.com/topclass/login.do.*



*Figure 4: Screenshot of "reset password" functionality on Ryanair training portal, located at https://training.ryanair.com/topclass/resetPassword.do.*



*Figure 5: Example of random text entered into "Crew Code" field to reset password on Ryanair training portal, located at https://training.ryanair.com/topclass/resetPassword.do.*

| ATTORNEYS' EYES ONLY



*Figure 6: Error message - unrecognized user credentials. Password reset request unsuccessful, located at https://training.ryanair.com/topclass/resetPassword.do.*

In the above example, Ryanair imposes a barrier to access the training material and other protected Ryanair information. Authorization occurs in Ryanair affirmatively validating a particular individual's status as a Ryanair employee prior to issuing a crew code and creating an account for the individual. Furthermore, the web server validates and authenticates the particular user attempting to exercise their authorization and ensure the user attempting to log-in is a verified Ryanair employee with a legitimate need to access the information. To reiterate from above: Authorization is about permission, Authentication is about validating identity.  And both concepts—Authorization and Authentication—are in play when browsing to the Ryanair online training portal.

The Authorization and Authentication principles in play for the Ryanair training portal, an area Ryanair seeks to shield from public access, is in stark contrast to the openly accessible nature of the Ryanair website and the purchase page which nominally requires a user to create a myRyanair account, as discussed in the next section.

### 1.5 myRyanair's Email and Password Requirement Is Neither Authorization nor Authentication

During the booking process—either after selecting a fare or immediately before securing the reservation—Ryanair requires the use of an email address and password to create an account to proceed and finalize the booking. This "myRyanair" account "gives you access to your Ryanair Wallet" and allows website visitors to save information for "faster" future bookings.[20]   At what point during a visit to Ryanair.com this account creation occurs depends entirely on the visitor's preference, as account creation can be done optionally at various times. ██████████████████████████████████████████████████████ ████████████████████████████████████████████.[21] The only requirement is that eventually a user have (or create) a myRyanair account in order to purchase the flight, as shown in the below examples. In fact, according to Mr. O'Callaghan, the use of myRyanair is not required for browsing flights, managing bookings, or checking in. Mr. O'Callaghan

---

[20] https://help.ryanair.com/hc/en-us/articles/12893759512337-Why-do-I-need-a-myRyanair-account-

[21] DAY 01 081523 (Deposition of David O'Callaghan) – MASON HAYES & CURRAN DEPOSITION, Page 120, Lines 2-20.

| ATTORNEYS' EYES ONLY

further notes that Ryanair has a mechanism where a customer can retrieve their booking through email and Passenger Name Record (PNR).[22]



*Figure 7: Ryanair Flight Selection - Option to "log in later" per customer preference. www.ryanair.com/us/en*



*Figure 8: Ryanair Flight Purchase Screen - The customer is required to create a myRyanair prior to purchasing a flight. www.ryanair.com/us/en*

Unlike the Ryanair training portal example described above, where only an employee with an assigned Crew Code/user account can access the portal, Ryanair allows the use of any email address capable of even temporarily receiving email, so that it may receive a verification code to complete the account creation process. All users of the web have the ability to create email addresses thorough freely available email providers, such as "Gmail," "Mail.com," "AOL," "Outlook," "Yahoo" and more. In the Hurley deposition, Mr. Hurley describes the generally permissive nature of all emails because "we're a commercial business, we need to sell fares, and we want the shop window to be open to as many people as possible."[23] In fact, customers or entities can even use a temporary email—one that is available for use for only a brief period before becoming entirely unusable or unrecoverable again—to create an account and receive a verification code, in order to

---

[22] DAY 01 081523 (Deposition of David O'Callaghan) – MASON HAYES & CURRAN DEPOSITION, Page 228, Lines 10-26.

[23] DAY 02 081623 (Deposition of John Hurley) – MASON HAYES & CURRAN DEPOSITION, Page 30, Lines 12-14.

| ATTORNEYS' EYES ONLY

complete the booking process. One such example is provided below, using a temporary email generated by TempMail[24] and not tied to a particular person.

While Ryanair complains that Defendants use "fake" or "fictitious" emails and virtual payment methods for travelers on Ryanair, this report's replicated testing shows that Ryanair takes no measures to stop an individual flyer directly visiting the Ryanair site from doing the same and yielding a successful booking regardless of their intention (personal or commercial). The emails used to book tickets are valid email addresses, they simply may not be email addresses belonging to the specific traveler. There is no technical device or system on the Ryanair website to determine whether the email address used to book a flight "belongs" to the specific traveler—or travelers in the case of multiple bookings. In other words, because a traveler can select and use any email address to book his or her ticket, the email address does not act as any form of technical check or identity verification, but is merely one additional step for the public to book a flight on the Ryanair website.

Testing by FTI revealed that a Ryanair flight can be booked on myRyanair utilizing a disposable temporary email address and an unattributed payment method through a gift card.[25] This same testing utilized a Virtual Private Network (VPN)[26] to mask the IP address making the booking, ensuring Internet identity and location was suitably masked. Further, the virtual Ryanair gift card used for payment was delivered to the temporary email address under a fictitious name, different from the name used for booking, and included a different phone number and billing address. Payment was successful and the flight was booked. A visual flow of this process is included below:

---

[24] TempMail (www.temp-mail.org/en/) is an online service that allows a user to create a temporary, throw-away email address. TempMail markets itself as a service to combat spam, advertising mailings, and other undesired emails. TempMail provides temporary, secure, anonymous, free, disposable email addresses.

[25] Of course, if the passenger name entered is inaccurate, this would pose other issues at the airport upon checking in, but is also not at issue by Ryanair, as Defendants pass through correct customer names.

[26] According to Cisco, a leader in Internet connected devices, a virtual private network, or VPN, "is an encrypted connection over the Internet from a device to a network. The encrypted connection helps ensure that sensitive data is safely transmitted. It prevents unauthorized people from eavesdropping on the traffic and allows the user to conduct work remotely." https://www.cisco.com/c/en/us/products/security/vpn-endpoint-security-clients/what-is-vpn.html

| ATTORNEYS' EYES ONLY



Figure 9: Creation of a Temporary Disposable Email Address. www.temp-mail.org/en/



Figure 10: Creation of myRyanair Account Using Disposable Email Address. www.ryanair.com/us/en



Figure 11: One-time-Code generated by Ryanair when creating or logging into myRyanair account from an unknown device. This code is sent to the customer's inputted email address. The customer, in turn, enter's this one-time-code into the "verify your account" prompt on Ryanair's website.

| ATTORNEYS' EYES ONLY



*Figure 12: MyRyanair Account Personal Information Page. https://www.ryanair.com/us/en/myryanair/personal-info*



*Figure 13: Ryanair e-Gift Card with Fictitious Customer Information.*



*Figure14: Ryanair Flight Successfully Booked with Fictitious Name and Unattributed Payment Method.*

| ATTORNEYS' EYES ONLY



*Figure 15: Flight Booking Details. https://www.ryanair.com/us/en/trip/manage*

The replicated testing did not encounter any obstacles or technical limitations despite attempting to flag many hallmark signs of suspicious behavior, to include a temporary email, VPN, rotating IP, and virtual payment. Each leg of this process demonstrated lack of authentication of identity or account credentials, further validating the mechanisms in place at Ryanair are not designed to block or prevent anyone from booking a flight in this manner, and consequently, not a gate.

By analogy, imagine the person entering a public storefront, browsing the shop freely as expected, and when arriving at the counter to pay, instead of just exchanging a twenty-dollar bill for payment, the clerk first asks, "What is your telephone number?"  The clerk does not care about the answer. The purchaser can make up any number desired, and no answer is wrong so long as a number is uttered, at which time the transaction completes with a receipt. Though the number was "necessary" to complete the purchase, it was devoid of authorization or authentication. The telephone number given had no bearing on what could or could not be viewed or purchased in the store nor by whom. This account creation step, while presented by Ryanair as a convenience measure to the customer, could be perceived by the rushed customer as a more irritating, unnecessary step and serves no legitimate purpose from a cybersecurity perspective.

Alternatively, if a client is so inclined, they can choose to create a myRyanair account utilizing their existing Google, Paypal, or Facebook credentials.  In this scenario, myRyanair automatically creates a myRyanair account for the customer based on data sourced from the user's Google, Paypal or Facebook account, to include name, contact information, and email address. Ryanair relies on Google, Paypal, and/or Facebook to authenticate and validate the user. However, [27]

---

[27] DAY 01 081523 (Deposition of David O'Callaghan) – MASON HAYES & CURRAN DEPOSITION, Page 132, Lines 24-28.

| ATTORNEYS' EYES ONLY

*Figure 16: Screenshots of options to create or log-in to a myRyanair account utilizing Google, Facebook, or Paypal credentials. https://www.ryanair.com/us/en*

In summation, despite Ryanair's claims to the contrary, the myRyanair account requirement is merely an added step in the booking process, but in no way serves to block, ban, or deter "who" or "what" is establishing an account. The fact that anyone with an email address or a Google, Paypal, or Facebook account can create a myRyanair account with no effort by Ryanair to authenticate or validate the identity of the user serves no legitimate purpose from a cybersecurity, network defense, data protection, or access control perspective.

**1.6 No Sensitive Information for Protection**

One important distinction between Ryanair's public website, including the myRyanair account offering, and a private web server is that Ryanair's public website is not in any way designed to protect sensitive information from public consumption. According to Mr. O'Callaghan, there is no confidential information on myRyanair that isn't explicitly entered by the user/account owner, which is then stored separately in a segregated database, described in more detail below. There is no sensitive information belonging to Ryanair.[28] The only information being protected by the myRyanair username/password is information entered into the system by the customer, such as name, email address, address, passport information, etc.

The account creation process described above does not affect authorization to Ryanair information, provide access to a sensitive segment of Ryanair's internal network, or otherwise segregate information as "off limits" to the public. To the contrary: all public visitors, even those entirely fabricated and ephemeral, may pursue this area of the website. When information is entered as a part of the myRyanair account creation, that entered information gets stored in a database, on a server not connected to the website, and has no bearing on the public's access to the myRyanair account creation page. One can think of this as a car proceeding down the highway, throwing a locked suitcase out the window while it is in motion and then continuing on. No one in the car is prevented or restricted in any way. Indeed, the information before and after the account creation process is equally intended for viewing and access by any and all public entities. In this way, the myRyanair account offering is no different than a bookmark between chapters: its usefulness comes from allowing any public user to return to a particular chapter of the same story more quickly. In

---

[28] DAY 01 081523 (Deposition of David O'Callaghan) – MASON HAYES & CURRAN DEPOSITION.pdf, Page 139, Lines 21-26.

| ATTORNEYS' EYES ONLY

Ryanair's own words in its FAQs, the purpose of the account is to "enable you to make bookings faster":



*Figure 17: Ryanair FAQs. https://help.ryanair.com/hc/en-us/articles/12893759512337-Why-do-I-need-a-myRyanair-account*

As a further example of the limited utility of the myRyanair account, once a flight is booked and the traveler takes note of the confirmation number and other pertinent details, the email itself is no longer necessary. A user need never return to the email if the traveler does not wish to utilize a "faster" booking process in the future. Of note, the customer's ability to conduct additional or related transactions online is meaningfully limited without accessing myRyanair, though the customer can still obtain pertinent flight details by contacting Ryanair and providing the confirmation number or checking in to the flight in person at the airport (for an extra fee of 55 euro imposed on the traveler by Ryanair).[29] In essence, access to the email address and myRyanair account is no longer a necessity once the flight is booked, so long as the customer maintains a copy of the original flight itinerary received upon booking and pays the additional fees at the airport.

### 1.7 Defendants are a Travel Agent, Not a Hacker, Evidenced by a Common Interest in the Functioning of Ryanair's Site, and Traffic Volume that Mirrors Real Traveler Interest in Ryanair

The CFAA was enacted to prevent intentional intrusion onto someone else's computer—specifically, computer hacking.[30] According to the Florida Bar Journal, "The House report on the CFAA analogized the conduct prohibited by the law to breaking and entering into a dwelling, and the legislative history makes clear that the CFAA was 'designed to prevent unlawful intrusion into otherwise inaccessible computers.'"[31]

In the cybersecurity industry, the term "hacker" is typically used to connote disruptive or malicious behavior, often conducted by a criminal or nation state. According to the leading

---

[29] RYANAIR-BOOKING_0026740

[30] *See United States v. Nosal* (*Nosal I*), 676 F.3d 854, 858 (9th Cir. 2012) (citing S. Rep. No. 99-432, at 9 (1986) (Conf. Rep.)).

[31] Emily Chase-Sosnoff & Shane T. Muñoz, Understanding the Bounds of the Computer Fraud and Abuse Act in the Wake of Van Buren, Florida Bar Journal, Vol. 96, Issue No. 2., Page 22 (citing *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 1000 (9th Cir. 2019) (extensively citing the legislative record); *U.S. v. Valle*, 807 F.3d 508, 525 (2d Cir. 2015) (citing the legislative record and noting that "Congress enacted the CFAA in 1984 to address 'computer crime,' which was then principally understood as 'hacking' or trespassing into computer systems or data.")).

| ATTORNEYS' EYES ONLY

provider of Network equipment, Cisco, "a hacker is a person who breaks into a computer system."[32] Likewise, per global cybersecurity company Kaspersky, "Hacking is the act of identifying and then exploiting weaknesses in a computer system or network, usually to gain unauthorized access to personal or organizational data."[33] This intent to cause harm is fundamentally at odds with Defendants' relationship to Ryanair: Defendants' interest is in Ryanair's site functioning properly to best serve its potential travelers.

In their capacities as online travel agents offering Ryanair flights to customers, Defendants have an interest in the success and functioning of the Ryanair website. Further, as a travel agency simply facilitating the traffic of real potential travelers, Defendants' ultimate site traffic volume to Ryanair reflects actual customer demand. Defendants are not malicious cyber actors attempting to hack into Ryanair's computer networks to steal proprietary or non-public information.  Rather the Defendants act as the public's intermediary, offering travelers a service designed to take the burden of booking a flight off their shoulders. Where and how a passenger chooses to book their travel is their own choice, and in no circumstance can Defendants' travel service be considered hacking, illicit, or malicious. ███

████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████ ████████████
██████████████████████████████████████████████████████████████████████
██████████████ [34] Furthermore, best cybersecurity practices dictate that sites that do wish to prohibit agency action, even if not malicious agents, put in place meaningfully tailored authorization and authentication measures.

There is no circumvention of legitimate technical protections, no exploitation of weak or outdated security measures, and no malicious codes, "worms" or the like behind Defendants' actions that would align it with anything that the cyber industry recognizes as "computer hacking."

In my opinion and experience in the cyber security industry, and in government regulation and enforcement of cyber security laws, online travel agencies purchasing tickets on Ryanair's website is not computer hacking.  The conduct of Defendants targeted by Ryanair in this case is common—near ubiquitous—commercial conduct on the Internet.

---

[32] Cisco Systems, Inc., What is a Hacker? 2023, https://www.cisco.com/c/en/us/products/security/what-is-a-hacker.html

[33] AO Kaspersky Lab, What is hacking? And how to prevent it? 2023, https://usa.kaspersky.com/resource-center/definitions/what-is-hacking

[34] DAY 02 081623 (Deposition of John Hurley) – MASON HAYES & CURRAN DEPOSITION, Page 99, Line 27 through Page 100, Line 28.

| ATTORNEYS' EYES ONLY

## 2. Opinion 2: Ryanair necessarily granted access to its website in order for any flight purchases to have been made.

As a general preface to this finding, Ryanair produced almost no technical documentation on the configuration of its webserver environment and access of its resources. Notwithstanding this limitation, there are fundamental concepts underpinning configuration and access of public webservers that apply in this scenario, which are discussed in detail below. These concepts illustrate that online travel agency access of Ryanair is routine and consistent with public use, and to the extent Ryanair's defensive measures were intended to create a gate or barrier of some sort, such gate or barrier was necessarily lifted for all traffic, to include traffic related to online travel agencies.

Throughout Ryanair's complaint and relevant Ryanair documents reviewed by FTI, Ryanair repeatedly and arbitrarily classifies Defendants' and similar companies' activity to be "malicious" "bot activity."[35]  Though bots will be defined and distinguished in the following subsection, it should be noted at the outset that ███████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████ [36]




*Figure 18: Acquisition of Ryanair Flight Information from Google Flights*

---

[35] 2023-02-13 Plaintiff's First Supplemental Response to Defendants' First Set of Interrogatories; RYANAIR-BOOKING-0016278, Page 1.

[36] RYANAIR-BOOKING-0016278, Pages 1-2.

| ATTORNEYS' EYES ONLY

This suggests both a misunderstanding and mischaracterization as to what, exactly, is considered "good" vs. "bad" bot activity, especially within the cybersecurity context. The mere fact that Ryanair does not agree with Defendants' utilization of automation to identify and book flights on Ryanair.com does not qualify the activity as malicious, "bad bot" activity, or hacking. Defendants' activities are no different than what Google does, in that both utilize automation to obtain information from Ryanair's website, but Ryanair's classification of Google as non-malicious further shows their classification of "good" vs. "bad" fails to have grounding within a cybersecurity context.

In that light, this finding begins with an explanation of the nature of bots and public web servers, and an examination of Ryanair's bot management strategy to the extent allowable with documentation provided.

### 2.1 "Good" Bots vs. "Bad" Bots

"Bot" traffic is ubiquitous in the cyber world and makes up almost half of Internet use. Cloudflare, a leading cybersecurity provider, estimates that over 40% of all Internet traffic is comprised of bot traffic.[37] As discussed earlier in this report, a web visitor need not be a human. Computers are just as capable of visiting a site automatically, and in many contexts, help ensure the smooth operation of the Internet. The software programs behind this type of computer automation are called "bots."  At its most basic description, a bot is simply a software program that performs specific tasks over the Internet.  A bot can handle a wide range of tasks, from simple, repetitive manual processes to more complex tasks, the functionality of which dates back more than half a century.[38]  In the cyber security industry, bots are frequently characterized as either "good" or "bad."

**Good Bots.**  So-called "good bots" are designed to perform legitimate activities. "Good bots" perform helpful and ethical activities, and they are designed to make life easier and more efficient for everyone. There are *search engine bots*, which are employed by popular search engines such as Google, Yahoo, and Bing. There are *backlink bots*, which are an integral part of search engine optimization. *Social media bots* are designed to automate tasks on social media platforms and can create social media posts and provide customer support. There are *chatbots*, which are most often used in a customer service setting and are often the first interaction a customer has with a company when seeking assistance. *Gaming bots* facilitate video game testing, and *e-commerce bots* are designed to help customers with product purchases, provide customer service, answer questions, recommend products, gather feedback, and track customer engagement with 24/7 availability. "Good bots" have many benefits, such as enhanced efficiency of repetitive

---

[37] Cloudflare, Inc., What is bot traffic? How to stop bot traffic, 2023, https://www.cloudflare.com/learning/bots/what-is-bot-traffic/#:~:text=It%20is%20believed%20that%20over,traffic%20coming%20to%20their%20sites.

[38] Shanika Wickramasinghe, Splunk, Bot Types 101: Bad Bots, Good Bots and Everything in Between, July 26, 2023, https://www.splunk.com/en_us/blog/learn/bots-types.html

| ATTORNEYS' EYES ONLY

tasks, improved user experience, "always-on availability," efficient handling of high transaction volumes, reduced costs, and customization.[39]

In fact, Ryanair itself utilizes bots as part of its normal day to day business. Ryanair offers a "Ryanair Live Chat" feature on its website. According to Ryanair, the "chatbot" is the quickest and easiest way to get help from Ryanair. Ryanair's "Chat Bot Molli" is available 24/7 to assist customers with whatever they need.[40]

**Bad Bots.**  Alternatively, so-called "bad bots" are those responsible for many of the malicious threats facing public websites, to include distributed-denial-of-service ("DDoS") attacks. "Bad bots" pose a serious threat, as they can act as malware, exploit vulnerabilities to gain unauthorized access to user accounts, target specific organizations to tarnish their image on social media, execute ransomware attacks, serve as trojan horses, steal sensitive data, encrypt user data for malicious purposes, post fake news or spread disinformation, execute a DDoS attack, and conduct credential-stuffing attacks to facilitate account take over (ATO).[41]

### 2.1.1 Bot Management Strategies

There are numerous techniques companies can affordably deploy to mitigate the threat from "bad bots." These techniques are relatively standard across the cybersecurity industry, as the threat from "bad bots" is rather widespread. Techniques include, but are not limited to the following[42]:

- Completely Automated Public Turing Test to Tell Computer and Humans Apart (CAPTCHA/reCAPTCHA)
- Fingerprinting
- Honeypots
- Web Application Firewalls
- Network and Access Log Analysis

It is especially important that search engines do not block "good bots," such as search engine web crawler bots, because without them, a website would not show up in search results. This would, in turn, harm a company's business, often rather significantly.

---

[39] Shanika Wickramasinghe, Splunk, Bot Types 101: Bad Bots, Good Bots and Everything in Between, July 26, 2023, https://www.splunk.com/en_us/blog/learn/bots-types.html

[40] https://help.ryanair.com/hc/en-us/articles/4420827829649-Contact-Customer-Service

[41] Shanika Wickramasinghe, Splunk, Bot Types 101: Bad Bots, Good Bots and Everything in Between, July 26, 2023, https://www.splunk.com/en_us/blog/learn/bots-types.html

[42] Shanika Wickramasinghe, Splunk, Bot Types 101: Bad Bots, Good Bots and Everything in Between, July 26, 2023, https://www.splunk.com/en_us/blog/learn/bots-types.html

| ATTORNEYS' EYES ONLY

**2.2 Defendants Do Not Deploy "Bad Bots"**

Any automation utilized by Defendants indirectly through partner companies is designed to facilitate specific flight booking/reservations on behalf of legitimate travel customers, and is neither malicious in either form or intent nor cyber-intrusion. That is, the traffic originating from Defendants is not designed to cause harm, steal sensitive data, spam, exploit vulnerabilities, deploy malware, or deface Ryanair's website, among other examples discussed above.

Whether Defendants' traffic is welcomed by Ryanair becomes irrelevant within the context of cybersecurity, as Defendants' traffic is not designed to cause such harm, and as the next section discusses, Ryanair has designed its environment to welcome the nature of bots similar in nature to Defendants, which it views as "good bots".

**2.3 Ryanair Welcomes Good Bots through its use of industry standard API**

**2.3.1 API Introduction**


.[43]

First, as a simple analogy, an API can be thought of as a wait server at a restaurant; API documentation equates to a menu of offerings by the kitchen. In a restaurant setting, the wait server takes your order and passes it to kitchen for cooking and return. Similarly, when interacting with an API, a request containing specific parameters (identified from API documentation) gets sent to the API, which in turn sends to the relative server(s) for processing and returns the response to the user. ███████████████████████ ████████████████████████████████████████████████████ If this sounds similar to visits to the Ryanair website, it is because a web service is merely an API wrapped in HTTP, which, as discussed above, is the request language to and from a web server. An API helps automates this exchange.

**2.3.2 Navitaire's New Skies**

To provide an accessible website, airlines utilize specific e-commerce tools to provide the most seamless experience for their customers, as well as create revenue through various price optimization tools tailored to the industry. Ryanair utilizes Navitaire, which is specifically designed to provide tools to low-cost airlines. Navitaire offers a product called "New Skies," a digital-first reservation, retailing, and e-commerce system.[44] According to "Plaintiff's Second Supplemental Responses to Defendants' First Set of Interrogatories

---

[43] 2023-07-14 Plaintiff's Second Supplemental Responses to Defendants' First Set of Interrogatories, Pages 105-07.

[44] "New Skies Reservation System" https://www.navitaire.com/new-skies-reservation-system

| ATTORNEYS' EYES ONLY

(7.14.2023)," "Navitaire is a software that manages the booking process including flight reservations" for Ryanair.[45]

To suit each airline's specific needs, Navitaire allows companies to develop their own APIs, which then allows for different website capabilities by using pre-built functionalities and libraries, so the companies' own developers do not have to build all common functionalities from scratch. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ [46] New Skies provides the resources for airlines to access the global distribution system (GDS) platform, which is a tool that can be used to facilitate reservations from service providers to travel agencies, as well as price optimization tools, payment processing, and work with "alternative distribution options" such as online travel agencies (OTAs).[47] A global distribution system facilitates transactions between service providers, such as Ryanair and travel agencies, by keeping an inventory of available flights that can be booked by the travel agent or agency.[48]

Outside of online sales through its website, Ryanair allows "offline" distribution channels (i.e., "brick and mortar" travel agents and closed non-public corporate travel agents) to access Ryanair fares and sell Ryanair flights through one of three GDS partners: Amadeus, Sabre and Travelport.[49]

Even more, the Navitaire software is a subsidiary of Amadeus, making this GDS a core piece of Ryanair's booking software.[50] The presence of Ryanair flights on several GDSs expands the scope of who can book Ryanair flights and is a voluntary partnership on behalf of Ryanair. This inherently opens Ryanair flights up to booking opportunities outside of a direct channel that is merely a customer and service provider interaction.

Ryanair's "open/public access model" and desire to market its services to the widest audience possible is best demonstrated in the following two press examples:

- According to a Ryanair press release on Aviation 24.be, As of November 2022, Ryanair and Amadeus resumed their GDS partnership. Accordingly, this "new distribution partnership" is designed to "further expand access to Ryanair's offering

---

[45] 2023-07-14 Plaintiff's Second Supplemental Responses to Defendants' First Set of Interrogatories, Page 21.

[46] 2023-07-14 Plaintiff's Second Supplemental Responses to Defendants' First Set of Interrogatories, Page 27.

[47] "New Skies Reservation Brochure"
https://www.navitaire.com/downloads/New%20Skies%20Reservations%20Brochure.pdf

[48] https://amadeus.com/en/topic/travel-platform/global-distribution-system-gds

[49] 2023-07-14 Plaintiff's Second Supplemental Responses to Defendants' First Set of Interrogatories, Pages 106-107.

[50]https://www.navitaire.com/amadeus#:~:text=Navitaire%2C%20a%20wholly%20owned%20subsidiary,and%20solve%20critical%20business%20challenges.

| ATTORNEYS' EYES ONLY

to Amadeus' industry-leading customer base." This "partnership supports Ryanair's vision to grow its visibility and reach to Amadeus customers, particularly for business travel. This seamless integration with Amadeus' booking flows and processes will grant customers high operational efficiency in searching, booking and servicing content from Ryanair, as well as being able to offer a broader choice of travel options to cost-conscious travellers."[51]

- o According to Dara Brady, Head of Digital Experience at Ryanair, "[w]e are pleased to announce this partnership with Amadeus, the world's leading travel technology company, further expanding Ryanair's offering and enabling corporate customers in particular greater access to our unrivalled network of connections, high frequencies, on-time performance, and unbeatable low fares as they return to collaborating with colleagues face-to-face. We look forward to working with Amadeus and its efficient distribution solution and industry-leading network over the coming years."[52]

- o According to Jose-Luis Aragon, Amadeus Regional VP for Air Distribution in Europe, "We are very happy that Ryanair has chosen to capitalise [sic] on Amadeus' technology to support its distribution strategy. This partnership illustrates the value of our platform for low-cost carriers, offering the airline access to the widest network of travel sellers worldwide and the technology to help them get the most out of the indirect channel. This partnership is another example of our commitment to delivering the broadest and most relevant travel content from any technology source to our travel sellers, with smooth and seamless integration into their everyday tools and processes."[53]

- An airport API is a web-based interface that allows you to access airline data on the fly. The API provides you with real-time flight information, including flight times, delays, and cancelations among much other valuable information. An airport API can also be utilized to search for flights and view seat maps. This type of service is extremely beneficial for a variety of reasons. Perhaps you are a travel agent looking to keep your customers updated on the status of their flights, or maybe you are an airline looking to offer your customers real-time flight information. Either way, an airport API can provide you with the data you need.[54]  To that end, a general

---

[51] André Orban, Aviation24.be, Ryanair and Amadeus partner again to enhance travel offering, November 11, 2022, https://www.aviation24.be/airlines/ryanair/ryanair-and-amadeus-partner-to-enhance-travel-offering/

[52] André Orban, Aviation24.be, Ryanair and Amadeus partner again to enhance travel offering, November 11, 2022, https://www.aviation24.be/airlines/ryanair/ryanair-and-amadeus-partner-to-enhance-travel-offering/

[53] André Orban, Aviation24.be, Ryanair and Amadeus partner again to enhance travel offering, November 11, 2022, https://www.aviation24.be/airlines/ryanair/ryanair-and-amadeus-partner-to-enhance-travel-offering/

[54] The Startup Founder, An Airport API Provides You With Ryanair Airline Data On The Fly, https://www.thestartupfounder.com/an-airport-api-provides-you-with-ryanair-airline-data-on-the-fly/

| ATTORNEYS' EYES ONLY

Internet search for "Ryanair API" yields a number of valuable results. For example, one can find and configure the following API endpoints for Ryanair[55]:

- API Domains
- Airports
- Closures
- Flight Information
- Schedules
- Availability and fares information
- Fair finder
- Currencies
- Discounts
- Markets

As indicated by the above two examples, in particular the renewed partnership with Amadeus, Ryanair seeks to benefit from the widened scope of buyers that placing flights on a GDS attracts, specifically business travelers. Ryanair is cited as engaging or re-engaging in each of their respective partnerships with Travelport in 2014,[56] Sabre in 2015,[57] and Amadeus in 2022,[58] to capitalize on the opportunity to engage with business travel and corporate customers.

Ryanair's efforts to selectively ban Defendants, which by cybersecurity definition employ "good bots," is ineffective. The technical challenges that ensue from the mere fact Ryanair wants good bots to access its site, with the exception of Defendants (due to name and not characteristic), is the focus of the next section of this report.



[55] https://gist.github.com/vool/bbd64eeee313d27a82ab

[56] Edward Robertson, We believe in the GDS: Ryanair signs travelport deal, March 11, 2014, https://www.ttgmedia.com/news/we-believe-in-the-gds-ryanair-signs-travelport-deal-86

[57] André Orban, Ryanair signs new agreement with Sabre GDS, May 6, 2015, https://www.aviation24.be/airlines/ryanair/ryanair-signs-new-agreement-with-sabre-gds/

[58] Monica Hansen, Amadeus Corporate Communications, Ryanair and Amadeus partner to enhance travel offering, November 11, 2022, https://amadeus.com/en/insights/press-release/ryanair-and-amadeus-partner-to-enhance-travel-offering

[59] RYANAIR-BOOKING_0026973.pdf

| ATTORNEYS' EYES ONLY

- ███████████████████████████████████████████
  █████████████████████████████████████
  ████████████████████████████ ”60

All said, Ryanair welcomes the very type of automated access business that Defendants are also doing, but Ryanair wants to selectively ban Defendants.

**2.4 Ryanair's Bot-banning strategy, including SHIELD, necessarily must allow any traffic from Defendants that lead to purchasing a flight**
Ryanair's SHIELD solution seeks to identify devices, users, and accounts a website/network can trust, and those that it cannot.

Though limited documentation has been produced detailing Ryanair's implementation of SHIELD, open source research, review of the August 2023 depositions cited elsewhere in this report, and a review of SHIELD's public website indicate ████████████████████



---

[60] RYANAIR-BOOKING-0016261, Pages 1-2.

[61] RYANAIR-BOOKING_0014245; RYANAIR-BOOKING_0026785; RYANAIR-BOOKING-0016378.

[62] RYANAIR-BOOKING_0026915

| ATTORNEYS' EYES ONLY



SHIELD provides Ryanair with information for decision making, not active prevention without routine user intervention and configuration. SHIELD collects and provides intelligence for its customer(s) so that they may make precise decisions about risk. Based on SHIELD's intelligence and analytics, a customer can configure traffic filtering and blocking, though this requires the customer's intervention to develop and deploy the rules.[65] Through SHIELD's network analytics, threat libraries, AI, and intelligence network, customers are able to monitor traffic in real time and customize network filters and block lists based on their own threat matrix and business needs.[66] SHIELD can be designed to automate network filtering; however, as noted above, it requires customer intervention and configuration based on network metrics, traffic, and business needs. SHIELD's Risk Policy Engine, for example, allows the customer to "set thresholds and take action themselves based on configurable risk policies. Customers can leverage SHIELD's intelligence to challenge, deny, or allow access to users in real time.[67]

---

[63] 2023-03-01 Plaintiff's Responses to Defendants' Second Set of Interrogatories (Nos. 15-29), Page 8.

[64] DAY 02 081623 (Deposition of John Hurley) – MASON HAYES & CURRAN DEPOSITION, Page 102, Lines 3-7.

[65] https://shield.com/use-cases/bot-attacks; https://shield.com/use-cases/account-takeovers

[66] https://shield.com/use-cases/account-takeovers

[67] https://shield.com/compliance-ai

| ATTORNEYS' EYES ONLY



---

68 RYANAIR-BOOKING_0026799, Page 6.

69 DAY 02 081623 (Deposition of John Hurley) – MASON HAYES & CURRAN DEPOSITION, Page 52, Lines 15-26.

70 RYANAIR-BOOKING-0016234, Page 1.

71 RYANAIR-BOOKING-0016234, Page 5 (emphasis omitted and added).

72 RYANAIR-BOOKING_0027623, Page 8.

73 RYANAIR-BOOKING-0016234, Page 5

74 RYANAIR-BOOKING_0026799, Page 3.

| ATTORNEYS' EYES ONLY



From a cybersecurity perspective, the problem with this approach remains that even if Ryanair seeks to label SHIELD as a "gate," it has, effectively, left the "gate" open and any person or entity can access Ryanair with ease.

---

[75] RYANAIR-BOOKING_0026799, Page 2.

[76] 2023-07-14 Plaintiff's Second Supplemental Responses to Defendants' First Set of Interrogatories, Pages 106-07.

[77] DAY 03 081723 (Deposition of Lukasz Stocki) – MASON HAYES & CURRAN DEPOSITION, Page 90, Lines 14-23; Page 115, Lines 21-24.

[78] DAY 03 081723 (Deposition of Lukasz Stocki) – MASON HAYES & CURRAN DEPOSITION, Page 115, Lines 21-24; Page 112, Lines 17-23.

[79] DAY 03 081723 (Deposition of Lukasz Stocki) – MASON HAYES & CURRAN DEPOSITION, Page 65, Lines 18 through Page 66, Line 1.

[80] DAY 03 081723 (Deposition of Lukasz Stocki) – MASON HAYES & CURRAN DEPOSITION, Page 62, Lines 10-12; Page 85, Lines 7-9 and 25-29.

| ATTORNEYS' EYES ONLY

███████████████████████████████████████████

███████████████████████████████████

### 3. Opinion 3: There is no documentation or evidence that any of the Defendants caused harm to the Ryanair website.

Ryanair contends that traffic on its website sometimes causes the website to slow down or stop, which interferes with customers who are attempting to use the website.  From the perspective of cybersecurity attribution, however, there is no evidence that web traffic or ticket bookings connected to Defendants have caused or contributed in any way to any impact on Ryanair's web server.

Learned from extensive experience in both cybersecurity consulting and law enforcement, one of the most difficult aspects of conducting a cyber investigation is the matter of attribution—specifically, can a given cyber action be tied to a specific individual or group with a high degree of accuracy and confidence? Here it cannot.

The logic syllogism that Ryanair posits is not supported by any computer-based or technical evidence, which Ryanair witnesses concede.  Ryanair proceeds with the syllogism that "unwanted activity was observed; Actor A is unwanted; therefore Actor A is responsible for the activity." This is the underpinning for its accusation of "harm" for which it alleges Defendants are responsible, as evidenced by the following statement:

> Because Defendants' direct and indirect access is masked by the use of dynamic IP addresses and other purposefully misidentifying information, making it difficult if not impossible for Ryanair to determine which of the unauthorized attacks originated with Defendants or those acting at the direction, encouragement, or inducement of Defendants, Ryanair attributes the entirety of the above-referenced damages and costs to Booking.com, Priceline.com, Kayak, and Agoda, jointly and severally.[81]



.[82]

---

[81] 2023-02-13 Plaintiff's First Supplemental Response to Defendants' First Set of Interrogatories, Page 7.

[82] DAY 02 081623 (Deposition of John Hurley) – MASON HAYES & CURRAN DEPOSITION, Page 41, Lines 10-18.

| ATTORNEYS' EYES ONLY

**Priceline**[117]



**Agoda**[118]

**All Defendants, Cumulatively**

Furthermore, any

---

[117] 2023-06-07 Priceline.com LLC's Responses and Objections to Plaintiff Ryanair DAC's Second Set of Interrogatories & Ex. A; RYANAIR-BOOKING_0022845.xlsx.  "Flights" is derived from the "Bookings" column in Ex. A.

[118] 2023-06-07 Agoda Company Pte. Ltd.'s Responses and Objections to Plaintiff Ryanair DAC's Second Set of Interrogatories & Ex. A; RYANAIR-BOOKING_0022845.xlsx.

| ATTORNEYS' EYES ONLY

allegation ███████████████████████████████████████
██████████████████████████████████████████
████████████████████████████.

**3.4 Overall Takeaways**

From a network efficiency and stability perspective, all of the above considerations play into volume arriving at a website. Ryanair has thus far provided no attribution to Defendants for significant and/or prolonged surges that would legitimately lead to a network slowdown or outright disruption, failing to demonstrate Defendants were in any way responsible for perceived or real network strain. Moreover, Ryanair intentionally invites surges of bot activity, which would certainly contribute to an increase in demand for network resources, as discussed in prior sections.  In addition, ██████████████████████



Above all, by operating a public website intended for public consumption, one is inevitably forced with its associated operating costs. As discussed earlier in this report, there are many different tools and capabilities a company can deploy to block "bad bot" activity and ensure only wanted/legitimate bot activity can access its website.  Ryanair chooses not to deploy these options because they would reduce the number of users on its website and cause "friction" amongst its customer base.

## Conclusion

As a result of my analysis and examination of the materials provided, it is undisputable that Ryanair presented a public website intended for access by as many patrons as possible, both through direct access and through the indirect use of both human and automated agents. The idea of "gates" on a public website is inherently contradictory from a technical standpoint. As an agent of the people seeking Ryanair flights, Defendants' traffic to Ryanair's site reflects traffic sought by Ryanair - traffic that is both benign in intent, to get a flight booked, and form, through automated use of the site that Ryanair otherwise invites.

It is evident from the use of the Ryanair site and the August 2023 depositions that the Ryanair site held no proprietary information meriting AAA access controls. Simply requiring an email address and password is not tantamount to AAA access control when there is no limit on access. Likewise, deploying a website tool, SHIELD, whose purpose is to identify unwanted behavior after that same behavior has been let in, is not a gate by any stretched

| ATTORNEYS' EYES ONLY

definition or connotation. This is particularly underscored by the fact that Ryanair intentionally seeks the very type of traffic that Defendants bring to Ryanair's site from other sources who aren't Defendants in particular.

Either for this reason, for other strategic motives, or for the likely reason that it doesn't exist, Ryanair has not provided any technical supporting documentation connecting Defendants to the harm alleged on its site. The "harm," which I believe is more accurately characterized as "frustrations" that Ryanair expresses, are commonplace and logical consequences of operating a public website.

Dated: August 31, 2023

_____

Jordan Rae Kelly

| ATTORNEYS' EYES ONLY

# EXHIBIT 36

**PUBLIC VERSION - CONFIDENTIAL MATERIAL OMITTED**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - x
                                 :
RYANAIR DAC,                     :
                                 :
        Plaintiff,               :
                                 :
vs.                              :   C.A. No.
                                 :   1:20-CV-01191-WCB
BOOKING HOLDINGS INC.,           :
BOOKING.COM B.V., KAYAK          :
SOFTWARE CORPORATION,            :
PRICELINE.COM LLC, and           :
AGODA COMPANY PTE, LTD.,         :
                                 :
        Defendants.              :
                                 :
- - - - - - - - - - - - - - - - x


CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEOTAPED DEPOSITION OF

JORDAN R. KELLY


Washington, D.C.

October 4, 2023


Reported by:
Misty Klapper, RMR, CRR, CSR
Job No.: 1034063



2

```
1
2
                     Wednesday, October 4, 2023
3                    9:38 a.m. EDT
4
5
6   Held at the offices of:
7       Holland & Knight
        800 17th Street, N.W., Suite 1100
8       Washington, D.C. 20006
        (202) 955-3000
9
10
11
12
13
14
15
16
17
18          Taken pursuant to notice, before Misty
19   Klapper, Registered Professional Reporter,
20   Certified Realtime Reporter, Certified Shorthand
21   Reporter and Notary Public in and for the
22   District of Columbia.
```

3

```
1   APPEARANCES:
2   ON BEHALF OF PLAINTIFF:
3       R. DAVID DONOGHUE, ESQUIRE
        HOLLAND & KNIGHT LLP
4       150 North Riverside Plaza, Suite 2700
        Chicago, Illinois 60606
5       (312) 263-3600
        E-mail: david.donoghue@hklaw.com
6
7   ON BEHALF OF DEFENDANTS:
8       ALEXANDER J. KASNER, ESQUIRE
        COOLEY LLP
9       1299 Pennsylvania Avenue, N.W., Suite 700
        Washington, D.C. 20004
10      (202) 842-7800
        E-mail: akasner@cooley.com
11
                    AND
12
        KATHLEEN HARTNETT, ESQUIRE
13      COOLEY LLP
        3 Embarcadero Center, 20th Floor
14      San Francisco, California 9411-4004
        (415) 693-2000
15      E-mail: khartnett@cooley.com
16
17  ALSO PRESENT:

18          ROBYN ELLIS, VIDEO OPERATOR
19
20
21
22
```

4

```
1            C O N T E N T S
2   WITNESS:        EXAMINATION BY:      PAGE:
3   Jordan R. Kelly    Mr. Donoghue        6
4
5
6
7            E X H I B I T S
8   NO.:      DESCRIPTION:          PAGE:
9   Exhibit 418   Expert report of Jordan Rae
10          Kelly, dated 8/31/23      28
11  Exhibit 419   Rebuttal report of Jordan
12          Rae Kelly, dated 9/29/23    368
13
14
15
16
17
18
19
20
21
22
```

5

```
1            P R O C E E D I N G S
2       VIDEO OPERATOR:  We are now on
3   the record.  This begins videotape
4   number 1 in the deposition of Jordan
5   Kelly in the matter of Ryanair DAC,
6   Plaintiff, versus Booking Holdings,
7   Inc., Booking.Com B.V., Kayak Software
8   Corporation, Priceline.com, LLC and
9   Agoda Company PTE, LTE -- LTD.,
10  Defendants, in the United States
11  District Court for the District of
12  Delaware, Case Number
13  1:20-CV-01191-WCB.
14      Today is October 4th 2023 and
15  the time on the monitor is 9:38 a.m.
16  This deposition is being taken at
17  Holland & Knight, 800 17th Street,
18  Northwest, Washington, D.C. 20006 at
19  the request of Holland & Knight.
20      The videographer is Robyn Ellis
21  of Magna Legal Services and the court
22  reporter is Misty Klapper of Magna
```



2 (Pages 2 to 5)

94

1    considerable time reviewing and interacting
2    with the Ryanair website, right?
3        A.   Yes.
4        Q.   How long?
5        A.   I don't know that that's an
6    estimate I could make offhand.  We have
7    certainly -- you can clearly see from both
8    reports the level of interaction we've had
9    with examining what we believe we can tell
10   about it from a technical perspective within
11   browser features.
12            And I'd be hesitant to put a
13   number when I certainly don't have our -- our
14   time entries or a real sense of the totality
15   of that number.
16       Q.   All right.  And then further down
17   in that paragraph you say that interacting
18   with the Ryanair website demonstrates that
19   it's public and there's no barrier to access,
20   correct?
21       A.   Yes.
22       Q.   But it does require an account

95

1    with a password to book a flight?
2        MR. KASNER:  Object to form.
3        THE WITNESS:  It's probably
4    worth the nuance here.  What you have
5    said is correct, to -- does it require
6    an account with a password to book a
7    flight, going to the general Ryanair
8    website does not require such an
9    action.
10       BY MR. DONOGHUE:
11       Q.   So logging on to www.ryanair.com
12   doesn't have any barrier to access?
13       A.   To my knowledge, correct.  We
14   could go there now with no password
15   combination needed.
16       Q.   But purchasing a flight on
17   ryanair.com does have a barrier in that you
18   have to have an account with a password?
19       MR. KASNER:  Object to form.
20       THE WITNESS:  I think it's
21   probably worth noting that the terms
22   gate and barrier are not inherently

96

1    cybersecurity terminology.  They are
2    certainly more lingo that we -- we
3    see.
4            So whether or not the creation
5    of an account poses a barrier, I'm not
6    sure that I can weigh in.  But I do
7    believe that -- that it -- it -- from
8    a technical perspective, just given
9    that it's not a technical measure that
10   is a common, known term, I believe
11   creation of the account, which is open
12   to all users, is not a barrier.
13       BY MR. DONOGHUE:
14       Q.   Why do you believe the creation
15   of account -- creation of an account is not a
16   barrier?
17       A.   Again, it's -- it's a little
18   imprecise because of the fact that these
19   aren't, you know, industry standard
20   technology terms, but the -- if -- we could
21   probably pull -- the definition of a barrier
22   implies -- it -- you know, it -- it creates

97

1    an impasse.
2            And I would suggest that it's not
3    an impasse, rather than the -- the creation
4    of the account and password is not an
5    impasse, rather than just a step in the
6    process.
7        Q.   So creation of an account is a
8    step, not a barrier?
9        MR. KASNER:  Object to form.
10       THE WITNESS:  I agree with
11   that, just as typing in the website
12   address into the browser is a step.
13   You have to know ryanair.com to do it.
14   But it is available for you to do it,
15   just as it is available for you to
16   type a -- create an account and move
17   forward in the process.
18       BY MR. DONOGHUE:
19       Q.   So a barrier has to be an
20   absolute stop to something?
21       MR. KASNER:  Object to form.
22       THE WITNESS:  I think -- again,



110

1    Q.    In terms of being a barrier.
2    A.    Well, I don't think either are
3  barriers.  But I view them as similar, you
4  know, similar actions that one must take to
5  move forward, yes.
6    Q.    But they are different in that
7  the myRyanair.com provides access to stored
8  personally identifiable information?
9        MR. KASNER:  Object to form.
10       THE WITNESS:  Oh.  They are
11  different, right?  I don't think that
12  they are the exact same thing.  I
13  think they are conceptually in the
14  process.
15       But to my earlier point,
16  myRyanair -- provision of your
17  credentials appears to provide one
18  access to one's own information that
19  they have chosen to provide to
20  myRyanair.  And I'm not sure,
21  because of, again, not having full --
22  knowledge of the network

111

1  architecture -- that that information
2  is being stored in the environment
3  that's deemed myRyanair.
5        So there are -- there's
6  obviously a protocol of a touchpoint
7  happening there.  And I'm able to
8  access that by being there, but I -- I
9  wouldn't agree that logging in means
10  I -- I'm getting access to some secret
11  spot on myRyanair where my things
12  are stored, because that's not been
13  made plain or evident to me.
14       BY MR. DONOGHUE:
15    Q.    So you say to a secret spot on
16  myRyanair.
17       Does myRyanair need to be
18  secret to be private?
19       MR. KASNER:  Object to form.
20       THE WITNESS:  This is on me
21  again, introducing imperfect
22  technology.  I did -- certainly meant

112

1  that sort of in a little bit of a -- a
2  whimsical sense.
3
                    Our further --
11      Too fast?
12       Our further examination
13  revealed technical indicators that
14  seemed to reflect the same.  And so
15  in -- forgive me for the secret spot
16  in myRyanair.
17

113

                    BY MR. DONOGHUE:
4    Q.    Okay.  And under your definition
5  of a barrier, creation of an account with a
6  password doesn't — doesn't count as a
7  barrier?
8    A.    In my view, that is not a
9  barrier.
10    Q.    And that view isn't based on some
11  particular cybersecurity standard?
12       MR. KASNER:  Object to form.
13       THE WITNESS:  Agreed.  As we
14  kind of initially embarked down this
15  piece, both gate, technological
16  barrier are terms that we certainly
17  see in the -- the legal piece here,
18  but not in the textbook definition
19  of -- we tend to in the cybersecurity
20  professionals community speak more
21  specifically about mechanisms and what
22  those mechanisms do and not -- there

```
1    is not one broad category that I'm
2    aware of where you go and you say what
3    are all the gates or what is a gate.
4         But the -- and I won't assent
5    that this is a barrier, but
6    particularly because the -- if there
7    is -- if it does place any limitation
8    on the user, it's only by the user
9    because they could, as you had said,
10   choose to not make an account at that
11   point.  But the concept of a barrier
12   is an -- a -- a stopping point that is
13   implemented by the network environment
14   owner and we do not have that here.
15        BY MR. DONOGHUE:
16   Q.    So the requirement for a barrier
17   is that it be controlled by the website
18   provider?
19        MR. KASNER:  Object to form.
20        THE WITNESS:  I would actually
21   say -- you know, I'm sort of -- at a
22   high level, yes.  An environment that
```

```
1    is owned and operated by someone else
2    and they are gearing -- imposing an
3    impasse or impediment that they decide
4    who will be able to overcome -- could
5    you say the question again and let me
6    just think through my response?
7         BY MR. DONOGHUE:
8    Q.    The requirement for a barrier is
9    that it be controlled by the website
10   provider?
11        MR. KASNER:  Object to form.
12        THE WITNESS:  No, I don't think
13   I want to make that -- that conflation
14   exactly.  But in the -- in that
15   example I just gave, the -- what I am
16   trying to indicate is that in this
17   situation of progressing through to
18   the environment, control and decision
19   to progress through is fully in the
20   hands of the user.
21        BY MR. DONOGHUE:
22   Q.    And the barrier can't be fully in
```

```
1    the hands of the user?
2         MR. KASNER:  Object to form.
3         THE WITNESS:  I'm trying -- I'm
4    trying to -- to think through that,
5    like because I'm trying to think of,
6    like, sophisticated passwords and
7    things where -- I mean, I'm -- I --
8    hypotheticals are very difficult,
9    right, and I -- so I don't want to --
10   I -- I imagine there could be some
11   scenario where -- I'm sure Alex is
12   cringing -- I'm going to do a
13   hypothetical.
14        I am the network provider and I
15   give you a very complicated password.
16   And in my provision of that password
17   to you, I lose -- I don't know it
18   anymore.  It's no longer knowable by
19   me.  It is only knowable by you.  But
20   now you lose it.  And now I think
21   because we don't have what we need to
22   move forward and it can't be achieved
```

```
1    somewhere other than by you, you had
2    it, that would be an instance where
3    we've created an impediment that the
4    user has some level of responsibility
5    over.
6         It's kind of a -- I mean, I
7    guess I'm just trying to say, like, in
8    these worlds of these configurations,
9    I don't know that it's -- it's a good
10   thing to say no, the user can never be
11   responsible for the barrier.
12        BY MR. DONOGHUE:
13   Q.    Does the barrier have to be
14   absolute?
15        MR. KASNER:  Object to form.
16        THE WITNESS:  Could you tell me
17   what you mean by absolute?
18        BY MR. DONOGHUE:
19   Q.    Well, in your example, the user
20   lost the password that couldn't be retrieved
21   by the website provider and that became a
22   barrier to entry for the user, I presume
```



166

1    is somewhere between 600 and 750, but
2    we can find out for sure.
3         BY MR. DONOGHUE:
4    **Q.   What was the test designed to**
5    **determine?**
6    A.   So this demonstration was
7    intended to really further enumerate for the
8    report and for the readers of the report the
9    process by which someone can progress through
10   the various steps of creating account -- an
11   account and making a booking.
12        Obviously, it wouldn't have been
13   necessary to create a temporary disposable
14   E-mail or use a non-attributable payment
15   method to -- to also do such a demonstration.
16   But in this instance, we chose to do that to
17   demonstrate the highly permissive nature of
18   the environment and the low perceivable level
19   of scrutiny placed on the characteristics of
20   the -- the user that we were being as we
21   moved through the environment.
22   **Q.   All right.  So this was a point**

167

1    **that it was more a demonstration than a test?**
2    A.   Yes.
3    **Q.   Did you take the Ryanair flight?**
4    A.   We did not.
5    **Q.   You missed out.  It probably**
6    **would have been wonderful.**
7         **How would you stop someone from**
8    **using a temporary E-mail?**
9         MR. KASNER:  Object to form.
10        THE WITNESS:  There are a few
11   mechanisms through which one could do
12   that.
13        You -- temporary E-mail is not
14   a -- temporary E-mail is a term of art
15   more than science, meaning if I were
16   to say I want to create a Gmail
17   account that I'm only going to use for
18   a moment, that, in theory, could be a
19   temporary E-mail.
20        But in most instances when
21   people refer to a temporary E-mail,
22   they're talking about a service that

168

1    allows for a transient E-mail address
2    that you don't expect to have and use
3    for a permanent basis, just as we did
4    here in the testing.
5         And as you can see from that
6    simulation, it created a domain name
7    associated with that E-mail.  And
8    there would be methods to be aware of
9    the domain names that would be either
10   definitely or most likely to be
11   associated with those temporary
12   E-mails.  And those could be deemed
13   impermissible to move forward in the
14   environment.
15        BY MR. DONOGHUE:
16   **Q.   Turning to page 17 of**
17   **Exhibit 418, the -- the text at the top of**
18   **the page below the --**
19   A.   Um-hmm.
20   **Q.   -- Ryanair image says, The**
21   **replicated testing did not encounter any**
22   **obstacles or technical limitations despite**

169

1    **attempting to flag many hallmark signs of**
2    **suspicious behavior.**
3         **Do you see that?**
4    A.   Yes.
5    **Q.   The replicated testing, that's**
6    **the demonstration we're talking about?**
7    A.   Yes.
8    **Q.   And you said the demonstration**
9    **was performed by your team?**
10   A.   Yes.
11   **Q.   So it wasn't done by an automated**
12   **system?**
13   A.   It was not.
14   **Q.   It wasn't a computer that was**
15   **taking the actions, it was a user presumably**
16   **on a keyboard of some sort?**
17        MR. KASNER:  Object to form.
18        THE WITNESS:  Correct.
19        BY MR. DONOGHUE:
20   **Q.   And so you're aware of SHIELD?**
21   A.   I am.
22   ████    █████████████████████







238

3  MR. KASNER:  Object to form.
4  THE WITNESS:  What do you mean
5  by a right?
6  BY MR. DONOGHUE:
7  **Q.  What do you think a right is?**
8  MR. KASNER:  Object to form.
9  THE WITNESS:  I guess I'm
10  trying to get at if you mean do they
11  have the ability to configure their
12  website in that way, are they legally
13  allowed to do that.  I just want to
14  make sure I'm understanding the --
15  BY MR. DONOGHUE:
16

239

240

4  **Q.  All right.  And turning to**
5  **page 22 of your report, Exhibit 418, there's**
6  **a good versus bad bot discussion.**
7  A.  Yes.
8  **Q.  Do you see that?**
9  A.  I do, yes.
10  **Q.  The good versus -- sorry.**
11  **Apparently I left my phone in here.**
12  **The good versus bad bot --**
13  MR. DONOGHUE:  We're going to
14  go off the record for a second.
15  VIDEO OPERATOR:  The time is
16  now 2:20.  We're off the record.
17  (Thereupon, a brief recess was
18  taken.)
19  VIDEO OPERATOR:  The time is
20  now 2:21.  We are back on the record.
21  BY MR. DONOGHUE:
22  **Q.  Is there a definition of good**

241

1  **bots versus bad bots?**
2  A.  There is not.  That is a -- a
3  colloquial characterization.  I think I've
4  attempted to sort of aggressively footnote
5  some of the interpretations that you might
6  see in the community on that, but there is no
7  dictionary good bot, bad bot definition.
8  **Q.  Good versus bad bot is somewhat**
9  **in the eye of the website?**
10  MR. KASNER:  Object to the
11  form.
12  THE WITNESS:  I think that
13  there -- I would say there are some
14  broad characteristics that most in the
15  community would agree about what is
16  good and what is bad.  And so I think
17  in -- to your suggestion that the
18  website is the determiner of good or
19  bad might be a, you know, more
20  specific conclusion to reach, rather
21  than I do think if you canvassed a
22  room of cybersecurity professionals,

MAGNA
LEGAL SERVICES

242

1    they would give you some
2    characteristics that would broadly
3    fall into good category and bad
4    category.  And I've attempted to do
5    that within my report.
6        BY MR. DONOGHUE:
7        Q.    Good bots perform legitimate
8    activities?
9        A.    Yes.
10       Q.    And they're helpful and ethical
11   activities?
12       A.    As a broad characterization, yes.
13       Q.    Would ethical include adhering to
14   terms of use of a website?
15       MR. KASNER:  Object to form.
16       THE WITNESS:  I don't generally
17   think of ethics and ascension to terms
18   of use as being kind of inherently
19   linked.
20       BY MR. DONOGHUE:
21       Q.    Why not?
22       A.    Perhaps a more appropriate word

243

1    to have used rather than ethical would have
2    been non-malicious, meaning there's sort of
3    a -- a general sense of positive intent.
4        Q.    So it's not that good bots are
5    ethical, it's that they have good intent?
6        MR. KASNER:  Object to form.
7        THE WITNESS:  I think I'm --
8    I'm generally comfortable with that
9    characterization, although more
10   comfortable with sticking with the
11   words from my report.  But -- but good
12   bots are, again, legitimate -- you
13   said legitimate activities, helpful
14   activities, meant to increase
15   efficiencies and drive behaviors that
16   are -- have a general connotation of
17   being positive and non-malicious.
18       BY MR. DONOGHUE:
19       Q.    So sticking with the words of
20   your report, good bots are ethical?
21       A.    Good bots perform ethical
22   activities.

244

1        Q.    Is it an ethical activity to
2    disregard the website's terms of use?
3        MR. KASNER:  Object to form.
4        THE WITNESS:  I don't think
5    it's inherently ethical or inethical
6    [sic], especially not without having
7    the terms of use in front of you to
8    observe them.  The terms of use could
9    be the -- unethical.  And I think
10   ethics -- although with this many
11   lawyers as we have might agree --
12   might disagree that the concept of
13   ethics is relatively subjective.  But
14   it -- it certainly -- it requires
15   quite a lot of determination about the
16   appropriateness of behavior.
17       BY MR. DONOGHUE:
18       Q.    All right.  So ethics are
19   subjective?
20       MR. KASNER:  Objection to form.
21       THE WITNESS:  Can be.  I think
22   in the context here that I've said

245

1    ethical activities, the dictionary
2    definition would likely point us to
3    something that says lives up to
4    societal expectations, does not
5    conduct bad behavior.  Those are the
6    general terms that I think come to
7    mind when we think about good bots and
8    their behavior.
9        BY MR. DONOGHUE:
10       Q.    So is it ethical to breach
11   someone's terms of use?
12       MR. KASNER:  Object to form.
13       THE WITNESS:  So same --
14   similar to my -- to my last answer,
15   having not -- I -- I don't think
16   breaching terms of use is -- is
17   inherently ethical or inethical,
18   particularly without examining said
19   terms of use.
20       BY MR. DONOGHUE:
21       Q.    Did defendants examine Ryanair's
22   terms of use before accessing its website?



258

1     increased sophistication measures on the part
2     of the computers who are encountering
3     CAPTCHA.
4     **Q.    All right.  Let's move to page 24**
5 **of Exhibit 418.**
6     **Do you see the first section**
7 **heading 2.2, Defendants Do Not Deploy, quote,**
8 **Bad Bots, unquote?**
9     A.   I do, yes.
10     **Q.    All right.  And this is not a**
11 **primer like the last section, but this is an**
12 **opinion?**
13     A.   This is as opinion, yes.
14     **Q.    And there's no citation in this**
15 **opinion, is there?**
16     A.   Not that I see, no.
17     **Q.    So it's just your opinion?**
18     A.   Yes.
19     **Q.    Not based on some third-party**
20 **source?**
21     A.   It's based on my knowledge,
22 expertise and industry experience.

259

1     **Q.    But it's not based on any**
2 **knowledge about a cease and desist that**
3 **Ryanair sent defendants?**
4     A.   It is not --
5     MR. KASNER:  Object to form.
6     THE WITNESS:  It is not based
7 on that, but that also wouldn't change
8 the characterization of the type of
9 bot that would be necessary to conduct
10 this type of activity.  I wouldn't
11 view any process documents or legal
12 documents around it to change the
13 technical nature of it as a tool.
14     BY MR. DONOGHUE:
15     **Q.    And is ethicalness not a**
16 **consideration in this analysis?**
17     MR. KASNER:  Object to form.
18     THE WITNESS:  It is -- I mean,
19 I don't believe I have cited
20 ethicalness as a factor that I
21 considered.  I talked about the intent
22 not to cause harm, steal data, spam,

260

1 exploit vulnerabilities, deploy any
2 malware, deface the website or do
3 other malicious activities on the
4 site.
5     BY MR. DONOGHUE:
6     **Q.    Would violating the website**
7 **provider's explicit instruction be malicious?**
8     MR. KASNER:  Object to the
9 form.
10     THE WITNESS:  It wouldn't
11 change the nature of the bot.  So
12 whether -- I think you're getting at
13 is -- and I'm making a supposition --
14 more about the behavior of those --
15 the intent of those operating the bot
16 or the -- taking the actual action in
17 the deployment.  But it wouldn't
18 change my view of the nature of the
19 technical behavior that the bot is
20 purportedly conducting on the site.
21     BY MR. DONOGHUE:
22     **Q.    Well, I'm just using your**

261

1 **language in your report.  It --**
2     A.   Um-hmm.
3     **Q.    -- says that they're neither**
4 **malicious in either form or intent.**
5     **So --**
6     A.   It's -- and I believe I'm
7 speaking about the -- the bot itself, the
8 technical tool here that's being used to
9 conduct the activity.
10     **Q.    The bot has intent?**
11     MR. KASNER:  Object to form.
12     THE WITNESS:  Purpose.
13     BY MR. DONOGHUE:
14     **Q.    The bot -- is it Skynet?**
15     **Sorry.  That's maybe not a fair**
16 **question, nor would it be understandable to**
17 **everybody.**
18     **But the bot has purpose?**
19     MR. KASNER:  Object to form.
20     THE WITNESS:  The bot, again,
21 is not self-thinking.  I don't --
22 not -- not intended to say that.  But

262

1   the bot has been created with an
2   intent.
3         My understanding of that intent
4   is to be able to traverse the public
5   website and review and aggregate
6   information that is available to the
7   public to another population that
8   might not be looking on that website
9   themselves.
10        And that intent is one that I
11  view as non-malicious.
12        BY MR. DONOGHUE:
13      Q.    So it's the intent of whomever
14  deploys the bot, not the intent of the bot
15  itself?
16      A.    Well, I was trying to say, but
17  obviously not fully clearly, that the bot
18  itself was created by people and that now
19  that it has been created, it has an intent or
20  a purpose, a meaning, a -- a goal and
21  objective.  And, again, not -- it's not
22  self-thinking, but that bot -- what's the

263

1   intent of this bot?  The intent of this bot
2   is to go and do these certain behaviors.
3       Q.    So the intent of the bot is
4   infused in it by whomever creates or deploys
5   the bot?
6         MR. KASNER:  Object to form.
7         THE WITNESS:  Presumably.  I'm
8   comfortable with that, yes.
9         BY MR. DONOGHUE:
10      Q.    And so when defendants disregard
11  a cease and desist letter, that informs the
12  intent of their bot?
13        MR. KASNER:  Object to form.
14        THE WITNESS:  I don't know that
15  I fully agree with that, because what
16  I imagine is into the coding of the
17  bot is not -- the headline does not
18  read terms of service, violate terms
19  of service.  Right?  They've given it
20  a directive to perform in a certain
21  way on the website.  And that is
22  removed from the -- any cease and

264

1   desist letter or terms of use because
2   those don't have a bearing on the
3   behavior that they're trying to drive
4   in the technical tool that they're
5   using.
6         BY MR. DONOGHUE:
7       Q.    So if defendants had written into
8   the comments in the code of the bot violate
9   terms of use, then the bot would have that
10  intent?
11        MR. KASNER:  Object to form.
12        THE WITNESS:  I'll give -- I'll
13  give you that.
14        BY MR. DONOGHUE:
15      Q.    Thank you.  But -- but it's fair
16  to say that's not what somebody creating a
17  malicious bot would write into their code,
18  isn't it?
19        MR. KASNER:  Object to form.
20        THE WITNESS:  Quite a bit of --
21  of leaps I need to take here, but if
22  you think of -- if you think of

265

1   commands that we put into technical
2   tools as -- as being in plain
3   language, there certainly are
4   instances where there are direct
5   coding into a tool to do -- to -- to
6   do something adversarial.
7         So it might not be as plain as
8   attack this website or do this thing,
9   but the coding is clearly designed --
10  the code will clearly reveal a -- an
11  intent to do something nefarious.
12        We see this with websites that
13  are being hit with DDoS traffic,
14  right?  The code of those bots clearly
15  shows that it is meant to inundate
16  this website with traffic that is
17  insurmountable.
18        BY MR. DONOGHUE:
19      Q.    So the intent of the bot is
20  derived from the code that creates the bot?
21        MR. KASNER:  Object to form.
22        THE WITNESS:  The intent is

MAGNA
LEGAL SERVICES

266

1    derived from.  The intent could be
2    interpreted by review of the code.
3         BY MR. DONOGHUE:
4         Q.   But the intent comes from the
5    creator of the bot?
6         A.   Presumably, yes.
7         Q.   Or whomever deploys the bot?
8         A.   Presumably, yes.
9         Q.   And so in the case of defendants,
10   a cease and desist letter warning not to use
11   the Ryanair website could make a bot bad that
12   was otherwise good?
13        MR. KASNER:  Object to form.
14        THE WITNESS:  I think I tend to
15   disagree with this.  And I've said it
16   a few different ways, but I'll -- I'll
17   try again, that I do not believe that
18   the purpose of a technology like the
19   one in question that I don't have a
20   lot of technical information about
21   seems to be in any way informed by the
22   contextual items that you're

267

1    mentioning, terms of use, a cease and
2    desist order.
3         It seems to me it has a very
4    specific purpose, which is to review
5    and aggregate fares.  And that purpose
6    does not, in my view, seem to
7    implicate these other contextual data
8    points.
9         BY MR. DONOGHUE:
10        Q.   All right.  Let's move to
11   Section 2.3.1, still on page 24.  It's an API
12   Introduction heading.
13        A.   Yes.
14        Q.   The second paragraph you have
15   what you refer to as a simple analogy, but I
16   need help to understand it.
17        Can you explain the wait server
18   analogy?
19        A.   Certainly.  So --
20        MS. REPORTER:  I'm sorry.  What
21   was that?
22        MR. DONOGHUE:  Wait server,

268

1    W-A-I-T --
2         MS. REPORTER:  Okay.
3         MR. DONOGHUE:  Separate word
4    S-E-R-V-E-R.
5         THE WITNESS:  So there are
6    quite a few analogies for APIs and we
7    certainly wrestled with which was the
8    best and most obvious to include.  But
9    this is the one that we went with.
10        And the interaction between you
11   looking at the website, interacting
12   with the website in the back end
13   really has a fair amount of parallels
14   to the setting of being in a
15   restaurant.
16        So you are in a restaurant.
17   You review the menu.  The wait server
18   takes your order and gives it to the
19   kitchen.  So the menu in this instance
20   is the API.  You are looking at it,
21   but you are going to be interacting
22   with another party.

269

1    So those two pieces have an
2    interplay together, which sends
3    commands from -- from you to the
4    server to the kitchen, directs people
5    to prepare the food, present the food
6    and have the food returned to your
7    table.
8         So you are often interacting
9    with a -- what would be considered a
10   back end API when you are having a
11   forward experience with a website
12   that's allowing commands to be
13   directed such that you have the
14   desired outcomes without you having to
15   enter code to communicate directly
16   with the website.
17        BY MR. DONOGHUE:
18        Q.   All right.  And does the bot have
19   a place in this analogy?
20        A.   So a bot is no different than a
21   user interacting with the interface.
22        Q.   Okay.

**MAGNA**
LEGAL SERVICES

278

```
1        put it in their own testimony.
2             BY MR. DONOGHUE:
3        Q.    So a determination of ethical
4   behavior is whether it's generally socially
5   acceptable?
6             MR. KASNER:  Object to form.
7             THE WITNESS:  Could you say
8        it -- could you repeat it back?
9        Sorry.
10            BY MR. DONOGHUE:
11       Q.    The determination of what is
12  ethical is whether it's generally socially
13  acceptable behavior?
14            MR. KASNER:  Object to form.
15            THE WITNESS:  I think that it's
16       probably much broader and I was trying
17       to boil down something that has a lot
18       of complications to it related to
19       values and -- and belief systems.
20            But for the construct of the --
21       an ethical bot, as I laid it out here,
22       talking about a good bot generally
```

279

```
1        performing ethical activities, and
2        the -- the juxtaposition that I
3        offered to you when we first started
4        talking about this was that these were
5        activities that were non-malicious --
6        I mean, ethical activities being
7        non-malicious, I think that construct
8        works.  So I think that one's better
9        to stick with.
10            But conceptually in the system
11       that's been put in place by Ryanair,
12       these are non-malicious activities
13       that are very welcomed and very
14       permissible in the technical
15       configuration that they've put
16       forward.
17            BY MR. DONOGHUE:
18       Q.    So ethical means non-malicious?
19            MR. KASNER:  Object to form.
20            THE WITNESS:  I think I've
21       offered quite a few suggestions of
22       the -- the parallels of how it can be
```

280

```
1        described.  I'm not saying that the
2        definition of ethical is
3        non-malicious, but I think it works
4        well to describe the characteristics
5        of good bots.
6             BY MR. DONOGHUE:
7        Q.    Why does it matter that Navitaire
8   is a subsidiary of Amadeus?
9             MR. KASNER:  Object to form.
10            THE WITNESS:  It matters in the
11       construct of the -- the GDS platform.
12       Navitaire is a subsidiary of a -- of a
13       major GDS and thus making that
14       mechanism of the interplay of how the
15       bookings are constructed an important
16       part of Ryanair's ecosystem.
17            BY MR. DONOGHUE:
18       Q.    Because Ryanair has contracts
19  with a GDS, does Ryanair have to allow OTAs
20  to sell its flights?
21            MR. KASNER:  Object to form.
22            THE WITNESS:  The -- the
```

281

```
1        if-then suggestion there does not
2        work, but it does tie back in to the
3        technical nature of this opinion,
4        which is that they have to inherently
5        create an environment that invites
6        access from nonhuman users in order to
7        make these partnerships that they have
8        celebrated a successful part of their
9        ecosystem.
10            BY MR. DONOGHUE:
11       Q.    So because Ryanair invites
12  nonhuman GDS traffic, it also has to invite
13  OTA traffic?
14            MR. KASNER:  Object to form.
15            THE WITNESS:  Not because of
16       that.  But it has to operate a
17       technical environment that opens
18       itself to that type of traffic.
```

MAGNA
LEGAL SERVICES

282



12      BY MR. DONOGHUE:
13      Q.    Going to page 27 of Exhibit 418,
14  your report, the second full paragraph
15  begins, Ryanair's efforts to selectively ban
16  defendants, which by cybersecurity definition
17  employ good bots is ineffective.
18      Do you see that?
19      A.    Yes.
20      Q.    So defendants use good bots to
21  access the Ryanair website; is that right?
22      A.    So I've said it before but I'll

283

1       just caveat it again.  Not -- I do not fully
2   understand the nature of the automation or if
3   there is automated behavior that is happening
4   by the third party to access Ryanair, because
5   that information has not been made available.
6           That said, the nature of the
7   activity that's happening here I understand
8   generally and I characterize as good bot
9   activity from my cybersecurity experience.
10      Q.    And what did you do to find out
11  what bots defendants employ to access the
12  Ryanair website?
13          MR. KASNER:  Object to form.
14          THE WITNESS:  I did not examine
15      that issue as it wasn't needed to
16      understand the opinions about the
17      website itself.
18          BY MR. DONOGHUE:
19      Q.    You didn't need to understand the
20  bots that are used to access the Ryanair
21  website to determine whether they were good
22  or bad?

284

1           MR. KASNER:  Object to form.
2           THE WITNESS:  Correct.
3           BY MR. DONOGHUE:
4       Q.    But don't we determine whether a
5   bot is ethical based on its code, in part?
6           MR. KASNER:  Object to form.
7           THE WITNESS:  The code drives
8       the behavior of what -- the operation
9       of the bot.  And while I don't have
10      access to the evidence or information
11      that maps specifically how this robot
12      process works, I do generally
13      understand the nature of what is
14      happening when either the defendants
15      or others are inside the myRyanair
16      environment from both my own review,
17      but also through the depositions of
18      others who have spoken specifically
19      about bots operating in the
20      environment.
21          And I could draw that
22      characterization without asking

285

1       additional questions about the
2   underlying code of the bot.
3           BY MR. DONOGHUE:
4       Q.    So you don't need to see the
5   actual bots that defendants used to know
6   whether they're ethical?
7           MR. KASNER:  Object to form.
8           THE WITNESS:  Obviously the
9       more complete information that one
10      could have the better.  But the code
11      is only going to demonstrate what the
12      bot does.  And I believe I have
13      adequate knowledge of what the bot
14      does to make a supposition about how
15      it's behaving in the myRyanair
16      environment.
17          BY MR. DONOGHUE:
18      Q.    So you don't know what bots
19  defendants use, right?
20          MR. KASNER:  Object to form.
21          THE WITNESS:  Correct.  I do
22      not understand fully the process flow,



286

1    underlying technology of the third
2    party that engages directly with
3    Ryanair.
4        BY MR. DONOGHUE:
5        Q.    But you know enough to make a
6    determination that the bots are good?
7        MR. KASNER:  Object to form.
8        THE WITNESS:  I do.  As I said
9    before, the good bot/bad bot
10   distinction is one that's relatively
11   broad and that we largely look at the
12   purpose and intent of the bot.  And I
13   do believe that the information I have
14   is enough to understand such purpose
15   and intent and to make that
16   characterization.
17       BY MR. DONOGHUE:
18       Q.    Even though you don't know
19   exactly what the bot is?
20       MR. KASNER:  Object to form.
21       THE WITNESS:  Correct.
22

287

1        BY MR. DONOGHUE:
2        Q.    And even though you've never seen
3    the bot's code?
4        MR. KASNER:  Object to form.
5        THE WITNESS:  Correct.
6        BY MR. DONOGHUE:
7        Q.    And even though whether or not a
8    bot is ethical is derived at least in part
9    from the code?
10       MR. KASNER:  Object to form.
11       THE WITNESS:  So I think that
12   might be a slight misstatement of my
13   original point, which I'm sure will be
14   slightly aggravated for me to go
15   through again.
16       But the code drives the
17   purpose.  And intent is behind the
18   authors of the code who drive the
19   purpose.  So once I see the purpose,
20   if the bot is operating as intended,
21   then I can -- I don't necessarily need
22   to see the middle piece.  There's a

288

1    slight bit of assumption there, that
2    the code is done correctly and that
3    it's not behaving in a way different
4    than intended by the programmers, but
5    I'm comfortable with that.
6        BY MR. DONOGHUE:
7        Q.    So you could get the intent from
8    defendants on the one end and on the other
9    end you could see how the bots interact with
10   the website and you could derive the answer
11   from that?
12       MR. KASNER:  Object to form.
13       THE WITNESS:  And which answer
14   would I be deriving?
15       BY MR. DONOGHUE:
16       Q.    Whether the bots are good bots,
17   ethical bots.
18       MR. KASNER:  Object to form.
19       THE WITNESS:  Yes.  And I think
20   obviously we would need to speak to
21   the third party that is deploying the
22   tools, rather than the defendants.

289

1        BY MR. DONOGHUE:
2        Q.    The third party and the
3    defendants?
4        A.    I said rather than the
5    defendants.
6        Q.    So you have to speak to the third
7    party, not the defendants?
8        A.    Correct.
9        Q.    Did you ask to speak to the third
10   party?
11       A.    I did not.
12       MR. KASNER:  Object to form.
13       BY MR. DONOGHUE:
14       Q.    Why not?
15       MR. KASNER:  Object to form.
16       THE WITNESS:  Not necessary to
17   understand the -- again, the -- the
18   general sense of the desired activity,
19   the outcome of the desired activity.
20   I believe that is adequate to -- I
21   actually believe that the -- observing
22   the outcome of the behavior, even

MAGNA
LEGAL SERVICES

290

```
 1        if -- even at a generic level, which
 2   is the case here, is adequate to
 3   understand the behavior of the bot,
 4   which tells me how it's interacting
 5   with the permissions of the
 6   environment that it's operating in.
 7        BY MR. DONOGHUE:
 8        Q.    So it's really all about
 9   operating within the permissions of the
10   website?
11        MR. KASNER:  Object to form.
12        THE WITNESS:  The technical
13   permissions, yes.
14        BY MR. DONOGHUE:
15        Q.    It has nothing really to do with
16   the intent of whomever deployed the bot?
17        MR. KASNER:  Object to form.
18        THE WITNESS:  Well, typically
19   the behavior is -- at least -- is
20   directly tied to the intent.
21        BY MR. DONOGHUE:
22        Q.    What if the intent was to violate
```

291

```
 1   a cease and desist letter?
 2        MR. KASNER:  Object to form.
 3        THE WITNESS:  Well, I -- I
 4   think we've -- we've covered this in
 5   that you would not see a piece of code
 6   that would have something so generic
 7   as go out and violate this, right?
 8   There has to be --
 9        BY MR. DONOGHUE:
10        Q.    Which is why you would speak to
11   the person that deployed the bot or the
12   entity that deployed the bot, right?  That's
13   what we were talking about before.
14        A.    Um-hmm.
15        MR. KASNER:  Object to form.
16        BY MR. DONOGHUE:
17        Q.    But you don't want to do that
18   because you never bothered to ask about the
19   intermediaries?
20        MR. KASNER:  Object to form.
21        THE WITNESS:  It's not so much
22   that.  It's just that I don't think
```

292

```
 1        it's necessary to, one, my
 2   understanding of the operation of the
 3   bot and then, two, the level of depth
 4   of information I needed to have to
 5   form the opinion that we have here.
 6        So it's not as though I avoided
 7   accessing that information.  I just
 8   didn't -- I didn't believe and
 9   continue to not believe that it was
10   needed to understand this open access
11   environment that Ryanair has created.
12        BY MR. DONOGHUE:
13        Q.    Do you know whether the bots
14   employed by defendants use myRyanair
15   account information to purchase Ryanair
16   flights?
17        MR. KASNER:  Object to form.
18        THE WITNESS:  It's my
19   understanding that one has to have a
20   myRyanair account to make a booking
21   and there are not exceptions to that.
22   And I understand that from
```

293

```
 1   myRyanair's -- Ryanair's information
 2   that it has provided.  So it stands to
 3   reason that the bookings must be made
 4   using a myRyanair account.
 5        BY MR. DONOGHUE:
 6        Q.    All right.  Why don't we go to
 7   page 28, Section 2.4.
 8        Do you see that heading,
 9   Ryanair's Bot-banning strategy --
10        A.    Um-hmm.
11        Q.    -- and some more stuff there?
12        And you're talking about
13   Ryanair's SHIELD solution.
14        A.    Yes.
15        Q.    Do you know who created SHIELD?
16        MR. KASNER:  Object to form.
17        THE WITNESS:  It's my
18   understanding that SHIELD is an
19   in-house tool that previously had
20   another name that's been developed by
21   Ryanair.
22
```

MAGNA ▶
LEGAL SERVICES

362

1          BY MR. DONOGHUE:
2          **Q.    And do you know whether, when**
3  **Booking.com makes a Ryanair flight purchase**
4  **for a Booking.com customer, it accesses the**
5  **ryanair.com website once or multiple times?**
6          MR. KASNER:  Object to form.
7          THE WITNESS:  How such a
8  transaction takes place and the
9  technical details there I do not have
10  specific data and evidence about how
11  that takes place.
12          BY MR. DONOGHUE:
13          **Q.    Did you ask Booking.com for that**
14  **information?**
15          MR. KASNER:  Object to form.
16          THE WITNESS:  I did not.
17          BY MR. DONOGHUE:
18          **Q.    Did you ask KAYAK for that**
19  **information?**
20          MR. KASNER:  Object to form.
21          THE WITNESS:  I did not.
22          Again, to take it back, I don't think

363

1          it is relevant or necessary to form
2          the opinions I have here.
3          BY MR. DONOGHUE:
4          **Q.    Did you ask Priceline for that**
5  **information?**
6          MR. KASNER:  Object to form.
7          THE WITNESS:  I did not.
8          BY MR. DONOGHUE:
9          **Q.    Did you ask Agoda for that**
10  **information?**
11          MR. KASNER:  Object to form.
12          THE WITNESS:  I did not.
13          BY MR. DONOGHUE:
14          **Q.    Have you looked at the linked out**
15  **flight data?**
16          MR. KASNER:  Object to form.
17          THE WITNESS:  I have reviewed
18  opposing counsel's expert's rebuttal
19  report that speaks to the linked out
20  data at a high level.
21          BY MR. DONOGHUE:
22          **Q.    Did you ask to see the linked out**

364

1  **data specifically?**
2          MR. KASNER:  Object to form.
3          THE WITNESS:  I did not,
4  although I did discuss or did ask
5  counsel for some clarification of that
6  data upon seeing it in the opposing
7  counsel's expert rebuttal report.  I
8  understand it was very recently
9  received and I have not had time to
10  request and add it to an analysis, if
11  needed.
12          But to be clear, I do not think
13  it would change the opinions that I've
14  stated here in this particular section
15  we're talking about, attributed harm,
16  and I think that the sections even
17  before this made quite clear that
18  there is no way to do -- to show
19  attributed harm.
20          BY MR. DONOGHUE:
21          **Q.    What clarifications did you**
22  **request from counsel?**

365

1          MR. KASNER:  Objection, calls
2  for privileged information.  I can
3  instruct the witness to respond at a
4  high general level, if -- if she can.
5          THE WITNESS:  At a high general
6  level, having not seen linked out
7  bookings previously, I asked for some
8  information about what that referred
9  to and we spoke very briefly about
10  what that information was.
11          BY MR. DONOGHUE:
12          **Q.    So you received the**
13  **clarifications you requested?**
14          A.    Yes.
15          **Q.    Turning to page 41 of**
16  **Exhibit 418, your initial report, there's a**
17  **heading, Overall Takeaways.**
18          Do you see that?
19          A.    Yes.
20          **Q.    The second paragraph you refer to**
21  **evidence of technical harm.**
22          Do you see that?

**MAGNA** ►
LEGAL SERVICES

366

1      A.   Yes.
2      Q.   What does technical harm mean?
3      A.   In this instance it would mean
4  a -- a -- a notable damage, a technical
5  impact to a system from which some type of
6  recovery would be necessary.
7      Q.   Notable damage or a technical
8  impact to the a system from which some type
9  of recovery would be necessary; is that
10 right?
11     A.   Yes.
12     Q.   What is notable damage?
13     A.   Some type of outcome that impacts
14 a network or system's ability to operate in
15 the way it is intended.
16     Q.   So would the website going down
17 be notable damage?
18        MR. KASNER:  Objection to form.
19        THE WITNESS:  It could be.
20        BY MR. DONOGHUE:
21     Q.   Would the website being slowed be
22 notable damage?

367

1        MR. KASNER:  Objection to form.
2        THE WITNESS:  It could be.
3        BY MR. DONOGHUE:
4      Q.   I'm going to move to the rebuttal
5  report.  We can take a break if you want or
6  we can keep going.
7        Do you have a preference?
8      A.   I'm fine if you -- I'm fine.
9        MR. KASNER:  We can start for a
10 bit, five -- we can five, 10 minutes,
11 whenever it feels natural.  Maybe
12 10 minutes we take a break.
13        MR. DONOGHUE:  Why don't we
14 just take a break now instead of --
15        MR. KASNER:  Okay.
16        MR. DONOGHUE:  -- taking a
17 break in 10 minutes.
18        MR. KASNER:  Okay.
19        VIDEO OPERATOR:  The time is
20 now 4:34.  We are off the record.
21        (Thereupon, a brief recess was
22          taken.)

368

1        (Exhibit 419 was marked for
2          identification.)
3        VIDEO OPERATOR:  The time is
4  now 4:46.  We are back on the record.
5        BY MR. DONOGHUE:
6      Q.   All right.  You've been handed
7  what's marked as Exhibit 419.
8        Do you recognize this document?
9      A.   Yes, I do.
10     Q.   What is it?
11     A.   This is my rebuttal report to my
12 initial report response submitted last
13 Friday.
14     Q.   And since you submitted it last
15 Friday, any changes to your opinions?
16     A.   No.
17     Q.   Going to page 8 of Exhibit 419,
18 your rebuttal report, there's a Section 1.1
19 about firewalls.
20        Do you see that?
21     A.   Yes.
22     Q.   And there -- below that there's,

369

1  I guess, a subheading, Firewall explained.
2      A.   Yes.
3      Q.   We've talked a little bit about a
4  firewall, but just to confirm, can a firewall
5  be a gate?
6      A.   So a firewall is -- is very much
7  a technical term that individuals are
8  constantly using in the world of describing
9  cybersecurity environments.  Firewalls are --
10 are -- firewalls are used to modulate in and
11 out traffic on a website or environment.
12        So a firewall could be configured
13 in such a way that one might characterize it
14 as a gate, but it is not inherently a gate.
15     Q.   So a firewall could be used as a
16 gate?
17        MR. KASNER:  Object to form.
18        THE WITNESS:  It could -- it
19 could be used, although it wouldn't be
20 the typical technical measure that one
21 would think to use in such a way.
22

MAGNA
LEGAL SERVICES

430

1    as I recall it, I believe that it is
2    fair to say that --
3        BY MR. DONOGHUE:
4        **Q.    And that would be true --**
5        A.    -- to assume that.
6        **Q.    That would be true for each of**
7    **the defendants?**
8        A.    Yes.
9        **Q.    Did you ask any of the defendants**
10   **whether they use virtual credit cards?**
11       A.    I didn't.  And I'll similarly
12   repeat I did not because it was not in any
13   way related to the opinions that I offer
14   here.
15       MR. DONOGHUE:  Subject to any
16   questions you may have, I don't have
17   additional questions right now.
18       MR. KASNER:  I don't have any
19   further questions.
20       MR. DONOGHUE:  Thank you for
21   your time.
22       THE WITNESS:  Thank you.

431

1        VIDEO OPERATOR:  This concludes
2    today's deposition of Jordan Kelly.
3        The time on -- we are off the
4    record at 5:48.
5        (Thereupon, signature having not
6        been waived, at 5:48 p.m. EDT
7        the deposition concluded.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

432

1        CERTIFICATE OF DEPONENT
2        I, Jordan R. Kelly, do hereby
3    certify that I have read the foregoing pages,
4    which contain a correct transcript of the
5    answers given by me to the questions
6    propounded to me herein, except for changes,
7    if any, duly noted on the enclosed errata
8    sheet.
9
10
11    _____
          JORDAN R. KELLY
12
13
14
15        Sworn and subscribed to before me
16    this ___ day of _____, 2023.
17
18
19    My commission expires:    Notary Public:
20    _____    _____
21
22

433

1    CASE:  Ryanair DAC v. Booking Holdings, Inc., et al.
2    DEPOSITION OF:  Jordan R. Kelly
3    TAKEN:  October 4, 2023
4    PAGE  LINE  ERROR        CORRECTION        REASON
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21    _____
          JORDAN R. KELLY
22

434

```
 1            CERTIFICATE OF NOTARY
 2         I, MISTY KLAPPER, the officer before
 3    whom the foregoing deposition was taken, do
 4    hereby certify that the witness whose testimony
 5    appears in the foregoing deposition was duly
 6    sworn by me; that the testimony of said witness
 7    was taken by me in shorthand and thereafter
 8    reduced to typewriting by me; that said
 9    deposition is a true record of the testimony
10    given by said witness; that I am neither counsel
11    for, related to, nor employed by any of the
12    parties to the action in which this deposition
13    was taken; and, further, that I am not a relative
14    or employee of any attorney or counsel employed
15    by the parties hereto, nor financially or
16    otherwise interested in the outcome of this
17    action.
18
19
20    _____
      Misty Klapper, RMR, CRR, CSR
21    Notary Public in and for the
      District of Columbia
22
```



DEPOSITION OF:  JORDAN RAE KELLY
DATE OF DEPOSITION:  Tuesday, October 4, 2023
CASE:  *Ryanair DAC v. Booking Holdings Inc., et al*, Case No. 20-1191-WCB

## ERRATA SHEET

The following are the corrections which I have made to my deposition transcript:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|-----|-----|-----------|-------------|--------|
| 148 | 15-17 | footnote 20, At what point . . . visitor's preference. | footnote 20, "At what point . . . visitor's preference." | Transcription |
| 206 | 2-3 | Strict access to | Strictly – access to | Transcription |

I, the undersigned, declare under penalty of perjury, that I have read the above-referenced deposition transcript and have made any corrections, additions or deletions reflecting my true and correct testimony.

EXECUTED this __16__ day of November 2023, at __Lewisville, Texas__ .

*Jordan Rae Kelly*
Jordan Rae Kelly

294245151 v1

# EXHIBIT 37

**PUBLIC VERSION - CONFIDENTIAL MATERIAL OMITTED**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

CASE NO.: 20-1191-LPS

- - - - - - - - - - - - - - - - - - - - - - - - x

RYANAIR DAC,


                    Plaintiff,


          - against -


BOOKING HOLDINGS INC,.  BOOKING.COM B.V.,

KAYAK SOFTWARE CORPORATION, PRICELINE.COM

LLC, and AGODA COMPANY PTE, LTD.,


                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - x

          CONFIDENTIAL ATTORNEYS' EYES ONLY

          VIDEOTAPE ZOOM DEPOSITION OF

                    BASIL IMBURGIA


               October 13, 2023

             MAGNA LEGAL SERVICES

               (866) 624-6221

               www.MagnaLS.com



2

```
 1          VIDEOTAPE ZOOM VIDEOCONFERENCE ORAL
 2   DEPOSITION OF BASIL IMBURGIA, pursuant to Notice,
 3   commencing October 13, 2023, at 9:35 a.m., on the
 4   above date, before Catherine M. Donahue, a
 5   Certified Court Reporter and Notary Public in the
 6   State of New Jersey.
 7
 8   Magna Job No. 1045045
 9
10
11
12
13
14
15              MAGNA LEGAL SERVICES
16                 (866) 624-6221
                   www.MagnaLS.com
17
18
19
20
21
22
23
24
25
```

3

```
 1   A P P E A R A N C E S:
 2   (All parties present via Zoom Remote)
 3
 4   HOLLAND & KNIGHT LLP
 5   BY:  WILLIAM OLIVER, III, ESQ.
 6   10 St. James Avenue, 11th Floor
 7   Boston, Massachusetts 02116
 8   (617) 573-5863
 9   william.oliver@hklaw.com
10   Attorneys for Plaintiff
11
12   COOLEY LLP
13   BY:  ALEXANDER J. KASNER, ESQ.
14        JOHN H. HEMANN, ESQ.
15   3175 Hanover Street
16   Palo Alto, California 94304-1130
17   (650) 843-5770
18   akasner@cooley.com
19   jhemann@cooley.com
20   Attorneys for Defendants
21
22   ALSO PRESENT:
23        Tyler Crotty, Videographer
24
25
```

4

```
 1              I N D E X
 2
 3   Witness:                    Page
 4   BASIL IMBURGIA
 5     Examination by Mr. Oliver................  8
 6     Examination by Mr. Kasner................ 304
 7
 8
 9
10
11
12
13
14
15
16
17
18   October 13, 2023
19
20
21
22
23
24
25
```

5

```
 1              E X H I B I T S
 2   Exhibit Name    Description         Page No.
 3
 4   420    Curriculum vitae of Basil      12
            Imburgia
 5
 6   421    Expert Rebuttal Report and     95
            Disclosure of Basil Imburgia
 6
 7   422    statutory text of the Computer 157
            Fraud & Abuse Act
 8
 9   423    text of the Computer Fraud &   160
            Abuse Act
10   424    Document bearing Bates No.     248
            RYANAIR-BOOKING 0063234
11
12   425    Lopata report                  273
13
     426    Supplemental expert rebuttal   297
            report of Basil Imburgia dated
            October 10, 2023
14
15
16
17
18
19
20         (Exhibits retained by counsel.)
21
22
23
24
25
```



6

```
 1           DEPOSITION SUPPORT INDEX
 2
 3     Instruction To Witness Not To Answer
 4              PAGE     LINE
 5              None Marked
 6     Request for Production of Documents
 7              PAGE     LINE
 8              None Marked
 9
10              Marked Text
11              PAGE     LINE
12              None Marked
13
14
15
16
17
18
19
20
21
22
23
24
25
```

7

```
 1          THE VIDEOGRAPHER:  Good morning.
 2     We are now on the record.  This
 3     begins the video deposition of Basil
 4     Imburgia in the matter of Ryanair DAC v.
 5     Booking Holdings Inc., et al.
 6          Today is October 13, 2023 and the
 7     time is approximately 9:35 a.m.
 8          This deposition is being taken
 9     remotely via Zoom.  The videographer is
10     Tyler Crotty of Magna Legal Services and
11     the court reporter is Catherine Donahue,
12     also of Magna.
13          Counsel, could you please state
14     your appearances and who you represent
15     for the record?
16          MR. OLIVER:  My name is William
17     Oliver with Holland & Knight, and I'm
18     representing Ryanair DAC.
19          MR. KASNER:  My name is Alexander
20     J. Kasner of Cooley LLP representing
21     defendants.
22          I also have with me Mr. John
23     Hemann of Cooley LLP representing
24     defendants.
25          THE VIDEOGRAPHER:  Thank you,
```

8

```
 1     Counsel.
 2          Could our court reporter please
 3     swear in the witness.
 4          (The witness is sworn by the
 5     court reporter.)
 6     B A S I L   I M B U R G I A,  called as a
 7     witness by (Plaintiff), having been first
 8     duly sworn by Catherine M. Donahue, a
 9     Notary Public within and for the State of
10     New Jersey, was examined and testified as
11     follows:
12     EXAMINATION BY MR. OLIVER:
13          Q.  Good morning, Mr. Imburgia.
14          Would you please spell your full
15     name for the record?
16          A.  Yes.  The first name is B-a-s-i-l.
17     The last name is I-m-b-u-r-g-i-a.
18          Q.  Have you been deposed before today?
19          A.  Yes.
20          Q.  About how many times?
21          A.  Probably, I would guess about 60, 65
22     times.
23          Q.  Have you also testified at trial?
24          A.  Yes.
25          Q.  About how many times?
```

9

```
 1          A.  I would guess about 40 times at
 2     trial.
 3          Q.  And was that as an expert witness?
 4          A.  Yes.
 5          Q.  So I would like to go over some
 6     ground rules, although you're probably very well
 7     aware of them.
 8          I'm going to ask some questions and
 9     you'll be answering them under oath.
10          Do you understand that?
11          A.  Yes.
12          Q.  We have a court reporter here
13     transcribing everything we say.  So it is
14     important that we do not talk over each other.
15          Do you understand that?
16          A.  Yes.
17          Q.  And clearly, you already understand
18     this, but you have to give a "yes" or "no"
19     answer as opposed to nonverbal answers.
20          Do you understand that as well?
21          A.  Yes.
22          Q.  Your counsel may object from time to
23     time, which he is entitled to.  But unless he
24     instructs you not to answer, you need to answer
25     my questions.
```



34

1        I probably review about 25 to 30
2    senior managing directors as a performance
3    reviewer.  I handle aspects of conflict issues
4    that may pop up from our conflicts department.
5        I'm the designated person for the
6    forensic and litigation group in dealing with
7    some conflict issues.  I deal with compensation,
8    raises, bonuses, things like that.
9    BY MR. OLIVER:
10       **Q.  So you said you have a**
11   **responsibility for 20 to 30 reviewers.**
12       **Are they your direct reports?**
13       A.  They could be -- well, I'm a
14   performance manager for them.  So in our system,
15   I would be their direct report.
16       But sometimes I may review an
17   individual that's in a product that may report
18   to their product leader as well as report to me
19   as the North American leader.
20       **Q.  How many direct reports do you have?**
21       A.  The people I review as a performance
22   manager, 25 or so.  So it is probably about 25,
23   30 maybe.
24       **Q.  And when you say reviewers, can you**
25   **explain what those individuals do?**

35

1        MR. KASNER:  Object to the form.
2        A.  I would say generally they're either
3    people that do investigative work, people that
4    do litigation work.
5        I do review some people that do data
6    analytics work.  I review people that do trial
7    graphics and trial services work because there's
8    a lot of products in North America.  I cross
9    different products, I guess.
10       So those are the ones that I can
11   recall.
12   BY MR. OLIVER:
13       **Q.  Do you work with Ms. Jordan Kelly?**
14       MR. KASNER:  Object to the form.
15       A.  I don't work with Jordan.  She works
16   in our cyber practice and she reports to Anthony
17   Ferrante.  She doesn't report to me.
18   BY MR. OLIVER:
19       **Q.  Are you aware that she is also an**
20   **expert in this case?**
21       A.  Yes.  Her and her senior director, I
22   think, contacted us when Cooley was looking for
23   a damages expert, and that's how I got involved.
24       But that was as much of my
25   communications with her.  It was kind of the

36

1    introduction to the Cooley team.
2        **Q.  So you said Ms. Kelly was looking**
3    **for a damages expert.**
4        **Is that generally why people would**
5    **come to you for work?**
6        MR. KASNER:  Object to the form.
7        A.  Well, let me clarify that.
8        Cooley was looking for a damages
9    expert.  Jordan just passed on my information to
10   Cooley.
11       But typically the things that I'm
12   doing are forensic accounting, economic damage
13   calculations, investigative work or really
14   neutral arbitration work.  I've probably been a
15   neutral over 35 times.  Working capital.
16       Those, those are the kinds of things
17   that I'm typically working on.
18   BY MR. OLIVER:
19       **Q.  So looking at the second full**
20   **sentence of your CV, it says you have over 30**
21   **years of experience in providing forensic**
22   **accounting and financial and economic analysis**
23   **to attorneys in litigation/arbitration.**
24       **Do you see that?**
25       A.  Yes.

37

1        **Q.  Do you see that you have a backslash**
2    **there on your CV?**
3        A.  Yes.
4        **Q.  Is there any reason you use a**
5    **backslash as compared to a forward slash**
6    **throughout the rest of your CV?**
7        MR. KASNER:  Object to the form.
8        A.  No.
9    BY MR. OLIVER:
10       **Q.  You don't know why it is a different**
11   **type of slash?**
12       MR. KASNER:  Object to the form.
13       A.  No, I don't.
14   BY MR. OLIVER:
15       **Q.  So let's look at the second**
16   **paragraph here.**
17       **It says you have advised on matters**
18   **involving accounting and auditing issues,**
19   **patent, false advertising and trademark.**
20       **Then it goes on with all these other**
21   **areas of your expertise.**
22       **Do you see where I'm looking?**
23       A.  Yes.
24       **Q.  What kind of patent cases have you**
25   **worked on?**



---

38

1          MR. KASNER:  Object to the form.
2          A.  I guess the ones that I can
3   remember -- platinum-tip spark plugs was one.
4   LCDs was another.  I think another one dealt
5   with some kind of valves.  Roofing tiles.
6          Those are the ones I can recall.
7   BY MR. OLIVER:
8          Q.  **Have you done any patent work**
9   **related to software?**
10         MR. KASNER:  Object to the form.
11         A.  I did a matter that dealt with
12   matching software.  It dealt with a
13   pharmaceutical product that I was calculating
14   profits relating to or forcing profits relating
15   to the matching software.
16         I'm not sure if that was -- I'm not
17   sure if that was a patent case or a copyright
18   case because a lot of the technology cases --
19   like I've worked on software implementation
20   projects where I'm doing the damages relating
21   to, you know, a misapplication of software if
22   there's a new system put in place and there were
23   problems with that system.
24         I've calculated the different types
25   of damage relating to system implementation.  I

---

39

1   have worked on another software case that dealt
2   with some developers not, not getting their fair
3   portion of the license fees and things like
4   that.
5          So, I don't know if the patent cases
6   dealt with -- I think most of them were
7   copyright related, if I remember.  It could have
8   been a patent.  Some of them could have been
9   patent related.
10   BY MR. OLIVER:
11         Q.  Okay.
12         **So you provided examples there of**
13   **just your general technology experience with**
14   **software; is that fair?**
15         A.  Yes, some of the software cases that
16   I remember working on the damage aspect of.
17         Q.  **Can you explain what matching**
18   **software is?**
19         A.  This was pharmaceutical data.  So a
20   lot of times the pharmaceutical companies give
21   to -- I think my client, I think it is ITU now.
22   It used to be IMS.
23         Basically what they do is compile
24   all the pharmaceutical sales and then they, they
25   spit them back out to their customers.

---

40

1          So part of that, dealing with
2   prescriptions and things like that, they want to
3   make sure that they're like de-duping the data.
4   So there's matching software to make sure if the
5   doctors' names are reversed and things like
6   that, that they're matched and eliminated so
7   they're not, you know, counting more than once a
8   certain prescription for a certain
9   pharmaceutical.
10         So the matching software was
11   designed to kind of eliminate duplications, in
12   essence.
13         Q.  **And apologies if you already said**
14   **this, but what was your role in helping this**
15   **case with the matching software for the**
16   **pharmaceutical company?**
17         A.  It was to calculate damages.  And
18   the damages were -- there were claims for
19   profits, and I did an apportionment analysis.
20         I also did a royalty study comparing
21   the royalty -- the amounts paid for the software
22   and what those would be, what the comparable
23   companies would be.
24         So it was kind of like a royalty
25   analysis and a profits analysis, as well.

---

41

1          Q.  **You mentioned one of your**
2   **experiences with software related to software**
3   **implementation.**
4          **Can you explain what your role with**
5   **that project was?**
6          A.  Yes.
7          That was back a long time, Coopers &
8   Lybrand.  And I was a damages expert, and we had
9   a management consulting partner.  One of my
10   partners that was a systems implementation
11   expert.  So he dealt with like the liability
12   aspects of the problems with the implementation.
13         And what I did is I did the damage
14   analysis in relation to the implementation which
15   dealt with, you know, when the system was down;
16   what kind of lost profits were there,
17   compilation of what the repair costs were, what
18   the replacement costs were.
19         So it was investigating those kinds
20   of things.
21         Q.  **You explained you were doing the**
22   **damage analysis.**
23         **Can you explain a little bit more**
24   **what the damage analysis is used for?**
25         MR. KASNER:  Object to the form.



42

1        A.  So if the case is about a vendor's
2    inappropriate actions or not complying with a
3    contract, the court will have experts
4    potentially deal with liability issues that are
5    in the industry.
6        And so, I would typically be
7    presenting, if liability is found, what the
8    damages were.
9        So, you know, you look at a but-for
10   world and you say but for the plaintiff's
11   action -- defendant's, excuse me, actions, how
12   would the -- how would the profitability, cost,
13   revenues, profitability change.
14       And so, there were aspects that I
15   looked at to see if, when there were shutdowns
16   of certain plants, you know, did the company
17   lose profits or were they able to mitigate those
18   losses.
19       And so, that was one aspect that I
20   kind of reviewed.
21       And then, if the system ultimately
22   was pulled out and not used and had to be
23   repaired for a brief period of time and then had
24   to be fully replaced, I did a compilation of the
25   costs relating to repair and replacement by

43

1    looking at, you know, summarizing all the
2    invoices that were spent and relating to repairs
3    and all the invoices relating to, you know,
4    system replacement.  Things like that.
5    BY MR. OLIVER:
6        Q.  And ultimately would your client be
7    seeking to recover those damages?
8        MR. KASNER:  Object to the form.
9        A.  Yes.
10       That's the purpose of it, is if the
11   vendor or supplier is found liable, then it
12   would be, okay, what are the harms relating to
13   that liability.
14   BY MR. OLIVER:
15       Q.  And when you say harms, financial
16   harm; is that correct?
17       A.  It is economic damage relating to
18   the, relating to the issues of the case.
19       Q.  So moving through that first
20   sentence still in the second paragraph, you used
21   the phrase derivative products in banking
22   litigation.
23       What do you mean by derivative
24   products in banking litigation?
25       A.  What that would be is litigation and

44

1    investigative work relating to, for example -- I
2    can give you examples, like, that I would think
3    about.
4        Like I worked on the Merrill Lynch
5    Orange County litigation, and that litigation
6    dealt with a number of derivative products that
7    were sold by Merrill Lynch to Orange County.
8        And so, there was issues around
9    suitability of those derivative products.  And
10   derivative products are, you know -- you can
11   take a bond and slice it into all different
12   pieces and have interest only and have just a
13   balloon payment at the end.
14       And what a lot of these investment
15   banks do, is they'll take a product and they'll,
16   you know -- derivative products are being
17   derived from one regular bond and they're
18   basically, you know, developing products that
19   are derived from a regular bond.
20       Or it even could be some kind of
21   equities that they're doing with a product.  So
22   it really deals with those kinds of products.
23       Q.  Okay.  Thank you.
24       You have a section here on the list
25   that says valuation of entities.

45

1        What type of entities are you
2    referring to?
3        A.  It is probably all different types
4    of business valuations from companies that
5    manufacture pallets.
6        I mean, it is a little difficult for
7    me to remember them all because I do a lot of
8    rep and warranty cases for insurance carriers.
9        So if a buyer has a rep and warranty
10   insurance claim -- a rep and warranty insurance
11   policy, I should say, the buyer will go to the
12   insurance carrier and say my business was
13   misvalued by a certain amount.
14       And I would go in and analyze the
15   information that's been put forth by the buyer.
16   I'll look at the valuation models.  So a lot of
17   it is me overlaying the issue and revaluing the
18   company.
19       So, I'm just trying to think --
20   there have been all different types of
21   companies, financial services companies,
22   companies in the gas turbines of power plants
23   that I have done that kind of work for;
24   retailers that I have done that kind of work
25   for.  You know, waste energy plants.



82

1        MR. KASNER:  Object to the form.
2        A.  They were an audit client of mine.
3    Financial statements.
4    BY MR. OLIVER:
5        Q.  Okay.
6        So let's move over to the fourth
7    page, I believe, where it says additional
8    professional education.
9        Do you see that?
10       A.  Yes.
11       Q.  And these are education that you
12   have received from other entities; is that
13   correct?
14       MR. KASNER:  Object to the form.
15       A.  You know, I'm looking at them and I
16   mean, the paragraph up top, like where it talks
17   about various sponsored training programs
18   covering forensic accounting audit topics and
19   things like that, a lot of those were things
20   that I attended.
21       But then probably after that when it
22   talks about Lotus 123, fraud training, and then
23   all the other things I think are things that I
24   either co-presented on or actually presented on.
25   So I was actually an instructor.

83

1        So I think it is a combination of
2    professional education that I took in house, as
3    well as some of the things that I presented
4    outside of the firm.
5    BY MR. OLIVER:
6        Q.  So you performed training programs
7    within FTI?
8        A.  I have, yes.
9        Q.  How often do you do those training
10   programs?
11       A.  At least annually.  I'm usually
12   asked to do some breakout training at our annual
13   SMD meeting.  Like the last one I did was on
14   international arbitration.  So I presented on
15   that.
16       Sometimes -- I presented once on
17   ability to pay.  So, you know, it is a lot of
18   aspects of what I work on.
19       And we'll do breakouts and then SMD
20   level professionals will pick the breakout
21   training.
22       Q.  Excuse me, what does SMD stand for?
23       A.  Senior managing director.
24       Q.  And about how many senior managing
25   directors are there of FTI?

84

1        A.  Probably 500 or more.
2        Q.  And so, for these topics that you're
3    training, you would be considered the subject
4    matter expert for them?
5        MR. KASNER:  Object to the form.
6        A.  Yes, the firm would ask me to
7    present on it because I am subject matter
8    expert.
9        There are other subject matter
10   experts in the same areas of the firm.  I'm not
11   the only one.  Sometimes I'll co-present.  But
12   they're asking me because it is one of the areas
13   of my expertise, typically.
14   BY MR. OLIVER:
15       Q.  And so, your areas of expertise
16   could be generally summarized as what's listed
17   in the professional experience litigation and
18   investigation section on the second page?
19       MR. KASNER:  Object to the form.
20       A.  I mean, that might not be
21   everything.  As I said, there are other aspects
22   discussed throughout this resume, but those are
23   the primary ones.
24   BY MR. OLIVER:
25       Q.  And so, it looks like you list three

85

1    publications here on page 4.
2        Do you see where I'm looking?
3        A.  Yes.
4        Q.  Are there any other publications
5    that you have written?
6        A.  I don't believe so.
7        Q.  The practice note, would you
8    consider that a publication?
9        A.  Where are you looking?
10       Q.  I believe you mentioned earlier that
11   you wrote a practice note for AICPA, M&As
12   dispute task force.
13       A.  Yes, that's not really -- I mean, I
14   was the primary editor and I wrote certain
15   sections and edited certain sections.
16       But there's a whole list of like 15
17   or 20 people that were involved in writing that.
18   So I'm listing publications that I specifically
19   wrote alone.
20       I didn't list the practice aid
21   primarily because it was issued by the AICPA and
22   I was one of the editors but with about 20 other
23   people.  So a lot of the aspects I didn't write;
24   I only edited.
25       So that's why it was not listed.



86

1          Q.  Are there other publications that
2     you co-wrote or edited that aren't on this list?
3          A.  No, not that I can recall.
4          Q.  Did you mention that you wrote
5     something for PLI?
6               MR. KASNER:  Object to the form.
7          A.  No, those are just presentations
8     that I did for PLI.
9     BY MR. OLIVER:
10         Q.  Okay.
11              And so, the next several pages,
12    almost ten pages it looks like, lists your
13    testimony experience; is that correct?
14         A.  It is the last four years of my
15    testimony, that's correct.
16         Q.  I'm sorry, can you repeat that?
17         A.  This is the last four years of my
18    testimony experience.
19         Q.  The first line starts at June 1994.
20         Do you see that?
21         A.  Just give me a second.  Oh, okay.  I
22    don't think that's the one attached to my
23    report.  It is the one probably on the website.
24              Yes, I see that.
25         Q.  So of all of this list here, how

87

1     many of them are software cases?
2               MR. KASNER:  Object to the form.
3          A.  The Pentatech Corporation v. On-line
4     Software, software case.
5               The Peckham Materials versus Raima
6     Corporation, that was a software case.
7               The IMS Health versus Validity
8     Technology was a software case that I talked
9     about with matching.
10              The Avigilon Technology cases that
11    are here, I think there's maybe a few of them,
12    but those are technology cases.  Those are
13    dealing with technology that identifies -- it is
14    security technology.  So it is hardware,
15    software, code related to identifying, you know,
16    cars and people and things like that and how the
17    notifications work.  So that's all technology.
18              Those are the ones on my resume that
19    are related to technology matters.
20    BY MR. OLIVER:
21         Q.  Let's go back to the very first one,
22    Pentatech.
23              Can you explain what your role was
24    in those cases?
25         A.  Yes, that's the one that I talked

88

1     about with the system failure.
2               Let me just get back up to that one.
3               No, Pentatech was the one that was
4     against On-line Software and Computer
5     Associates.  That dealt with the software that
6     was written by my clients and then sold and
7     utilized by On-line Software when they merged
8     with Computer Associates.
9               It was considered a competition
10    violation.  So I was calculating the damages
11    relating, relating to that case.  So that dealt
12    with main frame software.
13         Q.  Do you remember what type of damages
14    you were calculating, such as, for example, lost
15    profits?
16              MR. KASNER:  Object to the form.
17         A.  I don't really remember.  I think, I
18    think it was lost profits and unpaid royalties,
19    a combination of the two.  I just can't recall
20    the details.
21    BY MR. OLIVER:
22         Q.  How about the next one you
23    identified, Peckham Materials Corporation.
24              Can you explain your role in that
25    case?

89

1          A.  Yes, that was the one that I talked
2     about with -- Raima Corporation was hired to
3     redesign its entire accounting, delivery
4     systems.
5               It was -- Peckham Materials Corp. I
6     think sold different types of rock and blacktop
7     and stuff like that to the New York Department
8     of Transportation.
9               So they had sophisticated systems
10    that would actually make the mixes, would record
11    the billings, would do all the accountings, an
12    entire system.
13              And so, the dispute was dealing with
14    Raima Corporation's alleged programming problems
15    and overcharges and the fact that they crashed
16    the systems and they had to be worked around.
17              And so, it was basically the systems
18    and limitation failure.  And so, I was doing the
19    damages work relating to that.
20         Q.  And damages work being the amount of
21    money that your client would want to recover due
22    to these issues?
23              MR. KASNER:  Object to the form.
24         A.  Yes.
25



BY MR. OLIVER:
Q. We talked about IMS Health Incorporated which was the next one you identified. So I don't think we need to talk about that again.
A. Yes.
Q. Alfa Laval, I believe is how you would say that, which occurred, you have dated December 2017.
Do you see that one?
A. Yes.
Q. I think that's on the third page from the end.
Can you tell me about your role in that case?
A. What's the caption on that case?
Q. Alfa Laval v. Blue Sage Capital, dated December 2017.
A. Yes, that was a transaction dispute where I was doing damages work, valuation work related to a water, water treatment company that did water treatment work.
Q. And what type of damages were you calculating for your client?
MR. KASNER: Object to the form.

A. I think I was evaluating the valuation damages that were being put forth by the buyer's expert. I was working for a seller.
BY MR. OLIVER:
Q. Okay.
So you were checking the damage calculations that they provided; is that correct?
MR. KASNER: Objection to the form.
A. Yes, I was replying to it. I was removing certain of the ones that were invalid. I was adjusting the market multiple because I did a market analysis.
I also -- I did put in an earn-out calculation. So there was a direct aspect of my testimony as well of what the earn-out should have been that wasn't paid to the seller.
So I did that calculation for the court, as well.
BY MR. OLIVER:
Q. Can you estimate how often you're -- for lack of a better word -- you're doing the initial calculations as compared to the rebuttal of those calculations?

MR. KASNER: Object to the form.
A. Probably a 50/50 mix, I would imagine. I kind of work on both sides of things.
And a lot of times, the defendant may call me in to do a counterclaim. So it is kind of like a defendant may be really making a kind of plaintiff type claim.
So there's some of the jobs that look like they're defendant that they might have been kind of plaintiff-related work.
So, but I would just -- my estimate would be about 50/50.
BY MR. OLIVER:
Q. Okay.
Did you identify, I may pronounce this wrong, Avigilon Technologies as a software case?
A. Yes, that's the securities software that I was talking about.
Q. Okay. Yes.
Are any of these cases related to the Computer Fraud & Abuse Act?
MR. KASNER: Object to the form.
A. I don't believe so.

BY MR. OLIVER:
Q. Have you done any litigation work related to the Computer Fraud & Abuse Act?
A. Not that I can recall.
Q. Okay.
So in your list of testimony experience, are any of these related to airlines?
MR. KASNER: Object to the form.
A. No. On the global business travel matter, I didn't end up testifying because it settled. That was the only one that I remember being airline-related.
We did a little work -- I did a little work, consulting work for Norwegian Air when they were having some financial difficulty, but I don't remember it being that much work.
BY MR. OLIVER:
Q. And then so, let's take those one at a time here.
For Allegiant, what type of work were you doing for them?
MR. KASNER: Object to the form.
A. I think I was pitching as part of a team to look at certain -- I think certain -- it



---

94

1  may have been certain restructuring aspects. I
2  just don't recall.
3          It was not a significant amount of
4  work. We just did a little work in the
5  beginning and I don't recall much of the
6  details.
7  BY MR. OLIVER:
8      **Q. And I know we talked about it**
9  **before, but can you explain again what your role**
10 **in Global Travel was?**
11     A. Yes.
12         I had a client that was going to buy
13 a percentage of that, of that business. And,
14 you know, Co-Vid hit and they ended up not
15 closing.
16         So we were looking at the ordinary
17 course aspects of the agreement. We were
18 looking at valuation changes in the business.
19 We were looking at, you know, at what point cash
20 flow -- at what point the business would run out
21 of cash flow as an entity, re-funded, you know,
22 would have to borrow more money.
23         You know, was it going to be solvent
24 after a certain period of time. So it was like
25 solvency valuation, cash flows. Those kinds of

---

95

1  things that we analyzed.
2          And we started to draft four
3  different expert reports, and it ended up
4  settling.
5      **Q. Okay. Thank you.**
6          MR. OLIVER: I'm going to pull up
7  another exhibit for us. This will be
8  Exhibit 421.
9              (Expert Rebuttal Report and
10             Disclosure of Basil Imburgia was
11             marked as Exhibit 421 for
12             identification, as of this date.)
13         THE WITNESS: Okay.
14 BY MR. OLIVER:
15     **Q. And can you state for the record**
16 **what document we're looking at?**
17     A. This is my expert rebuttal report
18 issued on September 29, 2003. 2023. Excuse me.
19     **Q. We talked a fair bit about your**
20 **professional background, but maybe we can start**
21 **with this section here on page 1.**
22     A. Okay.
23     **Q. You have a sentence that "My**
24 **expertise includes providing financial,**
25 **accounting, valuation and economic analysis to**

---

96

1  **attorneys and corporations in litigation,**
2  **arbitration and mediation matters."**
3      **Do you see that section?**
4      A. Yes.
5      **Q. Do you do any type of work currently**
6  **outside of litigation?**
7          MR. KASNER: Object to the form.
8      A. I would say the only aspects that
9  are nonlitigation but they're kind of
10 claim-related is I do a lot of rep and warranty
11 claims work.
12         So I'll review a claim presented.
13 It is not a litigation because I'm reviewing the
14 insurance company's client's presentation of a
15 claim and making a determination as to whether
16 it should be paid or not.
17         So it is not really a dispute. It
18 is really a valuation of a claim. So that's not
19 really arbitration or litigation. It is really
20 claims work.
21 BY MR. OLIVER:
22     **Q. So you would consider your expertise**
23 **also in claims work with regards to reps and**
24 **warranty, as you described it?**
25     A. Yes.

---

97

1          I mean, currently -- I mean,
2  historically I was a financial statement
3  auditor. I did performance improvement work. I
4  did valuation in nonlitigation cases previously.
5          Over the years, I've done probably
6  much more higher percent of nonlitigation work.
7          But I would say now -- besides the
8  North American leadership work, which is not
9  client work, but that's probably about 30
10 percent of my work that's nonlitigation-related.
11 But that's more leadership work.
12         The rest of it is, you know, is very
13 mediation, arbitration and litigation focused.
14     **Q. In our discussion of your**
15 **background, I don't know if we talked about**
16 **ERISA, Employment Retirement Income Security**
17 **Act.**
18     A. Sure.
19     **Q. Can you tell me a little bit about**
20 **what you do in that space?**
21     A. You know, I've done, you know, a
22 number of accounting-related claims that are
23 being put forth by different pension funds
24 relating to, you know, failure to account for
25 things properly.

---



1        MR. KASNER: Object to the form.

2     A. I mean, general damage analysis, if

3 you're talking about general damage analysis or

4 valuation analysis or accounting analysis,

5 you're not -- like accounting, you're applying

6 Generally Accepted Accounting Principles. So

7 your calculations and application are following

8 those principles.

9       In valuation, you're following the

10 typical valuation approaches like the cost, the

11 market approach, the discounted cash. You're

12 following the same approaches.

13       It is the same in damage analysis.

14 In damage analysis, you're following the same

15 approach. You're trying to do the but-for

16 analysis. You're trying to look at causal links

17 and things like that or are there other causes.

18       So the methodology is not different

19 in any of those kinds of areas. You just, you

20 just need to understand the facts and

21 circumstances of the situations that you are

22 applying those commonly applied kind of

23 calculation rules and facts to, in essence.

24 BY MR. OLIVER:

25   **Q. We talked about GAAP for accounting**

1 **as the standard.**

2     **Is there a standard for general**

3 **damage analysis?**

4        MR. KASNER: Object to the form.

5     A. The generally accepted accounting

6 literature is literature that companies need to

7 follow and accountants need to follow.

8       It is, it is, it is authoritative

9 literature that needs to be followed. When it

10 comes to damage analysis or even valuation, for

11 the most part, there's books, textbooks written,

12 publications written on valuation methodologies,

13 on damages methodologies that are put out by the

14 industry of different type -- you know, the

15 damages experts or the valuation experts.

16       So you're typically following those

17 general rules as a damage or valuation expert,

18 but it is not like the accounting literature.

19       The accounting literature is adopted

20 by the SEC. The accounting literature comes out

21 from bodies. And as a CPA, these are the kind

22 of rules that you actually follow when you're

23 doing -- putting together financial statements.

24       I think when it comes to valuation

25 and damages, there really aren't like a set of

1 rules like the accounting standards. They're,

2 you know, discussions in textbooks and things

3 like that of things you should be following and

4 ways that a damage expert should be thinking to

5 make things -- to make sure it is logical.

6       There's causal links to things that

7 makes fair that there's no windfalls and things

8 like that.

9       So that practice is typically, is

10 typically followed, but it is not -- they're not

11 rules that, you know, that are put out.

12       Now, I mean, there's case law that's

13 relating to damage analysis that could be

14 construed as some kind of rules, as well. But

15 as a damages expert, I think you're mostly --

16 you're understanding how, how your industry does

17 calculations when you come to a damage type

18 situation.

19       THE WITNESS: I just want a

20 bathroom break and grab some water.

21 Maybe five minutes?

22       MR. OLIVER: That works for me.

23 Five minutes, yes.

24       THE VIDEOGRAPHER: We are going

25 off the record. The time is 11:53 a.m.

1       (Whereupon, at 11:53 o'clock

2 a.m., a recess was taken until 12:40

3 o'clock)

106

1      A F T E R N O O N   S E S S I O N
2           12:40 o'clock p.m.
3           THE VIDEOGRAPHER:  We are back on
4      the record.  The time is 12:40 p.m.
5   BY MR. OLIVER:
6      Q.  So before the break, we were talking
7   about general industry rules and standards.
8   Basically about general accounting damage
9   analysis, accounting and then valuation.
10          I would like to move over to
11  paragraph 6 in your report, which is
12  Exhibit 421.
13     A.  Okay.
14     Q.  My first question to you is, were
15  you working with team members on this report?
16     A.  Yes.
17     Q.  What was the billing rate of your
18  team members?
19     A.  Probably somewhere in the range of
20  500 to $900 an hour, roughly.
21     Q.  How many team members were you
22  working with?
23     A.  I think principally two team members
24  were kind of the core team.
25     Q.  And were there other team members

107

1   supporting you outside of this core team?
2      A.  We usually have a separate group
3   doing like QC work.  So there's probably one or
4   two people that did QC work.
5      Q.  What do you mean by QC work?
6      A.  Like, they'll take the report and
7   they'll tie to the support.  Even though we've
8   done that already when we're drafting the
9   report, we'll just have one or two separate
10  people kind of redo those steps, add up the
11  numbers on the schedules and just making sure,
12  you know, the report is correct.
13     Q.  And so, the core team members that
14  you were referring to, these two people, what
15  were their roles in this report?
16     A.  Dana Hayes is a managing director.
17  Her primary responsibility is being charged with
18  the project, draft sections of the expert report
19  and help me supervise the team.
20          The team really is Carly Rowen.  She
21  was a director that worked on this matter, as
22  well.  She would have done some of the
23  calculations in schedules or calculations that
24  were referred to in notes to the report.
25     Q.  What sections did Dana Hayes write?

108

1      A.  What I typically do and did in this
2   matter is I will typically sit down and I'll
3   outline the report draft.
4           Like things like my background and
5   things like that are already written from other
6   reports.  So I will provide that to Dana and the
7   team.
8           I'll outline the report, you know,
9   after reviewing the pleadings and the opposing
10  expert's report, I'll outline it for her.  I'll
11  provide her that outline.
12          And then Dana and Carly will write
13  the sections of the report.  They take the first
14  shot at writing and then provide it to me, and
15  then I provide edits to them, rewrites to them.
16          That's how I typically work.
17     Q.  Can you estimate how much time you
18  and your team spent on this report?
19     A.  I'm not the billing person, so I
20  don't have it.  I would imagine maybe 120 hours,
21  maybe 140 hours, roughly.
22     Q.  And about how much of that was your
23  core team as compared to you?
24     A.  I probably had about 20 or 25 hours,
25  roughly, I would guess.

109

1      Q.  And so, the balance would be your
2   core team?
3      A.  Yes.
4      Q.  Jumping back up to paragraph 5, you
5   mention you've been deposed and testified as an
6   expert in several -- you know, in many different
7   cases here.
8           Have any of your expert reports been
9   disqualified?
10     A.  No, they haven't been disqualified.
11  I've had -- I had one case where I was doing a
12  covenant compliance review in a bench trial.
13          And when I said out of compliance,
14  the judge said "Your direct testimony should
15  cross that out because I'll make the decision
16  about out of compliance.  With the covenants you
17  can just present me with the numbers in the loan
18  agreements and you can do the calculations and
19  present me.  I want out of compliance out of
20  your direct testimony."  Making the conclusion
21  that that's a legal conclusion.
22          So that was one where just the out
23  of compliance was taken out of my report, but
24  the direct testimony went in.  The rest of it
25  went in in writing.

110

1        I just recently was doing a case
2   where I'm doing the damages work and I'm relying
3   on a branding and I'll call it a communications
4   expert to do all of my damage calculations.
5        But instead of just relying on that
6   expert, I wanted to kind of redo all the work
7   that she did myself and put that in my report.
8        And I did, I did the branding tests.
9   I looked at the communications.  I listened to
10  all the customer communications with the, with
11  the service providers that were at issue in this
12  matter.
13       In that case, the judge said "You
14  can rely on that branding and communications
15  expert.  It is fine.  You can do all your
16  calculations, but, you know, since you're an
17  accountant, I don't want you dealing with the
18  branding communications.  I don't want a redo of
19  what she did."
20       So all the numbers went in, and that
21  stuff I'm not going to be able to testify to.  I
22  believe that's, that's it that I can think of.
23       Q.  So now referring to paragraph 7 of
24  your report, do you see which paragraph I'm
25  looking at?

111

1        A.  Yes.
2        Q.  The sentence reads "This matter
3   relates to claims brought by Ryanair DAC against
4   Booking Holdings Inc." and then the rest of the
5   defendants here.
6        Is your report related to the
7   defendants' counterclaims?
8             MR. KASNER:  Object to the form.
9        A.  Yes, at this point I haven't been
10  asked to do anything relating to any
11  counterclaims.
12  BY MR. OLIVER:
13       Q.  Are you aware of the counterclaims
14  from the defendants?
15            MR. KASNER:  Object to the form.
16       A.  I mean, I heard the word
17  counterclaim mentioned by the attorneys, but I
18  haven't reviewed any counterclaims or I haven't
19  reviewed anything relating to them.
20  BY MR. OLIVER:
21       Q.  Okay.
22       Looking at paragraph 8 here, it says
23  "FTI has been retained by Cooley LLP (Counsel)
24  to evaluate Ryanair's estimate of damages."
25       Do you see the sentence I'm

112

1   referring to?
2        A.  Yes.
3        Q.  So when you say evaluate Ryanair's
4   estimate of damages, what are you referring to
5   by that?
6        A.  I'm referring to Mr. Lopata's report
7   and what he's presenting in his report.
8        Q.  And then, the next sentence there
9   refers to the Computer Fraud & Abuse Act.
10       Do you see that?
11       A.  Yes.
12       Q.  Did you review the Computer Fraud &
13  Abuse Act?
14            MR. KASNER:  Object to the form.
15       A.  Yes, yes.
16  BY MR. OLIVER:
17       Q.  Is it all right if I refer to that
18  Computer Fraud & Abuse Act as the CFAA?
19       A.  Yes, that's fine.
20       Q.  In the next paragraph, you note
21  that -- and I'm reading from your paragraph 9.
22       It says "I note that
23  Mr. Lopata states that he's not a damage expert.
24  However, his report concerns the calculation of
25  damages, which he acknowledges."

113

1        Do you see which sentence I'm
2   referring to?
3        A.  Yes.
4        Q.  Why does it matter that Mr. Lopata
5   stated that he's not a damages expert?
6             MR. KASNER:  Object to the form.
7        A.  It matters because he may not be
8   familiar with how to do a complete damage
9   calculation.  That's why I referred to that.
10  BY MR. OLIVER:
11       Q.  Okay.
12       So that's relevant for the reasons
13  you stated before?
14            MR. KASNER:  Object to the form.
15       A.  Well, it is relevant because since
16  he doesn't do damage analysis, he may not
17  understand what kind of support you would
18  normally look for as a damages expert.
19       You would not understand causation
20  issues.  You would not understand offsetting
21  profits and things like that.
22       So, he may not understand what is
23  typically done in doing damage analysis and what
24  is typically considered.
25





122

1  the high-level summary opinions in my report.
2  BY MR. OLIVER:
3      Q.  Okay.
4

123

124

1  BY MR. OLIVER:
2

25  because it is based on the underlying

125



126

17    Q.   What do you mean by the actual costs
18  related to the claimed violation?
19       A.   Well, the actual costs related to
20  the claimed violations are going to be, you
21  know, the actual costs of -- making it simple,
22  it is going to be the actual costs in the
23  payroll records for certain individuals and it
24  is going to be the actual costs that are
25  reflected in the invoices that were sent to the

127

1   company and paid by the company.
2        So it is twofold.  The actual costs
3   are not confirmed by relying on just the
4   interrogatories.
5        And so, you know, if you went and
6   got the correct documentation, then that would
7   support the actual costs.
8        Now, there's issues with estimates
9   as well, which is a different issue.  But, you
10  know, when we're talking about support, those
11  are the elements of support that he didn't, he
12  didn't, he didn't trace and agree his
13  calculations to.

128

129

MAGNA
LEGAL SERVICES



**130**

[text redacted]

**131**

MR. KASNER:  Object to the form.

[text redacted]

15  BY MR. OLIVER:
16      Q.  And can you explain what a slowdown
17  is?
18      A.  I think in the pleadings, I saw
19  reference to you, you know, significant activity on
20  Ryanair computer systems and claims and alleged
21  claims that they, you know, as the activity
22  increased, the system slowed down.
23          So that's what I'm referring to.
24      Q.  And then, what about a shutdown,
25  what is that?

**132**

1       A.  I think if the activity was so
2   significant, I think there's like a day they
3   referred to when the system went down.
4           I think that's -- I think that's
5   what Mr. Lopata was referring to in his report
6   because this is kind of a reply to his report.
7   So I think that's what he's referencing.
8       Q.  Do you know what a brownout is?
9           MR. KASNER:  Object to the form.
10      A.  Excuse me, can you repeat that?
11  BY MR. OLIVER:
12      Q.  A brownout, do you know what that
13  means?
14          MR. KASNER:  Object to the form.
15      A.  I mean, only in the context of --
16  you know something, I wouldn't want to
17  speculate.  I'm not sure that I know.
18  BY MR. OLIVER:
19      Q.  Do you know what a blackout is?
20          MR. KASNER:  Object to the form.
21      A.  I mean, in the context of utilities
22  and things like that, I would think it is, you
23  know, exactly what it sounds like.  Your
24  electricity goes off and you're blacked out.
25

**133**

1   BY MR. OLIVER:
2       Q.  Do you know what it means in the
3   context of computer science?
4           MR. KASNER:  Object to the form.
5       A.  I don't really recall.  I might have
6   read it in a deposition that I read, but I don't
7   recall.
8   BY MR. OLIVER:
9       Q.  So moving to the next bullet point

[text redacted]

MAGNA
LEGAL SERVICES

134



135



20    Q.  You used this term a few times.  I
21  don't know if we have gotten to a proper
22  definition.
23    Can you explain the term but-for?
24  A.  Sure.
25    Typical damage analysis.  So let's

136

1    just put a hypothetical up there.  So if I have
2    a contract where somebody was supposed to supply
3    me a thousand products and they didn't comply
4    with the contract and they only gave me 500 of
5    those products, right, a but-for world analysis
6    is had they actually complied with the contract,
7    did the right things, didn't violate and breach
8    a contract, the supplier would have given me a
9    thousand.
10    And then you have to say, okay, what
11  kind of profits would I have made on that
12  additional 500.
13    So the but-for world is basically
14  taking the acts of the defendants and saying,
15  okay, how would the profit and loss of a
16  business change but for these acts.
17    So you correct for it, and then you
18  try to calculate what the effect is.
19    So that's the but-for world.
20    Q.  And does that come from your general
21  damage analysis?
22    MR. KASNER:  Object to the form.
23  BY MR. OLIVER:
24    Q.  Sorry, let me rephrase that.
25    Is the but-for world the source of

137

1    that theory from general industry practice for
2    damage calculations?
3    A.  Yes, that's general practice.
4    That's where I referred to a number of textbooks
5    that talk about it, as well as my, you know, 35
6    years of doing this kind of work, my knowledge
7    of how you do these calculations.
8    Q.  Okay.
9    So moving to the next paragraph,
10  paragraph 13 in the summary of factual
11  background.  This very first sentence, it reads
12  "Ryanair is Europe's largest airline group and
13  parent company of Ryanair, Ryanair UK, Buzz,
14  Lauda and Malta Air."
15    Do you see that sentence?
16  A.  Yes.
17    Q.  Can you clarify that for me?
18    Is Ryanair the parent company of
19  Ryanair?
20    MR. KASNER:  Object to the form.
21    A.  You know, this is a quote we got off
22  of Ryanair website.
23    So Ryanair is Europe's largest
24  airline group and parent company of Ryan, Ryan
25  UK.  I mean, I'm quoting.



138

1          I'm trying to give some background
2   of the company, so I usually go to their own
3   descriptions.
4          And so, I don't think I know the
5   answer because -- like I don't think these
6   are -- I think in this language, they're not the
7   official corporate names.  They're kind of more
8   user friendly names.  So they're cutting out
9   some of the LLPs and the inc.s and things like
10  that.
11         So I think they're just trying to
12  make it more customer friendly.  So I can't
13  answer it based on this without probably looking
14  at -- I could look at the 10K and tell you.
15  BY MR. OLIVER:
16      **Q.  Do you know who the party of this**
17  **litigation is?**
18      A.  So the plaintiff is Ryanair DAC.
19      **Q.  And do you know if that's the**
20  **airline group and parent company as it says in**
21  **that quote?**
22      A.  I would assume it is because Ryan
23  was probably named in the beginning of this
24  report as the, as the plaintiff.
25         So Ryanair in paragraph 7 is Ryanair

139

1   DAC Ryanair.  So -- and the way this is -- if
2   we're putting in Ryan, then this information --
3   if this is the parent company, I would imagine
4   based on the way this is written Ryanair is the
5   parent company to these other companies.
6      **Q.  Also, in the next sentence it says**
7   **"The tables below contain summaries of Ryanair**
8   **operational and financial data."**
9          **Do you see that?**
10      A.  Yes.
11      **Q.  So this is financial data in your**
12  **understanding of Ryanair DAC?**
13      A.  Well, it is going to be -- if you
14  look in note 9, it is Ryanair Group.
15         So I assume it is the parent company
16  and all of its subsidiaries consolidated.
17      **Q.  Okay.**
18         **So you would believe that this**
19  **information includes Ryanair UK, Buzz, Lauda and**
20  **Malta Air?**
21      A.  I mean again, I would have to look
22  at the note 1 to the financial statements to see
23  what's consolidated out.
24         But I would assume the Ryanair Group
25  is all their entities because you don't have a

140

1   choice if they're -- if they're majority owned,
2   you have to consolidate them in these, in these
3   financial statements.
4      **Q.  Okay.**
5          **Why did you include this**
6   **information?**
7      A.  For background purposes.  You're
8   always going -- I mean, we're dealing with costs
9   that are being put forward in Mr. Lopata's
10  report.
11         So if you're putting costs forward,
12  you want to understand what the entire income
13  statements look like for the company at issue.
14         So, what we did is we took like some
15  of their selected financial data that deals with
16  flight activity and passenger load factors and
17  profitability revenues, as well as the actual
18  income statement for the entity that lays out
19  the actual revenues, profits, taxes, things like
20  that.
21         But it is background.  It is for
22  background purposes.
23      **Q.  Okay.**
24         **Looking at paragraph 14 --**
25      A.  Okay.

141

1      **Q.  -- it looks like you have some**
2   **quotes about each of the different defendants**
3   **such as, you know, Booking.com is an online**
4   **travel company founded in Amsterdam and is,**
5   **quote, one of the world's largest leading**
6   **digital travel companies, end quote.**
7          **Do you see that?**
8      A.  Yes.
9      **Q.  For Priceline, a couple sentences**
10  **down, you write that "Priceline, an OTA, was**
11  **founded in 1997 to address unmet travel demands**
12  **through the internet."**
13         **What travel demands was Priceline**
14  **trying to meet?**
15         MR. KASNER:  Object to the form.
16      A.  You know, without looking at the
17  website, I don't think I recall.  Because this
18  is coming from their own website information.
19  So, I just don't remember without looking at
20  more details.
21         And they may not even say it in
22  there.  That may just be, you know -- it is just
23  background on why the company was formed.  So
24  I'm not sure it would even be in the details.
25





142

BY MR. OLIVER:
Q.  Okay.
So you're not sure if that is a
quote or if that's your own language?
A.  I mean, we -- it may be
paraphrasing.  It is possible, but it would have
been basically paraphrasing what we saw on the
website.
Q.  Okay.

143

So it is fair to say that these are,
you know, standard damage practice best
practices?
MR. KASNER:  Object to the form.
A.  Yes, these are things that damage
experts are going to consider in their analysis;
fixed variable expenses, verifying costs.  You
know, what the but-for world would be, you know,
with offsetting revenues and mitigation.
BY MR. OLIVER:

144

Q.  Okay.
And so this, as you were saying, is
a standard practice and, you know, you cite to
the Reference Guide on Estimation of Economic
Damages?
MR. KASNER:  Object to the form.
A.  Yes.
BY MR. OLIVER:
Q.  Is that a well-regarded source in
your industry?
A.  Yes.
These textbooks that I'm referring
to, I typically do refer to and utilize.
They're in my office.  And others in my firm and
practice also utilize the similar, same
textbooks.

145

Q.  And so, when you're looking at
resources like this, it is pretty standard
across claims and across industry; is that
correct?
MR. KASNER:  Object to the form.
A.  Yes, I would say, you know, these
kinds of things are things that damages experts
are typically considering and evaluating and
building into their calculations.
BY MR. OLIVER:

MAGNA
LEGAL SERVICES





162

1    So you can read No. 11 there. "As
2  used in this section, the term loss means any
3  responsibility," and then it goes on for the
4  rest of the definition.
5    A. Yes.
6      MR. KASNER: Object to the form.
7    A. I see that. Okay.
8  BY MR. OLIVER:
9    Q. Okay.
10    So looking back at 11 here for the
11  term loss, and it means -- do you understand
12  what any reasonable cost to any victim means?
13      MR. KASNER: Object to the form.
14    A. I mean, my view is looking at that
15  as a damages person is, you know, if you have
16  some kind of computer fraud event that, you
17  know, it is describing loss as being, you know,
18  any cost to the victim.
19    I mean, cost I assume is going to be
20  some kind of expense, spending, that kind of
21  thing.
22  BY MR. OLIVER:
23    Q. And it goes on to provide examples,
24  and it says including the cost of responding to
25  an offense.

163

1    Do you see that?
2    A. Yes.
3    Q. And then it says conducting a damage
4  assessment.
5    Do you see that?
6    A. Yes.
7    Q. And then it says and restoring the
8  data program system or information to its
9  condition prior to the offense.
10    Do you see that?
11    A. Yes.
12    Q. Any revenue lost.
13    Do you see that?
14    A. Yes, I see that.
15    Q. And then it goes on to say cost
16  incurred or other consequential damages incurred
17  because of the interruption of service.
18    Do you see that?
19    A. Yes, I see that.
20    Q. So I would like to jump back to
21  Exhibit 422.
22    A. Okay.
23    Q. And then back to 5(c) in that far
24  right column where it leads with intentionally
25  accesses a protected computer without

164

1  authorization.
2    A. Yes.
3    Q. What do you mean by the term loss
4  there?
5      MR. KASNER: Object to the form.
6    A. Yes, I think the term loss, as
7  they're using it, probably is -- it seems like
8  it is everything. It is costs, it is
9  consequential damages. It is investigative
10  costs. It seems like it is the whole gamut.
11    I think damage, as they're using it,
12  seems to be relating to damage to your computer
13  system. It seems to be more limited. Loss
14  seems to be a bigger category, in essence.
15  BY MR. OLIVER:
16    Q. Okay.
17    So let's take one more jump back to
18  Exhibit 421 which is your report.
19    A. Yes.
20    Q. So I would like you to take a look
21  at paragraph 17.
22    A. Okay.
23    Q. What do you mean by the industry
24  standard principles of calculating economic loss
25  and damages?

165

1      MR. KASNER: Object to form.
2    A. It is basically, as a damages
3  expert, it is basically the principles I talked
4  about previously; mitigation, the but-for world,
5  understanding fixed and variable expenses,
6  understanding, you know, what costs and what
7  revenues would be eliminated but for the
8  defendants' actions.
9    It is general damage analysis.
10  BY MR. OLIVER:
11    Q. So when you use the term loss and
12  damages here, are you referring to those
13  definitions we saw in the Computer Fraud & Abuse
14  Act?
15      MR. KASNER: Object to the form.
16    A. I would say that I'm referring to
17  general damages and loss as a damages expert
18  would do its calculations which, if you look at
19  paragraph 16, which is from the CFAA, I think it
20  is looking at all those components, the
21  consequential damages, the cost elements, is
22  there any data program problems, cost
23  investigation.
24    I think it relates to the issue here
25  is coming into a system using that data to sell



166

1  customer business.  So it is basically related
2  to the situation and the claims of the case.
3         So I'm referring to it from a
4  general damage theory, and I use loss and
5  damages synonymously because, you know, when it
6  comes into investigating the damage to your
7  computer system, right, I would think about that
8  as, you know, I lost data, I lost code and I
9  have to spend costs to get that data and code
10  back up.
11         They define that as a damage.  You
12  could define that as a loss, too, reading this
13  because, you know, it talks about conducting
14  damage analysis when it is referring to the term
15  loss.
16         So I still think they're very
17  synonymous because all of those things are, in
18  my view, expenditures that you need to incur.
19         And, you know, as I said, we use
20  damage and loss usually synonymously.  We don't
21  define them as different things because they are
22  very similar.
23  BY MR. OLIVER:
24     Q.  Are you aware of any industry
25  standard principles for calculating loss as

167

1  defined by the CFAA?
2         MR. KASNER:  Object to the form.
3     A.  Yes, it would be my opinion that you
4  have to apply general damage theory, and I don't
5  see the loss reference as being any different
6  than general damage theory.
7         So, you know, you have this statute,
8  the CFAA.  It is talking about costs.  It is
9  talking about lost profits and those kinds of
10  damages and interruption of services.
11         It is the same kind of damage
12  analysis you would do in any type of case.  You
13  are going to look at costs.  You're going to
14  look at revenues.  You're going to look at lost
15  profits, consequential damages which are
16  typically referred to in most contracts.  The
17  same kind of thing in my opinion.
18  BY MR. OLIVER:
19     Q.  So let's go back to paragraph 18.
20     A.  Okay.
21     Q.  Do you see the sentence that starts
22  with damages should be limited to those which
23  would not have arisen absent the defendant's
24  conduct?
25         Do you see that?

168

1     A.  Yes, correct.
2     Q.  And then it goes on to have a quote
3  from the Reference Guide on Estimation of
4  Economic Damages?
5     A.  Yes.
6     Q.  Does the Reference Guide on
7  Estimation of Economic Damages discuss the CFAA?
8         MR. KASNER:  Object to the form.
9     A.  The text that I'm referring to are
10  written by financial and economic and accounting
11  people.
12         I don't think they're going to go in
13  and reference, you know, different types of laws
14  and rules.  They may.  I have to look at the
15  entire text.
16         But I would think they're basically
17  talking about damage analysis from the
18  perspective of what damage professionals do in
19  the industry.
20         But, you know, I would have to look
21  at the entire text to see if they're referring
22  to the CFAA in any way.  I just don't recall.
23  BY MR. OLIVER:
24     Q.  So the first part of that sentence,
25  you know, that we were just talking about says,

169

1  damages should be limited to those which would
2  not have arisen absent the defendant's conduct.
3         Do you see that?
4     A.  Yes.
5     Q.  And then, looking at the term loss
6  as defined in the CFAA, which you can also see
7  in paragraph 16 so we don't have to go back to
8  those other exhibits, conducting a damages
9  estimate.
10         Do you see that?
11     A.  Yes.
12     Q.  Wouldn't that be a, you know, a cost
13  associated from the defendants' conduct?
14         MR. KASNER:  Object to the form.
15     A.  Yes, I mean, that's a situation if
16  the defendants have done something and, in
17  relation to what they have done, you have to do
18  a damage assessment.
19         So you have to investigate the
20  effects of what the defendants have done.  That
21  is something that is tied to the defendants'
22  actions.
23         So if I'm doing it in relation to
24  the defendants' actions, and but for those
25  defendants' actions that cost wouldn't be



170

```
 1    incurred, then it is related.  It is kind of an
 2    incremental cost.
 3    BY MR. OLIVER:
 4        Q.  So moving over to paragraph 19
 5    again.  The first sentence reads damages must be
 6    proven to a reasonable degree of certainty.
 7            Do you see that?
 8        A.  Yes.
 9        Q.  Are you referring to damages as
10    defined by the CFAA or damages as used in your
11    general damage industry standard?
12            MR. KASNER:  Object to the form.
13        A.  Let's put it this way, I use damages
14    and loss synonymously.
15            So I would refer to both damages and
16    losses, anything you're claiming.
17            Because normally, you know, in a
18    litigation you don't say I have a loss expert.
19    You normally say I have a damage expert that's
20    putting all of the what you want to call losses
21    and damages together and making a damages claim.
22            So when I refer to damages, I'm
23    referring to the whole gamut.
24    BY MR. OLIVER:
25        Q.  And then you provide a quote from
```

171

```
 1    the AICPA in the next sentence.
 2            Do you see that?
 3        A.  Yes.
 4        Q.  Does the AICPA discuss calculating
 5    loss under the CFAA?
 6            MR. KASNER:  Object to the form.
 7        A.  Yes, I'd have to look at the text to
 8    see if they talk about it or not.
 9            I think again it is more general
10    damage calculations that you are doing in all
11    different types of contexts, including the CFAA,
12    I would imagine, because paragraph 16 sounds
13    just like the way you do a general damage
14    calculation in many different cases.
15            But, again, I don't know if they
16    refer to it or not without looking at the text.
17    BY MR. OLIVER:
18        Q.  Okay.
19            But you're not aware of as of right
20    now?
21        A.  Yes, I don't recall one way or the
22    other at this point.
23        Q.  Okay.
24            Looking back at paragraph 20,
25    failure to consider offsetting revenues.
```

172

```
 1            Do you see that?
 2        A.  Yes.
 3        Q.  Does the CFAA require offsetting
 4    revenue?
 5            MR. KASNER:  Object to the form.
 6        A.  I would believe so based on the fact
 7    that when it is defining the term loss, it is
 8    talking about components, costs, respond to an
 9    offense, conducting damage assessment, restoring
10    the data programs and systems to the condition
11    they were prior to the offense and then any
12    revenue loss, costs incurred and other
13    consequential damages incurred because of the
14    interruption.
15            You know, my view is looking at
16    that, it is looking at all elements of damage
17    analysis.  It is looking at consequential too.
18    Do I have lost profits, as well.
19            So, you know, components of loss
20    would include lost profits.  It is just here we
21    have a unique situation where the OTA's business
22    is bringing profits to Ryanair.  So a
23    consequence of the OTAs, based on paragraph 16,
24    would be profits.
25            So my view is that that's part of
```

173

```
 1    typical damage analysis.  You're doing typically
 2    a lost profits claim.
 3            But here the consequence is an
 4    actual profit, not loss.  So it's got to be
 5    considered based on this paragraph and general
 6    damage theory.
 7    BY MR. OLIVER:
 8        Q.  Does the definition of loss use the
 9    term profit?
10            MR. KASNER:  Object to the form.
11        A.  It is using consequential damage
12    which you're thinking is lost.
13            But if it is not a harm, you know,
14    in your but in your but-for world analysis,
15    you're going to try to figure out what it is.
16            And if it is profits, you know, if
17    you're going to put forward a reasonable damage
18    calculation, you have to consider all the
19    effects of the but-for world of eliminating
20    defendants.  And this would be one of those
21    effects.
22    BY MR. OLIVER:
23        Q.  And does your answer change even
24    though it says "or other consequential damages
25    incurred because of the interruption of
```



174

```
 1    service"?
 2              MR. KASNER:  Object to the form.
 3         A.  No, it doesn't change my view.  You
 4    have to look at -- I think most of this -- it is
 5    a unique situation.  All right.
 6              If you think about it, you think
 7    about loss and harm.  You don't think about
 8    somebody taking data off your system, selling
 9    business in essence to customers that come back
10    and buy Ryanair flights and you make a profit.
11              It is almost like the activities of
12    the OTAs are profitable.
13              I don't think that the CFAA was
14    thinking that computer fraud and abuse would
15    lead to profits.  I just don't think it was
16    designed that way.
17              But it does talk about consequential
18    damages which are the consequence of the actions
19    which are the consequence of these actions, and
20    eliminating those actions in damage analysis
21    would eliminate a profit for Ryanair.
22              And that has to be considered in
23    damage work.
24    BY MR. OLIVER:
25         Q.  And so, can you explain the
```

175

```
 1    difference between offsetting revenues and
 2    considering mitigation?
 3         A.  Offsetting revenues are
 4    consequential damages are one of the effects of
 5    taking the OTAs out of, you know, the OTA
 6    defendants out of the Ryanair activity.
 7              So offsetting revenues is what
 8    profit if those OTAs that are the defendants
 9    weren't selling bookings, what profits would be
10    eliminated.
11              So, that's separate.  I think
12    mitigating -- I don't think mitigation is
13    relating to Ryanair specifically.
14              I don't think Ryanair -- I don't
15    think the offsetting revenues is mitigation.  I
16    think the offsetting revenues is just -- it is
17    something Ryanair isn't, isn't doing relating to
18    a damage.  It is just the effects of removing
19    the defendants from Ryanair activity.
20              Mitigation is basically -- and I
21    talked about it.  You know, the streamlining is
22    are there things that Ryanair are doing that
23    they're doing specifically that are costing
24    more.
25              And mitigation would be if they're
```

176

```
 1    deciding to do something that cost them more.
 2    If they mitigated, they would maybe change a
 3    procedure and it may cost them less kind of
 4    thing.
 5              I think they're two separate things.
 6         Q.  Does the definition of loss under
 7    the CFAA include the cost of responding to an
 8    offense?
 9              MR. KASNER:  Object to the form.
10         A.  Yes, I mean it says any reasonable
11    cost to any victim, including the cost of
12    responding to an offense.
13    BY MR. OLIVER:
14         Q.  And do you understand what the word
15    offense means in the context of the CFAA?
16              MR. KASNER:  Object to the form.
17         A.  I would say it is some computer
18    fraud alleged offense.  I would think that
19    that's what they're referring to.
20    BY MR. OLIVER:
21         Q.  And so, responding to an offense, is
22    that different than the duty to mitigate?
23              MR. KASNER:  Object to the form.
24         A.  I would think that's something
25    different than duty to mitigate.
```

177

```
 1              Responding to events to me seems
 2    like I have a hacking issue and I'm going to
 3    respond to that issue.
 4              So, I don't -- mitigation is
 5    something different.
 6    BY MR. OLIVER:
 7         Q.  And so, something like streamlining
 8    certain processes -- let me start that over.
 9              So streamlining certain processes
10    would make it easier for OTAs; is that correct?
11              MR. KASNER:  Object to the form.
12         A.  I think the streamlining I'm talking
13    about is -- I think we specifically referred to
14    in my report as them, Ryanair, making it more
15    difficult for certain verifications and things
16    like that for certain OTA customers.
17              And I refer to that as my example of
18    duty to mitigate.  I say that, you know, that's
19    under their control.  They can make, they can
20    make it easier for the customer.  If they make
21    it easier for the customer, it may cost them
22    less.
23              So that's the duty to mitigate.  I
24    don't think it is talking about making it easier
25    for OTAs to scrape or do any of that kind of
```



182

[redacted]s.

6  BY MR. OLIVER:
7     Q.  So you believe those types of
8  calculations are required under the CFAA when
9  determining loss?
10    A.  Yes.
11    Q.  Are those minimum calculations
12  required when determining the $5,000 threshold
13  under the CFAA for bringing a claim?
14       MR. KASNER:  Object to the form.
15    A.  I would imagine they are.  I mean,
16 if you're trying to look at a statute and the
17 statute says you should refer to a certain level
18 of costs, I would think that you, you know, you
19 shouldn't be not tying into the actual
20 information.
21       I mean, if you're comparing a
22 number, you want to make sure you're doing loss
23 and damage analysis to a reasonable degree of
24 certainty.
25       So when you do that, you can always

183

1  compare, as the statute says, to a $5,000
2  number.  That's fine.
3       But you can't have speculative
4  numbers that are being compared to a $5,000
5  number.  They're looking for, you know, real
6  valid loss numbers that are substantiated when
7  you do that comparison.
8     Q.  And what do you --
9       MR. KASNER:  Let him finish.
10    A.  I just wanted to say -- so ask your
11 question, and then if we can just take a
12 five-minute break.
13 BY MR. OLIVER:
14    Q.  What is your understanding -- so you
15 just explained -- let me start over.
16       So you just explained that you
17 believe these general accounting principles are
18 applicable to the $5,000 threshold limit under
19 the CFAA, and obviously you used different words
20 there.
21       But my question to you is, what's
22 the basis for your understanding for that?
23    A.  Well, when I read the paragraph
24 about the types of loss, right, those types of
25 loss basically a description of different

184

1  types of damages that you would calculate;
2  consequential costs, direct damages, indirect
3  damages, those kinds of things.
4       The $5,000, if you're comparing
5  those losses, those types of losses to a $5,000
6  number, you know, those types of losses are
7  going to have to be, you know, done to a
8  reasonable degree of certainty.
9       I mean, it starts with any
10 reasonable costs.  So it is putting the words
11 reasonable in there, as well.
12       So my view is the 5,000 is just a
13 number.  You're supposed to follow their kind of
14 definitions, which to me, sound just like, you
15 know, typical economic damage work.
16    Q.  You used the -- referenced the word
17 "reasonable".
18       Who determines reasonability under
19 the definition of loss?
20       MR. KASNER:  Object to form.
21    A.  Well, reasonable degree of
22 certainty.  Reasonable nature.  I mean, as a
23 damage expert, I'm evaluating the reasonable
24 nature of things because when I'm putting any
25 kind of loss damage analysis together, they have

185

1  to be to a reasonable degree of certainty.
2       But ultimately the court makes that
3  determination.  I'm just presenting to the
4  finder of facts my views and then they consider
5  whether what I'm presenting is to a reasonable
6  degree of certainty or not.
7       But as a damages expert, I am
8  attempting to make sure that what I'm presenting
9  is to a reasonable degree of certainty.
10       THE WITNESS:  Can I just take
11    that break now?
12       MR. OLIVER:  Yes, let's go ahead
13    and take a break.
14       MR. KASNER:  We'll be back pretty
15    quickly.  We'll just take five minutes.
16       THE VIDEOGRAPHER:  We're going
17    off the record.  The time is 2:39
18    o'clock p.m.
19          (Whereupon, at 2:39 o'clock
20    p.m., a recess was taken until 2:48
21    o'clock p.m.)
22       THE VIDEOGRAPHER:  We are back on
23    the record.  The time is 2:48 p.m.
24 BY MR. OLIVER:
25    Q.  Let's take a look at paragraph 25.





190

191

1          MR. KASNER:  Object to the form.

192

193

6          Q.  Does every piece of evidence need to
7     have an auditable source?
8          MR. KASNER:  Object to the form.
9          A.   When it comes to costs.  I mean,
10    costs are expended because there are invoices
11    that are presented and you're paying those
12    invoices, your sources of payroll, registers and
13    records and things like that.
14          So when it comes to costs, costs
15    come from underlying accounting records.  So
16    those are, in essence, things that you can trace
17    and agree to source information, in essence.  So
18    when it comes to costs, you can tie back to
19    documentation.
20    BY MR. OLIVER:
21          Q.  Does a deposition testimony need an
22    auditable source?
23          MR. KASNER:  Object to the form.
24          A.   Deposition testimony is just
25    somebody's answer to a question.  So, many times



**194**

1  there is an auditable source because in those
2  questions, you may be presented with underlying
3  documentation as well.
4          So when you're looking at a
5  deposition, many times you're looking at the
6  exhibits too which could be sources.
7          But if somebody is just talking
8  about the way they operate their business,
9  that's different than what I'm talking about
10 here.
11         I'm talking about actual costs
12 incurred and expenses that you're paying.
13 BY MR. OLIVER:

**195**

19         Q.  And so, you know, should they have
20 an auditable source behind them, that opinion
21 would change?
22         MR. KASNER:  Object to the form.
23         A.  Yes, I would have to look at the
24 source documents, but I wouldn't be critiquing
25 him.

**196**

1          I mean, that's my critique, that he
2  didn't tie to the underlying records.
3          If he did tie to the underlying
4  records and I reviewed them and there were
5  supporting invoices and things like that and he
6  referenced those in his report, then I don't
7  think I would have this critique.
8  BY MR. OLIVER:
9          Q.  Do you have a general rule to not
10 rely on interrogatory responses?
11         MR. KASNER:  Object to the form.
12         A.  Yes, I would say as a damage expert,
13 I don't want to get thrown out on Daubert for
14 not doing anything and not providing anything to
15 the court.
16         So if all I do is just tie to
17 something the company gave me, I'm really not
18 providing much value.
19         If I tie to underlying books and
20 records and I tie to invoices and things like
21 that, then I'm providing value to the court as a
22 damages expert because I'm tying into the
23 underlying support.
24         So, you know, that when you're
25 talking about damages, to a reasonable degree of

**197**

1  certainty, if I'm tying to the support, then,
2  you know, I'm putting them forward, costs to a
3  reasonable degree of certainty.
4  BY MR. OLIVER:
5          Q.  And is that a general rule within
6  the industry?
7          MR. KASNER:  Object to the form.
8          A.  I would say generally damages
9  experts are looking to verify the underlying
10 support for costs, verify the underlying support
11 for lost revenues and lost profits.
12         You're trying to dig in and do the
13 analysis and go to the underlying support.
14 BY MR. OLIVER:
15         Q.  And is that the same situation when
16 calculating loss under the CFAA?
17         MR. KASNER:  Object to the form.
18         A.  Yes, I would interpret their point
19 that these should be reasonable under the same
20 degree.
21         They're all the same elements of
22 damages that I would typically look at in
23 different types of damages cases.  So, yes, I
24 agree that this approach applies.
25







274

275

276

277

1    BY MR. OLIVER:









298

```
1    rebuttal report dated October 10, 2023.
2         Q.   Can you take a look at page 11?
3         A.   Yes.
```

299

300

301

302

5    Q.  And so, when you pulled the
6  information from Ryanair's annual report, did
7  you pull it out for a specific subsidiary or --
8    A.  No, that information wasn't
9  available.  I'm pulling it out for the
10  consolidated group.  That's how they're
11  reporting.  They're reporting on a consolidated
12  basis.
13    So I looked at the revenue on a
14  consolidated basis.  I looked at the cost on a
15  consolidated basis because that's what I had
16  available to me and that's how I did the
17  calculations.
18    Q.  Do you have any reason to believe
19  that Ryanair DAC's profit is the same as the
20  consolidated group numbers?
21    MR. KASNER:  Object to the form.
22    A.  Well, as the owner, you're basically
23  rolling up all those subsidiaries.  So your
24  profit, because you own all those companies, is
25  the same as all those companies.

303

1    So the parent company just because
2  of ownership, right -- because if my subsidiary
3  is making profit and I own a hundred percent of
4  it, it is my profit as the owner.  So the profit
5  would be the same, the corporate parent
6  company's profit.
7    Different subs could potentially
8  have different profit that I wasn't able to
9  analyze because I didn't have that data.
10  BY MR. OLIVER:
11    Q.  And so, if a different subsidiary
12  had a different profit for booking, it would
13  change these calculations; is that correct?
14    MR. KASNER:  Object to form.
15    A.  I mean, perhaps.
16  BY MR. OLIVER:
17    Q.  And once again, do you remember who
18  is the party in this litigation, the plaintiff?
19    MR. KASNER:  Object to the form.
20    A.  It is the parent company.
21    MR. OLIVER:  Okay.
22    And that's it.  I have no further
23  questions.
24    MR. KASNER:  Okay.
25    Just a couple super quick

304

1  questions on our end.
2    THE WITNESS:  Great.
3
4  EXAMINATION BY MR. KASNER:
5    Q.  Are you ready?
6    A.  Sure.
7    Q.  In this case, are you offering
8  cybersecurity expertise?
9    A.  No.
10    Q.  In this case, are you offering
11  technical expertise?
12    A.  No.
13    Q.  In this case, are you offering
14  technical expertise on how myRyanair functions?
15    A.  No.
16    MR. KASNER:  Nothing further.
17    MR. OLIVER:  I'm good for my
18  side.
19    THE VIDEOGRAPHER:  This marks the
20  end of today's testimony.
21    We are going off the record.  The
22  time is 6:03 p.m.
23    MR. KASNER:  We will order a copy
24  of the transcript and rough.
25    (Whereupon, at 6:03 o'clock

305

1  p.m., the deposition was concluded.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

306

INSTRUCTIONS TO WITNESS

Read your deposition over carefully.  It is your right to read your deposition and make changes in form or substance.  You should assign a reason in the appropriate column on the errata sheet for any change made.

After making any change in the form or substance, and which have been noted on the following errata sheet, along with the reason for any change, sign your name on the errata sheet and date it.

Then sign your deposition at the end of your testimony in the space provided.  You are signing it subject to the changes you have made in the errata sheet, which will be attached to the deposition before filing.  You must sign it in front of a notary public.  Any competent adult may witness your signature.

Return the original errata sheet to the court reporter promptly.  Court rules require filing within 30 days after you receive deposition.

307

ERRATA SHEET

PAGE   LINE#   CHANGE        REASON

____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____
____  _____  _____  _____

308

SIGNATURE PAGE
OF
BASIL IMBURGIA

I hereby acknowledge that I have read the foregoing deposition, dated October 13, 2023, and that the same is a true and correct transcription of the answers given by me to the questions propounded, except for the changes, if any, noted on the attached errata sheet.

SIGNATURE: _____

WITNESSED BY: _____

DATE: _____

309

C E R T I F I C A T E
STATE OF NEW JERSEY)
          )SS:
COUNTY OF MONMOUTH )

I, CATHERINE M. DONAHUE, a Certified Court Reporter and Notary Public within and for the State of New Jersey, do hereby certify:

That the witness whose deposition is hereinbefore set forth was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of October, 2023.

_____
CATHERINE M. DONAHUE, CCR
License No. 30X100223700



DEPOSITION OF: B a s i l  I m b u r g i a
DATE OF DEPOSITION: O c t o b e r  1 3 ,  2 0 2 3
CASE: *Ryanair DAC v. Booking Holdings Inc., et al*, Case No. 20-1191-WCB

ERRATA SHEET

The following are the corrections which I have made to my deposition transcript:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|-----|-----|-----------|-------------|--------|
| 33 | 15 | forensic and litigation consulting | Forensic & Litigation Consulting | Capitalization of Name |
| 33 | 22 | forensic and litigation services | Forensic & Litigation Services | Capitalization of Name |
| 34 | 6 | forensic and litigation | Forensic & Litigation | Capitalization of Name |
| 43 | 2 | spent | sent | Typographical Error |
| 45 | 25 | for. You know | for, you know | Stenographical Error |
| 47 | 1 | purchasers | purchases | Typographical Error |
| 49 | 12 | Co-Vid | Covid | Typographical Error |
| 50 | 6 | corporate finance practice | Corporate Finance practice | Capitalization of Name |
| 50 | 8 | aeronomical | aeronautical | Stenographical Error |
| 53 | 11-12 | expenses. You know | expenses, you know | Stenographical Error |
| 60 | 8 | practice in law institute | Practising Law Institute | Stenographical Error |
| 64 | 6 | my expert's report | my expert report | Stenographical Error |
| 70 | 19 | mistaken | misstated | Stenographical Error |
| 84 | 7 | I am subject | I am a subject | Typographical Error |
| 94 | 14 | Co-Vid | Covid | Typographical Error |
| 107 | 20 | Rowen | Rowan | Spelling |
| 143 | 6 | summary opinion | summary of opinions | Stenographical Error |
| 172 | 8 | respond | responding | Stenographical Error |
| 173 | 11 | damage | damages | Stenographical Error |
| 192 | 4 | reference that | reference to that | Stenographical Error |

DEPOSITION OF: B a s i l   I m b u r g i a

DATE OF DEPOSITION: O c t o b e r   1 3 ,   2 0 2 3

CASE: *Ryanair DAC v. Booking Holdings Inc., et al*, Case No. 20-1191-WCB

| 233 | 19 | company make profitability | company's profitability | Stenographical Error |
|-----|----|----------------------------|-------------------------|----------------------|
| 239 | 21 | applying is to | applying it to | Typographical Error |
| 248 | 25 | non-Ryanair | Ryanair | Clarification |
| 249 | 21 | non-Ryanair | Ryanair | Clarification |
| 249 | 23 | non-OTA | OTA | Clarification |
| 250 | 22 | non-Ryanair | Ryanair | Clarification |
| 254 | 19 | unfound | unfounded | Stenographical Error |

I, the undersigned, declare under penalty of perjury, that I have read the above-referenced deposition transcript and have made any corrections, additions or deletions reflecting my true and correct testimony.

EXECUTED this 12___ day of _Nov_____,
at _____.

_____
                Basil Imburgia

2

# EXHIBIT 38

**PUBLIC VERSION - CONFIDENTIAL MATERIAL OMITTED**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

RYANAIR DAC,

*Plaintiff,*

v.

BOOKING HOLDINGS INC.,
BOOKING.COM B.V., KAYAK
SOFTWARE CORPORATION,
PRICELINE.COM LLC, and AGODA
COMPANY PTE. LTD.,

*Defendants.*

C.A. No. 20-01191-WCB

JURY TRIAL DEMANDED

EXPERT REBUTTAL REPORT AND DISCLOSURE OF
BASIL IMBURGIA

SEPTEMBER 29, 2023

Highly Confidential – Attorneys' Eyes Only

## Table of Contents

I.  PROFESSIONAL BACKGROUND ................................................................. 1

II.  SCOPE OF ASSIGNMENT ...................................................................... 2

III.  SUMMARY OF OPINIONS ...................................................................... 4

IV.  SUMMARY OF FACTUAL BACKGROUND ......................................... 5

V.  ANALYSIS OF FACTS AND OPINIONS ............................................... 6

  A.  Cost Categories .............................................................................. 9

    1.  Shield AWS Costs................................................................ 10

    2.  Software Engineers .............................................................. 11

    3.  Business Intelligence Employees......................................... 12

    4.  Digital Employees................................................................ 14

    5.  CloudFront ........................................................................... 16

    6.  New Relic.............................................................................. 17

    7.  myRyanair............................................................................ 18

    8.  Customer Service Agents .................................................... 20

    9.  Online Customer Verification.............................................. 22

    10.  In-Person Customer Verification ......................................... 24

    11.  Navitaire............................................................................... 26

    12.  Slow Downs & Shutdowns .................................................. 27

  B.  Cost Allocation.............................................................................. 28

Highly Confidential – Attorneys' Eyes Only

**Exhibits**

Exhibit 1: Curriculum Vitae

Exhibit 2: Documents Relied Upon

19.     ***Failure to Verify Costs.***  Damages must be proven to a reasonable degree of

certainty.[18] As stated in a practice aid issued by the American Institute for Certified Public

Accountants ("AICPA"), "the core objective of the reasonable certainty standard is to ensure that

plaintiffs are not awarded speculative, overly optimistic, or unrealistic damages."[19]  A proper

assessment of damages involves an analysis and weighing of relevant documents and other

evidence, examination and testing of underlying data to confirm reliability, identification of

support and reasoning for assumptions and ensuring "assumptions applied in the damages

analysis are reasonable and tethered to the evidence expected to be admitted in the case"[20] and

limits as much as possible reliance on unverified inputs. The Lopata Report does not meet this

standard.

20.     ***Failure to Consider Offsetting Revenues.***  Damages are often considered in the

context of lost profits, where a bad act may result in the loss of sales (revenue), but any recovery

must be reduced by incremental costs that would have been incurred to generate the revenue. In

this case, Ryanair claims Defendants' actions resulted in increased costs from OTA bookings,

however, Ryanair derived revenue from the bookings that would offset and/or exceed the

purported (and speculative) costs attributable to them.

21.     ***Failure to Consider Mitigation.***  It is further understood that the plaintiff has a

duty to mitigate its damages. The duty of mitigation requires that the plaintiff take appropriate

actions to overcome the damage purportedly caused by the defendant.  Another practice aid states:

> [t]he 'mitigation-of-damages doctrine' is defined in *Black's Law Dictionary* as

---

[18] *See, e.g.,* THE RESTATEMENT (SECOND) OF CONTRACTS § 352 (1981) as cited in Weil, Roman L., Daniel G. Lentz, Elizabeth A. Evans, *Litigation Services Handbook: The Role of the Financial Expert,* Sixth Ed., 4.9.
[19] AICPA, Forensic & Valuation Services Practice Aid, *Attaining Reasonable Certainty in Economic Damages Calculations,* p. 10.
[20] AICPA & CIMA Forensic & Valuation Services Practice Aid, *Calculating Lost Profits*, pp. 14-15.

Highly Confidential – Attorneys' Eyes Only

> The principle requiring a plaintiff, after an injury or breach of contract, to make reasonable efforts to alleviate the effects of the injury or breach. If the defendant can show that the plaintiff failed to mitigate damages, the plaintiff's recovery may be reduced.[21]

22.     The Lopata Report's failure to consider Ryanair's duty to mitigate, such as by streamlining certain processes, distorts and overstates the assessment of loss.

### A.      Cost Categories

23.     The Lopata Report calculates damages for twelve types of costs.[22] The costs are calculated for two one-year periods which the Lopata Report states were selected based on data availability: March 1, 2022 to February 28, 2023 for Booking.com and March 1, 2019 to February 29, 2020 for Kayak.[23]

24.     As discussed in detail below, there appears to be no means for Mr. Lopata to have performed testing or verification of the data he uses in his analysis—the support for his data is primarily Ryanair's own representations made in interrogatory responses. Nor does the Lopata Report present any evidence of any analysis beyond minimal calculation. As detailed below, for each cost, the absence of credible examination and substantiation of the assumptions and inputs related to these costs, renders them unreliable.

25.     Further, the Lopata Report fails to adequately consider whether the actions by the Defendants caused a cost to be incurred or whether the cost would have been incurred in the normal course of business if a booking was made through an OTA or directly through Ryanair. Additionally, the Lopata Report completely disregards the revenue generated by the bookings which should be offset against costs in the determination of damages.

---

[21] AICPA & CIMA Forensic & Valuation Services Practice Aid, *Calculating Lost Profits*, p. 68.
[22] Lopata Report, ¶¶81, 153.
[23] Lopata Report, ¶¶74-75. "For Agoda and Priceline I would expect to use one of the same timeframes…" (Lopata Report, ¶76.)

Highly Confidential – Attorneys' Eyes Only

32.    No description of the table or other support or analysis is provided in the Lopata

Report or in Plaintiff's Third Supplemental Responses.



### 3.    Business Intelligence Employees

34.    The Lopata Report states that based on "Ryanair's interrogatory responses and

[Mr. Lopata's] interviews of Mr. Stocki and Mr. O'Callaghan," that other Ryanair employees

spend time limiting OTA access to Ryanair and presents an analysis in Appendix G purporting to

---

[32] Lopata Report, ¶90.
[33] Plaintiff's Third Supplemental Responses, p. 30.
[34] ███████████████████████████████████

Highly Confidential – Attorneys' Eyes Only

quantify costs related to that time.[35] No other source or support is referenced related to the business intelligence employees in the Lopata Report or appendices.[36]

35. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

36. ███████████████████████████████████████████

█████████████████████

███████████████████████████████████

█████████████████████████████████████

[35] Lopata Report, ¶91.
[36] Lopata Report, §F.1.3.
[37] Plaintiff's Third Supplemental Responses, pp. 28-29.

Highly Confidential – Attorneys' Eyes Only

13



37. ██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████

38. ████████████████████████████

████████████████████████████████

██████████████████████████████

███████████

39. ████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████  ████████████████████████████

██████████████████████████████████

█████████████████████

### 4.    Digital Employees

40.    The Lopata Report states "Ryanair employees in its Digital department are

involved with facets of monitoring and blocking unauthorized access and/or remedying the results

---

[38] Plaintiff's Third Supplemental Responses, p. 29.
[39] Lopata Report, ¶93.
[40] Lopata Report, ¶93.
[41] Plaintiff's Third Supplemental Responses, p. 29.

Highly Confidential – Attorneys' Eyes Only

activity on Ryanair's servers."[100] ███████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

██    █████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

**B.    Cost Allocation**

77.    ████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████  ████████████████████

██████████████████████████████████████████

███████████████████████████  █

78.    ████████████████████████████████

█████████████████████████████  ██████████

████████████████████████████████

████████████████████████████████████

██ ████ Report, ¶144.
[101] Lopata Report, ¶149.
[102] Lopata Report, ¶151.
[103] Lopata Report, ¶¶162-165; 170-173.
[104] Lopata Report, ¶¶176-177.
[105] Lopata Report, ¶¶180-181.
[106] Lopata Report, ¶156.

Highly Confidential – Attorneys' Eyes Only

\*\*\*\*\*

This report reflects my opinions and the analyses upon which they are based.  This report should not be construed to constitute or contain opinions on matters of law.  The schedules and exhibits are an integral part of this report and support the opinions contained herein.  To the extent any additional information is produced by either party, I reserve the right to incorporate such additional information into my report.  This report was prepared solely for the above-captioned matter and should not be used for any other purpose without prior written authorization.

By:

Basil Imburgia

Basil Imburgia

September 29, 2023

Highly Confidential – Attorneys' Eyes Only

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2023, a true and correct copy of the foregoing

document was caused to be served on the following counsel of record in the manner indicated.

**BY ELECTRONIC MAIL**
R. Touhey Myer
Kratz & Barry LLP
800 N. West Street
Wilmington, Delaware 19801
(302) 527-9378
tmyer@kratzandbarry.com

**BY ELECTRONIC MAIL**
R. David Donoghue
Anthony J. Fuga
Holland & Knight LLP
150 N Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600
david.donoghue@hklaw.com
anthony.fuga@hklaw.com

*/s/ Tyler E. Cragg*
Tyler E. Cragg (#6398)

# EXHIBIT 39

**PUBLIC VERSION - CONFIDENTIAL MATERIAL OMITTED**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| RYANAIR DAC, <br><br> *Plaintiff,* <br><br> v. <br><br> BOOKING HOLDINGS INC., BOOKING.COM B.V., KAYAK SOFTWARE CORPORATION, PRICELINE.COM LLC, and AGODA COMPANY PTE. LTD., <br><br> *Defendants.* | C.A. No. 20-01191-WCB <br><br> JURY TRIAL DEMANDED |

SUPPLEMENTAL EXPERT REBUTTAL REPORT AND DISCLOSURE OF
BASIL IMBURGIA

OCTOBER 10, 2023

Highly Confidential – Attorneys' Eyes Only

## Table of Contents

I.      SCOPE OF ASSIGNMENT ................................................................................. 1

II.    SUMMARY OF SUPPLEMENTAL OPINIONS ................................................. 1

III.   ANALYSIS OF SUPPLEMENTAL FACTS AND OPINIONS ........................... 2

     1.     Shield AWS Costs.................................................................................... 2

     2.     Software Engineers ................................................................................. 3

     3.     Business Intelligence Employees ........................................................... 3

     4.     Digital Employees ................................................................................. 4

     5.     CloudFront ............................................................................................. 5

     6.     New Relic ............................................................................................... 5

     7.     myRyanair .............................................................................................. 5

     8.     Customer Service Agents ....................................................................... 6

     9.     Online Customer Verification ................................................................ 6

     10.    In-Person Customer Verification .......................................................... 7

     11.    Navitaire ................................................................................................ 9

     12.    Slow Downs & Shutdowns .................................................................... 9

   B.      Cost Allocation................................................................................................ 9

Highly Confidential – Attorneys' Eyes Only

**Exhibits and Schedules**

Supplemental Exhibit 2: Documents Considered

Schedules 1-3

Highly Confidential – Attorneys' Eyes Only



## IV.    SUMMARY OF FACTUAL BACKGROUND

13.     Ryanair "is Europe's largest airline group and parent company of Ryanair, Ryanair UK, Buzz, Lauda and Malta Air."[8] The tables below contain summaries of Ryanair operational and financial data from 2019 through 2023.[9]

| | 2019 | | 2020 | | 2021 | | 2022 | | 2023 |
|---|---|---|---|---|---|---|---|---|---|
| Revenue Passengers Booked (millions) | 142 | | 149 | | 28 | | 97 | | 169 |
| Booked Passenger Load Factor | 96% | | 95% | | 71% | | 82% | | 93% |
| Sectors Flown | 789,771 | | 823,897 | | 204,828 | | 620,524 | | 946,643 |
| Flights per Day | 2,500 | | 1,000 | | 2,100 | | 3,000 | | 3,000 |
| Number of Airports | 219 | | 242 | | 225 | | 223 | | 222 |
| Number of Countries Served | N/A | | 40 | | 37 | | 36 | | 36 |
| Aircrafts | 471 | | 466 | | 451 | | 500 | | 537 |
| Average Booked Passenger Fare | € 37.03 | € | 37.46 | € | 37.65 | € | 27.33 | € | 41.12 |
| Ancillary Revenue per Booked Passenger | € 17.40 | € | 19.71 | € | 21.80 | € | 22.13 | € | 22.81 |
| Total Revenue per Booked Passenger | € 54.17 | € | 57.17 | € | 59.45 | € | 49.47 | € | 63.93 |
| Cost Per Booked Passenger | € 47.01 | € | 49.58 | € | 89.95 | € | 52.97 | € | 55.37 |

---

[6] Lopata Report, ¶¶111-112.
[7] Lopata Report, ¶¶162-165; 170-173.
[8] https://corporate.ryanair.com/?market=us
[9] Ryanair Group Annual Report 2023; Ryanair Group Annual Report 2022; Ryanair Group Annual Report 2021; Ryanair Group Annual Report 2020, Ryanair Group Annual Report 2019.

Highly Confidential – Attorneys' Eyes Only

| | Mar 31, 2019 | Mar 31, 2020 | Mar 31, 2021 | Mar 31, 2022 | Mar 31, 2023 |
|---|---|---|---|---|---|
| | €m | €m | €m | €m | €m |
| Schedule Revenue | 5,261 | 5,566 | 1,036 | 2,653 | 6,930 |
| Ancillary Revenue | 2,436 | 2,929 | 600 | 2,148 | 3,845 |
| Total Revenue | 7,697 | 8,495 | 1,636 | 4,801 | 10,775 |
| Fuel | 2,427 | 2,762 | 543 | 1,699 | 4,026 |
| Ex-Fuel Costs | 4,254 | 4,605 | 1,932 | 3,442 | 5,306 |
| Total Operating Costs | 6,681 | 7,367 | 2,475 | 5,141 | 9,332 |
| Interest | (68) | (50) | (54) | (91) | (34) |
| Foreign Exchange/Hedge Ineffectiveness | - | (407) | (216) | 1 | 34 |
| (Loss)/ Profit Before Tax | 948 | 671 | (1,109) | (430) | 1,443 |
| Tax Credit/ (Expense) | (63) | (22) | 94 | 189 | (129) |
| (Loss)/ Profit After Tax | 885 | 649 | (1,015) | (241) | 1,314 |

14.     The Defendants (except for Booking Holdings, which I understand owns and operates the other Defendants) are online travel companies. Booking.com is an online travel company ("OTA") founded in Amsterdam in 1966 and is "one of the world's leading digital travel companies."[10] Kayak is a metasearch engine that began in 2004 and helps travelers to find information across "hundreds of travel sites."[11] Priceline, an OTA, was founded in 1997 to address unmet travel demands through the internet.[12] Agoda, also an OTA, was founded in 2005 and is "considered one of Asia's leading travel-tech companies."[13]

## V.     ANALYSIS OF FACTS AND OPINIONS

15.     The Lopata Report opines "[l]imiting my analysis to those costs that are available and using a conservative approach, the harm to Ryanair's systems attributable to OTAs exceeded

---

[10] https://www.booking.com/content/about.html?label=gen173nr-
1FCAEoggI46AdIM1gEaKcCiAEBmAExuAEXyAEM2AEB6AEB-
AECiAIBqAIDuAKPvtGoBsACAdICJGZlMTc4NmMwLTQyOWUtNDVhZC04NTkxLTA1ZWQ5NGE1MWIzM
NgCBeACAQ&sid=8daf0eed10a73b958fa4cbd98f2e4509
[11] Kayak was acquired by Booking Holdings in 2013. (https://www.kayak.com/about)
[12] Priceline is part of Booking Holdings. (https://press.priceline.com/our-story/)
[13] https://www.agoda.com/about-agoda?cid=1844104

Highly Confidential – Attorneys' Eyes Only



29. ███████████████████████████

███████████████████████████████

███████ █ ███████████████████████

█████████████████████████████████

███████ █ ██████████████████████████

30.      Based on Ryanair's annual reports, I calculated the total Ryanair revenue for each

damages period.[53] ██████████████████████████████

██████████████████████████████████████

█████████████████████████████████████

---

[51] Second Hurley 30(b)(6) Deposition, 139:14-140:3.
[52] Second Hurley 30(b)(6) Deposition, 140:4-141:1.
[53] See Schedule 2.



31. ███████████████████████████████████████

████████████████████████████████████████████
██████████████████████████████████████

32. ████████████████████████████████████████

████████████████████████████████████████
█████████████████████ █████████████████████████████
████████████████████████████████████

---

[54] See Schedule 1.
[55] See Schedule 3.
[56] See Schedule 1.
[57] Second Hurley 30(b)(6) Deposition, 140:22-25.
[58] See Schedule 1.

Highly Confidential – Attorneys' Eyes Only

€ ██████████████████████████████████████████████

████████████████████████████████████████ . [60]



---

[59] See Schedule 1. ███████████████████

████████████████████████████████████████

[60] ██████████████████

*****

This report reflects my opinions and the analyses upon which they are based.  This report should not be construed to constitute or contain opinions on matters of law.  The schedules and exhibits are an integral part of this report and support the opinions contained herein.  To the extent any additional information is produced by either party, I reserve the right to incorporate such additional information into my report.  This report was prepared solely for the above-captioned matter and should not be used for any other purpose without prior written authorization.

By:

Basil Imburgia

Basil Imburgia

October 10, 2023

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 10, 2023, a true and correct copy of the foregoing

document was caused to be served on the following counsel of record in the manner indicated.

**BY ELECTRONIC MAIL**
R. Touhey Myer
Kratz & Barry LLP
800 N. West Street
Wilmington, Delaware 19801
(302) 527-9378
tmyer@kratzandbarry.com

**BY ELECTRONIC MAIL**
R. David Donoghue
Anthony J. Fuga
Holland & Knight LLP
150 N Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600
david.donoghue@hklaw.com
anthony.fuga@hklaw.com

*/s/ Tyler E. Cragg*
Tyler E. Cragg (#6398)

# EXHIBIT 40

**PUBLIC VERSION -
CONFIDENTIAL MATERIAL OMITTED IN FULL**

# EXHIBIT 41

**PUBLIC VERSION -
CONFIDENTIAL MATERIAL OMITTED IN FULL**

# EXHIBIT 42

**PUBLIC VERSION - CONFIDENTIAL MATERIAL OMITTED**

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3   _____

 4   RYANAIR DAC,

 5             Plaintiff,

 6       v.                               C.A. No.

 7   BOOKING HOLDINGS INC., BOOKING.COM      20-1191-LPS

 8   B.V., KAYAK SOFTWARE CORPORATION,

 9   PRICELINE.COM LLC, and AGODA

10   COMPANY PTE. LTD.,

11             Defendants.

12   _____

13                   TELEPHONIC HEARING

14   DATE:         Monday, September 25, 2023

15   TIME:         3:59 p.m.

16   BEFORE:       Honorable William Bryson

17   LOCATION:     Remote Proceeding

18                 717 Madison Place, NW

19                 Washington, DC 20439

20   REPORTED BY:  Andrew Weader, Notary Public

21   JOB NO.:      6119095

22

23

24
```

Page 2

```
 1          A P P E A R A N C E S
 2  ON BEHALF OF PLAINTIFF RYANAIR DAC:
 3      TOUHEY MYER, ESQUIRE (by videoconference)
 4      Kratz & Barry LLP
 5      800 North West Street
 6      Wilmington, DE 19801
 7      tmyer@kratzandbarry.com
 8      (302) 527-8378
 9
10      JI MAO, ESQUIRE (by videoconference)
11      Holland & Knight LLP
12      31 West 52nd Street, 12th Floor
13      New York, NY 10019
14      ji.mao@hklaw.com
15      (212) 513-3420
16
17      WILLIAM OLIVER, ESQUIRE (by videoconference)
18      Holland & Knight LLP
19      10 St. James Avenue, 11th Floor
20      Boston, MA 02116
21      william.oliver@hklaw.com
22      (617) 573-5863
23
24
```

Page 4

```
 1          E X H I B I T S
 2  NO.       DESCRIPTION        ID/EVD
 3          (None marked.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1      A P P E A R A N C E S (Cont'd)
 2  ON BEHALF OF DEFENDANTS BOOKING HOLDINGS INC.,
 3  BOOKING.COM B.V., KAYAK SOFTWARE CORPORATION,
 4  PRICELINE.COM LLC, AND AGODA COMPANY PTE. LTD.:
 5      JEFFREY MOYER, ESQUIRE (by videoconference)
 6      Richards, Layton & Finger, P.A.
 7      One Rodney Square 920 North King Street
 8      Wilmington, DE 19801
 9      moyer@rfl.com
10      (302) 651-7525
11
12      KRISTINE FORDERER, ESQUIRE (by videoconference)
13      Cooley, LLP
14      3 Embarcadero Center, 20th Floor
15      San Francisco, CA 94111
16      kforderer@cooley.com
17      (415) 693-2128
18
19      JOHN HEMANN, ESQUIRE (by videoconference)
20      Cooley, LLP
21      3 Embarcadero Center, 20th Floor
22      San Francisco, CA 94111
23      jhemann@cooley.com
24      (415) 693-2038
```

Page 5

```
 1          P R O C E E D I N G S
 2          THE COURT:  Good afternoon.  This is
 3  Judge Bryson.  Do we have a court reporter on the
 4  line?
 5          THE REPORTER:  Yes, Your Honor.  This
 6  is Andrew Weader.  I'll be the court reporter today.
 7          THE COURT:  Hi, Mr. Weader.
 8          THE REPORTER:  Good afternoon, sir.
 9          THE COURT:  Very good.  Yeah.
10          Okay.  We're here on Ryanair DAC
11  against Booking Holdings Incorporated, number 20-1191,
12  in the District of Delaware, discovery dispute.
13          Who do we have for the plaintiff?
14          MR. MYER:  Good afternoon, Your Honor.
15  This is Touhey Myer from Kratz & Barry on behalf of
16  Ryanair DAC.  And also appearing with me today is Ji
17  Mao and William Oliver from Holland & Knight.  And
18  Mr. Mao will be handling the argument today.
19          THE COURT:  Okay.  And for the
20  defendants, who do we have?
21          MR. MOYER:  Good afternoon, Your Honor.
22  Jeff Moyer from Richards, Layton & Finger on behalf of
23  the defendants.  And I'm joined today by my co-
24  counsel, John Hemann and Kristine Forderer, of the
```

2 (Pages 2 - 5)

Page 6

1 Cooley firm. And with the court's permission,
2 Ms. Forderer will present our argument on behalf of
3 the defendants this afternoon.
4          THE COURT: Okay. I missed your name.
5 The gentleman that was just speaking,
6 what was your name again?
7          MR. MOYER: Oh, it's Jeff Moyer, Your
8 Honor.
9          THE COURT: Moyer. Okay. Yeah. All
10 right. I'm good. Thanks.
11          All right. Let's get started here. I
12 would like to get clear in my mind exactly how the
13 Kayak system works because it wasn't entirely clear to
14 me from the letters.
15          Mr. Mao, you're going to be the one
16 carrying the ball for the plaintiff?
17          MR. MAO: Right, Your Honor.
18          THE COURT: Okay. Kayak has a lot of
19 flights listed including, I gather, Ryanair flights.
20 So where does it get that information?
21          MR. MAO: So Kayak has agreements with
22 third-party aggregators to do two things. First, to
23 access their API so that they can get the flight data
24 from these aggregators. And that access provides the

Page 7

1 flights that are listed on Kayak.com.
2          And the other point is they either work
3 with the aggregators to create links that go directly
4 to the checkout page on the aggregator website where
5 the user can book the flight. Or they'll just take
6 the information from the user themselves and transmit
7 it to the aggregator for the aggregator to book the
8 flight.
9          THE COURT: So the folks that are doing
10 the, you refer to it as, screen scraping are the
11 aggregators who provide the information to Kayak;
12 right?
13          MR. MAO: Correct.
14          THE COURT: Okay. And now, if Kayak
15 decides to use the link-out booking system, are they
16 the exact same ones that actually book the flights?
17          MR. MAO: They are.
18          THE COURT: How do you know who's who?
19 What confused me was you've got a bunch of different
20 parties here.
21          So Kayak has a number of flights listed
22 on its website. Those flights are provided to Kayak
23 for the website by, you say, one or another of the
24 aggregators.

Page 8

1          How does Kayak know who to send the
2 customer to in a link-out booking system when the
3 customer makes a request for a particular flight? Is
4 that necessarily tied to the particular aggregator
5 that gathered the information that went to Kayak?
6          MR. MAO:   I understand your
7 confusion, Your Honor. So what will happen is a user
8 will put in their first parameters; right? "I want to
9 fly from Dublin to Berlin tomorrow in the morning."
10          And then Kayak will generate a number
11 of results. There might be a Ryanair flight that
12 leaves at 10 a.m. and arrives at, I don't know how
13 long it takes but, 1 p.m.
14          And for that flight, Kayak will display
15 the lowest fare, but when the user wants to book the
16 flight, they'll be presented with a list of options.
17 Each of those options is one of the aggregators that
18 provided that flight data to Kayak.
19          And the user can then choose which
20 aggregator who provided that flight data they want to
21 book with, presumably based on price, but maybe not.
22          THE COURT: I see. So there would be
23 multiple aggregators providing information about the
24 same flights. And then the customer picks the

Page 9

1 particular one, not knowing who the aggregator is
2 presumably, but it'll pick the flight that that
3 customer is most interested in.
4          And then under the link-out booking
5 system, Kayak will then give that customer the link to
6 the particular aggregator who provided that login or
7 that flight information to Kayak. Have I got it down
8 right?
9          MR. MAO: Almost. But one point of
10 correction I'd want to make is that the customer, in
11 most cases, would know which aggregator provided which
12 price for the flight.
13          THE COURT: Okay. In any event, the
14 aggregator is doing two things. One is, it is
15 providing information to Kayak from the Ryanair
16 website.
17          And then it is booking the flight when
18 the customer clicks onto that aggregator's website at
19 the behest of or is offered that option by Kayak. So
20 that's the complete loop, I take it?
21          MR. MAO: I would add one more thing to
22 that, or two more things actually. Number one, the
23 aggregator and Kayak have an agreement where they work
24 together to provide the link that the customer clicks

3 (Pages 6 - 9)

Page 10

1  on or generates a link.
2          And the link goes directly to the
3  checkout page on the aggregator's website. It's not
4  like you're going to the home page or just looking up
5  a flight and you have to add to cart. You are going
6  directly to where you can input your information.
7          And number two, the aggregator will
8  provide some sort of data depending on the commercial
9  agreement that Kayak has with that aggregator to let
10 Kayak know how much the aggregator is going to pay
11 Kayak for that referral.
12         THE COURT: All right. And so your
13 theory of why this is relevant to the alleged
14 inducement of screen scraping is that Kayak is
15 inducing the aggregators to scrape the Ryanair
16 website. That's your theory here; right?
17         MR. MAO: Right.
18         THE COURT: Okay. Regardless of
19 whether the customer or any customer ends up buying
20 any Ryanair flights. In other words, Kayak, in your
21 view, is inducing the aggregator to obtain the
22 information without regard to what happens downstream
23 from the obtaining of the information?
24         MR. MAO: So there's two issues. One

Page 11

1  is that Kayak is inducing the aggregator to obtain the
2  flight information in the first place.
3          And the second issue is that when Kayak
4  directs the user to the checkout page on the third-
5  party website, it is inducing the third party to book
6  the flight again by accessing Ryanair's website
7  without authorization.
8          THE COURT: Why does that second step
9  have anything to do with the violation alleged to the
10 CFAA?
11         MR. MAO: Because in order for the
12 third-party aggregator to book a Ryanair flight, they
13 need to create a myRyanair account without
14 authorization. And then, they will submit potentially
15 fake customer data and payment information.
16         THE COURT: Well, who's the they here?
17         MR. MAO: Ryanair.
18         THE COURT: No, no. I understand the
19 argument that you make that if the aggregator is doing
20 the screen scraping, and that is the violation of the
21 CFAA, that that is being done, you say, at the behest
22 of Kayak; okay.
23         But what I'm having a hard time
24 understanding is why it matters to your theory of

Page 12

1  violation of the CFAA, whether the customer ultimately
2  purchases a flight or not. I mean, is it something
3  that the aggregator does after Kayak sends the
4  customer down to the aggregator that is part of the
5  CFAA violation?
6          MR. MAO: It is. So when the
7  aggregator books the flight for the customer, the
8  aggregator isn't using an employee to do that
9  necessarily. They are ultimately engaging a bot to
10 access the Ryanair website without authorization to
11 book the flight.
12         Ryanair has gates in place to stop that
13 from happening. ████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████
19         THE COURT: Well, let me ask this
20 question. Suppose that I decided to have a big party
21 with all of my friends. And I decided, "Look, I'm
22 going to make everything very convenient for you all.
23 There are 50 of you that are going to come to my
24 party. I'm going to pay for all of your plane

Page 13

1  tickets, and I'll do the booking."
2          And they all give me the information of
3  when they want to leave, and when they want to get to
4  wherever we're going to have our party. And I go onto
5  the Ryanair website, and I purchase 50 tickets. In
6  your view, have I done anything wrong?
7          MR. MAO: It would depend on how you're
8  purchasing the tickets. Are you using a illusive
9  computer program to purchase the tickets and creating
10 multiple myRyanair accounts, and when you're blocked,
11 finding ways to get around that with your computer
12 program to purchase the tickets?
13         Or are you manually doing it yourself?
14 Are you going in putting in the payment information as
15 a human buying a ticket, going in, putting the payment
16 information as a human, and buying another ticket?
17         THE COURT: So if I wrote a little
18 program to save myself the trouble of buying 50
19 tickets, would I violate the CFAA?
20         MR. MAO: You would depending on if
21 Ryanair was trying to block the type of program that
22 you're running. The thing is that Ryanair is trying
23 to block the type of program that the aggregators are
24 running, and that's where the violation occurs.

4 (Pages 10 - 13)

Page 14

1 They're trying to evade Ryanair's technological
2 method.
3        THE COURT: And if Ryanair decided it
4 just doesn't like anybody to buy 50 tickets, it looks
5 suspicious, and I, nonetheless, went ahead and
6 purchased the 50 tickets, I would be violating the
7 CFAA?
8        MR. MAO: If you did it manually, I do
9 not believe that would be a violation.
10        THE COURT: Okay. All right. Well,
11 that helps me understand at least the theory here. So
12 what is it that you need to know about the link-out
13 booking system that you don't already know?
14        In other words, I take it you're not
15 looking at damages here; right? You're not looking
16 for damages, at least, in the form of some kind of
17 recovery of monies made by Kayak or the third parties.
18        Your argument is that you need to know
19 something about those transactions between Kayak and
20 the aggregators at the back end in order to what?
21 What is the purpose of that information?
22        MR. MAO: So I think it would be the
23 same as the purpose with all the other information
24 we'd want to know for interrogatory number 4. We'd

Page 15

1 want to first identify which flights and how many
2 flights were booked using that method, if possible.
3        And I think that's relevant to number
4 1, establishing liability. And I think it is relevant
5 to damages, to know how many flights Kayak booked in
6 that manner.
7        THE COURT: How is it relevant to
8 damages?
9        MR. MAO: So the technological harm
10 from Kayak booking flights in that manner is both the
11 harm caused by the unauthorized access, and, I
12 believe, what Ryanair spends to address that type of
13 harm.
14        So knowing how many flights Kayak
15 booked in this manner is going to be relevant to how
16 Ryanair addresses the harm.
17        THE COURT: All right. Let me go to
18 Ms. Forderer.
19        I guess the first question is do you
20 agree with Mr. Mao that his understanding of the
21 relationship between Kayak and the aggregators and
22 their responsibilities in this series of transactions
23 is basically accurate?
24        MS. FORDERER: I would put it a little

Page 16

1 differently, Your Honor. Kayak is a meta-search
2 engine, so it's a little bit like Google or any other
3 search engine. Kayak gets fed information from, in
4 this case, it's, Travel Partners.
5        And when a user types in certain
6 parameters, Kayak, based on all of that information
7 this has been fed from its partner, spits out flights
8 that might be desirable to the user.
9        Those flights are provided by third
10 parties. So the user would have a choice between --
11 you know, they could buy on Kiwi. They could buy on
12 eDreams. They could buy on Ryanair directly. They
13 could buy on any number of OTAs that offer the Ryanair
14 flight.
15        Once they click the flight that they'd
16 like to purchase, it goes to the OTA's website. And
17 the rest of the transaction happens entirely on or
18 through the third-party OTA's website.
19        It has nothing to do with Kayak after
20 that other than, in some cases, Kayak gets either a
21 small commission for the click or a commission for the
22 price of whatever flight was ultimately booked as a
23 result of the click, whether that be the Ryanair
24 flight that was clicked or other tons of flights that

Page 17

1 the customer then decided they'd rather purchase.
2        THE COURT: I didn't hear any
3 substantive disagreement with the way that Mr. Mao
4 described the transaction. You used different words.
5        MS. FORDERER: Yeah. Frankly, I think
6 we are mostly aligned with how the search engine
7 function works. I think Ryanair is trying to argue
8 for a greater role than Kayak really has in that
9 transaction.
10        THE COURT: Well, in the course of the
11 transaction and to focus on the issue of
12 encouragement, inducement, et cetera, I take it that
13 Kayak has an arrangement with the aggregators, in
14 which the aggregators will provide Kayak with this
15 flight information; right?
16        MS. FORDERER: Right. So Kayak
17 partners with these OTAs that give Kayak all of the
18 inventory they have. So that might include Ryanair.
19 It might not include Ryanair, but whatever they have,
20 Kayak gets it.
21        THE COURT: Right. The short answer to
22 my question was yes. So I understand.
23        Now, why is that not possible to
24 characterize that as inducement on the part of Kayak

5 (Pages 14 - 17)

Page 18

1 to the aggregators, assuming that Kayak knows that the
2 aggregators are obtaining this information from
3 Ryanair and assuming further that the evidence should
4 show that Kayak knows that the aggregators are
5 attaining this information in violation of Ryanair's
6 terms of use?
7          Why isn't that an indication of
8 encouragement to obtain that information in a way that
9 is contrary to Ryanair's wishes?  We're setting aside
10 for the moment whether or not that's a violation of
11 the CFAA.
12          MS. FORDERER:  Sure, Your Honor.
13 There's nothing in the record that shows that Kayak
14 has any understanding of where the OTAs that it
15 partners with obtain their inventory.
16          So for all Kayak knows, they have a
17 direct relationship with Ryanair or they're getting
18 them, you know, in a way that Ryanair is comfortable
19 with.  Kayak simply knows --
20          THE COURT:  Right.  But this is
21 discovery.  This is discovery.  So if we're engaging
22 discovery, we don't have to prove every element.  We
23 just have to establish a basis on which this could be
24 deemed relevant.

Page 19

1          MS. FORDERER:  All right.  So, Your
2 Honor, there's a difference between the flights.  And
3 this is the line that we've drawn in discovery that we
4 think is the reasonable line to draw.
5          Kayak is a meta-search engine.  It has
6 an added program called facilitative booking or
7 Whiskey [ph] where --
8          THE COURT:  Yeah.  I'm familiar with
9 that.  Right.
10          MS. FORDERER:  -- okay.  For those
11 flights that are sterilely considered to be sold on or
12 through Kayak's website, we've given them that
13 information.  Their request does not extend to flights
14 that are sold on or through the websites belonging to
15 third parties.
16          And frankly, Kayak's data related to
17 those sales is bad data.  It's not something that
18 Kayak keeps in the regular course of business.  It's
19 going to be underinclusive because many partners don't
20 report it at all to Kayak.
21          It's going to be overinclusive because
22 it's going to include flights where the customer
23 clicked on a Ryanair flight but they ended up booking
24 an AirTran flight or a Lufthansa flight.  And that's

Page 20

1 where --
2          THE COURT:  Well, what Mr. Mao is going
3 to say is that he doesn't mind if the data is not
4 perfect.  He just wants the data.  So if you have the
5 data, it may not be a perfect reflection of exactly
6 how many flights you sell and to which aggregator, et
7 cetera.
8          But that's more his problem upon
9 getting the data than it is your problem in terms of
10 saying you don't have to produce it because it's not
11 perfectly sound in reflecting the number of flights
12 sold.
13          There was some confusion.  And I admit
14 that the language of the interrogatory is certainly
15 confusing.  I don't know what "through," means in that
16 context, but now we know.
17          What they're looking for is the number
18 of flights that you have sold through the link-out
19 bookings program.  You have some kind of data as to
20 that.  It may be bad data, but why should he not be
21 entitled to obtain whatever you've got along those
22 lines?
23          MS. FORDERER:  Because their damages
24 theory is that Ryanair sends X amount of dollars to

Page 21

1 try and stop OTAs from booking flights on Ryanair's
2 website.  And their damages theory as to each
3 defendant is the portion of those costs that they
4 attribute to each defendant based on how many flights
5 that defendant sold on or through their website.
6          And we've given them Kayak's flights
7 both on or through Kayak, and they're trying to
8 artificially inflate the number of flights that Kayak
9 sold via this framework and it's not accurate.  It's
10 not.
11          THE COURT:  If Kayak is making money on
12 each of the sales, whether in the form of a click or a
13 transaction fee from the third-party aggregator, the
14 third parties, and if Kayak can be said to be
15 encouraging the aggregators to provide this
16 information and by extension to do whatever is
17 necessary to book these flights on Ryanair, even if
18 Ryanair disapproves of the way they're going about
19 doing that, then it seems to me, at least consistent
20 with their theory, that the amount of money that
21 you're making through the link-out booking program is
22 pertinent to the amount of trouble that Ryanair is
23 having to put up with from the aggregators who are
24 being induced to engage in this conduct by Kayak.

6 (Pages 18 - 21)

Page 22

1    Why isn't that a reasonable theory?
2        MS. FORDERER:  There's no evidence
3  anywhere that Kayak is playing anything like the role
4  that you just described.  It is very much like
5  entering a search.  This is what we put in our briefs
6  for shoes on Google, and Google spits out a bunch of
7  different links to shoes.
8        If I buy a pair of Tennis shoes on
9  Nike's website, and Nike violates the CFAA by selling
10 me those tennis shoes somehow, there's no universe in
11 which Google is somehow an accomplice to that or is
12 somehow vicariously liable for that sale.
13       Google is doing nothing but spitting
14 out data that has been neutrally provided to it by
15 third parties in, yeah, publicly available data that
16 has been provided to it by third parties in response
17 to user-selected criteria.
18       THE COURT:  Well, it depends.  The
19 thing you left out, it seems to me, in your example is
20 if Google was involved in inducing Nike to do
21 something at the front end that's illegal.
22       That is kind of the question that, I
23 think, if I understand Mr. Mao's theory, the theory on
24 which they're saying liability lies against Kayak.

Page 23

1  They're inducing illegal activity at both ends as I
2  understand him.
3        Number one, scraping.  And then
4  providing that information to Kayak.  And then,
5  ultimately, selling the flights to individual
6  customers by going to the website and doing things
7  that Ryanair regards as unlawful.
8        And it's all doing this as part of a
9  coordinated scheme to provide funds to Kayak from the
10 sales that are ultimately made.  That's his theory as
11 I understand it.
12       MS. FORDERER:  So that theory that
13 you're referring to doesn't extend to these link-out
14 bookings as they call it; right?  Plaintiff's theory
15 as it's set forth in the complaint is that the
16 defendants have engaged third parties for the purpose
17 of accessing the Ryanair website for them in order to
18 obtain these flights.
19       And again, we're going to argue that
20 that's not a violation of the CFAA at summary
21 judgment, of course.  So we've provided the slice that
22 Kayak is actually selling as part of the facilitated
23 opening framework --
24       THE COURT:  Yes, I understand that.  I

Page 24

1  understand that, but you're not really engaging with
2  the question that I have for you, which is, if it is
3  the case -- I mean you say there's no evidence to this
4  effect and this is discovery.
5        It is a theory as I understand it, is
6  if it is the case that Kayak is encouraging the third
7  parties, let's say Kiwi just to take one, is
8  encouraging Kiwi to obtain information in a way that,
9  according to Ryanair's theory is illegal from the
10 Ryanair website, is providing it to Kayak, and then
11 ultimately is selling tickets in a way that Ryanair
12 regards as unlawful, and Kayak is encouraging both
13 aspects of that activity, then it seems to me that
14 it's relevant to know how many of those sales are
15 being made.
16       MS. FORDERER:  I fully agree with that
17 as we're discussing sales that are on or through
18 Kayak's website.  When we're talking about Kayak in
19 its separate function as a meta-search engine where
20 it's simply spitting out data and users are deciding
21 what link to click or not, and they're going entirely
22 to a third-party website, that's not Kayak acting as
23 an OTA.
24       That's not Kayak directing anybody to

Page 25

1  book a flight.  That's not anybody booking a flight
2  for Kayak in any sense.  That's simply a search engine
3  acting like a search engine, directing people to a
4  third party where they may choose to book or not a
5  flight.
6        So that's a different entirely function
7  of Kayak than the function that we're talking about
8  when we're talking about their theory that Kayak
9  encourages and induces third parties to go out and get
10 Ryanair flights so that Kayak can provide them to
11 Kayak's own customers.
12       THE COURT:  Let me ask you this
13 question on a different subject.  You say that the
14 information you have is very incomplete and, perhaps
15 in some ways, underinclusive, and, perhaps in other
16 ways, overinclusive.  But you have the information I
17 take it?
18       I mean you must because that's how you
19 were able to determine that it's both under and over-
20 inclusive; right?  So you know how many flights were
21 sold under the link-out system?
22       MS. FORDERER:  In some cases, third
23 parties do report the flights that they sell as a
24 result of clicks on Kayak.  Not in every case and not

7 (Pages 22 - 25)

Page 26

1 under every contract, but sometimes they do report
2 those sales to Kayak. Kayak does have abstractly some
3 data on this that would of course need to be compiled.
4         But the problem with that data is that
5 it includes sales of flights that are not Ryanair
6 flights because it's not the case that when somebody
7 clicks on a Ryanair flight, they necessarily buy the
8 Ryanair flight.
9         They go to the third party and they buy
10 whatever flight they want on the third party. Maybe
11 they see a Lufthansa flight that's a little bit more
12 expensive but includes seat selection and a bag. And
13 so they'd like to purchase that flight instead.
14         And the Kayak data includes those
15 flights. So it's not fair to peg Kayak under their
16 damages theory with all of these flights that these
17 third parties have sold.
18         If they wanted to do that, we've
19 identified all of the third parties. They're more
20 than free to go out and obtain that information from
21 the parties that actually have it, which are the
22 parties that make the sales.
23         THE COURT: Okay. Let me hear from
24 Mr. Mao.

Page 27

1         You heard Ms. Forderer's argument about
2 how this data is both unreliable and, in some
3 respects, overinclusive. What is your response?
4         MR. MAO: So I understand that concern
5 and I don't agree with her. She keeps going back to
6 that Lufthansa example where after Kayak links the
7 user to the third-party website, the user can book a
8 different flight.
9         While technically true, I cannot
10 imagine a reason why the user would do that when Kayak
11 is linking the user directly to the checkout page for
12 the flight that the user already shows on the Kayak
13 website.
14         For the user to then book a different
15 flight on the third-party website, they would have to
16 backtrack, somehow get to the homepage either by
17 clicking on a banner at the top or typing in a
18 different URL, and then completing a completely
19 different flight search. That's just not going to
20 happen when you're already on the checkout page.
21         THE COURT: Well, it could happen.
22 I've certainly had second thoughts when I was on a
23 checkout page more than a few times. All right.
24         MR. MAO: Yeah.

Page 28

1         THE COURT: Go ahead.
2         MR. MAO: I hear the point that the
3 data could be under and overinclusive but then Kayak
4 would have the right to criticize Ryanair's use of
5 that data or reliance on that data at a later time.
6         THE COURT: Yeah.
7         Okay. And Ms. Forderer, what is the
8 state of play with respect to the availability of this
9 data? In what form have you seen the data compiled?
10         MS. FORDERER: It's not as if Kayak, in
11 the regular course of business, has data for each
12 airline and how many clicks of and flights have been
13 sold to the airline. That's not at all what it would
14 be.
15         So Kayak would have to go and look at
16 each aggregator that offers Ryanair flights and see
17 for which period that aggregator provided the data and
18 compile, I guess it would be, maybe a list of the
19 different -- it would just be numbers; right?
20         So Kayak definitely doesn't have any
21 more information than just numbers for flights. But
22 again, those are bad numbers. They're not reflective
23 of the actual bookings that were made.
24         THE COURT: Well, I understand that the

Page 29

1 data may well be flawed and may ultimately be
2 determined that it's badly flawed, but that isn't, at
3 this point, the matter of principle concern for me.
4 The data may be somewhat flawed.
5         It may be seriously flawed. And
6 that'll be possible to sort out over time if the data
7 is made available. But if we don't make the data
8 available at all, then we'll never know. So that
9 argument does not move me very far.
10         What I'm trying to get at is in what
11 form would this data be producible that would minimize
12 the burden on Kayak?
13         MS. FORDERER: So Kayak, I suppose,
14 could produce the numbers, you know, to the extent
15 they think the data is reliable. They could produce
16 the numbers from, you know, maybe the top few
17 aggregators that provide it.
18         I think the numbers get even less
19 reliable as with the sales that are the lower -- you
20 know, the aggregators that are booking fewer flights.
21 You know, there's more than 60 aggregators potentially
22 at issue here, so we could look at the top few of them
23 and produce that data.
24         But again, like, even that data is

8 (Pages 26 - 29)

Page 30

1 necessarily going to include the Lufthansa flight and
2 the AirTran's flight and we have absolutely no way to
3 know whether it's two out of the ten or whether it's
4 eight out of the ten or -- I mean, nobody knows that
5 except Kiwi or whatever aggregator books it.
6         THE COURT:  What percentage of the
7 flights would you guess come from, let's say, the top
8 ten of the 60 aggregators?
9         MS. FORDERER:  Gosh.  That's very hard
10 for me to say as I sit here today without having the
11 data compiled.  I'd guess it's a high percentage.
12        THE COURT:  Yeah.  I have to start a
13 more general question along the same lines.  Many of
14 these kinds of things involve a small number of
15 entities that have the great bulks, say 90 percent, of
16 the activity.
17        And the last 75 percent of the entities
18 have only 10 percent, going down to the last 10 or 12
19 have almost nothing.  So is that the pattern that you
20 have here of a very large number of a very large
21 percentage of the activity is with a relatively small
22 number of aggregators?
23        MS. FORDERER:  It could be, Your Honor.
24        THE COURT:  Yeah.  All right.  Well,

Page 31

1 let me hear from Mr. Mao.
2         Mr. Mao, I'm looking for a way to try
3 to maximize the relevance of what's obtained while
4 minimizing the burden and the busy work that might go
5 into obtaining information from parties that really
6 have very little to offer.
7         So do you have any proposals short of
8 just saying, "Give us everything," that might tend to
9 be a more reasonable approach to the information
10 you're looking for?
11        MR. MAO:  I understand.  And I'm
12 certainly not trying to overly burden them, but it's
13 hard for me to make a proposal without knowing exactly
14 what they have.
15        Now, as I understand it, the two main
16 models that Kayak just paid for link-out bookings are
17 per click, where every time a user clicks on the link,
18 the third party pays Kayak, number one.
19        And the other one would be by
20 commissions where every time the user books the
21 flight, the third party pays Kayak a percentage of
22 what the user pays.
23        THE COURT:  Which is the more common?
24 Ms. Forderer, do you know which is the more common?

Page 32

1         MS. FORDERER:  So my understanding, and
2 I think the Kayak witness may have testified to
3 this -- but my understanding is that the pay-per-click
4 is and historically has been the most common.  I would
5 say that as I understand it, we're not talking about
6 clicks right now.  We're talking about -- the
7 interrogatory asks for information about flights sold.
8         The fact that some Kayak partners are
9 paid per click only means that Kayak won't necessarily
10 have the data about flights sold because if they're
11 paid per click, they don't necessarily care if the
12 flight is ever sold.
13        So some partners are per acquisition.
14 And in those cases, they do get some data about the
15 flight that is sold as a result of the click, whether
16 it be a Ryanair flight or any other flight.  So what
17 I'm saying is I don't think they're even asking for
18 the click data.  They're asking about the flights
19 sold.
20        And when we're talking about the
21 flights sold, as you pointed out, like, there are more
22 than 60 companies that potentially, at some point,
23 have provided Kayak with data that includes Ryanair
24 flights.  And so if we can be looking at a portion of

Page 33

1 those rather than all of them, I think that helps a
2 little bit.
3         But frankly, we're still left with a
4 really unfair case where they are pegging Kayak with
5 overinclusive sales that don't reflect actual Ryanair
6 bookings and certainly don't reflect bookings that
7 Kayak had anything to do with.
8         THE COURT:  Well, I understand.  And
9 you've repeated that theory enough that it's finally
10 gotten through my thick head what it is that your
11 theory is.  No, I understand your theory.  Actually, I
12 understand it for the first time.
13        But I'm not going to foreclose
14 discovery on the ground that they may not be able to
15 make a convincing case as to liability on the kinds of
16 transactions that Kayak is engaged in.
17        I don't think that's clearcut enough at
18 this point for me to say, "Cut them off with a pass,"
19 and say that, "Kayak can't possibly be responsible in
20 any way for the activities of the aggregators."
21        It seems to me that it's at least
22 possible that it can be viewed as an inducement
23 situation.  So that argument, as far as I'm concerned,
24 is not very persuasive.

9 (Pages 30 - 33)

Page 34

1    Question in my mind that I'm struggling
2 with here and looking for help on is whether we're
3 talking about something that is sufficiently large in
4 terms of total numbers and at least minimally
5 accurate. It doesn't have to be perfectly accurate.
6 There can be over-inclusiveness. There can be under-
7 inclusiveness.
8    But if it's minimally accurate, it may
9 be an indication of the volume of activity. And if
10 the volume of activity reflects what, according to
11 Ryanair's theory, is unlawful activity, then that's
12 relevant.
13    So here's what I am inclined to do, and
14 I will listen to arguments from either of you to
15 persuade me that this is not the right approach.
16    But I think of the 60 aggregators, what
17 we should do is to take, let's say, 15 of the
18 aggregators and obtain the number of flights that were
19 forwarded by Kayak to the aggregators under the link-
20 out booking system and that were designated as Ryanair
21 flights.
22    Mr. Mao, any comments?
23    MR. MAO: Well, a question actually.
24 Would that include both the per click to know the

Page 35

1 number of clicks and the number of commission
2 bookings?
3    THE COURT: Well, it seems to me that
4 Ms. Forderer has a point that you are asking for
5 flights, not clicks. So it seems to me that her --
6 isn't she right about that? That seems to me that the
7 interrogatory was for flights, not just for clicks.
8    MR. MAO: So I understand that clicks
9 are not going to be a perfect conversion into flights.
10 Not every user who clicks on the link is going to book
11 a flight necessarily. But to the extent that a
12 percentage of users -- and we'll try to figure out
13 this percentage maybe in deposition coming up.
14    To the extent that a percentage of
15 users who click the link do book a flight, I think the
16 clicks is a proxy for the number of flights.
17    THE COURT: All right.
18    Ms. Forderer, response to my inquiry?
19    MS. FORDERER: Well, yeah. I mean,
20 Your Honor, if you're inclined to order the production
21 of this data, I'm fine to provide 15 of the
22 aggregators that, you know, do the itinerary for Kayak
23 and Kayak does link-outs for those aggregators.
24    But I don't understand at all the basis

Page 36

1 for requiring us to produce number of clicks. If
2 we're giving the bookings, and the bookings are
3 themselves already not a great indicator, but the
4 bookings are the indicator of the booking.
5    I don't know why they would need the
6 clicks as an indicator of the bookings. They haven't
7 asked for that. They're not entitled to it. It
8 certainly doesn't have anything to do with their CFAA
9 that they've articulated today.
10    So I would say your proposal that we
11 would provide, you know, 15 of the aggregators that
12 have linked out and recorded bookings from linked out
13 Ryanair links is okay with us.
14    THE COURT: Well, Mr. Mao's argument as
15 I understand it is that the clicks may not be a
16 perfect proxy for the number of flights. It was
17 probably by some measure overstates the number of
18 actual bookings that occurred, but that some
19 percentage of the clicks actually do produce bookings.
20    And he says that he may be able to
21 establish roughly what percentage that is in later
22 discovery. If that's --
23    MS. FORDERER: But --
24    THE COURT: -- go ahead. Go ahead.

Page 37

1    MS. FORDERER: -- if we're giving the
2 bookings, I don't understand why he needs to reverse
3 engineer the number of -- if we're already agreeing to
4 give the bookings -- which I understand that you're
5 going to order us to do.
6    So if we give them the bookings, why
7 would he need the clicks to try and reverse engineer
8 how many bookings there were or what percentage of --
9    THE COURT: Well, what I understood was
10 that when you do clicks, you don't know how many of
11 those ultimately result in booking.
12    In other words, if your arrangement is
13 just to get 10 cents per click, now correct me if I'm
14 wrong, but I would assume that last you hear of
15 anything is that you get your click, you get your 10
16 cents regardless of whether there's a booking.
17    And you never have any information as
18 to whether there was a booking; right? Or do you get
19 information as to whether there was a booking? If you
20 do, then information about the booking is obviously
21 better than information about the click.
22    But I think Mr. Mao is suggesting that
23 the number of clicks is necessary because he doesn't
24 have the number of bookings in a system in which

10 (Pages 34 - 37)

1 clicks are the motive payment to Kayak.
2          Is that --
3          MS. FORDERER:  So I think --
4          THE COURT:  -- Mr. Mao?
5          Let me check with Mr. Mao and see if
6 I'm misunderstanding his point.
7          MR. MAO:  No.  You're absolutely right,
8 Your Honor.
9          THE COURT:  Okay.
10          Then Ms. Forderer, if it's true that
11 the number of clicks is the only way to determine any
12 activity on the part of customers whose activity is
13 based on clicks, then I don't see why you say that,
14 "Well, he already has the information or already would
15 have the information," as to the number of bookings.
16          MS. FORDERER:  So for a given partner,
17 if we are going to provide them the number of bookings
18 that were reported to us, that's the number of
19 booking.  You wouldn't be able to tell from the
20 overall number of clicks how many of those clicks
21 above the number of bookings resulted in a booking.
22          There would be absolutely no way to
23 divine that from the number of actual bookings.  So we
24 have the number of bookings.  And more importantly,

1 Your Honor, they haven't asked for that and --
2          THE COURT:  Ms. Forderer, please.  I
3 need to understand something here before you go any
4 farther.  My question is in a system in which Kayak is
5 being paid by clicks, does Kayak nonetheless
6 ultimately get information as to whether there were
7 bookings emerging from those clicks?
8          MS. FORDERER:  Not necessarily.
9          THE COURT:  Okay.  So if all you have
10 is clicks, then with respect to, let's say, a number
11 of the arrangements with the aggregators, then if we
12 don't collect information as to the clicks, then it
13 sounds like we would not have any information with
14 respect to those aggregators as to the number of
15 bookings; is that right?
16          MS. FORDERER:  Kayak has no information
17 with respect to those aggregators about the number of
18 bookings.  Kayak simply does not possess that
19 information.  But the entity that would possess that
20 information is the entity that made the booking.  The
21 clicks don't indicate how many bookings were made.
22          THE COURT:  Yeah.  I understand that.
23 But in response to my question earlier, you said, "Why
24 do they need the clicks if we're giving them the

1 bookings?"  I believe that's what you said.
2          My concern is that if the people that
3 are processed through the system in a click system
4 ultimately, whether they book or not, that you never
5 get information as to whether they book, then the
6 clicking and the booking is not redundant.  You
7 understand what I'm saying?
8          MS. FORDERER:  Yes, I understand what
9 you're saying.  And I --
10          THE COURT:  Then why is your answer to
11 me on several occasions that, "Why do they need the
12 clicks when they have the bookings?"  Do you
13 understand why that doesn't make any sense to me?
14          MS. FORDERER:  I'll try my best to
15 clarify our position.  So Kayak has certain unreliable
16 information about bookings made by third parties as a
17 result of clicks on Kayak.  And that is what I
18 understand the motion to compel was filed about and
19 that we're discussing we would provide.
20          In addition to that, Kayak may have
21 information about the overall number of clicks for
22 that party.  But a particular aggregator may have a
23 per-click agreement per year and then a
24 per-acquisition agreement for a year.  And it may

1 change over time.
2          But Kayak simply does not have the
3 information, does not possess, and cannot provide the
4 information about how many bookings were made as a
5 result of clicks on Kayak when the third parties do
6 not provide Kayak that information.
7          And the number of clicks itself is not
8 a proxy for that number.  And there is no way to
9 divine what percentage of those clicks ultimately
10 resulted in a sale based on just the number of clicks,
11 which is all Kayak would ever have.
12          So what I'm saying is we can provide
13 the unreliable bookings number if you require us to
14 and we are willing to do that.  But the clicks isn't
15 relevant to anything; right?  The clicks are not
16 something that get to how many bookings were made and
17 Kayak doesn't have that information.
18          So we can't provide them with bookings
19 that were made when the third parties don't provide
20 that information from us.  Clicks are not a proxy for
21 that information.
22          THE COURT:  Okay.
23          Now, Mr. Mao, you said earlier that the
24 clicks would be something that you could use to

11 (Pages 38 - 41)

Page 42

1 determine the number of bookings, if I recall
2 correctly. How would you make the connection?
3     MR. MAO: Certainly, we try by asking
4 their witnesses via deposition. But one thing
5 Ms. Forderer mentioned that gave me an idea.
6     She mentioned that Kayak's relationship
7 with an aggregator might change year to year. It
8 might be per click one year and per booking the next
9 year.
10     Now, it strikes me that if the links
11 are on the Kayak website, Kayak should always know how
12 many times each of its links are clicked; right? So
13 if we know at one year that they use a per-booking
14 model, we'd know both the number of bookings and
15 number of clicks for that year.
16     You divide number of bookings by number
17 of clicks, and that should give you a pretty good idea
18 of the conversion rate for other years too.
19     THE COURT: So how are you knowing the
20 number of bookings with respect to that year if all
21 you have is information about clicks? Where are you
22 getting the information about bookings? From the
23 aggregators or what?
24     MR. MAO: No. What I'm saying is that

Page 43

1 for a year where they know the information about
2 bookings, because they get paid per booking, I think
3 they should also know the information per clicks too
4 just because I think any website should know how many
5 times a link on their website has been clicked.
6     So for the years where they get paid by
7 clicks, they would only know clicks. But for the
8 years where they get paid by booking, I think they
9 should know both bookings and clicks. And from that,
10 we can calculate the percentage of clicks that are
11 converted into bookings. Yeah.
12     THE COURT: I'm not understanding how
13 you're finding the number of bookings in a year in
14 which the only information that Kayak has is the
15 number of clicks.
16     That's my problem. Is there some kind
17 of way that you expect to see both bookings and clicks
18 in a particular year with a particular aggregator?
19 I'm not understanding that.
20     MR. MAO: Did you get the first part
21 about in a year where they have the booking
22 information? Did you understand that part correctly?
23     THE COURT: Well, in other words,
24 you're saying that if it so happens that they have a

Page 44

1 company that one year has clicks and another year is
2 paid by per transaction and actual purchased tickets,
3 then you could say in a year that all you have is
4 clicks, that, you know, you got twice as many clicks
5 as you had last year with bookings. And therefore,
6 you figure 50 percent. Is that your theory?
7     MR. MAO: No. Let me try to clarify it
8 here. Let's say in the year 2019, they know
9 information for bookings because they get paid per
10 booking; okay?
11     THE COURT: All right.
12     MR. MAO: All right.
13     Please, Ms. Forderer, correct me if I'm
14 wrong.
15     But I think Kayak, for 2019 where they
16 know the number of bookings, should also know the
17 number of clicks because these are links on their
18 website.
19     So here we have both pieces of
20 information for 2019. We can calculate a percentage
21 of clicks that are converted to bookings in 2019. And
22 then --
23     THE COURT: Oh, I see. Okay. So
24 you're saying when they have both pieces of

Page 45

1 information that are available if that ever happens?
2     MR. MAO: Yeah. And then
3 hypothetically in 2020, they changed the model and now
4 they only get paid by clicks. So we only know the
5 number of clicks in 2020. And while it's not going to
6 be perfect, we can take that conversion rate on 2019
7 and apply it to 2020 and at least get an idea of how
8 many bookings.
9     THE COURT: All right. I'm not sure
10 the game here is worth the gamble but I'm satisfied
11 that there's enough of a basis for relevancy here that
12 I'm going to direct that with respect to the 15
13 leading aggregators, and I allow Kayak to make a
14 determination of that, that the actual bookings and
15 the number of clicks should be provided.
16     I have my doubts as to whether any of
17 this will end up being central to the case, but it
18 seems to me that they're sufficient showing
19 irrelevance to satisfy the requirements. So that's
20 what we'll order.
21     And I think I will leave it at that and
22 expect that if there are any problems that arise from
23 the implementation of the order, that you all will
24 strive very hard to work them out between you.

12 (Pages 42 - 45)

Page 46

1      We've had several of these discovery
2 conferences now in a row. I don't want this to become
3 a habit. I want you all to work these things out.
4      It takes a lot of work and, in terms of
5 your client's resources, a lot of money to have these
6 things hashed out in court, things that could be
7 resolved between you. So I would hope that you would
8 be able to resolve them in the future between you.
9      All right. We'll be adjourned. I will
10 stay on the line for a couple of minutes with the
11 court reporter, if the court reporter has any
12 questions, to try to help in that regard.
13      Thank you.
14      MS. FORDERER: Your Honor, may I just
15 add one clarification? And we're happy to comply with
16 your order, completely understand. I just want it to
17 be clear so that nobody misunderstood. I have never
18 seen this data broken out by year. So we may not even
19 have the year -- we may be providing an overall
20 number. We'll provide what Kayak has but I --
21      THE COURT: That's fine. And I
22 think --
23      MS. FORDERER: -- we'll give them what
24 we have.

Page 47

1      THE COURT: -- and I think Mr. Mao
2 should understand that what he gets is what you got.
3 And if what you got is not particularly useable, well
4 that's a problem that he's going to have to cope with.
5 I understand that it may not be a perfect spreadsheet
6 of data that you have. So that's not something that I
7 would expect you have to worry about.
8      All right. So we're adjourned. And I
9 will hear from the court reporter if the court
10 reporter has any questions.
11      THE REPORTER: Perfect. We are off the
12 record at 4:58.
13      (Whereupon, at 4:58 p.m., the
14      proceeding was concluded.)
15
16
17
18
19
20
21
22
23
24

Page 48

1      CERTIFICATE OF DEPOSITION OFFICER
2      I, ANDREW WEADER, the officer before whom
3 the foregoing proceedings were taken, do hereby
4 certify that any witness(es) in the foregoing
5 proceedings, prior to testifying, were duly sworn;
6 that the proceedings were recorded by me and
7 thereafter reduced to typewriting by a qualified
8 transcriptionist; that said digital audio recording of
9 said proceedings are a true and accurate record to the
10 best of my knowledge, skills, and ability; that I am
11 neither counsel for, related to, nor employed by any
12 of the parties to the action in which this was taken;
13 and, further, that I am not a relative or employee of
14 any counsel or attorney employed by the parties
15 hereto, nor financially or otherwise interested in the
16 outcome of this action.   *Andrew Weader*
17
18      ANDREW WEADER
19      Notary Public in and for the
20      Commonwealth of Pennsylvania
21
22
23
24

Page 49

1      CERTIFICATE OF TRANSCRIBER
2      I, CHRISTIAN CHEEHE, do hereby certify that
3 this transcript was prepared from the digital audio
4 recording of the foregoing proceeding, that said
5 transcript is a true and accurate record of the
6 proceedings to the best of my knowledge, skills, and
7 ability; that I am neither counsel for, related to,
8 nor employed by any of the parties to the action in
9 which this was taken; and, further, that I am not a
10 relative or employee of any counsel or attorney
11 employed by the parties hereto, nor financially or
12 otherwise interested in the outcome of this action.
13
14
15      CHRISTIAN CHEEHE
16
17
18
19
20
21
22
23
24

13 (Pages 46 - 49)

| & |
|---|
| **&**  2:4,11,18 3:6 5:15,17,22 |

| 0 |
|---|
| **02116**  2:20 |

| 1 |
|---|
| **1**  8:13 15:4 |
| **10**  2:19 8:12 30:18,18 37:13 37:15 |
| **10019**  2:13 |
| **11th**  2:19 |
| **12**  30:18 |
| **12th**  2:12 |
| **15**  34:17 35:21 36:11 45:12 |
| **19801**  2:6 3:8 |

| 2 |
|---|
| **20-1191**  1:7 5:11 |
| **2019**  44:8,15,20 44:21 45:6 |
| **2020**  45:3,5,7 |
| **2023**  1:14 |
| **20439**  1:19 |
| **20th**  3:14,21 |
| **212**  2:15 |
| **25**  1:14 |
| **25386**  48:17 |

| 3 |
|---|
| **3**  3:14,21 |
| **302**  2:8 3:10 |

| **30321**  49:13 |
|---|
| **31**  2:12 |
| **3:59**  1:15 |

| 4 |
|---|
| **4**  14:24 |
| **415**  3:17,24 |
| **4:58**  47:12,13 |

| 5 |
|---|
| **50**  12:23 13:5 13:18 14:4,6 44:6 |
| **513-3420**  2:15 |
| **527-8378**  2:8 |
| **52nd**  2:12 |
| **573-5863**  2:22 |

| 6 |
|---|
| **60**  29:21 30:8 32:22 34:16 |
| **6119095**  1:21 |
| **617**  2:22 |
| **651-7525**  3:10 |
| **693-2038**  3:24 |
| **693-2128**  3:17 |

| 7 |
|---|
| **717**  1:18 |
| **75**  30:17 |

| 8 |
|---|
| **800**  2:5 |

| 9 |
|---|
| **90**  30:15 |
| **920**  3:7 |
| **94111**  3:15,22 |

| a |
|---|
| **a.m.**  8:12 |
| **ability**  48:10 49:7 |
| **able**  25:19 33:14 36:20 38:19 46:8 |
| **above**  38:21 |
| **absolutely**  30:2 38:7,22 |
| **abstractly**  26:2 |
| **accepted**  12:17 |
| **access**  6:23,24 12:10 15:11 |
| **accessing**  11:6 23:17 |
| **accomplice**  22:11 |
| **account**  11:13 12:14 |
| **accounts**  13:10 |
| **accurate**  15:23 21:9 34:5,5,8 48:9 49:5 |
| **acquisition**  32:13 40:24 |
| **acting**  24:22 25:3 |
| **action**  48:12,16 49:8,12 |
| **activities**  33:20 |
| **activity**  23:1 24:13 30:16,21 34:9,10,11 38:12,12 |

| **actual**  28:23 33:5 36:18 38:23 44:2 45:14 |
|---|
| **actually**  7:16 9:22 23:22 26:21 33:11 34:23 36:19 |
| **add**  9:21 10:5 46:15 |
| **added**  19:6 |
| **addition**  40:20 |
| **address**  15:12 |
| **addresses**  15:16 |
| **adjourned**  46:9 47:8 |
| **admit**  20:13 |
| **afternoon**  5:2,8 5:14,21 6:3 |
| **aggregator**  7:4 7:7,7 8:4,20 9:1,6,11,14,23 10:7,9,10,21 11:1,12,19 12:3,4,7,8 20:6 21:13 28:16,17 30:5 40:22 42:7 43:18 |
| **aggregator's**  9:18 10:3 |
| **aggregators**  6:22,24 7:3,11 7:24 8:17,23 10:15 13:23 |

**[aggregators - booking]** Page 2

14:20 15:21
17:13,14 18:1
18:2,4 21:15
21:23 29:17,20
29:21 30:8,22
33:20 34:16,18
34:19 35:22,23
36:11 39:11,14
39:17 42:23
45:13
**agoda**  1:9 3:4
**agree**  15:20
24:16 27:5
**agreeing**  37:3
**agreement**  9:23
10:9 40:23,24
**agreements**
6:21
**ahead**  14:5
28:1 36:24,24
**airline**  28:12,13
**airtran**  19:24
**airtran's**  30:2
**aligned**  17:6
**alleged**  10:13
11:9
**allow**  45:13
**amount**  20:24
21:20,22
**andrew**  1:20
5:6 48:2,18
**answer**  17:21
40:10
**anybody**  14:4
24:24 25:1

**api**  6:23
**appearing**  5:16
**apply**  45:7
**approach**  31:9
34:15
**argue**  17:7
23:19
**argument**  5:18
6:2 11:19
14:18 27:1
29:9 33:23
36:14
**arguments**
34:14
**arrangement**
17:13 37:12
**arrangements**
39:11
**arrives**  8:12
**articulated**
36:9
**artificially**  21:8
**aside**  18:9
**asked**  36:7 39:1
**asking**  32:17,18
35:4 42:3
**asks**  32:7
**aspects**  24:13
**assume**  37:14
**assuming**  18:1
18:3
**attaining**  18:5
**attorney**  48:14
49:10

**attribute**  21:4
**audio**  48:8 49:3
**authorization**
11:7,14 12:10
**availability**
28:8
**available**  22:15
29:7,8 45:1
**avenue**  2:19

**b**

**b**  4:1
**b.v.**  1:8 3:3
**back**  14:20
27:5
**backtrack**
27:16
**bad**  19:17
20:20 28:22
**badly**  29:2
**bag**  26:12
**ball**  6:16
**banner**  27:17
**barry**  2:4 5:15
**based**  8:21 16:6
21:4 38:13
41:10
**basically**  15:23
**basis**  18:23
35:24 45:11
**behalf**  2:2 3:2
5:15,22 6:2
**behest**  9:19
11:21
**believe**  14:9
15:12 40:1

**belonging**
19:14
**berlin**  8:9
**best**  40:14
48:10 49:6
**better**  37:21
**big**  12:20
**bit**  16:2 26:11
33:2
**blacklist**  12:13
**block**  12:17
13:21,23
**blocked**  13:10
**book**  7:5,7,16
8:15,21 11:5
11:12 12:11,15
12:16 21:17
25:1,4 27:7,14
35:10,15 40:4
40:5
**booked**  15:2,5
15:15 16:22
**booking**  1:7 3:2
5:11 7:15 8:2
9:4,17 13:1
14:13 15:10
19:6,23 21:1
21:21 25:1
29:20 34:20
36:4 37:11,16
37:18,19,20
38:19,21 39:20
40:6 42:8,13
43:2,8,21
44:10

**[booking.com - commercial]**                                                Page 3

**booking.com**
1:7 3:3
**bookings** 20:19
23:14 28:23
31:16 33:6,6
35:2 36:2,2,4,6
36:12,18,19
37:2,4,6,8,24
38:15,17,21,23
38:24 39:7,15
39:18,21 40:1
40:12,16 41:4
41:13,16,18
42:1,14,16,20
42:22 43:2,9
43:11,13,17
44:5,9,16,21
45:8,14
**books** 12:7 30:5
31:20
**boston** 2:20
**bot** 12:9,16
**briefs** 22:5
**broken** 46:18
**bryson** 1:16 5:3
**bulks** 30:15
**bunch** 7:19
22:6
**burden** 29:12
31:4,12
**business** 19:18
28:11
**busy** 31:4
**buy** 14:4 16:11
16:11,12,13

22:8 26:7,9
**buying** 10:19
13:15,16,18

**c**

**c** 2:1 3:1 5:1
**c.a.** 1:6
**ca** 3:15,22
**calculate** 43:10
44:20
**call** 23:14
**called** 19:6
**care** 32:11
**carrying** 6:16
**cart** 10:5
**case** 16:4 24:3
24:6 25:24
26:6 33:4,15
45:17
**cases** 9:11
16:20 25:22
32:14
**caused** 15:11
**center** 3:14,21
**central** 45:17
**cents** 37:13,16
**certain** 16:5
40:15
**certainly** 20:14
27:22 31:12
33:6 36:8 42:3
**certificate** 48:1
49:1
**certify** 48:4
49:2

**cetera** 17:12
20:7
**cfaa** 11:10,21
12:1,5 13:19
14:7 18:11
22:9 23:20
36:8
**change** 41:1
42:7
**changed** 45:3
**characterize**
17:24
**check** 38:5
**checkout** 7:4
10:3 11:4
27:11,20,23
**cheehe** 49:2,15
**choice** 16:10
**choose** 8:19
25:4
**christian** 49:2
49:15
**clarification**
46:15
**clarify** 40:15
44:7
**clear** 6:12,13
46:17
**clearcut** 33:17
**click** 16:15,21
16:23 21:12
24:21 31:17
32:3,9,11,15,18
34:24 35:15
37:13,15,21

40:3,23 42:8
**clicked** 16:24
19:23 42:12
43:5
**clicking** 27:17
40:6
**clicks** 9:18,24
25:24 26:7
28:12 31:17
32:6 35:1,5,7,8
35:10,16 36:1
36:6,15,19
37:7,10,23
38:1,11,13,20
38:20 39:5,7
39:10,12,21,24
40:12,17,21
41:5,7,9,10,14
41:15,20,24
42:15,17,21
43:3,7,7,9,10
43:15,17 44:1
44:4,4,17,21
45:4,5,15
**client's** 46:5
**collect** 39:12
**come** 12:23
30:7
**comfortable**
18:18
**coming** 35:13
**comments**
34:22
**commercial**
10:8

**commission**
16:21,21 35:1
**commissions**
31:20
**common** 31:23
31:24 32:4
**commonwealth**
48:20
**companies**
32:22
**company** 1:10
3:4 44:1
**compel** 40:18
**compile** 28:18
**compiled** 26:3
28:9 30:11
**complaint**
23:15
**complete** 9:20
**completely**
27:18 46:16
**completing**
27:18
**comply** 46:15
**computer** 13:9
13:11
**concern** 27:4
29:3 40:2
**concerned**
33:23
**concluded**
47:14
**conduct** 21:24
**conferences**
46:2

**confused** 7:19
**confusing**
20:15
**confusion** 8:7
20:13
**connection**
42:2
**considered**
19:11
**consistent**
21:19
**cont'd** 3:1
**context** 20:16
**contract** 26:1
**contrary** 18:9
**convenient**
12:22
**conversion**
35:9 42:18
45:6
**converted**
43:11 44:21
**convincing**
33:15
**cooley** 3:13,20
6:1
**cooley.com**
3:16,23
**coordinated**
23:9
**cope** 47:4
**corporation**
1:8 3:3
**correct** 7:13
37:13 44:13

**correction** 9:10
**correctly** 42:2
43:22
**costs** 21:3
**counsel** 5:24
48:11,14 49:7
49:10
**couple** 46:10
**course** 17:10
19:18 23:21
26:3 28:11
**court** 1:1 5:2,3
5:6,7,9,19 6:4,9
6:18 7:9,14,18
8:22 9:13
10:12,18 11:8
11:16,18 12:19
13:17 14:3,10
15:7,17 17:2
17:10,21 18:20
19:8 20:2
21:11 22:18
23:24 25:12
26:23 27:21
28:1,6,24 30:6
30:12,24 31:23
33:8 35:3,17
36:14,24 37:9
38:4,9 39:2,9
39:22 40:10
41:22 42:19
43:12,23 44:11
44:23 45:9
46:6,11,11,21
47:1,9,9

**court's** 6:1
**create** 7:3
11:13
**creating** 12:14
13:9
**criteria** 22:17
**criticize** 28:4
**customer** 8:2,3
8:24 9:3,5,10
9:18,24 10:19
10:19 11:15
12:1,4,7 17:1
19:22
**customers** 23:6
25:11 38:12
**cut** 33:18

**d**

**d** 5:1
**dac** 1:4 2:2
5:10,16
**damages** 14:15
14:16 15:5,8
20:23 21:2
26:16
**data** 6:23 8:18
8:20 10:8
11:15 19:16,17
20:3,4,5,9,19
20:20 22:14,15
24:20 26:3,4
26:14 27:2
28:3,5,5,9,9,11
28:17 29:1,4,6
29:7,11,15,23
29:24 30:11

**[data - esquire]**

32:10,14,18,23
35:21 46:18
47:6
**date**  1:14
**dc**  1:19
**de**  2:6 3:8
**decided**  12:20
12:21 14:3
17:1
**decides**  7:15
**deciding**  24:20
**deemed**  18:24
**defendant**  21:3
21:4,5
**defendants**
1:11 3:2 5:20
5:23 6:3 23:16
**definitely**  28:20
**delaware**  1:2
5:12
**depend**  13:7
**depending**  10:8
13:20
**depends**  22:18
**deposition**
35:13 42:4
48:1
**described**  17:4
22:4
**description**  4:2
**designated**
34:20
**desirable**  16:8
**detects**  12:16

**determination**
45:14
**determine**
25:19 38:11
42:1
**determined**
29:2
**difference**  19:2
**different**  7:19
17:4 22:7 25:6
25:13 27:8,14
27:18,19 28:19
**differently**  16:1
**digital**  48:8
49:3
**direct**  18:17
45:12
**directing**  24:24
25:3
**directly**  7:3
10:2,6 16:12
27:11
**directs**  11:4
**disagreement**
17:3
**disapproves**
21:18
**discovery**  5:12
18:21,21,22
19:3 24:4
33:14 36:22
46:1
**discussing**
24:17 40:19

**display**  8:14
**dispute**  5:12
**district**  1:1,2
5:12
**divide**  42:16
**divine**  38:23
41:9
**doing**  7:9 9:14
11:19 13:13
21:19 22:13
23:6,8
**dollars**  20:24
**domain**  12:13
**doubts**  45:16
**downstream**
10:22
**draw**  19:4
**drawn**  19:3
**dublin**  8:9
**duly**  48:5

**e**

**e**  2:1,1 3:1,1 4:1
5:1,1
**earlier**  39:23
41:23
**edreams**  16:12
**effect**  24:4
**eight**  30:4
**either**  7:2 16:20
27:16 34:14
**element**  18:22
**embarcadero**
3:14,21
**emerging**  39:7

**employed**
48:11,14 49:8
49:11
**employee**  12:8
48:13 49:10
**encouragement**
17:12 18:8
**encourages**
25:9
**encouraging**
21:15 24:6,8
24:12
**ended**  19:23
**ends**  10:19 23:1
**engage**  21:24
**engaged**  23:16
33:16
**engaging**  12:9
18:21 24:1
**engine**  16:2,3
17:6 19:5
24:19 25:2,3
**engineer**  37:3,7
**entering**  22:5
**entirely**  6:13
16:17 24:21
25:6
**entities**  30:15
30:17
**entitled**  20:21
36:7
**entity**  39:19,20
**es**  48:4
**esquire**  2:3,10
2:17 3:5,12,19

[establish - gates]

**establish** 18:23 36:21
**establishing** 15:4
**et** 17:12 20:6
**evade** 14:1
**evd** 4:2
**event** 9:13
**evidence** 18:3 22:2 24:3
**exact** 7:16
**exactly** 6:12 20:5 31:13
**example** 12:18 22:19 27:6
**except** 30:5
**expect** 43:17 45:22 47:7
**expensive** 26:12
**extend** 19:13 23:13
**extension** 21:16
**extent** 29:14 35:11,14

**f**

**facilitated** 23:22
**facilitative** 19:6
**fact** 32:8
**fair** 26:15
**fake** 11:15
**familiar** 19:8
**far** 29:9 33:23

**fare** 8:15
**farther** 39:4
**fed** 16:3,7
**fee** 21:13
**fewer** 29:20
**figure** 35:12 44:6
**filed** 40:18
**finally** 33:9
**financially** 48:15 49:11
**finding** 13:11 43:13
**fine** 35:21 46:21
**finger** 3:6 5:22
**firm** 6:1
**first** 6:22 8:8 11:2 15:1,19 33:12 43:20
**flawed** 29:1,2,4 29:5
**flight** 6:23 7:5 7:8 8:3,11,14 8:16,18,20 9:2 9:7,12,17 10:5 11:2,6,12 12:2 12:7,11,15,16 16:14,15,22,24 17:15 19:23,24 19:24 25:1,1,5 26:7,8,10,11,13 27:8,12,15,19 30:1,2 31:21 32:12,15,16,16

35:11,15
**flights** 6:19,19 7:1,16,21,22 8:24 10:20 15:1,2,5,10,14 16:7,9,24 19:2 19:11,13,22 20:6,11,18 21:1,4,6,8,17 23:5,18 25:10 25:20,23 26:5 26:6,15,16 28:12,16,21 29:20 30:7 32:7,10,18,21 32:24 34:18,21 35:5,7,9,16 36:16
**floor** 2:12,19 3:14,21
**fly** 8:9
**focus** 17:11
**folks** 7:9
**forderer** 3:12 5:24 6:2 15:18 15:24 17:5,16 18:12 19:1,10 20:23 22:2 23:12 24:16 25:22 28:7,10 29:13 30:9,23 31:24 32:1 35:4,18,19 36:23 37:1 38:3,10,16

39:2,8,16 40:8 40:14 42:5 44:13 46:14,23
**forderer's** 27:1
**foreclose** 33:13
**foregoing** 48:3 48:4 49:4
**form** 14:16 21:12 28:9 29:11
**forth** 23:15
**forwarded** 34:19
**framework** 21:9 23:23
**francisco** 3:15 3:22
**frankly** 17:5 19:16 33:3
**free** 26:20
**friends** 12:21
**front** 22:21
**fully** 24:16
**function** 17:7 24:19 25:6,7
**funds** 23:9
**further** 18:3 48:13 49:9
**future** 46:8

**g**

**g** 5:1
**gamble** 45:10
**game** 45:10
**gates** 12:12

| | | | i |
|---|---|---|---|

**gather** 6:19
**gathered** 8:5
**general** 30:13
**generate** 8:10
**generates** 10:1
**gentleman** 6:5
**getting** 18:17
　20:9 42:22
**give** 9:5 13:2
　17:17 31:8
　37:4,6 42:17
　46:23
**given** 19:12
　21:6 38:16
**giving** 36:2
　37:1 39:24
**go** 7:3 13:4
　15:17 25:9
　26:9,20 28:1
　28:15 31:4
　36:24,24 39:3
**goes** 10:2 16:16
**going** 6:15 10:4
　10:5,10 12:22
　12:23,24 13:4
　13:14,15 15:15
　19:19,21,22
　20:2 21:18
　23:6,19 24:21
　27:5,19 30:1
　30:18 33:13
　35:9,10 37:5
　38:17 45:5,12
　47:4

**good** 5:2,8,9,14
　5:21 6:10
　42:17
**google** 16:2
　22:6,6,11,13,20
**gosh** 30:9
**gotten** 33:10
**great** 30:15
　36:3
**greater** 17:8
**ground** 33:14
**guess** 15:19
　28:18 30:7,11

**h**

**h** 4:1
**habit** 46:3
**handling** 5:18
**happen** 8:7
　27:20,21
**happening**
　12:13
**happens** 10:22
　16:17 43:24
　45:1
**happy** 46:15
**hard** 11:23
　30:9 31:13
　45:24
**harm** 15:9,11
　15:13,16
**hashed** 46:6
**head** 33:10
**hear** 17:2 26:23
　28:2 31:1
　37:14 47:9

**heard** 27:1
**hearing** 1:13
**help** 34:2 46:12
**helps** 14:11
　33:1
**hemann** 3:19
　5:24
**hereto** 48:15
　49:11
**hi** 5:7
**high** 30:11
**historically**
　32:4
**hklaw.com**
　2:14,21
**holdings** 1:7
　3:2 5:11
**holland** 2:11,18
　5:17
**home** 10:4
**homepage**
　27:16
**honor** 5:5,14
　5:21 6:8,17 8:7
　16:1 18:12
　19:2 30:23
　35:20 38:8
　39:1 46:14
**honorable** 1:16
**hope** 46:7
**human** 13:15
　13:16
**hypothetically**
　45:3

**idea** 42:5,17
　45:7
**identified**
　26:19
**identify** 15:1
**illegal** 22:21
　23:1 24:9
**illusive** 13:8
**imagine** 27:10
**implementati...**
　45:23
**importantly**
　38:24
**inclined** 34:13
　35:20
**include** 17:18
　17:19 19:22
　30:1 34:24
**includes** 26:5
　26:12,14 32:23
**including** 6:19
**inclusive** 25:20
**inclusiveness**
　34:6,7
**incomplete**
　25:14
**incorporated**
　5:11
**indicate** 39:21
**indication** 18:7
　34:9
**indicator** 36:3
　36:4,6

**[individual - knows]**

**individual**  23:5
**induced**  21:24
**inducement**
  10:14 17:12,24
  33:22
**induces**  25:9
**inducing**  10:15
  10:21 11:1,5
  22:20 23:1
**inflate**  21:8
**information**
  6:20 7:6,11 8:5
  8:23 9:7,15
  10:6,22,23
  11:2,15 13:2
  13:14,16 14:21
  14:23 16:3,6
  17:15 18:2,5,8
  19:13 21:16
  23:4 24:8
  25:14,16 26:20
  28:21 31:5,9
  32:7 37:17,19
  37:20,21 38:14
  38:15 39:6,12
  39:13,16,19,20
  40:5,16,21
  41:3,4,6,17,20
  41:21 42:21,22
  43:1,3,14,22
  44:9,20 45:1
**input**  10:6
**inquiry**  35:18
**interested**  9:3
  48:15 49:12

**interrogatory**
  14:24 20:14
  32:7 35:7
**inventory**
  17:18 18:15
**involve**  30:14
**involved**  22:20
**irrelevance**
  45:19
**issue**  11:3
  17:11 29:22
**issues**  10:24
**it'll**  9:2 12:16
**itinerary**  35:22

**j**

**james**  2:19
**jeff**  5:22 6:7
**jeffrey**  3:5
**jhemann**  3:23
**ji**  2:10 5:16
**ji.mao**  2:14
**job**  1:21
**john**  3:19 5:24
**joined**  5:23
**judge**  5:3
**judgment**
  23:21

**k**

**kayak**  1:8 3:3
  6:13,18,21
  7:11,14,21,22
  8:1,5,10,14,18
  9:5,7,15,19,23
  10:9,10,11,14

10:20 11:1,3
11:22 12:3
14:17,19 15:5
15:10,14,21
16:1,3,6,19,20
17:8,13,14,16
17:17,20,24
18:1,4,13,16,19
19:5,18,20
21:7,8,11,14,24
22:3,24 23:4,9
23:22 24:6,10
24:12,18,22,24
25:2,7,8,10,24
26:2,2,14,15
27:6,10,12
28:3,10,15,20
29:12,13 31:16
31:18,21 32:2
32:8,9,23 33:4
33:7,16,19
34:19 35:22,23
38:1 39:4,5,16
39:18 40:15,17
40:20 41:2,5,6
41:11,17 42:11
42:11 43:14
44:15 45:13
46:20
**kayak's**  19:12
  19:16 21:6
  24:18 25:11
  42:6
**kayak.com.**  7:1

**keeps**  19:18
  27:5
**kforderer**  3:16
**kind**  14:16
  20:19 22:22
  43:16
**kinds**  30:14
  33:15
**king**  3:7
**kiwi**  16:11 24:7
  24:8 30:5
**knight**  2:11,18
  5:17
**know**  7:18 8:1
  8:12 9:11
  10:10 14:12,13
  14:18,24 15:5
  16:11 18:18
  20:15,16 24:14
  25:20 29:8,14
  29:16,20,21
  30:3 31:24
  34:24 35:22
  36:5,11 37:10
  42:11,13,14
  43:1,3,4,7,9
  44:4,8,16,16
  45:4
**knowing**  9:1
  15:14 31:13
  42:19
**knowledge**
  48:10 49:6
**knows**  18:1,4
  18:16,19 30:4

**kratz**  2:4 5:15
**kratzandbarr...**
  2:7
**kristine**  3:12
  5:24

**l**

**language**  20:14
**large**  30:20,20
  34:3
**layton**  3:6 5:22
**leading**  45:13
**leave**  13:3
  45:21
**leaves**  8:12
**left**  22:19 33:3
**letters**  6:14
**liability**  15:4
  22:24 33:15
**liable**  22:12
**lies**  22:24
**line**  5:4 19:3,4
  46:10
**lines**  20:22
  30:13
**link**  7:15 8:2
  9:4,5,24 10:1,2
  14:12 20:18
  21:21 23:13
  24:21 25:21
  31:16,17 34:19
  35:10,15,23
  43:5
**linked**  36:12,12
**linking**  27:11

**links**  7:3 22:7
  27:6 36:13
  42:10,12 44:17
**list**  8:16 28:18
**listed**  6:19 7:1
  7:21
**listen**  34:14
**little**  13:17
  15:24 16:2
  26:11 31:6
  33:2
**llc**  1:9 3:4
**llp**  2:4,11,18
  3:13,20
**location**  1:17
**login**  9:6
**long**  8:13
**look**  12:21
  28:15 29:22
**looking**  10:4
  14:15,15 20:17
  31:2,10 32:24
  34:2
**looks**  14:4
**loop**  9:20
**lot**  6:18 46:4,5
**lower**  29:19
**lowest**  8:15
**lps**  1:7
**lufthansa**  19:24
  26:11 27:6
  30:1

**m**

**ma**  2:20
**made**  14:17
  23:10 24:15
  28:23 29:7
  39:20,21 40:16
  41:4,16,19
**madison**  1:18
**main**  31:15
**make**  9:10
  11:19 12:22
  26:22 29:7
  31:13 33:15
  40:13 42:2
  45:13
**makes**  8:3
**making**  21:11
  21:21
**manner**  15:6
  15:10,15
**manually**  13:13
  14:8
**mao**  2:10 5:17
  5:18 6:15,17
  6:21 7:13,17
  8:6 9:9,21
  10:17,24 11:11
  11:17 12:6
  13:7,20 14:8
  14:22 15:9,20
  17:3 20:2
  26:24 27:4,24
  28:2 31:1,2,11
  34:22,23 35:8
  37:22 38:4,5,7

41:23 42:3,24
  43:20 44:7,12
  45:2 47:1
**mao's**  22:23
  36:14
**marked**  4:3
**matter**  29:3
**matters**  11:24
**maximize**  31:3
**mean**  12:2 24:3
  25:18 30:4
  35:19
**means**  20:15
  32:9
**measure**  36:17
**mentioned**  42:5
  42:6
**meta**  16:1 19:5
  24:19
**method**  14:2
  15:2
**mind**  6:12 20:3
  34:1
**minimally**  34:4
  34:8
**minimize**  29:11
**minimizing**
  31:4
**minutes**  46:10
**missed**  6:4
**misunderstan...**
  38:6
**misunderstood**
  46:17

**[model - page]**                                        Page 10

| | | | |
|---|---|---|---|
| **model** 42:14 | **needs** 37:2 | **nw** 1:18 | **ones** 7:16 |
| 45:3 | **neither** 48:11 | **ny** 2:13 | **opening** 23:23 |
| **models** 31:16 | 49:7 | **o** | **option** 9:19 |
| **moment** 18:10 | **neutrally** 22:14 | | **options** 8:16,17 |
| **monday** 1:14 | **never** 29:8 | **o** 5:1 | **order** 11:11 |
| **money** 21:11 | 37:17 40:4 | **obtain** 10:21 | 14:20 23:17 |
| 21:20 46:5 | 46:17 | 11:1 18:8,15 | 35:20 37:5 |
| **monies** 14:17 | **new** 2:13 | 20:21 23:18 | 45:20,23 46:16 |
| **morning** 8:9 | **nike** 22:9,20 | 24:8 26:20 | **ota** 24:23 |
| **motion** 40:18 | **nike's** 22:9 | 34:18 | **ota's** 16:16,18 |
| **motive** 38:1 | **north** 2:5 3:7 | **obtained** 31:3 | **otas** 16:13 |
| **move** 29:9 | **notary** 1:20 | **obtaining** | 17:17 18:14 |
| **moyer** 3:5,9 | 48:19 | 10:23 18:2 | 21:1 |
| 5:21,22 6:7,7,9 | **number** 5:11 | 31:5 | **outcome** 48:16 |
| **multiple** 8:23 | 7:21 8:10 9:22 | **obviously** | 49:12 |
| 13:10 | 10:7 14:24 | 37:20 | **outs** 35:23 |
| **myer** 2:3 5:14 | 15:3 16:13 | **occasions** 40:11 | **overall** 38:20 |
| 5:15 | 20:11,17 21:8 | **occurred** 36:18 | 40:21 46:19 |
| **myryanair** | 23:3 30:14,20 | **occurs** 13:24 | **overinclusive** |
| 11:13 13:10 | 30:22 31:18 | **offer** 16:13 | 19:21 25:16 |
| **n** | 34:18 35:1,1 | 31:6 | 27:3 28:3 33:5 |
| | 35:16 36:1,16 | **offered** 9:19 | **overly** 31:12 |
| **n** 2:1 3:1 5:1 | 36:17 37:3,23 | **offers** 28:16 | **overstates** |
| **name** 6:4,6 | 37:24 38:11,15 | **officer** 48:1,2 | 36:17 |
| **names** 12:13 | 38:17,18,20,21 | **oh** 6:7 44:23 | **own** 25:11 |
| **necessarily** 8:4 | 38:23,24 39:10 | **okay** 5:10,19 | **p** |
| 12:9 26:7 30:1 | 39:14,17 40:21 | 6:4,9,18 7:14 | |
| 32:9,11 35:11 | 41:7,8,10,13 | 9:13 10:18 | **p** 2:1,1 3:1,1 |
| 39:8 | 42:1,14,15,16 | 11:22 14:10 | 5:1 |
| **necessary** | 42:16,20 43:13 | 19:10 26:23 | **p.a.** 3:6 |
| 12:15 21:17 | 43:15 44:16,17 | 28:7 36:13 | **p.m.** 1:15 8:13 |
| 37:23 | 45:5,15 46:20 | 38:9 39:9 | 47:13 |
| **need** 11:13 | **numbers** 28:19 | 41:22 44:10,23 | **page** 7:4 10:3,4 |
| 14:12,18 26:3 | 28:21,22 29:14 | **oliver** 2:17 5:17 | 11:4 27:11,20 |
| 36:5 37:7 39:3 | 29:16,18 34:4 | **once** 16:15 | 27:23 |
| 39:24 40:11 | | | |

**[paid - program]**                                                                 Page 11

**paid**  31:16 32:9
  32:11 39:5
  43:2,6,8 44:2,9
  45:4
**pair**  22:8
**parameters**  8:8
  16:6
**part**  12:4 17:24
  23:8,22 38:12
  43:20,22
**particular**  8:3
  8:4 9:1,6 40:22
  43:18,18
**particularly**
  47:3
**parties**  7:20
  14:17 16:10
  19:15 21:14
  22:15,16 23:16
  24:7 25:9,23
  26:17,19,21,22
  31:5 40:16
  41:5,19 48:12
  48:14 49:8,11
**partner**  16:7
  38:16
**partners**  16:4
  17:17 18:15
  19:19 32:8,13
**party**  6:22 11:5
  11:5,12 12:20
  12:24 13:4
  16:18 21:13
  24:22 25:4
  26:9,10 27:7

27:15 31:18,21
  40:22
**pass**  33:18
**pattern**  30:19
**pay**  10:10
  12:24 32:3
**payment**  11:15
  12:17 13:14,15
  38:1
**pays**  31:18,21
  31:22
**peg**  26:15
**pegging**  33:4
**pennsylvania**
  48:20
**people**  25:3
  40:2
**percent**  30:15
  30:17,18 44:6
**percentage**
  30:6,11,21
  31:21 35:12,13
  35:14 36:19,21
  37:8 41:9
  43:10 44:20
**perfect**  20:4,5
  35:9 36:16
  45:6 47:5,11
**perfectly**  20:11
  34:5
**period**  28:17
**permission**  6:1
**persuade**  34:15
**persuasive**
  33:24

**pertinent**  21:22
**ph**  19:7
**pick**  9:2
**picks**  8:24
**pieces**  44:19,24
**place**  1:18 11:2
  12:12
**plaintiff**  1:5 2:2
  5:13 6:16
**plaintiff's**
  23:14
**plane**  12:24
**play**  28:8
**playing**  22:3
**please**  39:2
  44:13
**point**  7:2 9:9
  28:2 29:3
  32:22 33:18
  35:4 38:6
**pointed**  32:21
**portion**  21:3
  32:24
**position**  40:15
**possess**  39:18
  39:19 41:3
**possible**  15:2
  17:23 29:6
  33:22
**possibly**  33:19
**potentially**
  11:14 29:21
  32:22
**prepared**  49:3

**present**  6:2
**presented**  8:16
**presumably**
  8:21 9:2
**pretty**  42:17
**prevented**
  12:14
**price**  8:21 9:12
  16:22
**priceline.com**
  1:9 3:4
**principle**  29:3
**prior**  48:5
**probably**  36:17
**problem**  20:8,9
  26:4 43:16
  47:4
**problems**  45:22
**proceeding**
  1:17 47:14
  49:4
**proceedings**
  48:3,5,6,9 49:6
**processed**  40:3
**produce**  20:10
  29:14,15,23
  36:1,19
**producible**
  29:11
**production**
  35:20
**program**  13:9
  13:12,18,21,23
  19:6 20:19
  21:21

**proposal** 31:13 36:10
**proposals** 31:7
**prove** 18:22
**provide** 7:11 9:24 10:8 17:14 21:15 23:9 25:10 29:17 35:21 36:11 38:17 40:19 41:3,6 41:12,18,19 46:20
**provided** 7:22 8:18,20 9:6,11 16:9 22:14,16 23:21 28:17 32:23 45:15
**provides** 6:24
**providing** 8:23 9:15 23:4 24:10 46:19
**proxy** 35:16 36:16 41:8,20
**pte** 1:10 3:4
**public** 1:20 48:19
**publicly** 22:15
**purchase** 13:5 13:9,12 16:16 17:1 26:13
**purchased** 14:6 44:2
**purchases** 12:2

**purchasing** 13:8
**purpose** 14:21 14:23 23:16
**put** 8:8 15:24 21:23 22:5
**putting** 13:14 13:15

**q**

**qualified** 48:7
**question** 12:20 15:19 17:22 22:22 24:2 25:13 30:13 34:1,23 39:4 39:23
**questions** 46:12 47:10

**r**

**r** 2:1 3:1 5:1
**rate** 42:18 45:6
**rather** 17:1 33:1
**really** 17:8 24:1 31:5 33:4
**reason** 27:10
**reasonable** 19:4 22:1 31:9
**recall** 42:1
**record** 18:13 47:12 48:9 49:5
**recorded** 36:12 48:6

**recording** 48:8 49:4
**recovery** 14:17
**reduced** 48:7
**redundant** 40:6
**refer** 7:10
**referral** 10:11
**referring** 23:13
**reflect** 33:5,6
**reflecting** 20:11
**reflection** 20:5
**reflective** 28:22
**reflects** 34:10
**regard** 10:22 46:12
**regardless** 10:18 37:16
**regards** 23:7 24:12
**regular** 19:18 28:11
**related** 19:16 48:11 49:7
**relationship** 15:21 18:17 42:6
**relative** 48:13 49:10
**relatively** 30:21
**relevance** 31:3
**relevancy** 45:11
**relevant** 10:13 15:3,4,7,15

18:24 24:14 34:12 41:15
**reliable** 29:15 29:19
**reliance** 28:5
**remote** 1:17
**repeated** 33:9
**report** 19:20 25:23 26:1
**reported** 1:20 38:18
**reporter** 5:3,5 5:6,8 46:11,11 47:9,10,11
**request** 8:3 19:13
**require** 41:13
**requirements** 45:19
**requiring** 36:1
**resolve** 46:8
**resolved** 46:7
**resources** 46:5
**respect** 28:8 39:10,14,17 42:20 45:12
**respects** 27:3
**response** 22:16 27:3 35:18 39:23
**responsibilities** 15:22
**responsible** 33:19

**[rest - sold]** Page 13

| | | | |
|---|---|---|---|
| **rest** 16:17 | 8:11 9:15 | 41:12 42:24 | **separate** 24:19 |
| **result** 16:23 | 10:15,20 11:12 | 43:24 44:24 | **september** 1:14 |
| 25:24 32:15 | 11:17 12:10,12 | **says** 36:20 | **series** 15:22 |
| 37:11 40:17 | 13:5,21,22 | **scheme** 23:9 | **seriously** 29:5 |
| 41:5 | 14:3 15:12,16 | **scrape** 10:15 | **set** 23:15 |
| **resulted** 38:21 | 16:12,13,23 | **scraping** 7:10 | **setting** 18:9 |
| 41:10 | 17:7,18,19 | 10:14 11:20 | **several** 40:11 |
| **results** 8:11 | 18:3,17,18 | 23:3 | 46:1 |
| **reverse** 37:2,7 | 19:23 20:24 | **screen** 7:10 | **shoes** 22:6,7,8 |
| **rfl.com** 3:9 | 21:17,18,22 | 10:14 11:20 | 22:10 |
| **richards** 3:6 | 23:7,17 24:10 | **search** 16:1,3 | **short** 17:21 |
| 5:22 | 24:11 25:10 | 17:6 19:5 22:5 | 31:7 |
| **right** 6:10,11 | 26:5,7,8 28:16 | 24:19 25:2,3 | **show** 18:4 |
| 6:17 7:12 8:8 | 32:16,23 33:5 | 27:19 | **showing** 45:18 |
| 9:8 10:12,16 | 34:20 36:13 | **seat** 26:12 | **shows** 18:13 |
| 10:17 14:10,15 | **ryanair's** 11:6 | **second** 11:3,8 | 27:12 |
| 15:17 17:15,16 | 14:1 18:5,9 | 27:22 | **signature** 48:17 |
| 17:21 18:20 | 21:1 24:9 28:4 | **see** 8:22 26:11 | 49:13 |
| 19:1,9 23:14 | 34:11 | 28:16 38:5,13 | **simply** 18:19 |
| 25:20 27:23 | **s** | 43:17 44:23 | 24:20 25:2 |
| 28:4,19 30:24 | | **seems** 21:19 | 39:18 41:2 |
| 32:6 34:15 | **s** 2:1 3:1 4:1 5:1 | 22:19 24:13 | **sir** 5:8 |
| 35:6,17 37:18 | **sale** 22:12 | 33:21 35:3,5,6 | **sit** 30:10 |
| 38:7 39:15 | 41:10 | 45:18 | **situation** 33:23 |
| 41:15 42:12 | **sales** 19:17 | **seen** 28:9 46:18 | **skills** 48:10 |
| 44:11,12 45:9 | 21:12 23:10 | **selected** 22:17 | 49:6 |
| 46:9 47:8 | 24:14,17 26:2 | **selection** 26:12 | **slice** 23:21 |
| **rodney** 3:7 | 26:5,22 29:19 | **sell** 20:6 25:23 | **small** 16:21 |
| **role** 17:8 22:3 | 33:5 | **selling** 22:9 | 30:14,21 |
| **roughly** 36:21 | **san** 3:15,22 | 23:5,22 24:11 | **software** 1:8 |
| **row** 46:2 | **satisfied** 45:10 | **send** 8:1 | 3:3 |
| **running** 13:22 | **satisfy** 45:19 | **sends** 12:3 | **sold** 19:11,14 |
| 13:24 | **save** 13:18 | 20:24 | 20:12,18 21:5 |
| **ryanair** 1:4 2:2 | **saying** 20:10 | **sense** 25:2 | 21:9 25:21 |
| 5:10,16 6:19 | 22:24 31:8 | 40:13 | 26:17 28:13 |
| | 32:17 40:7,9 | | |

32:7,10,12,15
32:19,21
**somebody**  26:6
**somewhat**  29:4
**sort**  10:8 29:6
**sound**  20:11
**sounds**  39:13
**speaking**  6:5
**spends**  15:12
**spits**  16:7 22:6
**spitting**  22:13
24:20
**spreadsheet**
47:5
**square**  3:7
**st**  2:19
**start**  30:12
**started**  6:11
**state**  28:8
**states**  1:1
**stay**  46:10
**step**  11:8
**sterilely**  19:11
**stop**  12:12 21:1
**street**  2:5,12
3:7
**strikes**  42:10
**strive**  45:24
**struggling**  34:1
**subject**  25:13
**submit**  11:14
**substantive**
17:3
**sufficient**  45:18

**sufficiently**
34:3
**suggesting**
37:22
**summary**  23:20
**suppose**  12:20
29:13
**sure**  18:12 45:9
**suspicious**  14:5
**sworn**  48:5
**system**  6:13
7:15 8:2 9:5
14:13 25:21
34:20 37:24
39:4 40:3,3

**t**

**t**  4:1
**take**  7:5 9:20
14:14 17:12
24:7 25:17
34:17 45:6
**taken**  48:3,12
49:9
**takes**  8:13 46:4
**talking**  24:18
25:7,8 32:5,6
32:20 34:3
**technically**
27:9
**technological**
14:1 15:9
**telephonic**  1:13
**tell**  38:19
**ten**  30:3,4,8

**tend**  31:8
**tennis**  22:8,10
**terms**  18:6 20:9
34:4 46:4
**testified**  32:2
**testifying**  48:5
**thank**  46:13
**thanks**  6:10
**theory**  10:13,16
11:24 14:11
20:24 21:2,20
22:1,23,23
23:10,12,14
24:5,9 25:8
26:16 33:9,11
33:11 34:11
44:6
**thick**  33:10
**thing**  9:21
13:22 22:19
42:4
**things**  6:22
9:14,22 23:6
30:14 46:3,6,6
**think**  14:22
15:3,4 17:5,7
19:4 22:23
29:15,18 32:2
32:17 33:1,17
34:16 35:15
37:22 38:3
43:2,4,8 44:15
45:21 46:22
47:1

**third**  6:22 11:4
11:5,12 14:17
16:9,18 19:15
21:13,14 22:15
22:16 23:16
24:6,22 25:4,9
25:22 26:9,10
26:17,19 27:7
27:15 31:18,21
40:16 41:5,19
**thoughts**  27:22
**ticket**  13:15,16
**tickets**  13:1,5,8
13:9,12,19
14:4,6 24:11
44:2
**tied**  8:4
**time**  1:15 11:23
28:5 29:6
31:17,20 33:12
41:1
**times**  27:23
42:12 43:5
**tmyer**  2:7
**today**  5:6,16,18
5:23 30:10
36:9
**together**  9:24
**tomorrow**  8:9
**tons**  16:24
**top**  27:17 29:16
29:22 30:7
**total**  34:4
**touhey**  2:3 5:15

**transaction**
16:17 17:4,9
17:11 21:13
44:2
**transactions**
14:19 15:22
33:16
**transcriber**
49:1
**transcript** 49:3
49:5
**transcriptionist**
48:8
**transmit** 7:6
**travel** 16:4
**trouble** 13:18
21:22
**true** 27:9 38:10
48:9 49:5
**try** 12:17 21:1
31:2 35:12
37:7 40:14
42:3 44:7
46:12
**trying** 12:16
13:21,22 14:1
17:7 21:7
29:10 31:12
**twice** 44:4
**two** 6:22 9:14
9:22 10:7,24
30:3 31:15
**type** 13:21,23
15:12

**types** 16:5
**typewriting**
48:7
**typing** 27:17

**u**

**ultimately** 12:1
12:9 16:22
23:5,10 24:11
29:1 37:11
39:6 40:4 41:9
**unauthorized**
15:11
**under** 9:4
25:19,21 26:1
26:15 28:3
34:6,19
**underinclusive**
19:19 25:15
**understand** 8:6
11:18 14:11
17:22 22:23
23:2,11,24
24:1,5 27:4
28:24 31:11,15
32:5 33:8,11
33:12 35:8,24
36:15 37:2,4
39:3,22 40:7,8
40:13,18 43:22
46:16 47:2,5
**understanding**
11:24 15:20
18:14 32:1,3
43:12,19

**understood**
37:9
**unfair** 33:4
**united** 1:1
**universe** 22:10
**unlawful** 23:7
24:12 34:11
**unreliable** 27:2
40:15 41:13
**url** 27:18
**use** 7:15 18:6
28:4 41:24
42:13
**useable** 47:3
**used** 17:4
**user** 7:5,6 8:7
8:15,19 11:4
16:5,8,10
22:17 27:7,7
27:10,11,12,14
31:17,20,22
35:10
**users** 24:20
35:12,15
**using** 12:8 13:8
15:2

**v**

**v** 1:6
**vicariously**
22:12
**videoconfere...**
2:3,10,17 3:5
3:12,19
**view** 10:21 13:6

**viewed** 33:22
**violate** 13:19
**violates** 22:9
**violating** 14:6
**violation** 11:9
11:20 12:1,5
13:24 14:9
18:5,10 23:20
**volume** 34:9,10

**w**

**want** 8:8,20
9:10 13:3,3
14:24 15:1
26:10 46:2,3
46:16
**wanted** 26:18
**wants** 8:15
20:4
**washington**
1:19
**way** 17:3 18:8
18:18 21:18
24:8,11 30:2
31:2 33:20
38:11,22 41:8
43:17
**ways** 13:11
25:15,16
**we've** 19:3,12
21:6 23:21
26:18 46:1
**weader** 1:20
5:6,7 48:2,18
**website** 7:4,22
7:23 9:16,18

[website - york]                                      Page 16

| | |
|---|---|
| 10:3,16 11:5,6 | **wrote**   13:17 |
| 12:10 13:5 | **x** |
| 16:16,18 19:12 | **x**   4:1 20:24 |
| 21:2,5 22:9 | **y** |
| 23:6,17 24:10 | **yeah**   5:9 6:9 |
| 24:18,22 27:7 | 17:5 19:8 |
| 27:13,15 42:11 | 22:15 27:24 |
| 43:4,5 44:18 | 28:6 30:12,24 |
| **websites**   19:14 | 35:19 39:22 |
| **went**   8:5 14:5 | 43:11 45:2 |
| **west**   2:5,12 | **year**   40:23,24 |
| **whiskey**   19:7 | 42:7,7,8,9,13 |
| **william**   1:16 | 42:15,20 43:1 |
| 2:17 5:17 | 43:13,18,21 |
| **william.oliver** | 44:1,1,3,5,8 |
| 2:21 | 46:18,19 |
| **willing**   41:14 | **years**   42:18 |
| **wilmington**   2:6 | 43:6,8 |
| 3:8 | **york**   2:13 |
| **wishes**   18:9 | |
| **witness**   32:2 | |
| 48:4 | |
| **witnesses**   42:4 | |
| **words**   10:20 | |
| 14:14 17:4 | |
| 37:12 43:23 | |
| **work**   7:2 9:23 | |
| 31:4 45:24 | |
| 46:3,4 | |
| **works**   6:13 | |
| 17:7 | |
| **worry**   47:7 | |
| **worth**   45:10 | |
| **wrong**   13:6 | |
| 37:14 44:14 | |