**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| RYANAIR DAC,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>BOOKING HOLDINGS INC.,<br>BOOKING.COM B.V., KAYAK SOFTWARE<br>CORPORATION, PRICELINE.COM LLC,<br>and AGODA COMPANY PTE. LTD,<br><br>　　　　　Defendants. | C.A. No. 20-01191-WCB<br><br>**PUBLIC REDACTED VERSION** |

<u>**DEFENDANTS' OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE THE TESTIMONY OF IAIN
LOPATA AND ANTHONY VANCE**</u>

OF COUNSEL:

John H. Hemann
Kathleen Hartnett
Kristine Forderer
Alexander J. Kasner
Jessie Simpson LaGoy
Hannah Pollack
COOLEY LLP
3 Embarcadero Center, 20th Fl.
San Francisco, CA 94111
(415) 693-2200
jhemann@cooley.com
khartnett@cooley.com
kforderer@cooley.com
akasner@cooley.com
jsimpsonlagoy@cooley.com
hpollack@cooley.com

Jeffrey L. Moyer (#3309)
Alexandra M. Ewing (#6407)
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
moyer@rlf.com
ewing@rlf.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   SUMMARY JUDGMENT SHOULD BE GRANTED TO DEFENDANTS ON ALL OF RYANAIR'S CLAIMS. .............................................................. 3

    A.    Factual and Procedural Background .................................................. 3

        1.    Introduction to Defendants ...................................................... 3

        2.    Ryanair, its Public Website, and its Anti-OTA Business Plan ................. 3

            a.    Booking a Flight on Ryanair.com and "myRyanair" .................... 4

            b.    Ryanair's Website Terms Of Use .................................................. 7

            c.    Ryanair's Anti-OTA Strategy ........................................................ 8

            d.    Ryanair's Website Security and Shield........................................... 9

        3.    Defendants' Flight Businesses .................................................. 10

            a.    Booking.com ............................................................................ 10

            b.    Priceline ..................................................................................... 12

            c.    Agoda ......................................................................................... 13

            d.    KAYAK ...................................................................................... 14

            e.    BHI............................................................................................. 15

        4.    Procedural Background.............................................................. 15

            a.    Ryanair's Cease and Desist Letters............................................. 15

            b.    Ryanair's Claims and Discovery ................................................. 16

    B.    Legal Standard ................................................................................. 17

    C.    Summary Judgment Should Be Granted To Defendants On Ryanair's Claims. ............................................................................. 17

        1.    No Defendant Has Accessed Ryanair's Website To Engage In The Challenged Conduct.................................................................. 17

        2.    Judgment Should Be Entered For Defendants Because They Are Not Vicariously Liable For The Actions Of Their Third Party Vendors. ...................................................................................... 18

            a.    Vicarious Liability Under the CFAA Requires Active Direction of a Third Party Concerning the Alleged Violative Conduct. ...................................................................... 19

            b.    Defendants Do Not Control Whether or How Ryanair Flights Are Sourced by Their Vendors or Otherwise Direct, Induce, or Encourage any Violation of the CFAA. ..................... 20

# TABLE OF CONTENTS
(continued)

**Page**

c.    Defendants Are Not Vicariously Liable for Any Harm to Ryanair's Website, Including the So-Called ███ Attack." ................................................................................ 22

3.    Ryanair Cannot Establish That Defendants' Vendors Access Ryanair's Website "Without Authorization" or "In Excess of Authorization." ....................................................................... 24

    a.    The Court Already Has Held That Accessing Pre-myRyanair Portions of Ryanair's Website Contrary to Ryanair's TOU And Letters Does Not Violate The CFAA. ........ 25

    b.    Purchasing Tickets Contrary to Ryanair's TOU And Letters Does Not Establish a CFAA Violation. ....................................... 25

4.    Judgment Should Be Entered For Defendants Because Ryanair Has Failed To Show That Any Defendant Has Caused $5,000 Or More Of "Loss" To Ryanair In A One-Year Period. ......................................... 27

    a.    Ryanair's Claimed Harms Are Standard Website Security Measures or Business Costs Related to Its Anti-OTA Campaign, Not "Loss" Under the CFAA. ................................. 28

    b.    Ryanair Has Failed to Connect Any Technological Harm— Namely, the "███ Attack"— To Any Defendant. ................. 34

    c.    Ryanair Cannot Attribute $5,000 of Loss in a One-Year Period to Any Defendant. ............................................. 35

5.    Judgment Should Be Entered For Defendants On Conspiracy. ............... 35

6.    Judgment Should Be Entered For Defendants On The Fraud Claim. ....... 36

7.    Ryanair Cannot Obtain a Permanent Injunction ..................................... 37

III.    RYANAIR'S EXPERT TESTIMONY SHOULD BE EXCLUDED. ........................... 38

    A.    Certain Opinions Of Iain Lopata Should Be Excluded. ....................................... 38

    1.    Background ................................................................................ 38

    2.    Lopata's Testimony Violates Rule 702 and *Daubert*. ........................... 40

    a.    The Court Should Exclude Lopata's Damages and Loss Opinions. ....................................................................... 41

    b.    The Court Should Exclude Lopata's Opening Cybersecurity Opinions. ...................................................................... 44

    c.    The Court Should Exclude Certain of Lopata's Rebuttal Opinions ....................................................................... 45

    B.    The Opinions Of Anthony Vance Should Be Excluded. ....................................... 47

# TABLE OF CONTENTS
(continued)

**Page**

1. Background ................................................................................................. 47

2. Vance's Purported "Rebuttal" Expert Report Violates Rule 26. ............. 47

3. Vance's Testimony Violates Rule 702 and *Daubert*. ............................. 49

IV. CONCLUSION ................................................................................................. 50

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Fluid Sys., Inc. v. Huber*,
28 F. Supp. 3d 306 (M.D. Pa. 2014), *aff'd*, 958 F.3d 168 (3d Cir. 2020) .............................34

*Alchem Inc. v. Cage*,
2021 WL 4902331 (E.D. Pa. Oct. 21, 2021), *vacated and remanded on other grounds*, *Alchem USA Inc. v. Cage*, 2022 WL 3043153 (3d Cir. Aug. 2, 2022)....................20

*Allscripts Healthcare, LLC v. Andor Health, LLC*,
2022 WL 3021560 (D. Del. July 29, 2022) ......................................................42, 50

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).....................................................................................17

*Boles v. United States*,
2015 WL 1508857 (M.D.N.C. Apr. 1, 2015) .......................................................45

*Bradley v. Amazon.com, Inc.*,
2023 WL 2574572 (E.D. Pa. Mar. 17, 2023)...........................................45, 48, 49

*Bruno v. Bozzuto's, Inc.*,
311 F.R.D. 124 (M.D. Pa. 2015)...............................................................42, 43

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).....................................................................................17

*Daubert v. Merrell Dow Pharmaceuticals., Inc.*,
509 U.S. 579 (1993).....................................................................................41

*Depalma v. Scotts Co.*,
2019 WL 2417706 (D.N.J. June 10, 2019).........................................................42

*Fidlar Techs. v. LPS Real Estate Data Sols., Inc.*,
810 F.3d 1075 (7th Cir. 2016) .......................................................................37

*Fiona Chen v. Yellen*,
2021 WL 4192078 (N.D. Ill. Sept. 15, 2021) ....................................................49

*Gillispie v. City of Miami Twp.*,
2022 WL 14758379 (S.D. Ohio Oct. 26, 2022)..................................................50

*Glob. Policy Partners, LLC v. Yessin*,
686 F. Supp. 2d 642 (E.D. Va. 2010) ..............................................................33

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Grill v. Aversa,*
    2014 WL 4784150 (M.D. Pa. Sept. 22, 2014) .......................................................................50

*HCC Ins. Holdings, Inc. v. Flowers,*
    237 F. Supp. 3d 1341 (N.D. Ga. 2017)..................................................................................34

*Heller v. Shaw Indus., Inc.,*
    167 F.3d 146 (3d Cir 1999)....................................................................................................46

*hiQ Labs, Inc. v. LinkedIn Corp.,*
    31 F.4th 1180 (9th Cir. 2022) .....................................................................................26, 27, 30

*Holman Enterprises v. Fidelity & Guaranty Insurance Co.,*
    563 F. Supp. 2d 467 (D.N.J. 2008) .......................................................................................49

*Meadows v. Anchor Longwall & Rebuild, Inc.,*
    306 F. App'x 781 (3d Cir. 2009) ...........................................................................................46

*Metro-Goldwyn-Meyer Studios Inc. v. Grokster, Ltd.,*
    545 U.S. 913 (2005)...............................................................................................................36

*Montgomery Cnty. v. Microvote Corp.,*
    320 F.3d 440 (3d Cir. 2003)...................................................................................................43

*Nitkin v. Main Line Health,*
    67 F.4th 565 (3d Cir. 2023) ...................................................................................................17

*Nordetek Env't, Inc. v. RDP Techs., Inc.,*
    862 F. Supp. 2d 406 (E.D. Pa. 2012) ....................................................................................43

*Padillas v. Stork-Gamco, Inc.,*
    186 F.3d 412 (3d Cir. 1999)...................................................................................................41

*Pantoja v. Brennan,*
    257 F. Supp. 3d 636 (D. Del. 2017).......................................................................................17

*In re Paoli Railroad Yard PCB Litigation,*
    35 F.3d 717 (3d. Cir. 1994)..............................................................................................42, 44

*Salinas v. United States,*
    522 U.S. 52 (1997).................................................................................................................36

*Shire ViroPharma Inc. v. CSL Behring LLC,*
    2021 WL 1227097 (D. Del. Mar. 31, 2021) .....................................................................41, 43

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Svanaco, Inc. v. Brand*,
   417 F. Supp. 3d 1042 (N.D. Ill. 2019) ........................................................................19, 20, 24

*TD Bank N.A. v. Hill*,
   928 F.3d 259 (3d Cir. 2019) .........................................................................................38

*In re TMI Litig.*,
   193 F.3d 613 (3d. Cir. 1999) .........................................................................................43

*Travelers Prop. Cas. Co. of Am. v. Hallam Eng'g & Constr. Corp.*,
   2012 WL 13029519 (D.N.J. Aug. 16, 2012) .................................................................42

*Trs. of Univ. of Pa. v. Eli Lilly & Co.*,
   2022 WL 3973276 (E.D. Pa. Jan. 14, 2022) .................................................................41

*U.S. Gypsum Co. v. Lafarge N. Am. Inc.*,
   670 F. Supp. 2d 737 (N.D. Ill. 2009) ............................................................................42

*United States v. Carbo*,
   572 F.3d 112 (3d Cir. 2009) .........................................................................................36

*United States v. Dixon*,
   658 F.2d 181 (3d Cir.1981) ...........................................................................................36

*United States v. Falcone*,
   311 U.S. 205 (1940) ......................................................................................................36

*United States v. Middleton*,
   231 F.3d 1207 (9th Cir. 2000) ......................................................................................28

*United States v. Starr*,
   816 F.2d 94 (2d Cir. 1987) ...........................................................................................37

*Van Buren v. United States*,
   141 S. Ct. 1648 (2021) .........................................................................................26, 27, 28

*Vox Marketing Group, LLC v. Prodigy Promos L.C.*,
   521 F. Supp. 3d 1135 (D. Utah 2021) ...................................................................32, 50

*Waldorf v. Shuta*,
   142 F.3d 601 (3d Cir. 1998) .........................................................................................49

*Wiest v. Tyco Elecs. Corp.*,
   812 F.3d 319 (3d Cir. 2016) .........................................................................................17

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Williams v. Borough of W. Chester, Pa.*,
    891 F.2d 458 (3d Cir. 1989)............................................................................17

*Withrow v. Spears*,
    967 F. Supp. 2d 982 (D. Del. 2013)..........................................................45, 47

**Statutes**

18 U.S.C.
    § 1030(a)(2)(C) ..................................................................................16, 25
    § 1030(a)(4) ........................................................................................16, 37
    § 1030(a)(5)(B)-(C) ...........................................................................16, 25
    § 1030(b) .............................................................................................16, 35
    § 1030(c)(4)(A)(i)(I) ................................................................................27
    § 1030(e)(8) ..............................................................................................28
    § 1030(e)(11) ....................................................................................28, 29
    § 1030(g) ...................................................................................................27

**Other Authorities**

Fed. R. Civ. P. 56(a) ...........................................................................................17
Fed. R. Civ. P. 702 .............................................................................................41

## I.   INTRODUCTION

Plaintiff Ryanair DAC ("Ryanair"), a low-cost Irish airline, has sued four online travel platforms and their US-based parent company ("Defendants"), because it does not want Defendants to offer Ryanair flights to their customers.  Ryanair seeks to use an inapt federal *criminal* statute—the Computer Fraud and Abuse Act ("CFAA")—to hold Defendants civilly liable as computer hackers based on the routine conduct of Defendants' vendors, which obtain Ryanair flight inventory for Defendants from Ryanair's public website.  Faced with the undisputed facts that Defendants neither access Ryanair's website nor harm Ryanair by receiving Ryanair flight inventory from their vendors, Ryanair most recently has sought to blame Defendants for a claimed "bot attack" on the Ryanair website that occurred this October, three years *after* Ryanair filed this lawsuit.  This eleventh-hour allegation is false, unsupported by evidence, and cannot rescue Ryanair's case.  To the contrary, the evidentiary record makes clear that—at every level— Ryanair's CFAA claims fail.  Defendants did not, directly or indirectly, engage in conduct prohibited by the CFAA.  Accordingly, the Court should (1) grant summary judgment to Defendants on all of Ryanair's claims; and (2) exclude Ryanair's expert testimony.

Summary judgment should be granted because the record now establishes the following:

- No Defendant has accessed Ryanair's computers to engage in the challenged conduct, and thus no Defendant can be held directly liable under the CFAA.  (*See* Section II.C.1, *infra*.)

- No Defendant has directed, encouraged, or induced a third party to violate the CFAA, and thus Defendants cannot be held vicariously liable.  Defendants license content from third-party vendors.  (*See* Section II.C.2, *infra*.)

- The underlying access to Ryanair's website is not "without authorization" or "in excess of authorization" under the CFAA because Ryanair.com is a public website.  As this Court

has explained, "[i]f the information on the website is publicly available without requiring users to authenticate themselves, a violation of the terms of use or the defiance of a cease-and-desist letter will not give rise to liability under the CFAA."  D.I. 105 ("MTD Order") at 23–24.  The Court already has held that the portion of Ryanair's website that does not require a "myRyanair" login is public and cannot support a CFAA claim.  The record now is clear that the "myRyanair" login requirement to make a purchase on Ryanair.com is not a "code-based authentication method," but a mechanism open to the general public.    It does not require the user to identify themselves in any way.  (*See* Section II.C.3, *infra*.)

- No Defendant has caused Ryanair $5,000 of "loss" in a single year, as required to maintain a CFAA civil action.  Nearly all of the "loss" alleged by Ryanair is not "technological harm," and thus is not actionable under the CFAA, and the evidence does not support the notion that Defendants are responsible for any of Ryanair's scant alleged technological harm, including the "so-called ███ attack."  D.I. 321.  (*See* Section II.C.4, *infra*.)

- There is no evidence to support Ryanair's CFAA fraud or conspiracy claims, and Ryanair is not entitled to an injunction.  (*See* Sections II.C.5 and II.C.6, *infra*.)

Finally, with respect to Defendants' *Daubert* motions, portions of Ryanair's expert opinions should be excluded—although summary judgment can and should be granted regardless.  Ryanair's proffered cybersecurity and damages expert Iain Lopata has acknowledged that he is not a damages expert, and his cybersecurity testimony suffers from serious, methodological defects.  Anthony Vance, Ryanair's proffered "rebuttal" expert to Defendants' travel-industry expert admits he has no experience in the travel industry and offers improper and belatedly disclosed cybersecurity opinions instead of rebuttal to Mr. O'Neil-Dunne.

## II.   SUMMARY JUDGMENT SHOULD BE GRANTED TO DEFENDANTS ON ALL OF RYANAIR'S CLAIMS.

### A.   Factual and Procedural Background[1]

#### 1.   Introduction to Defendants

Defendant Booking Holdings, Inc. ("BHI") is a non-operating United States holding company.  Its subsidiaries include Defendants Agoda Company Pte. Ltd. ("Agoda"), Booking.com B.V. ("Booking.com"), Priceline.com LLC ("Priceline"), and KAYAK Software Corporation ("KAYAK").  Booking.com is headquartered in Europe, Agoda in Asia, and Priceline and KAYAK in the United States.   Booking.com, Agoda, and Priceline are online travel companies— sometimes called "Online Travel Agencies," or "OTAs"—that enable consumer purchases of flights, transportation, accommodations, and travel services.  KAYAK is not an OTA, it is a metasearch engine that allows consumers to search and compare travel itineraries.  OTAs are a product of the transformation of the travel industry in the post-Internet age. Ex.[2] 39 § 4.3.  Responding to the needs of online consumers, traditional brick-and-mortar travel agencies have evolved into OTAs, and many new players have joined the field.[3]  *Id.*  Like traditional travel agencies, OTAs provide a service to travelers and generally charge a fee or a mark up for that service, though they are typically less expensive than traditional travel agents. *Id.* § 5.2.1.

#### 2.   Ryanair, its Public Website, and its Anti-OTA Business Plan

---

[1] The facts discussed herein and throughout Defendants' Opening Brief reflect what exists in the case record.  However, some of those facts have changed since discovery closed.  For instance, after the close of discovery, Ryanair appears to have made various changes to its website, including to its purchase flow.  Additionally, since late November 2023, Booking.com has not received Ryanair content and has thus not offered Ryanair flights.  For purposes of the Opening Brief, Defendants treat the facts as they existed during discovery as the relevant and operative facts.

[2] All "Exhibit" or "Ex." references are to the Declaration of John H. Hemann ("Hemann Decl.") unless otherwise noted.

[3] Other (non-Defendant) OTAs include companies like Expedia, tripadvisor.com, eDreams, Orbitz. Ex. 39 §§ 4.3, 5.2.1.

Ryanair is an Irish low-cost airline that does not operate any flights to, from, or within the United States.  Ryanair sells its flights through a public website—Ryanair.com—and mobile app so that they are available as widely as possible. ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

Under Ryanair's business model, the cost for purchasing a seat is low, but "ancillaries"—such as seat selection, priority check-in, or luggage—require an additional fee.  Ex. 1, Hurley Dep. Tr. I at 121:2-122:14, 15:23-16:4.  Like an OTA website, Ryanair.com also offers other "ancillary" travel services, such as car rental, hotels, airport transfer, and travel-related insurance.  *Id.* at 21:25-22:24. ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

### a.      Booking a Flight on Ryanair.com and "myRyanair"

When a user navigates to Ryanair.com, they first reach a "landing page," where they can enter flight origin and destination, travel dates, and the number of passengers; if the user then clicks "search," they are taken to a page displaying available flights.  Ex. 1, Hurley Dep. Tr. I at 16:27-18:29.[4]  Once the user selects a flight, they are asked to select one of several possible fare

---

[4] During the August 16, 2023 deposition of Ryanair's 30(b)(6) witness, counsel opened the live Ryanair.com website and questioned the witness about the various steps for booking a flight. Hemann Decl. ¶ 12.  Screenshots depicting the various web pages from the video recording of that deposition are included in the Hemann Declaration, ¶¶ 13-22.

classes, each with different ancillaries. *Id.* at 19:1-22. Once the user selects a fare class, they are prompted to login to "myRyanair," with options to "Sign-up," "Log in," or "Log in later." *Id.* Ryanair's purpose for myRyanair ████████████████████████ it has described its reason for the myRyanair login as follows: "we can improve your user experience because we can pre-populate and we can offer you some degree of personali[z]ation in there as well." Ex. 4, O'Callaghan Dep. Tr. at 119:4-11. However, Ryanair does not actually *require* login to myRyanair at this point in the purchase flow because █████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

After the user either logs in to myRyanair *or* selects "Log in later" and enters a passenger name, they are taken to pages offering ancillary services. Hemann Decl. ¶¶ 18-19. After those pages, the user is taken to the final page in the purchase flow—the payment page. *Id.* ¶¶ 20-22.

There is no dispute that a user can access any page in the Ryanair website booking flow, except the final payment page, without any "authorization." Ex. 1, Hurley Dep. Tr. I at 23:1-5

████████████████████████████████████████████████████████████

████████████████████████ *see also* Ex. 28 at 16-19 (identifying only payment page as non-public in response to request to identify "all non-public information on Your website"). Ryanair maintains, however, that its payment page is "non-public" and that Ryanair's "authorization" is required to access that page because of the myRyanair login requirement. Ex. 28 at 17-19. Absent a login, the payment page is visible on the website behind a window stating, "Log in to continue." *Id*. at 16; *see also* Hemann Decl. ¶ 21. According to Ryanair, "[o]nce an email address associated with a myRyanair account and password is inputted by the user and validated by the Ryanair

Website, the user enters a non-public portion of the Ryanair Website." Ex. 28 at 19.[5]

A user has five options for logging into myRyanair: "Continue with Google," "Continue with Facebook," "Continue with PayPal," "Login," or "Sign Up." Ex. 4, O'Callaghan Dep. Tr. at 125:19-27; *see also* Ex. 1, Hurley Dep. Tr. I at 44:5-9. For the first three options, a user can enter credentials from existing Google, Facebook, or PayPal accounts, and a myRyanair account is automatically created. Ex. 4, O'Callaghan Dep. Tr. at 132:24-133:4, 133:28-134:12; *see* Ex. 38 at 18, Figure 16. If a user has an existing myRyanair account, they may "Login" using the email and user-created password associated with the account. Ex. 4, O'Callaghan Dep. Tr. at 137:28-138:7. Finally, if a user selects "Sign Up," they can create a myRyanair account by providing an email address and a user-generated password. *Id*. at 134:17-26. None of these options "authenticate" a user. Users are not required to identify themselves; any working email can be used to create a myRyanair account, ██████████████████████████████ (discussed below). *See* Ex. 38 at 15 (creating account with a temporary email and "Password1").

Ryanair sends a verification code to the email provided, and once that code is retrieved and entered, the myRyanair account has been created and can be used for future logins. Ex. 4, O'Callaghan Dep. Tr. at 135:14-136:10. The user is not required to demonstrate any relationship with the traveler; any user is able to purchase a ticket for any traveler. Ex. 1, Hurley Dep. Tr. I at 33:25-34:17. After logging in to myRyanair through one of the methods described above, the user can then interact with Ryanair.com's payment page, which prompts the user to enter payment

---

[5] The Android version of Ryanair's mobile app requires a myRyanair login earlier in the process than its website and iOS mobile version. Ex. 28 at 30. Untenably, Ryanair's discovery responses claim that the *same* information admittedly "public" and accessible without authorization on the website and through iOS, is somehow "non-public" when viewed on an Android device because of Ryanair's decision to place the myRyanair credential requirement in a different place for Android users. *Id.*

information before clicking "Pay now."  Ex. 28 at 21.  Ryanair admits the payment page contains

no Ryanair confidential information or confidential information users other than the user who is

imputting their own payment information.  *See* Ex. 4, O'Callaghan Dep. Tr. at 44:29-45:9.[6]



### b.    Ryanair's Website Terms Of Use

A user is deemed by Ryanair to "agree" with its website Terms of Use ("TOU") when the

user clicks "Search" on its home page after entering initial flight search parameters.  *See* D.I. 76

("FAC") ¶¶ 50-57 & FAC Ex. A; Ex. 1, Hurley Dep. Tr. I at 18:10-20.  Users are not required to

read the TOU before they are deemed to have agreed to them.  Section 3 of the TOU purports to

limit use of the website to "private, non-commercial purposes" and bans the use of "automated

system[s] or software." FAC ¶ 50. The TOU require users to "submit[] to the sole and exclusive jurisdiction of the Courts of the Republic of Ireland and to the application of the law in that jurisdiction[.]" FAC Ex. A, § 9. Ryanair has identified the TOU as the sole basis for its claim that OTAs are not "authorized" to purchase tickets on the Ryanair website using bots. Ex. 1, Hurley Dep. Tr. I at 55:3-12 (Rule 30(b)(6) testimony of Ryanair's CTO); *see also id.* at 88:15-20.

### c.    Ryanair's Anti-OTA Strategy

Ryanair conceived of this lawsuit as part of its broader public relations strategy to prevent travelers from using OTAs to purchase Ryanair flights. ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ Ryanair also routinely disparages OTAs in the press, including Booking.com, as "a bunch of scam artists" and "internet pirates." Ex. 23. And Ryanair targets travelers directly: for example, it forces passengers suspected of purchasing flights via OTA to either undergo a biometric verification process to check in for a flight online or pay Ryanair's €55 per passenger fee to check in at the airport. *See* Ex. 24; Ex. 6, Brady Dep. Tr. at 227:20-229:6.



**d.      Ryanair's Website Security and Shield**

Ryanair deploys various standard cybersecurity measures to block malicious attacks on its website and traffic from "bots," as well as to protect against payment fraud. *See, e.g.*, Ex. 1, Hurley Dep. Tr. I at 65:5-20; *id.* at 65:24-27 (discussing firewall); Ex. 4, O'Callaghan Dep. Tr. at 45:13-46:3; Ex. 38 at 23 (describing firewalls as "relatively standard across the cybersecurity industry"); Ex. 27 at 45 ███████████████████████████████████ *id.* at 46 ████████████████████████████ ████████████ Ex. 1, Hurley Dep. Tr. I at 68:21-69:22 █████████████ ████████████████████████████

Ryanair has also created an ████████████-based program—"Shield"—to detect, and in some cases, block, ██████████ access to Ryanair.com. Ex. 4, O'Callaghan Dep. Tr. at 55:11-13 (Shield is "an in-house product that is built to detect ███ hitting our website"). ███████

─────────────

7 ████████████████████████████████████████████████████



### 3.     Defendants' Flight Businesses

As explained herein, Defendants do not access Ryanair's website to book flights or otherwise source Ryanair content directly.  Rather, Defendants contract with vendors who provide flight information and book flights for Defendants' users.  These contracts are not specific to Ryanair.  Defendants do not access Ryanair.com to obtain flight information or flights.  Nor do they direct or control their vendors' activities in doing so.

### a.     Booking.com

Booking.com is a European-based OTA.  Ex. 47 at 3.  Most of its revenue comes from booking accommodation reservations.  *Id*. at 2.  In August 2019, Booking.com began offering flight bookings, including Ryanair flights, through its website.[8]  Ex. 12, Guerrero Dep. Tr. I at 162:13-19.  ██████████████████████████████████████████████████████

████████████████████████████████████████████.  Ex. 31 at 7-9 & Exs. A, B; Ex. 46; Hemann Decl. ¶ 11a.

---

████████████████████████████████████████████████████████████████

[8] References herein to all Defendants' "websites" also include information relevant to mobile versions of their websites and mobile apps, unless otherwise noted.

Booking.com does not source flights or flight information from Ryanair or any other airline.  Declaration of Marcos Guerrero ("Guerrero Decl.") ¶ 5.  Instead, Booking.com has a contract with another OTA, Etraveli Group AB ("Etraveli"), under which Etraveli provides all flight information displayed on Booking.com and carries out all flight bookings for customers on Booking.com's platform.  *See id*.; Exs. 48 & 49.  █████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████  As Booking.com discloses to customers, the purchase contract is between the customer and Etraveli (or one of Etraveli's subsidiaries or vendors); Booking.com is not a party.  *See* Ex. 49 § 2.1.2-2.1.3.  All Ryanair flights booked through Booking.com were provided by Etraveli.  *See* Ex. 31 at 8; Guerrero Decl. ¶¶ 3, 5.  ███████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████.[9]

Etraveli operates independently from Booking.com.  Guerrero Decl. ¶ 4.  It offers an

---

[9] Etraveli provides similar services to other third parties and also operates its own consumer-facing travel agency brands.  *See* https://www.etraveligroup.com/partners/ (listing third parties, including Google Flights and Skyscanner) (last accessed December 18, 2023); https://www.etraveligroup.com/about/brands/ (listing brands) (last accessed December 18, 2023).

existing inventory of available airlines and, ████████████████████████████████████
████████████████████████████████████████████. Guerrero Decl. ¶ 5; *see* Ex. 12, Guerrero Dep. Tr. I at 25:1-24, 26:3-6.  Booking.com does not tell Etraveli how to obtain flight information or make flight bookings.  Guerrero Decl. ¶ 8.  Booking.com also does not know how Etraveli obtains Ryanair's fares and schedules or books Ryanair (or any other airline's) flights.  Ex. 12, Guerrero Dep. Tr. I at 42:25-43:8, 39:19-25; Guerrero Decl. ¶ 8.  Etraveli confirmed that Booking.com does not tell Etraveli how to obtain Ryanair bookings or fares and schedules.  Ex. 25 at 00:23:01.500-00:24:45.750.  Indeed, Etraveli itself sources flights from third parties and does not know how Ryanair flights are ultimately booked.  *Id.* at 00:00:00:00-00:05:29.960.  Booking.com has no knowledge of and has never instructed Etraveli or any other third party to engage in any kind of harmful conduct related to Ryanair's website.  Guerrero Decl. ¶¶ 10-13; Declaration of Anne Housseau ("Housseau Decl.") ¶¶ 3-4.

### b.    Priceline

Priceline is a US-based OTA.  Declaration of Corey Vezina ("Vezina Decl.") ¶ 2.  Ryanair flights were displayed on Priceline.com from May 2019 until March 2023.[10]  Ex. 33 at Ex. A; Ex. 14, Vezina Dep. Tr. at 47:24-48:3, 41:13-15; Vezina Decl. ¶ 4.  For that entire period (nearly four years), ████████ Ryanair bookings were made through Priceline's platform.  Ex. 33 at 7 & Ex. A; Hemann Decl. ¶ 11c.  Likewise, ████████████████████████████████████████████
████████████████████████████ Ex. 14, Vezina Dep. Tr. at 140:15-141:1.

Priceline sourced Ryanair flight information and flight purchases through standard license

---

[10] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████

agreements with two third-party vendors, Mystifly and Travelfusion.  Ex. 32 at 8; Ex. 14, Vezina

Dep. Tr. at 37:12-21, 51:22-24; Exs. 51, 52.  Priceline did not have visibility into how Mystifly

and Travelfusion obtained Ryanair flight information or made bookings during the time it offered

Ryanair flights.  *See* Ex. 14, Vezina Dep. Tr. at 95:21-96:5 ███████████████████████████

████████████████████████████████████████████████████████████████ Vezina

Decl. ¶¶ 7-8 (same as to Mystifly); Ex. 32 at 9 ("Priceline has no visibility into the process by

which Suppliers obtain information from Ryanair.").

<p style="text-align:center;"><strong>c.    Agoda</strong></p>

Agoda is an Asia-based OTA.  Declaration of Olivier Roset ("Roset Decl.") ¶ 2.  It offered

Ryanair flights on its website from 2019 through 2022.  Ex. 35 at Ex. A.  During this time, Agoda

facilitated ███████ Ryanair bookings ████████████████████████████.  *Id*.; Roset Decl.

¶ 3; Ex. 34 at 9.  ███████████████████████████████████████.  *Id*.

Ryanair flight information and flights on Agoda were sourced entirely by third parties, in

two ways: ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████

Agoda does not know how these suppliers obtained Ryanair content or booked Ryanair

flights.  Roset Decl. ¶¶ 7-9.  Agoda did not tell any third parties to obtain Ryanair flights for Agoda;

such flights were simply part of the vendors' inventory.  Ex. 15, Roset Dep. Tr. at 24:24-25:5.[11]

---

[11] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████

### d.      KAYAK

U.S.-based KAYAK is not an OTA; it is a metasearch engine that allows consumers to search for and compare travel itineraries.  Ex. 16, Bruni Dep. Tr. at 87:10-11; Declaration of Matteo Bruni ("Bruni Decl.") ¶ 2; Ex. 36 at 7.  KAYAK has agreements with OTAs and airlines that allow KAYAK to display their flight content on the KAYAK website for users to compare. Ex. 36 at 7-8; Bruni Decl. ¶ 3. ███████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████       When a user clicks on a particular flight itinerary from a search on KAYAK, the user is redirected to a third-party website—either an OTA or an airline—to complete the booking.  Ex. 36 at 10-13; Declaration of Alexandria Weltert ("Weltert Decl.") ¶ 4; Bruni Decl. ¶ 5; Ex. 16, Bruni Dep. Tr. at 83:3-6.  KAYAK does not know how the third parties whose content populates KAYAK's search engine source their inventory or book flights.  Bruni Decl. ¶ 9; Ex. 16, Bruni Dep. Tr. at 58:2-25, 71:25-73:1; Ex. 17, Weltert Dep. Tr. at 86:23-87:19.  KAYAK does not tell its vendors to offer particular airlines or how to obtain flight information or book flights. Weltert Decl. ¶ 8.[12]

In a small number of cases, a KAYAK user may complete a booking on a KAYAK-branded website that is powered by an OTA, referred to by KAYAK as "facilitated booking" or "Book on KAYAK."  Ex. 36 at 13-14; Weltert Decl. ¶¶ 5-6.  When a user selects the "Book on KAYAK" option, they are directed to a webpage hosted on KAYAK.com, but the booking process is run by

---

[12] KAYAK's search results may contain direct links to Ryanair flights on Ryanair.com.  Bruni Decl. ¶ 5. █████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████" Ex. 16, Bruni Dep. Tr. at 222:25-223:4.  Ryanair has pled no claim or harm based on such conduct, nor could it.

a third-party OTA.  Ex. 36 at 13-16.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  and the final page prior to booking confirms to the

traveler that "You are booking directly with [a third-party OTA]."  *Id.*  From September 1, 2018

through June 30, 2023, KAYAK's facilitated bookings made up, on average, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮  Ex. 37 at 7 & Ex. A; Ex. 46; Hemann Decl. ¶ 11b.

### e.    BHI

BHI is the parent company of the other Defendants; it does not operate a consumer-facing

website, offer flights for sale, have agreements with third parties regarding flight content or

booking, or communicate with the third parties that provide flight content to the other Defendants.

Declaration of Glennon Paredes ("Paredes Decl.") ¶¶ 2-6; Ex. 29 at 8.  ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮  .  Ex. 11, Paredes Dep. Tr. at 233:8-234:19; Paredes Decl. ¶¶ 5-7.

### 4.    Procedural Background

### a.    Ryanair's Cease and Desist Letters

On November 15, 2019, Ryanair sent Booking.com a letter demanding that Booking.com

"cease offering for sale and selling Ryanair flights" and "remove all Ryanair flight sales

information/data" from Booking.com's website, claiming that Ryanair "does not authori[z]e third

parties to sell its flights online."  D.I. 76-2.  The letter referenced Booking.com's claimed

"commercial gain," but did not allege any technical harm, that Ryanair's website is non-public, or

any violation of the CFAA.  *Id.*  On December 11, 2019, Ryanair sent another letter to

Booking.com alleging misleading price representations made by Booking.com and/or Gotogate

(an Etraveli brand), but it did not ask those entities to stop selling Ryanair flights.  Ex. 50.

On July 30, 2020, Ryanair sent a letter to BHI stating that BHI did not have "authorization

to access the Ryanair website for commercial purposes" and claiming that BHI or third parties engaged by BHI violate the CFAA by accessing Ryanair's website without authorization.  D.I. 76-3.  Ryanair then filed this action on September 4, 2020.  D.I. 1.

On May 19, 2022, nearly two years after filing this lawsuit, Ryanair sent letters to BHI, Booking.com, KAYAK, Agoda, and Priceline claiming that they "specifically had no authority to scrape Ryanair's website or to purchase or assist in the purchase of Ryanair flights."  D.I. 76-5.

### b.   Ryanair's Claims and Discovery

Ryanair has four remaining CFAA claims against Defendants:  Counts I and IV of the FAC (intentionally accessing a protected computer "without authorization or by exceeding authorization," FAC ¶¶ 310-319, 338-344, 18 U.S.C. §§ 1030(a)(2)(C), (a)(5)(B)-(C)); Count II (engaging in such access fraudulently, FAC ¶¶ 320-329, 18 U.S.C. § 1030(a)(4)); and Count V (conspiring to engage in such access, FAC ¶¶ 345-351, 18 U.S.C. § 1030(b)).[13]  Booking.com has counterclaimed against Ryanair for defamation, tortious interference, unfair competition, trade libel, and deceptive trade practices, related to Ryanair's false and misleading communications with customers (among other things). D.I. 111.

Discovery closed on October 6, 2023.  D.I. 115, 177.  Ryanair deposed nine fact witnesses, Defendants deposed seven, and the Parties conducted extensive written discovery.  Hemann Decl. ¶ 2.  Ryanair subpoenaed five U.S. third parties, including some of Defendants' vendors, but received no documents from any of these parties, did not take their depositions, and filed no motions to compel regarding this discovery.  *Id.* ¶ 2.  Eight months into discovery, Ryanair moved the Court to issue five Letters of Request, which the Court did. D.I. 170.  The only response has

---

[13] Defendants moved to dismiss Ryanair's original complaint under the doctrine of forum non conveniens and CFAA non-extraterritoriality.  There remains no evidence that Ryanair operates in the United States or that any potentially relevant computer is located in the United States.  Ex. 1, Hurley Dep. Tr. I at 60:22-61:6 (█████████████████████)

been from Etraveli, which gave evidence at an October 2023 hearing in Sweden.  *See* Ex. 25 at 00:00:00:00-00:05:29.960, 00:23:01.500-00:24:45.750.  Ryanair has taken no action to enforce the Letters of Request, including as to the ticket aggregators that may be obtaining tickets from Ryanair's website.  Hemann Decl. ¶ 3.  The record is, accordingly, devoid of evidence as to who is accessing Ryanair's website or how that access is being accomplished.

### B.    Legal Standard

A party is entitled to summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party has the initial burden of demonstrating the absence of genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Thereafter, the non-movant must "make a sufficient showing" on each "essential element of its case with respect to which it has the burden of proof[.]" *Pantoja v. Brennan*, 257 F. Supp. 3d 636, 641 (D. Del. 2017) (citing *Celotex*, 477 U.S. at 322); *Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023) (same).  The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment." *Pantoja*, 257 F. Supp. 3d at 641 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  Nor can a plaintiff avoid summary judgment with speculation, conjecture, or mere allegation.  *Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Anderson*, 477 U.S. at 249); *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 328 (3d Cir. 2016).

### C.    Summary Judgment Should Be Granted To Defendants On Ryanair's Claims.

#### 1.    No Defendant Has Accessed Ryanair's Website To Engage In The Challenged Conduct.

The record now confirms that Defendants do not access Ryanair's website to obtain Ryanair flight information or to book Ryanair flights.  To the contrary, Defendants source the

flight inventory offered through their platforms—for all airlines, including Ryanair—from third-party vendors with which Defendants have commercial contracts.  *See infra* Section II.C.2.  Thus, there can be no CFAA liability against any Defendant on any theory of direct access to Ryanair's website—let alone one based on the "intentional" access barred by the CFAA.  *See infra* Section II.C.3.

<div align="center">

**2.      Judgment Should Be Entered For Defendants Because They Are Not Vicariously Liable For The Actions Of Their Third Party Vendors.**

</div>

At the motion to dismiss stage, the Court concluded that the CFAA allows for vicarious liability and that a defendant may be held liable for "directing, encouraging, or inducing" others to violate the CFAA in certain circumstances.[14]  MTD Order at 12-14.  The Court also determined that Ryanair stated a claim for vicarious liability by pleading that "Defendants specifically direct one or more of those third parties to access the myRyanair portion of the Ryanair website when a user purchases a particular Ryanair flight itinerary" and that "various interests" "are shared between the [D]efendants and some of the third parties with whom they contract."  *Id.* at 13.

After nearly a year of discovery, Ryanair has failed to adduce evidence supporting vicarious liability.  Far from showing that Defendants "direct, encourage, or induce" any violation of the CFAA by third parties, there is no evidence that Defendants have knowledge of, a role in, or input into how their vendors obtain Ryanair flight information and book Ryanair flights, and that no Defendant directs any vendor to access the Ryanair website, let alone to engage in criminal activity in violation of the CFAA.  *See supra* Section II.A.3.a-d.  Moreover, to the extent that any actor caused Ryanair to experience any technical issues with its website, there is zero evidence that Defendants directed, induced, encouraged, or even knew of this conduct, such that a finding

---

[14] Defendants continue to preserve their argument that the CFAA does not authorize vicarious liability, and that the proper standard is not "direct, encourage, induce," but even under that standard, Defendants are entitled to summary judgment.

of vicarious liability could follow.  The only third party that participated in discovery—Etraveli—confirmed, as discussed above, that it does not take direction from Booking.com or access Ryanair's website itself.  Ex. 25 at 00:00:00:00-00:05:29.960, 0:23:01.500-00:24:45.750.

> **a.    Vicarious Liability Under the CFAA Requires Active Direction of a Third Party Concerning the Alleged Violative Conduct.**

In articulating the "direct, encourage, induce" standard at the motion to dismiss stage, the Court drew from Ryanair's allegations that Defendants' conduct was "purposely inducing" and reflective of the "principal's active role."  *Id.* at 12-14.  Relevant caselaw also makes clear that for liability to attach under this standard there must be some purposeful, active influence by the defendant aimed at the specific computer access at issue—akin to, if not identical to, an agency relationship.

For example, in *Svanaco, Inc. v. Brand*, 417 F. Supp. 3d 1042, 1049-50 (N.D. Ill. 2019), defendant MGI hired a third-party consultant, Brand, regarding a dispute with Svanaco over an unsatisfactory website that Svanaco had designed for MGI.  Brand carried out numerous offenses against Svanaco including writing false customer reviews, creating insulting websites, and launching a DDOS attack on Svanaco's website that caused a service disruption.  *Id.* at 1050-51.  The court cited the "direct[], encourage[], induce[]" formulation but ultimately concluded that "no reasonable jury could find that with respect to the DDOS attacks, MGI was the principal and that Brand was MGI's agent."  *Id.* at 1060.  The Court further reasoned that MGI was not vicariously liable because MGI was not aware of the DDOS attack, even though MGI was aware that Brand was taking action against Svanaco generally.  *See id*.  As another example, in *Alchem Inc. v. Cage*, 2021 WL 4902331, at *7 (E.D. Pa. Oct. 21, 2021), *vacated and remanded on other grounds*, *Alchem USA Inc. v. Cage*, 2022 WL 3043153 (3d Cir. Aug. 2, 2022), the court rejected liability under the "direct[], encourage[], induce[]" test, where an employee allegedly accessed her

employer's computer system to obtain customer contact information and reached out to customers to encourage them to switch to a competing service. The court reasoned that even though the employee was paid a commission by the competitor, NAN, for sales garnered as a result of her contacts, there was no "actual evidence that NAN directed, encouraged, or induced Ms. Cage to *access Alchem's protected computers*[.]" *Id.* (emphasis added).

Thus, for vicarious liability to attach, Ryanair must show that Defendants took purposeful steps to direct, encourage, or induce third parties to access Ryanair's computers in violation of the CFAA. As explained in the next section, no evidence supports that notion.

> **b.** **Defendants Do Not Control Whether or How Ryanair Flights Are Sourced by Their Vendors or Otherwise Direct, Induce, or Encourage any Violation of the CFAA.**

Defendants' arrangements with their vendors are straightforward and not in dispute. Defendants, other than BHI, operate travel websites and populate those websites with flight fares and schedules that they obtain through paid vendors with which they contract. *See supra* Section II.A.3. Defendants do not have the right or ability to direct their vendors in obtaining flight information and booking flights. *See id.* And no Defendant has a contract with any vendor that is specific to Ryanair, or even mentions Ryanair by name. *See id.* Certain relevant excerpts from Defendants' agreements include:

*Booking.com*: ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

***Priceline & Agoda***: ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

***KAYAK***. ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████   ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

Ryanair has adduced no evidence indicating that Defendants and their vendors have any relationship other than the arm's-length vendor relationship set forth in their contracts.  Nor is there evidence that, despite these contracts, any Defendant directed a vendor to access Ryanair's website in a way that violates a criminal computer hacking statute.  Using Booking.com as an

example, the following graphic illustrates the undisputed facts regarding the relationship between the Defendants and a booked Ryanair flight:



████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████   There is no evidence as to where Etraveli obtains its inventory or as to whether or how its vendors obtain it from Ryanair.  What is clear is that in all cases, Ryanair is paid for the tickets.  Ex. 7, O'Leary Dep. Tr. at 30:20-23; Ex. 6, Brady Dep. Tr. at 175:25-176:4.

In sum, there is a complete lack of evidence that any Defendant directs, encourages, or induces any third party to book Ryanair flights in a particular way, much less to violate the CFAA.  Vicarious liability is not available on these facts.[15]

> **c.   Defendants Are Not Vicariously Liable for Any Harm to Ryanair's Website, Including the So-Called "████ Attack."**

While Ryanair accuses OTAs generally of causing errors on the Ryanair website, Ryanair's only accusations pertaining to Defendants in particular concern an alleged October 2023 "bot attack" on Ryanair's website involving ████████████████████.  D.I. 321 (permitting

---

[15] At the pleading stage, Ryanair purported to assert a second vicarious liability theory:  that Defendants exert management or financial control over their vendors.  D.I. 76 ¶¶ 230-242.  No evidence supports this theory, which Ryanair appears to have abandoned.  And BHI's planned acquisition of Etraveli, *id.*, ¶ 240, did not close.  Paredes Decl. ¶ 8.

depositions on the "so-called ███ attack").  Ex. 26 at 38-49, 82-87.  Ryanair's "███"

allegations against Defendants are false: as the recent depositions have confirmed, there is *no*

evidence that Defendants engaged in or directed, induced, or encouraged a third party to engage

in any attack on Ryanair's website—including but not limited to the "███ attack."

Ryanair's repeated contention in its written discovery responses that "Defendants" engaged

in or are otherwise responsible for the "███ attack" is baseless and irresponsible.[16]  Ryanair has

no evidence that any Defendant accesses the Ryanair website for customer bookings *at all*, let

alone that any Defendant has engaged in any cyberattack on that website.  *See supra* Section II.C.1.

Instead, as discussed above, Defendants contract with *third parties* for all flight bookings, they do

not book flights themselves, and there is no material dispute on this point.  *See* Section II.A.3.

Ryanair's flimsy attempt to connect Defendants to the "███ attack" boils down to ███



Ex. 26

at 84-85.  There is no evidence that these bookings caused or even contributed in any significant

way to ███ s failure ███████

Ex. 3, Hurley Dep. Tr. III at 79:15-80:14.  There is also no evidence that Booking.com made these

bookings (and plenty of evidence to the contrary—Booking.com makes none of its own Ryanair



bookings). ██████████████████████████████████████

████████████████████████████████████████████

████████████████ *Id.* at 63:14-64:3, 79:23-80:24 ███ ████████████████████████

████████████████████████████

Were there any doubt on this point (and there is not), Booking.com's own testimony has confirmed that Booking.com has *no idea* why Etraveli was unable to access Ryanair inventory ██



██████████████████████████ Ryanair's bald speculation about Monex cannot establish vicarious liability.  *See Svanaco,* 417 F. Supp. 3d at 1060 (no liability for cyberattack carried out by contractor where defendant did not know of or direct the attack).

### 3.   Ryanair Cannot Establish That Defendants' Vendors Access Ryanair's Website "Without Authorization" or "In Excess of Authorization."

The record also now firmly establishes that there have been no underlying CFAA violations by Defendants' vendors.  Ryanair.com—including its payment page—is a fundamentally public website:  no part of Ryanair.com is protected with a "code-based authentication mechanism[]," MTD Order at 24-25, such that access to Ryanair.com or myRyanair could be "unauthorized" or "exceed[] authorized access" under the CFAA.  *See* 18 U.S.C. §§ 1030(a)(2)(C), (a)(5)(B)-(C). Judgment must therefore be entered for Defendants on all remaining Counts (I, II, IV, and V).

         **a.**      **The Court Already Has Held That Accessing Pre-myRyanair Portions of Ryanair's Website Contrary to Ryanair's TOU And Letters Does Not Violate The CFAA.**

In its MTD Order, the Court recognized that "[i]f the information on the website is publicly available without requiring users to authenticate themselves, a violation of the terms of use or the defiance of a cease-and-desist letter will not give rise to liability under the CFAA."  MTD Order at 23-24.  Thus, to the extent that Ryanair's claims pertain to the availability, seating, flight selection, etc. pages of Ryanair.com that do not require a myRyanair login—*i.e.*, all pages before the payment page—those are not actionable.  ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████  *See supra* Section II.A.2.a (citing, *inter alia*, Ex. 1, Hurley Dep. Tr. I at 23:1-5; Ex. 28 at 17-19).  This includes any scraping of Ryanair's routes and fares, which are displayed prior to any required myRyanair login.  *See id.*

         **b.**      **Purchasing Tickets Contrary to Ryanair's TOU And Letters Does Not Establish a CFAA Violation.**

Ryanair's claim of "unauthorized access" thus turns entirely on whether purchasing tickets on the payment page of Ryanair.com is made "private" by requiring a myRyanair login.  *See* MTD Order at 23-25.  It is not, because any member of the public is able to create an account and buy a ticket.  Ryanair cannot show that Defendants' vendors "circumvent code-based authentication mechanisms that are designed to limit access to the myRyanair portion of the website."  *Id.*

The undisputed record now makes clear that the requirement to enter a "myRyanair" login to progress to the payment page on Ryanair.com is not a "code-based authentication mechanism," MTD Order at 24, or CFAA "gate," *Van Buren v. United States*, 141 S. Ct. 1648, 1659-60 (2021).  To the contrary, any member of the public can presumptively create a myRyanair account and access the payment page by providing an email address and creating a password, or avoid the

requirement entirely by using an existing Facebook, Google, or PayPal account.  *See supra* at X; Hemann Decl. ¶ 20.  Ryanair does not—and cannot—dispute this fact.  *See* Ex. 1, Hurley Dep. Tr. at  30:6-14 ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████

In contrast, a "code-based authentication mechanism[]," MTD Order at 24, contemplates a preapproved list of individuals who are authorized to enter, requires disclosure and/or verification of a user's actual identity, and is used to protect confidential information.  *See* Ex. 38 at 9.  As the Ninth Circuit has explained, "'[a]uthorization' is an affirmative notion, indicating that access is restricted to those specially recognized or admitted."  *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1195–96 (9th Cir. 2022).  As such, "without authorization" implies "a baseline in which access is not generally available and so permission is ordinarily required."  *Id.*  Drawing from the language of *Van Buren*, myRyanair is, at most, a locked door with a key-making machine built in, presumptively allowing anyone who comes to the door to make a key and enter—and thus not a "gate" at all. *Van Buren*, 141 S. Ct. at 165960.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████.  As Defendants' expert has explained, an *authentication* mechanism typically involves a pre-approved list of users that must confirm their identity to access a network.  *See* Ex. 38 at 9; *see also HiQ*, 31 F.4th at 1195-96.  ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████ This selective denial of access is not a CFAA "gate."  "Where the default is free access without authorization, in ordinary parlance one would characterize selective denial of access as a ban, not as a lack of 'authorization.'"  *HiQ*, 31 F.4th at 1196.  There can be no dispute that Ryanair.com—including the payment page—is "public."[17]

Finally, as the Court has already held, Ryanair's TOU and cease and desist letters cannot create CFAA liability where no authorization is required.  MTD Order, at 23-24.  Were it otherwise, the CFAA would allow for the criminalization of a vast amount of normal activity.  *Van Buren*, 141 S. Ct. at 1661.

### 4. Judgment Should Be Entered for Defendants Because Ryanair Has Failed to Show That Any Defendant Has Caused $5,000 or More of "Loss" to Ryanair in a One-Year Period.

Ryanair rests its loss case on preemptive expenditures designed to keep OTAs off of its website, rather than on technological harm that is the focus of the CFAA.  To "maintain a civil action" under the CFAA, "[a]ny person who suffers damage or loss" must show that "the conduct involves 1 of the factors set forth in [five] subclauses . . . of subsection (c)(4)(A)(i)."  18 U.S.C. § 1030(g).  The only one of those subclauses allegedly applicable here is "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value[.]"  *Id.* § 1030(c)(4)(A)(i)(I).  And, as the Supreme Court has recognized, the terms "loss" and "damage" both "focus on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data."  *Van Buren*, 141 S. Ct. at 1660; *see* MTD Order at 14; 18 U.S.C. § 1030(e)(11) (defining "loss" as "any reasonable cost to any victim, including the cost of

---

[17] Nor is Ryanair's "Shield" mechanism for bot detection and management a "code-based authentication" mechanism.  *See supra* Section II.A.2.d.  It is not even a ban at the myRyanair login part of the Ryanair website—it provides information, but prevents no user from creating a myRyanair login.  *Id.*  It is simply a homemade version of the types of standard cybersecurity defenses that websites use to address bot activity.

responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service"); *id.* § 1030(e)(8) (defining "damage" as "any impairment to the integrity or availability of data, a program, a system, or information"). Moreover, such "loss" or "damage" must be caused by the alleged intrusion; preemptive measures to secure a system do not qualify because they are not "respons[es] to an offense" or "restor[ation]" of a system. 18 U.S.C. § 1030(e)(11); *see, e.g.*, *United States v. Middleton*, 231 F.3d 1207, 1213 (9th Cir. 2000) (CFAA recognizes "only those costs" to "resecure" system, not costs "that would [] create an improved computer system").

Summary judgment should be entered for Defendants because Ryanair has failed to show that *any* Defendant has caused it "loss" of $5,000 or more during a one-year period. Ryanair's alleged harms are largely costs associated with standard cybersecurity measures or Ryanair's anti-OTA business practices, not technological harms that constitute CFAA "loss." And Ryanair's scant evidence of technological harm is not traceable to any Defendant. Nor has Ryanair attributed to any Defendant alleged harm in the sum of $5,000 or more in a one-year period.

### a. Ryanair's Claimed Harms Are Standard Website Security Measures or Business Costs Related to Its Anti-OTA Campaign, Not "Loss" Under the CFAA.

Nearly all of Ryanair's claimed harms are not technological harms caused by the alleged CFAA violation and thus are not "loss" under the CFAA. *See* 18 U.S.C. § 1030(e)(11). Instead, Ryanair largely seeks to hold Defendants liable for costs related to basic website security and its business campaign against OTAs. Specifically, according to Ryanair's expert, the following costs constitute "loss . . . due to technological harm caused by each of the Defendants over a one-year period." Ex. 40 ¶ 71; *see id.* ¶¶ 69-152 (detailing alleged costs); *id.* ¶¶ 153-154 (summarizing

alleged costs); Ex. 26 at 28-38 (same):[18]



*None* of these costs involve addressing technological harm caused by Defendants.

      **Shield**.  Shield is a tool built by Ryanair that is directed at detecting, and in some cases, blocking, ▬▬▬▬▬▬▬▬ access to Ryanair.com, which Ryanair connects to OTA activity. *See supra* Section II.A.2.d. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬



---

[18] Ryanair also has failed to limit nearly all of these claimed losses to those related to the ticketing/myRyanair part its website, despite that the Court already has held that the availability and non-ticketing parts of its website cannot support a CFAA claim. *See* MTD Order at 23-24.

[redacted]

In *hiQ Labs*, 31 F.4th 1180, the Ninth Circuit held that "LinkedIn has not alleged that hiQ's scraping of public profiles caused any such technological harms[,]" *id.* at 1195 n.12, notwithstanding that LinkedIn—just like Ryanair here—alleged that "it employs an array of technological safeguards and barriers designed to prevent data scrapers, bots, and other automated systems from accessing and copying its members' data on a large scale" and "has a dedicated team of engineers whose full-time job is to detect and prevent scraping, and maintain LinkedIn's technical defenses." Ex. 66, *hiQ Labs, Inc. v. LinkedIn Corp.*, Defendant and Counterclaimant LinkedIn Corporation's Answer and Counterclaims, Case No. 17-cv-03301, ECF No. 170 (Nov. 20, 2020), ¶ 24. Likewise here, Ryanair's Shield-related costs are not "loss" under the CFAA, as Shield is not a response to technological harm.

[redacted] **<u>and Other Third Party Service Providers</u>**. [redacted] is a tool used by Ryanair to measure and maintain its website performance. *See* Ex. 2, Hurley Dep. Tr. II at 126:3-127:24, 136:19-24 [redacted] not specific to OTAs, let alone any harm they allegedly cause. *See id.* at 131:23-132:7, 136:14-17 ("preventing OTAs has no impact on the costs of [redacted]). [redacted]. *See id.* at 132:3-16. That Ryanair uses a general website performance tool is a basic operating cost, not a cost of responding to any

alleged violation of the CFAA, and it does not constitute "loss" under the CFAA.[19]

Ryanair's effort to claim "loss" under the CFAA based on the cost of services provided by ███████████████████████ similarly fails.[20]   None of these services are directed at investigating or remediating technological harm caused by OTAs.   The primary function of ██████████████████████████████████████████ Ex. 1, Hurley Dep. Tr. I at 69:23-29, which Ryanair's own expert concedes "is not appropriate to allocate" to OTAs, Ex. 40 ¶ 99, and to the extent ████████ is used to ████████████ ███████████████████, that is not an effort directed at technological harm, *see* Ex. 9, Lopata Dep. Tr. at 84:1-8 ████████████████████████████████████ ███████████████████ As to ██████, Ryanair testified: ████████████████████████ ████████████████████████ Ex. 1, Hurley Dep. Tr. I at 66:13-14; *see also id.* at 68:6-10, but that is a general preventive measure disconnected from any technological harm allegedly caused by OTAs, let alone any Defendant.  Finally, Ryanair seeks to count as "loss" a percentage of the hosting costs it pays ████████ to operate Ryanair's *entire* reservation system.  Ex. 40 ¶¶ 138-139; Ex. 26 at 22; *see* Ex. 4, O'Callaghan Dep. Tr. at 73:2-4 ████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████ Such hosting fees are unrelated to any "loss" under the CFAA, and, moreover, would still be incurred by Ryanair if customers were to book directly rather than use OTAs.  *See* Ex. 44 ¶¶ 71-73.

---



[19] ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ *See* Hemann Decl. ¶¶ 5-6.

**myRyanair**.  Ryanair's costs for developing and operating the "myRyanair" function on its website are not "loss" under the CFAA.  ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

**OTA-Related Employee Costs.**   Ryanair asserts CFAA "loss" based on estimated percentages of time spent by its "business intelligence" (BI) and "digital" employees "addressing OTA related matters."  Ex. 40 ¶¶ 91-97; Ex. 26 at 28-29. Ryanair also asserts "loss" based on its customer service employees' claimed dealings with OTA customers.  Ex. 40 ¶¶ 118-122; Ex. 26 at 30-31.  None of these costs are CFAA "loss": they are not costs incurred in responding to technological harm, but instead are anti-OTA business efforts.  *See, e.g.*, Ex. 2, Hurley Dep. Tr. II at 26:23-28:16 ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

[REDACTED]

[REDACTED]

**Ryanair's Online and In-Person Verification Process**.  Ryanair seeks to claim as CFAA "loss" the [REDACTED] in costs associated with its online and in-person "verification" processes for passengers booking through OTAs.  Ex. 40 ¶¶ 123-136; Ex. 26 at 34-35.  These anticompetitive efforts by Ryanair are currently under investigation by the Italian Competition Authority[22] and are the subject of Booking.com's counterclaims.  *See* D.I. 111, Counterclaims. Most pertinent here, however, is that Ryanair's efforts to supposedly "correct[] the fake and incorrect data the Defendants input into the Ryanair Website due to their unauthorized access," Ex. 26 at 8, are not "loss" under the CFAA.  They are not a response to any technological harm but are self-inflicted business processes that attempt to deter customers' use of OTAs.[23]

In short, Ryanair's claimed harm consists of every day website protections and business expenses that are not CFAA "loss."

---

[21] Ryanair has also failed to substantiate any of these claimed employee costs beyond speculation, which is insufficient.  *See, e.g.*, *Glob. Policy Partners, LLC v. Yessin*, 686 F. Supp. 2d 642, 651-52 (E.D. Va. 2010) (rejecting personnel-related costs claimed under the CFAA that were "unsupported" and described "so vague[ly] that no reasonable jury could conclude that the expended time was reasonably necessary to restore or resecure the system").  *See also* Ex. 44 ¶¶ 24, 34-45, 56-60; Ex. 45 ¶¶ 11-14, 18 (discussing reliability problems with cost figures).

[22] *See* https://en.agcm.it/en/media/press-releases/2023/9/A568 (last visited Nov. 28, 2023).

[REDACTED]

**b.     Ryanair Has Failed to Connect Any Technological Harm—Namely, the ▮▮▮▮ Attack"— To Any Defendant.**

Throughout the litigation, Ryanair has strained to identify any technological harm that could constitute "loss" under the CFAA, and it has failed entirely to connect any such harm to the Defendants in this case.[24]  It is for that reason that it has overstated the relevance of its eleventh-hour allegations about a "▮▮▮▮ attack" (*see* D.I. 321)—Ryanair's only claimed "technological" harm (as opposed to the business costs, discussed above) with any purported connection to Defendants–that the evidence makes crystal clear was not caused by Defendants.  *See supra* Section II.C.2.c.  It thus cannot be used support this case.  *See, e.g.*, *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 326, 329-30 (M.D. Pa. 2014) (damage must be "caused by" the alleged violation), *aff'd*, 958 F.3d 168 (3d Cir. 2020); *HCC Ins. Holdings, Inc. v. Flowers*, 237 F. Supp. 3d 1341, 1357 (N.D. Ga. 2017) (rejecting CFAA claim at summary judgment in part because damage did not result from alleged conduct).

Further confirming that Defendants are not responsible for any technological harm to Ryanair is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See supra* Sections II.A.3.a-d; *see also* Hemann Decl. ¶¶

---

[24] Ryanair also claims that its technical harm includes "[t]he millions of fake myRyanair accounts [that] impair the integrity of the Ryanair servers to store and utilize proper customer information to operate their business."  Ex. 27 at 67.  It does not quantify or allege how this is attributable to Defendants, nor does it provide any associated loss calculation.  Any technological harm related to these processes is—by Ryanair's own admission ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Ex. 1, Hurley Dep. Tr. I at 195:12-196:26.  This "harm" cannot support Ryanair's claims, as the CFAA requires "loss"—not speculative harms that do not yet exist.  Furthermore, creating new myRyanair accounts necessarily does not impair or harm existing data.  *Id.* at 59:6-10.

REDAC█████████████████████████████████████

### c. Ryanair Cannot Attribute $5,000 of Loss in a One-Year Period to Any Defendant.

Although all of Ryanair's claimed "loss" should be rejected outright for the reasons explained above, were any of this alleged "loss" compensable under the CFAA, Ryanair has not attributed $5,000 or more of loss in a single year to any Defendant, as required to maintain a civil action under the CFAA.[25] *See supra* Section II.C.4 (explaining legal framework). █████████

███████████████████████████████████████████████

██ Thus, the only question is whether Ryanair has presented evidence of $5,000 or more of "loss" in a one-year period attributed to █████████████████████████. ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ This analysis is unreliable for myriad reasons, including that it includes unverified costs and costs that are clearly not limited to issues with OTAs (such as customer service or Navitaire).  *See supra* Section II.C.4.a; Ex. 44 ¶¶ 19, 71-73. ██████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

### 5. Judgment Should Be Entered For Defendants On Conspiracy.

Ryanair asserts a conspiracy claim against Defendants under 18 U.S.C. § 1030(b) (Count V), based on Defendants' vendor contracts.  FAC ¶¶ 220, 333, 348.  But these contracts do not reflect any agreement for Defendants' vendors to access Ryanair's website, let alone in any

---

[25] No other subsection of section (c)(4)(A)(i) is alleged or could apply.

particular manner or in violation of the CFAA.  *See supra* Section II.C.2.b.  There is no other evidence of a conspiracy.  Summary judgment should be granted for Defendants on this claim.

To establish a CFAA conspiracy, Ryanair must prove that Defendants entered into agreements with the specific intent "to further the substantive offense"—*i.e.*, violate the CFAA.  *United States v. Carbo*, 572 F.3d 112, 116 n.2 (3d Cir. 2009) (citing *Salinas v. United States*, 522 U.S. 52, 65 (1997) and *United States v. Dixon*, 658 F.2d 181, 189 n.17 (3d Cir.1981)).  Mere association with conspirators, *see United States v. Falcone*, 311 U.S. 205, 207 (1940), or mere knowledge without cooperation, *Metro-Goldwyn-Meyer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 937 (2005), is not enough.  *United States v. Falcone*, 311 U.S. 205, 207 (1940).  Ryanair's evidence shows no such thing.

The conspiracy claim against BHI and Agoda necessarily fails because there is no evidence that either Defendant entered into *any* agreements with third parties that access Ryanair's website at all.  *See supra* Section II.C.2.b.  Ryanair's claim also fails as to KAYAK, Priceline, and Booking.com because Ryanair has failed to adduce any evidence that these Defendants had any intent to effectuate a violation of the CFAA.  None of Defendants' vendor agreements are specific to any airline, let alone Ryanair, and none of the agreements grant Defendants control over (or even visibility) into how the vendors source flight information and bookings.  *See supra* Section II.A.3.  Defendants' vendor agreements do not provide that the vendors will obtain Ryanair flight information and bookings, at all, much less in any specific way, and Defendants do not know how their vendors do so.  *See id*.  Absent any agreement to take actions that violate the CFAA, there can be no conspiracy.

### 6.    Judgment Should Be Entered For Defendants On The Fraud Claim.

The evidence does not support Ryanair's fraud claim (Count II).  To prove fraud, Ryanair must show that Defendants, "knowingly and with intent to defraud, accesse[d] a protected

computer without authorization, or exceed[ed] authorized access, and by means of such conduct further[ed] the intended fraud and obtain[ed] anything of value[.]"  Among other things, Ryanair fails to adduce evidence of Defendants' (1) knowing access of Ryanair's website without authorization or in excess of authorized access or (2) intent to defraud Ryanair.[26]

*No Knowing Access.*  Defendants do not directly access Ryanair's website at all, let alone knowingly.  *See supra* Section II.C.1.  And Defendants are not vicariously liable for access by their vendors.  *See supra* Section II.C.2.  Accordingly, this element of Ryanair's fraud claim fails.

*No Intent to Defraud.*  "To act with an 'intent to defraud' means to act knowingly and with the intention or the purpose to deceive or to cheat."  Third Circuit Model Crim. Jury Inst. 6.18.1341-4; *see also Fidlar Techs. v. LPS Real Estate Data Sols., Inc.*, 810 F.3d 1075, 1079 (7th Cir. 2016) (applying this standard in CFAA case).  There must be proof "that defendants contemplated some actual harm or injury to their victims.  Only a showing of intended harm will satisfy the element of fraudulent intent."  *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987).

Ryanair has adduced no evidence that any Defendant had an intent to defraud or harm Ryanair.  *See supra* Sections II.A.3, & II.C.2.  Rather, the undisputed evidence shows that Defendants' intent was to provide flight information to their customers and facilitate the sale of airline tickets, and that Ryanair is paid fully for such ticket purchases. Ex. 6, Brady Dep. Tr. at 175:25-176:4; Ex. 7, O'Leary Dep. Tr. at 30:20-23.

### 7.   Ryanair Cannot Obtain a Permanent Injunction

Although summary judgment should be entered against Ryanair on all claims, rendering

---

[26] Ryanair has also failed to show, as required for a CFAA fraud claim, that Defendants "obtain[ed] [some]thing of value" other than "the use of the computer and the value of such use is not more than $5,000 in any 1-year period[.]"  18 U.S.C. § 1030(a)(4).  Here, "the thing obtained" is the use of the Ryanair website, but there is no evidence that the "value of such use" to any Defendant is more than $5,000 in any 1-year period. ██████████████████████████████████

moot the question of relief, Defendants also are entitled to summary judgment on Ryanair's request for a permanent injunction. Ryanair has no evidence of irreparable harm to Ryanair or the absence of an adequate remedy at law. *See TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019) ("the inability to show irreparable harm—or, relatedly, that a legal remedy would be inadequate—defeats a request for injunctive relief"). It is undisputed that Ryanair is paid fully for its airline tickets sold to Defendants' customers, *see* Ex. 6, Brady Dep. Tr. at 175:25-176:4, and ███████████████ ██████████████████████████████████████████████████, *see* Ex. 2, Hurley Dep. Tr. II at 140:4-141:1; Ex.45 ¶¶ 29-32. Ryanair's claimed harm is not irreparable but economic in nature. *See supra* Section II.C.4. And, Ryanair cannot show that "any future [ticket sales] would irreparably injure" Ryanair. *TD Bank*, 928 F.3d at 280.

## III.   RYANAIR'S EXPERT TESTIMONY SHOULD BE EXCLUDED.

Defendants are entitled to summary judgment against all of Ryanair's claims, even viewing the testimony of Ryanair's experts as admissible and in the most favorable light, for the reasons set forth above. But the testimony of Ryanair's experts also should be excluded at summary judgment, for multiple reasons. Ryanair's proffered cybersecurity and damages expert Iain Lopata is admittedly not a damages expert, and his cybersecurity testimony is riddled with admitted errors and methodological flaws. And Ryanair's proffered "rebuttal" expert, Anthony Vance, offered in response to Defendants' industry expert, is neither a rebuttal expert nor a travel industry expert, but a late-disclosed cybersecurity expert whose opinions are deeply flawed and unreliable.

### A.   Certain Opinions Of Iain Lopata Should Be Excluded.

#### 1.   Background

Ryanair submitted Opening and Rebuttal Reports of Iain Lopata. Lopata has a background in consulting companies as to "computer software implementation"—*e.g.*, "design[ing] . . . payroll, pension, and insurance management systems[.]" Ex. 40 ¶¶ 8-9. Lopata now serves on the advisory

board for an IT security services company; as CEO of "Fair Opinion – Expert Witness Services"; and as co-founder of Aerial Metrics Inc., which "use[s] drones and photogrammetry for forensic mapping of crash and crime scenes." *Id.* ¶ 14.

Drawing on none of this experience, Lopata's Opening Report offers two categories of opinions.  First, Lopata opines on "Defendants' unauthorized access of the protected Ryanair website," *id.* ¶ 18, asserting that: "Ryanair's website is designed to prevent unauthorized use of their booking system," *id.* ¶ 27(a); users must agree to Ryanair's website "terms and conditions," *id.* ¶¶ 27(b), 27(e); and, █████████████████████████████████████

████████████████████████████████████████████████████████████

*id.* ¶ 27(c) (collectively, *id.* ¶¶ 27(a)-27(f), 29, 31, 38-68, "Opening Cybersecurity Opinions").

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████, *id.* ¶ 27 (collectively, *id.* ¶¶ 27(g)-27(k), 28, 69-182, "Damages and Loss Opinions").  Lopata admits, "I am not a damages expert," and that he did "not consider[] broader consequential and business impacts to Ryanair[.]" *Id.* ¶ 28.  He also admits that he could not opine on "the amount of harm" from alleged system interruptions.  *Id.* ¶ 151.[27]

Lopata's Rebuttal Report ostensibly responded to the opening report of Defendants' cybersecurity expert Jordan Kelly, former Director of Cyber Incident Response on the National

---

[27] Ryanair promised "to produce an expert analysis of damages," including "costs of interruption of service to Ryanair'[s] website," "conducting damage assessments of the unauthorized access; consequential damages; and lost revenue" but it has not done so.  Ex. 26 at 5, 10, 91*; id.* at 7 ("The method of calculating [] damages will be the subject of expert testimony.").

Security Council at the White House.  As to Kelly's opinion that Ryanair (and Lopata) had failed to substantiate its claims of technical harm, Lopata crafted a new "test" ███████████ ████████████████████████ relying on Ryanair discovery disclosed the same day as his expert report, and a month after the Kelly Report.  Ex. 42 ¶¶ 115-124.

A week after serving Lopata's Rebuttal Report, Ryanair served an "Amended and Supplemented Expert Report of Iain Lopata," admitting a massive error.  ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

At deposition, Lopata confirmed again that he is not a damages expert, Ex. 9, Lopata Dep. Tr. at 56:8-9 ("Q. Are you an expert on damages?  A. No."), and admitted he did not "cross check any of th[e cost] data" provided to him by Ryanair against an "alternative source," *id.* at 60:17-61:14.  Lopata also confirmed that one of his initial "tests"—Test B—did not demonstrate programmatic access to Ryanair's computers ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

**2.      Lopata's Testimony Violates Rule 702 and *Daubert*.**

Under Rule 702 of the Federal Rules of Evidence, an expert witness may testify only if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Applying both Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993), courts consider "a trilogy of restrictions on expert testimony: qualification, reliability, and fit."  *Shire ViroPharma Inc. v. CSL Behring LLC*, 2021 WL 1227097, at *2 (D. Del. Mar. 31, 2021) (citation omitted).   The proponent of the expert's testimony has the burden of proving admissibility.  *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999); *see* Fed. R. Evid. 702 (Dec. 1, 2023) (same).  Plaintiffs have failed to meet their burden; Lopata's testimony fails in multiple respects.

### a.    The Court Should Exclude Lopata's Damages and Loss Opinions.

Lopata's Damages and Loss Opinions should be excluded in full.  (Ex. 40 ¶¶ 27(g)-27(k), 28, 69-182; *see also* Ex. 42 ¶¶ 9(c)(i), 77, 111.)  First, Lopata lacks the expertise to opine on damages and loss.  To qualify as an expert, a witness must have "specialized knowledge regarding the area of testimony."  *Trs. of Univ. of Pa. v. Eli Lilly & Co.*, 2022 WL 3973276, at *3 (E.D. Pa. Jan. 14, 2022) (cleaned up).  As Lopata admits, he is "not a damages expert[.]"  Ex. 41 ¶ 28; Ex. 9, Lopata Dep. Tr. at 56:8-9.  He has no education or practical or expert experience in accounting, finance, or economics.  Yet Lopata impermissibly opines on "damages," joint and several liability, allocation, and whether Ryanair's purported losses exceed the statutory threshold.  *See supra* Section III.A.1.  While Lopata downplayed his work during his deposition as a mere assessment of "[t]he costs incurred by Ryanair in responding to . . . OTAs," Ex. 9, Lopata Dep. Tr. at 57:5-13, his report begs to differ, *see, e.g.*, Ex. 41 ¶ 81 (opining on "[t]he damages considered in my analysis").   And in any event, an expert offering damages opinions cannot shortcut lacking

qualifications by avoiding the word "damages." *See Travelers Prop. Cas. Co. of Am. v. Hallam Eng'g & Constr. Corp.*, 2012 WL 13029519, at *3-4 (D.N.J. Aug. 16, 2012) (excluding proffered expert testimony "allocat[ing] what percentage of loss is attributable to" defendant given failure to meet "industry standards" for "damages calculations").

Second, if Lopata simply is performing basic math rather than opining on damages, he is not offering expert testimony at all. To wit, Lopata's "method" was simply taking Ryanair's unverified cost calculations and adding them together. *See* Ex. 9, Lopata Dep. Tr. at 228:21-229:14. Such "calculations, which involve little more than arithmetic, are within the ken of a lay person," not an expert. *Depalma v. Scotts Co.*, 2019 WL 2417706, at *7 (D.N.J. June 10, 2019). *See Allscripts Healthcare, LLC v. Andor Health, LLC*, 2022 WL 3021560, at *19 (D. Del. July 29, 2022) ("multiplication is not a specialized form of knowledge" (cleaned up)).

Third, Lopata's Damages and Loss Opinions lack a reliable method. An expert's "testimony is admissible" only "so long as the process or technique [] the expert used in formulating the opinion is reliable[,]" *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 742 (3d. Cir. 1994). A damages expert must use "the same intellectual rigor that characterizes accounting practices in the field," "present[ing] all of the formulas and schedules on which she relied." *U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 737, 741 (N.D. Ill. 2009). Yet Lopata admits he did not "think in terms of accounting principles" in developing his uncited method, Ex. 9, Lopata Dep. Tr. at 228:11-18, making it merely "an exercise in arithmetic based on inherently unreliable values." *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 140 (M.D. Pa. 2015) (cleaned up). What's more, Lopata's Damages and Loss Opinions hinge on Ryanair's Interrogatory Responses for cost data, which Lopata cites at least 27 times. (Ex. 41 at nn.69-70, 73, 76-81, 83-85, 89-92, 95-96, 98-101, 103, 107-108, 110, 115.) Lopata admits he did not verify

or "cross check any of th[e cost] data" against an "alternative source," Ex. 9, Lopata Dep. Tr. at 60:17-61:14—for instance, "look at the original books and records," conduct interviews, view billing entries, or verify invoices. *Bruno*, 311 F.R.D. at 129. Such "unblinking reliance" is impermissible, *In re TMI Litig.*, 193 F.3d 613, 716 (3d Cir. 1999); "experts who use data in their reports without independently verifying the accuracy of reliability of those figures fail to satisfy th[e Third] Circuit's reliability requirement." *Shire Viropharma*, 2021 WL 1227097, at *10 n.5 (citation omitted). Lopata reveals a total lack of reliability and expert methodology by simply parroting Ryanair's inputs, *and adopting without question a* ▮▮▮▮▮▮ *error in cost calculations*. Ex. 9, Lopata Dep. Tr. at 18:14-17. Further, Lopata improperly attributed to OTAs payroll costs for Business Intelligence Employees and Digital Employees, based on "Ryanair['s] estimates" that these employees "spend ▮▮▮▮▮▮▮ of their time addressing OTA related matters." Ex. 40 ¶¶ 93, 94, 96, 97. But as Ryanair confirmed, the ▮▮▮ figure is based on a "feeling," Ex. 45 ¶ 12; the 35% figure could be a "guestimate," *id.* ¶ 14; and it is unaware of any substantiating ▮▮▮▮▮▮▮▮▮▮▮▮ *id. See Montgomery Cnty. v. Microvote Corp.*, 320 F.3d 440, 448-49 (3d Cir. 2003) (excluding expert report relying on client employee's "guestimate" on time spent).

Fourth, Lopata's "damages" analysis fails to follow fundamental principles. To begin, Lopata fails to consider Ryanair's offsetting revenues from the challenged conduct, contrary to the principle that an injured party should not receive a "windfall," placed in a better position than it would have occupied but-for the conduct. *Nordetek Env't, Inc. v. RDP Techs., Inc.*, 862 F. Supp. 2d 406, 422 (E.D. Pa. 2012) (excluding expert testimony). Defendants' activities here *have made, and continue to make, money for Ryanair*, Ex. 2, Hurley Dep. Tr. II at 140:4-141:1, exceeding the costs Ryanair and Lopata attribute to OTAs, *e.g.*, Ex. 45 at 12-13 (▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████    But Lopata simply chose to ignore "Ryanair's gain," based on his *legal interpretation* of the CFAA.  Ex. 9, Lopata Dep. Tr. at 241:18-242:9.  Lopata also double-counts as a "cost" the €0.59 Ryanair 'pays' for online verification of OTA customers:

████████████████████████████████████████████████████████████████████

████████████████    Ex. 2, Hurley Dep. Tr. II at 111:13-17.

## b.    The Court Should Exclude Lopata's Opening Cybersecurity Opinions

Lopata's Opening Cybersecurity Opinions rest on Test B, purporting to show that "Booking.com, Agoda and Kayak access the Ryanair website ████████████████  Ex. 41 ¶ 27(c); *see id.* (applying analysis to Priceline as well).  But as noted above, *see supra* Section III.A.1, Lopata has since conceded that his ***Test B failed***.  It does not—as Lopata initially claimed—████████████████████████████████████████████████████

████████████████    Ex. 9, Lopata Dep. Tr. at 201:2-5; Ex. 41 ¶ 27(d).  An opinion that is "not supported by [the expert's] own methodology" due to a "flawed" approach is not reliable and should be excluded.  *TMI*, 193 F.3d at 676-77 (affirming exclusion of expert testimony).  As the "flaw" in Test B "is large enough that [he] lacks 'good grounds' for his [] conclusions[,]" Lopata's Opening Cybersecurity Opinions should be excluded.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 746.  Setting its failure aside, Lopata has provided no indicia to conclude that his homemade "testing"—having Ryanair remove a flight from its website and seeing if a Defendant booking goes through, Ex. 41 ¶ 65—is a valid, industry-accepted method to determine programmatic access.  Lopata's Test B (and all resulting Opening Cybersecurity Opinions, *e.g.*, *id.* ¶¶ 27(c)-27(e), 29, 31, 38-68, 70) must be excluded.

### c.    The Court Should Exclude Certain of Lopata's Rebuttal Opinions

Lopata's Rebuttal Report offers additional opinions that should be excluded.   First,
paragraph 42 of Lopata's Rebuttal Report misstates his own testing.  Lopata claims that his Test
A in the opening report ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████ Ex. 42
¶ 42.  But Test A had nothing to do with blocking— ███████████████████████████████
██████████████████████████.  Ex. 41 ¶¶ 39, 42, 54(e) and Lopata offered no opinion on why
the BudgetAir flights failed, *id.* ¶ 62 n.63.

Second**,** the Court should exclude paragraphs 9(c)(ii) and 112-124 of Lopata's Rebuttal
Report.  To begin, this testimony is improper rebuttal, introducing new theories and evidence
unresponsive to Kelly's opinions.   "[R]eply expert reports must be limited to true rebuttal."
*Withrow v. Spears*, 967 F. Supp. 2d 982, 1001-02 (D. Del. 2013) (cleaned up).  Lopata accuses
Kelly of not considering "[r]eferral or link-out bookings" offered by KAYAK and "[r]etr[y]"
booking attempts by non-defendant ███████ Ex. 42 ¶¶ 113, 114, but neither Kelly nor Lopata
(nor Ryanair) offered an opinion on whether link-out bookings or retries caused Ryanair any harm.
Lopata also accuses Kelly of *not* opining on the impact to Ryanair of "availability" requests
Defendants might have performed, *id.* ¶ 115, and then offers his own test for this new theory.  *Id.*
¶¶ 116-123.  "Rebuttal experts" like Lopata "cannot put forth their own theories" backed by new
tests, "they must restrict their testimony to attacking the theories offered by the adversary's
experts."  *Boles v. United States*, 2015 WL 1508857, at *2 (M.D.N.C. Apr. 1, 2015) (cleaned up).
These opinions should have been in Lopata's opening report, if Ryanair intends to rely on them—
because it is Ryanair's burden to prove harm.  *Bradley v. Amazon.com, Inc.*, 2023 WL 2574572,

at *5 (E.D. Pa. Mar. 17, 2023) (appropriate to reject case-in-chief evidence offered in rebuttal to ensure "orderly presentation of proof").

Lopata's availability test at paragraphs 115-124 of his Rebuttal must also be excluded because it is unreliable and does not support his opinions. First, Lopata never explains his test's methodology or accredits his methods and factors used. Moreover, "Ryanair conducted [the] test," Ex. 42 ¶ 118, not Lopata; he "wasn't involved in its execution or any of the monitoring of the process." Ex. 9, Lopata Dep. Tr. at 214:3-215:24. And Lopata's inputs—routes operated, advance publication, frequency of requests, and days called—are his inventions; in deposition he admitted that he relied on Googling and guessing to come up with what should be precise numbers. *Id.* at 210:24-211:17, 211:23-212:2. So too with the load (amount of traffic) created by an ███████ ███—the entire aim of Lopata's test—Lopata admitted that he did "not have any data available to adjust for this consideration," Ex. 9, Lopata Dep. Tr. at 219:17-19, so he simply chose a number based on "gut instinct" "not based on experience with availability in booking transactions[.]" *Id.* at 223:19-224:8. Such a cavalier approach is improper expert testimony.

Lopata's conclusion—that "the load generated by the Defendants" ████████████ ███ "affect[s] Ryanair's capacity to handle surges in demand in a material way" and puts "demands [] on Ryanair's systems," Ex. 42 ¶¶ 123-124—is also rank speculation, failing to "reliably flow" from the test and necessitating exclusion. *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 159 (3d Cir 1999). Lopata admits that Test B—his predicate ██ test—failed. *See supra* Section III.A.1. Lopata admits that the affected system is ██████, not Ryanair's. Ex. 9, Lopata Dep. Tr. at 219:17-220:7. Lopata admits *he simply does not know* the load created by each ██████████, Ex. 42 ¶ 120, and doesn't "know specifically" the aggregate load (if any), or

46

Ryanair's load capacity.  Ex. 9, Lopata Dep. Tr. at 222:10-16.  Lopata cannot then reliably opine

that the load created by OTAs on "Ryanair's systems" (if any) was "material."  Ex. 42 ¶¶ 123-124.

"[T]he analytical gap between the data and the opinion proffered is too great and is

connected only by the ipse dixit of the expert[.]" *Meadows v. Anchor Longwall & Rebuild, Inc.*,

306 F. App'x 781, 790 (3d Cir. 2009) (affirming exclusion).

### B.      The Opinions Of Anthony Vance Should Be Excluded.

Vance is not a "rebuttal" expert.  He should be excluded under Rule 26 as his opinions are

belatedly disclosed opening opinions, rather than rebuttal.  Alternatively, if he is a "rebuttal"

expert, he lacks any qualification to rebut Defendants' travel industry expert.

### 1.      Background

On the Rebuttal Expert deadline, Ryanair served the Expert Report of Anthony Vance,

which Vance described as "provid[ing] expert opinion in rebutting the expert opinion of [Timothy]

O'Neil-Dunne." Ex. 43 at 2.  O'Neil-Dunne is Defendants' timely disclosed travel industry expert.

But Vance, a Professor and Cyber Initiative Fellow at Virginia Tech, has no experience or training

in the travel industry.  *Id.* at App'x A.  His degrees are in information and computer science, and

his writing is in information security systems.  *Id.*  His academic career is in "cybersecurity and

digital forensics."  *Id.* at 3.  He has no travel industry employment experience.  *Id.* at App'x A.

And, at deposition, Vance confirmed that O'Neil Dunne is "a travel industry executive with

decades of experience," Ex. 10, Vance Dep. Tr. at 199:14-23, whereas Vance is not holding

himself out as a travel industry expert, *see id.* at 58:25-59:16, 197:23-198:9 ("I'm not an expert in

the travel industry.").

### 2.      Vance's Purported "Rebuttal" Expert Report Violates Rule 26.

Vance's "rebuttal" report is an untimely opening report, not a proper rebuttal report, and

thus violates Rule 26.  "[R]eply expert reports must be limited to true rebuttal"—"explain[ing],

repel[ling], counteract[ing] or disprov[ing] evidence of the adverse party." *Withrow*, 967 F. Supp. 2d at 1001-02 (citations omitted).  Expert reports that "do not directly contradict or rebut the actual contents of that prior report, do not qualify as proper rebuttal . . . reports."  *Id.* at 1002.

Vance's report opines on cybersecurity issues that O'Neil-Dunne never discussed, as O'Neil-Dunne is a *travel industry expert*, not a cybersecurity expert.  While Vance recognizes that O'Neil-Dunne does not "use the term 'unauthorized access'" in his report and "was not asked to opine on authorized versus unauthorized access," Ex. 43 at 6, Vance spends over five pages opining on "authorized and unauthorized access," *id.*, Part VI.B.  Vance opines on "technical hacks," Shield, and bots (Part VI.C), and the "costs" and "net costs" to Ryanair by OTAs purportedly "disrupt[ing] or degrad[ing] Ryanair's services" (Parts VI.D and VI.E), despite that— as Vance admits—O'Neil-Dunne opined on none of those topics.  *See* Ex. 10, Vance Dep. Tr. at 12:17-21, 45:4-6, 87:13-20.  And Vance's cybersecurity opinions are *particularly* improper given that "[i]t is well settled that evidence which properly belongs in the case-in-chief"—*e.g.*, evidence supporting Ryanair's claim of unauthorized access—"but is first introduced in rebuttal may be rejected[.]" *Bradley*, 2023 WL 2574572, at *5 (citation omitted); *see* D.I. 45 at 3 (expert testimony must be disclosed in opening reports where a party "has the initial burden of proof").

Nor does Vance attempt to directly rebut O'Neil-Dunne's opinions.  He does not disagree with O'Neil-Dunne's opinions on modern airline ticket distribution, *see* Ex. 39 at 5, or the historical analogue of "screen scraping" in "screen emulation" systems, *id.*  Ex. 43 at 21 (offering no dispute); Ex. 10, Vance Dep. Tr. at 205:6-13 (admitting reliance on O'Neil-Dunne's historical account).  Nor does Vance dispute OTAs' prevalence as a core method of airline-travel distribution, *see* Ex. 39 at 9-11; that "the information-sharing feature of OTAs can also prove beneficial to airlines," *id.* at 15-16; or the importance of Ryanair's ancillary revenue to its business

strategy as a low-cost carrier, *see id.* at 18-19.  Indeed, as Vance put it, "I'm not an expert in the travel industry" and lack the "expertise to rebut" O'Neil-Dunne, Ex. 10, Vance Dep. Tr. at 197:23-198:9; he had never "stud[ied] OTAs before submitting [his] report in this case," *id.* at 92:4-6; and he was "grateful for Mr. O'Neil-Dunne's report," *id.* at 79:12-18.

Under the Third Circuit's five-factor test, Vance's untimely expert report should be excluded: (1) its belated disclosure prejudices Defendants; (2) such prejudice cannot be cured; (3) it has "disrupt[ed] the orderly and efficient litigation process," including by relying on material disclosed after O'Neil-Dunne's report and deposition, *see* Ex. 10, Vance Dep. Tr. at 10:4-17; (4) Ryanair has given no reason for noncompliance; and (5) there is little prejudice to Ryanair, given that Ryanair already has an opening expert (Iain Lopata) who offered cybersecurity testimony.  *See Bradley*, 2023 WL 2574572, at *14-15 (citation omitted).  Ryanair should be "precluded from relying upon [the] report in any motion, hearing, or trial of this case."  *Id.* at *15.

### 3.    Vance's Testimony Violates Rule 702 and *Daubert*.

Vance also fails to satisfy Rule 702 and *Daubert*'s requirements of qualification, reliability, and fit, *see supra* III.A.2, in multiple respects.  First, Vance lacks any "specialized knowledge" as to the travel industry, *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998), yet opines that "Ryanair offers its licensing of flight data on very reasonable terms," Ex. 43 at 5; that "Ryanair has a very different business model compared to that of OTAs," *id.* at 25; and that "[a]llowing customers to personalize their myRyanair account in no way equates the business models of Ryanair and Defendants" or "make[s] Ryanair a competitor to OTAs," *id*.  Second, Vance repeatedly relies on Ryanair's allegations as fact.  *E.g.*, Ex. 43 at 8 & n.16, 13 & n.35 (citing FAC ¶¶ 59-67, 72, 73, 90).)  But "federal courts across the country have found that expert opinions that rely primarily upon allegations in a complaint are not 'based on sufficient facts and data,' as required by Rule

702, and are otherwise unreliable." *Fiona Chen v. Yellen*, 2021 WL 4192078, at *3 (N.D. Ill. Sept. 15, 2021) (citation omitted).  That principle forcefully applies and merits exclusion.

Third*,* though the "prohibition on experts testifying as to their own legal conclusions is so well established that it is often deemed a basic premise or assumption of evidence law," *Holman Enterprises v. Fidelity & Guaranty Insurance Co.*, 563 F. Supp. 2d 467, 472 (D.N.J. 2008) (cleaned up), Vance's Report repeatedly does just that.  Vance opines on "unauthorized access as defined by law [] in the CFAA," Ex. 43 at 7; Defendants' "alleged violation of the CFAA," *id.* at 6; that "[t]he CFAA clearly governs access by OTAs," *id.* at 7; that "popular practice and pervasiveness . . . do not confer authorization for access," *id.* at 6-7, 21; and "whether access is common or not common has no effect on whether certain access is authorized or unauthorized," *id.* at 16 n.49.  This is not Vance's first strike—in *Vox Marketing Group, LLC v. Prodigy Promos L.C.*, Vance's opinion was partially excluded for this exact failing: "Vance cannot render a legal conclusion that the [] Defendants' access [] was 'unauthorized'" under the CFAA.  521 F. Supp. 3d 1135, 1149 (D. Utah 2021).  Likewise, Vance *repeatedly* asserts that O'Neil-Dunne's opinions are "largely – or wholly irrelevant," Ex. 43 at 6; *see also id.* at 5, 21, but relevance is a legal question reserved for the court.  *See Grill v. Aversa*, 2014 WL 4784150, at *3 (M.D. Pa. Sept. 22, 2014); *Gillispie v. City of Miami Twp.*, 2022 WL 14758379, at *6 (S.D. Ohio Oct. 26, 2022).  Likewise impermissible are Vance's opinions that Defendants act "against Ryanair's Terms of Use," Vance at 14; *see id.* at 7, 12, 24, as "[a]n expert may not opine regarding the scope and meaning of a contract," *Allscripts Healthcare*, 2022 WL 3021560, at *44 (cleaned up).

## IV.    CONCLUSION

Summary judgment should be entered for Defendants on all of Ryanair's claims, and Ryanair's expert testimony should be excluded as set forth herein.

OF COUNSEL:

John H. Hemann
Kathleen Hartnett
Kristine Forderer
Alexander J. Kasner
Jessie Simpson LaGoy
Hannah Pollack
COOLEY LLP
3 Embarcadero Center, 20th Fl.
San Francisco, CA 94111
(415) 693-2200
jhemann@cooley.com
khartnett@cooley.com
kforderer@cooley.com
akasner@cooley.com
jsimpsonlagoy@cooley.com
hpollack@cooley.com

Dated: December 20, 2023

*/s/ Jeffrey L. Moyer*
Jeffrey L. Moyer (#3309)
Alexandra M. Ewing (#6407)
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
moyer@rlf.com
ewing@rlf.com

*Attorneys for Defendants*

51

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 20, 2023, a true and correct copy of the foregoing

document was caused to be served on the following counsel of record in the manner indicated.

<u>**BY ELECTRONIC MAIL**</u>
R. Touhey Myer
Kratz & Barry LLP
800 N. West Street
Wilmington, Delaware 19801
(302) 527-9378
tmyer@kratzandbarry.com

<u>**BY ELECTRONIC MAIL**</u>
R. David Donoghue
Anthony J. Fuga
HOLLAND & KNIGHT LLP
150 N Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600
david.donoghue@hklaw.com
anthony.fuga@hklaw.com


_/s/ Jeffrey L. Moyer_
Jeffrey L. Moyer (#3309)