**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

---

|  |  |
|---|---|
| RYANAIR DAC, | : |
|  | : |
| *Plaintiff/* | : C.A. No. 1:20-cv-01191-WCB |
| *Counterclaim Defendant,* | : |
|  | : |
| v. | : |
|  | : |
| BOOKING HOLDINGS INC., | : |
| BOOKING.COM B.V., KAYAK SOFTWARE | : |
| CORPORATION, PRICELINE.COM LLC, | : |
| and AGODA COMPANY PTE. LTD., | : |
|  | : |
| *Defendants,* | : |
|  | : |
| BOOKING.COM B.V., | : **PUBLIC VERSION -** |
|  | : **CONFIDENTIAL MATERIAL OMITTED** |
| *Counterclaim Plaintiff.* | : |
| | : |

---

**PLAINTIFF RYANAIR DAC'S BRIEF**
**IN OPPOSITION TO DEFENDANTS' MOTION**
**FOR SUMMARY JUDGMENT AND TO PRECLUDE**
**EXPERT TESTIMONY OF IAIN LOPATA AND ANTHONY VANCE**

Dated: January 22, 2024

R Touhey Myer (#5939)
KRATZ & BARRY LLP
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

R. David Donoghue (*pro hac vice*)
Anthony J. Fuga (*pro hac vice*)
HOLLAND & KNIGHT LLP
150 N Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600
david.donoghue@hklaw.com
anthony.fuga@hklaw.com

Cynthia A. Gierhart  (*pro hac vice*)
HOLLAND & KNIGHT LLP
800 17th Street NW, Suite 1100
Washington, DC 20011
(202) 569-5416
cindy.gierhart@hklaw.com

Ji Mao (*pro hac vice*)
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
(212) 513-3420
ji.mao@hklaw.com

William H. Oliver III (*pro hac vice*)
HOLLAND & KNIGHT LLP
10 St. James Ave. 11th Floor
Boston, MA 02116
(617) 573-5863
william.oliver@hklaw.com

*Attorneys for Plaintiff/*
*Counterclaim Defendant, Ryanair DAC*

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION AND SUMMARY OF THE ARGUMENT ........................................1

II.    NATURE AND STAGE OF THE PROCEEDINGS .........................................2

III.   STATEMENT OF THE FACTS ..........................................................................2

IV.   LEGAL STANDARD ...........................................................................................6

V.    ARGUMENT .........................................................................................................6

    A.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON RYANAIR'S CFAA CLAIMS .........................................................6

       1.    Defendants Are Vicariously Liable for Violating the CFAA ...................7

          a.   Kayak is directly liable for violating the CFAA .......................................7
          b.   All Defendants are vicariously liable for accessing the Ryanair Website .................7
          c.   Defendants cannot redefine the vicarious liability standard to escape liability ........10
          d.   Defendants' agreements with vendors cannot disclaim vicarious liability...............12
          e.   At least Booking is vicariously liable for the ███ attack on ███████ ......13

       2.    Defendants Access the Ryanair Website Without Authorization .............................15

          a.   Defendants violate the CFAA when they access any portion of the Ryanair Website, not just the myRyanair portion .........................................16
          b.   Defendants violate the CFAA by bypassing myRyanair's account creation and password login requirements .......................................17

       3.    Ryanair Has Met the $5,000 Threshold for a Private Right of Action ......................20

          a.   Ryanair has properly claimed its costs as losses under the CFAA ...........................22
          b.   Ryanair's losses are not routine expenditures............................................................24
          c.   Ryanair has suffered losses in excess of $5,000 due to each Defendant's actions....31

       4.    Defendants' Request for Judgment on Conspiracy Should Be Denied ...................31

       5.    Defendants' Request for Judgment on Fraud Should Be Denied .............................34

       6.    Ryanair Is Entitled to Injunctive Relief ................................................................36

    B.    THE TESTIMONY OF IAIN LOPATA SHOULD NOT BE EXCLUDED.................37

       1.    Lopata Was Never Offered as, or Intended to Be, a Damages Expert......................37

       2.    Lopata's Testimony Is Reliable and Admissible .....................................................40

       3.    Lopata's Cybersecurity Opinions Should Not Be Excluded....................................42

       4.    Lopata's Rebuttal Report Should Not Be Excluded Because of Defendants' Delay in Producing Link-Out Booking Data ...........................................................44

    C.    THE TESTIMONY OF ANTHONY VANCE SHOULD NOT BE EXCLUDED ........45

       1.    Vance Provides a Proper Rebuttal Expert Report Under Rule 26 ...........................45

       2.    Vance Provides a Proper Rebuttal Expert Report Under Rule 702 and Daubert.......49

VI.   CONCLUSION....................................................................................................50

## **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Alchem Inc. v. Cage*,
   No. 2:20-cv-03142-JDW, 2021 U.S. Dist. LEXIS 202868 (E.D. Pa. Oct. 21,
   2021) .................................................................................................................11, 12

*Allscripts Healthcare, LLC v. Andor Health, LLC*,
   2022 WL 3021560 (D. Del. July 29, 2022) ...................................................38, 39

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...............................................................................................6

*Asplundh Mfg. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Eng'g*,
   57 F.3d 1190 (3d Cir. 1995).................................................................................49

*AssociationVoice, Inc. v. AtHomeNet, Inc.*,
   Civil Action No. 10-cv-00109-CMA-MEH, 2011 U.S. Dist. LEXIS 1654 (D.
   Colo. Jan. 6, 2011) .......................................................................................15, 36

*Astellas US LLC v. Apotex Inc*.,
   No. CV 18-1675-CFC-CJB, 2021 WL 1518716 (D. Del. Apr. 8, 2021)................12

*Bombin v. Sw. Airlines Co.*,
   No. 5:20-CV-01883-JMG, 2023 WL 2647861 (E.D. Pa. Mar. 27, 2023) .............42

*Brooks v. AM Resorts, LLC*,
   954 F. Supp. 2d 331 (E.D. Pa. 2013) ...................................................................21

*Buchanan v. Ingram Content Grp.*,
   No. 20-CV-2421, 2020 WL 5957618 (D.N.J. Oct. 6, 2020) ................................20

*Crowley v. Chait*,
   322 F. Supp. 2d 530 (D.N.J. 2004) ..........................................................42, 45, 47

*Depalma v. Scotts Co.*,
   2019 WL 2417706 (D.N.J. June 10, 2019) ..........................................................38

*Drexel v. Union Prescription Centers, Inc.*,
   582 F.2d 781 (3d Cir. 1978).................................................................................13

*Facebook, Inc. v. Power Ventures, Inc.*,
   252 F. Supp. 3d 765 (N.D. Cal. 2017), aff'd, 749 F. App'x 557 (9th Cir. 2019) ...................36

*Facebook, Inc. v. Power Ventures, Inc.*,
   844 F.3d 1058 (9th Cir. 2016) ..............................................................9, 18, 19, 29

*Glob. Policy Ptnrs, LLC v. Yessin*,
    686 F. Supp. 2d 642 (E.D. Va. 2010) ............................................................30, 31

*Goodman v. Goodman*,
    No. 21-CV-10902 (GHW) (RWL), 2022 U.S. Dist. LEXIS 230085 (S.D.N.Y.
    Dec. 21, 2022) ......................................................................................21, 22, 25

*Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*,
    556 F. Supp. 2d 1122 (E.D. Cal. 2008) ..........................................................35

*Haskins v. First Am. Title Ins. Co.*,
    No. CIV.A. 10-5044 RMB, 2013 WL 5410531 (D.N.J. Sept. 26, 2013) ...............................45

*Health First, Inc. v. Hynes*,
    No. 6:11-cv-715-Orl-41KRS, 2014 U.S. Dist. LEXIS 201307 (M.D. Fla. Nov.
    3, 2014) ..............................................................................17, 18, 21, 22

*hiQ Labs, Inc. v. LinkedIn Corp.*,
    31 F.4th 1180 (9th Cir. 2022) ......................................................18, 19, 25

*Integra LifeSciences Corp. v. HyperBranch Med. Tech., Inc.*,
    No. CV 15-819-LPS-CJB, 2018 WL 2551053 (D. Del. May 8, 2018) ...........................40, 45

*Metro-Goldwyn-Meyer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913, 918-19 (2005) ............................................................34

*Meyers v. Pennypack Woods Home Ownership Ass'n*,
    559 F.2d 894 (3d Cir. 1977) ............................................................47

*New York Pizzeria, Inc. v. Syal*,
    56 F. Supp. 3d 875 (S.D. Tex. 2014) ..................................................37, 38

*Nordetek Env't, Inc. v. RDP Techs., Inc.*,
    862 F. Supp. 2d 406 (E.D. Pa. 2012) ....................................................40

*Robocast, Inc. v. Netflix, Inc.*,
    640 F. Supp. 3d 365 (D. Del. 2022) ........................................................8

*Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*,
    119 F. Supp. 2d 1121 (W.D. Wash. 2000) ................................................35

*Svanaco, Inc. v. Brand*,
    417 F. Supp. 3d 1042 (N.D. Ill. 2019) ..............................................11, 12, 29

*Tormenia v. First Invs. Realty Co.*,
    251 F.3d 128 (3d Cir. 2000) ............................................................41, 44

*United States v. Carbo*,
    572 F.3d 112, 113 (3d Cir. 2009) ................................................................34

*United States v. Falcone*,
    311 U.S. 205, 206 (1940) ...........................................................................34

*United States v. Millot*,
    433 F.3d 1057 (8th Cir. 2006) ....................................................................29

*United States v. Starr*,
    816 F.2d 94, 98 (2d Cir. 1987) ...................................................................35

*United States v. Wasserson*,
    418 F.3d 225 (3d Cir. 2005) .........................................................................8

*Univ. Sports Publ'ns Co. v. Playmakers Media Co.*,
    725 F. Supp. 2d 378 (S.D.N.Y. 2010) .........................................................21

*Van Buren v. United States*,
    141 S. Ct. 1648 (2021) ...........................................................................21, 40

*Volpe v. Abacus Software Sys. Corp.*,
    No. CV2010108RMBKMW, 2021 WL 2451968 (D.N.J. June 16, 2021) ...........35

*Vox Mktg. Grp., LLC v. Prodigy Promos L.C.*,
    521 F. Supp. 3d 1135 (D. Utah 2021) .........................................................50

*Welenco, Inc. v. Corbell*,
    126 F. Supp. 3d 1154 (E.D. Cal. 2015) .......................................31, 32, 33, 34

*Withrow v. Spears*,
    967 F. Supp. 2d 982 (D. Del. 2013) .......................................................47, 48

*Zeno v. Ford Motor Co.*,
    480 F. Supp. 2d 825 (W.D. Pa. 2007) .........................................................13

**Statutes**

18 U.S.C. § 1030(a)(2)(c) .................................................................................17

18 U.S.C. § 1030(a)(3) ......................................................................................16

18 U.S.C. § 1030(a)(4) ..........................................................................34, 35, 36

18 U.S.C. § 1030(a)(5) ......................................................................................17

18 U.S.C. § 1030(b) ....................................................................................31, 34

18 U.S.C. § 1030(c)(4)(A)(i)(I) ........................................................................20

18 U.S.C. § 1030(e)(8) ..................................................................................................39

18 U.S.C. § 1030(e)(11) ........................................................................................21, 37, 39

18 U.S.C. § 1030(g) ........................................................................................9, 10, 22

**Other Authorities**

Fed. R. Civ. P. 56(a) ......................................................................................................6

Fed. R. Evid. 702 ................................................................................................6, 41, 44, 49

## I.      INTRODUCTION AND SUMMARY OF THE ARGUMENT

Defendants seek summary judgment largely on the theory that their violations are no different than their competitors', other online travel agents ("OTAs"), and that Ryanair DAC ("Ryanair") does not do enough to stop the violations. But whether someone is the first, second, or fiftieth person to break the law does not change that the law was broken. Commonly breaking the law does not provide an excuse. And Defendants' arguments about Ryanair's efforts to stop Booking's website access ignore the facts. Ryanair has created Shield and myRyanair in-house to protect Ryanair's website (the "Ryanair Website"). In fact, Shield was created specifically for the sole purpose of stopping Defendants and other OTAs from selling Ryanair's flights. And Ryanair works continuously to improve Shield and to otherwise prevent Defendants and other OTAs from accessing its website.

Defendants Booking Holdings, Inc. ("BHI"), Booking.com ("Booking"), Kayak Software Corporation ("Kayak"), Priceline.com LLC ("Priceline"), and Agoda Company Pte. Ltd. ("Agoda," and collectively with BHI, Booking, Kayak, and Priceline, the "Defendants") further argue that anyone can access the Ryanair website and, therefore, it is not a protected website. This cannot be taken seriously considering that the Defendants, quite literally, cannot currently access the Ryanair Website. This bears repeating: Defendants and Defendants' vendors cannot currently access the Ryanair Website that Defendants claim to be public and unprotected. This simple fact exposes Defendants' argument.

With respect to Ryanair's expert Iain Lopata, Defendants purposefully misrepresent what he is. Lopata is not a damages expert. He is a technical expert assessing the technical loss Ryanair has suffered from Defendants' continued unauthorized access of the Ryanair Website, which is an element of a CFAA claim. Defendants object that Lopata states some costs do not count as

technical harms, but that does not undercut his credibility, it only increases it.

With respect to Ryanair's expert Anthony Vance, Defendants argue that he is not a travel expert and cannot, therefore, respond to Defendants' travel expert. But, again, Defendants miss the point. Vance is not a travel expert because a travel expert is unnecessary for this case. The issue is that Booking's purported travel expert disclosed opinions related to supposed benefits of screen scraping. Vance, an expert on screen scraping and bots, rebuts that improper opinion.

## II.       NATURE AND STAGE OF THE PROCEEDINGS

Ryanair incorporates its Nature and Stage of the Proceedings section from its opening summary judgment brief. D.I. 348 at 1-3. In addition, on December 20th, 2023, Defendants filed their Motion for Summary Judgment and Motions to Exclude the Testimony of Iain Lopata and Anthony Vance and supporting documents. *See* D.I. 335. On the same day, Ryanair filed its Motion for Summary Judgment and to Preclude Expert Testimony of Timothy James O'Neil-Dunne, Jordan Rae Kelly, and Basil Imburgia and supporting documents. *See* D.I. 348. Ryanair now files its Opposition to Defendants' Motions.

## III.       STATEMENT OF THE FACTS

Ryanair incorporates its Statement of the Facts from its opening summary judgment brief. *See* D.I. 348 at 4-6. In addition, and in response to Defendants' Statement of the Facts:

Defendants state that "Ryanair sells its flights through a public website–Ryanair.com–and mobile app so that they are available as widely as possible." D.I. 335 at 4. Defendants also state that "any user is able to purchase a ticket for any traveler." *Id.* at 6. These statements are false. Ryanair sells flight reservations only to authorized users, specifically users who have authenticated themselves ███████████████ *See* Mao Dec. Ex. 1 at 35:21-36:1. Furthermore, Ryanair does not sell flight reservations to ██████████████ *See* Mao Dec. Ex. 1 at 36:9-14.

Defendants state that "Ryanair wants all flight sales to occur through its website or app." D.I. 335 at 4. This is false. Ryanair also allows certain parties to sell Ryanair flights through ███████ ████████████████████████ if they meet certain requirements and enter a ██████ agreement with Ryanair. *See* Fuga Dec. Ex. 1 at 74; Ex. 14 at 67:14-23 (██████████████████████████████ ████████████████████).

Defendants state that "[t]here is no dispute that a user can access any page in the Ryanair website booking flow, except the final payment page, without any 'authorization.'" D.I. 335 at 5. This is false. Not only is Defendants' legal argument inappropriate for a Statement of the Facts, Ryanair has erected multiple code-based authentication mechanisms that protect every part of its website. *See* Mao Dec. Ex. 1 at 35:19-36:14; Hemann Dec. Ex. 26 at 101-103.

Defendants state that "Ryanair admits the payment page contains no Ryanair confidential information or confidential information users other than the user who is inputting their own payment information." D.I. 335 at 7. This is false. The ability to complete flight bookings is confidential and locked behind the myRyanair login requirement. *See, e.g.*, Fuga Dec. Ex. 7 at 17.

Defendants state that "Ryanair has identified the TOU as the sole basis for its claim that OTAs are not 'authorized' to purchase tickets on the Ryanair website ██████." D.I. 335 at 8. This is false. Not only is this argument inappropriate for Defendants' Statement of the Facts, Defendants are not authorized to access the Ryanair Website because Ryanair has implemented various code-based authentication mechanisms to prevent them from doing so. *See* Mao Dec. Ex. 1 at 35:22-36:14; Hemann Dec. Ex. 26 at 101-103.

Defendants state that "Ryanair conceived of this lawsuit as part of its broader public relations strategy to prevent travelers from using OTAs to purchase Ryanair flights." D.I. 335 at 8. This is false. Ryanair filed this lawsuit to stop Defendants from accessing and using the Ryanair

Website without authorization. *See* Mao Dec. Ex. 2 at 134:9-137:1; Mao Dec. Ex. 3 at 134:13-136:17.

Defendants state that "Ryanair's anti-OTA strategy includes components that interfere with OTA bookings or make them more costly to customers (such as … adding a 'surcharge' to OTA credit card purchases) and marketing campaigns … 'discrediting OTAs.'" D.I. 335 at 8. This is false. Ryanair does not purposefully interfere with OTA bookings, make it more costly for customers, or discredit OTAs. Ryanair incurs losses to respond to, and assess and restore the damage from, technological harms caused by OTAs. *See generally* Hemann Dec. Ex. 26 at 10-49. To the extent Defendants' customers incur additional costs when purchasing Ryanair flights, Defendants' illegal activities are the proximate cause of those additional costs. *See* Hemann Dec. Ex. 26 at 8, 22-23, 30-31, 37-38, 58-59, 78; Hemann Dec. Ex. 27 at 29-31.

Defendants state that "Ryanair targets travelers directly: for example, it forces passengers suspected of purchasing flights via OTA to either undergo a biometric verification process to check in for a flight online or pay Ryanair's €55 per passenger fee to check in at the airport." D.I. 335 at 8. This is false. Ryanair does not "target" its passengers; it identifies passengers who may have incorrect passenger data from booking through OTAs and verifies that data to protect those passengers. *See* Hemann Dec. Ex. 26 at 37-38; Mao Dec. Ex. 4. Passengers have the option of undergoing standard or express verification. Mao Dec. Ex. 4. Only express verification involves a biometric verification process. *Id*. Standard verification is free of charge. *Id*.

Defendants state that, ███████████████████████████████████████ '" D.I. 335 at 10. This is false. By determining if a user is authorized ████████████ Shield authenticates authorized users. *See* Mao Dec. Ex. 1 at 35:22-36:1.

Defendants state that "Shield ██████████████████████████████████

████████████████████████████████████████████████████████████████

█████ D.I. 335 at 9-10, n.7. This statement is incomplete. Shield ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Hemann Dec.

Ex. 26 at 101-103.

Defendants state that "Defendants do not access Ryanair's website to book flights or

otherwise source Ryanair content directly." D.I. 335 at 10. This is false. █████████████

██████████████████████████████████     ████████. Mao Dec. Ex. 5 at 225:2-25.

Defendants state that they "do [not] direct or control their vendors' activities." D.I. 335 at

10. This is false, as explained below. *See* Hemann Dec. Ex. 30 at 8-12; Hemann Dec. Ex. 32 at 7-

10; Hemann Dec. Ex. 34 at 7-9; Hemann Dec. Ex. 36 at 7-8, 10-16.

Defendants state that "[t]o purchase an available flight, the customer enters the data needed

for the booking on Booking.com, ██████████████████████████████████████████████

██████████████████████ This is only partially true. To purchase a flight, the customer enters

the data needed for the booking on Booking and provides payment information to Booking, and

Booking then directs, encourages, and induces Etraveli to make that customer's selected booking

██████████████████████████████████ Hemann Dec. Ex. 30 at 10-11.

Defendants state that "Booking.com does not tell Etraveli how to obtain flight information

or make flight bookings" and "Booking.com has no knowledge of and has never instructed Etraveli

or any other third party to engage in any kind of harmful conduct related to Ryanair's website."

D.I. 335 at 12. These statements are false. Booking's internal documents show that ████████████

████████████████████████████ Fuga Dec. Ex. 24. Ryanair has also put Booking on notice multiple times that Booking, either directly or indirectly, obtains Ryanair flights by scraping the Ryanair Website, which harms the Ryanair Website. D.I. 76 at Exs. B, C, E. As explained herein, Booking directs, encourages, and induces Etraveli to book the specific Ryanair flights chosen by Booking. *See* Hemann Dec. Ex. 30 at 8-12.

Defendants state that Priceline, Agoda, and Kayak also do not know how Priceline and Kayak's vendors purchase Ryanair flights. D.I. 335 at 12-14. This is false. As explained below, Priceline, Agoda, and Kayak direct, encourage, and induce Priceline and Kayak's vendors to purchase the specific Ryanair flights chosen by Priceline, Agoda, and Kayak. *See* Hemann Dec. Ex. 32 at 7-10; Hemann Dec. Ex. 34 at 7-9; Hemann Dec. Ex. 36 at 7-8, 10-16.

## IV.    LEGAL STANDARD

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An expert qualified by "knowledge, skill, experience, training or education" can testify if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (amended December 1, 2023).

## V.    ARGUMENT

## A.  DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON RYANAIR'S CFAA CLAIMS

Defendants argue Ryanair's CFAA claims suffer from three common defects: (1)

Defendants are not liable for the actions of their vendors; (2) Ryanair cannot establish that Defendants' vendors accessed Ryanair's website without authorization or in excess of authorization; and (3) no Defendant has caused $5,000 or more in loss to Ryanair within a one-year period. These arguments fail because Defendants repeatedly ignore or mischaracterize relevant evidence and fail to apply the correct legal standards. When looking at all of the evidence, the undisputed facts establish that (1) Defendants are well aware that their vendors access the Ryanair website without authorization, yet Defendants still direct, induce, and encourage their vendors to access the Ryanair Website on their behalf; (2) Defendants' vendors bypass numerous Ryanair code-based authentication mechanisms to access the Ryanair Website; and (3) each Defendant has caused Ryanair at least $5,000 in loss in a one-year period.

### 1. Defendants Are Vicariously Liable for Violating the CFAA

#### a. *Kayak is directly liable for violating the CFAA*

Defendants claim "there can be no CFAA liability against any Defendant on any theory of direct access to Ryanair's website" because Defendants exclusively use vendors to access the Ryanair Website. D.I. 335 at 17-18. That is false. At least Kayak is directly liable for violating the CFAA  because ███████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ Furthermore, it cannot be (and is not) the law that Defendants can avoid personal liability by hiring someone else to commit unlawful acts. Defendants are liable for their own acts and vicariously for the acts of their vendors.

#### b. *All Defendants are vicariously liable for accessing the Ryanair Website*

Defendants admit they may be held liable for directing, encouraging, or inducing a vendor to commit a CFAA violation, as they must. Instead, Defendants argue what amounts to willful ignorance:

> [T]here is no evidence that Defendants have knowledge of, a role in, or input into how their vendors obtain Ryanair flight information and book Ryanair flights.

D.I. 335 at 18; *see also id.* at 22 ("There is no evidence as to where Etraveli obtains its inventory or as to whether or how its vendors obtain it from Ryanair"). The undisputed evidence, which Defendants ignore, contradicts their claims. Defendants have both a role and input into how their vendors obtain Ryanair flights. Their vendors do not obtain Ryanair flights at random; they obtain the specific Ryanair flights Defendants request, when Defendants request them. D.I. 348 at 17-19. With respect to how Defendants' vendors obtain flights, Ryanair has confirmed that Defendants' vendors access the Ryanair Website to purchase flights both by analyzing Defendants' PNR codes and through Mr. Lopata's testing. This requires Defendants to circumvent Ryanair's code-based authentication mechanisms. D.I. 348 at 17. Defendants have never even offered an argument that Ryanair flights or flight data are obtained any other way because they cannot. Lastly, with respect to knowledge, Booking's own documents and testimony confirm that Booking knew Etraveli obtained Ryanair flight information and purchased Ryanair flights via scraping, and Defendants already acknowledged the intent element was satisfied to the Court. Fuga Dec. Ex. 3 at 43:9-16; Fuga Dec. Ex. 24 at BOOKING.COM00002386; Fuga Dec. Ex. 25; D.I. 349, Ex. 19 at 38:6-18.

Further, Defendants cannot turn a blind eye to their vendors' unauthorized access after Ryanair has put Defendants on notice multiple times that the access is unauthorized. *See* D.I. 1; D.I. 76; D.I. 76 at Exs. B, C, E; *United States v. Wasserson*, 418 F.3d 225, 2336-39 (3d Cir. 2005) (finding defendant vicariously liable for disposal of hazardous waste in a restricted location; even if defendant did not know where waste was dumped, defendant was still willfully blind to the ultimate destination of the hazardous waste); *Robocast, Inc. v. Netflix, Inc.*, 640 F. Supp. 3d 365, 371 (D. Del. 2022) ("plaintiff can meet the knowledge requirement by showing 'willful blindness,' which 'requires the patentee to show not only that the accused subjectively believed that there was

a high risk of infringement, but also that the accused took deliberate actions to avoid confirming

infringement.'") (citing *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1364 (Fed. Cir. 2016)).

Defendants cannot credibly dispute that they have entered into commercial agreements

with vendors whereby ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████ D.I. 348 at 17-19.

Defendants attempt to obscure their principal role by using the passive voice, but this fails.

In Defendants' example, "the customer selects a Ryanair flight that is shown on Booking.com; ███

████████████████████████████████████████████████████████████████; . . . the

████████████████████████████████████████████████████████████████████████████

███████ D.I. 335 at 22. But even using the example hand-picked by Defendants, the facts are

clear: (1) Booking maintains a website that offers Ryanair flights for purchase to its customers; (2)

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████ D.I. 348 at 18. Indeed, without Booking's inducement, direction, and encouragement,

Etraveli would not have accessed the Ryanair Website to obtain that flight at all. Hemann Dec. Ex.

30 at 10-11. Blaming this on third parties is transparent gamesmanship and should be rejected. D.I.

105 at 7-14 ("Numerous courts have recognized that vicarious or indirect liability under § 1030(g)

extends to parties who direct, encourage, or induce others to commit acts that violate the statute.");

*see also Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016) ("Once

permission [to access a computer] has been revoked, technological gamesmanship or the enlisting of a third party to aid in access will not excuse liability" under the CFAA).

   c. *Defendants cannot redefine the vicarious liability standard to escape liability*

Faced with clear evidence that they have encouraged and induced their vendors' CFAA violations, Defendants attempt to impermissibly narrow the vicarious liability standard. *Compare* D.I. 335 at 19 (Defendants alleging "[v]icarious liability under the CFAA **requires active direction** of a third party concerning the alleged violative conduct") *with* D.I. 105 at 7 (Court order stating, "[n]umerous courts have recognized that vicarious or indirect liability under section 1030(g) extends to parties who **direct, encourage, or induce** others to commit acts that violate the statute.") (emphases added); *see also* D.I. 335 at 19 ("The only third party that participated in discovery—Etraveli—confirmed . . . that it **does not take direction** from Booking.com") (emphasis added). Defendants' attempt to redefine the law fails because it would strip all meaning from the words induce and encourage. Even if Defendants do not formally direct their vendors to act in a specific way (which is heavily disputed by Ryanair), Defendants are still vicariously liable because Defendants do not—and cannot—dispute that they induce and encourage their vendors to purchase specific Ryanair flights when Ryanair has put Defendants on notice multiple times that it does not allow OTAs to access their website and has invested heavily in code-based authentication mechanisms to prevent such unauthorized access. D.I. 76 at Exs. B, C, E.; D.I. 105 at 7-14; *see generally* D.I. 350 at ¶¶ 50-108.

Defendants try again to redefine the vicarious liability standard by arguing that liability attaches only if there is an influence "akin to, if not identical to, an agency relationship." D.I. 335 at 19. This argument failed at the motion to dismiss stage, and it fails again now. This Court has already held that "the existence of an agency (or master-servant) relationship is not necessary predicate for liability on a 'direct, encourage, or induce' theory." D.I. 105 at 13.

10

Finally, the cases relied on by Defendants are inapposite. In *Svanaco*, the plaintiff was a contractor that created the website for defendant MGI and charged MGI hourly for the work. *Svanaco, Inc. v. Brand*, 417 F. Supp. 3d 1042 (N.D. Ill. 2019). MGI hired co-defendant Brand to determine how many hours the plaintiff spent to create a website. Following Brand's review, MGI asked Brand if the plaintiff could be "shamed" into repaying the money MGI had paid plaintiff. *Id.* at 1049. Without further direction from MGI, Brand independently launched a Distributed Denial of Service ("DDOS") attack against plaintiff's website, giving rise to the plaintiff's CFAA claim. *Id.* at 1050-51. MGI never knew about, much less encouraged or induced Brand to launch, the DDOS attack or to take any action against plaintiff's website. The court denied the plaintiff's claim that MGI was vicariously liable for Brand's DDOS attack because Brand launched the attack entirely of his own accord, without *any* direction, encouragement, or inducement. *Id.* at 1060.

In *Alchem*, the court found that defendant NAN did not direct, encourage, or induce defendant Cage, NAN's employee, to access the plaintiff's computer system without authorization to steal sales leads because all NAN did was hire Cage as an employee and agree to pay Cage a commission on new customers she attracted. *Alchem Inc. v. Cage*, No. 2:20-cv-03142-JDW, 2021 U.S. Dist. LEXIS 202868, at *21-22 (E.D. Pa. Oct. 21, 2021) ("At most, NAN's commission policy encouraged or induced Ms. Cage to attract new customers on NAN's behalf. However, it is not reasonable for the Court to infer that in structuring Ms. Cage's compensation this way, NAN induced Ms. Cage to access Alchem's protected computers to steal its confidential information."). NAN never asked Cage to access the plaintiff's computer systems or even to attract plaintiff's customers, only to perform her normal job duties. *Id.*

While Defendants also agreed to pay their vendors a commission, that is where the similarity ends. In both *Svanaco* and *Alchem*, the defendants were not vicariously liable because

their co-defendants acted completely outside the scope of what the defendants asked them to do. Unlike in *Svanaco* and *Alchem*, Defendants are vicariously liable because their vendors do exactly what Defendants direct, induce, and encourage them to do: purchase Ryanair flights, in violation of the CFAA. *See* D.I. 348 at 17-19.[1]

    *d. Defendants' agreements with vendors cannot disclaim vicarious liability*



D.I. 335 at 20-21. Defendants' agreement-based arguments are irrelevant to the ultimate question of whether Defendants directed, induced, or encouraged their vendors to purchase Ryanair flights by accessing the Ryanair Website without authorization:

Booking and Kayak. Defendants allege that ███

It is irrelevant whether ███ What matters is that Defendants did direct, encourage, and induce their vendors to violate the CFAA, and then the vendors did as directed, encouraged, and induced. *See* D.I. 348 at 18.

Priceline & Agoda. Defendants claim that ███

---

[1] Defendants have asserted the common interest doctrine to withhold certain correspondence and related documents exchanged between Defendants and their vendors, which necessarily means the Defendants assert that the Defendants and vendors have an "identical (or at least substantially similar) in nature" legal interest, and that said interest is legal, not solely commercial. *Astellas US LLC v. Apotex Inc.*, No. CV 18-1675-CFC-CJB, 2021 WL 1518716, at *1 (D. Del. Apr. 8, 2021).

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Regardless, Ryanair need not

prove an agency relationship exists; this Court has held that vicarious liability extends beyond

situations where the parties are engaged in an agency relationship. *See* D.I. 105 at 12-14.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████. Again, Defendants are liable for what happened, not what could have happened.

Defendants' attempts to offload all the blame to their vendors fail for each the reasons

discussed here but also because ██████████████████████████████

████████████████████████████████████████████████

██████████████ Furthermore, it is nonsensical for Defendants to avoid vicarious liability

because the party receiving direction *could have* not carried out the direction, and Defendants point

to no support for such an argument.

    *e.   At least Booking is vicariously liable for the* ████ *attack on* ████████

Defendants separately argue that they are not liable for the █████████████ attack

because they do not directly access the Ryanair website. D.I. 335 at 22-23. Even if true, as explained above, Defendants are liable for the acts of their vendors on Defendants' behalf. *See supra* Section V.A.1.b. Defendants next argue that Booking is not responsible for the ███ attack because Ryanair was able to ████████████████████████████████████████████████ ████████████████████████████████ D.I. 335 at 23-24. Defendants' either misrepresent their role in the attack or do not understand the attack.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████ Fuga Dec. Ex. 6 at 85-86.

████████████████████████████████████████████████

██████████████ *Id.* ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ *Id.* ████████████████████████████

██████████████████████ *Id.*; Fuga Dec. Ex. 22 at 71:9-72:21.

On ████████████ Booking.com sold 254 Ryanair flights to its customers, each associated with a PNR code. Fuga Dec. Ex. 6 at 84-85. Booking produced these PNR codes to Ryanair, and ██████████████████████████████████████ *Id.* at 86-87. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████ . *Id.* at 86. ████████████████████████



[2] *Id.* at 87.

*Id.* at 85-86.

### 2. Defendants Access the Ryanair Website Without Authorization

Defendants argue that it is impossible for them to access the Ryanair Website without authorization–either directly or through vendors–because "no part of Ryanair.com is protected with a code-based authentication mechanism." D.I. 335 at 24 (cleaned up). This cannot be true, since the same code-based authentication mechanisms that Defendants deny exist are currently preventing them from accessing the Ryanair Website and selling Ryanair flights.[4] D.I. 335 at 3 n.1. As explained below and in Ryanair's Opening Brief (D.I. 348), ████████ the Ryanair

---

[2] ██████████████████████████████████ *See* Fuga Dec. Ex. 6 at 86-87.

[3] ██████████████████████████████████ *Id.* at 86 n.1.

[4] Even though Defendants are currently unable to access the Ryanair website, injunctive relief is warranted. Ryanair's current code-based authentication mechanisms offer only a temporary reprieve from Defendants' unauthorized access. As explained by Ryanair's expert, Anthony Vance, and Ryanair CTO, John Hurley, Ryanair and Defendants are engaged in a technological arms race where Ryanair continuously develops more sophisticated authentication gates, and Defendants–either directly or through vendors–continuously develop more sophisticated hacking techniques to bypass them. Hemann Dec. Ex. 43 at 13-14; Fuga Dec. Ex. 22 at 71:9-76:12; *see also AssociationVoice, Inc. v. AtHomeNet, Inc.*, Civil Action No. 10-cv-00109-CMA-MEH, 2011 U.S. Dist. LEXIS 1654, at *33 (D. Colo. Jan. 6, 2011) (holding injunction was warranted even though the defendants' "access may have been severed" because "Defendants have exhibited the willingness to engage in improper conduct to obtain protected information from its direct competitor …. There is nothing to indicate to the Court that Defendants will not engage in similar conduct in the future, if left to their own devices.").

Website is protected by code-based authentication mechanisms that revoke authorization for Defendants to access the Ryanair Website. *See infra* Section V.A.2.a.; *see also* D.I. 348 at 21-25.

    a. *Defendants violate the CFAA when they access any portion of the Ryanair Website, not just the myRyanair portion*

Defendants claim that they cannot violate the CFAA by scraping routes and fares because Ryanair does not lock this information behind the myRyanair login and because Ryanair's 30(b)(6) witness, John Hurley, conceded that Defendants do not need authorization to access the pre-myRyanair portions of the Ryanair Website. D.I. 335 at 25. Mr. Hurley's "concession" was in response to a question designed to induce Mr. Hurley into responding a certain way, and Mr. Hurley cannot opine on a question of law regardless. Hemann Dec. Ex. 1 at 23:1-5. As explained in Ryanair's opening brief, Complaint, discovery responses, expert reports, produced documents, and deposition testimony, Defendants violate the CFAA when they access any part of the Ryanair Website because this requires them to bypass code-based authentication mechanisms. D.I. 238 at 21-25; *see* Hemann Dec. Ex. 26 at 88-105. Mr. Hurley discussed these protections, at length, during his depositions. *See, e.g.*, Mao Dec. Ex. 3 at 65:9-77:18. Rather than acknowledge the volumes of evidence on record stating ███████████████████████████, Defendants cling to a single engineered soundbite.

Defendants also make much of the fact that the pre-myRyanair portion of the Ryanair Website is supposedly "public." *See* D.I. 335 at 1-6, 25, 27. This is the wrong analysis. The CFAA itself makes clear that Ryanair's claims do not hinge on any public/private distinction. The only section of the CFAA that even references a "nonpublic computer" is Section 1030(a)(3), which prohibits the unauthorized use of a "nonpublic computer of a department or agency of the United States" – which does not apply here. 18 U.S.C. § 1030(a)(3). None of the CFAA sections asserted by Ryanair require Defendants to access a "nonpublic" computer. They only require Defendants

to access a computer without authorization. *See* 18 U.S.C. §§ 1030(a)(2)(c) & (a)(5). The operative question is not whether Ryanair's Website is public; it is whether Defendants' access bypasses code-based authentication mechanisms. D.I. 105 at 24; *see also id.* at 32 ("If the information on the website is publicly available **without requiring users to authenticate themselves**, a violation of the terms of use or the defiance of a cease-and-desist letter will not give rise to liability under the CFAA.") (emphasis added). The evidence overwhelming shows that it does.

> b.  *Defendants violate the CFAA by bypassing myRyanair's account creation and password login requirements*

According to Defendants, "Ryanair's claim of 'unauthorized access' thus turns entirely on whether purchasing tickets on the payment page of Ryanair.com is made 'private' by requiring a myRyanair login." D.I. 335 at 25. As discussed in Ryanair's opening summary judgment brief, this is wrong both legally and factually. ████████ Ryanair Website is protected by ██████ authentication gates, and Defendants' access is unauthorized. *See supra* Section III, V.A.2.a.; D.I. 348 at 21-23. However, even if Shield did not exist, Defendants' access would still be unauthorized when they purchase tickets because Ryanair has implemented *additional* code-based authentication mechanisms to protect the myRyanair portion of the website. D.I. 238 at 23-25. Defendants' arguments fail to prove otherwise.

*First*, Defendants argue that myRyanair account creation is not a form of authorization because "any member of the public can presumptively create a myRyanair account." D.I. 335 at 25-26. Defendants liken myRyanair to "a locked door with a key-making machine built in, presumptively allowing anyone who comes to the door to make a key and enter." D.I. 335 at 26. Yet Defendants admit in the same paragraph that not just any member of the public can create a myRyanair account. *Compare* D.I. 335 at 25 ("**any member of the public** can presumptively create a myRyanair account"), *with id.* at 26 ████████████████████

17

████████████████████████ (emphases added).

Ryanair has invested heavily in code-based authentication mechanisms to ensure that only authorized users, ██████████████████████, can access the Ryanair Website, including the added protection of myRyanair. D.I. 238 at 23-25. To create a myRyanair account, a user must first provide an e-mail address ██████████████████████████. *Id.* ███████

████████████████████████████████████████████████████████████

██████████████████████████████████████████ Fuga Dec. Ex. 5 at 98:14-17; Fuga Dec. Ex. 13 at 87:19-21. This serves as a form of authentication because ███████████

████████████████████████████████████████. *See supra* Section III. As another layer of authentication, Ryanair sends a verification e-mail to the e-mail account the user provided to create the myRyanair account. D.I. 350 at ¶ 128(b). ████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████ *Id.* Thus, a user must affirmatively complete the verification email before a myRyanair account is created. *Id.* Following account creation, users may enter the myRyanair portion of the website only if they enter their correct login credentials. *Id.* These are exactly the types of code-based authentication mechanisms contemplated by the CFAA. *See* D.I. 105 at 22-23; *see also Facebook*, 844 F.3d at 1068; *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1195–96 (9th Cir. 2022).

Furthermore, Ryanair has recently implemented an additional account verification procedure that requires website users to verify their identity before they are allowed to purchase a flight. *See* https://corporate.ryanair.com/news/ryanair-launches-new-customer-account-verification-to-protect-customers-from-internet-scams/. The first time users attempt to book a flight, they are prompted to provide a driver's license, passport, or other form of identification

before they are allowed to proceed. *See* Mao Dec. at ¶¶ 2-34. By default, no user is allowed to book a flight until the user completes this step. *Id.* This new verification procedure represents yet another code-based authentication mechanism. *See* D.I. 105 at 22-23; *see also Facebook*, 844 F.3d at 1068; *hiQ Labs*, 31 F.4th at 1195–96.

Defendants' real criticism appears to be that Ryanair's code-based authentication mechanisms do not revoke authorization because they can be bypassed by hackers. *See* D.I. 335 at 25-26. However, the CFAA does not require that code-based authentication mechanisms be perfect at preventing unauthorized access. If a party violates the CFAA only when it bypasses an impenetrable access gate, it would be impossible to violate the CFAA because either an unauthorized user is blocked and there is no access, or an unauthorized user gains access and this is evidence that the gate is insufficient. This, obviously, would be untenable.

*Second*, Defendants argue that because a user can log in to myRyanair using Facebook, Google, or PayPal, myRyanair's login requirement is ineffective as an access gate. D.I. 335 at 25-26. Again, there is no "effectiveness" baseline in the CFAA for the reasons described above. And furthermore, this argument defies logic. Even using Facebook, Google, or PayPal, the user is still required to create a myRyanair account and log in with a username and password. These login requirements represent the exact type of authentication mechanism that is protected by the CFAA. *Facebook*, 844 F.3d at 1068 (finding Power Ventures accessed Facebook's computers without authorization in violation of the CFAA by logging in to a Facebook account without authorization). ████████████████████████

████████████████████████████████████

████████████████████████████████████

Hemann Dec. Ex. 28 at 19; Mao Dec. Ex. 7 at 129:3-131:22; D.I. 350 at ¶ 16(c)(v). The code-

based authentication mechanisms of myRyanair and Shield still apply; a user cannot bypass the myRyanair authentication by using Facebook, Google, or PayPal.

*Third*, Defendants try to impose a fabricated requirement that simply does not exist under the CFAA. *See* D.I. 335 at 26. According to Defendants, a "code-based authentication mechanism [must comprise] a preapproved list of individuals who are authorized to enter." *Id.* This "requirement" does not appear in the CFAA, this Court's previous Order, the cases cited by Defendants, or even in the cited portions of Defendants' self-serving expert report. This argument should be ignored. Even if Defendants' self-legislated requirement were the law, which it is not, myRyanair nonetheless satisfies the requirement: After a user creates a myRyanair account via email verification, each time a user thereafter inputs a myRyanair username and password,

████████████████████████████████████████████████████████

███████████████████████. D.I. 348 at 24-25.

### 3. Ryanair Has Met the $5,000 Threshold for a Private Right of Action

Any person who suffers a **loss** during any one-year period aggregating at least $5,000 in value has an express right of action under the CFAA. *See Buchanan v. Ingram Content Grp.*, No. 20-CV-2421, 2020 WL 5957618, at *2 (D.N.J. Oct. 6, 2020) (citing 18 U.S.C. § 1030(g)); 18 U.S.C. § 1030(c)(4)(A)(i)(I). Defendants conflate the CFAA defined term "loss" with the narrower concept of "technological harm" and improperly attempt to classify Ryanair's costs to detect, diagnose, and correct technological harms as "self-inflicted business processes." *See* D.I. 335 at 27-35. For example, Defendants argue that "Ryanair [has not] attributed to any Defendant alleged harm in the sum of $5,000 or more in a one-year period," even though there is no requirement to show $5,000 in *harm*. D.I. 335 at 28. As another example, Defendants argue "[n]early all of Ryanair's claimed harms are not technological harms caused by the alleged CFAA violation and thus are not 'loss' under the CFAA." D.I. 335 at 28; *see also id.* at 34.

Defendants are wrong; loss and technological harm are not the same thing. The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). On the other hand, the Supreme Court has described *technological harm* as "the corruption of files" and similar harms "of the type unauthorized users cause to computer systems and data." *Van Buren v. United States*, 141 S. Ct. 1648, 1660 (2021). Losses must "**focus** on technological harms," but losses are not themselves technological harms. *Id.* (emphasis added); *Goodman v. Goodman*, No. 21-CV-10902 (GHW) (RWL), 2022 U.S. Dist. LEXIS 230085, at *22 (S.D.N.Y. Dec. 21, 2022) ("Courts have found that plaintiffs can still meet the loss requirement through a 'damage assessment and/or remedial measures, even without pleading actual damage.'"). While technological harms may be inherently unquantifiable, losses are the quantifiable costs of detecting and addressing technological harms and stopping unauthorized access that could cause technological harm from occurring. *See id.*; *see also Brooks v. AM Resorts, LLC*, 954 F. Supp. 2d 331, 338 (E.D. Pa. 2013) (Losses include the "cost of remedial measures taken to investigate or repair the damage to the computer[.]"); 18 U.S.C. § 1030(e)(11).

There is no requirement that technological harm must have actually even occurred, since "the costs of investigating security breaches constitute recoverable 'losses,' even if it turns out that no actual data damage or interruption of service resulted from the breach." *Univ. Sports Publ'ns Co. v. Playmakers Media Co.*, 725 F. Supp. 2d 378, 387 (S.D.N.Y. 2010); *Health First, Inc. v. Hynes*, No. 6:11-cv-715-Orl-41KRS, 2014 U.S. Dist. LEXIS 201307, at *11 (M.D. Fla. Nov. 3, 2014) ("The plain language of the CFAA allows for the recovery of reasonable costs to the victim

even in cases where the investigation ultimately reveals no damage."); *Goodman*, 2022 U.S. Dist. LEXIS 230085, at *22.[5] As demonstrated in Ryanair's opening summary judgment brief, Ryanair has a private right of action because it has shown $5,000 in losses, and Defendants cannot prove otherwise by arguing that Ryanair has not shown $5,000 in unquantifiable technological harms. D.I. 348 at 8-16.

> a. *Ryanair has properly claimed its costs as losses under the CFAA*

Defendants assert in a footnote that "Ryanair has failed to limit nearly all of [its] claimed losses to those related to the ticketing/myRyanair part its website, despite that the Court already has held that the availability and non-ticketing parts of its website cannot support a CFAA claim." D.I. 335 at 29 n. 18 (citing D.I. 105 at 23-34). Both halves of this argument are wrong.

*First*, the Court never held, when ruling on Defendants' third motion to dismiss, that Defendants' access to the availability and non-ticketing portions of the Ryanair Website cannot support a CFAA claim. Defendants' access to the pre-myRyanair portions of the Ryanair Website was not at issue in Defendants' third motion to dismiss. *See generally* D.I. 105. The Court held only that allegations that a user accessed a website cannot support a CFAA claim if there is no allegation that users are not required to authenticate themselves. *Id.* at 21-25. With the benefit of discovery, Ryanair has now established that the entire Ryanair website, not just the myRyanair portion of the website, is protected by numerous code-based authentication mechanisms. D.I. 348 at 21-23. Since Defendants' (and their vendors') access to any portion of the Ryanair Website violates the CFAA, losses related to Defendants' access of any portion of the Ryanair Website are properly considered losses under the CFAA. *Id.*; 18 U.S.C. § 1030(g).

---

[5] Even if Ryanair were required to show technological harms have occurred, Ryanair has suffered clear technological harms from data corruption and, at least, the ███████████████ attack. *See* D.I. 348 at 12-13, 26; *see also supra* Section V.A.1.e.

*Second*, even if Ryanair were somehow required to limit its losses to only those related to Defendants' access of the myRyanair portion of the Ryanair Website, Defendants have failed to show that Ryanair has not done so. As explained below, all of Ryanair's claimed losses can be attributed entirely to Defendants' access of the myRyanair portion of the Ryanair Website.

myRyanair. Ryanair's costs to maintain the myRyanair portion of the Ryanair Website are necessarily limited to the myRyanair portion of the website.

Shield. Shield monitors ████████████████████████████████

Mao Dec. Ex. 1 at 35:19-36:14. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████. Hemann Dec. Ex. 26 at 101-103. █

████████████████████████████████████████████████████████

████████████████████████ *See id.* Therefore, all of Ryanair's Shield costs, ████████████████

████████████████████████████████████ are fairly attributed to Defendants' access of the myRyanair portion of the website. D.I. 348 at 8-9.

Digital Employee, Customer Service Agent, Online Verification, and In-Person Verification Costs. These costs relate to Ryanair's detection and correction of data integrity issues caused by Defendants' unauthorized access. ████████████████████████████████████████ Since these costs occur only when Defendants successfully access the myRyanair portion of the website, the costs to correct the resulting harm necessarily result from Defendants' access of the myRyanair portion of the website and are, therefore, CFAA losses. D.I. 348 at 12-14.

Ryanair's Business Intelligence Employees. Ryanair's business intelligence employees analyze data to (1) support Shield and (2) help correct the technological harms that occur when

Defendants book flights. As explained above, both Shield costs and costs to correct corrupted data resulting from completed bookings are costs fairly attributable to Defendants' access of the myRyanair portion of the website without authorization. D.I. 348 at 10.

New Relic, Cloudfront, AWS-WAF, and Navitaire. Ryanair has calculated a pro-rata share of these costs that can be attributed to Defendants' activity. *See* Hemann Dec. Ex. 41 at 56-61.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████ D.I. 348 at 10-12.

### b. *Ryanair's losses are not routine expenditures*

Ryanair's identified losses are not merely "costs related to basic website security," as Defendants disingenuously claim. D.I. 335 at 28. Defendants have misunderstood or mischaracterized each cost, or outright ignored evidence explaining how each cost is a CFAA loss.

Shield Hosting Cost and Software Development Costs. Shield is not a routine business cost; it is an in-house software solution developed by Ryanair specifically because there were no existing website protection tools that could fulfill its function. Hemann Dec. Ex. 27 at 49. Defendants argue that Ryanair's Shield costs are not losses because "Shield is a preemptive measure to block disfavored website traffic, not a 'respon[se] to an offense[.]" D.I. 335 at 29 (alterations in the original). There is no rule that a preemptive measure cannot also be a response to an offense. Shield is preemptive only in the sense that it is created in response to Defendants' and other OTAs' repeated, unauthorized access to the Ryanair website to stop any further unauthorized access. For example, in direct response to the ████████████████ attack, Ryanair ████████████████████████████████████████████████████████████████████. *See* Fuga Dec. Ex. 22 at 71:9-72:21. Defendants have continuously and relentlessly accessed the Ryanair Website without authorization, from at least September 2018 to November 2023. *See* D.I.

335 at 3 n.1; Hemann Dec. Ex. 31 at Ex. A; Hemann Dec. Ex. 33 at Ex. A; Hemann Dec. Ex. 35 at Ex. A; Hemann Dec. Ex. 37 at Ex. A. ▮▮▮▮▮▮▮▮▮▮ the continuous web traffic that comes from Defendants and stopping it from doing any further harm necessarily responds to that traffic. This is exactly the sort of cost contemplated by the CFAA. *See Goodman*, 2022 U.S. Dist. LEXIS 230085, at *22-23 ("Qualifying investigations 'identify evidence of a breach of computer security, assess any damage it may have caused, and determine whether any remedial measures [are] needed to resecure the network.'") (quoting *Reis, Inc. v. Spring11 LLC*, No. 15-CV-2836, 2016 WL 5390896, at *8 (S.D.N.Y. Sept. 26, 2016)). Tellingly, Defendants cite to just one footnote from an out-of-circuit case for the proposition that costs of implementing technological barriers such as Shield are not losses. *See* D.I. 335 at 30. Defendants' reliance on *hiQ* is misplaced because the $5,000 loss requirement was not even at issue in *HiQ*. *See generally hiQ Labs*, 31 F.4th 1180. In *hiQ*, a web scraper preemptively filed a motion for declaratory judgment that LinkedIn could not invoke the CFAA. *Id.* at 1188. The Ninth Circuit's footnote that "LinkedIn has not alleged that hiQ's scraping of public profiles caused any such technological harms" merely notes that the CFAA $5,000 loss requirement exists, then states the reality of the situation: LinkedIn never alleged any technological harms because it never filed a CFAA claim. *Id.* at 1195 n.12.

Furthermore, Defendants' argument that Shield operates only as a preemptive measure directly contradicts Defendants' own purported expert, Ms. Kelly, who testified that Shield ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* D.I. 335 at 29; Fuga Dec. Ex. 35 at 29-30 . Both Defendants and Ms. Kelly are wrong. Shield is ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



████████ Defendants admit that Shield, in addition to its function as an authentication mechanism, operates ████████████████████████████████████ so that Ryanair may initiate additional processes to ████████████████████ ████████████████ D.I. 350 at ¶ 17(g); D.I. 335 at 9-10 (████████████████████ ████████████████████████████████████████). There can be no real factual dispute; Shield costs are losses under the CFAA.

████████ Defendants claim that ████████ is a basic tool used to measure and maintain website performance. D.I. 335 at 30-31. Defendants ignore that while ████████ is used to monitor web performance, ████████████████████████████████████ ████████████████ D.I. 348 at 10-11. Ryanair has carefully separated out the portion of ████████ costs that are attributed to the Defendants from the costs that are not, and counted only the former costs as losses. D.I. 350 at ¶¶ 75-78.

████████████████ Defendants also misunderstand the role of ████████████ ████████ within Ryanair's website. Defendants claim that neither is "directed at investigating or remediating technological harm caused by OTAs" because ████████████████████████ ████████████████████████████████████████████████ ████████████████████████ D.I. 335 at 31. Defendants again ignore the fact that systems can have multiple functions. ████████████████████████████ ████████████████████████████████████████████ Fuga Dec. Ex. 5 at 132:6-16. ████████████████████████ ████████████████ Fuga Dec. Ex. 15 at 100:10-17; *see also* Fuga Dec. Ex. 5 at 132:6-20. ████████████████████████████████████████ ████████████ Fuga Dec. Ex. 14 at 37:19-39:11. Therefore, the costs to maintain

**these** functions are appropriately considered losses under the CFAA.

Defendants quote Mr. Lopata out of context. D.I. 335 at 31 ("Ryanair's own expert concedes [sic] 'is not appropriate to allocate' to OTAs" Ryanair's ▮▮▮▮ costs) (quoting Hemann Dec. Ex. 40 ¶ 99). Mr. Lopata actually states that since it would not be appropriate to allocate such ▮▮▮▮ operating costs, he only counted as losses the portion of Ryanair's ▮▮▮▮ cost that *could* be allocated to OTAs. D.I. 350 at ¶¶ 67, 69 ("Since the Defendants, in general, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, it is not appropriate to allocate this portion of the ▮▮▮▮ costs to OTAs. . . . By analyzing the data transfer volumes, both in-bound and out-bound, and considering ▮▮▮▮ contribution to these volumes, Ryanair have determined that ▮▮▮ of these costs are attributable to OTAs.").

▮▮▮▮ As explained in Ryanair's opening brief, Ryanair has had no choice but to scale its infrastructure of its website to avoid slowdowns caused by ▮▮▮▮▮▮▮. Fuga Dec. Ex. 14 at 147:22-148:12. By responding to Defendants' defenses in such a way, Ryanair is avoiding even greater damage, which may cause the website to slow down or stop working entirely. Therefore, the additional ▮▮▮▮ costs Ryanair has incurred to prevent slowdowns and shutdowns caused by increased OTA traffic are fairly counted as losses. D.I. 348 at 11-12.

Defendants also argue that Ryanair's ▮▮▮▮ costs to respond to OTA traffic cannot be losses because the Ryanair Website would still experience the same amount of traffic if those same customers book directly on the Ryanair Website instead of through OTAs. D.I. 335 at 31. This is wrong. First, the suggestion that customers would book directly on the Ryanair Website if Defendants did not access the Ryanair Website is pure speculation based solely on the self-serving report of their expert, Basil Imburgia – who is not qualified to make such a guess, as a damages expert. Mr. Imburgia states only that Mr. Lopata's report "does not even attempt to offer a reason

why the OTAs should be responsible for a cost that would be incurred whether the booking was made through the Ryanair website or an OTA. Hemann Dec. Ex. 44 ¶ 73.  But Mr. Imburgia is wrong that Ryanair would incur the same cost if all of Defendants bookings were instead made on the Ryanair website. When Defendants were unable to access and sell Ryanair flights, ██████ ████████████████████████████████████████████████████████, which is logical since ██████users utilize the Ryanair Website in a much different manner than the ███████████████████ Defendants or Defendants' vendors, ███████████████ ████████████████████████ *See* https://www.independent.ie/business/irish/ryanair-shares-tumble-after-online-travel-agents-stop-selling-its-tickets/a208167301.html;  *see also supra* Section V.A.1.e. ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████

myRyanair. Defendants argue that the costs for developing and operating myRyanair are not losses because myRyanair was created to provide convenience for consumers. Once again, Defendants ignore that one system can have multiple functions. As explained in Ryanair's opening brief, ████████████████████████████████████████████████████████ ██████████████████████████████████ Defendants once again argue that such gatekeeping functions are not loss under the CFAA, but that argument fails for the reasons discussed above. *See supra* Section V.A.2.b.

Online Customer Verification and In-Person Customer Verification Costs. Defendants argue that "Ryanair's efforts to supposedly 'correct[] the fake and incorrect data the Defendants input into the Ryanair Website due to their unauthorized access' are not 'loss' under the CFAA" because "[t]hey are not a response to any technological harm but are self-inflicted business

processes that attempt to deter customers' use of OTAs." D.I. 335 at 33. Defendants' argument is obstruse and consists only of Defendants' unsubstantiated theories, but Defendants' point seems to be that their unauthorized access is not responsible for the corrupted data in Ryanair's databases because that data is not "incorrect." *See* D.I. 335 at 33 n.33. As explained further in Ryanair's opening summary judgment brief, Defendants' argument (as well as their customer data) is incorrect. Ryanair issues refunds to the original method of payment and contacts passengers via the e-mail used to book a flight to inform them about information that may impact their bookings. D.I. 348 at 12-13. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████  D.I. 348 at 12-13; *see* https://www.easa.europa.eu/en/the-agency/faqs/what-i-need-take-account-arriving-airport;                    https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32004R0261; *see generally* Fuga Dec. Ex. 7 at 5-16. Defendants' unauthorized access introduces corrupted data into Ryanair's databases, and the costs to investigate and correct such data corruption are properly counted as CFAA losses. *Svanaco*, 417 F. Supp. 3d at 1059 ("[W]asted or diverted employee time [to respond to attacks] falls squarely under the CFAA's definition of loss."); *see also Facebook*, 844 F.3d at 1066 ("It is undisputed that Facebook employees spent many hours, totaling more than $5,000 in costs, analyzing, investigating, and responding to [defendant]'s actions. Accordingly, Facebook suffered a loss under the CFAA."); *United States v. Millot*, 433 F.3d 1057, 1061 (8th Cir. 2006) (holding that salaried employees' time qualifies as a loss under the CFAA because "the hours spent by [employees] addressing the issues caused by [defendant]'s unauthorized intrusion could have been spent on other duties under the contract").

29

<u>Customer Service, Business Intelligence, and Digital Employees</u>. Defendants argue that Ryanair's customer service, business intelligence, and digital employees do not spend time responding to technical harm, but instead engage in anti-OTA business efforts. This is false. As explained in Ryanair's opening summary judgment brief, ████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████. D.I. 348 at 10, 14. The costs to perform these tasks are properly counted as losses. *See supra* Section V.A.3.a. Defendants also argue that Ryanair has failed to substantiate any of its employee costs beyond speculation, but Defendants' reliance on *Glob. Policy Partners* is distinguishable. In *Glob. Policy Partners*, the court rejected personnel-related costs as CFAA losses because the plaintiff did not offer **any** evidence for those costs while, importantly, acknowledging that time spent responding to an offense *is* a CFAA loss. *Glob. Policy Ptnrs, LLC v. Yessin*, 686 F. Supp. 2d 642, 651 (E.D. Va. 2010) ("[T]ime spent 'responding to an offense' appears plainly to fall within the CFAA's understanding of 'loss.' . . . Yet, because plaintiffs do not adduce evidence to prove (i) that this loss occurred and (ii) that its occurrence was a reasonably necessary consequence of the alleged CFAA violations, these alleged losses do not count toward the $5,000 CFAA threshold."). Here, Ryanair has presented evidence describing the function of each and every digital and business intelligence employee, documentation of each employee's salary, and an explanation of how the amount of each employee's time spent addressing OTA issues was calculated. Mao Dec. Ex. 8 at 3-5; Fuga Dec. Ex. 6 at 28-30; Fuga Dec. Ex. 14 at 16:14-19:2, 29:4-33:10. With respect to customer service agents, Ryanair explained how it calculated and attributed as loss only the portion of time spent correcting corrupted data caused by Defendants. Fuga Dec. Ex. 6 at 30, 34-35, 37-38. Therefore, Ryanair's costs from

responding to Defendants' offense clearly count as loss under the CFAA. *Glob. Policy Ptnrs*, 686 F. Supp. 2d at 651.

       *c.  Ryanair has suffered losses in excess of $5,000 due to each Defendant's actions*

Finally, Defendants claim that "Ryanair has not attributed $5,000 or more of loss in a single year to any Defendant" due to vague unverified costs. While it is not entirely clear why Defendants take issue with the losses attributed to Booking and Kayak, Defendants seem to be rehashing their failed arguments instead of making new ones. *See* D.I. 335 at 35 (citing the "myriad reasons" found in Section II.C.4.a of their brief but not providing any new reasons). For the reasons already provided, those arguments fail. Ryanair's well-documented costs establish that Booking and Kayak are each responsible for well over $5,000 in loss in a one-year period. D.I. 348 at 8-16.

With respect to Agoda and Priceline, Defendants incorrectly claim, by citing to certain portions of Mr. Lopata's expert report, that "Ryanair admits it cannot make this [$5,000] showing." D.I. 335 at 35 (citing Ex. 40 ¶¶ 161, 176-182). However, all Mr. Lopata's report states is that Mr. Lopata could ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ D.I. 348 at 9-10, 15. As Ryanair has explained, █

████████████████████████████████████████████████████████ *See, e.g.*, Hemann Dec. Ex. 26 at 9. Therefore, all of Ryanair's annual Shield costs can be attributed to each Defendant individually.

### 4.  Defendants' Request for Judgment on Conspiracy Should Be Denied

Defendants argue that there is *no* evidence for conspiracy under 18 U.S.C. Section 1030(b) other than their contracts with the Defendants' vendors, but this is wrong. "A claim under [CFAA] section (b) requires evidence of an agreement and common activities in furtherance of the unlawful act." *Welenco, Inc. v. Corbell*, 126 F. Supp. 3d 1154, 1176 (E.D. Cal. 2015) (citations omitted).

The mere operation of the Defendants' websites reflect agreement with each other and their contracted vendors to not only continue their conspiracy to access the Ryanair Website without authorization but also facilitate that unauthorized access. The Defendants and their vendors are collaborators. This agreement to commit conspiracy is formalized in their agreements. The common activity element is satisfied by Defendants displaying and offering Ryanair flights for sale on their respective websites and then directing their vendors to book the Ryanair flights via unauthorized means.

The Defendants' respective websites are evidence of an agreement to support conspiracy under the CFAA. *See Welenco, Inc.*, 126 F. Supp. 3d at 1176. For example, Defendants offer Ryanair flights for sale on their websites; customers initiate booking flights through the Defendants' websites; Defendants direct, induce, or, at least, encourage their vendors to access the Ryanair Website ███████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████; and the vendor proceeds unlawfully accesses the Ryanair website by booking the flight that Defendants directed it to book. *See* Hemann Dec. Ex. 30 at 8-12; Hemann Dec. Ex. 32 at 8-10; Hemann Dec. Ex. 34 at 8-9; Hemann Dec. Ex. 36 at 10-16. In some situations, ██████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ █████████████████████████████ If there were no agreement between the Defendants and their vendors, the integration between the parties could not function because it requires integration. *See* Hemann Dec. Ex. 30 at 8-12; Hemann Dec. Ex. 32 at 8-10; Hemann Dec. Ex. 34 at 8-9; Hemann Dec. Ex. 36 at 10-16. The agreement for conspiracy is also reflected in the

undisputed agreements between the Defendants and their vendors, and in some cases agreements among Defendants. *See, e.g.*, Hemann Dec. Ex. 30 at 8-10; Hemann Dec. Ex. 32 at 7-8; Hemann Dec. Ex. 34 at 7; Hemann Dec. Ex. 36 at 7-8.

Defendants claim that they are merely passive recipients of the functionality to book Ryanair flights from third parties, but the evidence undermines this claim. For example, 

. Defendants have made the conscious decision to participate in this conspiracy.

Defendants engage in concerted efforts with each other and their vendors to access the Ryanair website for flight information, and each Defendant is committing unauthorized access of the Ryanair website when booking a Ryanair flight. *See Welenco, Inc.*, 126 F. Supp. 3d at 1176.

and Defendants cannot feign negligence at least since the filing of this lawsuit. Mao Dec. Ex. 11 at BOOKING.COM00000683. Each booking is the result of unauthorized access, and Defendants continue to conspire to book Ryanair flights but for Ryanair's recent success in blocking their access. *See* Fuga Dec. Ex. 22 at 72:23-74:21; D.I. 335 at 3 n.1

Defendants' cited case law fails to support their argument. *United States v. Carbo* is a case about conspiracy to commit honest services mail fraud. 572 F.3d 112, 113 (3d Cir. 2009). *United States v. Falcone* is a case about conspiracy to violate revenue laws and was decided over 40 years before the CFAA was enacted. 311 U.S. 205, 206 (1940). *Metro-Goldwyn-Meyer Studios Inc. v. Grokster, Ltd.*, is a case about copyright infringement. 545 U.S. 913, 918-19 (2005). None of these cases relate to conspiracy under the CFAA; rather, the appropriate case law for establishing conspiracy under the CFAA is *Welenco, Inc.* and the cases on which it relies.

Accordingly, Defendants' request for judgment on Ryanair's conspiracy claim (Count V) under Section 1030(b) of the CFAA should be denied.

## 5. Defendants' Request for Judgment on Fraud Should Be Denied

The record *does* show that Defendants "knowingly and with intent to defraud, accesse[d] a protected computer without authorization, or exceed[ed] authorized access, and by means of such conduct further[ed] the intended fraud and obtain[ed] anything of value." 18 U.S.C. § 1030(a)(4).

Defendants knowingly access the Ryanair website and knowingly do so without authorization. *See supra* Section V.A.2. For example, Defendants have provided PNR codes showing countless examples where Defendants have made bookings through the Ryanair website. Hemann Dec. Ex. 31 at Ex. A; Hemann Dec. Ex. 33 at Ex. A; Hemann Dec. Ex. 35 at Ex. A; Hemann Dec. Ex. 37 at Ex. A. Defendants' only defense is that they "do not *directly* access Ryanair's website at all, let alone knowingly," because they are clearly accessing the Ryanair website through their contracted third parties. D.I. 335 at 37 (emphasis added). But Section 1030(a)(4) does not require that a party "directly" access a protected computer. Courts have been clear that a defendant may be liable under the CFAA for unauthorized access by a third party. *See supra* Section V.A.1. This case is no different. Defendants are liable for directing their vendors to access the Ryanair website. *See supra* Section V.A.1.

34

Defendants argue that the definition of "intent to defraud" from other circuits should apply. D.I. 335 at 37. However, the New Jersey District Court – in this circuit – has already adopted the *Shurgard* definition of fraud: "the CFAA's use of 'fraud' simply means wrongdoing and not proof of the common law elements of fraud." *Volpe v. Abacus Software Sys. Corp.*, No. CV2010108RMBKMW, 2021 WL 2451968, at \*5 (D.N.J. June 16, 2021) (citing *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1126 (W.D. Wash. 2000)); *see Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1131 (E.D. Cal. 2008). As *Volpe* explains, "[t]he Third Circuit has neither adopted nor rejected this definition [from *Shurgard*]. But it has been widely adopted by district courts across the country." *Volpe*, 2021 WL 2451968, at \*5 (collecting cases and further noting legislative intent). Adopting *United States v. Starr*, as argued by the Defendants, is inappropriate because *Starr* expands on fraudulent intent in the context of mail fraud and wire fraud, not the CFAA. 816 F.2d 94, 98 (2d Cir. 1987). Regardless, even under a stricter standard, the elements have been met, as Defendants have had ample knowledge for years that their actions harm Ryanair, and they continue to act knowing the intended harm will result.

Defendants acted with an intent to defraud because they furthered their unauthorized access of the Ryanair website (the "wrongdoing") by contracting and █████████████████████ ██████████████. *See* Hemann Dec. Ex. 30 at 8-12; Hemann Dec. Ex. 32 at 7-10; Hemann Dec. Ex. 34 at 7-9; Hemann Dec. Ex. 36 at 7-8, 10-16. Defendants admit to displaying Ryanair flights for purchase and providing customer and flight information they collect to their vendors, directing them to book flights through the Ryanair website. *Id.*

Defendants do not address the "obtain[ed] anything of value" element of § 1030(a)(4). However, it is undisputed Defendants are committing their unauthorized access to obtain a thing

of value (Ryanair flights and flight information), which are sold to Defendants' customers. *See Volpe*, 2021 WL 2451968, at *6.

Accordingly, Defendants' requested judgment on Ryanair's fraud claim (Count II) under Section 1030(a)(4) of the CFAA should be denied.

### 6. Ryanair Is Entitled to Injunctive Relief

According to Defendants, Ryanair cannot show irreparable harm or the absence of an adequate remedy at law, and injunctive relief is not warranted, because Ryanair is paid for its airline tickets. D.I. 335 at 38 (citing *TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019)). Defendants are wrong on both counts. Lost ticket sales are not the only source of harm stemming from Defendants' unauthorized access. As explained above, Defendants introduce corrupted data to Ryanair's databases, ████████████ have played a part in direct attacks █████████ ███████ attack that rendered the Ryanair Website inoperable, and prevent Ryanair from being able to refund and contact its own customers. *See supra* Section V.A.1.e. These harms irreparably damage Ryanair's reputation in the airline industry and with its customers. *See Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782 (N.D. Cal. 2017), aff'd, 749 F. App'x 557 (9th Cir. 2019) ("Numerous courts have found that unauthorized access of computers and the acquisition of data in violation of the CFAA constitute irreparable harm.").

There is no other adequate remedy other than an injunction where there is a "reasonable likelihood of defendant's future violations," as here. *See Facebook*, 252 F. Supp. 3d at 782. Defendants have continually accessed the Ryanair Website without authorization for years, including during the pendency of this lawsuit, to corrupt Ryanair's data and cause Ryanair's systems to slow down. *See, e.g.*, Hemann Dec. Ex. 26 at 35-48, 51-56, 59-63, 74-78; Hemann Dec. Ex. 31 at Ex. A; Hemann Dec. Ex. 37 at Ex. A. Unless an injunction is issued, they will continue to attempt to engage in similar acts in the future. *See AssociationVoice*, 2011 U.S. Dist. LEXIS

1654, at \*33 (holding injunction was warranted even after defendants' actions ceased).

## B.  THE TESTIMONY OF IAIN LOPATA SHOULD NOT BE EXCLUDED

### 1.  Lopata Was Never Offered as, or Intended to Be, a Damages Expert

Lopata was not offered as a damages expert; he writes in his report that he is not a damages expert; he testified at his deposition that he is not a damages expert; and he does not opine on Ryanair's damages. *See* Hemann Dec. Ex. 40 at ¶ 28; Fuga Dec. Ex. 15 at 228:11-18. Lopata is a cybersecurity expert set to opine, in part, on which of Ryanair's cybersecurity costs could be classified as losses, as that term is defined in the CFAA. *See generally* D.I. 350. Despite this objective reality, Defendants seek to exclude Lopata's opinion on Ryanair's losses by intentionally conflating two distinct concepts: CFAA loss and legal damages. The Court should disregard Defendants' arguments that Lopata did not perform a proper damages analysis because Lopata is not, and has never purported to be, a damages expert.

The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Courts have explained that "a 'loss' of $5,000 [under the CFAA] is only a threshold inquiry that once met opens up the door to a broader category of compensatory damages." *New York Pizzeria, Inc. v. Syal*, 56 F. Supp. 3d 875, 879 (S.D. Tex. 2014) (citing *Frees, Inc. v. McMillian*, 2007 WL 2264457, at \*4–6 (W.D. La. Aug. 6, 2007)). Thus, if Lopata were opining on damages, he would have opined on lost profits, for example, or calculating harm to Ryanair's reputation and goodwill. That is not his role, nor was it ever intended to be. In fact, Lopata explicitly declined to calculate the impact of costs that could fairly be considered Ryanair's damages but not Ryanair's losses. *See, e.g.*, Hemann Ex. 40 at ¶ 99. Defendants have paid Mr. Imburgia $1,325 per hour to write

nearly 70 pages explaining how a damages expert would calculate Ryanair's damages, but none of that testimony is helpful to answer the relevant question of whether Mr. Lopata acted as a proper technical expert, and none of that rebuts Mr. Lopata's technical analysis.[6]

Lopata's cybersecurity expertise is instead applied to determine what defenses Ryanair has implemented to prevent unauthorized access; whether Defendants book Ryanair flights through the Ryanair Website by bypassing Ryanair's code-based authentication mechanisms; and which of Ryanair's cybersecurity costs were incurred to identify, prevent, and correct unauthorized access by OTAs, generally, and Defendants, specifically. *See* Hemann Dec. Ex. 40, at ¶¶ 27-28. Defendants claim Lopata is opining on damages because Lopata occasionally uses the word "damages" in his report when referring to Ryanair's costs. However, a closer look reveals that Lopata uses "damages" as an informal term for costs of addressing technological harms, not as a formal legal term. *See New York Pizzeria, Inc.*, F. Supp. 3d at 879. While Lopata's report does have a minor quantitative aspect, Lopata does not need to be a damages expert to multiply numbers by a percentage or add Ryanair's applicable costs. Lopata's expert report is not faulty simply for "performing basic math," as Defendants contend. D.I. 335 at 42. Rather, Lopata's math is ancillary to his foundational expert opinion, which is, in part, identifying which costs are applicable. The math is simply the last step to provide a number; Lopata's expertise is applied to the analysis leading up to the math.

Defendants cite to *Depalma* and *Allscripts* to illustrate their agreement that Lopata does not need to be a damages expert to do simple arithmetic. In *Depalma* counsel for the plaintiffs offered a summary chart to "summarize[] the information contained in the voluminous but

---

[6] Defendants implicitly concede that Mr. Lopata's opinions relate to cybersecurity, not damages, since they retained "Jordan Kelly, former Director of Cyber Incident Response on the National Security Council at the White House" (D.I. 335 at 39-40), to rebut Mr. Lopata's technical opinions.

independently admissible Exhibits 14 and 15." *Depalma v. Scotts Co.*, 2019 WL 2417706, at *7 (D.N.J. June 10, 2019). In *Allscripts* the expert merely used payroll data (the hours worked by Allscripts's employees and the pay rates for Allscripts's programmers) to calculate an average pay rate for Allscripts's programmers. *Allscripts Healthcare, LLC v. Andor Health, LLC*, 2022 WL 3021560, at *19 (D. Del. July 29, 2022).

Where Lopata's expert report goes beyond a juror's common understanding is his opinion on "damage" and "losses" as defined by the CFAA, which does require specialized knowledge. *See Allscripts Healthcare, LLC*, 2022 WL 3021560, at *19 (citing *CareDx, Inc. v. Natera, Inc.*, 2021 WL 1840646, at *3 (D. Del. May 7, 2021). "Loss" under the CFAA requires an understanding of "any *reasonable* cost to any victim" (18 U.S.C. § 1030(e)(11) (emphasis added), which requires a specialized knowledge of responding to unauthorized access prohibited by the CFAA. "Damage" under the CFAA requires an understanding of "any impairment to the integrity or availability of data, a program, a system, or information" (18 U.S.C. § 1030(e)(8)), which also requires a specialized understanding of computer systems outside a juror's common knowledge. *See Allscripts Healthcare, LLC*, 2022 WL 3021560, at *19. Lopata provides his specialized knowledge to opine on loss and damage under the CFAA from his 40-year career that included decades of computer software design, implementation, project management, and managing project financials. D.I. 350 at ¶¶ 1-7; Hemann Dec. Ex. 9 at 57:9-24.

Defendants' misunderstanding of Lopata's role leads to another misguided argument: that Lopata's methodology is supposedly flawed because Lopata failed to consider Ryanair's offsetting revenues when calculating losses. *See* D.I. 335 at 43-44. This contention only serves to highlight the flaws in Defendants' approach, not Lopata's. The plain language of the CFAA makes clear that calculating "loss" exclusively involves counting the costs that were incurred to identify,

prevent, and correct a CFAA offense. *See* 18 U.S.C. § 1030(e)(11). For good reason, the CFAA's definition of loss makes no mention of offsetting against revenues, profits, or windfalls. The Supreme Court has made clear that losses must relate to "technological harms," and costs such as those spent "to remediat[e] 'misuse' of sensitive information" are explicitly excluded. *Van Buren*, 141 S. Ct. at 1660. It would defy logic for the CFAA to forbid plaintiffs from counting non-technological costs as losses while simultaneously allowing defendants to offset non-technological profits against losses. Defendants cite to no authority because there is simply no requirement to offset revenues or profits when calculating losses (i.e., determining if there is jurisdiction) under the CFAA. Even if an offset were part of the calculation (which it's not), revenue from flights sold on Defendants' websites is not a proper offset because the result of Ryanair successfully ██████ ███████████████████████████████████████████████ would result in *no* revenue from Defendants. Revenue from Defendants' sales is not a result of Ryanair's efforts to block OTAs but in spite of them.

Defendants' citation to *Nordetek* for its offset argument is inapposite. *Nordetek* is unrelated to the CFAA and stands for the unremarkable proposition that compensatory damages are not designed to award a windfall but instead to make the plaintiff whole. *Nordetek Env't, Inc. v. RDP Techs., Inc.*, 862 F. Supp. 2d 406, 418-49 (E.D. Pa. 2012). None of that is relevant to this case. Lopata offers no testimony about money supposedly owed from Defendants to Ryanair *at all* (let alone a windfall), because his report is not a damages report. Lopata's report assesses *costs* incurred by Ryanair to meet the CFAA threshold and takes no position whatsoever on whether, or how much, monetary damages Defendants might owe Ryanair if Ryanair were to succeed in its claims.

## 2. Lopata's Testimony Is Reliable and Admissible

"Where there is a logical basis for an expert's opinion testimony, the credibility and weight

of that testimony is to be determined by the jury, not the trial judge." *Integra LifeSciences Corp. v. HyperBranch Med. Tech., Inc.*, No. CV 15-819-LPS-CJB, 2018 WL 2551053, at *1 (D. Del. May 8, 2018) (quoting *In re TMI Litig.*, 193 F.3d 613, 713 (3d Cir. 1999) *amended*, 199 F.3d 158 (3d Cir. 2000)). Lopata has significant experience in computer software implementation including serving on the advisory board since 2012 of an IT security services and IT managed service provider company. D.I. 350 at ¶¶ 1-6. This specialized knowledge provides the logical basis for his expert opinion testimony when determining what is loss and damage under the CFAA. Lopata does not have an "unblinking reliance" or "parrot[] Ryanair's inputs" (D.I. 335 at 43) but rather evaluates the systems' and processes' applicability as a loss or damage. *See e.g.,* D.I. 350 at ¶¶ 50-51, 55, 59-60, 63, 66-67, 72-73, 81, 86-87, 91-93, 103. Further, Lopata ran his own tests, reviewed invoices and other primary source documents, and conducted his own interviews of key individuals at Ryanair to arrive at his opinions. D.I. 350 at ¶¶ 20-37, 59. There is no prohibition on an expert relying on interrogatory responses, as Defendants suggest. *See* D.I. 335 at 42. Experts are not required to have "personal experience" with the events of the litigation and may rely on a party's own "account of factual events that the experts themselves did not observe" as well as interrogatory responses. *See Tormenia v. First Invs. Realty Co.*, 251 F.3d 128, 135-136 (3d Cir. 2000). Defendants may challenge Lopata's assumptions at trial, but an expert relying on a party's statements and interrogatory response to form his opinion is not grounds for exclusion "[u]nder the liberal standards of Rule 702." *Id.* at 136.

Defendants argue that Lopata is not reliable as an expert because of an error in a cost calculation stemming from a single incorrect data point from Ryanair on which he relied. D.I. 335 at 40, 43. Ryanair's team initially provided Lopata with an estimated dollar amount ████████

████████████████████████████████████████████████████████████

███████████████. *See* Mao Dec. Ex. 1 at 118:11-21. After the error was discovered, Lopata

submitted a supplemented an amended report to correct this data error. *See generally* Hemann Dec.

Ex. 41. *Crowley* explains that:

> *Daubert* does not require that an expert's testimony be excluded simply because he
> admitted and corrected his own mistakes or retracted his false statements. In fact,
> one of the very purposes of a *Daubert* hearing, discussed above, is to give experts
> a chance to explain and even correct errors that they made in their reports. . . . There
> is no stigma attached to such error correction, nor should there be. If anything, it
> strengthens the quality of the expert report.

*Crowley v. Chait*, 322 F. Supp. 2d 530, 540 (D.N.J. 2004); *see also Bombin v. Sw. Airlines Co.*,

No. 5:20-CV-01883-JMG, 2023 WL 2647861, at *8 (E.D. Pa. Mar. 27, 2023) (citing *Crowley* and

holding the expert's "willingness to correct certain aspects of his report based on additional

information provided by [defendant] and its expert will not bar his testimony and opinion"). An

error in Lopata's report – which was not even his miscalculation – that was quickly corrected does

not cut against his reliability as an expert but rather, as the court in *Crowley* explains, strengthens

the quality of his report.

### 3. Lopata's Cybersecurity Opinions Should Not Be Excluded

Defendants grossly overstate Lopata's deposition testimony and fail to provide necessary

context when they claim that "Lopata conceded his Test B failed." D.I. 335 at 44. Test B involved

Lopata  attempting  ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████  Hemann Dec. Ex. 41 at ¶¶ 41-42, *see generally id*.

at ¶¶ 63-68. During Lopata's deposition, Defendants questioned whether Test B showed that ███

████████████████████████████████████████████████████████

█████████████████████████████████████████ *See* Mao Dec. Ex. 7 at 192:17-207:21.

But Lopata pointed out that the alterative is ███████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████. *Id.* at 204:10-24. Thus, Lopata

"maintain[ed] the same opinion" when asked if Booking.com engaged in ███████████████

███████. Mao Dec. Ex. 7 at 202:8-18. Further, Defendants' question about Test B applied only to

███████████████ Booking.com; Test B also evaluated Ryanair bookings on the Kayak and

Agoda websites – but Defendants never questioned those. *See* Hemann Dec. Ex. 41 at ¶ 67(5).

Further, subsequent to Lopata's Test B, it was confirmed by matching PNR codes with

███████data on Ryanair's systems that every single Booking reservation was made through the

████████████████████████████████████████████████████████████████████████

███████████████ *See* Fuga Dec. Ex. 6 at 83-84. Thus, this later testing proved Lopata's Test B

hypothesis through alternate means – that is, that nearly all of Defendants' bookings were ████

███████████████████████████████.[7] *Id.* It is not that Lopata's test failed, but that a ██████

████████ did not illustrate the point as clearly as intended. This matters little, if at all, since Lopata's

point was proven through alternative tests.

Defendants request that *all* of Lopata's opening cybersecurity opinions be excluded based

solely on Lopata's Test B analysis, which was ultimately proven to be correct. D.I. 335 at 44. None

of Lopata's opinions should be excluded as Test B did not "fail," but Defendants try to exclude a

broad category of opinions that are unrelated to Test B. Defendants cite to Paragraphs 27(c)-27(e),

29, 31, 38-68, 70 in Lopata's Amended and Supplemented Report as supposed examples of

---

[7] This means of confirmation was not available to Lopata because Booking provided incorrect
PNR data for months and did not correct its incorrect data until after the close of discovery.

resulting opinions from Test B—but the majority of these sections are unrelated to Test B. For example:



Hemann Dec. Ex. 41 at ¶¶ 27(e), 29, 31, 38-70. Neither Lopata's Test B nor resulting opinions should be excluded – and certainly Lopata's opinions wholly unrelated to Test B should not be excluded. *See Tormenia*, 251 F.3d at 135 ("[C]halleng[ing] perceived weaknesses in assumptions" is appropriate for cross-examination of an expert, not exclusion under Rule 702).

### 4. Lopata's Rebuttal Report Should Not Be Excluded Because of Defendants' Delay in Producing Link-Out Booking Data

Defendants have no basis for striking any of Lopata's rebuttal opinions. First, it matters little that the purpose of Lopata's Test A was to test ███████████████████ and that Lopata also concluded that ████████████████████████████. *See* D.I. 335 at 45. Just because the test had one stated purpose does not mean Lopata cannot deduce additional findings from the test, and Defendants can cite no support for such a rule.

Second, Lopata's rebuttals to Defendants' expert Jordan Kelly are proper. It is manifestly unjust for Defendants to argue that Lopata should have raised Kayak's link-out bookings sooner (and should be precluded from "belatedly" raising it in a rebuttal report) when it was *Defendants' delay* that made it impossible for Lopata to raise the issue sooner. Kayak refused to produce link-out data until ordered by the court on September 25, 2023. *See* D.I. 265. Kayak subsequently

produced the link-out booking data on September 27, 2023 nearly one month after the August 31, 2023 deadline to serve opening expert reports. As Lopata makes clear in his rebuttal, Kelly's opinions are flawed because they fail to account for a transactional volume of link-out bookings that is forty times higher than what Kelly relies on to form her opinion. Hemann Dec. Ex. 42 at ¶ 113. Defendants claim it is improper for Lopata to "introduc[e] new theories and evidence unresponsive to Kelly's opinions. D.I. 335 at 45. But a rebuttal expert "may rely upon new evidence and opinions to rebut [the other expert's] opinions." *Haskins v. First Am. Title Ins. Co.*, No. CIV.A. 10-5044 RMB, 2013 WL 5410531, at *4 (D.N.J. Sept. 26, 2013). Moreover, Lopata is not offering some new theory but rather pointing out the flaws of Kelly's opinions and her failure to account for a massive amount of data that Defendants produced after the deadline.

Third, Defendants attack Lopata's methodology via scattered barbs disconnected from their context, calling his approach "cavalier." D.I. 335 at 46. But the credibility and weight of Lopata's testimony is not for Defendants or the Court to judge and is not proper grounds for excluding testimony; rather, it is for the jury to decide whether Lopata's methodology is "cavalier" or not. *Integra LifeSciences Corp.*, 2018 WL 2551053, at *1.

Defendants have failed to provide any basis for excluding Lopata's testimony, and their motion should be denied.

## C.  THE TESTIMONY OF ANTHONY VANCE SHOULD NOT BE EXCLUDED

### 1.  Vance Provides a Proper Rebuttal Expert Report Under Rule 26

Rebuttal evidence is properly admissible when it will "explain, repel, counteract or disprove the evidence of the adverse party." *Crowley*, 322 F. Supp. 2d at 551. A rebuttal expert "may rely upon new evidence and opinions to rebut [the other expert's] opinions." *Haskins*, 2013 WL 5410531, at *4. The rebuttal expert "need only 'repel' the other expert's testimony." *Id.* (citing *Crowley*, 322 F. Supp. 2d at 551).

It is true that O'Neil-Dunne purports to be a travel industry expert, but his report opines on areas outside his expertise, such as screen scraping and the supposed "benefits" of OTAs and aggregation through scraping without identifying the technical impact of OTAs on low-cost carriers such as Ryanair. *See generally* Hemann Dec. Ex. 39. To properly rebut O'Neil-Dunne's flawed opinions on the benefits of OTAs and scraping, Ryanair offered Vance, an expert in cybersecurity and information systems, to explain and disprove O'Neil-Dunne's opinions. For example, O'Neil-Dunne provides the history of travel agents purchasing tickets from airlines and attempts to draw parallels with the practice today – without acknowledging his apples-to-oranges comparison of *authorized* access via airline contracts and OTAs' *unauthorized* access that is the subject of this lawsuit. *See, e.g.*, Hemann Dec. Ex. 39. at 6-12; Mao Dec. Ex. 12 at 118:12-19. Vance explains why the distinction between authorized and unauthorized access matters to O'Neil-Dunne's conclusions, including ██████████████████████████████ ████████████████████████████████████████████████ ████████████████. *See* Mao Dec. Ex. 13 at 114:4-116:6. Thus, O'Neil-Dunne cannot conclude that OTAs provide a benefit to airlines and customers without considering the harms they inflict – and Vance provides that counterpoint.

These counterpoints are apparent in O'Neil-Dunne's own public writings. O'Neil-Dunne wrote years ago that he has "an issue with the use of Screen Scraping"; that he has "never been a huge fan [of screen scraping] despite the value that can be derived"; that specifically Ryanair was "well within its rights" to cancel bookings made by screen scrapers; and that screen scrapers that book airlines' flights without redirecting them to the airline (like Defendants) are the "nasty" kind. Mao Dec. Ex. 12 at 225:2-248:10; Mao Dec. Ex. 14. Yet when offered compensation to write an expert report in this screen-scraping case, O'Neil-Dunne's opinions on the negative effects of

screen-scraping and unauthorized access are conspicuously absent. When asked how his opinions could have changed so drastically in the intervening years, O'Neil-Dunne replied only that screen-scraping is a "nonissue these days" for airlines and that screen-scraping had been "conquered" by 2017. Mao Dec. Ex. 12 at 239:9-240:20.

This is obviously not the case, and Vance provides rebuttal testimony to show that screen-scraping is by no means "conquered" and, in fact, it continues to cause immense harm to Ryanair. *See, e.g.*, Hemann Dec. Ex. 43 at 14-19. Vance's testimony illustrates that screen-scraping is not simply the norm in the industry that is easily managed, as O'Neil-Dunne attempts to portray, but is the core problem of the cybersecurity industry – to prevent bots' unauthorized access into computers that try to block access. *See* Mao Dec. Ex. 13 at 292:23-293:19 (discussing the importance of security controls for any company). Vance's testimony is not a belated opening report masquerading as a rebuttal report, as Defendants contend, but rather a counter to O'Neil-Dunne's opinions on screen-scraping and OTAs' supposed "benefits" to airlines. Thus, Vance's report and testimony are proper because he offered rebuttal opinions that "explain, repel, counteract, [and] disprove" O'Neil-Dunne's opinions. *See Crowley*, 322 F. Supp. 2d at 551. This is not a case like *Withrow*, cited by Defendants, in which the rebuttal report did not even "attempt to contradict or rebut the contents" of the opening expert report. *Withrow v. Spears*, 967 F. Supp. 2d 982, 1002 (D. Del. 2013). Rather, Vance provides expert testimony to explain why O'Neil-Dunne's opinions are faulty and incomplete.

Even if the Court were to find that an expert report is not a proper rebuttal report and is an untimely filed opening expert report, the Court still must consider whether the "untimely" expert report should be permitted regardless, under the five *Pennypack* factors. *See Withrow v. Spears*, 967 F. Supp. 2d 982, 1003 (D. Del. 2013). The five factors are: (1) the surprise or prejudice to the

47

moving party; (2) the ability of the moving party to cure any such prejudice; (3) the extent to which allowing the testimony would disrupt the order and efficiency of trial; (4) bad faith or willfulness in failing to comply with the court's order; (5) the explanation for the failure to disclose; and (6) the importance of the testimony sought to be excluded. *Id.* at 1000 (*citing Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904–05 (3d Cir. 1977), overruled on other grounds).

"[B]ecause '[t]he exclusion of critical evidence is an extreme sanction,' it should not be imposed where an untimely or improper expert disclosure amounts to only a 'slight deviation from pre-trial notice requirements' or occasions only 'slight prejudice' to the movant." *Id.* Aside from listing the factors, Defendants offer no argument or evidence to prove, as is their burden, that the factors favor Defendants and the Court should impose the "extreme sanction" of excluding Vance's testimony. *See* D.I. 335 at 49.

Here, the factors favor allowing Vance's testimony. First, no opinion provided by Vance should be a "surprise" or prejudice Defendants. Vance did not introduce a new theory of the case; rather, he reinforced arguments made throughout this case and by Ryanair's other expert, Iain Lopata. *See generally* Hemann Dec. Ex. 43. In fact, Vance cited Lopata's report throughout his report. *Id.* Vance's unique qualifications and opinions provided context with respect to the cybersecurity field to illustrate the gaps and failings in O'Neil-Dunne's report. But none of Vance's report could be considered a surprise. Second, Defendants deposed Vance after he submitted his rebuttal report, so any perceived prejudice was already cured by their ability to fully cross-examine Vance on the opinions provided in his report. Third, allowing the testimony would not disrupt the order and efficiency of trial. There is no need to reopen discovery since Defendants already took Vance's deposition, and trial would proceed as scheduled. Fourth, Ryanair, in good faith, offered Vance's testimony within the Court-ordered rebuttal period to refute O'Neil-Dunne's

48

claims. Fifth, Vance was disclosed in good faith during the rebuttal expert period; thus, there was no failure to disclose him earlier. Sixth, Vance's testimony is important, especially if O'Neil-Dunne is permitted to testify. O'Neil-Dunne offers a woefully inaccurate depiction of the effects and "benefits" of OTA screen-scraping, and it should not be permitted at all (for all of the reasons discussed in Ryanair's *Daubert* motion). *See* D.I. 348 at 38-40. But it certainly should not be permitted to go to the jury without Vance's testimony to illustrate O'Neil-Dunne's faulty opinions.

### 2. Vance Provides a Proper Rebuttal Expert Report Under Rule 702 and *Daubert*

None of Defendants' contentions regarding Vance's testimony support excluding his testimony under Rule 702 or *Daubert*. *See* D.I. 335 at 49-50. First, Defendants complain that Vance cannot hold certain opinions because he is not a travel industry expert. *Id.* at 49. But the opinions they cite (1) are not central to his overall conclusions, (2) are not the type that require expert testimony, or (3) are within Vance's business expertise. For example, Vance mentions in passing that Ryanair's ███████████████ is "reasonable" and "nominal consideration." Hemann Dec. Ex. 43 at 5 n.5. These observations are not the type requiring an expert opinion. Even a lay witness can provide an opinion "grounded either in experience or specialized knowledge." *Asplundh Mfg. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1201 (3d Cir. 1995). Regardless, Vance is a business professor, as well as a cybersecurity professor, and he made clear in his deposition that he was qualified to offer opinions in both capacities. Hemann Dec. Ex. 10 at 45:11-19. Thus, opining on the reasonableness of ████████ which are often based on costs due to resource investment in providing certain quantities of data, is squarely within Vance's technical and business expertise.

Second, Vance does not rely "primarily" on allegations in the complaint. Vance repeatedly cites to the parties' interrogatories, produced documents, Lopata's expert report, third-party resources, and his own knowledge and expertise. His list of materials that he considered in drafting

his report spans six pages. *See* Hemann Dec. Ex. 43 at App. B.

Finally, Defendants disingenuously allege that Vance is providing a legal conclusion about unauthorized access, when Vance *repeatedly* confirmed in his deposition that when he talks about unauthorized access, he is referring to the term used in his industry, not a legal definition. *See* Mao Dec. Ex. 13 at 39:25-40:7; 47:15-21; 51:25-52:2; 69:17-21. As Vance explained, "'authorization' is a term of art. It's a cybersecurity term, and you cannot talk about unauthorized access from a security vantage point without using that term." *Id.* at 176:6-25. Defendants' counsel even clarified during the deposition, "when we talk about unauthorized access, as you use that term in the report, I'm going to assume you are using that in terms of security practitioner, not a legal term." *Id.* at 69:17-20. Vance confirmed she should, saying "Thank you. I appreciate that." *Id.* at 69:21. Defendants cannot now claim the entire report is using the term as a legal conclusion, when Vance explicitly maintained he was using the term as an industry term of art.

Defendants' reference to Vance's testimony in another case has no bearing here. A portion of Vance's opinion in a single report was excluded from another case (along with legal scholar Orin Kerr's rebuttal) for providing a legal opinion, and he was still permitted to testify in that matter. *See Vox Mktg. Grp., LLC v. Prodigy Promos L.C.*, 521 F. Supp. 3d 1135, 1148 (D. Utah 2021). But Vance is not providing a legal opinion in this case as Defendants implicitly acknowledge, and, as Vance testified, he had multiple expert reports and opinions in that case that were not excluded and was scheduled to testify at trial. *See* Mao Dec. Ex. 13 at 25:7-12; 33:9-16.

For all of the foregoing reasons, Vance's expert testimony should not be excluded.

## VI.   Conclusion

For all of the reasons stated herein, Defendants' Motion for Summary Judgement and Motion to Exclude the Testimony of Iain Lopata and Anthony Vance should be denied.

Dated: January 22, 2024          Respectfully Submitted,

**KRATZ & BARRY LLP**

*/s/ R Touhey Myer*
R Touhey Myer (#5939)
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

*Of Counsel:*

**HOLLAND & KNIGHT LLP**

R. David Donoghue (*pro hac vice*)
Anthony J. Fuga (*pro hac vice*)
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600
david.donoghue@hklaw.com
anthony.fuga@hklaw.com

Cynthia A. Gierhart (*pro hac vice*)
800 17th Street NW, Suite 1100
Washington, DC 20011
(202) 569-5416
cindy.gierhart@hklaw.com

Ji Mao (*pro hac vice*)
31 West 52nd Street
New York, New York 10019
(212) 513-3420
ji.mao@hklaw.com

William H. Oliver III (*pro hac vice*)
10 St. James Ave. 11th Floor
Boston, MA 02116
(617) 573-5863
william.oliver@hklaw.com

*Attorneys for Plaintiff/*
*Counterclaim Defendant Ryanair DAC*