## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

RYANAIR DAC,

      *Plaintiff/*
      *Counterclaim Defendant,*

    v.

BOOKING HOLDINGS INC.,
BOOKING.COM B.V., KAYAK SOFTWARE
CORPORATION, PRICELINE.COM LLC,
and AGODA COMPANY PTE. LTD.,

      *Defendants,*

BOOKING.COM B.V.,

      *Counterclaim Plaintiff.*

C.A. No. 1:20-cv-01191-WCB

**PUBLIC VERSION -
CONFIDENTIAL MATERIAL OMITTED**

## PLAINTIFF RYANAIR DAC'S REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND TO PRECLUDE EXPERT TESTIMONY OF TIMOTHY JAMES O'NEIL-DUNNE, JORDAN RAE KELLY, AND BASIL IMBURGIA

Dated: February 5, 2024

R Touhey Myer (#5939)
KRATZ & BARRY LLP
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

R. David Donoghue (*pro hac vice*)
Anthony J. Fuga (*pro hac vice*)
HOLLAND & KNIGHT LLP
150 N Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600
david.donoghue@hklaw.com
anthony.fuga@hklaw.com

Cynthia A. Gierhart  (*pro hac vice*)
HOLLAND & KNIGHT LLP
800 17th Street NW, Suite 1100
Washington, DC 20011
(202) 469-5416
cindy.gierhart@hklaw.com

Ji Mao (*pro hac vice*)
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
(212) 513-3420
ji.mao@hklaw.com

William H. Oliver III (*pro hac vice*)
HOLLAND & KNIGHT LLP
10 St. James Ave. 11th Floor
Boston, MA 02116
(617) 573-5863
william.oliver@hklaw.com

*Attorneys for Plaintiff/*
*Counterclaim Defendant Ryanair DAC*

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................1

II.     ARGUMENT .....................................................................................................1

   A.      SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNTS I AND IV ............1

      1.      Ryanair Has a Private Right of Action Under the CFAA .............................................1

      2.      Ryanair Has Suffered Damage and Loss, as Required under Section
              1030(a)(5)(C) ................................................................................................4

      3.      Booking and Kayak Are Vicariously Liable Under the CFAA ...................................5

      4.      Booking and Kayak Intentionally Access the Ryanair Website .................................6

      5.      Booking and Kayak Access the Ryanair Website Without Authorization .................7

   B.      BOOKING'S COUNTERCLAIMS SHOULD BE DISMISSED ................................11

      1.      Booking's Counterclaims Fail Because Ryanair's Statements Are True .................11

      2.      Actual Malice Applies, and No Reasonable Juror Could Find That Ryanair's
              Statements Were Made with Actual Malice ...............................................14

      3.      Booking Cannot Prove That Ryanair Acted Wrongfully or Intentionally, and the
              Tortious Interference and Unfair Competition Claims Must Fail............................16

      4.      Booking Has Failed to Prove It Suffered Damages ..................................................17

   C.      DEFENDANTS' EXPERTS SHOULD BE EXCLUDED ..........................................20

      1.      O'Neil-Dunne's Opinions Are Not Relevant or Reliable ........................................20

      2.      Kelly's Opinions Are Unreliable and Should Be Excluded......................................21

      3.      Imburgia's Opinions on Damages Are Not Relevant or Reliable............................24

III.    CONCLUSION ................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                              **Page(s)**

*AAMCO Transmissions, Inc. v. Baker*,
   591 F. Supp. 2d 788 (E.D. Pa. 2008) .................................................................................17, 18

*Above & Beyond — Bus. Tools & Servs. for Entrepreneurs v. Wilson*,
   Civil Action No. 21-7339 (GC) (RLS), 2022 U.S. Dist. LEXIS 227754
   (D.N.J. Sep. 1, 2022)..............................................................................................................2

*Ayres v. MAFCO Worldwide, LLC*,
   No. CV1812071RBKAMD, 2019 WL 1001297 (D.N.J. Mar. 1, 2019)....................................7

*Bowen v. Porsche*,
   561 F. Supp. 3d 1362 (N.D. Ga. 2021) ...................................................................................6

*United States v. Frances Eddings 1 & Jude Denis 2*,
   No. 5:19-cr-00535, 2021 U.S. Dist. LEXIS 114796 (E.D. Pa. June 21, 2021) ......................10

*Callahan v. A.E.V., Inc.*,
   182 F.3d 237 (3d Cir. 1999)...........................................................................................18, 19

*Charles Schwab & Co. v. Carter*,
   No. 04 C 7071, 2005 U.S. Dist. LEXIS 21348 (N.D. Ill. Sep. 27, 2005)................................5

*Chegg, Inc. v. Doe*,
   No. 22-cv-07326-CRB, 2023 U.S. Dist. LEXIS 200023 (N.D. Cal. Nov. 7,
   2023) .....................................................................................................................................9

*Chubb INA Holdings, Inc. v. Chang*,
   Civil Action No. 16-2354-BRM-DEA, 2017 U.S. Dist. LEXIS 16744 (D.N.J.
   Feb. 7, 2017) .........................................................................................................................2

*Com. Nat. Ins. Servs., Inc. v. Buchler*,
   120 F. App'x 414 (3d Cir. 2004) .........................................................................................16

*Conroy v. Vilsack*,
   707 F.3d 1163 (10th Cir. 2013) ...........................................................................................22

*Couponcabin LLC v. Sav..com, Inc.*, No. 2:14-CV-39-TLS .....................................................8

*Cousins v. Goodier*,
   283 A.3d 1140 (Del. 2022) .................................................................................................14

*Danias v. Fakis*,
   261 A.2d 529 (Del. Super. Ct. 1969) ...................................................................................12

*Facebook, Inc. v. Power Ventures, Inc.*,
844 F.3d 1058 (9th Cir. 2016) ........................................................................6

*FinancialApps, LLC v. Envestnet, Inc.*,
No. CV 19-1337-GBW-CJB, 2023 WL 4744255 (D. Del. July 25, 2023).......................12, 14

*Goodman v. Goodman*,
No. 21-CV-10902 (GHW) (RWL), 2022 U.S. Dist. LEXIS 230085 (S.D.N.Y.
Dec. 21, 2022)...................................................................................................2

*Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*,
497 F. Supp. 2d 627 (E.D. Pa. 2007) ..............................................................4

*McCafferty v. Newsweek Media Grp., Ltd.*,
955 F.3d 352 (3d Cir. 2020)...........................................................................13

*In re Memorex Telex Corp.*,
242 B.R. 826 (D. Del. 1999) ..........................................................................18

*In re Nat'l Collegiate Student Loan Trusts Litig.*,
No. CV 12111-VCS, 2020 WL 3960334 (Del. Ch. July 13, 2020) .......................................14

*New York Pizzeria, Inc. v. Syal*,
56 F. Supp. 3d 875 (S.D. Tex. 2014) .............................................................24

*Page v. Oath Inc.*,
270 A.3d 833 (Del. 2022), cert. denied, 142 S. Ct. 2717 (2022)................................15

*Parsons v. Honeywell, Inc.*,
929 F.2d 901 (2d Cir. 1991)...........................................................................17

*QVC, Inc. v. MJC Am., Ltd.*,
No. CIV.A. 08-3830, 2012 WL 33026 (E.D. Pa. Jan. 6, 2012) .........................................17, 18

*Riley v. Moyed*,
529 A.2d 248 (Del. 1987) ...............................................................................12

*Skyhop Techs., Inc. v. Narra*,
58 F.4th 1211 (11th Cir. 2023) ........................................................................3

*Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*,
63 F.3d 1267 (3d Cir. 1995)......................................................................18, 19

*Univ. Sports Publ'ns Co. v. Playmakers Media Co.*,
725 F. Supp. 2d 378 (S.D.N.Y. 2010).............................................................2

*Van Buren v. United States*,
141 S. Ct. 1648 (2021).................................................................................2, 21

*Vox Mktg. Grp. v. Prodigy*
    556 F. Supp. 3d 1280, 1287-88 (D. Utah 2021) ........................................................4

*Wilco AG v. Packaging Techs. & Inspection LLC*,
    615 F. Supp. 2d 320 (D. Del. 2009)..........................................................................16

*Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*,
    774 F.3d 1065 (6th Cir. 2014) .............................................................................2, 3

**Statutes**

18 U.S.C. § 1030(a)(5)(A) ............................................................................................9

18 U.S.C. § 1030(e)(6)...............................................................................................11

18 U.S.C. § 1030(e)(8).................................................................................................3

18 U.S.C. § 1030(e)(11)..........................................................................................2, 25

**Other Authorities**

53 C.J.S. Libel and Slander; Injurious Falsehood § 33...............................................12

Fed. R. Evid. 702 ................................................................................................21, 23

Fed. R. Evid. 803(1)....................................................................................................18

Fed. R. Evid. 803(3)....................................................................................................18

# I.    INTRODUCTION

Defendants misconstrue the law and the facts – from inventing a narrow definition of "loss" that ignores the law to hiding from mounds of evidence (and commonsense) that prove Defendants direct, induce, and encourage their vendors to access the Ryanair Website. There is no genuine dispute that all Ryanair flights sold by Defendants were intentionally booked through the Ryanair Website, circumventing multiple authentication mechanisms without authorization.

As to the counterclaims, Ryanair's emailed statements to its customers were true, substantially true, or protected opinions. Moreover, Booking cannot show that Ryanair acted *wrongfully* when sending the emails. And Booking has failed to demonstrate that it suffered any damage as a result, relying solely on unrealistic speculations far after the close of discovery.

Finally, Defendants' expert testimony is not relevant or reliable and should be excluded. Defendants claim Timothy O'Neil-Dunne's testimony is relevant in multiple respects that simply do not appear in his report. Defendants want to connect dots that are not there. Basil Imburgia's testimony should be excluded because, as has been acknowledged, he is a damages expert using unreliable methods to rebut a non-damages report. Defendants trumpet Jordan Kelly's time with the White House and the FBI, but that amplifies the problem. Her purported credentials may sway a jury to incorrectly accept her unreliable opinions. This should not be allowed.

# II.    ARGUMENT

## A.    SUMMARY JUDGMENT SHOULD BE GRANTED ON COUNTS I AND IV

### 1.    Ryanair Has a Private Right of Action Under the CFAA

*a.  It Is Defendants, not Ryanair, That Misapprehend CFAA "Loss"*

Ryanair correctly claims as loss only those "cost[s] of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior

1

to the offense." 18 U.S.C. § 1030(e)(11)[1]; *see infra* Section II.A.1.b. Defendants improperly narrow the "loss" definition requiring that it result from technological harm (i.e., that you cannot have loss without damage). D.I. 372 (hereinafter "Opp'n") at 4. Defendants only muster *Van Buren* in support, which explains that loss must "**focus** on technological harms." *Id.* (emphasis added). That is not the same, as recognized by courts both pre- and post-*Van Buren*: "the costs of investigating security breaches constitute recoverable 'losses,' even if it turns out that no actual data damage or interruption of service resulted from the breach." *Univ. Sports Publ'ns Co. v. Playmakers Media Co.*, 725 F. Supp. 2d 378, 387 (S.D.N.Y. 2010); *see also* D.I. 376 at 21-22; *Goodman v. Goodman*, No. 21-CV-10902 (GHW) (RWL), 2022 U.S. Dist. LEXIS 230085, at *22-23 (S.D.N.Y. Dec. 21, 2022) ("plaintiffs can still meet the loss requirement through a 'damage assessment and/or remedial measures, even without pleading actual damage.'" (citations omitted)); *Above & Beyond — Bus. Tools & Servs. for Entrepreneurs v. Wilson*, Civil Action No. 21-7339 (GC) (RLS), 2022 U.S. Dist. LEXIS 227754, at *13 (D.N.J. Sep. 1, 2022); *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1073-74 (6th Cir. 2014) ("Plaintiffs [not required to] establish that an 'interruption in service' occurred."); *Chubb INA Holdings, Inc. v. Chang*, Civil Action No. 16-2354-BRM-DEA, 2017 U.S. Dist. LEXIS 16744, at *19-21 (D.N.J. Feb. 7, 2017).

   b.  *Ryanair's Claimed Losses Are the Costs of Responding to Defendants' Unauthorized Access, Not Prophylactic Measures or Ordinary Business Costs*

Defendants' shotgun approach to challenging Ryanair's layered losses fails. Opp'n at 7-11. *First*, Defendants argue that Ryanair has not shown that "bot activity damages its computers." Opp'n at 7. Ryanair's costs to investigate Defendants' unauthorized access are losses even if no

---

[1] Defendants argue that Ryanair claims mainly prophylactic losses. That is false. Ryanair's costs are necessary to secure its computers because of Defendants' unauthorized access. *See infra* Section II.A.1.b.

damage occurred. *See supra* Section II.A.1.a. Even if actual damage were required, Ryanair has suffered damage due to Defendants' activity:

- Damage is "impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). While the CFAA does not define these terms, the plain meaning of availability is "capability of being employed or made use of." *Skyhop Techs., Inc. v. Narra*, 58 F.4th 1211, 1225-26 (11th Cir. 2023). Defendants' use of incorrect information impairs the availability of Ryanair's data and databases. One example is the impairment to Ryanair's capability to refund payments to comply with EU regulations. *See* D.I. 376 at 28-29.

- Defendants misunderstand the ▮▮▮▮ attack. Opp'n at 11. The evidence establishes that the ▮▮▮▮ attack was deliberate and that it has damaged Ryanair's system. *See* D.I. 376 at 13-15.

- Defendants have damaged the integrity of Ryanair's Website by impairing Ryanair's ability to offer flights to its customers. In *Yoder & Frey Auctioneers*, the Sixth Circuit affirmed that by placing an unauthorized $10,000 bid on an auction item, defendants impaired the integrity of plaintiff's auction platform by precluding plaintiff's customers from bidding on or acquiring that item for $10,000. *Yoder*, 774 F.3d at 1073. *Yoder* is directly applicable: Defendants occupy the limited seats on each flight by accessing the Ryanair Website without authorization. Ryanair is therefore unable to offer those seats to an authorized customer. *See* Fuga Dec. Ex. 1 at 90; *see also* https://help.ryanair.com/hc/en-us/categories/12489305702289-Seat-Rules. Defendants have damaged the integrity of Ryanair's system by precluding Ryanair's legitimate customers from using the Ryanair Website for its main purpose. *See Yoder*, 774 F.3d at 1073.

*Second*, Ryanair has counted only losses attributable to Defendants, excluding unrelated losses. *See* D.I. 376 at 26-31; D.I. 348 at 8-16.[2] *Third*, claiming Ryanair's costs are prophylactic or due to Ryanair's business practices (Opp'n at 8, 10-11) contradicts Defendants' own arguments (claiming Shield's analysis is ▮▮▮▮▮▮▮) and ignores their cited evidence. *See, e.g.*, D.I. 376 at 24-26. Ryanair's Shield, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ myRyanair, and Business Intelligence costs are all responsive to Defendants' conduct and necessary to secure Ryanair's system from Defendants' unauthorized access. *See* D.I. 376 at 24-31; D.I. 348 at 8-16;

---

[2] Ryanair's claimed losses include only Defendants' share of Ryanair's costs. *See* D.I. 376 at 26-31; D.I. 348 at 8-16. Ryanair's approach is conservative, purposefully excluding costs not attributable to Defendants' unauthorized access. For instance, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* D.I. 350 (hereinafter "Lopata Dec.") ¶ 67.

*see also supra* Section II.A.1.a. Customer service agent, verification, and digital employee costs restore Ryanair's data integrity and availability. D.I. 376 at 30-31.

     *Fourth*, for each cost category, Ryanair has only counted the cost **increases** directly caused by Defendants as loss. D.I. 348 at 8-16. Ryanair would have developed and maintained Shield even if Booking or Kayak were the only OTAs accessing the Ryanair Website without authorization. D.I. 376 at 31; Hemann Dec.[3] Ex. 26 at 9. Further, Ryanair and Defendants are engaged in a technological arms race where Ryanair continuously develops more sophisticated authentication gates, as Defendants – either directly or through vendors – surreptitiously bypass them. Hemann Dec. Ex. 43 at 13-14; D.I. 349 (hereinafter "Fuga Dec.") Ex. 22 at 71:9-76:12. To the extent Ryanair's losses are "ongoing costs," they are necessary to resecure Ryanair's system as Defendants evolve their unauthorized access. For example, Ryanair upgraded Shield by ███ ███████████████████████████████████. *See* Fuga Dec. Ex. 22 at 71:9-72:21.

     *Finally*, Ryanair's losses are not speculative[4] because they rely on Mr. Lopata's calculations. Opp'n at 9. Loss and damages are separate concepts. D.I. 376 at 20-21. Mr. Lopata is a cybersecurity expert, not a damages expert. Criticism that he did not act like a damages expert are moot. *Id.* at 37. Mr. Lopata opined on which of Ryanair's cybersecurity costs were losses caused by Defendants. *Id.* His arithmetic is ancillary, and Ryanair does not rely on it to prove loss. *See Vox Mktg. Grp. v. Prodigy* Promos, 556 F. Supp. 3d 1280, 1287-88 (D. Utah 2021) (plaintiff satisfied loss requirement without expert testimony on loss calculation); *Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 647 (E.D. Pa. 2007) (same).

    **2.    Ryanair Has Suffered Damage and Loss, as Required under Section 1030(a)(5)(C)**

---

[3] D.I. 343-346 is hereinafter "Hemann Dec."

[4] To the extent Ryanair's calculations rely on estimates, such techniques are necessary only because Defendants purposefully mask their identities. *See* Lopata Dec. ¶¶ 10(d), 34-35.

Defendants claim that Ryanair has suffered neither damage nor loss as a result of Defendants' conduct. Opp'n at 11-12. Defendants are wrong on both counts. *See supra* Section II.A.1.a.

### 3.    Booking and Kayak Are Vicariously Liable Under the CFAA

*First*, ███████████████████████████████████████████████████████ ███████████████████ who also access the Ryanair Website without authorization. D.I. 377 (hereinafter "Mao Dec.") Ex. 5 at 225:2-25.

*Second*, Defendants' ignorance defense fails. *See* Opp'n at 12-16. Defendants need not know the technicalities of *how* their vendors access the Ryanair Website without authorization because Defendants know their vendors do it, without authorization, at their direction, encouragement, and inducement. *See* D.I. 348 at 17-19. Defendants' reliance on *Svanaco* and *Alchem* is misplaced. D.I. 376 at 11-12. In both *Svanaco* and *Alchem*, the defendants were not liable because their co-defendants acted completely outside the scope of defendants' requests. *Id.* Defendants are vicariously liable because they direct, induce, and encourage their vendors via contracts that compensate the vendors for committing the very acts that violate the CFAA: accessing Ryanair's protected website to obtain information and purchase tickets. *See Charles Schwab & Co. v. Carter*, No. 04 C 7071, 2005 U.S. Dist. LEXIS 21348, at *22 (N.D. Ill. Sep. 27, 2005). Booking knew ███████████████████████████████████ and Ryanair has put Defendants on notice multiple times that they are not authorized to access the Ryanair Website. Fuga Dec. Ex. 24; D.I. 76 at Exs. B, C, E.

*Third*, Defendants falsely argue that ███████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

5



This claim of "passive" receipt fails.

*Fourth*, Booking argues it █████████████████████████████████████████

████████████████████████████████ Booking cannot escape liability by ██████

██████ *See Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016) ("Once

permission [to access a computer] has been revoked, technological gamesmanship or the enlisting

of a third party to aid in access will not excuse liability"). ███████████████████

███████████████████████████████████████████████████

*Finally*, Kayak argues that there is no evidence that Kayak link-out bookings take

customers directly to a check-out page, and, even if they did, "it is still another company—not

KAYAK—obtaining the information that is displayed on KAYAK and booking the flight through

its own platform." Opp'n at 16. Both arguments fail. Kayak *does* "link out" directly to a checkout

page. Gierhart Dec. Ex. 1; Fuga Dec. Ex. 4 at 9; *see* Fuga Dec. Ex. 20 § 3.3. Nor is it a defense

that another company is obtaining the information displayed by Kayak or booking flights for

Kayak. That is the entire premise of vicarious liability. *See, e.g.*, D.I. 105 at 7-14.

### 4.    Booking and Kayak Intentionally Access the Ryanair Website

"CFAA [intent] requires merely that access to a computer system not be a careless or

inadvertent mistake." *Bowen v. Porsche*, 561 F. Supp. 3d 1362, 1369 (N.D. Ga. 2021) ("An inquiry

into a defendant's particular motives is not necessary so long as he purposefully accessed the

computer at issue.") (citations omitted). Defendants intended to access Ryanair's computer system

to make flight reservations. Even if intent required intentionally accessing a computer system

<u>without authorization</u>, Defendants intended to access Ryanair's computer without authorization by

continuing to direct, induce, and encourage their vendors even after they were put on notice that doing so was not authorized by Ryanair. *See supra* Section II.A.3.

### 5.  Booking and Kayak Access the Ryanair Website Without Authorization

#### a.  *Defendants Have Accessed Ryanair's Protected Computer*

Defendants argue that Ryanair cannot show Defendants booked flights via the Ryanair Website but immediately admit that Ryanair analyzed Defendants' PNR codes[5] and confirmed that they were obtained by accessing the Ryanair Website. Opp'n at 19-20.[6] Defendants also ignore Ryanair's and Mr. Lopata's testing that showed each time he attempted to book a Ryanair flight on Defendants' websites, the chosen flight was purchased by ████████████████████ and completing the purchase. Lopata Dec. ¶¶ 10(d), 34-35; *see* D.I. 342 at 30. A myRyanair account can only be created by accessing the Ryanair Website, and this testing further confirms that Defendants accessed the Ryanair Website. Lopata Dec. at ¶ 34(a)-(c); *see* Hemann Dec. Ex. 27 at 43, 69-70.

Ryanair does not need discovery from Defendants' vendors to establish that they accessed the Ryanair Website.[7] It is confirmed that all Ryanair flights sold on Defendants' websites were

---

[5] Defendants opposed Ryanair's efforts to obtain these PNR codes on the basis that they were not necessary to prove that Defendants (directly or indirectly) accessed the Ryanair Website.

[6] Defendants' issue is that Ryanair presented evidence in an interrogatory response verified by John Hurley, even though Mr. Hurley is not authorized to view Defendants' PNR codes. Opp'n at 20. To be clear, Ryanair has not breached this Court's Order that only two (and later three) designated employees may view Defendants' PNR codes. Mr. Hurley was nonetheless able to verify Ryanair's interrogatory because he is not required to have personal knowledge of every statement he verifies and was certainly not required to personally perform the test that analyzed the PNR codes. *Ayres v. MAFCO Worldwide, LLC*, No. CV1812071RBKAMD, 2019 WL 1001297, at *1 (D.N.J. Mar. 1, 2019) (holding "[a] corporate agent may certify the answers without personal knowledge" (citations omitted)). He verified the information by speaking with others in the Ryanair organization. Gierhart Dec. Ex. 2 at 14:20-18:7. Defendants had ample opportunity at Mr. Hurley's third deposition to question him and, in fact, did so. *E.g.*, *Id.* at 14:20-34:5.

[7] Ryanair issued Letters of Request on five of Defendants' vendors over two months before discovery closed. *See* D.I. 170. Despite that, discovery was only obtained from Etraveli so far.

purchased from the Ryanair Website based on the PNR codes and Mr. Lopata's testing. Defendants claim that the only way they obtain Ryanair flight reservations is through their third-party vendors. Opp'n at 14-16; *but cf.* D.I. 348 at 17 (citing Fuga Dec. Ex. 2 at 7-12; Fuga Dec. Ex. 4 at 6-8, 11-14, 17; Fuga Dec. Ex. 19 at 35:12-37:18); *see* D.I. 348 at 17-19.[8] All Ryanair flights sold by Defendants were purchased on the Ryanair Website *and* obtained by Defendants from their vendors. It is irrefutable that the vendors accessed the Ryanair Website to obtain the flights.

*b.    Shield Is an Authentication Mechanism*

This Court concluded in its October 24, 2022 Memorandum Opinion and Order ("MTD Order") that "in order for the CFAA's 'without authorization' and 'exceeds authorized access' elements to apply, some sort of authentication mechanism (e.g., the use of usernames and passwords) must be employed to limit access to the website." D.I. 105 at 23. As explained, Ryanair's Shield system is a code-based authentication mechanism that limits access to the Ryanair Website. *See* D.I. 376 at 15-20; D.I. 348 at 21-25; *see also* Mao Dec. Ex. 1 at 35:19-36:14; Hemann Dec. Ex. 26 at 101-103. Yet Defendants seek to introduce a new requirement that "'[a]uthorization' 'is an affirmative notion, indicating that access is restricted to those specially recognized or admitted," and cite a single, out-of-circuit case for support. Opp'n at 21-22.[9] However, *hiQ* is not controlling, courts outside of the Ninth Circuit have not adopted its overly-narrow view of authorization, and Shield even meets that narrow view. *See, e.g.*, *Couponcabin LLC v. Sav..com, Inc.*, No. 2:14-CV-39-TLS, 2016 U.S. Dist. LEXIS 74369, at *8-14 (N.D. Ind. June 8, 2016).

---

[8] Defendants criticize Ryanair's citations to Booking and Kayak interrogatory responses and defense counsel's comments. Opp'n at 19. Defendants miss the point.  That evidence establishes that Defendants obtain Ryanair flights from their vendors. Defendants' PNR codes and Lopata's testing establish that the vendors accessed the Ryanair Website to obtain flights for Defendants.

[9] Defendants also cite the *ipse dixit* of their expert, Ms. Kelly, for the proposition that "authentication" means the "process of confirming the correctness of the claimed identity." Opp'n at 24. As Ryanair has already explained, that argument fails. D.I. 376 at 20.

Defendants' narrow concept also conflicts with the CFAA itself, and for that reason alone should not be adopted. For example, the CFAA provides that it is a violation to knowingly transmit a program, information, code, or command and as a result intentionally cause damage without authorization to a protected computer. 18 U.S.C. § 1030(a)(5)(A). "[C]ourts have specifically held that a denial-of-service ('DDoS') attack[10] . . . violates [Section 1030(a)(5)(A) of] the CFAA." *Chegg, Inc. v. Doe*, No. 22-cv-07326-CRB, 2023 U.S. Dist. LEXIS 200023, at *17 (N.D. Cal. Nov. 7, 2023). Defendants' position that authorization means "access is restricted to those specially recognized or admitted" is incompatible with DDoS attacks violating the CFAA, since the perpetrators of DDoS attacks are never specially recognized or admitted to carry them out, yet they access a protected computer nonetheless.

Indeed, while the Court found *hiQ* "instructive," the Court found that Ryanair had adequately alleged that Defendants circumvent "code-based authentication mechanisms because "beyond the [myRyanair] login mechanism . . . defendants have sought to circumvent the Shield program in order to access information about Ryanair itineraries." D.I. 105 at 22, 24. Discovery confirmed that, even if the Court adopts Defendants' new requirement, Shield is a code-based authentication mechanism. Unlike LinkedIn's systems in *hiQ*, Shield ███████████ ████████████████████████████████████████████████████████████████████ ███████████ *See* Hemann Dec. Ex. 5 at 33:18-35:19; Hemann Dec. Ex. 26 at 83, 91-92. Shield then ██████████████████████████████████████████████████ *See* Fuga Dec. Ex. 5 at 74:27-79:2; Hemann Dec. Ex. 26 at 83, 91-92. This is authentication no matter how narrow Defendants attempt to define it.

---

[10] Distributed denial of service attacks use bots to send an overwhelming number of requests to a target's IP address, which prevents normal traffic from accessing that IP address. *See, e.g.*, https://www.cloudflare.com/learning/ddos/what-is-a-ddos-attack/.

### c.   *myRyanair Is an Authentication Mechanism*

Defendants wrongly argue that myRyanair is not an authentication mechanism because "any member of the public" can create an account. Opp'n at 26-27. That is wrong. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Defendants' argument related to Facebook, Google, or PayPal credentials fails as explained previously. See D.I. 376 at 19-20.

Hackers might bypass myRyanair's authentication measures, but the CFAA does not impose an "effectiveness" requirement. The fact that Defendants (or their vendors) were able to obtain myRyanair access credentials does not authorize the access. *C.f. United States v. Frances Eddings 1 & Jude Denis 2*, No. 5:19-cr-00535, 2021 U.S. Dist. LEXIS 114796, at *13-14 (E.D. Pa. June 21, 2021) ("[I]f it is a crime to provide someone with a password by which they will be able to access a computer 'without authorization,' it necessarily follows that the mere possession of a password does not render any subsequent access 'authorized.'"). Furthermore, as discussed above, Ryanair continually improves its authentication measures and has again improved its verification procedure to require users to verify their identity by uploading personal identification (e.g., passport) before being permitted full access to the Ryanair Website. *See* D.I. 376 at 18-19.

Defendants reference that Ryanair ▮▮▮▮▮▮▮▮▮▮▮▮ but this *supports* myRyanair being a form of authentication even under Defendants' stringent requirements. Opp'n at 26. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See id.* at 21. Finally, Defendants consistently argue that myRyanair does not protect any confidential or private information. *Id.* at 28-29. But this is simply not a requirement under the CFAA, and Defendants fail to cite to any authority. *Id.* The myRyanair login and account verification requirements prevent unauthorized users from fully accessing the Ryanair Website. Defendants

10

necessarily bypass myRyanair's authentication mechanisms to obtain Ryanair flights. Even if Defendants' fabricated "confidential information" requirement were the law, myRyanair protects the provision of confidential PNR codes, which are provided only to customers who book a flight.[11] *See* Fuga Dec. Ex. 6 at 83; Fuga Dec. Ex. 7 at 17, 21.

### d.   Defendants' Access Is in Excess of Authorization

Defendants argue that they cannot exceed authorized access because they do not obtain any confidential information from the myRyanair portion of the Ryanair Website. Opp'n at 29. Again, there is simply no requirement that the information be private or confidential. *See* 18 U.S.C. § 1030(e)(6). Even if Defendants' fabricated "confidential" requirement were the law, Defendants obtained confidential PNR codes. Hemann Dec. Ex. 31 at Ex. A; Hemann Dec. Ex. 33 at Ex. A; Hemann Dec. Ex. 35 at Ex. A; Hemann Dec. Ex. 37 at Ex. A; *see* Fuga Dec. Ex. 6 at 83-87.

Analysis of the law and the facts shows Defendants have no defense to Ryanair's CFAA claims. Defendants, often via their paid vendors, intentionally access the Ryanair Website to purchase Ryanair flights without authorization in violation of the CFAA.

## B.   BOOKING'S COUNTERCLAIMS SHOULD BE DISMISSED

### 1.   Booking's Counterclaims Fail Because Ryanair's Statements Are True

No reasonable juror could find that the three challenged statements are defamatory. First, Booking again attempts to evade liability by blaming its vendors. Opp'n at 30. Booking argues it is false for Ryanair to say that "[u]nauthorized OTAs have no commercial arrangement with Ryanair, and use 'screen scraper' software to mis-sell Ryanair flights in breach of the Terms of Use ("TOU") of the Ryanair website" because Booking *itself* does not use screen scraper software. Opp'n at 30-31. Instead, it hires vendors to use screen scraper software to sell Ryanair flights to

---

[11] Defendants cannot dispute that PNR codes are confidential, since they have argued against disclosing PNR codes due to their confidential nature. D.I. 186 at 1-2.

Booking's customers. The law does not support Booking's rigid reading. Statements must be *substantially true*. *Riley v. Moyed*, 529 A.2d 248, 253 (Del. 1987) (a statement is substantially true where, even if some details are incorrect, the "gist or sting" of the statement "produces the same effect . . ."). "If the alleged libel was no more damaging to the plaintiff's reputation in the mind of the average reader than a truthful statement would have been, then the statement is substantially true." *Id.* It is no more damaging to say Booking "uses 'screen scraper' software to mis-sell Ryanair flights" than to say Booking "hires vendors to use 'screen scraper' software to mis-sell Ryanair flights."[12] The statements are virtually identical, and the "gist" or "sting" is not removed simply by saying that Booking hires vendors to screen scrape instead of doing it itself.

Booking also takes issue with the statement that OTAs "mis-sell Ryanair flights in breach of the [TOU] of the Ryanair website." Opp'n at 31-32. Booking assigns the most nefarious meaning possible to the word "mis-sell," but the law requires the opposite. "Under the innocent construction rule, if a statement, given its natural and obvious meaning, can reasonably be given an innocent interpretation or understood to refer to someone other than the plaintiff, is it not actionable." 53 C.J.S. Libel and Slander; Injurious Falsehood § 33; *Danias v. Fakis*, 261 A.2d 529, 531 (Del. Super. Ct. 1969) ("[T]he Court must take [the words] in their plain and natural meaning, and so understand them as would a person of average intelligence and perception …."); *FinancialApps, LLC v. Envestnet, Inc.*, No. CV 19-1337-GBW-CJB, 2023 WL 4744255, at *3 (D. Del. July 25, 2023) ("[C]ourts must consider the statement 'in context …'").

Here, the meaning of the word "mis-sell" is clear when read in context: "mis-sell Ryanair flights in breach of the Terms of Use of the Ryanair website." Booking strains to argue it means something else, including even a crime. Booking cites to depositions and a report from the UK

---

[12] "Booking" was inserted here only for illustration. The original statements refer only to "OTAs."

Comptroller's office to argue alternative meanings of "mis-sell." Opp'n at 31-32. But recipients of the email will not have read deposition transcripts, nor are they likely to have consulted the UK National Audit Office reports. They will, however, have read the sentence in front of them, which provides the meaning: OTAs "mis-sell" by selling "in breach of the Terms of Use of the Ryanair website." Booking *does* sell Ryanair flights in breach of Ryanair's Terms of Use.[13] *See, e.g.*, D.I. 134 at 13 (Court order finding "it is undisputed that Ryanair has not authorized Booking.com to sell tickets for Ryanair flights"). The statement is therefore true.

Moreover, "[u]nder the First Amendment, opinions based on disclosed facts are 'absolutely privileged' …." *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 357 (3d Cir. 2020). To the extent it is a matter of interpretation whether a company "mis-sells" Ryanair flights, Ryanair has disclosed the facts upon which it bases its opinion, which is Ryanair's TOU. Readers can go to the TOU and determine for themselves whether they think OTAs "mis-sell" Ryanair flights. But Ryanair's *opinion* that OTAs "mis-sell" Ryanair flights is not actionable.

A similar analysis can be applied to the second and third challenged statements regarding OTAs providing Ryanair with "false payment and contact details."[14] Booking attempts to equate "false" with "fraudulent."[15] Opp'n at 33. Read in context, as the Court must, it is clear that "false

---

[13] Booking argues only that it is not subject to Ryanair's TOU, but Booking is undisputedly selling Ryanair flights without authorization. And to the extent its hired vendors clicked "I agree" to Ryanair's TOU rather than Booking, Booking is vicariously liable for its hired vendors' actions. It is still true, and at least substantially true, that Booking is the one "mis-selling" the flights obtained in violation of Ryanair's TOU.

[14] Booking's Opposition makes clear that it does *not* challenge the statement (included in Ryanair's Opening Brief): "The check-in process must be completed by a passenger personally to ensure passengers are in notice of, and have confirmed compliance with required safety, security and public health protocols …." *See* D.I. 348 at 28. Booking focuses only on the "false customer details" language overlapping the second and third challenged statements, and that receiving false details prevents Ryanair from notifying customers of important safety and security information.

[15] If "false" and "fraudulent" were synonyms, Booking would not only need to prove Ryanair's statements were false in this litigation, but also that they were fraudulent. It does not – and cannot.

customer details" are those which "prevent[] [Ryanair] from notifying passengers…" and "inhibit[] Ryanair from providing [its] post-contractual obligations." In other words, Ryanair receives *incorrect* contact and payment information. Courts must consider the words according to "their natural and obvious meaning." *FinancialApps*, 2023 WL 4744255, at *3.

It is undisputed that Booking provides false, or incorrect, customer *payment* details to Ryanair. *See* Fuga Dec. Ex. 28 at 8; Lopata Dec. ¶ 34(o). Booking alleges only that it does not provide false customer *email addresses* to Ryanair. Opp'n at 33-34. But Booking *does* provide

████████████████████████████████████████████████████

Lopata Dec. ¶ 34(n). Thus, it is at least substantially true to say "*Screen scraper OTAs provide Ryanair with false customer details*…." Moreover, Booking presumably would not dispute the statement if Ryanair had only said "**_most_** *screen scraper OTAs provide Ryanair with false customer details*," because most OTAs *do* provide false customer email addresses to Ryanair throughout the login and booking process, including the other Defendants. *Id.* Thus, it is substantially true to say OTAs provide Ryanair with false customer details, because most OTAs, including Booking, provide Ryanair with false email addresses.

## 2.   Actual Malice Applies, and No Reasonable Juror Could Find That Ryanair's Statements Were Made with Actual Malice

Booking's blanket declaration that actual malice "does not apply" to the counterclaims is perplexing because this Court has already held that Defendants' trade libel claim requires a showing of actual malice. D.I. 134 at 17; *see also In re Nat'l Collegiate Student Loan Trusts Litig.*, No. CV 12111-VCS, 2020 WL 3960334, at *4 (Del. Ch. July 13, 2020) (citing Restatement (Second) of Torts § 623A). Actual malice also applies to Defendants' defamation claim because Booking is a limited purpose public figure and seeks punitive damages. *See, e.g.*, *Cousins v. Goodier*, 283 A.3d 1140, 1148-49 & n.42 (Del. 2022) (actual malice standard applies in standard

14

defamation claims where the plaintiff is a public figure, or is a private figure seeking punitive damages); Hemann Dec. Ex. 26 at 68 (Booking is a public figure because its use of the Ryanair logo suggests to the public that it has authorization to sell Ryanair flights).

To prove actual malice, Defendants must show that the specific individuals responsible for the publication, not just Ryanair as an institution, had knowledge of falsity or acted with reckless disregard to falsity. *Page v. Oath Inc.*, 270 A.3d 833, 850 (Del. 2022), cert. denied, 142 S. Ct. 2717 (2022). Booking cites generally to "Ryanair's internal records," supposedly showing ███████ ████████████████████████████████████ Opp'n at 35 (citing Exs. L-N attached to the Opp'n). ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████ *See, e.g.*, Opp'n Ex. L ██████████████████

███████████████████████████████████████████████████████;

*id.* (████████████████████████████████████████████████████████

███████). Booking also cites to a deposition excerpt from a Ryanair marketing employee, but her opinion on whether generalized statements that are not the subject of this litigation would be true *if* applied to Booking cannot prove her knowledge of falsity of the emails that are the subject of this litigation when they were sent. *See* Opp'n at 35; Opp'n Ex. E.

Ryanair also does not know ██████████████████. Ryanair knows only that ██

███████████████████████████████████████████████████████

███████████████████████████████████ *See* Hemann Dec. Ex. 26 at 107-109, 131-133; Fuga Dec. Ex. 23 at 51-55. When Ryanair sends that email, it is unequivocally true that "*Screen scraper OTAs provide Ryanair with false customer details…*," and Ryanair's employees who draft and send that statement know it to be true. Booking does not claim that

statement is false on its face but rather claims it is false only when a Booking customer reads it and believes that Ryanair is referring to Booking. ███████████████████████████████

███████████████████████████████████████████████████████████████████

Thus, Booking cannot show that Ryanair *knew* its statement was false. Regardless, Booking *does*

███████████████████████████████████████████████████████████████████

███████████████ so the statement is not false even as applied to Booking. *See* D.I. 348 at 30.

### 3. Booking Cannot Prove That Ryanair Acted Wrongfully or Intentionally, and the Tortious Interference and Unfair Competition Claims Must Fail

Booking alleges that Ryanair "wrongfully" interfered with its prospective business relations because Ryanair's customer verification procedure "is simply part of Ryanair's anti-OTA business strategy." Opp'n at 36. Ryanair does not have an "anti-OTA" business strategy.[16] Ryanair's customer verification procedure was implemented to assess and correct the damage caused by OTAs in order to protect and better serve Ryanair's passengers. *See generally* Hemann Dec. Ex. 1 at 127:18-129:1; D.I. 348 at 12-13. Identifying and correcting inaccurate passenger information is not unlawful. A business is allowed to compete and have a business strategy that seeks to minimize harm caused by another business. *See Wilco AG v. Packaging Techs. & Inspection LLC*, 615 F. Supp. 2d 320, 325 (D. Del. 2009). It is not allowed to do so *unlawfully* or to use "*wrongful means*," which is defined as "tactics which are sufficiently 'predatory' that they form an independent basis for liability on the part of the defendant ... [such as] breach of fiduciary duty, 'physical violence, fraud....'" *Com. Nat. Ins. Servs., Inc. v. Buchler*, 120 F. App'x 414, 418–19 (3d Cir. 2004). Booking alleges only that Ryanair had an "anti-OTA" business strategy, not that

---

[16] Ryanair even recently partnered with OTAs Kiwi and Loveholidays offering flights to their customers. *See* https://corporate.ryanair.com/news/ryanair-agrees-new-partnership-deal-with-ota-kiwi-com/?market=en;  https://corporate.ryanair.com/news/ryanair-agree-new-deal-with-leading-ota-loveholidays/?market=en.

Ryanair has committed an unlawful act. That is not independently actionable, and thus Booking has not even properly alleged that Ryanair acted "wrongfully."

Additionally, Booking has failed to prove that Ryanair intentionally targeted Booking's customers with the intent to interfere in their relationship with Booking. Booking responds with various exhibits allegedly showing only that Ryanair knows that Booking sells Ryanair flights. *See* Opp'n at 37-38. That is not a revelation, and does not change the fact that, in relation to the emails that are the subject of the tortious interference and unfair competition counterclaims, Ryanair ███ ████████████████████████████████████████████████████████████. *See supra* Section II.B.2. And importantly, Booking has not proved Ryanair's primary intent when sending those emails was to target Booking customers, specifically. *See Buchler*, 120 F. App'x at 418-19.

Booking's counterclaims for tortious interference and unfair competition therefore fail.

### 4.      Booking Has Failed to Prove It Suffered Damages

Booking continues to rely heavily on inadmissible, untrustworthy customer complaints.[17] Booking's customer complaints are inadmissible hearsay because records are admissible under the business records exception only when the declaration was made by a person under a business duty to report it. *See AAMCO Transmissions, Inc. v. Baker*, 591 F. Supp. 2d 788, 794-795, 798 (E.D. Pa. 2008); *see also Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991); *QVC, Inc. v. MJC Am., Ltd.*, No. CIV.A. 08-3830, 2012 WL 33026, at *2 (E.D. Pa. Jan. 6, 2012) (exception applies only "'if it is shown that the business's standard practice was to verify the information provided'"). The sole case cited by Booking is distinguishable because, unlike here, it involved business notes by business employees, who had a "business duty" to report the contents of the

---

[17] Even if customer complaints were admissible, they do not establish Booking's damage due to Ryanair's statements. At most, they establish Booking's customers' frustration from Booking's poor service independent of Ryanair. Gierhart Dec. Ex. 3 at RYANAIR-BOOKING_0072294-98.

calls. *See In re Memorex Telex Corp.*, 242 B.R. 826, 829 (D. Del. 1999).

Here, the fact that emails from customers are stored in a database does not make them business records. They are statements made by third parties who have no business duty to make statements, and the declaration from Marcos Guerrero says nothing about a standard practice to verify the information provided. *See QVC, Inc.*, 2012 WL 33026, at *2. To the contrary, Guerrero states that the statements from customers found in the spreadsheet Bates stamped BOOKING.COM00010150 were translated to English via an automated computer system. *See* Guerrero Dec. ¶ 13. The translated statements cannot be authenticated, are wholly untrustworthy, and cannot be claimed as business records.

The statements are also not "present sense impressions" under FRE 803(1), which are "statement[s] describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." *AAMCO Transmissions*, 591 F. Supp. 2d at 795. Customer emails saying that they are distressed and will stop using Booking in the future do not describe an event as it is happening. *See* Opp'n, at 39. They express feelings and supposed intentions for the future, not a description of *present* events.

Regarding the FRE 803(3) "state of mind" exception, Booking's cases offer no support. Opp'n at 39-40. Some cases allow customer statements to show "motive," but also prevent use of customers' statements that they stopped doing business to show that loss in fact resulted. *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 252 (3d Cir. 1999). The Third Circuit in *Callahan* explains:

> In [*Stelwagon*], the only evidence of actual loss . . . was the employees' reports that customers had said that they were no longer buying from the plaintiff because the plaintiff's competitors had lower prices. **We concluded that this evidence could not be used to prove such loss.** While the plaintiffs here have also offered similar testimony that their customers told them that they were purchasing beer from the Beer World stores and not the plaintiffs, they offer it only for "the [limited] purpose of proving customer motive," for which purpose we found such evidence admissible under Rule 803(3).

*Id.* (discussing *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267 (3d Cir. 1995)) (emphasis added). The takeaway from both *Callahan* and *Stelwagon* is that customer statements that they stopped doing business (or, even more tenuous, the statements at issue here that they *plan* to stop doing business) are not admissible to prove that loss actually occurred.

Finally, despite never supplementing its initial disclosures or interrogatory responses as to its alleged damages, Booking attempts to introduce never-before-disclosed figures detailing Booking's total net revenue for 2022 and portions of 2023 as new evidence of damages. *See* D.I. 374 (hereinafter "Hartnett Dec.") ¶¶ 4-10; D.I. 373 ¶¶ 3-4. ████████████████



Hartnett Dec. ¶¶ 6, 8. First, the calculation is incorrect. Rather than divide the total revenues from year 2 by the total revenues from year 1 (and then multiplying by 100 to get a percentage), Booking's counsel should have first subtracted year 1 from year 2 to determine the increase, and then divide the difference by year one. *See* https://www.indeed.com/career-advice/career-development/calculating-sales-growth. The results would be a ██████ ████████ ██████████████ ██████████.

Second, Defendants' claimed damages are entirely speculative. Booking is not making a year-over-year comparison because it compares sales for an entire 12-month period with sales in a 10-month period the following year. It is possible Ryanair sales surge in the end-of-year holiday season relative to other airlines, but Defendants' surface-level analysis fails to even account for this possibility. Moreover, █████████████████████████████ ██████████ Fuga Dec. Ex. 6 at 84. ███████████████████ ██████████ Defendants also fail to control for the fact that as Ryanair imposes

technological barriers on its website, and Booking's sales of Ryanair flights will ███████

███ independent of Ryanair's customer emails as Ryanair's barriers improve. Further, Booking

fails to control for the possibility that its growth with other airlines was due to other factors, such

as partnering with new airlines and offering new routes. Finally, regardless of whether there was

█████████████ in Ryanair sales from 2022 to (parts of) 2023, it still represents ██

█████ If Booking wants to prove ████████████████

█████████ it simply does not have the evidence.

## C.   DEFENDANTS' EXPERTS SHOULD BE EXCLUDED

### 1.   O'Neil-Dunne's Opinions Are Not Relevant or Reliable

Defendants argue that "O'Neil-Dunne's industry expertise is relevant to Ryanair's

'authorization' argument, claims that OTAs allegedly provide Ryanair with 'false' contact and

payment information, arguments concerning the function and purpose of myRyanair, and other

issues." Opp'n at 42. These claims are plainly not reflective of the opinions O'Neil-Dunne offers.

O'Neil-Dunne admits that he does not opine on authorization. Fuga Dec. Ex. 34 at 38:7-9.

Even if he had, O'Neil-Dunne is not qualified to offer opinions on authorization under the CFAA

as a purported "travel industry expert." CFAA claims are inherently technical, and knowledge of

customs in the travel industry will not provide the jury with relevant, reliable or fit opinions on

any facet of the CFAA claims. *See* D.I. 348 at 7.

Defendants argue that *Van Buren* could make O'Neil-Dunne's opinions relevant because

the CFAA's authorization framework should not be interpreted so as to "'attach criminal penalties

to a breathtaking amount of commonplace computer activity.'" Opp'n at 42. This is misplaced.

O'Neil-Dunne does not address "commonplace computer activity" because he does not opine on

authorized versus unauthorized access. Fuga Dec. Ex. 34 at 38:7-8. Further, Defendants'

unauthorized ███ activity is not remotely similar to the type of commonplace computer activity

anticipated by *Van Buren*, such as sending a personal email from a work computer. *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021). O'Neil-Dunne's testimony is not reliable or relevant because he does not engage with the facts of the case but merely is a "generalist" for the travel industry, who provides no helpful testimony. *See* D.I. 348 at 39; Fuga Dec. Ex. 34 at 39:23-40:9.

Nor is O'Neil-Dunne's testimony relevant to how "OTAs allegedly provide Ryanair with 'false' contact and payment information." Opp'n at 42. O'Neil-Dunne, as a purported industry expert, does not provide any technical or specialized knowledge to reliably assist the juror in understanding the counterclaims. *See* Fuga Dec. Ex. 33 at 5-6; Fed. R. Evid. 702. O'Neil-Dunne's opinions about how other travel agents operate does not weigh on whether access was authorized or unauthorized (on which O'Neil-Dunne admits he does not provide any opinions) and therefore he should be excluded. *See* Opp'n at 43 (citing Hemann Ex. 39 § 8.2.2).

Finally, authentication is a technical concept that requires a skill set O'Neil-Dunne lacks and on which he has not opined. *See* Fuga Dec. Ex. 33 at 5-6. O'Neil-Dunne is not qualified to speak to myRyanair as an authentication mechanism, and any resulting, unreliable opinions should be excluded. Opp'n at 43-44.

### 2.    Kelly's Opinions Are Unreliable and Should Be Excluded

Kelly's opening and rebuttal reports are based on three opinions, each of which should be excluded. *Compare* Hemann Dec. Ex. 38, *with* Gierhart Dec. Ex. 4 at 8, 12-13, 18, 27.

#### a.    *Kelly's First Opinion Is Not Reliable Because She Ignore the Facts*

Kelly's distinction for public versus private webpages cannot assist the jury because the CFAA does not draw on a public or private distinction. *See* Opp'n at 44-45; D.I. 348 at 7. Rather, the CFAA requires a determination of whether an authentication mechanism has been bypassed. *See supra* Section II.A.5. Even if the distinction were helpful, Kelly did not engage with the actual operation of the Ryanair Website.

For example, Kelly does not engage with Shield or myRyanair in a way that would explain ██████████████████████████████████████. While Defendants assert that "she thoroughly analyzed Shield and myRyanair," her analysis was based on authorized ████████████ booking a flight on the Ryanair Website and admitted that her test would not have presented as ██████ ████████████████████████████████████████████████████████████████████. Fuga Dec. Ex. 36 at 169:5-170:15. This type of selective engagement with the facts makes her unfit to assist a jury and should be excluded. *Conroy v. Vilsack*, 707 F.3d 1163, 1170 (10th Cir. 2013) (excluding expert opinion where expert was "oblivious to … key facts").

> b.    *Kelly's Second Opinion Is Not Proper Because She Did Not Reliably Review or Test Ryanair Website Access, Relying on an Unsupportable Good vs. Bad Bot Distinction*

Defendants claim that Kelly's analysis gave "Ryanair's account of Shield due regard," but Kelly's opinion that "Ryanair 'necessarily granted access to its website' for flight purchase" is based on information that is neither related to the case nor fit to assist the jury. Opp'n at 45-46; *see also* Fuga Dec. Ex. 35 at 29 nn.65-67. Specifically, Kelly relied on an unrelated product that just happened to also be named Shield. *Id.* Defendants argue that Kelly relied on "Ryanair's description that Shield ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ (*id.* at 31 & n.79)." Opp'n at 46. But these are merely two facets of a complex machine-learning algorithm developed by Ryanair, and Kelly's misunderstanding of how Shield operates and her reliance on an unrelated third party's explanation of Ryanair's in-house software is fatal.

Further, Kelly's good vs. bad bot distinction would only confuse a jury by blending different technologies together in arbitrary categories. Opp'n at 46-47; *see also* Hemann Dec. Ex. 38 at 22-23. For example, a chatbot is nothing like the ████████ use. Defendants argue that the

good vs. bad bot distinction is common in cybersecurity and Kelly cited multiple secondary sources in support. Opp'n at 46-47 (citing Hemann Ex. 38 at 22-23 & nn.37-42). However, Kelly relied on three secondary sources: a CloudFront article, a blog post, and a dead link supposedly about Ryanair's chat bot. Kelly cites to the same blog post on splunk.com (with no citations itself) in four of six total footnotes copying nearly verbatim the blog post's language. *See* Hemann Ex. 38 at 22-23 & nn.38-39, 41-42. Even if this blog post were reliable, Kelly selectively ignores statements from the blog post, for example, that scalper bots, the very type of bot at issue in this case, are "bad bot[s]." *See* https://www.splunk.com/en_us/blog/learn/bots-types.html. These sources and the verbatim use of a blog post indicate Kelly's unreliability. Kelly's opinions are not grounded in facts.

Kelly defines "good bots" as helpful, ethical, and having good intentions (reciting from the splunk.com blog) and says intent comes from who creates and deploys the bot. Fuga Dec. Ex. 36 at 242:7-243:22, 260:6-263:8. Yet Kelly did no analysis of Defendants' ███████████ ████████████████████████████████████████████ the third party that engages directly with Ryanair." *Id*. at 285:18-286:3. Defendants inappropriately argue that, somehow, Ryanair has a burden here. Opp'n at 47. That is wrong. An expert is supposed to help the trier of fact understand the case, but Kelly does not provide reliable opinions. *See* Fed. R. Evid. 702.

       c.     *Kelly's Third Opinion Is Not Proper Because She Only Factually Engaged with a Limited Subset of Losses*

Kelly's unwillingness to address all evidence of losses also demonstrates a lack of reliability. *See* D.I. 348 at 46-47; Fuga Dec. Ex. 6 at 21-24, 28-35. Defendants seem to argue that a supposed "lack of industry-recognized attribution of such harms to Defendants" excuses any need for proper analysis by Kelly. *See* Opp'n at 47-48. Kelly acknowledges that Defendants mask their direct and indirect access "by the use of ██████████████ and other purposefully

misidentifying information" and quotes Hurley explaining ███████████████

███████████████. Hemann Dec. Ex. 38 at 32. Rather than offer any sort of analysis or

engage with the facts, Kelly merely provides (1) out of context quotes from Ryanair

acknowledging ████████████████████████████████████████████████

██████████████████████████████████████████████████████. *Compare*

*id.* at 33-41 *with* Hemann Dec. Ex. 26 at 25-27, 35-37, 51-56, 60-63.

     Finally, Defendants argue that Kelly was not opining on all legally cognizable harm (Opp'n

at 48); however, this misses Ryanair's point. *See* D.I. 348 at 46-47. By limiting her opinions to

only the harm related to ████████████████████████████████████████████

████████████████████████████████████████████████████████ risks

misleading the jury into ignoring the other types of losses available under the CFAA. Fuga Dec.

Ex. 35 at 41; Fuga Dec. Ex. 36 at 365:20-366:15.

### 3.    Imburgia's Opinions on Damages Are Not Relevant or Reliable

     Imburgia is not qualified to perform any technical analysis. *See* D.I. 348 at 47. "[A] 'loss'

of $5,000 [under the CFAA] is only a threshold inquiry that once met opens up the door to a

broader category of compensatory damages." *New York Pizzeria, Inc. v. Syal*, 56 F. Supp. 3d 875,

879 (S.D. Tex. 2014) (citing *Frees, Inc. v. McMillian*, 2007 WL 2264457, at *4–6 (W.D. La. Aug.

6, 2007)). Imburgia provides a *damages* rebuttal in response to a *technical* expert. Lopata is not a

damages expert; he is a cybersecurity expert opining on which cybersecurity costs are losses

caused by Defendants. Imburgia lacks the technical qualifications to provide a proper rebuttal.

     Defendants argue that "Imburgia thoroughly engages with Lopata's ████████████

████████████████████████████████████" but this misses the point that Imburgia

is not qualified to opine on the cybersecurity analysis of losses under the CFAA. Opp'n at 49.

Imburgia, as a purported damages expert, views verification costs from only a compensatory

damages perspective and cannot determine whether these costs are, for example, "a reasonable cost to any victim, including responding to an offense. . . and restoring the data, program, system, or information to its condition prior to the offense." 18 U.S.C. § 1030(e)(11). His lack of reliability is further reflected in ████████████████████████████████████ ████████████████████████████, but mitigation of costs is not a factor in determining loss under the CFAA. *See* Fuga Dec. Ex. 37 at 174:25-178:2.

Defendants further argue that "Imburgia properly critiques Lopata" "for assigning loss to Defendants despite acknowledging ████████████████████████████ ██████████████████████████████████[.]'" Opp'n at 49-50. Imburgia's critique is improper because it is based on an incorrect legal assumption—as explained above, there is no requirement that loss must follow damage. *See supra* Section II.A.1.a.

Finally, Defendants misconstrue Ryanair's argument that "[i]f Ryanair takes issue with Imburgia's reliance on the Ryanair Group Annual Report (as opposed to Ryanair DAC) they are welcome to 'explor[e]' such 'disputed facts [] on cross examination.'" Opp'n at 50 (citations omitted). The issue is not with reliance on the Ryanair Group Annual Report but that Imburgia did not even know the relevant party and improperly based his calculations from data for the entire Ryanair Group. *See* Fuga Dec. Ex. 37 at 300:12-303:20; Fuga Dec. Ex. 39, ¶¶ 30-32, *see generally* D.I. 348 at 48-49. Thus, Imburgia's unreliable methods led him to improper calculations and misstatements of basic facts, and his testimony should be excluded.

## III.    CONCLUSION

Ryanair respectfully requests that the Court grant its motion for partial summary judgment; its motion for summary judgment against Booking's Counterclaims; and its motion to preclude expert testimony of Timothy James O'Neil-Dunne, Jordan Rae Kelly, and Basil Imburgia.

Dated: February 5, 2024

Respectfully Submitted,

**KRATZ & BARRY LLP**

*/s/ R Touhey Myer*
R Touhey Myer (#5939)
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

*Of Counsel:*

**HOLLAND & KNIGHT LLP**

R. David Donoghue (*pro hac vice*)
Anthony J. Fuga (*pro hac vice*)
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600
david.donoghue@hklaw.com
anthony.fuga@hklaw.com

Cynthia A. Gierhart (*pro hac vice*)
800 17th Street NW, Suite 1100
Washington, DC 20011
(202) 469-5416
cindy.gierhart@hklaw.com

Ji Mao (*pro hac vice*)
31 West 52nd Street
New York, New York 10019
(212) 513-3420
ji.mao@hklaw.com

William H. Oliver III (*pro hac vice*)
10 St. James Ave. 11th Floor
Boston, MA 02116
(617) 573-5863
william.oliver@hklaw.com

*Attorneys for Plaintiff/*
*Counterclaim Defendant Ryanair DAC*