## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

RYANAIR DAC,

              Plaintiff,

       v.

BOOKING HOLDINGS INC.,
BOOKING.COM B.V., KAYAK SOFTWARE
CORPORATION, PRICELINE.COM LLC,
and AGODA COMPANY PTE. LTD,

              Defendants.

C.A. No. 20-01191-WCB

**REDACTED PUBLIC VERSION**

---

## DEFENDANTS' BRIEF IN OPPOSITION TO RYANAIR'S MOTION FOR SUMMARY JUDGMENT AND MOTIONS TO PRECLUDE DEFENDANTS' EXPERT TESTIMONY

OF COUNSEL:

John H. Hemann
Kathleen Hartnett
Kristine Forderer
Alexander J. Kasner
Jessie Simpson LaGoy
Hannah Pollack
COOLEY LLP
3 Embarcadero Center, 20th Fl.
San Francisco, CA 94111
(415) 693-2200
jhemann@cooley.com
khartnett@cooley.com
kforderer@cooley.com
akasner@cooley.com
jsimpsonlagoy@cooley.com
hpollack@cooley.com

Jeffrey L. Moyer (#3309)
Alexandra M. Ewing (#6407)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
moyer@rlf.com
ewing@rlf.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    RYANAIR'S OFFENSIVE MOTION FOR SUMMARY JUDGMENT
       AGAINST BOOKING.COM AND KAYAK SHOULD BE DENIED ........................... 3

       A.    Ryanair Cannot Meet The CFAA's Threshold "Loss" Requirement. .................. 3

             1.    Ryanair Misapprehends The Meaning Of "Loss" Under The
                   CFAA. ...................................................................................... 4

             2.    Ryanair's Claimed Business And Security Costs Are Not "Losses,"
                   And, In Any Event, Are Admittedly Incorrect And Unreliable ............... 6

             3.    Any Technological Harm From The "████ Attack" Cannot Be
                   Attributed To Defendants And Is Not Substantiated. ........................... 11

             4.    Ryanair Has No "Damage and Loss" Under Section 1030(a)(5)(C). ...... 11

       B.    Ryanair Has Not Established Defendants' Vicarious Liability. ......................... 12

       C.    Ryanair Has Not Established Defendants' Intent Under The CFAA. ................. 16

       D.    Ryanair Has Not Established Unauthorized Access Or Access In Excess
             Of Authorization In Violation Of The CFAA ............................................. 17

             1.    Ryanair Has Failed To Establish "Access" To A Protected
                   Computer ................................................................................... 19

             2.    Selective Denial Of Access ████ Is A Ban, Not
                   "Authorization". .......................................................................... 20

             3.    Ryanair Does Not "Authenticate" Visitors To Its Website. ................. 23

                   a.    Shield is not an Authentication Mechanism. .......................... 25

                   b.    myRyanair is not an Authentication Mechanism. ..................... 26

             4.    Ryanair Has Not Established Access In Excess Of Authorization
                   Under Section 1030(a)(2)(C) ......................................................... 29

III.   RYANAIR'S MOTION SHOULD BE DENIED AS TO THE
       COUNTERCLAIMS ........................................................................................... 30

       A.    Ryanair Is Not Entitled To Judgment Based On Falsity And
             Wrongfulness. .............................................................................................. 30

             1.    Defamation, Trade Libel, And The DTPA. ...................................... 30

                   a.    Booking.com Has Adduced Evidence of Falsity. ...................... 30

                   b.    "Actual Malice" Does Not Apply; But A Triable Issue of
                         Fact Exists Even if It Does ................................................... 35

             2.    Tortious Interference And Unfair Competition. ................................ 36

i

            a.      There Are Material Factual Disputes Regarding Whether
Ryanair Acted Wrongfully............................................................ 36

            b.      Ryanair Has Acted Intentionally Toward Booking.com.............. 37

  B.     There Is A Disputed Issue Of Material Fact As To Booking.com's
Damages............................................................................................. 38

IV.     RYANAIR'S MOTIONS TO EXCLUDE SHOULD BE DENIED ............................ 41

  A.     Timothy O'Neil-Dunne (Defendants' Travel Industry Expert). ......................... 41

  B.     Jordan R. Kelly (Defendants' Cybersecurity Expert). ........................................ 44

      1.     Kelly's First Opinion Is Proper............................................................. 44

      2.     Kelly's Second Opinion Is Proper. ........................................................ 45

      3.     Kelly's Third Opinion Is Proper. .......................................................... 47

  C.     Basil Imburgia (Defendants' Damages Expert). ................................................. 48

      1.     Imburgia Is Qualified And Offers Reliable Opinions............................ 49

      2.     Imburgia's Opinions Are Based On Reliable Methodologies. ............... 50

V.     CONCLUSION................................................................................................. 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agar v. Judy*,
    151 A.3d 456 (Del. Ch. 2017)....................................................................................35

*Alchem Inc. v. Cage*,
    2021 WL 4902331 (E.D. Pa. Oct. 21, 2021), *vacated and remanded on other
    grounds*, *Alchem USA Inc. v. Cage*, 2022 WL 3043153 (3d Cir. Aug. 2, 2022)..............13, 16

*Allscripts Healthcare, LLC v. Andor Health*,
    2022 WL 3021560 (D. Del. July 29, 2022) ....................................................48, 50

*Allscripts Healthcare, LLC v. Andor Health, LLC*,
    2022 WL 17403121 (D. Del. Aug. 9, 2022) ..........................................................40

*Beard Research, Inc. v. Kates*,
    8 A.3d 573 (Del. Ch. 2010)......................................................................................41

*Bobcat N. Am., LLC v. Inland Waste Holdings, LLC*,
    2019 WL 1877400 (Del. Super. Ct. Apr. 26, 2019).................................................32

*Brooks v. AM Resorts, LLC*,
    954 F. Supp. 2d 331 (E.D. Pa. 2013) ........................................................................5

*Brown v. City of Phila.*,
    541 F. Supp. 3d 605 (E.D. Pa. 2021) ......................................................................30

*Callahan v. A.E.V., Inc.*,
    182 F.3d 237 (3d Cir. 1999)....................................................................................41

*Charles Schwab & Co. v. Carter*,
    2005 WL 2369815 (N.D. Ill. Sept. 27, 2005) ........................................................13

*Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*,
    383 F.3d 110 (3d Cir. 2004)....................................................................................40

*Complaint of Borghese Lane, LLC*,
    2023 WL 3114851 (W.D. Pa. Apr. 27, 2023) ........................................................49

*In re ConAgra Foods, Inc.*,
    302 F.R.D. 537 (C.D. Cal. 2014) ............................................................................49

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)................................................................................................42

*DeBonaventura v. Nationwide Mut. Ins. Co.*,
  419 A.2d 942 (Del. Ch. 1980), *aff'd*, 428 A.2d 1151 (Del. 1981)..........................41

*Esch v. Cnty. of Kent*,
  699 F. App'x 509 (6th Cir. 2017) ..........................................................................17

*Ethypharm S.A. France v. Abbott Lab'ys*,
  598 F. Supp. 2d 611 (D. Del. 2009)......................................................................41

*Facebook v. Power Ventures*,
  844 F.3d 1058 (9th Cir. 2016) ..............................................................................27

*Fidlar Techs. v. LPS Real Est. Data Sols., Inc.*,
  810 F.3d 1075 (7th Cir. 2016) ..............................................................................12

*FinancialApps, LLC v. Envestnet, Inc.*,
  2023 WL 4936007 (D. Del. July 28, 2023) ...........................................................48

*Fink v. Time Warner Cable*,
  810 F. Supp. 2d 633 (S.D.N.Y. 2011), *on reconsideration*, 2011 WL 5121068
  (S.D.N.Y. Oct. 28, 2011) ........................................................................................5

*Flanagan v. Amon*,
  2015 WL 3462870 (Del. Ch. May 18, 2015)..........................................................32

*Franklin Prescriptions, Inc. v. N.Y. Times Co.*,
  267 F. Supp. 2d 425 (E.D. Pa. 2003) ....................................................................35

*GF Princeton, L.L.C. v. Herring Land Grp., L.L.C.*,
  518 F. App'x 108 (3d Cir. 2013) ...........................................................................39

*GlaxoSmithKline LLC v. Glenmark Pharms. Inc.*,
  2017 WL 11685723 (D. Del. May 2, 2017)............................................................42

*Haugabrook v. Valdosta City Schs.*,
  2012 WL 1014789 (M.D. Ga. Mar. 22, 2012), *aff'd sub nom. Haugabrook v.
  Cason*, 518 F. App'x 803 (11th Cir. 2013) ............................................................17

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022) ...................................................................... *passim*

*I.B.E.W. Loc. Union 380 Pension Fund v. Buck Consultants*,
  2008 WL 2265269 (E.D. Pa. June 3, 2008) ...........................................................46

*Incyte Corp. v. Flexus Biosciences, Inc.*,
  2017 WL 7803923 (Del. Super. Ct. Nov. 1, 2017).................................................41

*John McClelland & Assocs. v. Med. Action Indus.*,
     2006 WL 3333061 (D. Kan. Nov. 15, 2006) .......................................................................49

*Kos Pharms., Inc. v. Andrx Corp.*,
     369 F.3d 700 (3d Cir. 2004)...........................................................................................39

*Lee Valley Tools, Ltd. v. Indus. Blade Co.*,
     288 F.R.D. 254 (W.D.N.Y. 2013).....................................................................................50

*Luciotti v. Haddonfield, N.J.*,
     2023 WL 6366091 (D.N.J. Sept. 29, 2023) .....................................................................45

*Marcone v. Penthouse Int'l Mag. for Men*,
     754 F.2d 1072 (3d Cir. 1985)..........................................................................................38

*In re Memorex Telex Corp.*,
     242 B.R. 826 (Bankr. D. Del. 1999) ................................................................................38

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
     2022 WL 1990225 (N.D. Cal. June 6, 2022) ...................................................................22

*Mun. Revenue Serv., Inc. v. Xspand, Inc.*,
     700 F. Supp. 2d 692 (M.D. Pa. 2010)..............................................................................39

*Nexans Wires S.A. v. Sark-USA, Inc.*,
     319 F. Supp. 2d 468 (S.D.N.Y. 2004), *aff'd*, 166 F. App'x 559 (2d Cir. 2006)........................5

*NY Mach. Inc. v. Korean Cleaners Monthly*,
     2023 WL 3508330 (D.N.J. May 17, 2023) .......................................................................36

*Orbital Eng'g, Inc. v. Buchko*,
     578 F. Supp. 3d 736 (W.D. Pa. 2022)..........................................................................42, 44

*Page v. Oath Inc.*,
     270 A.3d 833 (Del. 2022) ................................................................................................35

*Rice v. Simmons*,
     2 Del. 417 (1838) ............................................................................................................31

*SEC v. Ambassador Advisors, LLC*,
     576 F. Supp. 3d 250 (E.D. Pa. 2021) ...........................................................................45, 47

*Shure Inc. v. ClearOne, Inc.*,
     2021 WL 4894198 (D. Del. Oct. 20, 2021) ......................................................................38

*In re Skye Min. Partners, LLC*,
     2020 WL 6709892 (Bankr. D. Del. Nov. 16, 2020) .........................................................17

*Spence v. Funk*,
  396 A.2d 967 (Del. 1978) ...................................................................................................31

*St. Surin v. Virgin Islands Daily News, Inc.*,
  21 F.3d 1309 (3d Cir. 1994)...............................................................................................35

*Svanaco, Inc. v. Brand*,
  417 F. Supp. 3d 1042 (N.D. Ill. 2019) ...............................................................................13

*Taj Mahal Travel, Inc. v. Delta Airlines Inc.*,
  164 F.3d 186 (3d Cir. 1998)...............................................................................................31

*U.S. Bank Nat'l Ass'n v. Gunn*,
  23 F. Supp. 3d 426 (D. Del. 2014).....................................................................................36

*U.S. Gypsum Co. v. Lafarge N. Am. Inc.*,
  670 F. Supp. 2d 737 (N.D. Ill. 2009) ...........................................................................49, 50

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*,
  898 F.2d 914 (3d Cir. 1990)...............................................................................................35

*UGI Sunbury LLC v. A Permanent Easement for 0.4308 Acres*,
  2021 WL 5140050 (M.D. Pa. Nov. 4, 2021) ......................................................................50

*United States v. Ford*,
  481 F.3d 215 (3d Cir. 2007)...............................................................................................42

*United States v. Merrill*,
  2010 WL 3981158 (S.D. Fla. Oct. 8, 2010) .......................................................................45

*United States v. Middleton*,
  231 F.3d 1207 (9th Cir. 2000) .............................................................................................5

*United States v. Schiff*,
  602 F.3d 152 (3d Cir. 2010)...............................................................................................42

*Univ. Sports Publ'ns Co. v. Playmakers Media Co.*,
  725 F. Supp. 2d 378 (S.D.N.Y. 2010)...................................................................................4

*Van Buren v. United States*,
  141 S. Ct. 1648 (2021) ............................................................................................... *passim*

*Varrallo v. Hammond Inc.*,
  94 F.3d 842 (3d Cir. 1996).................................................................................................36

*Ward v. Blair*,
  2013 WL 3816568 (Del. Super. Ct. July 16, 2013) ............................................................40

*Zap Cellular, Inc. v. Weintraub*,
   2022 WL 4325746 (E.D.N.Y. Sept. 19, 2022) ........................................................................5

**Statutes**

18 U.S.C.
   § 1030(a)(5)(C) ....................................................................................................................11
   § 1030(c)(4)(A)(i)(I) ..............................................................................................................5
   § 1030(e)(6) .........................................................................................................................29
   § 1030(e)(8) .........................................................................................................................11
   § 1030(e)(11) .....................................................................................................................4, 8
   § 1030(g) ...............................................................................................................................3


**Other Authorities**

Andromachi Georgosouli, *Payment Protection Insurance (PPI) Misselling: Some
   Lessons From the UK*, 21 Conn. Ins. L.J. 261 (2014-2015) ....................................................32

Fed. R. Civ. P. 702(b) ................................................................................................................50
Fed. R. Civ. P. 803(1) ................................................................................................................40

*Financial services mis-selling: regulation and redress*, National Audit Office
   (Feb. 24, 2016), https://www.nao.org.uk/reports/financial-services-mis-
   selling-regulation-and-redress/ ..............................................................................................31

## I.       INTRODUCTION

Ryanair's Motion for Summary Judgment and Motions to Exclude Defendants' Experts ("Motion") (D.I. 347) should be denied in full.

With respect to Ryanair's offensive motion for summary judgment[1] under the Computer Fraud and Abuse Act ("CFAA"), Ryanair does not—and cannot, as discussed in Defendants' Opening Brief (D.I. 335)—clear at least three of the fundamental hurdles.

*First,* in order to bring a civil action under the CFAA at all, Ryanair must prove that it suffered at least $5,000 in statutorily defined "loss" in a one-year period caused by each of Booking.com and KAYAK.  But Ryanair's only claimed "losses" are ongoing business-related costs, which Ryanair seeks to tax against all online travel agents (OTAs) generally and then unreliably portion out to Defendants over arbitrary periods.  None of Ryanair's claimed costs are remedial of "technological harm," as required to show CFAA "loss."  *Van Buren v. United States*, 141 S. Ct. 1648, 1660 (2021).  To the contrary, they are—at most—prophylactic expenses Ryanair incurs to support its anti-OTA business objectives, and many are just standard operating costs of running a business with an Internet presence.  Moreover, Ryanair's expert, Iain Lopata, has executed a declaration in claimed support of Ryanair's Motion that *admits* the ongoing erroneous nature of his "loss" calculations but refuses to identify or correct the errors.  D.I. 350 n.1.  Plainly

---

[1] Ryanair has moved for summary judgment on its affirmative claims only against Defendants Booking.com B.V. ("Booking.com") and KAYAK Software Corporation ("KAYAK"), and for those Defendants, only with respect to Count I (18 U.S.C. § 1030(a)(2)(C), intentional access without authorization or exceeding authorized access) and a portion of Count IV (18 U.S.C. § 1030(a)(5)(C), intentional access without authorization causing damage and loss).  Ryanair does not move on Counts II and IV (fraudulent access and conspiracy).  Ryanair also does not seek summary judgment on its CFAA claims against Defendants Booking Holdings, Inc., Priceline.com LLC, or Agoda Company Pte. Ltd.  Ryanair thus concedes that, at a minimum, trial would be necessary on its fraud and conspiracy claims and on its without access and exceeds authorized access claims against Defendants other than Booking.com and KAYAK.  However, for the reasons set forth in Defendants' Opening Brief in Support of Defendants' Motion for Summary Judgment ("Defs' Op. Br."), judgment should be entered in Defendants' favor on all claims.  *See* D.I. 335.

Ryanair is not entitled to summary judgment under the CFAA when it has failed to make a reliable showing of "loss" as the statute defines the term; in fact Defendants are entitled to judgment as a matter of law because Ryanair cannot make this showing.

*Second*, and equally dispositive against Ryanair is the fact that Ryanair cannot meet the standard for vicarious liability under the CFAA as articulated by this Court.  It is undisputed that the Defendants do not themselves access Ryanair's computers to engage in the challenged conduct and thus any liability under the CFAA must be vicarious.  Yet Ryanair has not shown, and there is no evidence, that Defendants "direct, induce, or encourage" others to violate the CFAA based on Defendants' arms-length commercial contracts with vendors.  Ryanair's Motion should be denied, and Defendants' motion granted, because Ryanair cannot establish vicarious liability.

*Third*, and also dispositive against Ryanair, is that it has failed to establish any underlying violation of the CFAA by third parties based on the conduct alleged.  In particular, Ryanair has not shown that its website requires "authorization" or contains any "authentication mechanism" such that Ryanair.com could be found to be anything other than what Ryanair's employees have admitted it is: a public website, available to anyone with a browser.  D.I. 105 ("MTD Order") at 23-24.  As the case law clearly establishes, authorization is an *affirmative* notion; it is not created simply by selectively banning other users.  Ryanair may not want travel agents (or their vendors) using its website to book flights, but it cannot create a sales channel open to the general public and at the same time invoke the protections of the CFAA, a criminal computer hacking statute, when undesired members of the public freely make use of it.  The CFAA is not directed at such common, commercial use of the Internet.  The evidence shows there is no claim here.

Ryanair's Motion should also be denied regarding Booking.com's counterclaims.  Booking.com has adduced evidence showing—at a minimum—a genuine dispute of material fact

as to the falsity of Ryanair's statements to customers about Booking.com, Ryanair's wrongfulness, and the resulting harm to Booking.com.  And, although the "actual malice" requirements do not apply here, even if they did, a reasonable jury could find that they were met.

Finally, Ryanair's challenges to Defendants' expert witnesses are meritless.  Defendants' experts are well-qualified and have provided relevant and reliable testimony.  They thus satisfy Federal Rule of Evidence 702 and *Daubert*.  That Ryanair disagrees with the experts' opinions or believes they should have opined on different topics is beside the point on a motion to exclude.

## II.   RYANAIR'S OFFENSIVE MOTION FOR SUMMARY JUDGMENT AGAINST BOOKING.COM AND KAYAK SHOULD BE DENIED

### A.   Ryanair Cannot Meet The CFAA's Threshold "Loss" Requirement.

Ryanair's CFAA claims fail, and certainly affirmative summary judgment must be denied, because Ryanair has not experienced the "loss" required to bring a civil claim.  Ryanair concedes that it must establish that a Defendant caused $5,000 or more of "loss" in a one-year period to maintain a civil action against that Defendant.  *See* Op. Br. at 8 (citing Section 1030(g)[2]).[3]   And, as Defendants established in their Opening Brief, Ryanair has failed to do so for *any* Defendant. Defs' Op. Br. at 27-35.  Its claimed loss, which ranges from ongoing prophylactic costs like Shield, to the entire cost of its ticket reservation system, to the salaries of employees providing service to customers at the airport, is not cognizable under the CFAA.

As set forth below, Ryanair's argument that it meets the $5,000 "loss" threshold for Booking.com and KAYAK is both legally and factually unsound.  Legally, Ryanair does not seek to satisfy the CFAA's definition of "loss," which must be remedial; instead Ryanair cites ongoing, preventative, business costs that were incurred during an arbitrarily defined one-year period for

---

[2] "Section" refers to portions of the CFAA 18 U.S.C. § 1030 *et seq* unless otherwise noted.
[3] Ryanair's Opening Brief in Support of its Motion (D.I. 348) ("Opening Brief" or "Op. Br.")

each Defendant.   Ryanair's attribution of loss to each Defendant is just an (unreliable) estimate of their pro rata share of Ryanair's total expenses in each category.   Factually, Ryanair fails to substantiate its foundational assumption— ███████████████████████████████ █████████████████████████████   That Ryanair bases its "loss" arguments on the speculative, unverified, and admittedly erroneous opinion of putative expert Iain Lopata further shows that Ryanair has no concrete "loss" from the alleged conduct—never mind $5,000 per year for either Booking.com or KAYAK.

### 1.   Ryanair Misapprehends The Meaning Of "Loss" Under The CFAA.

As Ryanair acknowledges, *see* Op. Br. at 8, the CFAA has a specific definition of "loss": "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."   Section 1030(e)(11).   As courts have recognized, "loss" must result from a *technological* harm.   The Supreme Court made this clear in *Van Buren v. United States*, explaining that the CFAA's "definitions of 'damage' and 'loss' thus focus on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data" and they are "ill-fitted . . . to remediating 'misuse'" of information.   141 S. Ct. at 1660 (noting that Van Buren's "run of the license plate did not impair the 'integrity or availability' of data, nor did it otherwise harm the database system itself").

"Loss" also must be *responsive* to a computer intrusion—not a prophylactic or preventative measure.   This is shown by the statute's use of terms such as "responding to," "damage assessment," "restoring," and "interruption of service" in defining "loss."   Section 1030(e)(11).   Ongoing, prophylactic measures to safeguard computer systems do *not* count as "loss" under the CFAA, as Ryanair's own authorities make clear.   *See, e.g.*, *Univ. Sports Publ'ns Co. v. Playmakers*

*Media Co.*, 725 F. Supp. 2d 378, 388 (S.D.N.Y. 2010) (explaining that a "prophylactic" audit that "sought to identify ways to improve the database's security systems, not to identify and address damage caused by the security breach that had already taken place" likely did not constitute "loss" under the CFAA); *Zap Cellular, Inc. v. Weintraub*, 2022 WL 4325746, at *12 (E.D.N.Y. Sept. 19, 2022) (acknowledging judicial "reluctan[ce] to allow losses stemming from prophylactic preventative measures to constitute 'losses' under the statute, even if such measure is prompted by a specific breach" (citation omitted)); *United States v. Middleton*, 231 F.3d 1207, 1213 (9th Cir. 2000) (explaining that the CFAA recognizes as "loss" "only those costs" to "resecure" a computer system, not costs "that would [] create an improved computer system"); *cf.* Op. Br. at 8-9 (citing these cases, but not acknowledging this point). Or, in the words of another case cited by Ryanair, "loss" must stem from "investigat[ing] or repair[ing] the damage to the computer." *Brooks v. AM Resorts, LLC*, 954 F. Supp. 2d 331, 338 (E.D. Pa. 2013) (cited in Op. Br. at 8). Myriad other cases also stand for this same basic principle: "loss" must be remedial. *See, e.g.*, *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 641 (S.D.N.Y. 2011) ("Plaintiffs do not allege that they needed to 'restore[ ] . . . data, [a] program, [a] system, or information to its condition prior to' [d]efendant's conduct. Plaintiff's alleged losses are simply not of the type contemplated by the statute and recognized in case law." (citation omitted)), *on reconsideration*, 2011 WL 5121068 (S.D.N.Y. Oct. 28, 2011); *Nexans Wires S.A. v. Sark-USA, Inc*., 319 F. Supp. 2d 468, 474 (S.D.N.Y. 2004) (explaining that "'loss' means any remedial costs of investigating the computer for damage, remedying the damage and any costs incurred because the computer cannot function while or until repairs are made"), *aff'd*, 166 F. App'x 559 (2d Cir. 2006).

Further supporting the notion that "loss" must be responsive not prophylactic, Section 1030(c)(4)(A)(i)(I) specifies that the loss must take place during a "1-year period." Contrary to

the statute's notion of a cost responsive to an intrusion over a specified time period, Ryanair's claimed "losses" are, uniformly, ongoing business costs that began before and continued after the date range Ryanair has chosen for trying to show "loss";  they are not connected to any particular damage or event, and; Ryanair does not start "counting" until an arbitrary time years after each Defendant started displaying Ryanair flights, *see* Op. Br. at 9 n.2

Ryanair's Opening Brief ignores that "loss" under the CFAA must be both *technological* and *responsive* in nature.  Instead, Ryanair seeks to establish "loss" based on ███████ allegedly "damaging the integrity of the Ryanair passenger data in its database, which prevents Ryanair from contacting or issuing refunds to its passengers[.]"  Op. Br. at 5.  Critically, what Ryanair means by "corrupted data," *id.* at 12, is *not*—as the CFAA covers—technological "corruption" of existing data or files by an intruder, *Van Buren*, 141 S. Ct. at 1660.  Instead, what Ryanair means by "corrupted data" is allegedly "fabricated payment methods, passenger personal information, and e-mail addresses when booking flight[s]."  Op. Br. at 12.  Although Defendants' vendors do not in fact appear to use "fake" customer and payment information (*see infra* Section III), even assuming they did, that is not "corruption" of existing data on Ryanair's system by an intruder; it is instead Ryanair's receipt of new data that Ryanair allegedly finds lacking from a business analytics perspective.  *See* Defs' Op. Br. at 33-34 & nn.23-24.  That is not CFAA "loss."

> ## 2.      Ryanair's Claimed Business And Security Costs Are Not "Losses," And, In Any Event, Are Admittedly Incorrect And Unreliable.

As Defendants explained in their summary judgment motion, all aspects of Ryanair's claimed "loss" are costs associated with standard website or cybersecurity measures or Ryanair's anti-OTA business practices, not "technological harms [based on computer intrusions] that constitute CFAA 'loss.'"  Defs' Op. Br. at 28; *id.* at 28-33.  Ryanair's motion confirms this point. *See* Op. Br. at 9-14.  Specifically, Ryanair chose arbitrary 1-year periods and claims that it

"determined its losses from ███ activity [during that year] and then calculated the proportion of those losses attributable to Booking and Kayak." *Id.* at 8-9.  This argument is flawed in multiple respects: (1) nowhere does Ryanair establish that ███ activity has in fact damaged its computers (as opposed to being undesirable from a business perspective); (2) many of its claimed costs are not even related to ███ activity; (3) Ryanair's claimed costs are largely prophylactic measures; and (4) Ryanair's loss calculations are speculative and unreliable, including because they are based on the error-prone analysis of an expert whose errors have not been corrected.

*First*, Ryanair asks the Court to assume, without substantiation, that ███ activity damages its computers. *See, e.g.*, Op. Br. at 9 (referring, without explanation, to "damage caused by such bots").  But elsewhere it acknowledges that ███ activity has not, to date, caused technological harm. *See id.* at 11 (claiming costs related to allegedly "*prevent[ing]*" Booking's ███ activity" from "causing the website to slow down or stop working entirely" (emphasis added)).  In fact, *none* of Ryanair's claimed "loss" from ███ activity relates to slow downs, shutdowns, excess usage of the website, or corruption of Ryanair's data.  Instead, Ryanair's arguments reveal that its actual issue ███ is not one of *technological* harm, but of receiving passenger information in a manner that allegedly complicates its business.  *See* Op. Br. at 5, 12 (claiming that "Defendants' ███ harms the Ryanair Website by damaging the integrity of the Ryanair passenger data in its database," meaning "disrupt[ing] the ability to carry out [Ryanair's] business processes"); Hemann Ex. 1, Hurley Dep. Tr. I at 119:17-19.  That customer information ███ is insufficient for Ryanair's business purposes is not a corruption of data or "loss" under the CFAA, *cf. Van Buren*, 141 S. Ct. at 1660, but simply a perceived business nuisance.

*Second,* many of Ryanair's categories of claimed loss are not ███ at all or minimally, yet Ryanair seeks to attribute the *entirety* of these costs to OTAs as "loss."  *See infra*

(detailing items).  For example, Ryanair would have Booking.com and KAYAK held responsible for a percentage of Ryanair's *entire* cost of hosting the ███████████████████ — not the "scale-up" costs related to ██████████████.  *See* Op. Br. at 10-11.  Ryanair's putative expert Lopata did not even *consider* whether Ryanair ever exceeded its ███████████ at all during the 1-year "loss" period (and there is no evidence it ever has), but simply attributed to OTAs *the entire cost of Ryanair's* ██████████████████████████████ Hartnett Ex. A, Lopata Dep. Tr. at 245:17-246:18 (loss is not connected to e███████████████ ██████████ Hartnett Exs. B, C.

*Third*, nearly all of Ryanair's categories of claimed loss are general, prophylactic website security or business measures.  Such costs are not "loss" under the CFAA because they are not "responses" to computer intrusions, but rather (at most) preemptive measures to maintain website security or efforts to interfere with OTAs' ability to book flights.  *See supra*; 18 U.S.C. § 1030(e)(11).  Moreover, they are ongoing costs that Ryanair incurs independently of Defendants—not costs within a 1-year period in response to a computer intrusion.  And the costs related to Ryanair's self-inflicted "verification" process—even if arguably "responsive" to reservations made ██████—are business costs, not a response to technological harm or data corruption, and thus not "loss."

*Fourth*, not only are Ryanair's categories of alleged "loss" not "loss" under the CFAA, but they are entirely speculative and unreliable.  As Ryanair's motion concedes, its loss calculations all derive from the expert testimony of Iain Lopata, who admittedly made a massive error in his initial expert report that overstated claimed annual costs from all OTAs ██████████  *See* Defs' Op. Br. at 40 (describing amendment of report to ███████████████████████

███████████████████████ Now, Lopata further admits that "[i]n reviewing my expert reports, I discovered a few minor errors in my calculation of the losses attributable to Booking and Kayak," but states that he has "opted not to correct these minor errors in my declaration," claiming that "these minor errors did not significantly impact my calculation of the losses attributable to Booking and Kayak and did not affect my ultimate conclusion as to whether Booking and Kayak had reached the $5,000 threshold for losses." D.I. 350 at 1 n.1. That Lopata concedes he has identified additional errors, but has not divulged them or adjusted his calculations, only underscores the flawed and unreliable nature of his "loss" analysis.

Moreover, even apart from being error-ridden, Lopata's methodology is fundamentally unreliable, as explained in Defendants' motion to exclude. *See* Defs' Op. Br. at 38-44. Not only is Lopata admittedly not a damages expert, *see id.* at 41-42, doing no more than non-expert math (and doing it poorly), *see id.* at 42, but his analysis lacks a reliable method and flouts fundamental principles of damages analysis, *see id.* at 42-44. Lopata simply accepted Ryanair's claimed costs without any verification, and he also ignored the *benefits* to Ryanair from the challenged conduct. *See id*; *see also* Hartnett Ex. C at RYANAIR-BOOKING_0080239 ███████████████ ██████████████████████████████████ Hemann Ex. 45 ¶¶ 29-32. Nor has he provided any reliable basis for ascribing percentages of responsibility to Booking.com and KAYAK. Indeed, his entire allocation to Booking.com and KAYAK rests on their respective percentages of supposed "OTA" bookings on Ryanair.com (Hemann Ex. 40 ¶¶ 164, 172), but Lopata cites only a single document for the number of OTA bookings in each month, Hemann Ex. 46, and provides no explanation of what that document is, where it came from, or how the numbers of "OTA bookings" were determined. Hemann Ex. 40 ¶162, n.118. And, for KAYAK, *he cites no source at all* for the number of OTA bookings during the period at issue. Hemann Ex. 40 ¶

172.  Thus, despite Ryanair's smokescreen of categories and charts, *see* Op. Br. at 15-16, all of which depend on Lopata's flawed analysis, *see id.* at 8-9, there is ultimately no reliable basis to conclude that any Defendant caused Ryanair $5,000 or more of loss in a one-year period.  *See* Defs' Op. Br. at 35.

To summarize, and as shown in Defendants' motion, *see* Defs' Op. Br. at 28-33, each and every category of "loss" claimed by Ryanair, Op. Br. at 8-16, is not "loss" under the CFAA:

- *Shield*:  Prophylactic, no technological harm.  Op. Br. at 9-10; Defs' Op. Br. at 29-30.

- *Business Intelligence Employees*:  Prophylactic, no technological harm cited, based on unverified data and unreliable calculation.  Op. Br. at 10; Defs' Op. Br. at 32-33.

- ██████████  Prophylactic, no technological harm cited, not about ████ but a website performance tool.  Op. Br. at 10-11; Defs' Op. Br. at 30-31.

- ████████████████  Prophylactic, no technological harm cited, not about ████ but general website tools.  Op. Br. at 11; Defs' Op. Br. at 31.

- ████████  Prophylactic, no technological harm cited, not about ███ but Ryanair's general reservation system.  Op. Br. at 11-12; Defs' Op. Br. at 31.

- *myRyanair*:  Prophylactic, no technological harm cited, not about ████, intended for marketing and customer convenience.  Op. Br. at 12; Defs' Op. Br. at 32.  Hartnett Ex. D, O'Leary Dep. Tr. at 29:2-21 (myRyanair "makes it much easier" for customers because it "backfills their next booking and all their details, that kind of stuff."); Hemann Ex. 4, O'Callaghan Dep. Tr. at 119:26-120:1 (myRyanair "give[s] [customers] a kind of tailored experience, improved experience"); Hartnett Ex. E, Murphy Dep. Tr. 143:11-145:8 (implementing myRyanair "was a business decision" that benefits consumers).

- *Customer Service Agents*, *Digital Employees*:  Not response to technological harm or data

corruption, but costs of conforming to Ryanair's business processes.  Op. Br. at 13, 14; Defs' Op. Br. at 32-33.

- *Online/In-Person Verification*:  Not response to technological harm or data corruption, but costs of conforming to Ryanair's business processes.  Op. Br. at 14; Defs' Op. Br. at 33.

      **3.**      **Any Technological Harm From The "████ Attack" Cannot Be Attributed To Defendants And Is Not Substantiated.**

As Defendants have explained, the only arguable technological harm claimed by Ryanair concerned the alleged "████ attack," which Ryanair has falsely ascribed to Defendants.  *See* Defs' Op. Br. at 22-24, 34.  Notably, Ryanair's Opening Brief does not assert "loss" from the "████ attack" under Sections 1030(g) & 1030(c)(4)(A)(i)(I) at all.  *See* Op. Br. at 8-16.  Nor could it, as Ryanair's Opening Brief has identified neither technological harm from that "attack" nor evidence that any Defendant was responsible.  *See* Defs' Op. Br. at 22-24, 34.  Nevertheless, Ryanair continues to repeat (though not substantiate) its baseless assertion that "Booking has taken part in an attack bringing down a portion of the Ryanair Website" Op. Br. at 5, and that ████ ████████████████████████████████████████████████████████████████████████ *id.* at 26.  There is not a scintilla of evidence that Booking.com (or any Defendant) had anything to do with the alleged ████ attack. Ryanair's false and utterly unfounded assertions certainly do not establish a basis for "loss" attributable to any Defendant.

      **4.**      **Ryanair Has No "Damage and Loss" Under Section 1030(a)(5)(C).**

For Ryanair's Section 1030(a)(5)(C) claim (Count IV), Ryanair must establish both "damage *and* loss."  *See* Op. Br. at 26 (citing statute) (emphasis added).  In addition to failing to show "loss," as just discussed, Ryanair has failed to show that any Defendant caused it "damage," which the CFAA defines as "any impairment to the integrity or availability of data, a program, a system, or information[.]"  18 U.S.C. § 1030(e)(8).  Again, as the Supreme Court has made clear,

"loss" and "damage" under the CFAA "focus on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data." *Van Buren*, 141 S. Ct. at 1660; *see also Fidlar Techs. v. LPS Real Est. Data Sols., Inc.*, 810 F.3d 1075, 1084 (7th Cir. 2016) (no CFAA "damage" where web-harvester "did not impair the integrity or availability of Fidlar's data or systems; it simply downloaded the data requested without leaving a trace").

Here, Ryanair's only claimed "damage" is that "Booking and KAYAK have impaired the integrity of its end-user passenger data" and that Ryanair's ███████████████████ ████████████████████████████████████████ Op. Br. at 26. These claims of "damage" fail. As explained above, Ryanair's claim is not that Defendants have corrupted or impaired any existing data, but that their vendors have provided Ryanair with new data that Ryanair does not find optimal from a business analytics perspective. And there is *no* evidence whatsoever that Defendants caused or played any role in the purported ██████ attack.

Because Ryanair has not adduced evidence of $5,000 of loss in a 1-year period attributable to any Defendant, it has no civil CFAA claim and, at least, its affirmative Motion must be denied.

### B.  Ryanair Has Not Established Defendants' Vicarious Liability.

Ryanair's CFAA claims fail—and its affirmative Motion must also be denied—for the additional reason that it cannot establish vicarious liability. It is uncontested that Defendants do not, themselves, access the Ryanair website in connection with the challenged conduct, and thus Ryanair's claims in this case rise or fall on vicarious liability. *See, e.g.*, Op. Br. at 16-19 (claiming Defendants' violation of the CFAA based on actions of "Third-Party Partners"). And, as shown in Defendants' Opening Brief, there is no record evidence that Defendants "direct, encourage, [or] induce" any third party to undertake any of the challenged conduct: *i.e.*, to ██████ to access Ryanair.com; to make myRyanair accounts; to bypass Shield; or to take any other action in alleged violation of the CFAA. Nor does Ryanair argue that such evidence exists. Rather, Ryanair's

theory is that *merely by offering* Ryanair flights through their platforms, Defendants "direct, encourage, and induce" third-parties' access to Ryanair.com in the challenged manner and therefore vicariously violate the CFAA.  There is no support for this far-reaching conception of vicarious liability in the case law, and for good reason—it is a dangerously attenuated theory that would sweep in wide swaths of conduct disconnected from the computer intrusions outlawed by the CFAA's criminal prohibitions.  Summary judgment should be denied to Ryanair and granted to Defendants, as Ryanair has failed to adduce evidence that Defendants direct, encourage, or induce third parties to commit violations of the CFAA.

The Court has held that to establish vicarious liability, Ryanair must prove that Defendants purposefully direct, encourage, or induce third parties to take the actions that violate the CFAA.  *See* Defs' Op. Br. at 19-21; MTD Order; *see also Svanaco, Inc. v. Brand*, 417 F. Supp. 3d 1042, 1059-60 (N.D. Ill. 2019) (no vicarious liability where defendant did not direct, induce, encourage the specific CFAA violation); *Alchem Inc. v. Cage*, 2021 WL 4902331, at *7 (E.D. Pa. Oct. 21, 2021) (no vicarious liability where plaintiff failed to provide "actual evidence" that defendant induced a third party to "access [plaintiff's] protected computer to steal its confidential information"), *vacated and remanded on other grounds*, *Alchem USA Inc. v. Cage*, 2022 WL 3043153 (3d Cir. Aug. 2, 2022).  Ryanair cites only one case applying the "direct, encourage, induce" framework—*Charles Schwab & Co. v. Carter*, 2005 WL 2369815 (N.D. Ill. Sept. 27, 2005)—and that case makes clear that, as Defendants have argued, vicarious liability under the CFAA requires direction, encouragement, or inducement *of the specific "access" that violates the CFAA*.  *See id*. at *7 ("Schwab alleges that Defendants *affirmatively urged* Carter to access Schwab's computer system beyond his authorization for their benefit" (emphasis added)).

The facts here are straightforward, undisputed, and cannot support CFAA liability against Defendants under the "direct, encourage, induce" framework.   Defendants have standard commercial agreements with third-party vendors, under which Defendants obtain access to the vendors' entire inventory of available flights and prices.  Hemann Exs. 56-65, 49.  These contracts also provide for the vendors to book flights on behalf of Defendants' customers, when requested by the customer.  *Id.*  The contracts ████████████████████████████████████

████████████████████████████████████████████████████████████

███████████ and they simply allow Defendants' customers to access whatever content the vendor has, and for the vendor to make whatever booking is selected using the vendor's own process.  *Id.*

As a technical matter, the facts are also straightforward, undisputed, and wholly insufficient to establish Defendants' vicarious liability.  Using Booking.com as an example, a customer goes onto Booking.com and searches for flights by entering travel dates and locations.  *See* Fuga Ex. 2 at 7-12.  ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ *Id.*[4] The results could include Ryanair—or not—depending on what Etraveli has available and whether the route

---

[4] Ryanair's Opening Brief notes ████████████████████████████
████████████████████████  Op. Br. at 17 (citing Fuga Ex. 2 at 10).
████████████████████████████████████████████ and, in any event,
this step does not even arguably involve a non-public portion of Ryanair's website.  *See* Hemann
Ex. 1, Hurley Dep. Tr. I at 17:18-23:5 (explaining that a myRyanair login is required only after
searching flights, selecting fares, adding passenger information, selecting airport-specific upgrades
such as "fastrack," selecting ancillaries such as bags and insurance); Hemann Ex. 28 at 17-18.  The
same is true for the argument Ryanair makes █████████████████████████████
██████████████████████████ *see id.* (citing Fuga Ex. 20 at § 3.1).

is one that Ryanair offers.   If the customer chooses to book, 

████████████     Hemann Ex. 49 § 2.1 *et seq.*; Fuga Ex. 2 at 7-12.

Dispositively for purposes of vicarious liability, *nowhere* in this process does Booking.com tell Etraveli to access the Ryanair website ████ or some other channel to book the flight, let alone to do so by any particular method.   Nor does Booking.com tell Etraveli to ████ to make a myRyanair account or to use PayPal, Facebook, or Google to bypass making a myRyanair account directly; to use or not use ████████████ or anything else about potentially accessing the Ryanair website.   Indeed, Booking.com does not tell Etraveli *anything* about how to or how not to book any flight, including whether even to book with Ryanair in the first place.   Declaration of Marcos Guerrero, D.I. 337, ¶ 8; Hemann Ex. 12, Guerrero Dep. Tr. I at 42:25-43:8, 39:19-25; Fuga Ex. 21, Humphries Dep. Tr. at 124:5-11 (Booking.com has no role in issuing tickets); Hemann Ex. 25 at 00:00:00:00-00:05:29.960.  ████████████████ ████████████████ customer X wants Y flight from Z airline.  Fuga Ex. 2 at 11.  If Etraveli can book the flight, Etraveli books the flight.  *Id.*

Likewise, nowhere in the KAYAK search process does KAYAK direct, induce, or encourage any of the allegedly violative conduct.   With respect to KAYAK's Book on KAYAK feature, *see* Fuga Ex. 4 at 6-8, 11-14, 17, as with Booking.com, KAYAK does not tell its vendors whether or how to obtain Ryanair flight information or book Ryanair flights.   Declaration of Matteo Bruni, D.I. 336, ¶ 9; Declaration of Alexandria Weltert, D.I. 342 ("Weltert Decl."), ¶ 8. Among other things, KAYAK does not tell its partners to use the Ryanair website, to ████████ to make myRyanair accounts, to use ████████████ or anything similar—with respect to Ryanair or any other airline.  *Id.*

███████████████████████████████████████████████████████████████

████████████████████ Hemann Ex. 36 at 10-11; Weltert Decl. ¶ 4.  Ryanair claims that KAYAK "generates a link directing the user directly to the partner's checkout page for that specific flight," Op. Br. at 19, but this is untrue and no evidence supports this assertion.  Indeed, the lone example Ryanair cites, depicted in Fuga Ex. 4 at 9, shows a page on eDreams.net that is plainly not a "checkout page." ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████.[5]

Because no Defendant directs, encourages, or induces any third party's violation of the CFAA as alleged by Ryanair, summary judgment must be denied to Ryanair on its CFAA claims.

### C.   Ryanair Has Not Established Defendants' Intent Under The CFAA.

In an attempt to show that Defendants *intentionally* accessed Ryanair's computers—a showing required for the CFAA claims at issue—Ryanair relies, exclusively, on a partial quote from counsel at a discovery hearing.  Op. Br. at 20.  But defense counsel's statements are not evidence, and because intent is a necessary element of Counts I and IV, the Court can and should

---

[5] Ryanair also claims that KAYAK is vicariously liable because it ████████████████████
████████████████████████████████████████████████████ Op. Br. at 19. ████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████████████████████████████████████

deny the Motion on this basis alone.  *See Esch v. Cnty. of Kent*, 699 F. App'x 509, 514 n.2 (6th Cir. 2017) ("[R]epresentations made during oral argument are not part of the record, and are generally not sufficient to support a motion for summary judgment." (collecting cases)); *Haugabrook v. Valdosta City Schs.*, 2012 WL 1014789, at *1 (M.D. Ga. Mar. 22, 2012) ("Plaintiff cannot rely on statements made by opposing counsel [during preliminary injunction hearing] to establish her case"), *aff'd sub nom. Haugabrook v. Cason*, 518 F. App'x 803 (11th Cir. 2013).

Moreover, the statement of counsel cited by Ryanair in no way supports Ryanair's counterfactual claim that "Booking and KAYAK admitted their intentional access of the Ryanair Website."  Op. Br. at 20.  To the contrary, it is undisputed that Booking.com and KAYAK do not themselves access Ryanair's website with respect to the challenged conduct, and counsel's statement does not refer to those Defendants, but to unknown third parties that access the Ryanair site—*i.e.*, referring to "*somebody* [who] is accessing the Ryanair website on purpose." *Id.* (quoting defense counsel, emphasis added).  Moreover, this statement by counsel was made in the context of a discovery hearing on Ryanair's request to depose Defendants' CEOs, and the point of the statement was that Defendants' CEOs would not have knowledge about the intent of third-party actors that access the Ryanair website.  Counsel for Booking.com and KAYAK do not represent such third parties and thus could not have made an admission as to their intent.[6]

### D.   Ryanair Has Not Established Unauthorized Access Or Access In Excess Of Authorization In Violation Of The CFAA.

Ryanair's Motion must also be denied because Ryanair cannot make the threshold showing that the computer access at issue here—searching and booking flights on Ryanair.com—was

---

[6] Ryanair cites one case describing a test for when counsel's statements may be considered admissions. *See* Op. Br. at 20 (citing *In re Skye Min. Partners, LLC*, 2020 WL 6709892, at *5 n.2 (Bankr. D. Del. Nov. 16, 2020)).  Ryanair does not argue how the circumstances here satisfy the test; nor could it.

without authorization or in excess of authorized access.  Section 1030(a)(2)(C) (Count I) requires Ryanair to prove that Defendants intentionally accessed a computer without authorization or in excess of authorized access, and thereby obtained "information" from a protected computer. Section 1030(a)(5)(C) (part of Count IV) requires intentional access to a protected computer "without authorization, and as a result of such conduct, causes damage and loss," and, unlike Section (a)(2)(C), does not apply to access that "exceeds" authorization.

Ryanair is not entitled to summary judgment on either of these claims, as it has not adduced evidence—much less undisputed evidence—as to their essential elements.  To the contrary, as set forth in Defendants' Opening Brief, the undisputed facts make clear that judgment is required for Defendants on these claims.  Ryanair's summary judgment arguments ignore or misconstrue existing law governing the application of the CFAA to public websites like Ryanair.com, including this Court's ruling that "[i]f the information on the website is publicly available without requiring users to authenticate themselves, a violation of the terms of use or the defiance of a cease-and-desist letter will not give rise to liability under the CFAA."  MTD Order at 23-24.  Ryanair has identified no authorization requirement or authentication mechanism restricting access to any part of Ryanair's public website.  To the contrary, Ryanair's attempts to block ██ from accessing its website using Shield and the myRyanair login portal are *bans* of particular users, not authentication mechanisms required to create an authorization framework subject to the CFAA.  *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1196 (9th Cir. 2022) ("Where the default is free access without authorization, in ordinary parlance one would characterize selective denial of access as a ban, not as a lack of 'authorization.'").

In short, there is no CFAA violation for multiple reasons: *first*, Ryanair has not established "access" to Ryanair.com; *second*, no "authorization" is required to access Ryanair.com; *third*,

Shield and myRyanair are not "authentication" mechanisms as Ryanair claims; and, *fourth* Ryanair cannot show the additional requirements for its "exceeds authorized access" theory.

### 1.    Ryanair Has Failed To Establish "Access" To A Protected Computer.

As an initial matter, Ryanair has failed to establish that there has been "access" to a Ryanair computer—a required element of its CFAA claims.  Other than Etraveli, Ryanair took no discovery from the third parties whose "commercial agreements" are the basis for Ryanair's theory of website access.  Op. Br. at 17.  And Etraveli did not testify that it accesses Ryanair's computers; rather, it contracts with third parties to book flights.  *See* Hemann Ex. 25 at 00:00:00:00-00:05:29.960.  Ryanair's Opening Brief is devoid of *any* evidence showing that the flights at issue are booked via Ryanair's website (as opposed to another method), much less who accesses its website, how they access the website, and whether such access involves the specific actions alleged by Ryanair.  Ryanair asks the Court to find CFAA liability in the absence of any evidence as to how the alleged computer intrusion took place or who the intruder was—a finding that would be without precedent.

Indeed, Ryanair's motion cites only four pieces of claimed "evidence" in an effort to show "access."  Op. Br. at 17.  This paltry showing fails.  First, Ryanair cites both Booking.com and KAYAK's interrogatory responses stating that they have commercial agreements with third parties as alleged proof that these Defendants "necessarily require[] their partners to circumvent Ryanair's security measures."  *Id.*  The agreements do not refer to Ryanair at all or establish the third parties' website access, let alone access in violation of any "security measures."  *See Section* II.B, *supra*.  Second, Ryanair cites defense counsel's comments from the same hearing identified in Section II.C, *supra*, which as described above are not evidence, and also do not establish access, but simply confirm that Defendants have commercial arrangements with third parties to book flights.  Third, and finally, Ryanair refers to its own interrogatory response stating—without further evidence or elaboration—that "[b]y reviewing the PNRs provided by Defendants of the Ryanair flights sold

19

on Defendants' websites, Ryanair has confirmed that each time Defendants sold a Ryanair flight, that Ryanair flight was purchased on the Ryanair website and not through other means (such as through a travel agent or calling Ryanair customer service)." Fuga Ex. 6 at 83 (cited in Op. Br. at 17). Notably, this response, served on December 11, 2023, after discovery closed, does not explain who at Ryanair made this determination or how they did so. Equally notable, John Hurley, the Ryanair witness who verified this interrogatory response, is not authorized to view Defendants' PNR codes under this Court's Protective Order (D.I. 192). Thus, unless Ryanair violated the Court's order, Hurley had no proper basis to draw this conclusion or "verify" that it was correct. In any event, Ryanair's interrogatory response is conclusory and unexplained, and does not permit a determination that any third parties accessed Ryanair's website to book the flights at issue.

### 2.     Selective Denial Of Access To Bots Is A Ban, Not "Authorization".

As Ryanair concedes, "in order for the CFAA's 'without authorization' and 'exceeds authorized access' elements to apply, Ryanair must employ some sort of authentication mechanism to limit access." Op. Br. at 21 (quoting MTD Order at 22-23). Ryanair has failed to adduce evidence of any such "authentication mechanism" for its website. In fact, the record reflects that the opposite is true—Ryanair's top technology employees agree that anyone with a browser can presumptively access Ryanair.com. Hartnett Ex. G, Hurley Dep. Tr. I at 12:25-13:16; Hemann Ex. 4, O'Callaghan Dep. Tr. at 99:6-11. Thus, Ryanair.com is a "computer[] for which access is open to the general public and permission is not required" and there can be no CFAA liability. *hiQ*, 31 F.4th at 1197-98. Ryanair's attempts to identify and ███████████████ are *bans*, not affirmative authentication mechanisms.

This Court has already addressed the "instructive" holding of *hiQ Labs, Inc. v. LinkedIn Corp.*, that CFAA liability requires circumvention of a computer's "generally applicable rules regarding access permissions, such as username and password requirements, to gain access to a

20

computer." MTD Order at 22-23 (quoting *hiQ*, 31 F.4th at 1201). As *hiQ* explained, "[a]uthorization" "is *an affirmative notion, indicating that access is restricted to those **specially recognized or admitted**.*" *hiQ*, 31 F.4th at 1195-96 (quoting Black's Law Dictionary (emphasis added)). Thus, *hiQ* concluded that if the "*default* is free access without authorization"—as it was with Linkedin.com, a public website—"selective denial of access" constitutes a "ban, not [] a lack of 'authorization.'" *Id.* at 1196. The Ninth Circuit further examined the analogies to "breaking and entering" in the CFAA's legislative history and concluded that "the legislative history of section 1030 [] makes clear that the prohibition on unauthorized access is properly understood to apply only to private information—information delineated as private through use of a *permission requirement* of some sort." *Id.* at 1197 (emphasis added). Thus, CFAA liability cannot attach for accessing "websites made freely accessible on the Internet." *Id*. at 1198.

Ryanair's briefing ignores *hiQ* and this Court's prior analysis of that case almost entirely. According to Ryanair, its "Shield" system for ████████████████, and its myRyanair "login" function, are not bans but authentication methods because "[t]here is no difference between a methodology that determines if a user is part of the group and a methodology that determines if a user is not part of the group." Op. Br. at 23. Or, put differently, "By determining that [a] number is not even, one is necessarily also making a determination that the number is odd." *Id.* Thus, under Ryanair's approach, *all* ████████ users are "authorized" by default because ████████████ *Id*. at 21 (stating that Shield is designed to "allow only authorized users, ██ ██████████ to access the Ryanair Website"). But, unlike with odd and even integers, a determination that one user is banned is not necessarily a determination that another user is authorized; Ryanair cites no authority for this say-so, and for good reason—there is none. To the contrary, this argument runs directly afoul of *hiQ*. As the Ninth Circuit made clear, where—as here—"the default is free access

without authorization, in ordinary parlance one would characterize selective denial of access as a ban, not as a lack of 'authorization.'" *hiQ*, 31 F.4th at 1196.  Ryanair simply ignores this reasoning, which clearly applies.  Likewise, this Court has recognized, following *hiQ* and other courts, that employing "technological measures to block specific users [or] suspicious activity" does not create an "authorization" framework absent authentication in the first place.  MTD Order at 23 (quoting *Meta Platforms, Inc. v. BrandTotal Ltd.*, 2022 WL 1990225, at *24 (N.D. Cal. June 6, 2022)).  Again, Ryanair simply ignores this ruling.[7]

Also instructive is that in *hiQ*, LinkedIn argued—like Ryanair does here—that CFAA liability should attach because LinkedIn used technological measures to block bots and prevent scraping, ██████████████████  This argument failed.  *See* Hemann Ex. 66 at 28-29, ¶ 6 ("LinkedIn has implemented over 200 custom rules to detect and prevent scraping, and has blocked over 100 million IP addresses that it suspects were being used by data scrapers."); *see also id.* at 32-39, ¶¶ 24-35 (explaining that LinkedIn "employs an array of technological safeguards and barriers designed to prevent data scrapers, bots, and other automated systems from accessing and copying its members' data on a large scale").  Likewise unavailing in *hiQ* was LinkedIn's attempt—as Ryanair seeks to do here—to characterize its ██████ measures as an affirmative permission mechanism.  *See* Hemann Ex. 66 at 32, ¶ 25 ("LinkedIn's website and servers are not unconditionally open to the general public. . . . LinkedIn's technical defenses currently block hundreds of millions of requests to access guest profiles per day from bots and scrapers, which constitute the majority of the requests made to LinkedIn's servers for guest profiles.").

---

[7] Ryanair's witnesses had no trouble identifying the difference between affirmative approval and a ban, and identifying Shield as a ban.  *See* Hemann Ex. 1, Hurley Dep. Tr. I (Ryanair's 30(b)(6) witness) at 55:13-19 (explaining that Shield ███████████████████████████ ████████████████████████ Hartnett Ex. G at 52:15-26 (similar); *see also* Fuga Ex. 5 at 74:3-18 (clarifying that Shield blocks ████████████████████

Finally, that an affirmative, "code based" (*hiQ*, 31 F.4th at 1198) authorization framework is required for CFAA liability is important because, as *Van Buren* noted, where a violation of the CFAA can be based solely on "an access restriction contained in a contractual agreement or term of service with an Internet service provider or website" it would "inject arbitrariness into the assessment of criminal liability." *Van Buren*, 141 S. Ct. at 1662. As the Court explained "[a]n interpretation that stakes so much on a fine distinction controlled by the drafting practices of private parties is hard to sell as the most plausible." *Id.*

Here, Ryanair freely admits that the only source for the purported access limitation to Ryanair.com at issue here is its own Terms of Use ("TOU"). *See* Hartnett Ex. G, Hurley Dep. Tr. I at 55:3-12 (testifying that access ██████ is "nothing" but a "breach of the terms and conditions"), 184:22-26 (asking about a scenario where a payment ██████ goes through: "Is, in that scenario, is the ██ authorized to purchase a Ryanair ticket? A. No. Q. Why not? A. Because they've broken terms and conditions."). And, however Ryanair may strain to characterize it, the restriction is fundamentally a use restriction: Ryanair does not want OTAs buying and reselling its flights directly to customers. *See* Defs' Op. Br. at 8-9 (describing Ryanair's anti-OTA efforts). As in *Van Buren,* the access to Ryanair.com alleged by Ryanair is incidental to the "use" (i.e. purchase of Ryanair flights) and causes no technological harm. *See Van Buren*, 141 S. Ct. at 1660. By attaching liability only where a computer system has a mechanism of *affirmative* authorization, the CFAA avoids creating sweeping criminal liability for violations of a website terms of use, *i.e.*, commonplace "computer activity." *Id.* at 1661.

### 3.  Ryanair Does Not "Authenticate" Visitors To Its Website.

In addition to arguing that its ██████ measures are necessarily an authorization mechanism, *see supra*, Ryanair also claims that Shield ████████████ and myRyanair act as "authentication mechanisms." But neither Shield nor myRyanair "authenticate" website

visitors as that term is properly understood, and for this reason (among others) summary judgment should be granted to Defendants and denied to Ryanair.

In the cybersecurity context, "authentication" means the "process of confirming the correctness of the claimed identity." Hemann Ex. 38 at 9 ("Authentication is an ongoing process, wherein a user's identity is validated through a variety of technical mechanisms to ensure the correct entity is accessing the resource. So, in short: *while authorization* governs permission, *authentication* validates the identity of the entity claiming permission." (emphasis in original)). Defendants' expert testimony on this point is undisputed.[8]

The record evidence proves that the Ryanair website does not authenticate users. As discussed in more depth below, any user, human or not, is allowed presumptive access to Ryanair.com ██████████████████████████████████ with no requirement to identify themselves or make a representation about who they are or whether they ████████████████ Once they access the Ryanair website, ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ To buy a ticket, users must only supply a working email address and invent a password—nothing else—to create a "myRyanair" account, or they can rely on existing credentials with Facebook, Google, or PayPal, and provide no information directly to Ryanair at all. Hemann Ex. 4, O'Callaghan Dep. Tr. at 125:19-27. At no point in these processes does Ryanair seek to "authenticate" a user—*i.e.*, confirm the correctness of a claimed identity.

---

[8] Ryanair's putative cybersecurity expert Lopata does not dispute Kelly's definition of "authentication" or her reliance on the Authentication, Authorization, and Accounting ("AAA") cybersecurity framework. *See* Hemann Ex. 42 ¶¶ 49-52. Nor would there be any basis to dispute her definition—Kelly is an accomplished cybersecurity professional, having previously served in leadership positions for both the White House and the FBI. Hemann Ex. 38 at 4.

### a.      Shield is not an Authentication Mechanism.

Ryanair's in-house ███████ software "Shield" does not "authenticate" users, but instead monitors user behavior on Ryanair's website and ███████████████████████ ████████ Hartnett Ex. H, O'Callaghan Dep. Tr. at 243:13-15 ("Ryanair Shield is an in-house product which primarily was built █████████████████████ When Shield detects █ █████████████████████████████████████ Op. Br. at 22-23, and ███████████████████ on portions of the website that Ryanair admits are "public," Hemann Ex. 26 at 100-01.  Ryanair's own putative expert did not even conclude that Shield engages in "authenticat[ion]" of customers.  Hartnett Ex. A, Lopata Dep. Tr. at 110:22-111:5. █████████████████████████████████ ███████████████████████████████

As the record makes clear, no Shield ███████ engages in authentication:

- ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

This is quintessentially a "selective denial of access" *i.e.*, a "ban."  *hiQ*, 31 F.4th at 1196.

- ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████

- ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████



*Id.* at 72:19-26.

This is, again, a "ban" rather than affirmative "authentication" of users.

- ███████████████████ occurs after the user has logged in to myRyanair or bypassed a myRyanair login with Google, Facebook, or PayPal credentials. *Id.* at 76:2-4. ███████████

████████████████████████████████████████████████████████

*Id.* at 76:17-77:11; Hartnett Ex. I, Stocki Dep. Tr. at 40:14-27.   In other words, ███████████

████████████████████████████████

In sum, the general public—with the █████████████████████—are

presumptively allowed to access the Ryanair website until Shield determines █████████████

██████████████████████████████████████████ Thus,

Shield, at most, engages in selective ████████████ and banning, not authentication.

### b.    myRyanair is not an Authentication Mechanism.

Ryanair also argues that even if the Ryanair website is "public, Defendants would have still exceeded authorized access because they access the private, password-protected myRyanair portion of the website to make flight bookings."  Op. Br. at 23.  But the "password-protected" portion of the Ryanair website is not private and myRyanair is not an authentication mechanism.

As Ryanair's 30(b)(6) witness agreed, *anyone* can provide a working email address and make up a password to create a myRyanair account for themselves ████████████████

████████████████████████████ Hemann Ex. 1, Hurley Dep. Tr. I at

30:6-14.  Moreover, Ryanair also has a ██████████████████████████████

████████████████ Hartnett Ex. I, Stocki Dep. Tr. at 204:20-205:24; Hemann Ex.

38 at 13 ("All users of the web have the ability to create email addresses thorough [sic] freely

available email providers, such as "Gmail," "Mail.com," "AOL," "Outlook," "Yahoo" and more."); Hemann Ex. 4, O'Callaghan Dep. Tr. at 132:24-28 (stating that "[a]nyone with a Google account can create a myRyanair account"). Thus, myRyanair is "password-protected" only in the sense that any member of the public can make up a password and access the final payment page on the Ryanair website. This is not authentication under the CFAA.

As this Court has recognized, a username and password *can* in some circumstances operate to limit access to a website such that the website becomes private and subject to the CFAA's protections. MTD Order at 23. For instance, Ryanair, like many businesses, maintains a "private" "intranet" site for employees with "forms" and "payslips," access to which is limited by a username and password *given* to Ryanair employees by Ryanair. Hartnett Ex. H, O'Callaghan Dep. Tr. at 165:4-169:10 (explaining that someone could not log into Ryanair's intranet with a myRyanair account "[b]ecause myRyanair is for customers. Intranet is private internal for staff members"); *see also hiQ*, 31 F.4th at 1200 (legislative history of Section 1030 and section 2701, which contains a "similar 'without authorization' provision . . . supports the district court's distinction between 'private' computer networks and websites, protected by a password authentication system and 'not visible to the public,' and websites that are accessible to the general public."). In stark contrast, the only information needed for a myRyanair account is a working email and a user-generated password. *See* Hemann Ex. 4, O'Callaghan Dep. Tr. at 134:20-26; *id.* at 135:9-18; Hartnett Ex. I, Stocki Dep. Tr. at 90:6-13; Hemann Ex. 1, Hurley Dep. Tr. I at 23:16-22; Hemann Ex. 38 at 14.[9]

---

[9] Ryanair cites *Facebook v. Power Ventures*, 844 F.3d 1058, 1067 (9th Cir. 2016) as support for its contention that parties exceed authorized access by accessing the myRyanair portion of the website to book flights. Op. Br. at 25. But *Power Ventures* did not directly address the issue of what "authorization" means in the context of a public website, and, moreover, involved Power Ventures' use of Facebook usernames and passwords that did not belong to Power Ventures. Here, Ryanair's allegation is that OTAs (or vendors) make their own accounts using the website function

Moreover, a user of the Ryanair website is not even required to supply an email and password to purchase a ticket if they provide Facebook, Google, or PayPal credentials. Hartnett Ex. I, Stocki Dep. Tr. at 110:21-111:1. In this circumstance, a myRyanair account is automatically created for them without the need for an email address or (user-created) password. Hartnett Ex. H, O'Callaghan Dep. Tr. at 131:9-23. As Ms. Kelly explains, "[t]he fact that anyone with an email address or a Google, PayPal, or Facebook account can create a myRyanair account with no effort by Ryanair to authenticate or validate the identity of the user serves no legitimate purpose from a cybersecurity, network defense, data protection, or access control perspective." Hemann Ex. 38 at 18; *see also* Defs' Op. Br. at 32. This is neither addressed nor rebutted by Ryanair's putative expert, Mr. Lopata. It is, moreover, consistent with the main purpose of myRyanair, which is not to authenticate users but to improve the "user experience." Hartnett Ex. D, O'Leary Dep. Tr. at 29:2-21 (myRyanair "makes it much easier" for customers because it "backfills their next booking and all their details, that kind of stuff"); Hemann Ex. 4, O'Callaghan Dep. Tr. at 119:4-120:1 (myRyanair "give[s] [customers] a kind of tailored experience, improved experience").

In addition, the only "portion" of the Ryanair website that requires logging in or bypassing the myRyanair login with a Facebook, Google, or PayPal account is the final payment page, where the user provides payment information and clicks "pay." Hemann Ex. 28 at 17-18. This page is visible even before a user accesses it, and once a user accesses it, the page contains no private or confidential information other than the user's own credit card information they later input themselves. Hemann Decl. ¶¶ 20-21 (clearly displaying "private" page behind the login window); Hemann Ex. 4, O'Callaghan Dep. Tr. at 44:29-45:12 (confirming information accessible with

---

intended for purpose. Further, as the Court has recognized (MTD Order p. 25, n. 11), *Power Ventures*' effect has likely now been limited by the subsequent decision in *Van Buren*.

myRyanair account is not "confidential" to Ryanair, only to each customer); *see also* Hartnett Ex. H, O'Callaghan Dep. Tr. at 139:21-26 (no Ryanair confidential information on myRyanair payments page); Hartnett Ex. G, Hurley Dep. Tr. I at 56:5-15 (same).

Finally, the only restriction on making a myRyanair account is 

Hemann Ex. 1, Hurley Dep. Tr. I at 28:26-29:1. ██████████████████████ ████████████ Hartnett Ex. I, Stocki Dep. Tr. at 99:4-7. ████████████████ ████████████████████████████████████████ is a "selective denial of access," not an authentication mechanism. *hiQ*, 31 F.4th at 1196.

### 4. Ryanair Has Not Established Access In Excess Of Authorization Under Section 1030(a)(2)(C)

To the extent Ryanair's claim under Section 1030(a)(2)(C) (Count I) relies on an "exceeds authorized access" theory (which is unavailable under Section 1030(a)(5)(C) (Count IV)), that claim fail for the additional reason that Ryanair has not proven that Defendants use the alleged access to "alter or obtain" information they are not entitled to obtain or alter. *See* Section 1030(e)(6) (defining "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter").[10]  As discussed above, there is no Ryanair private or confidential information accessed or altered by a user of the Ryanair website who reaches the myRyanair "portion" of the website—*i.e.*, the purchase page. *See* Section II.D.3.b, *supra*.

In sum, there can be no liability on Ryanair's CFAA claims.  Its Motion must be denied.

---

[10] Ryanair acknowledges, *see* Op. Br. at 23, that access to the payment page is governed by the "exceed[s] authorized access" framework; this conclusion is inevitable because the supposed "portion" of Ryanair's website requiring a myRyanair login is part of the same "computer" as the rest of the website.  Hartnett Ex. G, Hurley Dep. Tr. I at 34:18-36:2; Hemann Ex. 28 at 17-19.

### III.   RYANAIR'S MOTION SHOULD BE DENIED AS TO THE COUNTERCLAIMS

Multiple disputed issues of material fact preclude summary judgment on Booking.com's counterclaims, and Ryanair's Motion must be denied.[11]

### A.   Ryanair Is Not Entitled To Judgment Based On Falsity And Wrongfulness.

#### 1.   Defamation, Trade Libel, And The DTPA.

Ryanair argues that the defamation, trade libel, and Delaware Deceptive Trade Practices Act ("DTPA") counterclaims should fail because the Ryanair statements at issue are true, and because Booking.com cannot establish that the statements were made with actual malice.  Op. Br. at 27-31.  The Court should reject these arguments.  There is a genuine issue of material fact as to the truth of all three statements.  Further, while the heightened "actual malice" standard does not apply here, if it did, a jury could reasonably find that Ryanair's actions satisfy this standard.

#### a.   Booking.com Has Adduced Evidence of Falsity.

Ryanair claims—incorrectly—that its three statements at issue are non-actionable because they are true.[12]  At a minimum, there is a material dispute of fact as to the truth of each statement.

*Statement 1: "Unauthorized OTAs . . .  use 'screen scraper' software to mis-sell Ryanair flights in breach of the Terms of Use of the Ryanair website."*  Op. Br. at 27-28.

The evidence overwhelmingly shows—and in fact Ryanair does not contest—that Booking.com *itself* does not access Ryanair's website, does not use screen scraper software, and

---

[11]Ryanair continues to make false and defamatory claims, naming Booking.com specifically.  *See* Hartnett Ex. CC (naming "Booking.com" in an "OTA Pirate Update" on January 3, 2024).

[12] To the extent Ryanair contends, in a footnote, that Booking.com must prove falsity because the statements concern a matter of "public concern" (*see* Op. Br. at 27 n.14), that is wrong.  Ryanair's emails to customers are not a matter of public concern, but an attempt to encourage customers to use Ryanair instead of a competitor.  *See, e.g.*, Hartnett Ex. E, Murphy Dep. Tr. at 173:21-175:3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Hartnett Ex. D, O'Leary Dep. Tr. at 29:2-21 (listing ways that Ryanair "encourage[s] customers to book directly on Ryanair.com": "we generally use PR; we use advertising; we use direct emails; . . . myRyanair"); *Brown v. City of Phila.*, 541 F. Supp. 3d 605, 636-37 (E.D. Pa. 2021) (speech regarding "personal grievance" was not on a matter of public concern).

does not agree to the Ryanair TOU such that it could be in breach.[13]  And Ryanair's argument that this statement is nonetheless true because it refers to "OTAs" and not Booking.com is contrary to this Court's ruling at the pleadings stage: "the fact that the messages were sent specifically to customers of Booking.com supports the inference that the statements referred to Booking.com." D.I. 134 ("CC MTD Order") at 11; *see also Spence v. Funk*, 396 A.2d 967, 972 (Del. 1978) (defamation "does not require that such imputation . . . be in express terms," rather it "is to be judged of by the effect it produces on the mind[.]" (quoting *Rice v. Simmons*, 2 Del. 417, 433 (1838)); *Taj Mahal Travel, Inc. v. Delta Airlines Inc*., 164 F.3d 186, 188-90 (3d Cir. 1998) (letter from an airline that claimed a "travel agency" had "stolen" its tickets could reasonably be attributed to the travel agency Taj Mahal because the reader purchased the ticket from Taj Mahal).

Ryanair further argues that there is evidence that Booking.com "mis-sell[s]" Ryanair flights, but the record does not support this contention.  Ryanair argues that "mis-sell" means selling in violation of Ryanair's TOU.  Op. Br. at 29.  In deposition, however, Ryanair's witnesses testified that "mis-sell" meant different things, such as "inflat[ing] the cost" of Ryanair fares and optional services (O'Leary) or selling in a way that "isn't the way that we sell it" (Ryanair's 30(b)(6) witness).  Hartnett Ex. D, O'Leary Dep. Tr. at 20:8-18; *see also id.* at 8:8-12, 57:22-58:3; Hartnett Ex. J, Brady Dep. Tr. at 23:2-25:26 ("mis-sell" means multiple things including selling a Ryanair flight outside a Ryanair "channel," price "mark-ups," and "modification of copy or content").  Despite Ryanair's apparent confusion, so-called "mis-selling" is a recognized criminal act that involves intentionally misleading customers in order to make a sale.  *See Financial services mis-selling:    regulation    and    redress*,    National    Audit    Office    (Feb.    24,    2016),

---

[13] As discussed above, Ryanair also has not adduced evidence of by whom or how Booking.com's Ryanair flights are purchased, as Booking.com's contractual partner Etraveli itself uses vendors to obtain Ryanair flights.  *See supra* Sections II.D and Section II.B.

https://www.nao.org.uk/reports/financial-services-mis-selling-regulation-and-redress/ (defining "mis-selling" as "a failure to deliver fair outcomes for consumers" including "providing customers with misleading information or recommending that they purchase unsuitable products."); Andromachi Georgosouli, *Payment Protection Insurance (PPI) Misselling: Some Lessons From the UK*, 21 Conn. Ins. L.J. 261, 262-63 (2014-2015) (providing examples of mis-selling, including selling a product to a consumer that the consumer does not need). Plainly, Booking.com has not engaged in such conduct. In any event, the ambiguity about the meaning of "mis-sell" created by Ryanair's own statements precludes summary judgment. *See, e.g.*, *Bobcat N. Am., LLC v. Inland Waste Holdings, LLC*, 2019 WL 1877400, at *17 (Del. Super. Ct. Apr. 26, 2019) (denying summary judgment where "email is open to multiple meanings or interpretations"); *Flanagan v. Amon*, 2015 WL 3462870, at *6 (Del. Ch. May 18, 2015).

Further, by any of Ryanair's definitions, there is at least a disputed fact about whether Booking.com in fact "mis-sells" Ryanair flights. As to Ryanair's current claimed definition—sales in violation of Ryanair's TOU, *see* Op. Br. 29—Booking.com reasonably disputes that it ever agreed or was subject to Ryanair's website TOU such that it could do something in breach of them. *See* Section II.D.1, *supra*. Agreeing to Ryanair's TOU occurs while accessing the Ryanair website, which Defendants concededly do not do. D.I. 76 ("FAC") ¶¶ 52-56. Ryanair also identifies no way in which Booking.com misrepresents anything about the characteristics of the flights it sells to customers. To the extent the "mis-selling" is based on Ryanair's repeated refrain that OTAs inflate their prices above what Ryanair charges, it is plainly false to characterize this as "mis-selling" when Booking.com makes no representation to customers whether the price shown for a given flight is higher or lower than the price of buying the ticket from Ryanair directly. Hartnett Ex. K, Guerrero Dep. Tr. I at 126:2-136:13 (describing Booking.com's pricing model). Nor is it

inherently misleading for a travel agent to offer a travel service at its own price, rather than at cost. *Id.* at 131:22-132:9, 135:14-136:13 (Booking.com "tr[ies] to win [] by offering better customer experience . . . [t]hat is our value proposition" "as a retailer, you sell a good, in this case a ticket, for a price you consider to be the right price"); Hemann Ex. 31 § 5.2.1 (describing OTAs and indirect distribution model).

     *Statement 2: "Screen scraper OTAs provide Ryanair with false customer details which prevents us from notifying passengers" and "false payment and contact details screen scraper OTAs provide Ryanair for customers inhibits Ryanair from providing our post-contractual obligations."* Op. Br. at 28.

     *First*, again, any suggestion that this statement is true because it refers to "OTAs" but not Booking.com explicitly must be rejected because it was made directly to a Booking.com customer, as the Court's prior order recognized. *See supra* at 31.

     *Second*, Ryanair argues that "false" contact and payment information in this Statement means payment and contact information that does not belong to the passenger personally, but the Statement reasonably lends itself to a different interpretation that "false" means illegitimate (e.g. a fraudulent or non-working credit card). Op. Br. at 29-30; Defs' Op. Br. at 33 n.23 (explaining that Ryanair made an intentional "language decision" to refer to non-passenger payment and contact information as fake). And, yet, Ryanair admits that it is paid (i.e. a payment instrument is successfully processed) for all of its flights sold through Booking.com. *See, e.g.*, Hemann Ex. 7, O'Leary Dep. Tr. at 30:20-23; Hemann Ex. 6, Brady Dep. Tr. at 175:25-176:4.

     *Third*—and most glaringly—the evidence overwhelmingly shows that, for Ryanair bookings made via Booking.com, although a third-party books the flight, ███████████ ████████████████████████████████████ Ryanair's Opening Brief cites no evidence of any Booking.com booking where Ryanair ██████████████████████ ██████ Thus, far from a mere disputed issue of fact, there is *no* evidence in the record to support

Ryanair's claim that Booking.com bookings are related to erroneous customer information.  Even Ryanair's expert admits that ██████████████████████████████████████████████ ███████████████ Declaration of Iain Lopata, D.I. 350, ¶ 34(n) (███████████████████████████ ███████████████████████████████████████████████ *see* Hemann Ex. 41 at 78-86 ██████████████████████████████████████████████████████████ ███████████████████ Numerous Ryanair documents from Ryanair's files also confirm that it ███████████████████████████████████████████ Hartnett Ex. L at 15, Row 2█████████████████████████████████████ Hartnett Ex. J, Brady Dep. Tr. at 229:7-23 (same); Hartnett Ex. M at 2 ████████████████████████████████████████████ Hartnett Ex. E, Murphy Dep. Tr. at 39:16-40:10, 164:8-166:15; Hartnett Ex. N at 1 of 10, third row (████████████████████████████████████ 3 of 10, second row ████████████████████████████ 8 of 10, seventh row from bottom ████████████████████████

*Statement 3: "Screen scraper OTAs provide Ryanair with false customer details which prevents us from notifying passengers of important safety, security and public health requirements."* Op. Br. at 28.

As with Statement 2, the overwhelming evidence adduced in discovery shows Statement 3 is false because, as just explained, Ryanair ██████████████████████████████████████ █████████████████████████████████ Thus, Ryanair ████████████████████████████████ ███████████████████████████████████ Indeed, the entire basis of Booking.com's counterclaims is that Ryanair *sends defamatory emails to Booking.com's customers*, which are *received*.  Moreover, Ryanair's argument that it must, as a legal matter, possess the passenger's own email address is dubious at best.  *See, e.g.*, Hartnett Decl. Ex. O ¶¶ 40-53 (Czech constitutional court found that Ryanair's forcing OTAs to provide the passenger's contact information infringed on the OTA's fundamental right to engage in business).  For the same reasons applicable to

Statement 2, Ryanair cannot obtain summary judgment on the basis that Statement 3 is true.

> **b.** **"Actual Malice" Does Not Apply; But A Triable Issue of Fact Exists Even if It Does.**

Ryanair's Opening Brief implies, but does not substantiate, that the actual malice standard applies to Booking.com's counterclaims. Op. Br. at 31. Actual malice requires that the statement at issue was made with "knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *Page v. Oath Inc.*, 270 A.3d 833, 844 (Del. 2022) (quoting *Agar v. Judy*, 151 A.3d 456, 477 (Del. Ch. 2017)). Ryanair provides no case law, or even argument, as to why the "actual malice" standard should apply and its contention can be rejected on that basis alone. Moreover, the actual malice standard does not apply because the statements are commercial speech—aimed at convincing customers to book with Ryanair directly instead of OTA competitors. *See U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 933-39 (3d Cir. 1990); *see supra* n.14.

Even assuming actual malice were required, there is substantial evidence that Ryanair knows or recklessly disregards the falsity of the statements in its emails, as to Booking.com. With respect to Statements 2 and 3, Ryanair's internal records reflect—repeatedly— ██████████ ████████████████████████████████████████████████████ *See* Hartnett Exs. L-N; Hartnett Ex. E, Murphy Dep. Tr. at 137:3-17, 231:12-232:14 ████████████ ███████████████████████████████████████████████████ This is, at least, reckless disregard as to the truth. *See St. Surin v. Virgin Islands Daily News, Inc*., 21 F.3d 1309, 1318 (3d Cir. 1994) (reversing district court's grant of summary judgment because of factual disputes as to actual malice); *Franklin Prescriptions, Inc. v. N.Y. Times Co*., 267 F. Supp. 2d 425, 438 (E.D. Pa. 2003) (finding genuine issue of material fact as to falsity because publisher had "reliable Information that contradicted the alleged defamatory implication"). And with respect to

Statement 1, Ryanair is at least reckless with regard to falsity because it knows Booking.com does not misrepresent the nature and quality of Ryanair flights, and instead of arguing to the contrary, seeks to invent its own definitions of "mis-selling."  *See* Section III.A.1.a, *supra*; *see also* Hartnett Ex. DD ███████████████████████████████████████████████  In any event, Ryanair has no basis to claim Booking.com is subject to its TOU.

## 2.     Tortious Interference And Unfair Competition.

Ryanair argues for summary judgment on Booking.com's tortious interference and unfair competition counterclaims, claiming that Ryanair did not act wrongfully or intentionally.  These arguments ignore critical facts and misstate the law.  Summary judgment should be denied.

### a.     There Are Material Factual Disputes Regarding Whether Ryanair Acted Wrongfully.

Ryanair does not contest that it interferes with Booking.com's business but instead argues it was permitted to do so to protect its own business interests.  Op. Br. at 32-35.  As with Booking.com's defamation, DTPA, and trade libel counterclaims, whether Ryanair's conduct was wrongful for purposes of tortious interference and unfair competition depends on material disputed facts and is thus a jury question.  *NY Mach. Inc. v. Korean Cleaners Monthly*, 2023 WL 3508330, at *6 (D.N.J. May 17, 2023) (citing *Varrallo v. Hammond Inc*., 94 F.3d 842, 848 (3d Cir. 1996) (wrongfulness is a jury question)); *U.S. Bank Nat'l Ass'n v. Gunn*, 23 F. Supp. 3d 426, 437 (D. Del. 2014) (denying summary judgment where there were issues of fact re defendant's bad faith).

Moreover, there is a genuine dispute of material fact concerning Ryanair's argument that its emails and self-created "verification procedure" were intended for legitimate business reasons connected with the provision of safety-related information or COVID-related refunds, or to avoid customer complaints.  Contrary to Ryanair's narrative, Booking.com has adduced ample evidence that the Ryanair verification procedure is simply part of Ryanair's anti-OTA business strategy.

*See* Defs' Op. Br. at 8-9 (describing Ryanair's Anti-OTA strategy).[14]   Numerous pieces of evidence connect Ryanair's anti-OTA "strategy" with the procedures at issue.  *See, e.g.*, Hemann

Ex. 18 

Indeed, in early 2023, Ryanair began sending emails to Booking.com customers stating that their already-paid bookings are "blocked" (and indeed blocking them from checking in) until the customer either verifies their identity or pays a hefty fee at the airport.  Hartnett Ex. S; *id.* Ex. T, Hurley Dep. Tr. II at 122:18-123:21; *id.* Ex. U.

### b.    Ryanair Has Acted Intentionally Toward Booking.com.

Ryanair also claims that it is entitled to judgment on Booking.com's tortious interference and unfair competition counterclaims because "[w]hen Ryanair sent emails to suspected OTA customers," it "did not know whether it was communicating with a Booking customer."  Op. Br. at 35.  This argument fails and, at a minimum, pertains to a disputed issue of material fact.  Not only does this lawsuit itself show that Ryanair knows that "suspected OTA customers" include those of Booking.com, but Ryanair's internal records demonstrate that Ryanair specifically targets Booking.com customers.  *See, e.g.*, Hemann Ex. 18

---

[14] As noted in Defendants' Opening Brief, Ryanair is currently under investigation by the Italian Competition Authority for the conduct at issue here—namely imposition of onerous requirements on customers who book through OTAs.  Defs' Op. Br. at 33.

████████████████████████ Hartnett Ex. V ████████████████████████████

████████████████████████ Hartnett Ex. M ████████████████████████████

███████████████████████████ Hartnett Ex. CC (Ryanair continuing to target Booking.com in blog posts).  The case cited by Ryanair (Op. Br. at 35) confirms that such evidence is sufficient to show Ryanair's intent.  *See Shure Inc. v. ClearOne, Inc.*, 2021 WL 4894198, at *3 (D. Del. Oct. 20, 2021) (knowledge of opponent's business expectancy may be inferred, in part, from parties' awareness "of when a customer is considering purchasing from the other party").

### B.   There Is A Disputed Issue Of Material Fact As To Booking.com's Damages.

Ryanair challenges three of the counterclaims—tortious interference, unfair competition, and trade libel—based on Booking.com's alleged inability to prove damages.  Op. Br. at 36. Ryanair does not seek judgment on this basis with regard to defamation[15] or violation of the DTPA. Ryanair is not entitled to judgment on even the challenged claims because there is a genuine dispute of material fact as to whether Booking.com has suffered harm as result of Ryanair's emails.

Ryanair's damages argument focuses almost entirely on its claim that Booking.com is not entitled to rely on its customers' complaints as evidence of lost revenue from Ryanair's emails. Ryanair argues that these customer statements are inadmissible hearsay.  This argument fails.

*First*, the complaints are received by Booking.com from customers via email in the ordinary course, and thus will be admissible at trial as business records under FRE 803(6).  *See* Declaration of Marcos Guerrero in Support of Defendants' Brief in Opposition to Ryanair's Motion for Summary Judgment and Motions to Preclude Defendants' Expert Testimony and Pursuant to Federal Rule of Evidence 803(6) and 902(12) ¶¶ 5-13, filed concurrently herewith; *see*

---

[15] Ryanair suggests that Booking.com can at most seek nominal damages for defamation because the evidence required to prove "injury to reputation" is "inadmissible hearsay."  Op. Br. at 36 n.18. This is not correct; where, as here, statements constitute defamation *per se*, harm to reputation is presumed.  *Marcone v. Penthouse Int'l Mag. for Men*, 754 F.2d 1072, 1078 (3d Cir. 1985).

*also In re Memorex Telex Corp.*, 242 B.R. 826, 831 (Bankr. D. Del. 1999) (admitting a "Call Log" of customer contacts as business record).

      *Second*, the complaints are admissible under other hearsay exceptions, including state of mind and present-sense impression.  Customer statements that describe a motive or plan not to book flights with Booking.com are admissible under FRE 803(3) as "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan)[.]"  Customer statements are routinely deemed admissible under this exception.  *See GF Princeton, L.L.C. v. Herring Land Grp., L.L.C.*, 518 F. App'x 108, 113 (3d Cir. 2013) (testimony from a real estate broker relaying conversations with customer tenants admissible to show motive); *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 719–20 & n.17 (3d Cir. 2004) ("To the extent such statements address the speaker's plans . . . , they create an inference 'that the declarant acted in accord with that plan.'"); *Mun. Revenue Serv., Inc. v. Xspand, Inc.*, 700 F. Supp. 2d 692, 705-06 (M.D. Pa. 2010) (customer statements admissible under FRE 803(3) to establish causation: the customers' "motives are relevant in establishing whether or not Xspand's marketing strategy caused harm to MRS").  Here, the statements reflect customers' state of mind, motive, and in some cases plans not to book on Booking.com again or to stop using Booking.com's customer loyalty program "Genius."  *See, e.g.*, Hartnett Ex. W ("I have been advised by Ryanair that they have NO commercial relationship with booking.com and that the booking I have paid for has been blocked. . . . *I have been a Genius level customer for years but no more*." (emphasis added)); Hartnett Ex. X ("I'm getting more distressed now as I seem to have 2 different booking for RyanAir as a result of booking through you! . . . I will never use booking.com to make a reservation again after this experiences, which is a real shame as I have been using you successfully for years."); Hartnett Ex. Y (showing complaining customer is signed up for Genius program). ████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████.[16]  The customer complaints at issue are also admissible under

FRE 803(1) as present sense impressions "describing or explaining an event or condition" (*i.e.*,

the customer's particular issue) contemporaneous with their experiencing it.  Fed. R. Evid. 803(1);

*see also Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 121-22 (3d

Cir. 2004) (upholding admissibility of a "confusion log" documenting employees accounts of

customers' actual confusion in a trademark case).

     *Third*, the customer statements are also offered "for non-truth-of-the-matter purposes,

including to show [that] customers complained[.]"  *Allscripts Healthcare, LLC v. Andor Health,

LLC*, 2022 WL 17403121, at *2-3 (D. Del. Aug. 9, 2022) (admitting customer statements to show

the fact that they complained).  ████████████████████████████████████

███████████████████████████████ Hartnett Ex. K, Guerrero Dep. Tr. I at 251:4-9

██████████████████████████████████████████████████████████

████████████████████    ████████████████████████████████

██████████████████████████████.[17]

     Ryanair also misleadingly argues that Booking.com cannot have suffered lost profits or

pecuniary harm ██████████████████████████████████████████████████

████████  But this argument ignores other direct evidence of actual loss—namely, the testimony of

Marcos Guerrero, Booking.com's Senior Director of Flights, ████████████████████████████

---

[16] None of Ryanair's case law purporting to state that damages cannot be based on "speculation"
(Op. Br. at 36-37) prohibit Defendants from arguing injury and causation based on circumstantial
evidence to the jury.  To the contrary, as herein, courts consistently allow such factual argument.
[17] Unlike in *Ward v. Blair*, 2013 WL 3816568, at *8 (Del. Super. Ct. July 16, 2013), where the
reputational harm was emotional distress, here the reputational harm is pecuniary in nature.



*See generally* Hartnett Ex. K, Guerrero Dep. Tr. I at 248:8-260:14. ████ *Id.* at 255:17-20. ████ *Id.* at 255:3-259:23; *see also* Hartnett Decl. ¶¶ 4-10. ████ Hartnett Ex. K, Guerrero Dep. Tr. I at 260:9-11. As noted in Defendant's Opening Brief, Booking.com is not currently offering Ryanair flights at all. Defs' Op. Br. at 3 n.1.

Taking this evidence together, it is sufficient to demonstrate a genuine issue of fact as to (1) "loss of business" for intentional interference, *see DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947-48 (Del. Ch. 1980), *aff'd*, 428 A.2d 1151 (Del. 1981); (2) loss of "legitimate expectancy" of future business for unfair competition, *see* CC MTD Order at 9 (citing *Ethypharm S.A. France v. Abbott Lab'ys*, 598 F. Supp. 2d 611, 618 (D. Del. 2009); and (3) "pecuniary loss" for trade libel, *see id.* at 18 (citing *Incyte Corp. v. Flexus Biosciences, Inc.*, 2017 WL 7803923, at *7 (Del. Super. Ct. Nov. 1, 2017)).[18]

## IV.    RYANAIR'S MOTIONS TO EXCLUDE SHOULD BE DENIED

### A.    Timothy O'Neil-Dunne (Defendants' Travel Industry Expert).

Ryanair seeks to exclude Defendants' travel-industry expert, Timothy O'Neil-Dunne, under *Daubert* and FRE 702 on the basis that his testimony "is [not] relevant to proving any claim

---

[18] Ryanair faults Booking.com for failing to provide a calculation of its alleged lost revenue, but the *amount* of damages is a separate issue from the *fact* of damages. *See Callahan v. A.E.V., Inc.*, 182 F.3d 237, 247, 254 (3d Cir. 1999). As held by Ryanair's own case (Op. Br. at 36), *Beard Research, Inc. v. Kates*, 8 A.3d 573 (Del. Ch. 2010): "[t]o establish liability, however, Plaintiffs need show only that they suffered some damage, not the precise amount of damage." *Id.* at 612.

or defense" and his opinions are not expert opinions. Op. Br. at 39 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993)) (noting that O'Neil-Dunne fails to opine on particular issues identified by Ryanair).[19]   O'Neil-Dunne—a travel-industry expert—is not proffered for the topics that Ryanair claims, and thus Ryanair's entire argument for exclusion is based on a false premise and fails.

In assessing relevance, "the court should apply Rule 702's requirements liberally and should uphold the general framework of the Federal Rules of Evidence which favors the admissibility of evidence over non-admissibility." *Orbital Eng'g, Inc. v. Buchko*, 578 F. Supp. 3d 736, 740 (W.D. Pa. 2022) (citation omitted); *see also United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010); *United States v. Ford*, 481 F.3d 215, 219 (3d Cir. 2007).  Here, O'Neil-Dunne's industry expertise is relevant to Ryanair's "authorization" argument, claims that OTAs allegedly provide Ryanair with "false" contact and payment information, arguments concerning the function and purpose of myRyanair, and other issues.

*First*, with respect to "authorization," the Supreme Court in *Van Buren* made clear that, under the doctrines of lenity and constitutional avoidance, the CFAA's authorization framework should not be interpreted so as to "attach criminal penalties to a breathtaking amount of commonplace computer activity." *Van Buren*, 141 S. Ct. at 1661.  O'Neil-Dunne's travel industry opinions are relevant to showing that the actions of Defendants (or, more specifically, their

---

[19] O'Neil-Dunne is an industry expert; whether he is reliable thus turns not on the traditional *Daubert* factors regarding scientific methodology but on the sufficiency of his knowledge and experience. *See GlaxoSmithKline LLC v. Glenmark Pharms. Inc.*, 2017 WL 11685723, at *3–4 (D. Del. May 2, 2017).  Since the 1970s, O'Neil-Dunne has worked continuously in the travel industry, with travel agents, ticket consolidators, global distribution systems, OTAs (including Expedia at its founding) and airlines.  Ryanair does not appear to challenge the adequacy of O'Neil-Dunne's qualifications, nor the connection between his industry experience and the conclusions in his report; nor could it. *Id.* (*Daubert* challenge denied where industry expert's "past and present work experience provide[d] a firm foundation for her opinions.").

vendors) are the type of "commonplace computer activit[ies]" that should not be criminalized.  As O'Neil-Dunne explains, online travel agents (like Booking.com) have been around since the late 1990s.  Hemann Ex. 39 § 4.3.  Travel agents are "one of the most common ways that consumers book travel generally and airline tickets in particular[.]"  *Id.* § 5.2.1.  Likewise, metasearch engines like KAYAK have long provided services that make it easy for consumers to compare prices across multiple sources.  *Id.* § 5.2.2.  O'Neil-Dunne also explains that screen scraping—a practice alleged at the heart of this case—is a common tool within the online travel industry, one used by "[m]any OTAs" for flights, which have dynamic pricing and thus frequent price updates.  *Id.* § 7.2.1.  Thus, counter to Ryanair's "piracy" refrain, O'Neil-Dunne's travel-industry expertise shows that the practices at issue in this case offer important benefits, including speed, cost, accuracy, and obtaining data from many sources.  *Id.* § 7.2.1. Although, as in *Van Buren*, the CFAA does not apply to the conduct at issue based on the statute's "text, context, and structure," to the extent constitutional avoidance or lenity are consulted, O'Neil-Dunne's testimony is relevant.

*Second*, O'Neil-Dunne's opinions are relevant to Ryanair's claim that OTAs provide "false" contact information to Ryanair in connection with bookings.  This relates to both Ryanair's affirmative fraud claim under Section 1030(a)(4) and to Booking.com's counterclaims, including its claim for defamation (although, as discussed above, Booking.com does not actually provide "false" information, even by Ryanair's definition).  Ryanair claims that it receives "false" information from OTAs because the information does not belong to the passenger, but as O'Neil-Dunne opines, the use of agent-supplied information is at the very heart of how the travel industry and travel agents have always functioned.  *See* Hemann Ex. 39 § 8.2.2.

*Third,* with respect to the myRyanair login, which Ryanair claims as both an authentication mechanism, Op. Br. at 23-25, and a source of "loss," *id.* at 12, O'Neil-Dunne provides important

context for understanding its purpose and function.  As he explains, many travel websites "require users to login to access certain features," and myRyanair—like similar functions on other travel websites—is first and foremost about personalization and marketing connected to Ryanair's own business (in which it offers not only flights, but a wide array of add-ons, including hotels and cars), not cybersecurity.  Hemann Ex. 39 at § 8.2.3.  Ryanair appears to fault O'Neil-Dunne for not opining on the *legal* implications of these facts, *see* Op. Br. at 40, but that would be improper.

Because O'Neil-Dunne's opinions satisfy the "liberal" standard of relevance, there is no basis under Rule 702 or *Daubert* to exclude them.  *Orbital Eng'g*, 578 F. Supp. 3d at 740.

### B.      Jordan R. Kelly (Defendants' Cybersecurity Expert).

Ryanair's motion to exclude Defendants' cybersecurity Jordan Kelly is baseless.  At the threshold, Ryanair does not challenge Kelly's rebuttal opinions, only the opinions in her opening report ("Opening Report," Hemann Ex. 38).  Nor does Ryanair dispute that Kelly—former Director of Cyber Incident Response on the National Security Council at the White House (*id.* at 4)—has the requisite expertise to opine on the matters at issue.  As discussed below, each of Kelly's Opening Report opinions is proper; Ryanair's motion to exclude should be denied.

### 1.      Kelly's First Opinion Is Proper.

Ryanair makes two specious challenges to Kelly's First Opinion (that the Ryanair website "is publicly available" and has "no barrier to access").  Hemann Ex. 38 at 6.

*First*, Ryanair accuses Kelly of "employ[ing] a strained definition of 'public' versus 'private.'"  Op. Br. at 41, 42.  But, Kelly's framework draws from industry-recognized materials, including the Authentication, Authorization, and Accounting cybersecurity framework developed by the SANS Institute.  Hemann Ex. 38 at 7, n.10 (validating SANS Institute as industry source).  As Kelly testified at her deposition, the public-private distinction is a "concept that is well understood by cybersecurity professionals."  Hartnett Ex. AA, Kelly Dep. Tr. at 61:18-21.  "It is

well-settled that experts may testify to an industry's customs and practices" and "compare a party's conduct to those customs and practices." *SEC v. Ambassador Advisors, LLC*, 576 F. Supp. 3d 250, 257 (E.D. Pa. 2021). And Ryanair's cited case (Op. Br. at 42) confirms an expert may opine on a term's "plain language and as interpreted by this Court[]." *United States v. Merrill*, 2010 WL 3981158, at *8 (S.D. Fla. Oct. 8, 2010).

*Second*, Ryanair claims that Kelly "ignores the Ryanair Website's numerous technological protections introduced to stop Defendants[]," such as "Ryanair's Shield system" and "the myRyanair login." Op. Br. at 42-43. Kelly did no such thing. To the contrary, she thoroughly analyzed Shield and myRyanair (*see* Hemann Ex. 38 at 12-18), but came to a different conclusion than the one advocated for by Ryanair. *See, e.g.*, *id*. at 18. "The fact that" Ryanair may "disagree" with Kelly's "interpretation" "is not a basis to exclude h[er] opinions." *Luciotti v. Haddonfield, N.J.*, 2023 WL 6366091, at *6 (D.N.J. Sept. 29, 2023).

## 2.    Kelly's Second Opinion Is Proper.

In seeking to exclude Kelly's Second Opinion—that Ryanair "necessarily granted access to its website" for flight purchases, ▮▮▮▮▮▮▮▮▮▮▮▮ (Hemann Ex. 38 at 21)— Ryanair points to two issues, both of which, as above, are disagreements with Kelly's conclusions rather than her methods. First, Ryanair falsely accuses Kelly of "ignor[ing] . . . how Ryanair's Shield functions." Op. Br. at 44. To the contrary, Kelly's analysis of Shield: spans five pages, (Hemann Ex. 38 at 28-32); cites multiple documents produced by Ryanair (*id.* (citing Ryanair documents 14245, 16234, 16378, 26785, 26799, 27623, and 26915)); cites testimony from two Ryanair employees (*e.g.*, *id*. at nn.64, 69, 77-80), and cites Ryanair's interrogatory responses (*id.* at nn.63, 76). In doing so, Kelly provides and assesses Ryanair's own characterizations of how Shield operates (*id.* at 28-29), its efficacy and accuracy (*id.* at 30), and ▮▮▮▮▮▮▮▮

██████ (*id.* at 31).  Kelly gave Ryanair's account of Shield due regard; that she reached different cybersecurity conclusions than Ryanair is irrelevant to a Rule 702 motion to exclude.

Ryanair also notes that Kelly's analysis of Shield mistakenly relied on a public website that was not in fact connected to Ryanair's Shield product, and from that falsely insinuates that Kelly's opinion that ████████████████ relies entirely on the inapposite website.  Op. Br. at 45.  As made clear above, Kelly relied on substantial documents, testimony, and interrogatory responses from Ryanair—including *Ryanair's description* that Shield ████████████ ██████████████████████████████████ (Hemann Ex. 38 at 28-29 & n.63), and *Ryanair's own testimony* that Shield must ████████████████ ██████████████ (*id.* at 31 & n.79).  As for any reliance by Kelly on the unrelated Shield website, Kelly explained at her deposition that the cite was simply a mistake (Hartnett Ex. AA, Kelly Dep. Tr. at 294:2-14).  *I.B.E.W. Loc. Union 380 Pension Fund v. Buck Consultants*, 2008 WL 2265269, at *2 (E.D. Pa. June 3, 2008) (error not requiring expert to "revis[e] . . . general conclusion[]" is grounds for "cross examination," not exclusion of opinion).[20]

Second, Ryanair accuses Kelly of inventing a "meaningless" "'good bot' versus 'bad bot' dichotomy," and therefore offering "ipse dixit."  Op. Br. at 45-46.  Again, Ryanair's disagreement with Kelly's view is not a basis to exclude her opinion.  Kelly made clear that the good-bad bot distinction is common "[i]n the cyber security industry."  Hemann Ex. 38 at 22; *see also* Hartnett Ex. AA, Kelly Dep. Tr. at 241:12-242:5.  *See Ambassador Advisors*, 576 F. Supp. 3d at 257 (expert permitted to opine on industry custom).

---

[20] In stark contrast, Ryanair's expert Lopata did not recognize a massive error he made until confronted at deposition, lacked other support for his conclusion, and admitted that his conclusions necessarily changed because of his error.  Hartnett Ex. A, Lopata Dep. Tr. at 199:13-200:1, 205:24-207:11.  Lopata also refuses to identify or correct additional admitted errors.  *See supra* at 8-9.

Nor is Ryanair correct that "Kelly offered no real way to differentiate good versus bad bots." Op. Br. at 45. Kelly cited multiple secondary sources examining the good-bad bot distinction. Hemann Ex. 38 at 22-23 & nn.37-42. And Kelly provided half a dozen examples of good bots (*id.* at 22-23) as well as bad bots (e.g., those which perform DDoS attacks, act as malware, "execute ransomware attacks," "serve as trojan horses," or "post fake news," *id.* at 23). Even Ryanair's own expert (Vance) endorsed a secondary source setting out the difference between "good bots" and "bad bots." *See* Hemann Ex. 43 at 16-18.

Ryanair also accuses Kelly of "perform[ing] no analysis on ████" at issue. Op. Br. at 46. But it was Ryanair's burden, and Ryanair failed to adduce any evidence of "████ at issue." In any event, Kelly testified as to her understanding of ████ and why she was able to draw at least some conclusions from that understanding. Hartnett Ex. AA, Kelly Dep. Tr. at 284:7-285:2; *id.* at 292:8-11 ("I didn't believe and continue to not believe that [further information] was needed to understand this open access environment that Ryanair has created."). As she explained, by reference to Ryanair's own testimony, Ryanair "operate[s] a technical environment that opens itself to th[e] type of traffic" at issue in this litigation. *Id.* at 281:15-282:11. Kelly also compared ████████████ to Ryanair's own documents, which indicate that Ryanair selectively welcomes ████ bookings. Hemann Ex. 38 at 27-28 & nn.59, 60.

### 3.   Kelly's Third Opinion Is Proper.

Kelly's Third Opinion is straightforward—there is "no documentation or evidence that any of the Defendants caused harm to the Ryanair website." Hemann Ex. 38 at 32-41. Although Ryanair has long postulated that OTA activities had "impair[ed] the Ryanair Website's availability," "lead[] to error rates" and "slow response rates" (FAC ¶¶ 271, 272), as Kelly explained, there is a lack of industry-recognized attribution of such harms to Defendants. Hemann Ex. 38 at 32-41. This is not controversial: Ryanair's witnesses agree. *Id.* at n.88 & accompanying

text (citing testimony from O'Callaghan, Hurley, and Stocki).  So does Ryanair's expert.  Hemann Ex. 41 ¶ 149 ("I am not able to opine on the amount of harm from blackouts/brownouts that can be attributed to the Defendants at this time.").

Ryanair's argument is, again, not a challenge to Kelly's qualifications or methods, but a disagreement with her conclusion; that "is proper grounds for cross examination, not a basis for exclusion."  *Allscripts Healthcare, LLC v. Andor Health*, 2022 WL 3021560, at *26 (D. Del. July 29, 2022) (disagreement with opinion and conclusions as to facts relied upon "is proper grounds for cross-examination, not a basis for exclusion").

Ryanair also claims that the CFAA is "not limited to the technical impairments Kelly identifies."  Op. Br. at 47.  But this is not a basis for exclusion; Kelly did not opine on what every legally cognizable harm under the CFAA *could* be.  Moreover, Ryanair's complaint appears to be that Kelly's September 29, 2023 Opening Report did not anticipate that Lopata's September 29, 2023 Opening Report would opine on payroll costs (Hemann Ex. 40 ¶¶ 87-97, 118-122), based on discovery Ryanair served on September 29, 2023—the deadline for expert reports.  This is gamesmanship; "Daubert motions should not be the vehicle for 'gotcha' litigation." *FinancialApps, LLC v. Envestnet, Inc.*, 2023 WL 4936007, at *2 (D. Del. July 28, 2023) (rejecting *Daubert* argument that expert failed to consider theories held back until after expert report).

## C.      Basil Imburgia (Defendants' Damages Expert).

Finally, Ryanair's attempt to exclude the rebuttal testimony of Basil Imburgia is baseless. Imburgia is a Certified Public Accountant, a Certified Fraud Examiner, and is Certified in Financial Forensics.  Hemann Ex. 44 ¶ 1.  He has over 35 years of public accounting and consulting experience and has served as an expert in cases involving lost profits, loss of business value, and Generally Accepted Accounting Principles.  *Id.* ¶¶ 1-2.  He is qualified, his methods are reliable, and his testimony is helpful to the finder of fact.  There is no basis to exclude his opinions.

48

### 1.      Imburgia Is Qualified And Offers Reliable Opinions.

Ryanair attempts to discredit Imburgia by claiming that he "lacks experience to testify as a CFAA expert." Op. Br. at 47. This argument is baseless. Imburgia is not offered as "a CFAA expert. " As a rebuttal expert, Imburgia may properly "criticize [] theories and calculations," on damages, *Complaint of Borghese Lane, LLC*, 2023 WL 3114851, at *3 (W.D. Pa. Apr. 27, 2023) (citing cases), without offering his own theory on what "is a reasonable cost to [a] victim" under the CFAA (Opp. Br. at 47). "Prior experience need not consist of prior expert witness testimony on the same issue." *See In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 550-51 (C.D. Cal. 2014); *cf. id.* ("If witnesses could not testify for the first time as experts, we would have no experts" (citation omitted)). Indeed, Ryanair's unfounded position would disqualify its own opening expert, Lopata, who also has no apparent CFAA (or damages) experience. Hemann Ex. 41 ¶¶ 15-16.

Ryanair next asserts that Imburgia's lack of CFAA experience led him to "ignore the possibility that customer verification may be a loss under the CFAA." Op. Br. at 47. Ryanair is wrong. Imburgia thoroughly engages with Lopata's attempt to double-count Ryanair's verification costs passed on to customers. Hemann Ex. 44 ¶¶ 61-70; Hemann Ex. 45 ¶¶ 19-24 (citing Ryanair testimony that verification is ████████████).

Ryanair also baselessly accuses Imburgia of offering improper "technical opinions." Op. Br. at 49. He has done no such thing. Unlike the experts in the cases cited by Ryanair, Imburgia does not "summarize the evidence on [technical harm]," *U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 737, 745 (N.D. Ill. 2009), or testify on matters outside "his personal knowledge and experience," *John McClelland & Assocs. v. Med. Action Indus.*, 2006 WL 3333061, at *3 (D. Kan. Nov. 15, 2006). Instead, as the court permitted in *U.S. Gypsum* (just two sentences after the passage cited by Ryanair), Imburgia "rel[ies] on facts" alleged by Lopata "in the context of [his] damages assessment." 670 F. Supp. 2d at 745. Imburgia takes issue with Lopata for assigning

49

loss to Defendants despite acknowledging that ██████████████████████████

████████████████████████████████████████████ and that harm

from interruptions in service could not be attributed to Defendants.  Hemann Ex. 41 ¶¶ 145, 149.

Imburgia properly critiques Lopata for violating basic damages principles by allocating costs to

Defendants despite not being able to attribute any loss to them.

### 2.  Imburgia's Opinions Are Based On Reliable Methodologies.

Ryanair claims that Imburgia's opinions are unreliable and not "based on sufficient facts

or data" solely on the basis that he delegated work to assistants.  Op. Br. at 48 (citing Fed. R. Civ.

P. 702(b)).   But "[a]n expert witness is permitted to use assistants in formulating his expert

opinion," *Lee Valley Tools, Ltd. v. Indus. Blade Co.*, 288 F.R.D. 254, 266 (W.D.N.Y. 2013)

(citation omitted), and Imburgia testified that he provided an outline, conducted review, and edited

and rewrote the report (Hartnett Ex. BB, Imburgia Dep. Tr. at 108:1-16).  If Ryanair takes issue

with Imburgia's reliance on the Ryanair Group Annual Report (as opposed to Ryanair DAC) they

are welcome to "explor[e]" such "disputed facts [] on cross examination," *UGI Sunbury LLC v. A*

*Permanent Easement for 0.4308 Acres*, 2021 WL 5140050, at *9 (M.D. Pa. Nov. 4, 2021); *see*

*also Allscripts Healthcare*, 2022 WL 3021560, at *26.

### V.  CONCLUSION

For the reasons discussed herein, and in Defendants' Opening Brief, Ryanair's Motion for

Summary Judgment and Motions to Exclude Defendants' Expert Testimony should be denied.

OF COUNSEL:

John H. Hemann
Kathleen Hartnett
Kristine Forderer
Alexander J. Kasner
Jessie Simpson LaGoy
Hannah Pollack
COOLEY LLP
3 Embarcadero Center, 20th Fl.
San Francisco, CA 94111
(415) 693-2200
jhemann@cooley.com
khartnett@cooley.com
kforderer@cooley.com
akasner@cooley.com
jsimpsonlagoy@cooley.com
hpollack@cooley.com

Dated: January 22, 2023

*/s/ Jeffrey L. Moyer*
Jeffrey L. Moyer (#3309)
Alexandra M. Ewing (#6407)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
moyer@rlf.com
ewing@rlf.com

*Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 22, 2024, a true and correct copy of the foregoing document

was caused to be served on the following counsel of record in the manner indicated.

<u>**BY ELECTRONIC MAIL**</u>
R. Touhey Myer
Kratz & Barry LLP
800 N. West Street
Wilmington, Delaware 19801
(302) 527-9378
tmyer@kratzandbarry.com

<u>**BY ELECTRONIC MAIL**</u>
R. David Donoghue
Anthony J. Fuga
HOLLAND & KNIGHT LLP
150 N Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600
david.donoghue@hklaw.com
anthony.fuga@hklaw.com

*/s/ Jeffrey L. Moyer*
Jeffrey L. Moyer (#3309)