**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| RYANAIR DAC, | |
| Plaintiff, | |
| v. | C.A. No. 20-01191-WCB |
| BOOKING HOLDINGS INC., BOOKING.COM B.V., KAYAK SOFTWARE CORPORATION, PRICELINE.COM LLC, and AGODA COMPANY PTE. LTD, | **REDACTED PUBLIC VERSION** |
| Defendants. | |

## REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE THE TESTIMONY OF IAIN LOPATA AND ANTHONY VANCE

OF COUNSEL:

John H. Hemann
Kathleen Hartnett
Kristine Forderer
Alexander J. Kasner
Jessie Simpson LaGoy
Hannah Pollack
COOLEY LLP
3 Embarcadero Center, 20th Fl.
San Francisco, CA 94111
(415) 693-2200
jhemann@cooley.com
khartnett@cooley.com
kforderer@cooley.com
akasner@cooley.com
jsimpsonlagoy@cooley.com
hpollack@cooley.com

Jeffrey L. Moyer (#3309)
Alexandra M. Ewing (#6407)
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
moyer@rlf.com
ewing@rlf.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................... 1

II.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE
GRANTED IN FULL. ............................................................................ 2

    A.    The Facts in Evidence Do Not Support Vicarious Liability. ................................. 2

    B.    The Facts in Evidence Do Not Support an Underlying CFAA Violation............. 6

    C.    The Facts in Evidence Do Not Support Ryanair's Claim of "Loss."................... 10

        1.    Ryanair's "Losses" Are Not Responsive to Technological Harm. .......... 11

        2.    The Facts in Evidence Regarding Data "Corruption" and the
"████ Attack" Cannot Support Ryanair's Claimed "Loss."................. 13

        3.    Ryanair's Theory of Loss as to BHI, Priceline, and Agoda is
Baseless.................................................................................... 13

    D.    The Facts in Evidence Do Not Support Ryanair's Conspiracy Claim................. 14

    E.    The Facts In Evidence Do Not Support Ryanair's Fraud Claim. ....................... 14

    F.    Ryanair Cannot Prove The Prerequisites To A Permanent Injunction. .............. 15

    G.    Ryanair Has Identified No Triable Issues Of Material Fact. ............................. 16

        1.    There Is No Dispute of Material Fact Precluding Summary
Judgment. ................................................................................. 16

        2.    Ryanair May Not Rely On Extra-Record Facts. ..................................... 20

III.  DEFENDANTS' MOTIONS TO EXCLUDE RYANAIR'S EXPERTS SHOULD
BE GRANTED ................................................................................... 22

    A.    Certain Opinions of Iain Lopata Should Be Excluded........................................ 22

    B.    Anthony Vance's Opinions Should Be Excluded................................................ 24

IV.  CONCLUSION................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alchem Inc. v. Cage*,
  2021 WL 4902331 (E.D. Pa. Oct. 21, 2021), *vacated and remanded on other
  grounds, Alchem USA Inc. v. Cage*, 2022 WL 3043153 (3d Cir. Aug. 2, 2022) ..................3, 4

*Bradley v. Amazon.com, Inc.*,
  2023 WL 2574572 (E.D. Pa. Mar. 17, 2013) ..........................................................................25

*Brooks v. AM Resorts, LLC*,
  954 F. Supp. 2d 331 (E.D. Pa. 2013) ......................................................................................12

*Bruno v. Bozzuto's, Inc.*,
  311 F.R.D. 124 (M.D. Pa. 2015) ..............................................................................................24

*DOCA Co. v. Westinghouse Elec. Co., LLC*,
  2011 WL 12896754 (W.D. Pa. Dec. 7, 2011) ..........................................................................25

*Goodman v. Goodman*,
  2022 WL 17826390 (S.D.N.Y. Dec. 21, 2022) .......................................................................12

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F.4th (9th Cir. 2022) ................................................................................................7, 8, 10, 12

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
  2022 WL 1990225 (N.D. Cal. June 6, 2022) .............................................................................7

*Meta Platforms, Inc. v. Bright Data Ltd.*,
  2024 WL 251406 (N.D. Ca. 2024) .............................................................................................7

*NetApp, Inc. v. Nimble Storage, Inc.*,
  41 F. Supp. 3d 816 (N.D. Cal. 2014) ......................................................................................14

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994) ......................................................................................................24

*Robocast, Inc. v. Netflix, Inc.*,
  640 F. Supp. 3d 365 (D. Del. 2022) ..........................................................................................4

*Svanaco Inc. v. Brand*,
  417 F. Supp. 3d 1042 (N.D. Ill. 2019) .............................................................................3, 4, 5

*TD Bank N.A. v. Hill*,
  928 F.3d 259 (3d Cir. 2019) ....................................................................................................15

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*United States v. Carbo*,
    572 F.3d 112 (3d Cir. 2009)........................................................................14

*United States v. Czubinski*,
    106 F.3d 1069 (1st Cir. 1997)....................................................................15

*United States v. Wasserson*,
    418 F.3d 225 (3d Cir. 2005)........................................................................4

*Univ. Sports Publ'ns Co. v. Playmakers Media Co.*,
    725 F. Supp. 2d 378 (S.D.N.Y. 2010).......................................................12

*Van Buren v. United States*,
    141 S. Ct. 1648 (2021)......................................................................*passim*

*Vox Mkg. Grp., LLC v. Prodigy Promos L.C.*,
    521 F. Supp. 3d 1135 (D. Utah 2021).......................................................23

*Welenco, Inc. v. Corbell*,
    126 F. Supp. 3d 1154 (E.D. Cal. 2015).....................................................14

*Withrow v. Spears*,
    967 F. Supp. 2d 982 (D. Del. 2013)..........................................................25

**Statutes**

18 U.S.C. § 1030(e)(11)..................................................................................10

Fed. R. Civ. P. 56(c)(1)...................................................................................21

## I.   INTRODUCTION

Defendants' Motions for Summary Judgment and to Exclude should be granted.  Ryanair's Opposition Brief[1] seeks to create factual disputes where none exist, and repeatedly—and improperly—refers to post-discovery developments that may not be considered and that nonetheless do not help Ryanair's case.  Defendants are well-established US and international online travel companies engaged in "commonplace" e-commerce activity; neither they nor their vendors are computer hackers.  Defendants' websites display inventory to consumers on their platforms that is available to them through license agreements with third-party vendors.  Those agreements give Defendants access to whatever content the vendors happen to have.  Defendants do not instruct the third parties to offer Ryanair flights as part of their inventory of airlines or, if they do, how to book Ryanair flights when selected by consumers.  There is no factual dispute about how these relationships operate, and the evidence does not satisfy the "direct, encourage, induce" legal standard this Court articulated for Defendants' potential vicarious liability.

Nonetheless, Ryanair claims that when third parties obtain information or purchase Ryanair flights for Defendants' customers via Ryanair's website or API, those transactions violate the Computer Fraud and Abuse Act ("CFAA") because Ryanair's website terms of use forbid commercial purchases and access by ███  and Ryanair uses technology to try to identify and ███ ███  Ryanair's arguments badly overread the CFAA and its criminal prohibitions.  As cautioned in *Van Buren v. United States*, Ryanair, a private party, should not control application of a federal criminal computer hacking statute with its self-proclaimed terms of use.  Ryanair's website is public, presumptively open to all, and it does not violate the CFAA when third parties access the

---

[1] Ryanair's Brief in Opposition to Defendants' Motion for Summary Judgment and to Preclude Expert Testimony of Iain Lopata and Anthony Vance, D.I. 376 ("Opposition" or "Opp.").

site for a purpose or in a manner that allegedly violates Ryanair's terms. This is because, under the CFAA, and as this Court has expressly held, if there is no "code-based authentication mechanism" to restrict access to certain users, access to a computer cannot be without authorization or exceeding authorized access. D.I. 105 ("MTD Order") at 23-24. This is true even where, as here (and in the case of most public websites), the computer's owner takes steps to block specific unwanted users ███████████ *Id.* Likewise, Ryanair's claim of "loss" under the CFAA, which is based on its prophylactic steps to ██████████ and discourage passengers from booking Ryanair flights through online travel agents ("OTAs") such as Defendants, must fail based on the text of the CFAA and the way "loss" has been interpreted time and again by courts considering civil CFAA claims. As Ryanair candidly admits, *see* Opp. at 20-22 & n.5, its case is not about redressing technological harm to its computers—what the CFAA was enacted to address—but rather about its effort to "stop[] Defendants and other OTAs from selling Ryanair's flights[,]" *id.* at 1. Ryanair's fraud, conspiracy, and permanent injunction claims fare no better. Summary judgment should be granted for Defendants for each of these reasons, together and standing alone.

Ryanair's experts must also be excluded, though summary judgment should be granted to Defendants regardless. Ryanair's attempted defense ignores the experts' claimed role and their actual testimony, which makes clear their opinions are unreliable, untimely, or both.

## II.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED IN FULL.

### A.   The Facts in Evidence Do Not Support Vicarious Liability.

Ryanair does not dispute that it must establish vicarious liability to prevail on its CFAA claims given that Defendants do not access the Ryanair website themselves.[2]  The "direct,

---

[2] Ryanair briefly argues for ███████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████   *See infra* at 19.

encourage, induce" standard set forth by the Court requires some purposeful intent toward the actual computer access at issue (MTD Order at 12-14), and there is no evidence of any such purposeful intent here; access is only incidental to the vendors' flight purchases and Defendants do not have any say in how their vendors procure flights.

Ryanair argues that because Defendants allow passengers to book available Ryanair flights through their platforms, and in so, doing convey passenger information to third-party vendors, Defendants should be vicariously liable for the subsequent actions of those vendors when they actually book the flights. Opp. at 7-10. This sweeping theory of vicarious liability is unsupported by case law and should be rejected. ███████████████████████████████

████████████████████████████████████████████████████████████████

████████████████ nor does any other document or testimony in this case support the notion that Defendants purposefully intended these third-party vendors to access Ryanair.com much less to violate the CFAA. Ryanair conflates what it contends the vendors (or the vendors' vendors) do in violation of the CFAA (e.g. scrape, make a myRyanair account) with what Defendants "ask" for *i.e.*, to display whatever flight inventory the vendor has and, if selected by a consumer from that inventory, to reserve X flight on Y airline. There is no support for this egregious extension of vicarious liability in the law and Ryanair's argument must be rejected.[3]

Defendants cited two authorities in their Motion[4] (at 19-20), *Svanaco* and *Alchem*, both of which discuss and interpret the "direct, encourage, induce" standard in the context of CFAA

---

[3] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

[4] Defendants' Opening Brief in Support of Defendants' Motion for Summary Judgment and Motions to Exclude (D.I. 335) ("Motion or "Mot.").

claims.  Yet Ryanair incorrectly claims that Defendants refer to the wrong legal standard, and then bizarrely cites two inapposite authorities that neither are CFAA cases, nor discuss the "direct, encourage, induce" standard.[5]  As Defendants' on-point cases show, for vicarious liability to apply, a defendant must have purposefully intended for a third party to engage in the actual ***access*** that violates the CFAA.  In *Svanaco*, for example, the defendant was not vicariously liable for its contractor's cyberattack because, even though the defendant had discussed other actions the contractor could take against the plaintiff, it never discussed specifically that he would engage in a cyberattack.  *Svanaco Inc. v. Brand*, 417 F. Supp. 3d 1042, 1060 (N.D. Ill. 2019) (direct, encourage, induce standard not met where "no reasonable jury could find that with respect to the DDOS attacks, MGI was the principal and that Brand was MGI's agent.").  Similarly, in *Alchem*, there was no finding of vicariously liability for access to a computer where the defendants (working for NAN) "encouraged or induced Ms. Cage to attract new customers on NAN's behalf," because the defendants did not tell her to access the plaintiff's computer to get information to make a sale, even though that is what she did.  *Alchem Inc. v. Cage*, 2021 WL 4902331, at *7 (E.D. Pa. Oct. 21, 2021), *vacated and remanded on other grounds*, *Alchem USA Inc. v. Cage*, 2022 WL 3043153 (3d Cir. Aug. 2, 2022).

These cases highlight the critical flaw in Ryanair's theory of vicarious liability.  Even assuming, as Ryanair posits, that Defendants "direct, encourage, or induce" their vendors to book Ryanair flights because Ryanair flights are sometimes available on Defendants' platforms, it is an impermissible "logical leap," *Alchem*, 2021 WL 4902331, at *7, to claim that Defendants thus

---

[5] *See* Opp. at 8-9 (citing *United States v. Wasserson*, 418 F.3d 225 (3d Cir. 2005) (analyzing "aiding and abetting" liability under a federal environmental statute), and *Robocast, Inc. v. Netflix, Inc.*, 640 F. Supp. 3d 365 (D. Del. 2022) (assessing a motion to dismiss a patent infringement claim regarding knowledge and willfulness).  Ryanair fails to show how "willful blindness" would apply to Defendants' conduct, even if it were the relevant standard.

necessarily "direct, encourage, or induce" their vendors to access Ryanair.com in the manner Ryanair claims is barred by the CFAA. This is a particularly unsupported logical leap, where, as here, there is no evidence that Defendants have direct knowledge of how particular flights are booked. Mot. at 10-15, 20-22. In short, there is no basis for Ryanair to equate passing consumer information to vendors (which does occur, via an automated process, not specific to Ryanair or any other airline) with directing, encouraging, or inducing vendors to engage in conduct that allegedly violates the CFAA (which does not occur).

Finally, Ryanair cannot establish vicarious liability based on its eleventh-hour argument regarding the "███ attack." Opp. at 13-15. There is **no** evidence whatsoever—and Ryanair continues to cite none—that any Defendant knew of or directed this alleged attack (and Ryanair only purports to connect Booking.com). Mot. at 22-24; *see also* D.I. 338, Declaration of Anne Housseau, Ex. A; D.I. 337, Declaration of Marcos Guerrero ¶ 13; *Svanaco*, 417 F. Supp. 3d at 1060 (defendant not vicariously liable for DDOS attack it did not know of or direct). Moreover, Ryanair's briefing omits critical evidence—such as the testimony of its own Rule 30(b)(6) witness



Hemann Ex. 3, Hurley Dep. Tr. III at 63:14-64:3 (emphasis added); *id.* at 80:16-24. Indeed, Ryanair testified that the attack ████████████████ *id.* at 79:15-80:14, and ███

████████████████████████ Ryanair's only supposed support for

---

[6] *See* Opp. at 14 ████████████████████████

the ████ argument is its own self-serving interrogatory responses, *see* Opp. at 13-15, but these responses ███████████████████████████ and are replete with falsities (Mot. at 23 & n.16). They were also verified by a witness who could not view Defendants' PNR codes under D.I. 192, and did not review the entirety of the responses before "verifying" them. Forderer Ex. 2, Hurley Dep. Tr. III at 25:9-28:6; *id*. at 116:7-16.[7] This "evidence" should be disregarded.

Because Ryanair cannot establish vicarious liability against any Defendant, Defendants are entitled to judgment on all of Ryanair's CFAA claims.

**B.     The Facts in Evidence Do Not Support an Underlying CFAA Violation.**

Defendants are also independently entitled to summary judgment on all of Ryanair's claims because the record fails to support an underlying CFAA violation. Put simply, no "authorization" within the meaning of the CFAA is needed to access ***any*** portion of Ryanair.com—a public website that lacks any code-based authentication mechanism. Ryanair's arguments to the contrary fail to create any disputed issue of material fact; they also ignore the Supreme Court's admonitions in *Van Buren* and this Court's explanation of what is required for CFAA liability.

Ryanair's effort to impose far-reaching CFAA liability for use of its public website is exactly the specter contemplated by the Supreme Court in *Van Buren*, and why courts, including

---

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

[7] Ryanair's representations about ██████ in its discovery responses, deposition testimony, and briefing all raise serious concerns under Federal Rules of Civil Procedure 11 and 37. Defendants reserve their rights to pursue relief under these Rules. For present purposes, Ryanair's ████ arguments do not raise disputed issues of material fact that preclude summary judgment.

this one, have insisted upon a "code-based authentication mechanism[]" limiting access to a computer in order for CFAA protections to apply in the first place.  MTD Order at 22-24 (citing others).  Specifically, Ryanair's theory of liability would ***criminalize*** the act of accessing Ryanair.com and using Ryanair's presumptively public account-making functionality to make a myRyanair account in alleged violation of its terms of use.[8]  This is the type of "purpose based limitation" on access and "commonplace" computer activity to which the CFAA was never intended to apply.  *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021).

As discussed in Defendants' brief in opposition to Ryanair's cross-motion for summary judgment, D.I. 372 ("Defs' Opp.") at 23-29, there is no code-based authentication mechanism limiting access to Ryanair.com. Shield and myRyanair are, at most, engaged in ███████████ and ████████████████████ *see id.*, and this is insufficient to transform a public website into a computer protectable under the CFAA.  *See* MTD Order at 23 ("Where a website is made available to the public without any authentication requirement at least in the first instance, the concept of 'without authorization' does not apply, even if the owner employs technological measures to block specific users, suspicious activity, or—as here—repeated access beyond a particular threshold.") (quoting *Meta Platforms, Inc. v. BrandTotal Ltd.*, 2022 WL 1990225, at *24 (N.D. Cal. June 6, 2022)); *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th at 1180, 1196 (9th Cir. 2022) ("Where the default is free access without authorization, in ordinary parlance one would characterize selective denial of access as a ban, not as a lack of 'authorization.'"); *cf. Meta Platforms, Inc. v. Bright Data*

---

[8] Hemann Ex. 1, Hurley Dep. Tr. I at 55:3-19 ████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████ ███████████████████████████████ (emphasis added).
Ryanair's cease-and-desist letters to Defendants also reference Ryanair's website terms and conditions.  If Ryanair asked the vendors themselves to cease and desist from certain activities, it is not in the record.

*Ltd.*, 2024 WL 251406, at *7 (N.D. Ca. 2024) (describing the "difference between defeating anti-automated scraping and piercing privacy walls" as "pivotal"). Indeed, Ryanair's concept that the "authorized" group is limited to ███████████ is hardly a meaningful restriction. *See* Opp. at 17-18; D.I. 348 ("Ryanair Mot.") at 21-23.

Further, Ryanair cannot establish "authentication" under either the definition offered by Defendants' expert or under Ryanair's own expert's definition. First, Ryanair's putative expert, Lopata, defines "[u]ser authentication" as "a process for ***uniquely*** identifying an individual user of a computer system and then assigning them rights to access specific capabilities of the system based upon their role." Hemann Ex. 41 at 15-16 (emphasis added). Second, Defendants' expert, Kelly, explains that authentication is the "process of confirming the correctness of the claimed identity." *Id*. Ex. 38 at 9. Neither Shield nor myRyanair do either of these things: neither "authenticates" any user as being who they say they are.[9]

With respect to Shield, Ryanair's evidence shows that Shield may ████████████ ████████████████████████████████████████████████████████████████ Ryanair Mot. at 22-23; Hemann Ex. 26 at 102-03. ████████████████████████████████ ████████████████—under either expert's definition, or the common understanding of the term— ***authenticate*** a user (or even authenticate non-blocked IP addresses) as "permitted" to access Ryanair.com such that there is "authorization." *See HiQ*, 31 F.4th at 1195-96 (authorization is an "affirmative notion"); *see also* Hemann Ex. 1, Hurley Dep. Tr. I at 55:13-19 ████████████ ███████████████████████████████████ *id.* at 55:3-18 █████████████████████

---

[9] Contrary to Ryanair's claim (Opp. at 16), Defendants rely on more than just Hurley's admission that ████████████████████████████████████████████████████████████████████ Among other things, Ryanair's own interrogatory responses confirm this point. *See*, *e.g.*, Hemann Ex. 28 at 17-19 (identifying only the payment page as nonpublic information on Ryanair.com).

███████████████ *id*. Ex. 9, Lopata Dep. Tr. at 76:17-22 ███████████ *id*. at 87:8-

14 ████████████████████████████ Mot. at 26-27.

The same is true with respect to myRyanair.  Anyone with a working email address can

make a myRyanair account without making any representation about who they are.  The fact that

there is a ████████████████████████████████████████████

██████████████████████ does not operate to (a) authenticate or authorize domain names

████████████████ or (b) authenticate individual users at all.  Fuga Ex. 23 at 12-23; *id*.

Ex. 5 at 203:24-27 ██████████████████ Thus, the myRyanair ████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████ Hemann Ex. 38 at 13 (noting that

anyone can make a Gmail account).  myRyanair does not meet either expert's definition of

"authentication" and thus cannot result in authorization under the applicable legal standard.

Ryanair argues that once a myRyanair account has been created, there is an "affirmative"

authentication process that takes place when a user tries to login using that account because

Ryanair compares the myRyanair login credentials supplied against the list of existing accounts.

Opp. at 18.  But, as discussed above, *anyone* who wants to make a myRyanair account can make

one with an email domain (like Gmail) ██████████████ Fuga Ex. 5 at 204-206.  As

such, "verifying" that myRyanair account credentials already exist in Ryanair's system is not

authentication.  Nor is any user forced—at any point during this process—to identify *themselves*

████████████████████████ takes place as a result of the process.[10]

---

[10] Nor is the fact that Ryanair requires a user to retrieve a code from the provided email address
"authentication." All this does is prove that the unknown entity can access the email address
provided to Ryanair at least once.  The concept of "authorization" contemplates affirmative action

Finally, in ruling on the motion to dismiss, the Court framed the authorization question as follows: "[t]he question before the court is whether the steps Ryanair has taken to protect the myRyanair portion of its website from unwanted incursions such as those allegedly sponsored by the defendants are sufficient to ***render that portion of the website non-public***[.]"  MTD Order at 25 (emphasis added); *see also hiQ*, 31 F.4th at 1197 (CFAA authorization only applies to computers that "prevent the general public from viewing the information").  With the benefit of all the evidence, the resounding answer to the Court's question is no.  There is nothing on Ryanair.com—including the myRyanair mechanism—rendering any portion of it non-public. Ryanair repeatedly asserts that whether its website is "public" or private is not the correct inquiry, Opp. at 16-17, but this is contrary to the Court's Order (which is based on the CFAA's terminology and key cases, such as *hiQ*).  MTD Order at 21-25.  Although inconvenient for Ryanair's legal argument, the fact that its website is public is consistent with the website's purpose: ████████ ██████████████████████ Hemann Ex. 1, Hurley Dep. Tr. I at 30:12-14.

### C.     The Facts in Evidence Do Not Support Ryanair's Claim of "Loss."

Ryanair's CFAA claims all additionally fail for the independent reason that Ryanair cannot show that any Defendant caused it at least $5,000 of "loss" in a single year, as required for Ryanair to proceed with a CFAA civil action.  "Loss" must result from actual or suspected technological harm.  *See* 18 U.S.C. § 1030(e)(11); *Van Buren*, 141 S. Ct. at 1659-60. █████████ ████████████████████████████████████████ ████████████████████████████████████████

---

by the ***owner of the computer***, not by the user themselves.  *hiQ*, 31 F.4th at 1195-96 ("'Authorization' is an affirmative notion, indicating that access is restricted to those specially recognized or admitted").  Users cannot "authorize" themselves to access a system.  To fall under the CFAA, unless the computer owner affirmatively authorizes some users but not others, the computer is public and the CFAA does not apply.

Opp. at 24-31.  Ryanair then attributes (unreliably) a *pro rata* share of these ongoing costs to Booking.com and KAYAK based on the number of Ryanair bookings made through their platforms in an arbitrarily chosen one-year period.  Opp. at 31.[11] ████████████

████████████████████████████████████████████

Ryanair inexplicably and unreasonably attributes the **entire** cost of Shield to them.  This approach fails.

### 1.    Ryanair's "Losses" Are Not Responsive to Technological Harm.

Both sides agree that CFAA "loss" must be connected to technological harm.  *See* Mot. at 27-28; Opp. at 21.  However, Ryanair argues that "[t]here is no requirement that technological harm must have actually even occurred" and thus its costs of trying to prevent technological harm, though prophylactic, are still "loss."  Opp. at 21.  This argument is wrong.

As Defendants have explained, both the statute and case law make clear that "loss" must be **responsive**, not prophylactic.  Specifically, the CFAA defines "loss" in terms of "responding to an offense" "damage assessment" "restoring the data . . . prior to the offense" and "interruption of service," which is why the Supreme Court (and others) have observed that "loss" must involve responding to a "technological harm."  *See* Mot. at 27-28; Defs' Opp. at 4.

None of the cases Ryanair cites in its Opposition support the notion that prophylactic expenses alone can constitute "loss" under the CFAA.  For instance, Ryanair cites two cases that stand for the uncontroversial point that the cost of a forensic investigation related to technological

---

[11] As to KAYAK, Ryanair purports to also include bookings that were made **entirely on third party websites**, based on clicks from KAYAK search engine results, *i.e.*, "link out" bookings.  These bookings should not be included at all, and in any event, the data at issue is unreliable: it comes unverified from third parties and includes non-Ryanair flights, *see* D.I. 257.  Ryanair has done nothing to verify the data and Lopata's calculation for the specific date range is based on nothing but assumption and estimate.  Hemann Ex. 41 ¶¶ 169-171.

harm can be considered CFAA loss, Opp. at 21, but both cases involved allegations of technological harm that **had already occurred**. *See Goodman v. Goodman*, 2022 WL 17826390, at *8 (S.D.N.Y. Dec. 21, 2022); *Brooks v. AM Resorts, LLC*, 954 F. Supp. 2d 331, 338 (E.D. Pa. 2013). Moreover, Ryanair is not claiming the cost of a forensic expert, and these cases have nothing to do with and do not support Ryanair's claim that costs incurred on an ongoing basis ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ could be CFAA "loss." Nor does Ryanair find support in the pre-*Van Buren* cases it cites for the notion that a forensic investigation can count as "loss" even where it ultimately finds no damage. Opp. at 21-22 (citing *University Sports* and *Health First*). Notably, in *University Sports*, the court held that one of the audits at issue could **not** be counted towards "loss" because "**the purpose of the [] audit was prophylactic**[.]" *Univ. Sports Publ'ns Co. v. Playmakers Media Co.*, 725 F. Supp. 2d 378, 388 (S.D.N.Y. 2010) (emphasis added). This hardly supports Ryanair's argument that it should be allowed to "count" purely prophylactic measures it takes to **avoid** technological harm—as opposed to actual "loss."[12]

 As Defendants have detailed (Mot. at 28-33; Defs' Opp. at 8-11), Ryanair's costs are not—like a forensic investigation after a suspected computer intrusion—responsive and technological as required for "loss." To the contrary, they are ongoing operating expenses either incidental to its online presence ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ or voluntarily incurred in connection with its business objective ▮▮▮▮▮▮▮▮▮ (myRyanair, Shield, verification costs, customer service agents, business intelligence employees). *See* Mot. at 12-16; Defs' Opp. at 24-31. Additionally, as discussed in prior briefing (Mot. at 28-33; Defs' Opp. at 8-

---

[12] Ryanair argues that Defendants' citation to *hiQ*, 31 F.4th at 1195 n.12 is unavailing because LinkedIn "never filed a CFAA claim." Opp. at 25. It did, and Defendants actually provided LinkedIn's CFAA counterclaim with their Motion. *See* Hemann Ex. 66, at 44-45. LinkedIn's claimed "loss" from combatting ongoing bot access is very similar to what Ryanair claims here. *Id.* at 45, ¶ 94; *see also* Defs' Opp. at 22.

12), Ryanair's purported calculation of these costs and attribution of them to Defendants is also fundamentally unreliable and insufficient to satisfy Ryanair's burden on this element.

###### 2. The Facts in Evidence Regarding Data "Corruption" and the "███ Attack" Cannot Support Ryanair's Claimed "Loss."

In a one-sentence footnote, Ryanair argues that even if the Court rejects its primary argument that "loss" may be comprised entirely of prophylactic costs, Ryanair has shown non-prophylactic "loss" associated with technological harm because of (1) "corruption" of its data by OTAs, and (2) the "███ attack." Opp. at 22 n.5. Neither of these purported harms rescue Ryanair's claims, as Ryanair appears to recognize given that they are presented in a footnote.

The supposed "corruption" of data referred to by Ryanair is anything but. What Ryanair means by "corruption" of data is that when Ryanair flight bookings are made via OTA, Ryanair does not find the information it receives with those bookings useful from a business perspective, as compared to the information it receives when passengers book directly. Ryanair Mot. at 12-13. This is not "corruption" of data, but the receipt of additional data from OTA bookings. Regarding ███, Ryanair makes no proffer of "loss" connected to it, and the alleged "attack" is not attributable to Defendants. *See supra*, II.A; *see also* Mot. at 8-16; Defs' Opp. at 11.

###### 3. Ryanair's Theory of Loss as to BHI, Priceline, and Agoda is Baseless.

With respect to Priceline and Agoda, Ryanair concedes that it has failed to proffer at least $5,000 of "loss" in a one-year period, but argues it can state a CFAA claim against either of these Defendants based on the ***entire alleged annual cost of Shield*** in any year. Opp. at 31. According to Ryanair, ███████████████████████████████ *Id.* Priceline and Agoda, ███████████████ ███████████████████████ whereas Ryanair sells ███████████ ███████ flights ***each day***. Hemann Exs. 33, 35, 46; Forderer Decl. ¶ 3. Ryanair's argument

is counterfactual speculation that no jury could find "reasonable," and thus must be disregarded. *See* Section1030(e)(11) (defining "loss" as "[a]ny **reasonable** cost to any victim (emphasis added)).  Finally, Ryanair makes no "loss" argument as to parent holding company BHI, which made no bookings at all, at any time.

### D.      The Facts in Evidence Do Not Support Ryanair's Conspiracy Claim.[13]

To establish a conspiracy claim, Ryanair must prove that Defendants entered into agreements with the specific intent to "further the substantive offense."  *United States v. Carbo*, 572 F.3d 112, 116 n.2 (3d Cir. 2009) (citations omitted).[14]  Ryanair argues, incorrectly, that it can show a conspiracy by "[t]he mere operation of the Defendants' websites" which "reflect agreement with each other and their contracted vendors to not only continue their conspiracy to access the Ryanair Website without authorization but also facilitate that unauthorized access."  Opp. at 32. This is absurd—the "mere operation" of a website is not evidence of agreement to commit an unlawful act.  And Defendants' agreements are commercial licenses to the content offered by the vendors, whatever content that may be.  Hemann Exs. 48-49, 51-65.  ███████████████████████

████████████████████████████████████████    *Id.*

### E.      The Facts In Evidence Do Not Support Ryanair's Fraud Claim.

To prove a fraud claim, Ryanair must satisfy the "intent to defraud" element of Section 1030(a)(4), but it has not adduced evidence to do so.  As Defendants have explained, "intent to

---

[13] Defendants are entitled to judgment on Ryanair's conspiracy and fraud claims (Counts II and V) based on the same vicarious liability, authorization, and loss arguments discussed above (*see* Sections II.A, II.B, and II.C), but each also fail for the additional reasons discussed herein.

[14] Rather than identifying any evidence to support its CFAA conspiracy claim, Ryanair purports to take issue with Defendants' framing of the legal standard.  But the standard in Ryanair's case does not meaningfully differ from Defendants' framing, and (in a portion Ryanair omits) states that conspiracy requires: "knowing agreement with another to commit the unlawful act."  *Welenco, Inc. v. Corbell*, 126 F. Supp. 3d 1154, 1176 (E.D. Cal. 2015) (quoting *NetApp, Inc. v. Nimble Storage, Inc*., 41 F. Supp. 3d 816, 835-36 (N.D. Cal. 2014)).

defraud" is a high bar, requiring evidence of "the intention or the purpose to deceive or to cheat." Mot. at 37.  Ryanair does not engage with this intent argument at all, and points to no evidence whatsoever which would satisfy this standard.  Opp. at 35.  Instead, Ryanair cites district court decisions that rejected the common law definition of the term "defraud."  *Id.*  But Defendants' argument about intent does not pertain to the definition of "defraud."  Mot. at 37.  Moreover, all of the supposed evidence of "intent" to which Ryanair points concerns commercial contracts between legitimate businesses and information openly posted on the Internet, which is far from the necessary intent to "deceive or cheat." [15]  In short, Ryanair's argument would impermissibly read the words "intent to defraud" out of the CFAA and should be rejected.  *See United States v. Czubinski*, 106 F.3d 1069, 1078-79 (1st Cir. 1997) (citing S. Rep. No. 432, 99th Cong., 2d Sess., reprinted in 1986 U.S.C.C.A.N. 2479, 2488) (the CFAA's legislative history distinguishes "between computer theft . . . and computer trespass" "requiring a showing of an intent to defraud, is meant to preserve that distinction").

### F.    Ryanair Cannot Prove The Prerequisites To A Permanent Injunction.

Although Defendants should be granted summary judgment on the merits, thus mooting any question of relief, Ryanair's request for a permanent injunction fails independently because Ryanair has no evidence of irreparable harm or the absence of an adequate remedy at law.  *See TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019).  First, as explained in Section II.C.2 *supra*, Ryanair misleadingly characterizes data from OTAs as "corrupted data."  Ryanair has not established any harm—let alone irreparable harm—associated with this data.  Second, Ryanair has

---

[15] Far from "cheating" Ryanair, it actually profits substantially from OTA-booked flights.  Mot. at 38; Defs' Opp. at 33. In fact, when OTAs stopped being able to sell Ryanair flights in late 2023 because of Ryanair's changes, Ryanair had to explain the dip in profit to the market.  *See* https://investor.ryanair.com/results-centre/q3-results-fy24/, Intro & Presentation by Group CEO Michael O'Leary Video at 00:23-30, 4:40-5:16 ("Q3 2024 Presentation"); *see section* II.G.2, *infra*.

not connected Defendants to a single spike in website traffic.  Third, Ryanair has not connected any Defendant to the alleged ███ attack.  *See* Section II.A *supra*.  Fourth, Ryanair has not pointed to a single instance where it could not contact or refund one of Defendants' customers.  Thus, to the extent Ryanair has experienced unsubstantiated reputational harm, it is not due to Defendants' actions.

### G.     Ryanair Has Identified No Triable Issues Of Material Fact.

#### 1.     There Is No Dispute of Material Fact Precluding Summary Judgment.

For all the reasons stated above, Defendants are entitled to summary judgment.  At the beginning of its Opposition, in Ryanair purports to dispute fifteen facts (or sets of facts) presented as undisputed in Defendants Motion, claiming, with rhetorical flourish, that each and every one of these facts is "false."  Opp. at 2-6.  But, Ryanair is wrong; no triable issues of fact prevent judgment as a matter of law in Defendants' favor.  The purportedly disputed facts are all either (a) legal argument, not fact (Facts 3, 9, 12), (b) not reasonably disputed based on the evidence (Facts 1, 2, 4-8, 11, 13,14), (c) not actually disputed (Fact 10, 15), or a combination of these categories.

(1) "*Ryanair sells its flights through a public website–Ryanair.com–and mobile app so that they are available as widely as possible*" and "*any user is able to purchase a ticket for any traveler.*"  Mot. at 4, 6; Opp. at 2.  Ryanair contends that these facts are "false" because Ryanair "sells flight reservations only to authorized users" and because ████████████████████ ████████████  Opp. at 2.  But Ryanair's own witnesses have testified that "we want the shop window to be open to as many people as possible."  Hemann Ex. 1, Hurley Dep. Tr. I at 30:12-14; *see also id*. Ex. 4, O'Callaghan Dep. Tr. at 99:16-25.  Ryanair also cannot dispute that it sells flights to allegedly "unauthorized" users; indeed, that is the entire basis of this lawsuit.  *See also*, Hemann Ex. 1 at 55:3-19 (acknowledging that unauthorized ███ book tickets).  Finally, Ryanair misdescribes ████████████████████████████████ any user can purchase

a flight ███████████████████████████████ Fuga Ex. 23 at 12-23 ████

████████████████████████████████████

    (2) ████████████████████████████████ Mot. at 4; Opp. at

3.  This fact comes from Ryanair's own witnesses.  Hemann Ex. 7, O'Leary Dep. Tr. at 28:5-10

████████████████████████████████████████████████████

████████████ *id.* Ex. 21 at 0018207 (similar); *id.* Ex. 8, Murphy Dep. Tr. at 104:15-18.  That

Ryanair also ███████████████████████████████████████

████████████████████████████████████████████████████

    (3) "*There is no dispute that a user can access any page in the Ryanair website booking*

*flow, except the final payment page, without any 'authorization.'*" Mot. at 5; Opp. at 3.  Ryanair's

attempt to run from this fact disregards its own sworn interrogatory responses stating that

Ryanair's website is public until a user reaches the payment page containing the myRyanair login

prompt.  *See* Hemann Ex. 28 at 17-19. ████████████████████████████

███████████████████████ *See* Hartnett Ex. A, Lopata Dep. Tr. at 110:22-111:5.

    (4) "*Ryanair admits the payment page contains no Ryanair confidential information or*

*confidential information users [sic] other than the user who is inputting their own payment*

*information.*"  Mot. at 7; Opp. at 3.  Ryanair argues that this admission is "false" because "[t]he

ability to complete flight bookings is confidential and locked behind the myRyanair login

requirement."  Opp. at 3.  This is Ryanair's legal argument; it does not actually dispute the "fact",

which comes directly from Ryanair's testimony and is obvious from the payment page itself.  *See*

Hemann Decl. ¶ 21; Hemann Ex. 4, O'Callaghan Dep. Tr. at 44:29-45:9; *id.* Ex. 28 at 16-19.

    (5) "*Ryanair has identified the TOU as the sole basis for its claim that OTAs are not*

*'authorized' to purchase tickets on the Ryanair website* ████████ Mot. at 8; Opp. at 3.  That

17

Ryanair's terms of use are the basis for its argument that OTAs are not permitted to access its website ████████ cannot be reasonably disputed; it is what Ryanair's operative complaint alleges, ████████████████████████████████████████████████ Hemann Ex. 1, Hurley Dep. Tr. I at 55:3-12, 88:15-20; D.I. 76, FAC, ¶ 50.  Ryanair cites no facts to the contrary.

(6) "*Ryanair conceived of this lawsuit as part of its broader public relations strategy to prevent travelers from using OTAs to purchase Ryanair flights.*"  Mot. at 8; Opp. at 3-4.  This fact, far from being "false," is established by Ryanair's own admissions.  ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Hemann Ex. 18 (emphasis added).

(7) ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Hemann Exs. 18 & 19.

(8) "*Ryanair targets travelers directly: for example, it forces passengers suspected of purchasing flights via OTA to either undergo a biometric verification process to check in for a flight online or pay Ryanair's €55 per passenger fee to check in at the airport.*"  Mot. at 8; Opp. at 4.  Ryanair first seeks to dispute this fact by claiming that it does not "target" OTA passengers, but merely "identifies" them.  Opp. at 4.  That is simply an argument over semantics.  Ryanair also states that there is a free, non-biometric verification option, which Defendants acknowledge; however, this does not undermine the actual material fact at issue—that Ryanair targets (or, identifies) OTA passengers to undergo burdensome processes.  *See* Fuga Ex. 23 at 51-55.

(9) ████████████████████████████████████████████████

18

██████████████████████████ Mot. at 10; Opp. at 4.  Ryanair claims this fact is "false" because ███████

████████████████████████████████████ Shield authenticates authorized users."

Opp. at 4.  This is legal argument, not a factual dispute, and as to the underlying fact, Ryanair itself

testified that Shield ██████████████████████ Hemann Ex. 1, at 30:15-27; *id.* 55:13-19.

(10) "*Shield* ████████████████████████████████████████████

████████████████████████████████████████████████ Mot. at 9-

10 n.7; Opp. at 5.  This is largely a direct quote from the architect of Shield, Lukasz Stocki.  *See*

Hemann Ex. 5, Stocki Dep. Tr. at 76:2-23.  Thus, Ryanair does not actually dispute this fact, but

claims that it is incomplete.  It is not, and, in any event, Stocki's full testimony on this point is in

the record.  *See* Hemann Ex. 5, Stocki Dep. Tr. at 76:2-23, 102:4-103:28; Fuga Ex. 5 (same).

(11) "*Defendants do not access Ryanair's website to book flights or otherwise source*

*Ryanair content directly*."  Mot. at 10; Opp. at 5.  This is true.  Ryanair's only attempted dispute

is ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ Hemann Ex. 16, Bruni Dep. Tr. at 222:25-

223:25; *see* Mot. at 14, n.12.  Ryanair cites no other "dispute" for this fact.

(12) Defendants *"do [not] direct or control their vendors' activities*[.]*"* Mot. at 10; Opp.

at 5.  As explained above, this fact is true. Ryanair does not explain why this is "false" (it is not)

other than to say it is "explained below."  This fails to create a factual dispute.

(13) "*To purchase an available flight, the customer enters the data needed for the booking*

*on Booking.com, which is sent to Etraveli through a direct API connection so that Etraveli can*

*make a booking*."  Mot. at 11; Opp. at 5.  Ryanair claims that this fact is only "partially true," but

then simply restates the fact and adds the "directs, encourages, and induces" terminology.  *See*

Opp. at 5.  Merely adding the legal standard to a fact does not create a disputed issue of fact.

(14) "*Booking.com does not tell Etraveli how to obtain flight information or make flight bookings*" and "*Booking.com has no knowledge of and has never instructed Etraveli or any other third party to engage in any kind of harmful conduct related to Ryanair's website.*"  Mot. at 12; Opp. at 5-6.  These facts are true and unrebutted.  Ryanair's attempt to create a factual dispute rests solely on (1) ████████████████████████████████████████████

████████████████████████████████████████████████████████ and  (2)

Ryanair's cease and desist letters.  Opp. at 5-6 (citing Fuga Ex. 24).  ██████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████  And Ryanair's C&D letters

merely restate its legal arguments and beliefs.  Opp. at 5-6.

(15) Finally, Ryanair declares as "false" that "*Priceline, Agoda, and Kayak also do not know how Priceline and Kayak's vendors purchase Ryanair flights*."  Opp. at 6; *see also* Mot. at 12-14.  It cites no evidence to dispute that fact, and instead again merely repeats its own conclusory, unsupported legal argument, which, again does not create an issue of disputed fact.

In sum, all of Ryanair's purportedly "disputed facts" are either not facts (but simply Ryanair repeating its legal argument), not credibly disputed, or both.  There are no material factual disputes that stand in the way of resolving the legal issues in Defendants' favor.

## 2.      Ryanair May Not Rely On Extra-Record Facts.

Ryanair's Opposition also seeks to highlight new, extra-record developments that are not properly before the Court.  These new facts are not in the record so must not be considered by the Court.  But even if they were considered, they do not create disputed issues of material fact.  Specifically, Ryanair claims that the argument that its website is public "cannot be taken

seriously considering that the Defendants, quite literally, cannot currently access the Ryanair Website." Opp. at 1; *see id.* at 15 (claiming that "the same code-based authentication mechanisms that Defendants deny exist are currently preventing them from accessing the Ryanair Website and selling Ryanair flights"). This is hyperbole, and it is false. Ryanair's website is still accessible. However, as Ryanair later clarifies, it ***recently*** (in the last three months) made technical changes and altered its purchase flow to require additional steps for customer "verification" that were not present before or during discovery: "Ryanair has recently implemented an additional account verification procedure that requires website users to verify their identity before they are allowed to purchase a flight." *Id.* at 18 (citing December 8, 2023 Ryanair press release); *id.* at 15 & n.4.

These new "facts," are recent developments from well after discovery closed. They may not be considered here. Fed. R. Civ. P. 56(c)(1) (factual disputes must be supported by "citing to particular parts of materials ***in the record***" (emphasis added)). Nor would they create disputed issues of material fact even were they properly before the Court. To begin, there is no evidence that any Ryanair flights have been booked through Defendants' platforms since these changes to the verification process and any other technical changes were made, so they are irrelevant and cannot support a claim because they are not tied to any activity that allegedly violates the CFAA. Moreover, whatever these claimed changes may be, the fundamental fact that Ryanair.com is a public website that exists to allow members of the public to buy flights has not changed. Ryanair still cannot criminalize access to a public website based on language it has chosen to include with its website terms of use. *See Van Buren*, 141 S. Ct. at 1660-62 (CFAA should not be interpreted such that its applicability is "controlled by the drafting practices of private parties"). Finally, and notably, while Ryanair takes ownership of having made these changes itself before the Court in hopes of improving its litigation posture, Ryanair has told a different story to the public. For

instance, on January 29, 2024, Ryanair claimed it was "***taken by surprise*** in the first week of December when many of these OTA Pirates . . .took us off sale."[16]  *See also* Hartnett Ex. CC ("In early Dec., most of the larger OTA Pirates (such as Booking.com . . .) ***suddenly removed*** Ryanair's flights from sale on their websites.") (emphasis added); Forderer Ex. 1 ("In early Dec., many of these OTA Pirates removed Ryanair flights from sale on their websites.").

For these reasons, Defendants are entitled to summary judgment.  Ryanair has not presented any genuine dispute of material fact that would warrant trial on these claims.

## III.   DEFENDANTS' MOTIONS TO EXCLUDE RYANAIR'S EXPERTS SHOULD BE GRANTED

### A.   Certain Opinions of Iain Lopata Should Be Excluded.

For the reasons set forth in the Motion (p. 38-47), Defendants seek exclusion of three categories of opinions from Iain Lopata: (1) all damages and loss opinions (Hemann Ex. 41 ¶¶ 27(g)-27(k), 28, 69-182; *id.* Ex. 42 ¶¶ 9(c)(i), 77, 111); (2) Test B and related opinions; and (3) certain rebuttal opinions.  Ryanair's Opposition confirms that these opinions should be excluded.

*First*, both parties agree that notwithstanding the references in his report to "damages," Lopata is "not a damages expert" and lacks any expertise to offer damages opinions.  Opp. at 37. Ryanair, however, claims that despite identifying them as such, Lopata did not, in fact, render "damages" opinions.  *Id.* at 38.  This attempted rewrite is simply not credible.  Ryanair does not dispute that Lopata offers substantive opinions on why this Court should "hold[ Defendants] joint and severally liable," Hemann Ex. 41 ¶ 154, how it should allocate loss, *id.* ¶ 155, and whether Ryanair's "damages [] exceed $5,000" under the CFAA, *id.* ¶¶ 25, 27(i).  Ryanair also does not contest that such opinions must comply with industry standards, which Lopata admittedly does not follow, Hemann Ex. 9, Lopata Dep. Tr. at 228:11-18, and which require expertise he does not

---

[16] Q3 2024 Presentation at 4:41.

have.  Opp. at 37-38.  Ryanair also concedes that Lopata "multipl[ying] numbers by a percentage or add[ing] Ryanair's applicable costs" is not expert opinion, Opp. at 38, but claims that Lopata still adds some "expert" value by "identifying which costs are *applicable*" and that his "specialized knowledge" is "his opinion on 'damage' and 'losses' *as defined by the CFAA*[.]"  Opp. at 38-39 (emphasis added).  But Lopata does not offer these opinions in his Opening Report, and they would be improper legal conclusions if he did.  *Vox Mkg. Grp., LLC v. Prodigy Promos L.C.*, 521 F. Supp. 3d 1135, 1148 (D. Utah 2021) (An "expert report offer[ing] opinions that draw legal conclusions on terms contained in the [CFAA] . . . must be excluded[.]").

Ryanair also largely concedes that Lopata's method is unreliable.  It does not dispute that

███████████████████████████████████████████████████████████████

████████   Hemann Ex. 2, Hurley Dep. Tr. II at 111:13-17, or that the claimed payroll costs rely on "feeling" and "guestimate" and are unsupported by "time sheet data," *id.* Ex. 45 ¶¶ 12, 14. Ryanair claims that Lopata "reviewed invoices," but this is fiction.  Opp. at 41.  Lopata does not cite invoices *anywhere* in his Opening Report.  Hemann Ex. 41 ¶¶ 20-37, 59.  He also conceded that he did not "cross check any of th[e cost] data" against "alternative source[s]" and simply accepted what Ryanair gave him.  *Id.* Ex. 9, Lopata Dep. Tr. at 60:17-61:14.  ███████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████

*Second*, Ryanair does not dispute that Lopata's Test B failed and that without Test B, Lopata cannot reliably opine that Defendants ████████████ (Hemann Ex. 41 ¶ 27(c)); engage in a "common approach" (*id.* ¶ 27(d)); or that their vendors ██████████████████████████

████████████████████████████████ (Mao Ex. 7, Lopata Dep. Tr. at 187:6-11).[17]  Ryanair

claims that Lopata "maintain[ed] the same opinion" despite his test's failure, but this is false.  Opp.

at 43 (alteration in original).  After ***initially*** defending his opinion, Lopata retreated, testifying that:

████████████████████████████████████████████████████████████

███████████████████  Mao Ex. 7, Lopata Dep. Tr. at 204:10-12; *see also id.* at 207:2-21.  And even

if it ***were*** true, as Ryanair claims, that Lopata's conclusions were proven alternatively, that would

mean Test B would not be "helpful[] to the trier of fact" and should be excluded.  *In re Paoli R.R.*

*Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

*Finally,* Ryanair cannot rescue Lopata's improper Rebuttal Opinions.  Ryanair cannot

dispute that Lopata announced a fortuitous conclusion from Test A, unconnected from its

objective, for the first time in rebuttal (Mot. at 45).  Setting aside that such sandbagging is

improper, Lopata provides no foundation that Test A shows ██████████████████████████

████████████████████████████████████  Ryanair also objects to Defendants'

calling Lopata's availability test "cavalier," but does not address the critiques.  *Id.* at 45.  Indeed,

performance of the test ██████████████████████████████ and it used inputs

based on Googling, guessing, and "gut instinct," "not based on experience[.]" Mot. at 46.  Lopata's

approach was unfitting of an expert; these Rebuttal Opinions should be excluded.

## B.  Anthony Vance's Opinions Should Be Excluded.

For the reasons set forth in Defendants' Motion (Mot. 47-50), Vance is not a proper rebuttal

travel expert, he is a late-disclosed (second) technical expert.  His testimony should be excluded.

---

[17] Ryanair asks that, if the Court is inclined to exclude Test B testimony, it should not exclude ***all*** his Cybersecurity Opinions.  Opp. at 43-44.  But Lopata's Cybersecurity Opinions are fundamentally built on Test B and excluding only the latter leaves lay and/or confusing testimony that should not be admitted. *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 144 (M.D. Pa. 2015).

First, Ryanair admits that Vance has no travel industry experience, but argues that Vance nonetheless rebuts O'Neil Dunne based on issues that O'Neil-Dunne ***should*** have considered but did not.  Hemann Ex. 43 at 12-13.  This is not permissible rebuttal opinion.  *Withrow v. Spears*, 967 F. Supp. 2d 982, 1002 (D. Del. 2013) (rebuttal experts must "directly contradict or rebut the actual contents of th[e] prior report").  Nor is Ryanair entitled to rely on O'Neil-Dunne's blog posts which were raised only by Ryanair's counsel during his deposition, not by O'Neil-Dunne. *DOCA Co. v. Westinghouse Elec. Co., LLC*, 2011 WL 12896754, at *1 (W.D. Pa. Dec. 7, 2011) (rebuttal must be "based on the opposing party's expert report – not the expert's deposition.").

Vance should also be excluded as prejudicial to Defendants.  The *Pennypack* factors do not save Ryanair's late disclosure.  Opp. at 47-48. Vance opines on new topics such as terms of use (8-14), and evidence disclosed after Defendants' expert reports (Mot. at 49), with no opportunity for Defendants to respond.  He is not critical to Ryanair, which "has already disclosed [a technical] expert[] in support of its case[.]"  *Bradley v. Amazon.com, Inc.*, 2023 WL 2574572, at *15 (E.D. Pa. Mar. 17, 2013).  To wit, Ryanair defends Vance as "reinforc[ing] arguments made" . . . by [] Lopata, suggesting that he is unnecessary.  Opp. at 48.

Finally, Ryanair futilely defends Vance against the *Daubert* standards on the basis that his testimony on business topics such as Ryanair's ███████████████ is not "expert opinion."  *Id*. at 49.  But, if it is not expert opinion, it should be excluded.  Ryanair makes ***no defense*** of Vance's legal interpretations of Ryanair's Terms of Use and the "relevance" of O'Neil-Dunne, so those are concededly excludable (Mot. at 50), and while Vance may have an industry-based opinion on unauthorized access, he leapt the guardrail in opining on unauthorized access "***as defined by law [] in the CFAA***."  *Id*. at 50 (emphasis added).

## IV.   CONCLUSION

Defendants are entitled to summary judgment; the motions to exclude should be granted.

OF COUNSEL:

John H. Hemann
Kathleen Hartnett
Kristine Forderer
Alexander J. Kasner
Jessie Simpson LaGoy
Hannah Pollack
COOLEY LLP
3 Embarcadero Center St., 20th Fl.
San Francisco, CA 94111
(415) 693-2200
jhemann@cooley.com
khartnett@cooley.com
kforderer@cooley.com
akasner@cooley.com
jsimpsonlagoy@cooley.com
hpollack@cooley.com

Dated: February 5, 2024

*/s/ Jeffrey L. Moyer*
Jeffrey L. Moyer (#3309)
Alexandra M. Ewing (#6407)
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
moyer@rlf.com
ewing@rlf.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 5, 2024, a true and correct copy of the foregoing document

was caused to be served on the following counsel of record in the manner indicated.

<table>
<tr>
<td>

**<u>BY ELECTRONIC MAIL</u>**
R. Touhey Myer
Kratz & Barry LLP
800 N. West Street
Wilmington, Delaware 19801
(302) 527-9378
tmyer@kratzandbarry.com

</td>
<td>

**<u>BY ELECTRONIC MAIL</u>**
R. David Donoghue
Anthony J. Fuga
HOLLAND & KNIGHT LLP
150 N Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600
david.donoghue@hklaw.com
anthony.fuga@hklaw.com

</td>
</tr>
</table>

*/s/ Jeffrey L. Moyer*
Jeffrey L. Moyer (#3309)