# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

RYANAIR DAC,

        Plaintiff,

    v.

BOOKING HOLDINGS INC.,
BOOKING.COM B.V., KAYAK
SOFTWARE CORPORATION,
PRICELINE.COM LLC, and AGODA
COMPANY PTE. LTD,

        Defendants.

C.A. No. 20-01191-WCB

---

### BRIEF OF DEFENDANT BOOKING.COM IN SUPPORT OF
### RULE 50(b) MOTION FOR JUDGMENT AS A MATTER OF LAW
### AND, ALTERNATIVELY, RULE 59 MOTION FOR A NEW TRIAL

OF COUNSEL:

John H. Hemann
Kathleen Hartnett
Kristine Forderer
Alexander J. Kasner
Jessie Simpson LaGoy
Hannah Pollack
Zoë Helstrom
COOLEY LLP
3 Embarcadero Center, 20th Fl.
San Francisco, CA 94111
(415) 693-2200
jhemann@cooley.com
khartnett@cooley.com
kforderer@cooley.com
akasner@cooley.com
jsimpsonlagoy@cooley.com
hpollack@cooley.com
zhelstrom@cooley.com

Dated: August 6, 2024

Jeffrey L. Moyer (#3309)
Alexandra M. Ewing (#6407)
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
(302) 651-7700
moyer@rlf.com
ewing@rlf.com

Orin S. Kerr
Law Office of Orin S. Kerr
334 Law Building
Berkeley, CA 94720-7200
(510) 664-5257
orin@orinkerr.com

*Attorneys for Defendant/Counterclaim*
*Plaintiff Booking.com B.V.*

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................ 1

II.     LEGAL STANDARD ...................................................................................... 3

III.    BOOKING.COM IS ENTITLED TO JUDGMENT AS A MATTER OF
        LAW. ............................................................................................................... 4

        A.      The CFAA Does Not Apply Extraterritorially on The Record at
                Trial. .................................................................................................... 4

        B.      No Reasonable Jury Could Have Concluded That Ryanair Proved
                $5,000 Or More Of Loss in A One-Year Period Attributable To
                Booking.com. ..................................................................................... 11

        C.      No Reasonable Jury Could Have Concluded That Ryanair Proved
                Damage for Ryanair's Claim Under 18 U.S.C. §§ 1030(a)(5)(B)
                and (C) (Count IV). ........................................................................... 21

        D.      No Reasonable Jury Could Have Determined That Booking.com
                Engaged In Fraud Under 18 U.S.C. § 1030(a)(4) (Count II). .................. 23

IV.     ALTERNATIVELY, THE COURT SHOULD GRANT A NEW TRIAL. ........ 25

V.      CONCLUSION .............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
  600 U.S. 412 (2023) ................................................................................................... *passim*

*Condux Int'l, Inc. v. Haugum*,
  2008 WL 5244818 (D. Minn. Dec. 15, 2008) ......................................................... 13

*Dupree v. Younger*,
  598 U.S. 729 (2023) ........................................................................................................ 4

*Eshelman v. Agere Sys. Inc.*,
  554 F.3d 426 (3d Cir. 2009) ........................................................................................ 4

*F'real Foods, LLC v. Hamilton Beach Brands, Inc.*,
  457 F. Supp. 3d 434 (D. Del. 2020) ................................................................... 4, 25

*Fidlar Techs. v. LPS Real Est. Data Sols., Inc.*,
  810 F.3d 1075 (7th Cir. 2016) ............................................................................. 23, 24

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
  2019 U.S. Dist. LEXIS 137804 (D. Del. Aug. 15, 2019) ..................................... 3

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010) ....................................................................................................... 9

*In re NFL "Sunday Ticket" Antitrust Litig.*,
  No. ML 15-02668 PSG (SKx), 2024 WL 3628118 (C.D. Cal. Aug. 1, 2024) ...... 20

*Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*,
  648 F.3d 295 (6th Cir. 2011) .................................................................................... 14

*QVC, Inc. v. Resultly, LLC*,
  159 F. Supp. 3d 576 (E.D. Pa. 2016) ...................................................................... 23

*Resdev, LLC v. Lot Builders Ass'n*,
  2005 WL 1924743 (M.D. Fla. Aug. 10, 2005) ....................................................... 13

*RJR Nabisco, Inc. v. Eur. Cmty.*,
  579 U.S. 325 (2016) ............................................................................................... 5, 7, 9

*United States v. Davila-Mendoza*,
  972 F.3d 1264 (11th Cir. 2020) ................................................................................. 9

## TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. Nosal*,
  676 F.3d 854 (9th Cir. 2012) ...................................................................................9

*United States v. Takhalov*,
  827 F.3d 1307 (11th Cir. 2016) .........................................................................23, 24

*Van Buren v. United States*,
  593 U.S. 374 (2021)...............................................................................................14

*Walter v. Holiday Inns, Inc.*,
  985 F.2d 1232 (3d Cir. 1993)..................................................................................3

*Worldspan, L.P. v. Orbitz, LLC*,
  2006 WL 1069128 (N.D. Ill. Apr. 19, 2006) .........................................................13

**STATUTES & RULES**

18 U.S.C. § 1030
  (a)(4) ....................................................................................................................23
  (a)(5)(B) ...............................................................................................................21
  (a)(5)(C) ...............................................................................................................21
  (c)(4)(A)(i)(I) ........................................................................................................11
  (e)(2)(B) ...........................................................................................................5, 7, 8
  (e)(8) .....................................................................................................................21
  (e)(11) ...................................................................................................................11
  (g) .........................................................................................................................11

Economic Espionage Act of 1996, Pub. L. 104–294, title II, § 201, Oct. 11, 1996,
  110 Stat. 3488 .......................................................................................................11

USA PATRIOT ACT, Pub. L. 107–56, title VIII, § 814(d), Oct. 26, 2001,
  115 Stat. 272 ...........................................................................................................8

**OTHER AUTHORITIES**

Fed. R. Civ. P.
  50(a)(1) ...................................................................................................................3
  50(b).........................................................................................................................3
  50(c)(1) ..................................................................................................................25
  59(a)(1)(A) ..............................................................................................................4

146 Cong. Rec. S10915 (Oct. 24, 2000) .......................................................................8

*Data integrity,* NIST Computer Security Resources Center,
  https://csrc.nist.gov/glossary/term/data_integrity (last visited Aug. 6, 2024) .........14

## I.      INTRODUCTION

On July 18, 2024, the jury returned a verdict against Defendant Booking.com B.V. ("Booking.com") on Count IV (access without authorization recklessly causing damage or causing damage and loss) and Count II (fraud) of Plaintiff Ryanair DAC ("Ryanair")'s Amended Complaint.  Booking.com hereby moves pursuant to Federal Rule of Civil Procedure ("Rule") 50(b) for judgment as a matter of law, and, in the alternative, for a new trial pursuant to Rule 59. Multiple grounds require that judgment be entered for Booking.com.[1]

First, Ryanair failed to establish at trial a basis for the extraterritorial application of the Computer Fraud and Abuse Act ("CFAA").   There is a well-settled presumption against extraterritorial application of federal statutes, and even if some extraterritorial applications of a particular statute are permissible, that does not mean *all* extraterritorial applications are allowed. At the pleadings stage, Ireland-based Ryanair alleged a connection between this case and the United States that the Court determined was sufficient for Ryanair's claims to survive dismissal. However, Ryanair voluntarily dismissed its claims against all U.S.-based Defendants prior to trial. And at trial, Ryanair presented *no* evidence connecting this dispute to the United States.  Thus, even assuming the CFAA applies to some foreign conduct, it does not apply extraterritorially here.

Second, Ryanair failed to show "loss," as that term is defined in the CFAA ("Loss"), attributable to Booking.com in the amount of $5,000 or more in a one-year period—a prerequisite to a civil action under the CFAA.  Even assuming the validity of Ryanair's flawed methodology of apportioning 2.8% of its claimed "OTA costs" to Booking.com, Ryanair's evidence at trial

---

[1] Booking.com filed a Rule 50(a) motion for judgment as a matter of law after Ryanair's case. *See* D.I. 447–448.   After hearing argument on that motion, the Court took the motion "under advisement," stating that it was "deferring" and "suspending ruling on it."  7/18/24 Trial Tr. at 854:7-9.  The Court issued its judgment following the jury's verdict on July 25, 2024.  D.I. 460.

showed at most $2,457.72 of Loss attributed to Booking.com (based on Shield hosting costs).  No reasonable jury could have found a higher Loss amount based on evidence presented at trial, as opposed to speculation, confusion, and prejudice.  Moreover, and further indicating that Ryanair's claim of Loss of at least $5,000 in a one-year period was based on speculation, the jury awarded *exactly the Loss threshold of $5,000* in economic damages to Ryanair, a number that is untethered to any quantification of Loss or damages by either side.  No reasonable jury could have reached this award based on the evidence.  Because Ryanair failed to meet the statutory Loss requirement, judgment should be entered for Booking.com.

Third, Ryanair failed to show "damage" as that term is defined in the CFAA ("Damage"), which is required for Ryanair's unauthorized access claim (Count IV).  The Court has recognized that Damage is not equivalent to Loss, and that it requires actual damage to a computer.  *See* D.I. 399 ("MSJ Opinion") at 27.  Ryanair's only claimed showing of Damage at trial was the so-called "Monex incident," but this incident could not support a finding of Damage by any reasonable jury, including because:  (1) the alleged Monex incident occurred in October 2023, whereas Ryanair's claimed Loss period was March 2022 through February 2023, and Ryanair's claimed Loss and Damage must occur in the same one-year period to have a complete CFAA claim; and (2) the evidence failed to establish that Booking.com caused the Monex incident or any Damage to Ryanair's computers as a result of that incident.

Finally, Ryanair failed to show fraud by Booking.com (Count II).  Far from showing the required intent to defraud or cheat, Ryanair's evidence *at most* showed Booking.com's knowing acquiescence to its vendor's access of the myRyanair portion of Ryanair's website—access that entailed providing (a) email addresses that worked and belonged to the passenger, thus allowing Ryanair to contact passengers who made a booking through Booking.com; and (b) credit cards that

worked, thus allowing Ryanair to receive the full purchase price for any ticket booked through Booking.com and to refund that same price to the same payment method.  On this evidence, no reasonable jury could find that Booking.com intended to defraud Ryanair.

For all these reasons, separately and together, judgment should be entered for Booking.com on Counts IV and II.  Alternatively, a new trial should be granted.

## II.   LEGAL STANDARD

Under Rule 50(b), "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a)," "[n]o later than 28 days after the entry of judgment," "the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59."  Fed. R. Civ. P. 50(b).  Judgment as a matter of law should be granted if the Court "finds that a reasonable jury would not have a legally sufficient evidentiary basis" to find for the nonmoving party.  Fed. R. Civ. P. 50(a)(1); *see Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir. 1993) (asking whether, "viewing all the evidence which has been tendered and should have been admitted in the light most favorable to the party opposing the motion, no jury could decide in that party's favor" (cleaned up)).  "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party."  *Liqwd, Inc. v. L'Oreal USA, Inc.*, No. 17-14-JFB-SRF, 2019 U.S. Dist. LEXIS 137804, at *2-3 (D. Del. Aug. 15, 2019) (citation omitted).  Judgment as a matter of law should be "granted where the record is critically deficient of the minimum quantum of evidence necessary to support a jury verdict" for the nonmoving party.  *Id.* at *3 (quoting *Eshelman v. Agere Sys. Inc.*, 554 F.3d 426, 433 (3d Cir. 2009) (internal quotation marks omitted)).

Under Rule 59, "[t]he court may, on motion, grant a new trial on all or some of the issues" decided by the jury "for any reason for which a new trial has heretofore been granted in an action

at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). The Court "has the discretion to order a new trial when the verdict is contrary to the evidence, a miscarriage of justice would result if the jury's verdict were left to stand, or the court believes the verdict resulted from confusion." *F'real Foods, LLC v. Hamilton Beach Brands, Inc.*, 457 F. Supp. 3d 434, 443 (D. Del. 2020).

## III.   BOOKING.COM IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.[2]

### A.   The CFAA Does Not Apply Extraterritorially on The Record at Trial.

As the Supreme Court recently reiterated, "the presumption against extraterritorial[]" application of United States statutes "is a longstanding principle of American law," reflecting that "exclusively foreign conduct is generally the domain of foreign law." *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 417 (2023) (cleaned up) (rejecting extraterritorial application of the Lanham Act). This "presumption serves to avoid the international discord that can result when U.S. law is applied to conduct in foreign countries" and reflects the "commonsense notion that Congress generally legislates with domestic concerns in mind." *Id.* (cleaned up). Moreover, even if a statute permits some extraterritorial application, such application is still "subject to the limits Congress has (or has not) imposed on the statute's foreign application." *Id.* at 418 (cleaned up).

Because Ireland-based Ryanair failed to make a showing at trial supporting the extraterritorial application of the CFAA against Netherlands-based Booking.com, judgment as a matter of law should be granted to Booking.com.

Plaintiff "Ryanair is a low-fare airline based in Ireland that offers flights in Europe and North Africa." D.I. 399 at 1. When Ryanair filed this case in 2020, it sued five Defendants— three U.S.-based companies (Booking Holdings Inc. ("BHI"), Priceline.com LLC ("Priceline"),

---

[2] In addition to the arguments herein, Booking.com preserves its challenges to the Court's legal rulings in its summary judgment order, which need not be re-raised in Rule 50 motions. *See Dupree v. Younger*, 598 U.S. 729, 731 (2023).

and KAYAK Software Corporation ("KAYAK")), and two non-U.S.-based companies (Booking.com, based in the Netherlands, and Agoda Company Pte. Ltd., based in Singapore). D.I. 1 ¶¶ 4–12. Thus, at the pleadings stage, the Court rejected Defendants' contention that Ryanair's claims sought an impermissible extraterritorial application of the CFAA. *See* D.I. 42 ("MTD Order") at 14–16. According to the Court, Defendants' extraterritoriality challenge failed under the "first step of the Supreme Court's framework" for determining whether "Congress has provided a 'clear, affirmative indication' that the CFAA applies extraterritorially," D.I. 42 at 15 (quoting *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 337 (2016)), because the CFAA defines "protected computer" to "explicitly include[] computers located outside the United States," D.I. 42 at 15 (citing 18 U.S.C. § 1030(e)(2)(B)). The Court rejected Defendants' contention that the CFAA cannot apply in this case because Ryanair's claims involve conduct "by foreign actors to a foreign website causing foreign harm,"—*i.e.*, where "the alleged perpetrator, the alleged victim, the alleged website, and all alleged instrumentalities are located outside of the United States." D.I. 42 at 16 n.12 (quoting D.I. 17 at 21, 24). According to the Court, no such concern was presented by Ryanair's complaint, which "charges that three Delaware companies, along with two foreign companies in the same corporate family, engaged in conduct that violates the CFAA—some of which conduct (e.g., using data obtained by screen scraping) may have occurred in the United States for websites that are accessible in the United States." D.I. 42 at 16 n.12.[3]

---

[3] Defendants argued that to allow the CFAA to "cover[] every computer intrusion in the world" "because the CFAA's definition of 'protected computer' includes computers involved in foreign commerce," D.I. 27 at 7, "would swallow the presumption against extraterritoriality and transform the United States into the worldwide enforcer against computer hacking[,]" despite there being "no indication whatsoever that Congress intended such a result[.]" D.I. 17 at 24. Booking.com preserves its challenge to the Court's pleadings-stage ruling regarding extraterritoriality, but, as set forth in this motion, judgment as a matter of law is required based on the ultimate facts at trial, which indicate that applying the CFAA here would be an impermissible extraterritorial application, even if there are circumstances in which the CFAA may apply extraterritorially.

By the time of trial, however, Ryanair had voluntarily dismissed with prejudice all Defendants other than Booking.com—including *all three* U.S.-based Defendants.  *See* D.I. 403, D.I. 451.  Priceline and Booking Holdings were dismissed three weeks before trial and Ryanair agreed to dismiss KAYAK moments before trial began.  *See id.*  Thus, at trial, the sole remaining Defendant was Netherlands-based Booking.com.  D.I. 76 ¶ 5.[4]  And Ryanair's case at trial was reduced to a dispute between two European companies over flights solely offered in Europe and North Africa, booked exclusively through a European third-party vendor that was not a party to the litigation (Etraveli, based in Sweden, *see* 7/16/24 Trial Tr. at 429:23–430:3 (Guerrero)), pursuant to a contract governed by Netherlands law, *see* PTX-19 at 32.  All fact witnesses who testified at trial live and work in Europe.  And Ryanair presented *zero* evidence at trial that any booking of a Ryanair flight made on Booking.com was made by or for a U.S.-based customer— nor that any of the 518,826 specific Booking.com bookings identified as the claimed basis of Ryanair's Loss had any connection to the U.S., *see* 7/18/24 Trial Tr. at 885:22–24.  Moreover, it is undisputed that the Ryanair computer systems allegedly harmed by Booking.com all sit entirely

---

[4] Notably, in rejecting Defendants' motion to dismiss based on *forum non conveniens*, the Court determined that "[t]his District has a local interest in the case because Ryanair alleges that three Delaware citizens—Booking Holdings, KAYAK, and Priceline—have gained unauthorized access to Ryanair's website and violated U.S. law in doing so."  D.I. 42 at 13; *see id.* ("the allegations against multiple Delaware corporate citizens justify the burdens that may be imposed on Delawareans to sit as jurors").  Ryanair dismissed all of those Defendants shortly before trial given the lack of any triable issue of liability or damages as to these Defendants.  The Court further rejected Defendants' *forum non conveniens* motion because it was not "persuaded that Ryanair has brought this case here simply to take advantage of law it might perceive as more favorable to it," given that "Ryanair sued three Delaware companies—Booking Holdings, KAYAK, and Priceline—in their home forum," which the Court found to be "a logical and legitimate basis on which to sue these companies, even absent a strong showing that litigating here is convenient for Ryanair."  *Id.* at 9–10.  As Ryanair's eventual voluntary dismissals of all Defendants other than Booking.com revealed, however, that is precisely why Ryanair sued in Delaware:  to seek application against Booking.com of foreign law that it perceived to be favorable to Ryanair.

in Europe.  7/15/24 Trial Tr. at 133:5–9 (Hurley) (testifying that "when the user is . . . within the myRyanair portion of the web site" they are "accessing" "computers" "based in Ireland").[5]

Since the Court's MTD Order, the Supreme Court has reiterated the stringent framework that applies to assessing whether a U.S. statute applies extraterritorially in a given case. Specifically, in 2023, the Supreme Court rejected extraterritorial application of key provisions of the Lanham Act in *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 428 (2023).  As the Supreme Court explained, "[i]t is a 'rare statute that clearly evidences extraterritorial effect despite lacking an express statement of extraterritoriality.'"  *Id.* at 420 (quoting *RJR Nabisco*, 579 U.S. at 340).  Indeed, neither "an express statutory reference to 'foreign commerce,'" nor "a definition of 'commerce' that refers to Congress's authority to regulate foreign commerce" is "enough to rebut the presumption."  *Abitron*, 600 U.S. at 420–21.

Here, the Court's MTD Order rejecting Defendants' extraterritoriality challenge hinged on the fact that "[t]he CFAA defines the term 'protected computer' to include a computer 'used in or affecting interstate or foreign commerce or communication, ***including a computer located outside the United States*** that is used in a manner that affects interstate or foreign commerce or communication of the United States.'"  D.I. 42 at 15 (quoting 18 U.S.C. § 1030(e)(2)(B)) (emphasis in MTD Order).  Under *Abitron* (and Supreme Court precedent cited therein), references to "foreign commerce" are alone insufficient to rebut the presumption against extraterritoriality. *See Abitron*, 600 U.S. at 420–21.  Thus, the Court's MTD Order relied on additional words in the statutory definition—"computer located outside the United States"—to rebut the presumption.

---

[5] Ryanair's only attempt at trial to connect this case to the United States was to claim that a hypothetical U.S. user of the Ryanair website receives graphical content from the Ryanair website from a local Amazon web service, which helps "speed up the web page."  *Id.* at 133:10–20.  Such graphical content has nothing to do with the alleged CFAA violation here.

D.I. 42 at 15.  Notably, however, that phrase is itself further modified and limited, as the "computer located outside the United States" must be "used in a manner that affects interstate or foreign commerce or communication *of the United States*," 18 U.S.C. § 1030(e)(2)(B) (emphasis added). In other words, the statute does not purport to apply to *any* computer outside of the United States, regardless of circumstances.  Instead, the computer located abroad must be used in a manner that impacts commerce in the United States for the CFAA to apply.  And, while the Court determined at the pleadings stage that Ryanair had alleged such a connection, *see, e.g.*, D.I. 42 at 16 n.13 (noting that "the Complaint alleges that Booking.com's CFAA violation enables it to sell Ryanair tickets to consumers in the United States"), at trial the evidence showed no such connection.[6]

In other words, the Court's MTD Order did not rule out interpreting the CFAA to foreclose extraterritorial application where "the alleged perpetrator, the alleged victim, the alleged website, and all alleged instrumentalities are located outside of the United States."  D.I. 42 at 16 n.12 (quoting D.I. 17 at 24).  It merely concluded that these were not the facts pled by Ryanair, *see* D.I. 42 at 15, 16 n.13.[7]  And the Court did not issue a more sweeping ruling for good reason:  if a

---

[6] Congress underscored the need for a sufficient connection to the United States when the "computer located outside the United States" language was added to the definition of "protected computer" in 2001.  *See* Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Pub. L. 107–56, title VIII, § 814(d), Oct. 26, 2001, 115 Stat. 272, 366, 384.  As Senator Leahy explained: "The amendment would clarify the definition of 'protected computer' to ensure that computers which are used in interstate or foreign commerce but are located outside of the United States are included within the definition of 'protected computer' *when those computers are used in a manner that affects interstate or foreign commerce or communication of this country*.  This will ensure that our government will be able to conduct domestic investigations and *prosecutions against hackers from this country who hack into foreign computer systems and against those hacking through the United States to other foreign venues*.  Moreover, by clarifying the fact that a domestic offense exists, the United States will be able to use speedier domestic procedures in support of international hacker cases, and create the option of prosecuting such criminals in the United States."  146 Cong. Rec. S10915 (Oct. 24, 2000) (emphasis added) (describing underlying bill).

[7] Nothing in Judge Stark's MTD ruling (or the CFAA) would permit the extraterritorial application of the CFAA to "a dispute between two companies, both of which are corporations housed and

CFAA claim could be pursued in any case involving the use of a "computer located outside the United States," regardless of circumstance, then the CFAA would apply to *all* alleged computer misuse around the world, given that courts have interpreted "protected computer" to mean "effectively all computers with Internet access[.]"  *United States v. Nosal*, 676 F.3d 854, 859 (9th Cir. 2012).  Such a lack of any limiting principle cannot be what Congress intended, particularly given that the CFAA was enacted in 1986, years before the rise of the Internet.  And, as the Supreme Court has made clear, just because a statute has *some* permissible extraterritorial applications does not mean that *all* extraterritorial applications are permissible.  Rather, courts must assess "the limits Congress has (or has not) imposed on the statute's foreign application." *Abitron*, 600 U.S. at 418 (quoting *RJR Nabisco*, 579 U.S. at 337–38); *see, e.g.*, *RJR Nabisco*, 579 U.S. at 338 ("the presumption against extraterritoriality has been rebutted—but only with respect to certain applications of the statute"); *id.* at 339 (explaining that "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms" (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 265 (2010)).[8]

---

operating entirely in [E]quatorial Guinea," absent some further connection to the United States, and Ryanair's contention to the contrary is wrong.  *See* 7/18/24 Trial Tr. at 827:7–9.  Just as the Court's hypothetical would not support a CFAA claim due to the lack of a sufficient connection to the United States, so too did the evidence at trial lack such a connection.

[8] Although the presumption against extraterritoriality largely addresses impermissible applications of federal statutes to foreign conduct, the Foreign Commerce Clause provides a constitutional safeguard as well, disallowing the application of federal statutes to circumstances with an insufficient connection to the United States.  For example, in *United States v. Davila-Mendoza*, the Eleventh Circuit rejected as unconstitutional the government's attempted application of a drug trafficking statute to "drug-trafficking conduct . . . in the territorial waters of a foreign nation, by foreign nationals using a foreign-registered vessel, of drugs not bound for the United States," where "[t]he record contain[ed] no evidence" that such a circumstance "substantially affects United States commerce with foreign nations."  972 F.3d 1264, 1276 (11th Cir. 2020).  The same is true for the facts at trial here.  The Court need not reach any constitutional question, however, because the CFAA does not apply extraterritorially in the first place based on the trial evidence.

Thus, even assuming the correctness of the MTD Order, *cf. supra* n.3, the jury's verdict against Booking.com is based on an unauthorized extraterritorial application of the CFAA given the evidence presented at trial that any reasonable jury would have had to accept as true before applying the CFAA:  an alleged foreign perpetrator (Booking.com), an alleged foreign victim (Ryanair), alleged unlawful access and computer harm abroad (Ryanair computers in Europe that host Ryanair's website), and an alleged foreign instrumentality (Etraveli).  *See* 7/15/24 Trial Tr. at 133 (Hurley); 7/16/24 Trial Tr. at 337–38, 364 (Stocki); 7/16/24 Trial Tr. at 425 (Guerrero).  There were no domestic parties (and no domestic third-party "victims") at trial.  There was no evidence of domestic computers allegedly harmed.  Indeed, there was ***no*** evidence that any relevant conduct at all occurred in the United States.

Because the CFAA does not apply extraterritorially based on the facts presented at trial, Ryanair would need to justify CFAA liability under step two of the extraterritoriality analysis:  a "(permissible) domestic . . . application." *Abitron*, 600 U.S. at 418.  The Court's MTD Order did not reach that issue.  D.I. 42 at 15.  Step two requires courts to identify the "focus of congressional concern" underlying the provision at issue.  *Abitron*, 600 U.S. at 418 (cleaned up).  To satisfy step two, "plaintiffs must establish that the conduct relevant to the statute's focus occurred in United States territory." *Id.*  Here, and as discussed above, Ryanair's evidence at trial did not establish that *any* conduct relevant to the focus of the CFAA (*i.e.*, unauthorized access and damage to Ryanair's computers), occurred in United States territory.  In fact, the only conclusion supported by the evidence at trial is the opposite—no protected computer is located in the United States and no potentially violative conduct "occurred in United States territory." *Id.* (cleaned up).

**B.    No Reasonable Jury Could Have Concluded That Ryanair Proved $5,000 Or More Of Loss in A One-Year Period Attributable To Booking.com.**

To sustain a civil action under the CFAA against Booking.com, Ryanair was required to show that it "suffer[ed] damage or loss by reason of a violation" of the CFAA by Booking.com. D.I. 399 at 21 (quoting 18 U.S.C. § 1030(g)) (alteration in original).  "The nature of qualifying damage or loss is further confined" to "conduct involv[ing] 1 of the factors" set forth in 18 U.S.C. § 1030(c)(4)(A)(i)(I)-(V).  D.I. 399 at 21 (quoting 18 U.S.C. § 1030(g)).  Ryanair has only ever argued for the application of one of those factors, 18 U.S.C. § 1030(c)(4)(A)(i)(I), which requires "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value[.]" D.I. 399 at 21; 18 U.S.C. § 1030(c)(4)(A)(i)(I).[9]  Ryanair's claimed one-year CFAA Loss period for Booking.com was "from March 1, 2022, to February 28, 2023."  D.I. 348 at 9 & n.2, 14–15. Because the trial evidence of Loss in this (or any) one-year period was entirely speculative, and by any reasonable calculation totaled—at most—$2,457.72, Ryanair failed to establish the required $5,000 of Loss, and judgment as a matter of law is required for Booking.com.[10]

At summary judgment, the Court determined that certain of Ryanair's claimed Losses were unavailable as a matter of law, *see, e.g.*, D.I. 399 at 28 (barring certain prophylactic measures), but that some of Ryanair's claimed Losses were theoretically available if supported by evidence at trial.  *See id.* at 28-32.[11]  At trial, Ryanair ultimately claimed four categories of Loss allegedly

---

[9] "[L]oss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service[.]"  18 U.S.C. § 1030(e)(11).

[10] The CFAA, originally enacted in 1986, was amended in 1994 to allow for civil actions, and was amended in 1996 to allow for civil actions upon a showing of $5,000 or more of Loss in a one-year period.  *See* Economic Espionage Act of 1996, Pub. L. 104–294, title II, § 201, Oct. 11, 1996, 110 Stat. 3488, 3493–3494.  The present value of $5,000 in 1996 is approximately $10,000 today.

[11] The MSJ Opinion, while excluding certain of Ryanair's claimed Losses, rejected Defendants' argument "that a qualifying 'loss' must result from technological harm and that Ryanair has not

11

totaling $177,000 for the Loss period: (1) online customer verification, (2) customer service costs, (3) Navitaire costs per flight, and (4) Shield hosting costs. 7/18/24 Trial Tr. at 885:5–15 (Ryanair's closing argument, citing a slide from Booking.com's accounting expert).[12]  Ryanair claimed these same costs as damages.  Ryanair's theory was that Booking.com, though responsible for only 0.6% of Ryanair bookings for the year at issue, was responsible for 2.8% of OTA bookings on Ryanair and thus 2.8% of Ryanair's OTA-related costs.  *See infra.*  However, even assuming Ryanair's flawed theory of 2.8% attribution, Ryanair failed to present sufficient evidence to support its cost claims for each of the four remaining Loss categories, other than—at most—$2,457.72 related to Shield hosting.[13]  And the fact that the jury awarded the ***exact*** $5,000 Loss threshold in damages— a figure that ***neither*** party proposed as Loss or damages—further indicates that the jury's determination of Loss was not based on the law and the evidence.

---

shown any such harm."  D.I. 399 at 23 (citing D.I. 335 at 27).  Instead, the Court ruled that the "term 'loss' is best understood to include the cost of an investigation following a CFAA violation, even in instances in which the violation has not resulted in actual impairment of the protected computer or loss of data."  D.I. 399 at 26.  Booking.com preserves its challenge to this ruling; under the CFAA, Loss (even investigation costs) must flow from an actual "technological harm." *See* D.I. 335 at 27–28 (Defendants' opening summary judgment brief); D.I 378 at 10–13 (Defendants' summary judgment reply).  However, as set forth in this brief, even under the Court's framework, Ryanair failed at trial to attribute $5,000 or more of Loss in a one-year period to Booking.com.

[12] The categories of Loss that Ryanair pressed at summary judgment but did not claim at trial were:  Shield Software Development, D.I. 399 at 29; New Relic, *id.*; Business Intelligence Employees (no evidence at trial); Cloudfront (no evidence at trial, *see* 7/16/24 Trial Tr. at 362:1–364:22 (Stocki)); Amazon AWS Firewall (no evidence at trial); myRyanair (disclaimed at trial, *see* 7/16/24 Trial Tr. at 301–02 (Hurley)); and Digital Employees (no evidence at trial).  At trial Ryanair also disclaimed any reliance on the so-called Monex attack, which occurred outside the Booking Period, to prove Loss.  7/18/24 Trial Tr. at 830:15–24 ("That's off the table.").

[13] And, as explained below, even assuming that Ryanair could claim Shield hosting costs for the entire one-year Loss period despite presenting evidence for only half that period, it still fell short of attributing $5,000 or more of Shield hosting costs to Booking.com in a one-year period.

*No reliable attribution of Loss to Booking.com.*  As an initial matter, for the categories of Shield hosting, online verification, and customer service Loss, Ryanair failed to present any evidence to substantiate attribution of that Loss to Booking.com.  At trial, Ryanair took its total spending on each of these categories, and sought to attribute—across the board—2.8% of these claimed costs to Booking.com.  However, the evidence at trial did not support this calculation, as Ryanair relied on data from Booking.com to arrive at the number of Booking.com bookings during the claimed Loss period (*i.e.*, the numerator), but it failed to introduce reliable evidence to establish the number of total Ryanair OTA bookings during the period (*i.e.*, the denominator), from which any percentage attributed to Booking.com could be derived.  *See* 7/15/24 Trial Tr. at 144–46 (Hurley) (agreeing that numbers provided to witness by counsel "look right," but not providing any evidence, and otherwise providing unclear at best math on the stand).  Thus, no reasonable jury could have concluded that Booking.com was responsible for precisely 2.8% (or any other particular percentage) of Ryanair's OTA costs—a foundational premise that Ryanair used to generate nearly all of its Loss calculations at trial, including for Shield hosting.

*No verification/customer service-related Loss.*  The Court ruled at summary judgment that there were triable issues regarding Ryanair's claimed Loss from its online verification process and customer service costs, but at trial Ryanair failed to show Loss based on this theory.[14]

---

[14] Booking.com respectfully disagrees with the Court's prior ruling that "unauthorized bookings affect Ryanair's data integrity," and thus can support a showing of Loss, "because such bookings input information into Ryanair's database that never should have been there in the first place." D.I. 399 at 32.  This conception of "data integrity" is against the weight of authority holding that "data integrity" does not mean additional, unwanted data, but rather "some **diminution** in the completeness or useability of data or information on a computer system."  *Worldspan, L.P. v. Orbitz, LLC*, No. 05 C 5386, 2006 WL 1069128, at *5 (N.D. Ill. Apr. 19, 2006) (quoting *Resdev, LLC v. Lot Builders Ass'n*, No. 6:04-CV-1374ORL31DAB, 2005 WL 1924743, at *5 n.3 (M.D. Fla. Aug. 10, 2005) (emphasis added)); *Condux Int'l, Inc. v. Haugum*, No. 08-4824 ADM/JSM, 2008 WL 5244818, at *8 (D. Minn. Dec. 15, 2008) (diminution of data integrity entails "alteration of or diminution to the integrity . . . of the computer data itself").  Trial confirmed that the allegedly

Under the Court's MSJ Opinion, to show Loss based on its verification process and customer service costs, Ryanair had to establish at trial that it received "fake" customer details and payment methods regarding Booking.com customers, and that Ryanair's verification processes were directed at data integrity rather than "simply a business practice designed to discourage the use of OTAs[.]"  D.I. 399 at 32.  However, the evidence at trial showed the opposite: that when a customer makes a Ryanair booking on Booking.com, Ryanair receives usable data, including real, functioning email addresses and real, functioning credit card numbers.  7/15/24 Trial Tr. at 220:2–4 (Hurley); 7/16/24 Trial Tr. at 398:24–402:23 (Lopata).  The evidence at trial also showed that Ryanair *can* and *does* communicate with passengers who book through Booking.com (7/16/24 Trial Tr. at 399:2–402:23 (Lopata));[15] that Ryanair is paid in full for all bookings made through

---

"unwanted" data from Booking.com (working e-mail addresses and valid virtual credit cards, in a number commensurate with the number of passengers), did nothing to diminish Ryanair's access to or completeness of existing data.  Nor did any data related to Booking.com entail a "blitz" designed to "wreak[] . . . havoc" by "overload[ing] [a] system" and "stall[ing] normal business operations because . . . employees could not access business-related e-mails or send e-mails to customers and vendors."  *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 299 (6th Cir. 2011).  Notably, the National Institute of Standards & Technology's ("NIST's") definitions of "data integrity" supports Booking.com's argument.  *See Data integrity,* NIST Computer Security Resources Center, https://csrc.nist.gov/glossary/term/data_integrity (last visited Aug. 6, 2024) (listing NIST definitions of "data integrity," such as "[t]he property that data has not been altered in an unauthorized manner[,]" and "[a] property whereby data has not been altered in an unauthorized manner since it was created, transmitted, or stored").  As the Supreme Court has explained in interpreting the CFAA, "[w]hen interpreting statutes, courts take note of terms that carry 'technical meaning[s].'"  *Van Buren v. United States*, 593 U.S. 374, 388–89 (2021) (second alteration in original) (citation omitted).  In any case, as described herein, Ryanair failed even to make the Loss case required by the Court's conception of "data integrity."

[15] Mr. Hurley claimed to have made two test bookings of Ryanair flights on Booking.com in the two weeks before trial without receiving confirmation emails from Ryanair, but he failed to provide any evidence substantiating these bookings after offering to do so.  *See* 7/15/24 Trial Tr. at 224:8–226:7.  This post-discovery "evidence" is contrary to all other evidence at trial, including the successful test bookings by Ryanair's own expert, and the testimony of both Booking.com witnesses that Ryanair inventory has not been available on Booking.com for months.  *See* 7/16/24 Trial Tr. at 467:9–24 (Guerrero); 7/17/24 Trial Tr. at 770:23–771:21 (Humphries).  Although Mr. Hurley's lack of substantiation is dispositive, it may be that he made bookings through LastMinute rather than through the Booking.com website.  *See* 7/16/24 Trial Tr. at 404:20–405:4.

Booking.com (7/16/24 Trial Tr. at 292 (Hurley); *id.* at 401–02 (Lopata)); and that there have been no refund challenges for Booking.com customers (7/15/24 Trial Tr. at 217:13–20 (Hurley)). Finally, the trial evidence established that for non-OTA bookings, Ryanair does not consider data "fake" or lacking "integrity" just because a passenger's name does not correspond to the email address or credit card provided (7/15/24 Trial Tr. at 212:13–213:1 (Hurley)), and, indeed, that Ryanair approves of its travel agent partners ***not*** sending Ryanair the passenger's own email address (7/16/24 Trial Tr. at 414:4–416:17 (Lopata)).  In short, no reasonable jury could have concluded that the information passed from Booking.com through its vendors to Ryanair caused any "data integrity" issue.

But even assuming that the data as passed from Booking.com through Etraveli to Ryanair constituted a cognizable Loss, Ryanair failed to show at trial $5,000 or more in Loss from its online verification or customer service processes due to Booking.com, for the following reasons:

***Online Verification.***  For online verification costs, Ryanair calculated its claimed $10,000 in Loss attributable to Booking.com, *see* Ex. A (DDX-9.3), by multiplying the number of OTA-related verifications during the Loss period by $0.59 (Ryanair's claimed cost of using GetID verification per passenger), and then apportioning 2.8% of that figure to Booking.com.  7/15/24 Trial Tr. at 166:13–168:24 (Hurley).  But Ryanair's witnesses confirmed before and during trial that its online verification cost is ***entirely passed through to the customer*** who completes the verification.  *See* 7/17/24 Trial. Tr. at 642:2–19 (Brady) (cost charged to passenger covers Ryanair's GetID cost); D.I. 343, Hemann Decl. Ex. 2 at 111:13–17 (confirming GetID "is not costing Ryanair money out of pocket"). Under the Court's rulings, this is not a Loss to Ryanair. *See* D.I. 453 (Final Jury Instructions) at 5 ("Losses do not include any costs that are not borne by Ryanair."); DTX-262.

***Customer Service.***  For customer service costs, Ryanair failed to adduce evidence to support its $112,000 claim of Loss as to Booking.com, *see* Ex. A (DDX-9.3).  Ryanair calculated the amount as follows: first, Ryanair took the average percentage of customer service inquiries concerning tickets booked through OTAs between August 2022-July 2023 (which overlaps with, but is different than Ryanair's Loss period); it then applied that percentage to the claimed monthly cost of unsupported and unspecified customer service agents' salaries ("384,000 Euros per month"); multiplied that monthly cost by 12 to reach a full year (€4.6 million); it then deducted €600,000 based on the notion that the March 2022 through February 2023 period "would be slightly lower" than the August 2022 through July 2023 period; and it then apportioned 2.8% of that €4,000,000 to Booking.com.  *See* 7/15/24 Trial Tr. at 170:16–171:3, 173:19–174:7 (Hurley).  Ryanair's testimony at trial—which largely involved Ryanair's witness agreeing with figures offered by Ryanair's counsel who was reading from an interrogatory response—did not support this calculation.  *Id.*  For instance, neither the witness, nor the interrogatory response from which counsel was reading identifies any basis for claiming €384,000 per month as the cost of customer service staff.  Ryanair's claimed customer service costs also fail to establish Loss under the CFAA because, as Ryanair acknowledged, its calculation does not limit claimed costs to customer service inquiries related to "data integrity"—as opposed to the plethora of other potential issues experienced by Ryanair passengers who happened to book through OTAs (such as changing flights or adding ancillaries).  7/16/24 Trial Tr. at 277:15–278:6 (Hurley).    In sum, Ryanair did not introduce evidence from which a reasonable jury could have found CFAA Loss attributable to online verification or customer service costs.

***No Navitaire Loss.***  The MSJ Opinion allowed Ryanair to claim hosting costs related to Navitaire—a vendor Ryanair uses to electronically make and store all flight bookings—as Loss if

"the facts developed at trial show that the bot traffic attributable to the defendants has **materially increased the cost of Ryanair's server infrastructure**." D.I. 399 at 30 (emphasis added). At trial, Ryanair claimed $49,000 of Loss attributable to Booking.com based on Navitaire, *see* Ex. A (DDX-9.3), but Ryanair made *no* showing at trial that any traffic allegedly attributable to Booking.com "materially increased the cost of Ryanair's server infrastructure," D.I. 399 at 30.

To begin, Ryanair made no showing that its costs from Navitaire—a Ryanair **vendor**— even pertained to "**Ryanair's** server infrastructure," as required by the MSJ Order. D.I. 399 at 30 (emphasis added). Moreover, Navitaire costs are borne by Ryanair for each and every passenger, regardless of whether a passenger books through an OTA or directly on Ryanair.com. 7/16/24 Trial Tr. at 270:24–271:10, 272:5–15 (Hurley). Ryanair testified at trial that if Booking.com did not exist, the customers still would have made the same number of bookings with Ryanair via other means. *Id.* at 272:16-273:1. Without the involvement of Booking.com, Ryanair would have incurred the same number of per-passenger Navitaire costs for the same number of flights booked, and thus, Navitaire costs related to Booking.com's bookings cannot and did not materially increase Ryanair's costs. In other words, Navitaire costs are a cost of doing business for **any** Ryanair passenger—just like jet fuel and cleaning the plane. 7/16/24 Trial Tr. 274:24–275:18 (Hurley). No reasonable jury could have found that the cost of Navitaire hosting for the Ryanair flights booked through Booking.com are Loss as defined in the CFAA.

In any event, the evidence at trial showed that Booking.com-related flights were, at most, **0.6%** of Ryanair's bookings during the Loss period, making the impact of such bookings on Ryanair's Navitaire costs *de minimis*, not material. D.I. 399 at 30 (requiring "material" increase); 7/15/24 Trial Tr. at 146:8–20, 144:5–9 (Hurley, testifying that Booking.com bookings accounted for 518,826 of 78,300,879 total Ryanair bookings during the loss period). Further, pursuant to the

17

Navitaire contract in evidence, Ryanair was required to pay a fixed cost to Navitaire unless Ryanair exceeded a certain number of bookings. *See* DTX-202. Ryanair failed to introduce any evidence at trial that it exceeded the contractual minimum and had to pay additional Navitaire costs for any Booking.com-related bookings on a per-booking basis. *See* 7/18/24 Trial Tr. at 829:16–18.

**Shield Hosting Costs.** Ryanair's only arguably substantiated Loss at trial was its Shield hosting cost, but it was only able to apportion, at most, ***$2,457.72*** of such costs to Booking.com. Moreover, even if one assumes the ***highest*** Shield hosting cost in evidence for the portion of the Loss period for which Ryanair introduced no evidence of cost, the total cost would be $4,886.22, still under $5,000. There is simply no evidence for a calculation that brings this cost above the $5,000 required to mount a CFAA claim.

Under the MSJ Opinion, "[t]o the extent that the facts at trial show that Shield prevents unauthorized bookings at the payment page after account creation, any portion of those costs [are] allocable to each defendant[.]" D.I. 399 at 28. At trial, Ryanair claimed costs associated with two Shield endpoints and argued that these endpoints together make up 80% of Shield's cost. 7/16/24 Trial Tr. at 341 (Stocki).[16] Even assuming Ryanair's 80% figure and even assuming Ryanair's unsupported 2.8% attribution to Booking.com, Ryanair still failed to show at trial $5,000 or more of Shield hosting costs attributable to Booking.com bookings. Instead, it introduced evidence of, at most, ***$2,457.72*** in such costs. Specifically, Ryanair's witness on Shield, Mr. Stocki, testified that during the relevant period, Shield was hosted on three different servers in three different time

---

[16] One of these two endpoints, allegedly responsible for 20-30% of Ryanair's total Shield cost, occurs only ***after*** the booking is processed, and thus cannot be a cost associated with "prevent[ing] unauthorized bookings at the payment page[.]" 7/16/24 Trial Tr. at 351:9–23; D.I. 399 at 28. Thus, at most, Ryanair should be limited to claiming 50%, not 80%, of Shield's cost is associated with preventing payments post-myRyanair login. As discussed herein however, even assuming 80% of Shield costs can be claimed, Ryanair did not show $5,000 in Loss attributable to Shield.

periods.  7/16/24 Trial Tr. at 354:6–358:3 (Stocki).  Mr. Stocki testified that the first server was a Microsoft server, followed by two Amazon servers, and that he did not know the hosting cost during the Microsoft period (nor was there any other evidence on this point).  7/16/24 Trial Tr. at 361:15–17 (Stocki).[17]  Mr. Stocki testified that the second server (the so-called "Legacy" Amazon server) was used between August 29, 2022 and October 2022 and had a daily cost of about $590 during that time.  *Id.* at 358:24–359:2, 360:19–361:1.  Mr. Stocki testified that Ryanair switched to the third server (Amazon "CTL-TWR") in October 2022, which it has used since that time, with a daily cost of $597.68 per day.[18]  7/16/24 Trial Tr. at 357:24–358:3.  Thus, the portion of the cost allocated to Booking.com for hosting Shield on the two Amazon servers for which there is cost evidence (Legacy and CTL-TWR) was *$2,457.72.*[19]

As explained, Ryanair introduced *no* evidence of the hosting costs for approximately half of its one-year claimed Loss period from March 2022, the start of the Loss period to August 28, 2022—*i.e.*, the period during which Shield was hosted on a Microsoft server.  Not only was there no direct evidence of the cost of the Microsoft server, but Ryanair's own witness could not and did not testify that the Amazon costs could simply be extrapolated to the Microsoft period.  *See*

---

[17] Ryanair's trial testimony regarding the Microsoft server additionally should be disregarded due to Ryanair's failure to disclose any Microsoft server prior to trial, including in its sworn interrogatory responses, which state that "Ryanair has run Shield on *two* AWS environments." D.I. 343, Hemann Decl. Ex. 26 at 31 (emphasis added).

[18] Mr. Stocki clarified that Shield was only ever hosted on one server at a given time.  Accordingly, there is no basis to double count the server costs for any period.  7/16/24 Trial Tr. at 358:11–17.

[19] The hosting cost on the Legacy server between August 29, 2022 and October 1, 2022 was $19,470 (33 days at $590 per day) (7/16/24 Trial Tr. at 360:19–361:1; D.I. 343, Hemann Decl. Ex. 26 at 31), and on the CTL-TWR server between October 1, 2022 and February 28, 2023 was $90,249.68 (151 days at a cost of $597.68 per day) (7/16/24 Trial Tr. at 357:24–358:3; Hemann Decl. Ex. 26 at 31).  Together the cost of hosting on both servers was $109,719.68.  80% of $109,719.68 (to account for Ryanair's allocation to two Shield endpoints) is $87,775.744.  And Booking.com's 2.8% of $87,775.74 is $2,457.72.

19

7/16/24 Trial Tr. at 361:6–17 (Stocki).  Accordingly, $2,457.72 is the only calculation of Shield hosting costs arguably attributable to Booking.com that was reasonably supported by the evidence introduced at trial, and it is well beneath the required $5,000 Loss for a civil claim.  But even assuming that the Amazon server costs *could* be extrapolated to the Microsoft period, and even using the highest daily cost for which there is evidence to compute a hypothetical Microsoft cost ($597.68), the total Shield hosting cost attributable to Booking.com at Ryanair's claimed 80% attribution rate is ***$4,886.22***—again, short of the $5,000 requirement.[20]

* * *

Ryanair's evidence of Loss for three of its four categories claimed at trial—online verifications, customer service costs, and Navitaire—was entirely speculative, passed through to passengers, and/or unconnected to the statutory definition of Loss.  And for the remaining category, Shield hosting, there is no scenario—even accepting all inferences in Ryanair's favor and assuming "evidence" of Loss during a period with no evidence introduced at trial—in which Ryanair could reach $5,000 between March 1, 2022 and February 28, 2023 for the cost of hosting Shield.  Judgment as a matter of law is thus required for Booking.com.[21]

---

[20] The highest average daily cost was for the CTL-TWR server at $597.68 per day.  $597.68 multiplied by 365 days is: $218,153.20.  $218,153.20 multiplied by 0.8 to account for the relevant parts of Shield (under Ryanair's framework) is $174,522.56.  2.8% of $174,522.56 is $4,886.63. The only way Ryanair was able to get above $5,000 for Shield alone was by claiming an average daily cost of $653.99, for which there is no support whatsoever in the trial record.

[21] A recent decision from the Central District of California granting a motion for judgment as a matter of law, and, alternatively, a motion for a new trial where the jury's damages award was untethered to the evidence at trial, and, indeed, was "irrational," is instructive.  *In re NFL "Sunday Ticket" Antitrust Litig.*, No. ML 15-02668 PSG (SKx), 2024 WL 3628118, at *9 (C.D. Cal. Aug. 1, 2024).  In *Sunday Ticket*, judgment as a matter of law was warranted because "Plaintiffs failed to provide evidence from which a reasonable jury could make a finding of injury and an award of actual damages that would not be erroneous as a matter of law, be totally unfounded and/or be purely speculative."  *Id.* at *8.  The same is true here regarding Loss (and economic damages).  In addition, in *Sunday Ticket*, a new trial was alternatively warranted because "the jury's damages

**C.      No Reasonable Jury Could Have Concluded That Ryanair Proved Damage for Ryanair's Claim Under 18 U.S.C. §§ 1030(a)(5)(B) and (C) (Count IV).**

The trial evidence failed to show that Booking.com caused Damage—a required element of Ryanair's claim under 18 U.S.C. § 1030(a)(5)(B) and (C) (Count IV); *see* 18 U.S.C. § 1030(a)(5)(B) (requiring "recklessly caus[ing] damage"); *id.* § 1030(a)(5)(C) (requiring "caus[ing] damage and loss"). Damage is defined by the CFAA as "any impairment to the integrity or availability of data, a program, a system, or information[.]" 18 U.S.C. § 1030(e)(8). It requires actual harm to a computer. D.I. 399 at 27 ("Interpreting the term 'loss' to require a plaintiff to show damage to the computer would make the reference to 'damage' in the phrase 'damage and loss' in that section superfluous."). Ryanair's only claimed Damage at trial was based on the "Monex incident," and this fails to support the verdict on Count IV, for two reasons.[22]

As an initial matter, Ryanair's alleged Damage from the Monex incident cannot support Ryanair's CFAA civil claim because the Monex incident occurred in October 2023, ***after*** the period in which Ryanair otherwise claims to have experienced its $5,000 or more of Loss (March 2022-April 2023). Ryanair cannot maintain a claim under 18 U.S.C. §§ 1030(a)(5)(B) or (C) based on one time period to satisfy the requirement of $5,000 or more of Loss in a one-year period, and an entirely different time period to establish "damage." In other words, two incomplete CFAA claims do not make a complete one. *See* D.I. 435 at 9.

Regardless, no reasonable jury could have determined that Booking.com caused Ryanair Damage based on the Monex incident. In its MSJ Opinion, the Court concluded that "whether a

---

awards were not based on the 'evidence and reasonable inferences' but instead were more akin to 'guesswork or speculation.'" *Id.* at *11. Again, the same is true here regarding Loss and damages.

[22] To the extent Ryanair bases its claim of Damage on "data integrity" issues, that fails as both a matter of law (because Damage requires actual harm to a computer) and based on the evidence at trial (which did not show any "data integrity" issues, as discussed above with respect to Loss).

portion of the Monex attack can be attributed to the defendants and whether the Monex attack damaged Ryanair's systems are factual questions that are not suitable for resolution on summary judgment." D.I. 399 at 30.  At trial, Ryanair wholly failed to show that the "Monex attack" could be attributed to Booking.com or that it damaged Ryanair's computers in any respect.  To the contrary, the trial evidence confirmed that the Monex incident most likely occurred because of the conduct of some unknown party.  *See, e.g.*, 7/16/24 Trial Tr. at 243–58 (Hurley); *id.* at 257:15–24 (admitting Ryanair has "[n]o evidence" the attack was carried out for Booking by Etraveli).  Indeed, in trying to hold Booking.com accountable for more than 5,000 "errors" (out of over 4 million, *see* PTX-153) based on a tenuous theory related to an allegedly matching IP addresses, Ryanair's own witness ignored a third booking that also "match[ed]" the IP address at issue but was indisputably *not* made through Booking.com, and which concededly "could have been an innocent party."  7/16/24 Trial Tr. at 246:7–247:9 (Hurley).  Likewise, Booking.com equally "could have been"—indeed, *was*—"an innocent party."  Ryanair also sought to gloss over its own testimony that the Monex incident was likely the work of one actor (*id.* at 246), and yet the one Booking.com booking presented at trial allegedly related to Monex is connected, at most, to a tiny fraction of Ryanair's claimed "errors" (*i.e.*, the cause of the incident).  But beyond the lack of any credible evidence connecting Booking.com to the Monex incident, Ryanair has shown no Damage to its computers related to the "Monex attack."  To begin, Ryanair failed to present any evidence indicating that the Monex incident damaged any of *its* computers—as opposed to the computers of Monex or some other party.  Tellingly, the only harm claimed by Ryanair at trial related to Monex was $13,000[23] of chargebacks by MasterCard for all of October 2023 (none of which can

---

[23] Originally, Mr. Hurley testified that Booking.com was responsible for a portion of a $35,000 MasterCard chargeback for September 2023 that Mr. Hurley alleges was related to the Monex

be attributed to a Booking.com booking), and two hours of sporadically inoperable currency conversion services, during which time Mr. Hurley testified Ryanair flights *could still be booked*. 7/16/24 Trial Tr. at 258–61.  This is not Damage, let alone due to Booking.com.[24]

### D.  No Reasonable Jury Could Have Determined That Booking.com Engaged In Fraud Under 18 U.S.C. § 1030(a)(4) (Count II).

For Ryanair to prove its claim under 18 U.S.C. § 1030(a)(4) (Count II), it was required to show at trial that Booking.com acted "knowingly" and "with intent to defraud."  D.I. 399 at 43-45; D.I. 453 at 8 ("To act with an 'intent to defraud' means to act knowingly and with the intention or the purpose to deceive or to cheat.").  An "intent to defraud" under the CFAA requires that a defendant act "willfully and with specific intent to deceive or cheat, usually for the purpose of getting financial gain for himself or causing financial loss to another."  *Fidlar Techs. v. LPS Real Est. Data Sols., Inc.*, 810 F.3d 1075, 1079 (7th Cir. 2016); *see* D.I. 399 at 44–45.  A showing that a defendant merely engaged in general wrongdoing to obtain something of value is insufficient to allege an intent to defraud.  *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576, 597–98 (E.D. Pa. 2016); *see also id.* at 598 (notwithstanding the plaintiff's allegation that the defendant had improperly used a web crawling program to crawl the plaintiff's web server, the court found that the plaintiff had "fail[ed] to allege any 'intent to defraud' whatsoever").  Nor is "deceit" sufficient to show fraud:  there must be an intent to "harm," not merely an intent to "trick."  *United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016); *see id.* at 1312 ("there is a difference between deceiving and defrauding: to defraud, one must intend to use deception to cause some injury; but one can deceive without intending to harm at all" (emphasis omitted)).  Thus, the Court left open

---

incident, but he then conceded that these charges could not be connected to any Booking.com PNR codes.  7/15/24 Trial Tr. at 185:7–186:15 (Hurley); 7/16/24 Trial Tr. at 262:2–263:18 (Hurley).

[24] Booking.com preserves its challenge to the inclusion of the "Monex attack" at trial, for the reasons stated in its Motion *in Limine* No. 3 (D.I. 407-18) and its brief regarding Monex (D.I. 435).

in its MSJ Opinion that Ryanair may be able to prove at trial that Booking.com "access[es] the Ryanair website by dishonest means, that is, by using 'false' contact and payment information." D.I. 399 at 45.

At trial, Ryanair did not present *any* evidence that Booking.com acted "willfully and with specific intent to deceive or cheat" Ryanair. *Fidlar Techs.*, 810 F.3d at 1079; *see also* D.I. 453 at 8. Nor did Ryanair present evidence that Booking.com intended to cause "harm" to Ryanair, or that it would be in Booking.com's interest to do so. *See Takhalov*, 827 F.3d at 1316. To the contrary, the record before the jury at the close of Ryanair's case shows that Booking.com used a third-party vendor to make flight bookings on hundreds of airlines, including Ryanair; that Ryanair was paid in full for each flight booked on its airline; that Ryanair received real, usable email addresses and payment information for flights booked by Booking.com customers (not "fake" information); and that, while Booking.com was aware of Ryanair's dislike of Booking.com's use of a third-party vendor to obtain Ryanair flights, Booking.com believed (and still does) that this was legally permitted, and Booking.com knew that Ryanair had a long history of bringing meritless lawsuits to bully OTAs. 7/16/24 Trial Tr. at 287–88 (Hurley); *id.* at 495–96 (Guerrero). No reasonable jury could have found intent to defraud on this record. *See, e.g.*, *Takhalov*, 827 F.3d at 1316 (for fraud, there must be an intent to harm regarding "the quality or price of the goods").

Judgment as a matter of law is also required on Count II because the jury concluded that the "the object of the fraud and the thing of value obtained by Booking.com [was] only the use of the myRyanair portion of Ryanair's website[,]" D.I. 456 at 3, but there was no evidence presented at trial to sustain a conclusion "that the value of the use of the myRyanair portion of Ryanair's website was $5,000 or more in a one-year period[,]" *id.* As discussed above, Ryanair fell far short

24

of the $5,000 Loss threshold, and the jury's award of **exactly** $5,000 in economic damages, *see* D.I. 460 at 1, only confirms that its valuation of harm was disconnected from the evidence at trial.

## IV.     ALTERNATIVELY, THE COURT SHOULD GRANT A NEW TRIAL.

As explained above, *see supra* Section III, judgment as a matter of law should be granted to Booking.com on both Counts IV and II.  Under Rule 50(c), "[i]f the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed."  Fed. R. Civ. P. 50(c)(1).  Accordingly, the Court also should conditionally grant Booking.com's motion for a new trial because "the verdict is contrary to the evidence," "a miscarriage of justice would result if the jury's verdict were left to stand," and the jury's "verdict resulted from confusion."  *F'real Foods*, 457 F. Supp. 3d at 443.  For all the reasons discussed above supporting Booking.com's motion for judgment as a matter of law, *see supra* Section III, a new trial would be required if a judgment as a matter of law is denied or reversed.  *See F'real Foods*, 457 F. Supp. 3d at 445 (granting motion for judgment as a matter of law and conditionally granting motion for new trial).

## V.     CONCLUSION

For the foregoing reasons, Booking.com respectfully requests that the Court grant it judgment as a matter of law as to the counts for which the jury found liability.  Alternatively, Booking.com respectfully requests that the Court grant a new trial.

OF COUNSEL:

John H. Hemann
Kathleen Hartnett
Kristine Forderer
Alexander J. Kasner
Jessie Simpson LaGoy
Hannah Pollack
Zoë Helstrom
COOLEY LLP
3 Embarcadero Center St., 20th Fl.
San Francisco, CA 94111
(415) 693-2200
jhemann@cooley.com
khartnett@cooley.com
kforderer@cooley.com
akasner@cooley.com
jsimpsonlagoy@cooley.com
hpollack@cooley.com
zhelstrom@cooley.com

Dated: August 6, 2024

/s/ Jeffrey L. Moyer
Jeffrey L. Moyer (#3309)
Alexandra M. Ewing (#6407)
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
(302) 651-7700
moyer@rlf.com
ewing@rlf.com

Orin S. Kerr
Law Office of Orin S. Kerr
334 Law Building
Berkeley, CA 94720-7200
(510) 664-5257
orin@orinkerr.com

*Attorneys for Defendant/Counterclaim Plaintiff Booking.com B.V.*