# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RYANAIR DAC, | : |
| *Plaintiff/ Counterclaim Defendant*, | : C.A. No. 1:20-cv-01191-WBC |
| v. | : |
| BOOKING HOLDINGS INC., BOOKING.COM B.V., KAYAK SOFTWARE CORPORATION, PRICELINE.COM LLC, and AGODA COMPANY PTE. LTD., | : |
| *Defendants*, | : |
| BOOKING.COM B.V., | : **CONFIDENTIAL – FILED UNDER SEAL** |
| *Counterclaim Plaintiff.* | : |

## PLAINTIFF RYANAIR DAC'S BRIEF REGARDING DISCLOSURE OF LOST PROFITS AND LOST REVENUE

Plaintiff Ryanair DAC ("Ryanair") respectfully requests the Court deny Defendants Booking.com B.V. and Kayak Software Corporation (collectively "Defendants") *sixth* motion in limine to exclude Ryanair's damages for lost profits and lost revenues. Ryanair has properly disclosed this theory of damages as far back as the initial complaint (D.I. 1 ¶ 90) and properly claimed these damages in Ryanair's Rule 26 Initial Disclosures, served on the Defendants on February 14, 2022. Ex. A; s*ee* D.I. 50. Furthermore, *voir dire* of John Hurley regarding the Monex incident is unnecessary. He has personal knowledge and, if not, a hearsay exception exists.

## I. RYANAIR HAS DISCLOSED ITS THEORY OF DAMAGES RELATED TO LOST PROFITS AND LOST REVENUES THROUGHOUT THIS LITIGATION.

### A. Ryanair's Complaint and First Amended Complaint Allege Lost Profits and Revenues.

Throughout this litigation, Ryanair has made clear it is seeking lost profits and lost revenues due to the inability of customers to purchase flights from the Ryanair website during periods when the website was impaired or interrupted.

Since the beginning of this litigation, Ryanair alleged that the Defendants were harming Ryanair's profits and revenues. *See* D.I. 1 (filed Sept. 4, 2020). The first amended complaint (D.I. 76), filed June 22, 2022, restated and expanded on the same allegations.

- "Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com, through their own or their agents' screen scraping of the Ryanair Website, deprive Ryanair of the opportunity to maximize its revenues from the Ryanair Website." D.I. 1 ¶ 90; D.I. 76 ¶ 267.
- "Furthermore, Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com and/or their agents' screen scraping of the Ryanair Website increases the quantities of queries on the Ryanair Website. These automated queries have the ability to overwhelm the systems of the Ryanair Website, which impairs the Ryanair Website's availability and/or usability for the intended users. This causes material harm to Ryanair, its customers, and Ryanair's reputation." D.I. 1 ¶ 92; *see* D.I. 76 ¶ 271.
- "Because of the data being scraped from the Ryanair Website by Booking Holdings, Booking.com, Kayak.com, Priceline.com, and Agoda.com and/or their agents,

1

response time on the Ryanair Website can deteriorate, leading to error rates, and unacceptably slow response rates." D.I. 1 ¶ 93; D.I. 76 ¶ 272.

The allegations include excerpts from Ryanair's Terms of Use, which define "screen scraping" as "any automated systems or software, whether operated by a third party or otherwise, to extract any data from this website for commercial purposes." D.I. 1 ¶ 49; D.I. 76 ¶ 45. Defendants' use of automated systems when accessing the Ryanair website impairs the website, such as Booking.com's involvement in the Monex attack, which brought down the Ryanair website. Defendants were aware of these allegations. They provided interrogatory requests quoting specific portions of paragraphs 90, 92, and 93 of the initial complaint in Defendants Interrogatory Request Nos. 3 and 5. Ex. C at 49-50, 71[1]; *see supra* Section I.C. (discussing the interrogatory requests and responses).

The prayer for relief in both the initial complaint and the first amended complaint requested "damages in favor of Plaintiff and against Defendants, sufficient to compensate Plaintiff for the damages sustained as a result of Defendants' actions as alleged herein." D.I. 1 at 25; D.I. 76 at 53. This includes lost profits and revenues from periods when the website was impaired or inoperable.

**B.   Ryanair's Rule 26(a) Initial Disclosures Claimed Lost Profits and Revenues When the Website Was Down.**

Both Ryanair's Initial Disclosures and Amended Initial Disclosures claim as a category of damages under Rule 26(a)(1)(A)(iii) "[d]amages for lost revenues, reputational harm, and lost profits due to Defendants depriving Ryanair of the opportunity to maximize its revenues from the

---

[1] In each subsequent supplemental response to Defendants' interrogatory requests, Ryanair provided all previous responses. In an effort to minimize exhibits with duplicative information, citations to Ryanair's interrogatory responses will be to the latest version of the responses and will note when the information provided was initially served.

2

Ryanair Website." *See* D.I. 50 (filed Feb. 14, 2022); Ex. A at 5; D.I. 223 (filed Aug. 23, 2023); Ex. B at 8.

The supplemental and amended initial disclosures further clarified what Ryanair sought for lost revenue and lost profits. It stated Ryanair claims: "[d]amages for lost revenues, reputational harm, and lost profits due to Defendants depriving Ryanair of the opportunity to maximize its revenues from the Ryanair Website; potential inability or difficulty to book Ryanair tickets while its website is down or slow; [and] lost ancillary sales." Ex. A at 8. Additionally, the supplemental and amended initial disclosures expressly state "Ryanair further incorporates by reference its responses to Defendants' Interrogatories Nos. 1 and 2." *Id.* at 9.

### C.  Ryanair's Interrogatory Responses Disclosed a Lost Profit and Lost Revenue Theory of Damages.

Ryanair has consistently disclosed to Defendants in its interrogatory responses it is seeking lost profits and lost revenue due to the inability of customers to purchase flights from the Ryanair website during periods when the website was impaired or interrupted.

In Ryanair's initial response to Defendants' interrogatory requests nos. 1 and 2 about damages Ryanair is claiming, Ryanair stated that it "expects to produce an expert analysis of damages as facts are learned through discovery. The expert analysis may include but is not limited to: costs of interruption of service to Ryanair' website, data and/or underlying databases; costs expended attempting to prevent the Defendant's unauthorized scraping; costs expended to ascertain identify of parties performing unauthorized access; conducting damage assessments of the unauthorized access; consequential damages; and lost revenue." *See* Ex. C at 5-6, 9-10; *see also supra* Section I.E. Ryanair further indicated it intended to seek damages related to the costs of interruption of service to Ryanair's website and lost revenues in response to Defendants' interrogatory request no. 6. *Id*. at 91. The response to interrogatory request no. 6 was later

3

incorporated into the response to interrogatory no. 1. *Id.* at 6. These disclosures of lost profits and lost revenues were served on Defendants on April 18, 2022. *See* D.I. 57.

Defendants' interrogatory request no. 3 asks for all facts that a CFAA violation deprives Ryanair the opportunity to maximize its revenues from the Ryanair website and directly quotes paragraph 90 of the initial complaint. Ex. C at 49. Ryanair stated in response "Ryanair is deprived of the opportunity to maximize its revenues from the Ryanair Website because Ryanair is unable to effectively make both sales and ancillary sales to customers flying on Ryanair when Defendants prevent Ryanair from directly making sales to Ryanair's customers." *Id*. at 50. This information was also served on Defendants on April 18, 2022. *See* D.I. 57.

Ryanair's disclosure of lost profits and lost revenue was not limited to its initial response to certain interrogatories. For example, in the first supplemental response to Defendants' interrogatory request no. 1 (served July 14, 2023; *see* D.I. 185) Ryanair explicitly stated "Ryanair suffered harm as a result of interruptions to its website, due to Defendants' actions, in the form of lost revenue, with respect to customers who were unable to purchase flights from Ryanair during periods when the website was impaired or interrupted." Ex. C at 7.

### D. Ryanair Disclosed Its Lost Profits and Lost Revenue Specifically from the Monex Attack.

In addition to disclosing Ryanair is seeking lost profits and lost revenue from website slowdowns or shutdowns, Ryanair disclosed the Monex attack was a source of lost revenue and lost profits. On October 6, 2023, Ryanair served its fifth supplemental interrogatory responses to Defendants first set of interrogatory. D.I. 285. The fourth supplemental responses that stated:

- "Due to OTAs, Ryanair and Monex, are experiencing an increased load on their systems due to bot activity. Ryanair is losing revenue not being able to offer its currency conversion service to its passengers." Ex. C at 40.

4

- "The volume of traffic caused Monex to fail, resulting in legitimate customer bookings being effected." *Id*. at 39.

Ryanair's Chief Technology Officer, John Hurley, in his subsequent deposition about the Monex attack made clear revenue was lost from ███████████████████████████████████████████████████████████████████████████████. Ex. D at 85:18 - 86:13.

### E.  Ryanair Is Not Required to Use a Damages Expert.

Ryanair is not required to use a damage expert to quantify its lost profit and lost revenue calculations. *See McGovern v. AGC Chemicals Americas*, No. CIV.A.05-3289 JAP, 2008 WL 750544, at *1 (D.N.J. Mar. 19, 2008) (assessing damages related to wages); *M2M Sols. LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 682 (D. Del. 2016) (assessing patent damages). Interpreting the Federal Rules of Evidence 701, it is well established that lay testimony is admissible when "it is well-founded on personal knowledge and susceptible to specific cross-examination." *Amgen Inc. v. Sanofi*, No. CV 14-1317-RGA, 2019 WL 11071409, at *3 (D. Del. Feb. 14, 2019) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993)). In *Lightning Lube, Inc.* a lay witness was allowed to testify about lost profits because of his specific experience in the industry the witness could predict expected profits. 4 F.3d at 1174.

Defendants questioned Ryanair's corporate witness on the relevant numbers for a lost profits calculation. For example, Mr. Hurley stated that the Ryanair website ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. E at 68:15-16; 159:15-16. In that same deposition, Hurley explained Ryanair's profits both from each passenger's flight and the ancillary sales. *Id*. at 119:9-17. A key facet of Mr. Hurley's job is ensuring the website is functioning so Ryanair can continue to make bookings and increase its revenue.

5

## II. VOIR DIRE OF JOHN HURLEY IS UNNECESSARY AT TRIAL

### A. Mr. Hurley Has Personal Knowledge of the Monex Incident.

John Hurley is Ryanair's Chief Technology Officer and has served since 2014. He was deposed in this matter over three separate sessions on August 16, 2023 (in both his individual and corporate representative capacities), September 29, 2023 (in his corporate representative capacity), and again on December 14, 2023 (in his corporate representative capacity).

Mr. Hurley should be allowed to testify about the Monex attack as well as the subsequent lost profits and lost revenues that resulted from the attack. Mr. Hurley testified in his December 14 deposition that he "looked at the errors that were generated," "looked at the issues that were caused," "the source of the cause," and confirmed with his team "that PNRs were in . . . this list." Ex. D at 15:10-17. Under the protective order associated with Defendants' PNR codes, Defendants demanded that only two people could view these PNR codes – and limited who would qualify. Mr. Hurley was not one of those people, nor does he need to be.

Federal Rule of Evidence 602 states: "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." The terms of FRE 602 expressly conflict with Federal Rule of Civil Procedure 30(b)(6), which governs deposition testimony of corporative representatives and states "The persons designated must testify about information known or reasonably available to the organization." Courts within the Third Circuit have acknowledged this tension and routinely allow corporate representatives to testify at trial consistent with their depositions.

As the District Court for the Eastern District of Pennsylvania has explained, "[a]ll perception is inferential to some degree." *In re Texas Eastern Transmission Corp. PCB Contamination Insurance Coverage Litigation*, 870 F. Supp 1293, 1304 (E.D. Pa. 1992). That

court noted that "[k]nowledge acquired through others may still be personal knowledge within the meaning of [FRE] 602, rather than hearsay, which is the repetition of a statement made by someone else," and distinguished a hearsay statement from "a statement of personal knowledge based, as most knowledge is based, on information obtained from other people." *Id*. (quoting *Agfa-Gevaert, A.G. V. A.B. Dick Co.*, 879 F.2d 1518, 1523 (7th Cir. 1989)).

Other courts in the Third Circuit are in accord. *Sherwin-Williams Co. v. PPG Industries, Inc.*, No. 17-1023, 2020 WL 6803077, at *4 (W.D. Pa. Nov. 19, 2020) ("The court is persuaded that the better rule, in the corporate setting, is that the personal knowledge requirement set forth in Federal Rule of Evidence 602 does not require first-hand observation or experience with respect to a corporate entity."); *LG Display Co. Ltd. v. AU Optronics Corp.*, 265 F.R.D. 189, 195-96 (D. Del. 2010) (allowing testimony of corporate representative as "correlated to" the representative's personal knowledge despite corporate representative also speaking to her supervisor to prepare for deposition); *LG Display Co. Ltd. v. AU Optronics Corp.*, 265 F.R.D. 199, 203 (D. Del. 2010) (finding no basis to exclude corporate representative testimony where representative gained personal knowledge post-deposition by performing site visits and studying additional materials).[2]

Likewise, Third Circuit case law is clear that a lay witness testifying about business operations is permitted to testify "about 'inferences that he could draw from his perception' of a business's records, or 'facts or data perceived' by him in his corporate capacity." *U.S. v. Polishan*, 336 F.3d 234, 242 (3d. Cir 2003) (citing *Teen-Ed Inc. v. Kimball Int'l Inc.*, 620 F.2d 399, 403-04 (3d Cir. 1980)). Accordingly, such testimony "may be based on the witness's own perceptions and

---

[2] Cases holding to the contrary commonly relate to corporate representatives attempting to testify concerning events that happened prior to their employment, an issue not implicated in this matter. *See, e.g., IOENGINE, LLC v. PayPal Holdings, Inc.*, Nos. 18-452-WCB and 18-826-WCB, 2022 WL 2800911, at *5 (D. Del. June 27, 2022) (prohibiting corporate representative testimony at trial concerning a patent filed in March of 2004 where representative was hired in June of 2004).

7

'knowledge and participation in the day-to-day affairs of [the] business.'" *Id*. (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993)).

Mr. Hurley's knowledge in this case is based on a decade of experience as Ryanair's CTO, his extensive review of documents and materials in preparation for his three sessions being deposed as Ryanair's corporate representative in this matter, and conversations with others within his corporate capacity at Ryanair. His knowledge does not rely solely on the "say-so" of other parties. *See In re Texas Eastern*, 870 F. Supp. at 1304. He testified on the topic of company financial information and job responsibilities throughout his deposition. Accordingly, because these topics are within Mr. Hurley's corporate capacity at Ryanair, he should be allowed to testify about these same topics again at trial. *See also Brazos River Authority v. GE Ionics, Inc.*, 469 F.3d 416, 434 (5th Cir. 2006) ("[I]f a rule 30(b)(6) witness is made available at trial, he should be allowed to testify as to matters within corporate knowledge to which he testified in deposition.")

John Hurley should be permitted to testify to matters within Ryanair's corporate knowledge and matters within his corporate capacity. He has obtained personal knowledge on these topics, including in preparation for his deposition, preparation for trial, otherwise through being informed about these topics based on his corporate capacity at Ryanair.

### B. The Residual Hearsay Objection Applies.

Even if the Court determines that Mr. Hurley does not have personal knowledge, the residual hearsay exception under the Federal Rules of Evidence Rule 807 would apply. The residual exception to the admissibility of hearsay under Fed. R. Evid. 807 applies if:

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and
> (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a).

Mr. Hurley is Ryanair's Chief Technology Officer. He has verified the interrogatory responses containing Ryanair's analysis of Monex under penalty of perjury. *See Harris-Williams v. Am. Freight Outlet Stores, LLC*, No. CV 22-76-SRF, 2023 WL 6621394, at *4 (D. Del. Oct. 11, 2023) (holding verified interrogatory responses contributed to a sufficient guarantee of trustworthiness). He has sat for depositions at three different dates, including one deposition specific to the Monex attack and his deposition testimony was consistent with the interrogatory responses. Defendants even provided a copy of the interrogatory responses in Hurley's third deposition to ultimately test the truthfulness of his statements about the Monex attack. *See e.g.* Ex. D at 18:8-17 (introducing Ryanair's sixth supplemental responses to Defendants' first set of interrogatories). Even though Mr. Hurley was not able to view the Defendants' PNR codes, his team was able to identity the PNR codes within the larger logs of all the applicable PNR codes. Mr. Hurley reviewed these larger logs and understood the analysis that linked Booking.com to the Monex attack. Ex. D at 16:15-24.

The facts surrounding production of Defendants' PNRs codes provide "exceptional circumstances" that would allow the residual hearsay exception. *Harris-Williams*, 2023 WL 6621394, at *3 (citing *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.,* 247 F.3d 79, 112 (3d Cir. 2001)). The "residual exception applies only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." *United States v. Nucera*, 67 F.4th 146, 171 (3d Cir.), cert. denied, 144 S. Ct. 366, 217 L. Ed. 2d 196 (2023) (quotations omitted) (citing *United States v. Bailey*, 581 F.2d 341, 347 (3d Cir. 1978)). Mr. Hurley can provide the full picture of the analysis linking the Monex attack to Booking.com, which provides highly probative evidence of damage under the CFAA. Details of the Monex attack are necessary to provide the jury a full picture of how Ryanair linked Booking.com to the Monex

attack. This evidence comes with a high degree of confidence because Mr. Hurley verified the corresponding analysis in the interrogatories under penalty of perjury, he was deposed about this specific material, and will be subject to cross-examination during trial.

This exception requires reasonable written notice to offer the statement. Fed. R. Evid. 807(b). To avoid any doubt, Ryanair intends to use Mr. Hurley to show Booking.com's connection to the Monex attack and to discuss any losses and damages under the CFAA, lost profit, and lost revenue. If it is determined that Mr. Hurley does not have personal knowledge, his testimony should still be allowed under this residual hearsay exception.

### C. Defendants Requested Limited Access to Their PNR Codes.

While prejudice is not an element to either the corporate representative exception to hearsay or the residual hearsay exception, it is relevant to this inquiry. Mr. Hurley cannot review the PNR codes implicated in the Monex attack because Defendants demanded only a few Ryanair employees could view their PNR codes. If Booking.com would allow Mr. Hurley to view the PNR codes he would have firsthand knowledge of all the pertinent facts and would alleviate any hearsay concerns Defendants' expressed in the pretrial conference. The same is true for Lukasz Stocki, another trial witness, who was also denied access to view Booking.com's PNR codes.

Ryanair is prejudiced by Defendants' challenge that no one at trial will have firsthand knowledge of the Monex attack because of this limitation regarding who can view the PNR codes. It is understandable Booking.com wants to keep the jury from hearing about Booking.com's involvement with the Monex attack because it was a direct attack on the Ryanair website. However, Ryanair can still provide trustworthy and probative evidence about Ryanair's analysis of the Monex attack. Should Defendants be granted a voir dire of Mr. Hurley, Ryanair request his voir dire should count against their time at trial.

| | |
|---|---|
| Dated: July 11, 2024 | Respectfully submitted,<br><br>**KRATZ & BARRY LLP**<br><br>*/s/ R Touhey Myer*<br>R Touhey Myer (#5939)<br>800 N. West Street<br>Wilmington, DE 19801<br>(302) 527-9378<br>tmyer@kratzandbarry.com<br><br>*Of Counsel:*<br><br>**HOLLAND & KNIGHT LLP**<br><br>R. David Donoghue (*pro hac vice*)<br>Anthony J. Fuga (*pro hac vice*)<br>150 N. Riverside Plaza, Suite 2700<br>Chicago, IL 60606<br>(312) 263-3600<br>david.donoghue@hklaw.com<br>anthony.fuga@hklaw.com<br><br>Cynthia A. Gierhart (*pro hac vice*)<br>800 17th Street NW, Suite 1100<br>Washington, DC 20011<br>(202) 569-5416<br>cindy.gierhart@hklaw.com<br><br>Ji Mao (*pro hac vice*)<br>31 West 52nd Street<br>New York, New York 10019<br>(212) 513-3420<br>ji.mao@hklaw.com<br><br>William H. Oliver III (*pro hac vice*)<br>10 St. James Ave. 11th Floor<br>Boston, MA 02116<br>(617) 573-5863<br>william.oliver@hklaw.com<br><br>*Attorneys for Plaintiff/*<br>*Counterclaim Defendant Ryanair DAC* |