**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RYANAIR DAC, | § | |
| | § | |
| *Plaintiff*, | § | Civil Action No. 20-1191-WCB |
| | § | |
| v. | § | |
| | § | |
| BOOKING.COM B.V., | § | |
| | § | |
| *Defendant*. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

After a four-day trial, the jury returned a verdict against Defendant Booking.com B.V. ("Booking.com") on Count II and Count IV of the Amended Complaint filed by Plaintiff Ryanair DAC ("Ryanair"). Following the entry of judgment on the jury's verdict, Booking.com filed a renewed motion for judgment as a matter of law or in the alternative for a new trial. Dkt. No. 466. Ryanair filed a motion for a permanent injunction. Dkt. No. 483. For the reasons explained below, Booking.com's renewed motion for judgment as a matter of law is granted. Ryanair's motion for a permanent injunction is denied as moot.

**I.    BACKGROUND**

Ryanair is an Irish airline company based in Dublin that offers low-fare flights in Europe and North Africa. On September 4, 2020, Ryanair filed this action against five defendants: Booking.com, Priceline.com LLC ("Priceline"), Agoda Company Pte. Ltd. ("Agoda"), Kayak Software Corporation ("KAYAK"), and Booking Holdings, Inc. ("Booking Holdings"). Dkt. No. 1. The case was initially assigned to Judge Stark, but later re-assigned to me.

All five defendants are online travel agents ("OTAs"), which sell airline tickets to customers over the Internet. In its complaint, Ryanair alleged that each of the defendants, either

directly or through their vendors, violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, by using Ryanair's website without authorization or in excess of their authorized access. Ryanair characterized the defendants' unauthorized use as "screen scraping," i.e., using an "automated system or software . . . to extract any data from [Ryanair's] website for commercial purposes," such as selling Ryanair flights on websites other than Ryanair's. *Id.* ¶ 49. According to the complaint, Ryanair "developed a program called Shield that blocks unauthorized third parties such as the Defendants from scraping the Ryanair Website and selling Ryanair inventory" on their own websites. *Id.* ¶ 95. According to Ryanair's allegations, the defendants circumvented the Shield program and continued to sell Ryanair flights, even after Ryanair sent cease-and-desist letters to the defendants directing them to stop their screen-scraping activities. *Id.* ¶¶ 97–110.

Booking Holdings, KAYAK, and Priceline are Delaware citizens; Agoda is a Singaporean private limited company with its principal place of business in Singapore; and Booking.com is a Dutch company with its principal place of business in Amsterdam. *Id.* ¶¶ 4–11. During the time that Judge Stark was presiding over this case, the defendants filed a motion to dismiss, asserting the doctrine of *forum non conveniens* and also arguing that Ryanair seeks impermissible extraterritorial application of the CFAA. *See* Dkt. No. 17. Judge Stark rejected both arguments and denied the motion. Dkt. No. 42. Regarding the defendants' argument on extraterritoriality, Judge Stark held that "Congress indicated a clear intent for the CFAA to apply extraterritorially." *Id.* at 16. In March 2022, this case was re-assigned to me.

On July 22, 2022, Ryanair filed an Amended Complaint asserting five counts under the CFAA. Dkt. No. 76. Specifically, Ryanair alleged that all defendants violated:

- Section 1030(a)(2)(C), which prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] information from any protected computer." (Count I).

- Section 1030(a)(4), which prohibits "knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." (Count II).

- Section 1030(a)(5)(A), which prohibits "knowingly caus[ing] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caus[ing] damage without authorization, to a protected computer." (Count III).

- Section 1030(a)(5)(B), which prohibits "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, recklessly caus[ing] damage"; and section 1030(a)(5)(C), which prohibits "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, caus[ing] damage and loss." (Count IV).

- Section 1030(b), which prohibits conspiring or attempting to commit a violation of any of the other provisions of section 1030(a). (Count V).

The Amended Complaint additionally alleged that "[t]o book a Ryanair itinerary, a person must create a myRyanair account and be accepted by Ryanair," and that "Ryanair implemented the myRyanair procedure to, in part, stop unauthorized persons and entities from accessing the Ryanair Website." *Id*. ¶¶ 93, 96.

On the defendants' motion to dismiss the Amended Complaint for failure to state a claim, I dismissed Count III but denied the motion as to the remaining counts. Dkt. No. 105. I rejected the defendants' argument that Ryanair may not rely on a theory of vicarious or indirect liability under the CFAA, as well as their argument that Ryanair had not adequately alleged such liability. *See id*. at 7–14. I held that Ryanair "adequately plead[ed] vicarious, or indirect, liability on a 'direct, encourage, or induce' theory" by alleging that the defendants contracted with third parties (including Etraveli, a vendor partnered with Booking.com to offer flights) to access Ryanair's website without authorization on the defendants' behalf. *Id*. at 12–13. The defendants then filed an answer, asserting five counterclaims: (1) tortious interference with business relations; (2) unfair competition; (3) defamation; (4) trade libel; and (5) deceptive trade practices. Dkt. No. 111.

On cross-motions for summary judgment, I addressed the meaning of the term "without authorization" under the CFAA. I held that because "any user can access any page on Ryanair's website without any prior authorization (except for the final payment page of the myRyanair portion of the website) . . . the defendants' access to the Ryanair website is not 'without authorization' as that term is used in the CFAA." Dkt. No. 399 at 13. But because "the payment page of the myRyanair portion of the Ryanair website . . . uses an authorization scheme that permits some users to create accounts but blocks others," I held that "if the defendants accessed the password-protected portion . . . after Ryanair issued cease-and-desist letters to them, they could be found liable for accessing myRyanair 'without authorization' within the meaning of 18 U.S.C. § 1030(a)." *Id*. at 19–20.

Although genuine issues "remain[ed] as to whether the defendants have accessed the password-protected portion of Ryanair's website, either directly or vicariously," it was undisputed that there is no information on the payment page of the myRyanair portion of the website "other

than the information input by the user, such as credit card numbers or the like." *Id*. at 20. The defendants therefore could not be held liable under section 1030(a)(2)(C), which requires "not only a showing of unlawful access, but also a showing that the unlawful access resulted in obtaining information from a protected computer." *Id*. I therefore granted summary judgment to the defendants on Count I and also on Count V, to the extent that count relied on the offense set forth in Count I as the offense underlying the conspiracy. *Id*. at 20–21. I denied summary judgment as to Ryanair's remaining claims, and I denied summary judgment as to the defendants' counterclaims on the ground that the defendants had raised genuine issues of material fact with regard to those counterclaims.

On June 26, 2024, less than a month before trial, Ryanair dismissed its claims against Booking Holdings, Priceline, and Agoda. Dkt. No. 403. A jury trial was held from July 15, 2024, to July 18, 2024.[1] *See* Dkt. Nos. 500–503. On July 17, 2024, in the course of trial, the parties filed a stipulation of dismissal of all claims against KAYAK.[2] Dkt. No. 446. On July 18, 2024, before the jury began deliberating, the parties also stipulated to dismiss the trade libel counterclaim asserted by the sole remaining defendant, Booking.com. Dkt. No. 455.

The jury returned a verdict in Ryanair's favor on Count II (accessing a protected computer with intent to defraud) and Count IV (accessing a protected computer without authorization and recklessly causing damage or causing damage and loss) of the Amended Complaint. Dkt. No. 457 at 2–3. The jury awarded $5,000 to Ryanair as the amount of "actual economic harm caused by Booking.com violating the [CFAA]." *Id*. at 4.

---

[1] References to the trial transcript will include the trial day ("TD1" through "TD4") and the page and line numbers of the transcript for that day. The trial transcripts can be found in docket entries 500 through 503.

[2] I approved the joint stipulation and dismissed the claims against KAYAK with prejudice on July 18, 2024. Dkt. No. 451.

The jury, however, found that Ryanair did not "prove by a preponderance of the evidence that Booking.com entered into a conspiracy with Etraveli to intentionally access the myRyanair portion of Ryanair's website in violation of the [CFAA]," as required to establish liability under Count V. *Id*. at 3. The jury also found that Booking.com did not prove defamation, unfair competition, tortious interference with business relations, and deceptive trade practices by a preponderance of the evidence. *Id*. at 5.

Booking.com filed a renewed motion for judgment as a matter of law and in the alternative, a motion for a new trial, Dkt. No. 466, and Ryanair filed a motion for permanent injunction, Dkt. No. 483. I held an oral argument on both motions, after which the parties filed supplemental letter briefs at my request.[3] *See* Dkt. Nos. 505–510, 515.

## II.    LEGAL STANDARD

Judgment as a matter of law under Federal Rule of Civil Procedure 50(b) may be granted "only if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001) (quoting *Powell v. J.T. Posey Co.*, 766 F.2d 131, 133–34 (3d Cir. 1985)) (internal quotation marks omitted). "Although judgment as a matter of law should be granted sparingly, more than a scintilla of evidence is needed to sustain a verdict." *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 383 (3d Cir. 2004).

In assessing the sufficiency of the evidence, the "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "Credibility

---

[3] The page numbers cited for the parties' briefs correspond to the page numbers at the bottom of the document, not those of the CM/ECF header.

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id*. (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)).  In addition, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id*. at 151.

## III.    DISCUSSION

Booking.com raises four issues in its renewed motion for judgment as a matter of law ("JMOL").  It contends (1) that it was improper to apply the CFAA to Booking.com in this case because the CFAA, at least as applied to the facts of this case, should not be given extraterritorial application; (2) that Ryanair failed to prove that it suffered a loss of at least $5,000 in any one-year period, as is required to establish civil liability under the CFAA under the statutory provisions invoked by Ryanair in this case; (3) that Ryanair did not prove that Booking.com caused damage to Ryanair as a result of intentionally accessing a protected Ryanair computer without authorization; and (4) that the evidence did not support the jury's verdict that that Booking.com, acting with fraudulent intent, induced a third party to access the myRyanair portion of Ryanair's website and thereby obtained something of value—the use of the myRyanair portion of Ryanair's website, which had a value of $5,000 or more in a one-year period.  Booking.com's contentions are each addressed below.

### A.  Extraterritorial Application of the CFAA

"It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 417 (2023) (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010)) (internal quotation marks omitted).  This principle is referred to as the "presumption against extraterritoriality." *Id*.

"Applying the presumption against extraterritoriality involves a two-step framework." *Id.* (quoting *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 337 (2016)) (internal quotation marks omitted). "At step one, we determine whether a provision is extraterritorial, and that determination turns on whether Congress has affirmatively and unmistakably instructed that the provision at issue should apply to foreign conduct." *Id.* at 417–18 (quoting *RJR Nabisco*, 579 U.S. at 335, 337) (internal quotation marks omitted). "If Congress has provided an unmistakable instruction that the provision is extraterritorial, then claims alleging exclusively foreign conduct may proceed, subject to the limits Congress has (or has not) imposed on the statute's foreign application." *Id.* at 418 (quoting *RJR Nabisco*, 579 U.S. at 337–338) (internal quotation marks omitted).

"If a provision is not extraterritorial, we move to step two, which resolves whether the suit seeks a (permissible) domestic or (impermissible) foreign application of the provision." *Id.* "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *RJR Nabisco*, 579 U.S. at 337. "The focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." *Abitron*, 600 U.S. at 418 (quoting *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413–14) (2018)) (internal quotation marks omitted). Thus, if the analysis ends at step one, there is no need to consider whether the conduct relevant to the statute's focus occurred in the United States. *See RJR Nabisco*, 579 U.S. at 342 ("[O]nly at the second step of the inquiry do we consider a statute's 'focus.'").

Courts have concluded at the first step of this framework that "the text of the CFAA provides a clear indication of extraterritorial application," citing the definition of a "protected computer" under the CFAA. *See In re Apple Inc. Device Performance Litig.*, 347 F. Supp. 3d 434, 448 (N.D. Cal. 2018); *United States v. Gasperini*, 729 F. App'x 112, 114 (2d Cir. July 2, 2018) ("There is a strong argument that § 1030(a)(2) applies extraterritorially."); *Ryanair DAC v. Expedia Inc.*, No. C17-1789, 2018 WL 3727599, at *2 (W.D. Wash. Aug. 6, 2018) ("The CFAA gives a clear, affirmative indication that its civil provision applies extraterritorially, and the presumption against extraterritoriality has accordingly been rebutted.") (cleaned up); *United States v. Ivanov*, 175 F. Supp. 2d 367, 375 (D. Conn. 2001) ("Congress has the power to apply its statutes extraterritorially, and in the case of [the CFAA], it has clearly manifested its intention to do so.").[4] That is, courts have held that the CFAA definition of a "protected computer" as a computer "which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States," 18 U.S.C. § 1030(e)(2)(B), is "as clear an indication as possible short of saying 'this law applies abroad.'" *In re Apple*, 347 F. Supp. 3d at 448 (quoting *Expedia*, 2018 WL 3727599, at *2). In *Ivanov*, the district court also cited the CFAA's definition of a "governmental entity" as "the Government of the United States, any State or political subdivision of the United States, any foreign country, and any state, province,

---

[4] In its supplemental briefing, Booking.com cites *In re Apple* to argue that whether the CFAA applies extraterritorially depends "on the facts of [each] case." *See* Dkt. No. 515 at 2 (emphasis removed). Booking.com then distinguishes *In re Apple*, *Ivanov*, *Gasperini*, and *Expedia* as cases in which either the defendant or the victim was a domestic entity. *See id.* However, none of those cases held that it was necessary for the defendant or the victim to be a domestic entity in order for the CFAA to apply extraterritorially. The courts' analysis of whether Congress provided a clear indication of extraterritorial application turned solely on the language of the CFAA (and any supporting legislative history).

municipality, or other political subdivision of a foreign country" as supportive of the conclusion that Congress intended for the statute to apply extraterritorially.  *See* 175 F. Supp. 2d at 374 (referring to 18 U.S.C. § 1030(e)(9)).

In this case, when all the originally named defendants raised arguments about extraterritoriality, Judge Stark held that the CFAA applied extraterritorially.  Dkt. No. 42 at 15. Consistent with the case law cited above, Judge Stark held that the definition of a "protected computer" as including "computers located outside the United States" was "clear, affirmative indication" that the CFAA applies extraterritorially.[5]  *Id*.  And by resolving the extraterritoriality issue at step one, Judge Stark did not need to engage in the analysis at step two.  *See id*.

Booking.com now raises new arguments about extraterritoriality as a basis for seeking judgment as a matter of law.  In its opening brief, Booking.com argues that "Ryanair's case at trial was reduced to a dispute between two European companies over flights solely offered in Europe and North Africa, booked exclusively through a European third-party vendor that was not a party to the litigation . . . pursuant to a contract governed by Netherlands law."  Dkt. No. 467 at 6 (internal citations omitted).  According to Booking.com, the evidence at trial as involved "an alleged foreign perpetrator (Booking.com), an alleged foreign victim (Ryanair), alleged unlawful access and computer harm abroad (Ryanair computers in Europe that host Ryanair's website), and an alleged foreign instrumentality (Etraveli)."  *Id*. at 10.  Booking.com thus argues that it is entitled

---

[5]  In a footnote addressing the defendants' assertion that Ryanair "seeks to apply the CFAA . . . to alleged conduct by foreign actors to a foreign website causing foreign harm," Judge Stark held that the defendants did not accurately characterize Ryanair's allegations.  Dkt. No. 42 at 16 n.12.  Judge Stark pointed out that "Ryanair charges that three Delaware companies, along with two foreign companies in the same corporate family, engaged in conduct that violates the CFAA – some of which conduct (e.g., using data obtained by screen scraping) may have occurred in the United States for websites that are accessible in the United States."  *Id*.  However, Judge Stark did not rely on the allegation of possible domestic conduct as the basis for finding clear, affirmative indication of extraterritorial application of the CFAA at step one.  *See id*.

to judgment as a matter of law because Ryanair "failed to make a showing a trial supporting the extraterritorial application of the CFAA." *Id*. at 4.

In response, Ryanair first argues that "Booking.com's extraterritoriality argument is not properly raised in a motion under Rule 50(b) or 59, where the issue was not presented to the jury at trial and the motion merely seeks to relitigate pure issues of law." Dkt. No. 489 at 3. It is well settled that a court can reconsider a purely legal issue—on summary judgment or otherwise—in addressing a Rule 50(b) motion, as long as the issue was timely raised in a Rule 50(a) motion. Rule 50(b) specifically provides that if a court "does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Thus, purely legal questions, including questions previously addressed at summary judgment, can be raised in a Rule 50(b) motion as long as they have been raised in a Rule 50(a) motion at trial. *See Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 n.9 (9th Cir. 2009); *K&T Enters., Inc. v. Zurich Ins. Co.,* 97 F.3d 171, 175 (6th Cir. 1996); *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Prods. Co.*, 51 F.3d 1229, 1236 (4th Cir. 1995); *ART+COM Innovationpool GmbH v. Google Inc.*, No. 1:14-cv-217, 2016 WL 10033420 (D. Del. Sept. 9, 2016) (Dyk, Circuit Judge, sitting by designation); 9 James Wm. Moore, Moore's Federal Practice §50.05[3] (3d ed. 2024) ("[J]udgment as a matter of law may be granted on purely legal  issues when unrelated to the sufficiency of the evidence."). The extraterritoriality issue as it pertains to Booking.com was raised by Booking.com in its Rule 50(a) motion and therefore was properly raised in Booking.com's Rule 50(b) motion.[6]

---

[6] In support of its argument that "'[p]ure questions of law unrelated to the sufficiency of the trial evidence' are not appropriate in a Rule 50(a) or (b) motion," Ryanair cites *Lawson v. Sun*

On the merits of the extraterritoriality issue, Ryanair responds that Booking.com's arguments "go to whether Ryanair's claims are a domestic application of the CFAA, which is Step 2 of the extraterritoriality analysis," and that the court need not consider that step "because Congress expressly indicated that the CFAA does apply extraterritorially as long as 'a [protected] computer located outside the United States . . . is used in a manner that affects interstate or foreign commerce or communication of the United States.'" Dkt. 489 at 8 (quoting 18 U.S.C. § 1030(e)(2)(B)). Ryanair asserts that its "website—*i.e.*, the protected computer in question—clearly affects interstate or foreign commerce of the United States because the evidence shows that Ryanair has sold a large number of flights to United States customers through its website." *Id.* at 7.

Booking.com replies that "the evidence at trial fails to support application of the CFAA in this case either under Step 1 (authorized extraterritorial application) or Step 2 (permissible domestic application)." Dkt. No. 496 at 6. Regarding the evidence of Ryanair flights sold to United States customers, Booking.com argues that Ryanair has not connected those numbers "to

---

*Microsystems, Inc.*, 791 F.3d 754, 761 (7th Cir. 2015). Dkt. No. 489 at 4. *Lawson* does not support Ryanair's position. While addressing arguments about waiver, the Seventh Circuit held in *Lawson* that "although a Rule 50 motion ordinarily is required to preserve a challenge to the sufficiency of the trial evidence, questions of contract interpretation are different," and that because "[t]hey involve pure questions of law unrelated to the sufficiency of the trial evidence, . . . it's not necessary for summary-judgment losers to relitigate purely legal issues of contract interpretation in a motion under Rule 50(a) or (b)." 791 F.3d at 761 (internal citations omitted). That a pure question of law need not be argued again in a Rule 50 motion to preserve that legal issue for appeal, a proposition that is clearly correct, *see Dupree v. Younger*, 598 U.S 729, 736 (2023), does not mean that it is improper to raise such an argument in a Rule 50 motion. That is particularly true in this instance where Booking.com argues that the question of extraterritoriality is factual in nature and where Booking.com's argument is based in part on the fact that immediately before and during trial, all the U.S.-based defendants were dismissed from the case. In that setting, Booking.com would have risked waiving the issue if it had not raised the matter in Rule 50(a) and Rule 50(b) motions. *See Ortiz v. Jordan*, 562 U.S. 180, 185 (2011); *Kars 4 Kids Inc. v. America Can!*, 8 F.4th 209, 216 n.3 (3d Cir. 2021) (*quoting Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC*, 784 F.3d 177, 186–87 (3d Cir. 2015)).

the conduct and harms claimed in this case, or even to Booking.com," and that "[i]n fact, Ryanair has not connected a *single* Ryanair flight sold to a U.S. customer to any alleged Loss." *Id*. at 6–7 (emphasis in original).

Booking.com has provided no justification for departing from Judge Stark's conclusion on the first motion to dismiss that the text of the CFAA provides clear, affirmative indication of its extraterritorial application. The CFAA's definition of a "protected computer" does not simply refer to "foreign commerce," which would be insufficient by itself to rebut the presumption against extraterritoriality. *See In re Apple*, 347 F. Supp. 3d at 449; *see also Abitron*, 600 U.S. at 420 ("When applying the presumption, we have repeatedly held that even statutes . . . that expressly refer to '*foreign* commerce' when defining 'commerce' are not extraterritorial.") (quoting *Morrison*, 561 U.S. at 262–63) (internal quotation marks omitted) (emphasis in original). Instead, the definition expressly includes computers "located outside of the United States," similar to language found in provisions of the RICO statute and the Securities Exchange Act that have been held to apply extraterritorially. *See RJR Nabisco*, 579 U.S. at 338 (finding extraterritorial application based on statutory language referring to offenses that "tak[e] place outside of the United States" and conduct that "occurred outside the United States") (quoting 18 U.S.C. § 1957(d)(2) and § 1203(b)); *Morrison*, 561 U.S. at 264–65 (finding a "clear statement of extraterritorial effect" in section 30(a) of the Securities Exchange Act, which refers to "an exchange not within or subject to the jurisdiction of the United States"). "While the presumption [against extraterritoriality] can be overcome only by a clear indication of extraterritorial effect, an express statement of extraterritoriality is not essential." *RJR Nabisco*, 579 U.S. at 340.

Booking.com notes that by the time this case was submitted to the jury, all the U.S.-based defendants had been dismissed from the case, and the action at that point involved only a non-U.S.

13

plaintiff suing a non-U.S. defendant over conduct affecting a computer based outside the U.S. Under those circumstances, Booking.com argues, this action should not be subject to the CFAA even if the CFAA is ordinarily given extraterritorial application.

The question whether a particular extraterritorial statute applies to particular foreign activities depends on the limits that Congress has imposed on the statute's foreign application. *Abitron*, 600 U.S. at 418. In the case of the CFAA, the limit on extraterritoriality is found also in the definition of a "protected computer," which includes a computer located outside the United States that is used in a manner that "affects interstate or foreign commerce or communication of the United States." 18 U.S.C. § 1030(e)(2)(B). In other words, the CFAA does not apply extraterritorially in all cases involving a computer "located outside the United States." It applies only if the computer in question is one whose use affects interstate or foreign commerce or communication.

There was evidence at trial that the Ryanair website—the computer at issue in this case—was used in a way that affects interstate or foreign commerce or communication of the United States. The Chief Technology Officer of Ryanair, John Hurley, testified that there were about five million Ryanair flights sold to U.S. customers in 2023, and that the figure for 2024 was heading towards 2 million flights by July 2024.[7] *See* TD1 at 125:3–7. Booking.com's argument that Mr. Hurley's testimony is insufficient to establish extraterritoriality in this case, *see* Dkt. No. 515 at 2, fails.

Booking.com objects that Mr. Hurley's testimony is not specific to flight reservations made by Booking.com. *See id.* ("Ryanair never introduced into evidence a single flight reservation made

---

[7]  Booking.com incorrectly characterizes Mr. Hurley's testimony as stating that Ryanair sold 5 million flights to U.S. customers from July 2023 to July 2024. *See* Dkt. No. 515 at 2 n.4.

by Booking.com for a U.S.-based customer, inside or outside the Loss period."). But nothing in the plain language of the CFAA makes the definition of a "protected computer" turn on the defendant's conduct. Indeed, the court held in *In re Apple* that "[w]hile [the defendant] rightly points out that the computer must be 'used in a manner that affects interstate or foreign commerce or communication of the United States,' Plaintiffs satisfy this element with the allegation that their devices 'are used in interstate commerce and/or communication.'" 347 F. Supp. 3d at 449 (internal citations omitted). The court did not require the plaintiffs to allege that the effect on interstate commerce or communication stemmed from the defendant's conduct.

Accordingly, the CFAA applies extraterritorially, and Ryanair's claims fall within the scope of extraterritoriality that Congress established. Moreover, the evidence supports Ryanair's contention that the statutory requirement that the protected computer affected interstate or foreign commerce of the United States.[8] I therefore reject Booking.com's argument that JMOL should be granted based on Ryanair's failure to prove that the CFAA should be applied extraterritorially in this case.

### B. Proof of $5,000 or More of Loss in a One-Year Period Attributable to Booking.com

The CFAA provides that a civil action for a violation of its provisions "may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of the subsection (c)(4)(A)(i)." 18 U.S.C. § 1030(g). The parties agree that the only relevant factor in this case is the first factor, which requires "loss to 1 or more persons during any 1-year period . . .

---

[8] Booking.com asserts in a footnote in its opening brief that "the Foreign Commerce Clause provides a constitutional safeguard as well, disallowing the application of federal statutes to circumstances with an insufficient connection to the United States." Dkt. No. 467 at 9 n.8. As Ryanair points out, however, "Booking.com failed to raise this argument in its Rule 50(a) motion and may not raise it now." Dkt. 489 at 9; *see also* Dkt. No. 448 (Booking.com's 50(a) motion for judgment as a matter of law).

aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I); *see also* Dkt. No. 399 at 21. Thus, Booking.com cannot be held civilly liable for violating *any* provision of the CFAA absent a "loss" of at least $5,000 in a one-year period, attributable to Booking.com.

The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). That definition of loss "focus[es] on technological harms." *Van Buren v. United States*, 593 U.S. 374, 392 (2021).

After being provided the CFAA definition of "loss," the jury was instructed that "the cost of responding to an offense may be considered a loss even if no actual technological harm has occurred, as long as the response is directed at technological harm, such as preventing an impending unauthorized access or investigating the method by which an offender accessed the computer, rather than business or other harms, such as investigating how the offender used the access for commercial gain." Dkt. No. 453 at 5. The jury was further instructed that they "should not offset any losses by any profits Ryanair may have received as a result of Booking.com's actions," and that "[l]osses do not include any costs that are not borne by Ryanair." *Id*.

The one-year period for which Ryanair sought to establish loss at trial was the period from March 1, 2022, to February 28, 2023. *See* TD4 at 885:6–9 (Ryanair's closing argument that it established "technological losses of at least $5,000" from "March 1, 2022, to February 28th of 2023"). Ryanair claimed approximately $177,000 in total losses attributable to Booking.com during that period, based on four categories of costs: (1) the cost of online verification ($9,912); (2) the cost of customer service agents ($112,000); (3) the cost of hosting Shield ($5,361.67); and

(4) the cost of payments made to Navitaire, a passenger service system company ($49,234). *See* TD4 at 885:5–13.[9] To calculate each category of loss, Ryanair relied on Mr. Hurley's testimony that: (1) Ryanair sold 78,300,879 flights between the beginning of March 2022 and the end of February 2023; (2) twenty-three percent of those flights were booked through OTAs (i.e., 18,416,864 flights); and (3) 2.8% of OTA bookings were made by Booking.com (i.e., 518,826 flights).[10] *See* TD1 at 144:2–146:20.

The jury found that Ryanair "prove[d] by a preponderance of the evidence that Booking.com's violation of the CFAA caused Loss to Ryanair totaling at least $5,000 during a one-year period." Dkt. No. 457 at 2. Booking.com argues that because the evidence of loss that was introduced at trial was "entirely speculative, and by any reasonable calculation totaled—at most—$2,457.72, Ryanair failed to establish the required $5,000 of Loss, and judgment as a matter of law is required for Booking.com." Dkt. No. 467 at 11. I address below the sufficiency of the evidence for each category of loss claimed by Ryanair.

### 1. Online Verification Costs

At summary judgment, Ryanair argued that OTAs provided "corrupted data" in the form of "fake" customer information (such as customer email addresses and payment methods) and that

---

[9] Ryanair's counsel used rounded figures at closing argument. The dollar amounts in parentheses are based on testimony at trial.

[10] Booking.com does not contest that it sold 518,826 Ryanair flights between March 1, 2022, and February 28, 2023. *See* Dkt. No. 467 at 13. However, Booking.com argues that Ryanair "failed to introduce reliable evidence to establish the number of total Ryanair OTA bookings during the [loss] period . . . from which any percentage attributed to Booking.com could be derived." *Id*. But that argument merely challenges the credibility of Mr. Hurley, who testified that twenty-three percent of Ryanair flights were purchased by OTAs from March 1, 2022, to February 28, 2023, a percentage he determined from counting the number of reservations that were tagged as made by an OTA. *See* TD1 at 144:22–145:9 ("Our intelligence team runs reports every night and they will tag all the reservations that were made by an OTA and they stay tagged and we count the tags."). A motion for judgment as a matter of law does not allow the court to make credibility determinations. *See Reeves*, 530 U.S. at 150.

the costs of verification procedures adopted to restore data integrity qualified as a loss under the CFAA. *See* Dkt. No. 399 at 31. Among the "costly customer verification procedures" that Ryanair identified were an online verification procedure and the use of customer service agents.[11] *Id.*

Several witnesses at trial testified about the nature of customer information transmitted to the Ryanair database when a customer purchases a flight through Booking.com. Mr. Hurley, whose team built and maintains the Ryanair's website, testified that "OTAs like Booking.com" create problems with "data integrity, because they give [Ryanair] false e-mail addresses [and] the wrong credit card details."[12] TD1 at 140:12–19; *id*. at 158:25–159:3 ("The data integrity, so the false e-mail addresses and the false credit card details, the data we have in the database is not accurate. That is the issue we have."). Mr. Hurley testified that receiving "false" email addresses or payment methods interfered with processing refunds and communicating with passengers, which was sometimes necessary to meet flight safety regulations. *Id*. at 141:4–142:1.

Dana Brady, Ryanair's Chief Marketing Officer, testified that Ryanair regarded as "fake" any information that Ryanair did not believe belonged to the customer. TD3 at 714:16–25. Mr. Brady further testified that he knew OTAs provided "fake" customer information to Ryanair based on "customer feedback, thousands of customers calling our call center," as well as through

---

[11] Other procedures that Ryanair identified at summary judgment were "an in-person customer verification procedure" and the use of "digital employees." Dkt. No. 399 at 31. Ryanair, however, introduced no evidence regarding such digital employees at trial. And Mr. Hurley's testimony about in-person verification costs was excluded following objections that Mr. Hurley's testimony was hearsay and was not based on first-hand knowledge. *See* TD1 at 159:22–165:7. Ryanair's loss calculation in its closing argument and post-trial briefing does not include the cost of digital employees or in-person verification.

[12] Mr. Hurley's testimony that OTA traffic also caused "slowdowns" to the website was stricken from the record by agreement of the parties. *See* TD1 at 142:17–143:14; *id*. at 221:25–222:14; Dkt. No. 423 at 15 ("Neither side will introduce evidence or argument at trial about outages, spikes, or slowdowns on the Ryanair website, with the exception of the October 2023 Monex incident, about which the Parties continue to disagree.").

test bookings Ryanair made on OTA websites. *Id*. at 715:5–19. According to Mr. Brady, Ryanair started conducting test bookings "roughly every six weeks" from mid-2020 onwards, and Booking.com was sometimes included in the test bookings, although not always. *Id*. at 715:20–716:10. The test bookings revealed that "[in] many instances . . . the e-mail address or the contact information isn't the customer's," and "nearly in all cases [Ryanair] never get[s] the accurate customer payment details." *Id*. at 716:23–717:3. That is, the information Ryanair received did not match the information Ryanair entered on the OTA websites for the test bookings. When asked whether those discoveries were "regarding Booking.com or all of [Ryanair's] OTA testing," Mr. Brady replied, "I would put Booking.com in that." *Id*. at 717:5–7.

Iain Lopata, Ryanair's expert in computer systems and data security, testified that when he made ten test bookings on Booking.com's website between the end of June and the beginning of July 2023, *see* TD2 at 375:11–25, none of the email addresses and payment methods Ryanair received matched what he entered on Booking.com's website as the customer. Whereas all email addresses he provided to Booking.com ended with the domain "fair-opinion.com," none of the emails that Ryanair received as the customer's email ended in that domain.[13] *Id*. at 380:10–14; *see also* PTX 55. In addition, none of the payment methods that Ryanair received matched the American Express credit card numbers that Mr. Lopata used to book the flights. *See* TD2 at

---

[13] Nevertheless, Mr. Lopata received Ryanair's flight confirmation for all Booking.com test bookings at the fair-opinion.com email addresses that he used. *See* TD2 at 402:8–23. That is, for the test bookings that Mr. Lopata conducted, the fact that Ryanair received an email address that did not belong to the customer did not prevent Ryanair from communicating with the customer.

383:11–18; PTX 55.[14]  The test bookings that Mr. Lopata made directly on Ryanair's website did not lead to such discrepancies in customer email address or payment methods.  *See* PTX 55.

Mr. Hurley explained that to restore data integrity, Ryanair required OTA customers to verify their identity and contact information.  TD1 at 159:8–21.  Mr. Hurley was involved in building and designing the online verification procedure, for which Ryanair contracted with a third party named GetID "to provide software to match your face with your passport image."  *Id*. at 165:9–166:15.  Mr. Hurley testified that GetID charges Ryanair $0.25 per customer verification attempt and that for many customers the verification process requires multiple verification attempts.  *Id*. at 166:18–167:7.  Mr. Hurley thus calculated that it costs an average of $0.59 per customer to complete the online verification procedure.  *Id*.

According to Mr. Hurley, Ryanair had "roughly . . . 600,000" passengers who completed online verifications between March 2022 and February 2023.  *Id*. at 167:8–16.  To calculate the online verification costs for those 600,000 passengers, Mr. Hurley multiplied 600,000 by $0.59, which equals $354,000.  *Id*. at 167:22–168:10.  To calculate the portion attributable to Booking.com, Mr. Hurley multiplied $354,000 by 0.028, based on his testimony that Booking.com was accountable for 2.8% of Ryanair flights purchased through OTAs from March 1, 2022, to February 28, 2023.  *Id*. at 168:11–24.  Mr. Hurley thus calculated online verification costs attributable to Booking.com to be $9,912.  *Id*.

---

[14]  PTX 55 shows that for the passenger "Emma Robertson," for example, Mr. Lopata used an American Express card ending in 6053 when purchasing the flight on Booking.com's website. *See* PTX 55 at 8.  Ryanair, however, received information of a credit card ending in 3980 for "Emma Robertson."  *See id*. at 13.  The credit card information also did not match for the nine other test bookings Mr. Lopata made on Booking.com's website. *See* PTX 55 (test bookings for "Bruno Chapman," "Mikayla Hartley," "Billie Merrill," "Brittney Ramirez," "Rebekah Rubio," "Tomos Slater," "Enzo Soto," "Steven Waters," and "Anya Wilkerson").

Those online verification costs, however, were not borne by Ryanair, because Ryanair charged the customers for the GetID fees. Ryanair's emails to OTA customers stated that customers would be charged for the cost of online verification. *See* DTX 240 (Ryanair email to OTA customer stating that the online verification service is "provided . . . for a fee of €0.35"); DTX 245 (same). Mr. Brady also testified that customers who paid for their online verification covered Ryanair's "costs of running the technology." TD3 at 642:2–19. Indeed, Ryanair's emails to customers stressed that the online verification fee was charged to "cover the verification checks" and that "Ryanair does not benefit from this transaction commercially." DTX 240; DTX 245.

Booking.com argues that the online verification costs do not qualify as a loss because they were "***entirely passed through to the customer*** who completes the verification." Dkt. No. 467 at 15 (emphasis in original). In response, Ryanair does not dispute that "[l]osses do not include any costs that are not borne by Ryanair," as the jury was instructed. Dkt. No. 453 at 5 (final jury instruction); *see* Dkt. No. 489 at 13. Instead, Ryanair argues that "profits are not counted *against losses*" and that "[w]hether Ryanair's online verification charge is a profit or a pass-through is a question of fact for the jury." Dkt. No. 489 at 13 (emphasis in original). While that is true, Ryanair does not point to any evidence from which the jury could conclude that Ryanair's online verification process could have resulted in a loss for Ryanair in light of the undisputed evidence that those costs were passed on to the customers.

Accordingly, no reasonable jury could have concluded that the $9,912 that Ryanair claimed as online verification costs attributable to Booking.com qualified as a loss.

## 2. Customer Service Agent Costs

Ryanair employs customer service agents who respond to customer inquiries on the telephone and online. *See* TD2 at 275:24–276:2. Mr. Hurley testified that "most customers" do

not contact customer service agents because it is when "things go wrong" that customers reach out to Ryanair. *Id*. at 276:8–10. When asked to describe the "kinds of things . . . passengers complain about . . . when they call customer service," Mr. Hurley listed issues such as adding ancillaries, flight changes, or delays caused by weather. *Id*. at 277:15–278:3. Mr. Hurley acknowledged that those complaints were made by customers who booked directly through Ryanair as well as customers who booked through OTAs. *Id*. at 278:4–6.

Mr. Hurley testified that Ryanair keeps track of inquiries made by OTA customers and counts the number of those inquiries (or "tickets") each month. TD1 at 171:16–172:12. Mr. Hurley explained that the inquiries are tagged as relating to "OTAs generally" rather than to a particular OTA and that he had "no idea" what percentage of the inquiries related specifically to Booking.com. TD2 at 276:11–20. According to Mr. Hurley, Ryanair "[has] a lot more complaints from OTA customers than [it] [does] with other customers," and the issue "keeps coming back to the passenger is not told the right information, or worse they were not told about the flight change, modifications or something, and they're frustrated and angry." TD1 at 170:2–14. Mr. Hurley, however, did not provide any numbers about the breakdown of issues raised in OTA customers' inquiries or which particular OTAs were responsible for generating greater or lesser shares of customer complaints.

Mr. Hurley also testified that from August of 2022 to July of 2023, Ryanair paid approximately €384,000 per month, or €4.6 million per year (which the parties stipulated was equal to roughly $4.6 million) in salaries to customer service agents who addressed OTA customers' inquiries. *See id*. at 170:16–173:5 (Ryanair's counsel reading aloud an interrogatory response and Mr. Hurley testifying that he attested to the truthfulness of the interrogatory response

from personal knowledge).[15]   When asked whether the salaries paid to those agents would be different for the claimed period of loss—March 1, 2022, to February 28, 2023—Mr. Hurley testified that the figure would be about $4 million.  *See id.* at 173:6–174:11.  Mr. Hurley explained that Ryanair would have paid less in salaries earlier in that year because the number of passengers was "growing in that year."  *Id.* at 174:2–5.  Mr. Hurley thus assumed that salaries paid to customer service agents correlated to the number of passengers.  Mr. Hurley attributed all $4 million in the salaries paid to customer service agents to costs attributable to OTAs and $112,000 specifically to Booking.com, a number obtained by multiplying $4 million by 0.028 to account for Booking.com's share of the total number of Ryanair flights booked through OTAs.  *Id.* at 174:12– 175:2.

Booking.com argues that Ryanair has not proved $112,000 in loss from the cost of customer service agents because Ryanair has not "not limit[ed] claimed costs to customer service inquiries related to 'data integrity'—as opposed to the plethora of other potential issues experienced by Ryanair passengers who happened to book through OTAs (such as changing flights or adding ancillaries)."  Dkt. No. 467 at 16; *see also* Dkt. No. 496 at 9 ("Ryanair failed to present evidence allowing the jury to reasonably conclude that Ryanair's claimed customer service costs were connected with restoring 'data integrity' for unauthorized bookings, rather than addressing other customer service issues that have nothing to do with data integrity (such as a late flight, a lost bag, or a complaint about Ryanair.")).  Ryanair responds in a single sentence that "customer service costs . . . are still fairly counted as losses since they resulted from technological harm to

---

[15]   Booking.com argues that Mr. Hurley identified no basis for claiming €384,000 as the monthly salary of customer service agents, *see* Dkt. No. 467 at 16, but that argument merely challenges Mr. Hurley's credibility.  Again, the court may not make credibility determinations on a motion for judgment as a matter of law.

data that should not have been in Ryanair's system in the first place." Dkt. No. 489 at 14. Ryanair cites the court's summary judgment order for support, but without any explanation for doing so. It is thus unclear what connection Ryanair is asserting between the $112,000 of customer service costs and technological harm.

In the portion of the summary judgment order that Ryanair cites, I ruled that "the question whether the OTA bookings affect the integrity of Ryanair's data turns on whether the bookings were unauthorized" and that "[i]f Ryanair is correct in its theory of the case, the unauthorized bookings affect Ryanair's data integrity because such bookings input information into Ryanair's database that never should have been there in the first place." Dkt. No. 399 at 32. As made clear by the preceding paragraphs, the discussion of data integrity in the summary judgment order was directed to Ryanair's argument on summary judgment that OTAs provide "fake" data and thus impair Ryanair's data integrity. *See* Dkt. No. 399 at 31–32; Dkt. No. 348 at 12 ("Data integrity refers to the accuracy, consistency, and reliability of data throughout its lifecycle. . . . Therefore, e-mail methods and payment methods that do not belong to the end customer . . . damage the integrity of Ryanair's database"). The order did not hold that the addition of accurate information, by itself, impairs data integrity and causes a "loss," because that was not Ryanair's theory of the case. Nor do I take that to be Ryanair's argument now—particularly since Ryanair still maintains that Booking.com provides "fake" data.[16]

As explained earlier, Ryanair offered evidence at trial that showed that the payment methods and customer email addresses provided by Booking.com were not those of the customers. *See supra*, section III.B.1. The addition of inaccurate and less useable information impairs data

---

[16] Even assuming that data integrity could be impaired by the addition of accurate data, Ryanair does not explain how that proposition then supports a finding of a "loss" of $112,000.

integrity and constitutes technological harm.[17]  Ryanair, however, failed to present evidence from which a reasonable jury could find that $112,000 in customer service agent salaries was directed at issues related to the incorrect payment methods and customer email addresses that Booking.com provided.

At most, Ryanair presented evidence that because of incorrect payment methods that were provided to Ryanair, some OTA customers did not receive refunds.  Based on that evidence, the jury could infer that those customers would have contacted Ryanair's customer service.  Mr. Brady testified that there were instances in which Ryanair "paid refunds back to payment cards that belonged to OTAs, and then that money never got to the customer."  TD3 at 659:19–22.  And because of "the difficulties [Ryanair] had with not getting money back to customers," Ryanair changed its policy to require customers suspected of having booked through OTAs to verify their payment information before the refund could be processed, unlike the procedure followed with customers who booked directly on Ryanair's website.  Id. at 666:1–19.  When asked whether Ryanair had difficulties refunding Booking.com customers, Mr. Brady replied that he had read two chat script conversations between customer service agents and customers that showed "some difficulties there."  Id. at 656:6–14.

But testimony about two chat script conversations is not sufficient to allow a jury to find that Ryanair paid $112,000 in customer service agent salaries to respond to the entry of incorrect

---

[17]  Booking.com argues that impaired data integrity "does not mean additional, unwanted data, but 'some *diminution* in the completeness or useability of data or information on a computer system.'"  Dkt. No. 467 at 13 n.14 (quoting *Worldspan, L.P. v. Orbitz, LLC*, No. 05 C 5386, 2006 WL 1069128, at *5 (N.D. Ill. Apr. 19, 2006)).  Ryanair responds that "[t]hat is exactly what Ryanair's trial evidence showed: John Hurley, Iain Lopata, and Dara Brady all testified that Booking.com diminished the useability of Ryanair's data and computer system."  Dkt. No. 489 at 19 n.9.  Although Booking.com added data to Ryanair's database rather than altering what was already there, the fact that Booking.com added inaccurate and less useable data had the same effect of impairing data integrity.

payment methods by Booking.com. Beyond that, Ryanair makes no argument that a smaller portion of the $112,000 was directed at technological harm. *See* Dkt. No. 489 at 14. Indeed, there is no evidence of the relative frequencies of different types of complaints and how much time a customer service agent spent on a particular type of complaint such that a jury might reasonably be able to apportion the customer service agents' salaries to specific issues.

Accordingly, I conclude that no reasonable jury could have found that the $112,000 that Ryanair claimed as customer service agent costs attributable to Booking.com qualified as a loss.

### 3. Shield Hosting Costs

Lukasz Stocki, a Ryanair data scientist responsible for the administration of Shield, testified at trial about how Shield works and what it costs Ryanair to run the program. Mr. Stocki explained that Shield is "active from the beginning . . . [of] when the user is starting using the Ryanair website to the end of . . . payment making" on the myRyanair portion of the website. TD2 at 328:1–14. During the period from March 1, 2022, to February 28, 2023, Shield was capable of blocking the use of automated "bots" to obtain information from Ryanair's website and purchase tickets at four end points: (1) "the availability end point"; (2) "the flights end point"; (3) "the seats end point"; and (4) "the payments end point." *See id.* at 345:22–349:20. Only the payment end point "occur[red] after the myRyanair login" page, i.e., on the portion of the website that required the customer to log in to gain access. *Id*. at 349:21–23.

According to Mr. Stocki, Shield performed two algorithms at the payment end point designed to detect bots, first before the payment was processed and then after the payment was processed. *Id*. at 349:24–350:4. Shield could not block every payment by a bot because the first algorithm had to "run very fast" to ensure that the "user is not waiting too long to make a payment." *Id*. at 334:15–22. Shield would then run a more complex algorithm after the payment was

processed to further analyze the data for bots. *Id*. at 334:25–335:8; *see also id*. at 351:5–15. If the "post booking analysis show[ed] that [the purchaser] was a bot," Ryanair would "update the block list" used to bar bots from Ryanair's website. *Id*. at 335:10–13; *see also id*. at 365:8–10 ("So we learn from our mistakes, and we use this information to improve our solution."). Mr. Stocki testified that "over 99 percent" of the purchases blocked by Shield were attempted purchases by bots controlled by OTAs. *Id*. at 333:6–8.

Running Shield required hosting the program on a server. Mr. Stocki explained that "more users on the [Ryanair] website" would lead to "more data and more activity," which in turn would increase the hosting costs. *Id*. at 339:15–340:4. Mr. Stocki also explained that some end points contributed to more of the hosting costs because they involved "more data" and a "much more advanced algorithm," resulting in "more computation" overall. *Id*. at 352:25–353:13. Mr. Stocki thus allocated "about 50 percent" of Shield's total hosting cost to the first algorithm of the payment end point and "about 20 to 30 percent" of Shield's total hosting cost to "the post booking analysis." *Id*. at 340:8–24. Mr. Stocki then added those percentages and allocated "about 80 percent" of Shield's total hosting cost "to the entire portion that comes after myRyanair." *Id*. at 341:3–6. When asked what percentage of the Shield hosting costs associated with the entire payment end point was attributable to Booking.com, Mr. Stocki replied, "Depends how many bookings they made. It's the same percent of the bookings they made." *Id*. at 343:23–24. That percentage, according to Mr. Hurley, was 2.8% of all the bookings made by OTAs.

At summary judgment, I determined that "[t]o the extent that . . . Shield prevents unauthorized bookings at the payment page after account creation, any portion of those costs allocable to each defendant may qualify as losses under the CFAA." Dkt. No. 399 at 28. Booking.com argues that, accepting the allocation of eighty percent of the Shield costs to the

myRyanair portion of Ryanair's website and accepting the attribution of 2.8% of those costs to Booking.com,[18] Ryanair was able to establish only $2,457.72 of Shield hosting costs as constituting a "loss." Dkt. No. 467 at 18. Booking.com contends that because "Ryanair introduced **no** evidence of the hosting costs . . . from March 2022, the start of the Loss period[,] to August 28, 2022," the jury could not have found any loss based on Shield hosting costs for that half of the critical year, the beginning of March 2022 to the end of February 2023. *Id*. at 19 (emphasis in original).

Booking.com's argument is based on the gaps in Mr. Stocki's testimony regarding the servers that Ryanair used. Mr. Stocki testified that from August 29, 2022, to August 29, 2023, Shield was hosted on two different Amazon servers, Legacy and CTRL-TWR. TD2 at 341:12–342:4. Legacy was "an old kind of account" that Ryanair used before "updgrad[ing]" to CTRL-TWR in October 2022. *Id*. at 342:9–11. According to Mr. Stocki, Ryanair paid $20,629.43 for the use of Legacy from August 29, 2022, to October 2022, and $218,730.94 for the use of CTRL-TWR from October 2022 to August 29, 2023.[19] *Id*. at 341:17–20. Dividing those payments by the number of days the servers were in use, Mr. Stocki testified that the average daily cost of the

---

[18] Booking.com argues that Ryanair may claim only fifty, not eighty, percent of the Shield hosting cost in its calculation of loss, because post-booking analysis at the payment end point does not prevent unauthorized bookings at the payment page. *See* Dkt. No. 467 at 18 n.16. That argument is unpersuasive. The jury was instructed that "loss" includes "the cost of responding to an offense," where the response was "directed at technological harm, such as preventing an impending unauthorized access or investigating the method by which an offender accessed the computer." Dkt. No. 453 at 4–5. The jury could reasonably have found that the post-booking analysis was directed at investigating the method by which an offender accessed the computer, because Mr. Stocki testified that Ryanair would use the post-booking analysis to detect more bots and improve Shield's system of detecting and blocking bot activities. Thus, the jury could reasonably have found that the post-payment analysis is directly related to Shield's ability to prevent unauthorized bookings at the payment page in subsequent attempts.

[19] Mr. Stocki did not identify the date in October when Ryanair started using CTRL-TWR. Booking.com, however, assumes that CTRL-TWR was used starting on October 1, 2022, which Ryanair does not contest. *See* Dkt. No. 467 at 19 n.19; Dkt. No. 489 at 17–18.

Legacy server was "about 590" dollars and that the average daily cost of the CTRL-TWR server was $597.63.[20]  *Id*. at 358:1–360:22.  Mr. Stocki, however, "[didn't] know exactly" what server was used to host Shield from March 1, 2022, to August 28, 2022, and "[didn't] remember" what the hosting costs were for that same period.  *Id*. at 361:6–17.

Ryanair does not dispute that its Shield hosting cost data covers only the period from August 29, 2022, to August 29, 2023, and thus leaves out the period from March 1, 2022, to August 28, 2022.  *See* Dkt. No. 489 at 17 ("The fact that the data did not cover the full period [of loss] does not harm the jury's finding.").  With respect to that period, Ryanair argues that the jury could make "reasonable projections" based on the evidence of the Shield hosting costs from August 29, 2022, to August 29, 2023.  *Id*. at 16.  Specifically, Ryanair asserts that it is reasonable to "calculate the average daily Shield cost for the March 1, 2022, to February 28, 2023 [period] by using all of Ryanair's Shield cost data from August 29, 2022 to August 29, 2023 (as opposed to using only the data from August 29, 2022 to February 28, 2023)."  Dkt. No. 508-1 at 2.  According to Ryanair, "[f]ailing to look at an entire year's worth of data would skew the average cost because it would fail to take into consideration the natural peaks and troughs caused by busy and quiet periods in the travel industry."  *Id*.  Ryanair argues that "it would be unreasonable to calculate Ryanair's total Shield cost without including Ryanair's busy summer months in the average cost."  *Id*.

Ryanair's argument fails for two reasons.  First, Ryanair cites no evidence at trial about the "busy summer months" or "natural peaks and troughs" in the travel industry—Ryanair thus suggests that the jury would have accounted for such variations purely as a matter of common sense.  Second, unrebutted evidence at trial established that the daily number of Ryanair flights

---

[20]  Booking.com, however, uses $597.68 as the average daily cost of CTRL-TWR in its calculations, as explained below.  That difference does not materially affect Booking.com's calculations.

sold by Booking.com increased significantly from 2022 to 2023. Marcos Guerrero, Senior Director of Flights at Booking.com, testified that the number of Ryanair flights sold by Booking.com "continually increased through 2023." TD2 at 462:14–18. That testimony is consistent with the table documenting Ryanair flights sold each day by Booking.com (which also forms the basis for Ryanair's calculation that Booking.com sold 518,249 Ryanair flights from March 1, 2022, to February 28, 2023). *See* PTX 34. For example, from March 1, 2022, to August 28, 2022, Booking.com did not sell more than 1,500 Ryanair flights on any single day. *See* PTX 34 at 19–23. From March 1, 2023, to August 28, 2023, however, Booking.com regularly sold more than 2,000 Ryanair flights per day, sometimes more than 2,800. *See id*. at 28–32. In light of Mr. Stocki's testimony that Shield hosting costs increase with more activities on Ryanair's website (e.g., more flights purchased on the website), the jury could not conclude with any confidence that hosting costs from March 1, 2022, to August 28, 2022, were the same as the costs from March 1, 2023, to August 28, 2023.[21] Any such conclusion would be speculative and not based on any evidence introduced at trial.[22]

---

[21] Booking.com also sold more Ryanair flights from August 29, 2022, to February 28, 2023, compared to sales from March 1, 2022, to August 28, 2022. *See* PTX 34 at 19–28. Thus, the jury could not use evidence of the Shield hosting costs from August 29, 2022, to February 28, 2023, to extrapolate the costs from March 1, 2022, to August 28, 2022, either. Even if the sale of Ryanair flights by other OTAs did not increase as it did for Booking.com, the evidence of the increase for Booking.com makes such extrapolations inappropriate, particularly since any loss that qualifies as a loss for purposes of the CFAA must be a loss that is specifically attributed to Booking.com.

[22] Booking.com argues that, even assuming extrapolation was allowed, the jury could have found only $4,886.22 in Shield hosting costs. *See* Dkt. No. 467 at 20. Booking.com's calculation of $4,886.22 uses an average daily cost of $597.68 (the average daily cost of CTRL-TWR) multiplied by 365 days. *See id*. at 20 n.20. That calculation, if anything, overestimates what the Shield hosting costs would be if extrapolation was allowed, because it ignores the lower average daily cost of the Legacy server ($590), which was used between August 29, 2022, and October 1, 2022. Using $590 as the average daily cost from March 1, 2022, to October 1, 2022, results in an estimated Shield hosting cost attributable to Booking.com of $4,849.64.

Without including the impermissible extrapolation that Ryanair proposes, Booking.com's method for calculating $2,457.72 as the Shield hosting costs for the subject one-year period proceeds as follows.  First, the cost of each server is calculated by using an average daily cost of $590 for Legacy from August 29, 2022, to October 1, 2022 ($590 x 33 days) and an average daily cost of $597.68 for CTRL-TWR from October 1, 2022, to February 28, 2023 ($597.68 x 151 days).  *See* Dkt. No. 467 at 19 n.19.  Second, the costs of the two servers are added, yielding a total cost of hosting Shield from August 29, 2022, to February 28, 2023 ($19,470 + $90,249.68 = $109,719.68).  *Id*.  Third, the total hosting cost is multiplied by 0.8 to account for Mr. Stocki's allocation of eighty percent of costs to the portion that come after myRyanair, and further multiplied by 0.028 to account for Mr. Hurley's testimony that flights booked by Booking.com made up 2.8% of all OTA bookings from March 1, 2022, to February 28, 2023 (($109,719.68 x 0.8) x 0.028 = $2,457.72).  *Id*.  That calculation is supported by the evidence.

Accordingly, the non-speculative evidence supports, at most, a finding of $2,457.72 in Shield hosting costs that are attributable to Booking.com for the period of March 1, 2022, to February 28, 2023.

#### 4.  Navitaire Costs

Navitaire is the passenger service system partner that Ryanair uses, which is essentially a "backing database that stores all of [Ryanair's] flight bookings."  TD1 at 176:5–9.  Mr. Hurley testified that OTA bookings of Ryanair flights increased Ryanair's Navitaire costs because Ryanair paid Navitaire a fee per flight leg.  *Id*. at 177:20–22.  Ryanair initially paid 11.5 cents per flight, but the fee dropped to 9.5 cents per flight when a particular threshold was reached.  *See* TD2 at 271:23–272:4.  The evidence showed that there was "no special fee" for OTA bookings and that Ryanair paid Navitaire "at the exact same rate" for flights booked directly on Ryanair's website as

flights booked through OTAs.  *Id*. at 272:5–15.  Mr. Hurley testified that Navitaire costs associated with the 518,249 Ryanair flights booked through Booking.com from March 1, 2022, to February 28, 2023, was around $49,234, which he calculated by multiplying 518,249 by 9.5 cents.  TD1 at 177:23–179:15.

Booking.com argues that Navitaire costs do not constitute a loss under the CFAA because "Navitaire costs are borne by Ryanair for each and every passenger, regardless of whether a passenger books through an OTA or directly on Ryanair.com," and "Navitaire costs are a cost of doing business for any Ryanair passenger—just like jet fuel and cleaning the plane."  Dkt. No. 467 at 17.  Ryanair responds by citing the testimony of Basil Imburgia, Booking.com's accounting damages and loss expert, *see* Dkt. No. 489 at 15, in which he testified that Ryanair would not have paid Navitaire fees for the 518,249 flights booked through Booking.com if "Booking.com didn't make those bookings and Ryanair didn't make those bookings and nobody else made those bookings," TD3 at 807:18–808:2.  Ryanair does not dispute that Navitaire fee per flight leg was the same regardless of how the Ryanair flight was purchased.  *See* Dkt. No. 489 at 15.

As with each category of loss discussed above, Navitaire costs must be directed at a technological harm to constitute loss.  The fact that Ryanair paid Navitaire fees for flights purchased through Booking.com does not itself establish loss.  At summary judgment, I held that "Ryanair may not include the costs of Navitaire [as loss] . . . because those costs are not related to responding to violations [of the CFAA], unless the facts developed at trial show that the bot traffic attributable to the defendants has materially increased the cost of Ryanair's server infrastructure."[23]  Dkt. No. 399 at 30.  In other words, to count as loss, Navitaire costs must result

---

[23]  Citing the summary judgment order, Booking.com argues that the increase of $49,000 in Navitaire costs was *de minimis*, not material, and therefore does not qualify as a loss.  *See* Dkt.

from the fact that a flight was purchased through Booking.com (a source of technological harm, according to Ryanair) and not directly through Ryanair.

Given the undisputed fact that Navitaire charges Ryanair 9.5 cents per flight no matter how the flight is booked, no reasonable jury could find that any part of the Navitaire costs was directed at technological harm. Rather, Navitaire costs are costs that exist simply because a flight has been purchased, independent of the manner in which that flight has been purchased or the technological harm caused by that process. For instance, if Ryanair provided free snacks to each passenger on a flight and Ryanair paid a fixed cost for each additional snack, the cost of snacks given to Booking.com customers would not be a cost of a response directed at the technological harm caused by Booking.com. Accordingly, no reasonable jury could conclude that the $49,234 that Ryanair claimed as Navitaire costs attributable to Booking.com qualified as a loss.

In sum, the only costs that Ryanair proved as contributing to a CFAA "loss" were the Shield hosting costs attributable to Booking.com, which amounted, at most, to only $2,457.72 during the one-year period in question at trial. Ryanair therefore did not meet its burden of proving at least $5,000 of loss attributable to Booking.com, which is a prerequisite to any finding of civil liability under the CFAA. Booking.com's motion for judgment as a matter of law is therefore granted.

Because of the failure of proof as to the "loss" issue, which is a necessary element of both of Counts II and IV, on which the jury based its verdict against Booking.com, my ruling on the "loss" issue requires that the jury's verdict be overturned and judgment as a matter of law be entered in favor of Booking.com. Nonetheless, I discuss below the remaining issues raised by

---

No. 467 at 17. Contrary to Booking.com's suggestion, I did not rule that a monetary threshold had to be met in order for Navitaire costs to count toward loss, nor did I suggest more generally that minimal costs do not qualify as contributing to the quantification of loss.

Booking.com in its JMOL motion in the interest of completeness, in the event that there is further review of my decision.

Although I find in favor of Ryanair on the "proof of damage" issue addressed in section III-C below, that resolution does not rescue Ryanair's claim under Count IV, because of the failure of Ryanair's proof with regard to the "loss" requirement applicable to that count. And as for my decision in favor of Booking.com on the "fraudulent intent" issue addressed in section III-D below, that resolution does not alter the disposition of Count II, but merely provides an additional reason why judgment as a matter of law must be granted to Booking.com on that Count.

### C. Proof of Damage

As relevant to Count IV, section 1030(a)(5)(B) of the CFAA prohibits "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, recklessly caus[ing] damage," and section 1030(a)(5)(C) prohibits "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, causing damage and loss." Thus, proof of "damage" is required under either of those sections.

The jury was instructed that "damage" under the CFAA means "any impairment to the integrity or availability of data, a program, a system, or information." Dkt. No. 453 at 7; *see also* 18 U.S.C. § 1030(e)(8). The jury was further instructed that "[t]he term 'damage' focuses on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data." Dkt. No. 453 at 7. The jury found by a preponderance of the evidence that "Booking.com intentionally directed, encouraged, or induced Etraveli to access the myRyanair portion of Ryanair's website without authorization," and that Etraveli's unauthorized access "recklessly caused Damage to a protected computer," in addition to "caus[ing] both Damage to a protected computer and Loss." Dkt. No. 457 at 2.

34

Central to the parties' arguments about damage is an event that occurred in early October of 2023, referred to as the "Monex attack" or the "Monex incident." Mr. Hurley testified at trial that "every single time a person goes through the payment page [on myRyanair], [Ryanair] go[es] through Monex" to provide currency conversion service for the customer. TD1 at 180:8–10. That is, credit card details are sent to Monex, which then "looks at it and says, 'No conversion necessary or conversion necessary, and here's the conversion rate,' and gives it back to [Ryanair]." *Id*. at 181:2–6. Mr. Hurley further testified from personal knowledge that in early October of 2023, the Monex end point on Ryanair's website was flooded with "null and void" requests made with "blank credit card details," *id.* at 181:14–182:1, with the volume reaching "60,000 calls an hour at one stage," *id*. at 184:5. According to Mr. Hurley, Ryanair had to disable Monex for two hours, which meant that it lost currency conversion for that time period. *Id*. at 184:16–22. Ryanair also turned off Shield, "hoping if we turned the Shield off, the attackers would stop trying to attack Shield in the cat and mouse and go away." *Id*. at 184:7–9. Mr. Hurley testified that that "Booking.com was responsible for at least 5,000 of those attacks." *Id*. at 186:7–10.

Booking.com asserts that Ryanair's only basis for establishing damage at trial was the Monex incident and that the Monex incident cannot establish damage for two reasons. Dkt. No. 467 at 21. First, Booking.com argues that "the Monex incident cannot support Ryanair's CFAA civil claim because the Monex incident occurred in October 2023, **after** the period in which Ryanair otherwise claims to have experienced its $5,000 or more of Loss (March 2022–April 2023)." *Id*. (emphasis in original). Second, Booking.com argues that "Ryanair wholly failed to show that the 'Monex attack' could be attributed to Booking.com or that it damaged Ryanair's computers in any respect." *Id*. at 22.

Ryanair responds that the Monex incident is not the only basis upon which the jury could have found damage under the CFAA. Ryanair argues that the jury could have found "impairment to the availability of Ryanair's data and system" through testimony that "Booking.com indirectly sends Ryanair payment information and myRyanair email addresses that do not match the details input by the Booking.com customer, which in turn impairs the ability of Ryanair to use that data and its website." Dkt. No. 489 at 20. Regarding the Monex incident itself, Ryanair argues that there is no requirement for damage to be established in the same period as loss, and that there was sufficient evidence at trial for the "jury to reasonably conclude that Booking.com was responsible for the Monex attack." *Id*.

As an initial matter, I agree with Ryanair that the jury was not limited to the Monex incident in finding damage. As explained in section III.B., *supra*, there was sufficient evidence for the jury to find that Booking.com provided customer information that did not belong to the customer, which impaired Ryanair's data integrity. Even if Ryanair had to establish damage based on the Monex incident alone, however, there was sufficient evidence for the jury to find damage.

First, contrary to Booking.com's argument, the CFAA does not require that the "damage" that is required for proof of a violation of section 1030(a)(5)(B) or (C) must occur during the same one-year period as the "loss" that is required to maintain a civil action under the statute when the civil action is predicated, as in this case, on conduct violating the "loss" provision of section 1030(c)(4)(A)(i)(I). The relevant provisions of the statute that require proof of damage make no reference to a one-year time period, unlike the provisions related to loss. *Compare* 18 U.S.C. §§ 1030(a)(5)(B) and 1030(a)(5)(C) *with* 18 U.S.C. § 1030(c)(4)(A)(i)(I).

Booking.com characterizes section 1030(g) as requiring "by its plain terms" that "Damage and Loss have occurred during the same year," and that Ryanair's argument to the contrary is

36

"simply wrong." Dkt. No. 496 at 14. But Booking.com's reading of the statute is unsupported by the text, and Booking.com cites no case law or other support for its argument that the "damage" and "loss" must occur during the same one-year period. Nor does Booking.com offer an analysis of the statutory text that supports its "plain terms" assertion. Although I conclude that the statutory text is plain, it is not plain in a way that supports Booking.com's argument. Quite the opposite is the case, as shown below.

Section 1030(g) provides that a civil action for a violation of the CFAA "may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." Subclause (I), the only relevant factor in this action, requires loss in a one-year period of at least $5,000 in value. 18 U.S.C. § 1030(c)(4)(A)(i)(I). No such restriction is placed on the proof of the "damage" necessary to support a violation of section 1030(a)(5)(B) or section 1030(a)(5)(C). And there is nothing about the language of section 1030(g) or subclause (I)—let alone its "plain terms"—that requires damage to be proved with reference to the same one-year period as loss, or any other time period. It is true that both damage and loss must be proved to establish a violation of section 1030(a)(5)(B) or (C), but the loss must be shown to be at least $5,000 in a one-year period, while the damage is not confined to a particular period or required to be in a particular amount. Thus, the fact that the Monex incident occurred outside the claimed period of loss (March 1, 2022, to February 28, 2023) does not by itself establish that Ryanair failed to prove "damage" for purposes of satisfying the requirements of sections 1030(a)(5)(B) and 1030(a)(5)(C).

There was also sufficient evidence for the jury to reasonably find that Booking.com was responsible—at least in part—for the Monex incident, and that the Monex incident impaired the integrity or availability of Ryanair's computer system. According to Booking.com, "the only harm

claimed by Ryanair at trial related to Monex was $13,000 of chargebacks by MasterCard for all of October 2023 (none of which can be attributed to a Booking.com booking), and two hours of sporadically inoperable currency conversion services, during which time Mr. Hurley testified Ryanair flights **could still be booked**." Dkt. No. 467 at 22–23 (emphasis in original). Booking.com argues that "[t]his is not Damage, let alone due to Booking.com." *Id*. at 23. I disagree.

The definition of "damage" under the CFAA does not require a specific quantum of impairment to the integrity or availability of data, a program, a system, or information, and Booking.com cites no case law to the contrary. *See id*. at 22–23. Even if flights could still be booked, Mr. Hurley testified that a feature of the payment page on the myRyanair portion of the website was unavailable for two hours. That Monex is a third party does not change the fact that Ryanair ordinarily uses Monex for every single payment made through myRyanair, so that the service that Monex provides is a feature of the myRyanair payment page. Indeed, if the Monex end point was not a part of myRyanair, Ryanair would not have had the ability to turn off Monex's services for two hours. *See* TD1 at 183:16–19 (Mr. Hurley's testimony that Ryanair has "a key system, if it's under pressure it's like a fuse on the plug, if the pressure gets too high it turns itself off and removes Monex from the flow"). Mr. Hurley also testified that Ryanair had to turn off Shield during the Monex incident, which was likewise evidence of impaired availability of a feature that Ryanair has built into its website. Accordingly, there was sufficient evidence to support a finding by the jury that the Monex incident caused damage to Ryanair's computers.

The remaining question is whether there was sufficient evidence for the jury to reasonably find that Booking.com was responsible, at least in part, for the Monex incident. Booking.com argues that Mr. Hurley's testimony about Booking.com's responsibility for 5,000 of the null requests was based on a "tenuous theory" that ignored the possibility that a party other than

Booking.com was responsible for those requests.  Dkt. No. 467 at 22.  Mr. Hurley's testimony, however, was subject to rigorous cross-examination on these issues; crediting Mr. Hurley's testimony, the jury could reasonably find by a preponderance of the evidence that Booking.com was responsible for at least 5,000 null requests.

In both his direct and cross examination, Mr. Hurley retraced his steps for concluding that Booking.com was responsible for at least 5,000 null requests.  In doing so, Mr. Hurley referred to two different log files produced by Shield related to the Monex incident—one for Ryanair flights that were successfully purchased ("success log") and one for failed attempts at payment ("error log").  *See* PTX 153, PTX 154.  The success log contained columns for a six-digit passenger name record ("PNR"), an email address used for myRyanair, an IP address, a string of letters and numbers known as a "session token," and a count of the number of attempts made. *See* PTX 154. The error log contained columns for the session token, the number of attempts made, the email address used for myRyanair, and the IP address.  *See* PTX 153.

First, Mr. Hurley identified a PNR in the success log ("BK23MT") that belonged to a flight purchased through Booking.com.[24]    That PNR was associated with the email address viviap.hhaley@gmail.com and the IP address 94.63.121.70.  *See* TD2 at 241:21–242:13; PTX 154 at 1.  Mr. Hurley then found that same IP address (94.63.121.70) in the error log, associated with the email address foleymessay1217@gmail.com.  *See* TD2 at 252:11–252:20; PTX 153 at 90.  The email address foleymessay1217@gmail.com "connected through lots of other sessions through lots of other different IP addresses," to make failed attempts at payment.  TD2 at 249:8–11; *see, e.g.*, PTX 153 at 111, 135, 138, 151, 160, 168, 175, 194, 206.  Mr. Hurley counted the failed

---

[24]  Booking.com provided the PNR and therefore does not contest that the PNR corresponded to a flight purchased through Booking.com. *See* TD1 at 187:6–9 (Mr. Hurley's testimony that Booking.com provided the PNR).

attempts made by foleymessay1217@gmail.com and testified that there were more than 5,000 attempts in total.  *See* TD1 at 195:10–17; TD2 at 254:16–17.

In short, Mr. Hurley concluded that Booking.com was responsible for at least 5,000 failed attempts at payment during the Monex incident because more than 5,000 attempts were made by foleymessay1217@gmail.com, which at one point used the same IP address associated with the Booking.com flight purchase for viviap.hhaley@gmail.com.  Mr. Hurley testified that where "the IP addresses match, I would assume it's the same party, yes, same company."  TD2 at 246:14–16.  The jury was free to credit Mr. Hurley's testimony and find that the use of the same IP address created an inference that Booking.com was responsible for the failed attempts at payment that Mr. Hurley identified.

Booking.com argues that Mr. Hurley ignored the fact that another flight was booked from the same IP address (94.63.121.70) that, according to Booking.com, "was indisputably not made through Booking.com."  Dkt. No. 467 at 22.  Booking.com refers to the flight purchased for the email address dianqfarms.strong@gmail.com.  *See* PTX 154 at 3.  However, there was no evidence at trial that the flight purchased for dianqfarms.strong@gmail.com was *not* made through Booking.com—Mr. Hurley testified that he had "no idea" whether the PNR for dianqfarms.strong@gmail.com ("JMS7QN") belonged to Booking.com, TD2 at 244:13–17.  Mr. Hurley's lack of knowledge as to whether that booking was made through Booking.com is not evidence that it was not; rather, it is an instance in which "absence of evidence is not evidence of absence."  *Chambers v. Sec'y Pa. Dept. of Corrections*, 442 F. App'x 650, 656 (3d Cir. 2011).  As for Booking.com's argument that Mr. Hurley's testimony accounts for only a "tiny fraction of Ryanair's claimed 'errors' (*i.e.*, the cause of the incident)," Booking.com does not explain why the

5,000 failed attempts are insufficient as a matter of law to establish causation of damage. *See* Dkt. No. 467 at 22.

Thus, even if it relied on the evidence of the Monex incident alone, the jury could reasonably have found damage to Ryanair's computers, which was attributable at least in part to Booking.com.

### D.  Proof of Fraud

As relevant for Count II, section 1030(a)(4) prohibits "knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." At the conclusion of its opening brief in support of judgment as a matter of law, Booking.com argues that there was no evidence presented at trial that the value of the use of the myRyanair portion of Ryanair's website was $5,000 or more in any one-year period.

The jury was instructed that "[t]o act with an 'intent to defraud' means to act knowingly and with the intention or the purpose to deceive or to cheat," and that "[i]n considering whether Booking.com acted with an intent to defraud, [it] may consider, among other things, whether Booking.com acted with a desire or purpose to bring about some gain or benefit to itself or someone else or with a desire or purpose to cause some loss to someone." Dkt. 453 at 8. The jury was further instructed that "Ryanair must prove either that Booking.com obtained something of value other than the use of the Ryanair website, such as a document accessible only on the myRyanair portion of the website, or that the use of the Ryanair website itself was valued at more than $5,000." *Id.*

41

The jury found by a preponderance of the evidence that "Booking.com knowingly and with an intent to defraud, directed, encouraged, or induced a third party to access the myRyanair portion of Ryanair's website without authorization and by means of such conduct furthered the intended fraud and obtained something of value for Booking.com." Dkt. 457 at 3.  The jury also found that "the object of the fraud and the thing of value obtained by Booking.com [was] only the use of the myRyanair portion of Ryanair's website," and that "the value of the use of the myRyanair portion of Ryanair's website was $5,000 or more in a one-year period." *Id*.

Booking.com raises two separate grounds for seeking judgment as a matter of law on Count II.  First, Booking.com argues that "intent to defraud" requires an intent to "harm" and that Ryanair did not "present evidence that Booking.com intended to cause 'harm' to Ryanair, or that it would be in Booking.com's best interest to do so." Dkt. No. 467 at 23–24.  Second, Booking.com argues that "there was no evidence presented at trial to sustain a conclusion 'that the value of the use of the myRyanair portion of Ryanair's website was $5,000 or more in a one-year period.'" *Id*. at 24. Booking.com follows this assertion by arguing that "Ryanair fell far short of the $5,000 Loss threshold, and the jury's award of *exactly* $5,000 in economic damages . . . only confirms that its valuation of harm was disconnected from the evidence at trial." *Id*. at 24–25 (emphasis in original).

Regarding the value of Booking.com's use of myRyanair, Ryanair points out that "[t]he value Booking.com gains from accessing the website and Ryanair's cost to investigate and address the harm caused by Booking.com's access are not linked in any way." Dkt. No. 489 at 24.  Ryanair then argues that there is "clear trial evidence from which the jury could conclude that Booking.com has gained at least $5,000 in value from accessing the Ryanair website." *Id*.  Ryanair does not elaborate on that argument but merely cites (1) the admission of PTX 34 into the record (which lists the daily number of Ryanair flights sold by Booking.com), *see* TD1 at 120:19–121:22; (2)

Mr. Hurley's testimony that Ryanair made a profit of around $10 per passenger per flight, of which $2.30 came from selling ancillaries such as allowing passengers to check extra baggage and granting seat preferences), *see id.* at 129:22–130:8; and (3) Mr. Hurley's testimony that Booking.com's sale of Ryanair flights constituted 2.8% of all OTA sales of Ryanair flights from March 1, 2022, to February 28, 2023, *see id.* at 146:7–19.   Ryanair also cites the summary judgment order in which I ruled that "Ryanair may still be able to show that the defendants have acted with the intent to deceive Ryanair by using false information to obtain something of value: to wit, profitable flight bookings that the defendants would not be able to obtain otherwise."  *See* Dkt. No. 399 at 45.

Ryanair is correct that the value Booking.com gained from its unauthorized use of the myRyanair portion of the Ryanair website is completely unrelated to the asserted loss suffered by Ryanair as a result of Booking.com's activities.   Nevertheless, Ryanair does not cite—and I have not found—any evidence that supports  finding that Booking.com gained at least $5,000 of value through its use of the myRyanair portion of the Ryanair website.

Ryanair asserts, in essence, that Booking.com made a profit on each Ryanair flight it sold and that the profits on those sales were in excess of $5,000.  In support of that proposition, Ryanair cites evidence that Ryanair made a profit on each flight it sold.  But that is a non-sequitur.  Ryanair cites no evidence to support an inference that Booking.com made the same profits as Ryanair. Ryanair's profits come from selling tickets and ancillaries for more than it costs Ryanair to operate. But since Booking.com has to pay Ryanair, the carrier that is actually providing the flight services, for the flights and ancillaries that it sells, Booking.com's profits have no relationship to Ryanair's. Indeed, Mr. Guerrero testified that Booking.com lost "a very large amount of money ever since

we started, and as a matter of fact, every Ryanair flight we sell loses money as well." TD2 at 463:12–15.

Because there was no evidence from which a reasonable jury could find that Booking.com obtained at least $5,000 in value from the use of myRyanair, the judgment in favor of Ryanair under Count II must be overturned. It is therefore unnecessary to address Booking.com's argument that the judgment under Count II must be overturned for the additional reason that the record does not contain sufficient evidence to establish that Booking.com had the intent to defraud Ryanair.

## IV.    CONDITIONAL MOTION FOR A NEW TRIAL

Booking.com points out that under Rule 50(c)(1) of the Federal Rules of Civil Procedure, if a court grants a renewed motion for judgment as a matter of law, "it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." Pursuant to that rule, Booking.com has moved the court to conditionally grant Booking.com's motion for a new trial on the grounds that "the verdict is contrary to the evidence, a miscarriage of justice would result if the jury's verdict were left to stand, and the jury's verdict resulted from confusion." Dkt. No. 467 at 25 (cleaned up).

This is not the conventional case in which a conditional motion for a new trial is granted. The ordinary case in which a conditional new trial motion is granted is one in which the district court grants a JMOL motion on the ground of insufficient evidence to support the verdict and in the alternative grants a motion for a new trial in the event that the JMOL is overturned on appeal. In that setting, the court's conditional new trial order is based on the court's conclusion that even if the evidence was legally sufficient to support the jury's verdict, the weight of the evidence was so strongly against the jury's verdict that the interests of justice require a new trial to be granted. *See, e.g., Personal Audio, LLC v. Google LLC*, 690 F. Supp. 3d 422, 436 (D. Del. 2023). This

case, by contrast, is one in which a judgment as to the sufficiency of the evidence on various issues depends on the resolution of legal arguments as to the requirements of the governing statute.

For that reason, Booking.com's entitlement to a new trial, in the event the judgment in its favor is overturned, depends on the legal reasons given by the reviewing court for overturning the judgment. For example, if the reviewing court should disagree with my analysis of the "loss" issue in a way that undermines the judgment but does not necessarily compel the re-entry of judgment in favor of Ryanair, a new trial may be required. In other circumstances, vacatur or reversal may require further proceedings before this court, but would not necessarily require a new trial. I will therefore postpone ruling on whether a new trial should be granted pending the outcome of any appellate proceedings that may be instituted in this case.

## V.    CONCLUSION

The motion for judgment as a matter of law filed by Booking.com with respect to Counts II and IV of Ryanair's Amended Complaint is granted. Whether Booking.com's conditional motion for a new trial is granted, in the event the judgment is vacated or reversed, will depend on the ground or grounds invoked by a reviewing court to support such a vacatur or reversal.

Booking.com is directed to prepare a proposed amended judgment within seven days of the date of this order.


IT IS SO ORDERED.

SIGNED this 22nd day of January 2025.



WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

45